Sarah E. Piepmeier, Bar No. 227094
SPiepmeier@perkinscoie.com
Elise Edlin, Bar No. 293756
EEdlin@perkinscoie.com
PERKINS COIE LLP
505 Howard Street, Suite 1000
San Francisco, California 94105
Telephone: +1.415.344.7000
Facsimile:  +1.415.344.7050

Janice L. Ta (appearance *pro hac vice*)
JTa@perkinscoie.com
PERKINS COIE LLP
405 Colorado Street, Suite 1700
Austin, Texas 78701
Telephone: +1.737.256.6100
Facsimile:  +1.737.256.6300

*Attorneys for Defendant*
*NETFLIX, INC.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAURI VALJAKKA, <br><br> *Plaintiff*, <br><br> v. <br><br> NETFLIX, INC., <br><br> *Defendant*. | **Case No. 4:22-cv-01490-JST** <br><br> **NETFLIX, INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF** <br><br> Date:     December 12, 2022 <br> Time:    2:00 p.m. <br> Judge:   Hon. Jon S. Tigar |

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     Background ......................................................................................................... 2

        A.      '167 Patent ............................................................................................. 2

        B.      '102 Patent ............................................................................................. 6

III.    Legal standards.................................................................................................... 9

IV.     ARGUMENT ...................................................................................................... 10

        A.      "modified transport request" ['167 patent] ........................................ 10

        B.      "data" ['167 patent].............................................................................. 13

        C.      "obtaining is based at least in part on the first digital rights management
                key" ['102 patent] ................................................................................ 15

        D.      "the digital rights management header" ['102 patent] ........................ 18

        E.      Method claim 10 requires a particular step order ['102 patent]........... 20

        F.      "fingerprint" ['102 patent] .................................................................. 21

V.      CONCLUSION .................................................................................................. 24

# TABLE OF AUTHORITIES

**CASES**

*24/7 Customer, Inc. v. LivePerson, Inc.,*
 235 F. Supp. 3d 1102 (N.D. Cal. 2016) ............................................................................ 18

*Biogen Idec, Inc. v. GlaxoSmithKline LLC,*
 713 F.3d 1090 (Fed. Cir. 2013) ........................................................................................ 15

*Cont'l Cirs. LLC v. Intel Corp.,*
 915 F.3d 788 (Fed. Cir. 2019) .......................................................................................... 13

*Eidos Display, LLC v. AU Optronics Corp.,*
 779 F.3d 1360 (Fed. Cir. 2015) ........................................................................................ 10

*Kaufman v. Microsoft Corp.,*
 34 F.4th 1360 (Fed. Cir. 2022) ......................................................................................... 10

*Media Rts. Techs., Inc. v. Cap. One Fin. Corp.,*
 800 F.3d 1366 (Fed. Cir. 2015) ........................................................................................ 18

*Mformation Techs., Inc. v. Rsch. in Motion Ltd.,*
 764 F.3d 1392 (Fed. Cir. 2014) ........................................................................................ 20

*Nautilus, Inc. v. Biosig Instruments, Inc.,*
 572 U.S. 898 (2014) ...................................................................................... 10, 18, 19

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,*
 521 F.3d 1351 (Fed. Cir. 2008) ............................................................. 10, 12, 23

*Phillips v. AWH Corp.,*
 415 F.3d 1303 (Fed. Cir. 2005) (en banc) ................................................................. 9, 10

*SpeedTrack, Inc. v. Amazon.com,*
 998 F.3d 1373 (Fed. Cir. 2021) ........................................................................................ 15

*Thorner v. Sony Comput. Ent. Am. LLC,*
 669 F.3d 1362 (Fed. Cir. 2012) ................................................................................... 14, 15

*Verizon Servs. Corp. v. Vonage Holdings Corp.,*
 503 F.3d 1295 (Fed. Cir. 2007) ........................................................................................ 13

*Vitronic Corp. v. Conceptronic, Inc.,*
 90 F.3d 1576 (Fed. Cir. 1996) ............................................................................................. 9

## I.    INTRODUCTION

The parties fundamentally disagree about the scope of the asserted claims. To bring clarity to the scope and meaning of these claims, Netflix has identified several terms that require construction, and has provided intrinsic evidence supporting its proposed construction. Plaintiff, by contrast, has chosen opacity. Plaintiff's apparent claim construction strategy is simple: propose plain and ordinary meaning across the board—without articulating that plain and ordinary meaning—to stay vague and nimble until expert reports are due. To that end, Plaintiff packs its brief with (often irrelevant) legal citations, quotes claim language, and deftly manages to avoid taking a position on what any term actually means. While this strategy, if successful, would leave Plaintiff with maximum flexibility to attempt to avoid summary judgment, a finding of plain and ordinary meaning for the disputed terms, without more, would fail to resolve many of the central disputes between the parties, and would simply kick the claim construction can down the road to expert reports and to a jury.

For example, with respect to the '167 patent, the term "modified transport request" has no plain and ordinary meaning outside the context of the patent, and applying a plain and ordinary meaning construction would not resolve the parties' central dispute as to what a "modified transport request" is, how it is created, or how it is even modified. Likewise, applying plain and ordinary meaning to the term "data" in the '167 patent would ignore the patentee's efforts to act as its own lexicographer to exclude streaming content from the definition of "data" in order to distinguish the prior art. This approach presents similar problems for the '102 patent. As just one example, applying plain and ordinary meaning to "obtaining is based at least in part on the first digital rights management key" leaves unresolved the claim's ambiguity as to whether deriving a fingerprint or obtaining access to restricted content is based on the first digital rights management key.

Plaintiff's "preserve all options until expert reports" approach should be rejected. The Court should resolve the parties' claim construction dispute now, rather than allow Plaintiff to stretch its vague claim proposals all the way to trial where it would be thoroughly unhelpful and confusing to a jury confronted with the disputed networking technology for the first time.

1

2

## II.     BACKGROUND

### A.     '167 Patent

The '167 patent is directed to technology for distributing data across a network, and more specifically, across a network that is "arranged in a tree structure." '167 patent at 3:28-29. In this network, network terminals (computing devices connected to the network) serve as nodes of the tree. This includes a main server (i.e., the head node of the tree) that manages the entire network—specifically, the retrieval and forwarding of data through the network. *Id.* at 2:4-7. The patent refers to data as "content" that "include[s] any type of data of interest to end users" and defines content as "files or parts of files or equivalents thereof that are stored on a server, downloaded from the server by a client and stored by the client for subsequent use . . . ." *Id.* at 1:58-67. Additionally, the patent distinguishes this content from digital broadcast media that is streamed. *Id.* at 1:67-2:3.

Content is sent throughout the distribution tree based on various performance metrics. Specifically, the '167 patent is directed to transmitting data to terminals in a data network using more than just a single server socket (i.e., a single point to retrieve data). *See Id.* at 1:12-20. The '167 patent purportedly seeks to reduce the load on a server socket when data is simultaneously requested by large numbers of terminal devices. *See id.* at 1:12-17. The "server socket" of the main server is used to connect the main server to the other parts of the network. *Id.* at 4:39-47. As the patent explains, "[i]n conventional client/server data networks . . . a main server serves all terminals via a single server socket." *Id.* at 1:12-14. Consequently, that single server socket can experience "spikes in the network load" when it has to distribute data to a large number of terminals at the same time. *Id.* at 1:14-17. As an alternative way to serve data, the '167 patent discloses a data communications network that distributes data among a subset of terminal devices requesting data. *Id.* at 2:29-31. Those terminal devices then serve as "relay servers" for relaying data to additional downstream terminals. *Id.* Each terminal device that operates as a relay server will also contain its own standard server socket to connect it to the rest of the network. *Id.* at 4:43-44.

As illustrated in Figure 1 below, the data communications network includes a data storage system 10 having a "media storage system 18 for data (i.e., 'media' or 'content') that is to be selectively distributed over the network." *Id.* at 1:53-56. It also includes main server 12, which

"controls the distribution of content from the media storage system 18." *Id.* at 2:4-7. The data network further "includes a plurality of terminals 14 and 16, to which content is to be distributed." *Id.* at 2:7-9. Each terminal 14 is "adapted to operate as a relay server by forwarding data to one or more of the second set of terminals 16." *Id.* at 2:26-29.



**'167 Patent, Figure 1**

Terminals are arranged in a "tree structure wherein each terminal is either a node (functioning as both a relay server and a target terminal) or a leaf (functioning only as a target terminal)." *Id.* at 3:27-31. A target terminal is one that is "the intended recipient of content (a data file) from the media storage 18." *Id.* at 2:23-25. In operation, the main server "initiates a data transport operation by sending a transport request to the first set of terminals 14, which are selected as being the best terminals from the list of target terminals on the basis of the current performance data." *Id.* at 2:44-49. The transport request includes "[d]etails of the file to be transported" and "addresses of relay servers and terminals that are to be involved in the distribution of the file." *Id.* at 2:51-56. The transport request "instructs these terminals to retrieve the data from the main server 12 (or from another server address included in the transport request)." *Id.* at 2:57-60.

In response to receiving the transport request, each terminal 14 in the first level of the distribution tree "selects its own downstream terminals/relay servers." *Id.* at 5:35-38. This selection establishes the route, or distribution tree, that the requested data will travel along and may be done

at subsequent levels of terminals. *Id.* at 5:49-52, Fig. 4. Each terminal then "sends a modified version of the original transport request to its subset of target terminals 16." *Id.* at 2:67-3:3. The modified transport request contains "the target network addresses" for the downstream terminals. *Id.* at 5:35-38. "Once the route to a particular target has been established, the packets of the data file are passed along the defined route via the selected relay servers." *Id.* at 5:49-51. Further, as a result of "this dynamic routing, the main server need not know which terminals deliver data and which terminals receive it." *Id.* at 5:43-45 Figure 4, shown below annotated with blue lines, provides an example path that requested data might travel to reach leaf node T13 after the distribution route is established.



**'167 Patent, Annotated Figure 4**

For reference, representative independent claim 1 of the '167 patent recites:

    1. A data communication network comprising:

    a plurality of terminals; and

    a main server adapted to manage selective retrieval of ***data*** from a first server by at least one target terminal selected from said plurality of terminals, said main server being distinct from said first server; and

    a network information database containing terminal performance information, wherein

1      at least two of said terminals are adapted to act as relay servers for serving

2      *data* retrieved from said first server to at least one target terminal; and wherein

3      the main server is adapted to send transport requests direct to at least one

4      first target terminal on the basis of said terminal performance information, and

5      wherein the main server is further adapted to monitor response times of terminals in

6      the network and in which terminals are selected to act as relay servers for a particular

7      *data* transfers on the basis of their relative response times, and the first target

8      terminal is adapted to act as relay server; and

9      wherein each such transport request includes details of **data** to be retrieved,

10      the address of the first server from which the **data** is to be requested by the first

11      target terminal, the addresses of at least one second target terminal to which the **data**

12      from the first server to be relayed by the first target terminal and an indication of a

13      relative performance of a further target terminal based on the terminal performance

14      information stored in the network information database; and

15      wherein terminals adapted to act as relay servers are adapted to modify

16      transport requests received from the main server or from other relay servers and to

17      transmit the **modified transport request** to selected target terminals from a set of

18      target terminals identified in the transport request, wherein the **modified transport**

19      **request** further includes addresses of further target terminals for which the recipient

20      of the **modified transport** request is to act as relay server; and

21      wherein **data** to be retrieved by said target terminals are divided into a series

22      of packets for transmission to said target terminals and each of said terminals is

23      adapted to communicate directly with said main server to acknowledge receipt of

24      the last packet of a series routed thereto.

25  *Id.* at 7:63-8:38. The two '167 patent terms in dispute for purposes of claim construction are

26  "modified transport request" and "data," which are in bold italics above.

27

28

**B.    '102 Patent**

The '102 patent relates to a method for accessing digital content that is restricted. '102 patent at 1:17-24. More specifically, the patent is directed to "using digital rights management keys to provide access to access restricted content." *Id.* at 1:7-9. When a request for restricted content is received by a "communication arrangement," the patent discloses that a user must first obtain a series of digital rights management ("DRM") keys—relating to different layers of DRM—before the user can access the restricted content. *Id.* at 1:30-37; Fig. 9. The patent describes this as "caus[ing] a first determination to be performed to yield a positive or negative result." *Id.* at 1:33-35. If that first determination is successful or "positive," the user can obtain a "first digital rights management key" that will allow the user to proceed to additional levels of validation. *Id.* at 1:43-54.

As the '102 patent admits, "numerous ways of controlling and protecting [] digital content . . . using digital rights management" existed prior to the '102 patent. *Id.* at 1:15-19. The claimed system purportedly offers an "alternative method" for providing access to restricted content by employing a communication device 12, a media storage device 14, and a content access authorization system 20. *Id.* at 1:22-24; Fig. 1.



**'102 Patent, Figure 1**

In operation, a user may use communication device 12 to request access to restricted content stored in a media storage device. *Id.* at 5:31-35. The claimed media storage device may contain

content identifiers, user identifiers, and digital rights management keys, which allow the authorization system 20 to verify access rights and grant access to content. *Id.* at 6:28-38. The authorization system 20, which purportedly ensures that the user "is authorized to obtain access" to the restricted content, is comprised of various modules—e.g., validation, interrogation, decryption—that perform successive determinations to yield positive or negative results. *Id.* at 1:28-42, 5:35-39, 6:1-3. These sequential determinations provide different layers of validation that must be met before the user can access the requested content.

Figure 4, shown below, provides an example of how these determinations are carried out in an exemplary embodiment.



**'102 Patent, Figure 4**

At phase 440 (yellow), the user requests access to content by sending two different types of identifiers—a content identifier (that provides information to identify the content) and a client identifier (that identifies which client is requesting the content)—to the content server. *Id.* at 10:10-12. In response to this request, the content server sends a query—comprising the content and client identifiers—to the content database at phase 450 (yellow). *Id.* at 10:14-17. Then, the content database returns a validation result that the content server checks to "determine[] whether the validation was unsuccessful" (phases 460 and 470, respectively, in blue). *Id.* at 10:18-23. If unsuccessful, the client does not have access to the content and the processing ends at phase 480 (blue). *Id.* at 10:22-25. If successful, a DRM key is retrieved from the validation result and returned to the client. *Id.* at 10:25-29. A DRM key allows a user to decrypt and access encrypted content.

Next, "[t]he client may obtain, in phase 4120 [(green)], a fingerprint of the content wherein the obtaining may be based at least in part on the first DRM key." *Id.* at 10:32-35. To facilitate a second validation check, the client sends the fingerprint to the content server, which then queries the content database for the content fingerprint—using the content identifier (phases 4130 and 4140, respectively, in green). *Id.* at 10:36-40. The content server then compares the fingerprint received from the client with the fingerprint received from the content database to determine whether the validation is successful (phase 4160, in purple). *Id.* at 10:42-43. If unsuccessful, the processing ends (phase 4170 in purple). *Id.* at 10:43-44. If successful, the content server returns a positive validation result to the client (phase 4180, in purple), which then "access[es] the content to retrieve a DRM header, and optionally also to apply the first DRM key to . . . gain[] access . . . to an open DRM header of the content" (phase 4190, in orange). *Id.* at 10:48-52. The client can then use the DRM header "to prepare second and third DRM keys, and, optionally, to apply at least one of the second and third DRM keys to retrieve payload of the content" (phases 4200 and 4210, respectively, in orange) *Id.* at 10:53-56. After retrieval, the client may then use the content (phase 4220, in red).

For reference, representative independent claim 10 of the '102 patent recites:

10. A method, comprising:

obtaining an access restricted content from at least one of a content database and a content providing server;

obtaining a first digital rights management key from a content database, wherein the obtaining is based at least in part on a query, the query comprising the content identifier and an identifier associated with the user;

deriving, using the first digital rights management key, from the access restricted content a ***fingerprint*** of the access restricted content wherein the ***obtaining is based at least in part on the first digital rights management key***, causing the content providing server to validate the ***fingerprint***, and, if the validation is successful, accessing the access restricted content and information describing encryption properties of the access restricted content, and deriving, using ***the digital rights management header*** of the access restricted content, from the access restricted content a second and third digital rights management key,

wherein the second and third digital rights management keys are applied to retrieve the payload of the access restricted content and wherein at least one of the second or third digital rights management key is used to encrypt the other key of the second or third digital rights management key,

wherein the content is usable without being in an unprotected state.

*Id.* at 14:1-28. The three terms/phrases in dispute for the '102 patent are "obtaining is based at least in part on the first digital rights management key," "the digital rights management header" and "fingerprint," which are in bold italics above. In addition, the parties dispute whether the method claim of claim 10 requires certain steps to be performed in order.

## III.   LEGAL STANDARDS

The primary source of evidence for claim construction is the entire body of intrinsic evidence, i.e., "the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The Federal Circuit confirmed the primacy of intrinsic evidence in *Phillips v. AWH Corp.*, 415 F.3d

1303, 1313 (Fed. Cir. 2005) (en banc). The words used in a claim are generally given their ordinary and customary meaning, which "is its meaning to the ordinary artisan after reading the entire patent." *See id.* at 1321. Moreover, the patent's specification remains the "single best guide to the meaning of a disputed term," and "[u]sually, it is dispositive" on claim construction. *Id.* at 1314-17.

"When the parties raise an actual dispute regarding the proper scope of [patent claims asserted to be infringed], the court, not the jury, must resolve that dispute." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008); *see also Kaufman v. Microsoft Corp.*, 34 F.4th 1360, 1369-70 (Fed. Cir. 2022) ("[A] district court's duty at the claim construction stage is . . . to resolve a dispute about claim scope that has been raised by the parties.") (citing *Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1319 (Fed. Cir. 2016)). Accordingly, "[a] determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *O2 Micro*, 521 F.3d at 1361.

A claim is invalid for indefiniteness when, read in light of the specification and the prosecution history, it "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). Indefiniteness is also a question of law. *Eidos Display, LLC v. AU Optronics Corp.*, 779 F.3d 1360, 1364-65 (Fed. Cir. 2015).

## IV.   ARGUMENT

### A.   "modified transport request" ['167 patent]

| Valjakka's Proposed Construction | Netflix's Proposed Construction |
|---|---|
| Plain and ordinary meaning | message that is modified by a relay server to add target terminal addresses |

Plaintiff proposes no construction for this term and provides no substantive response to Netflix's proposal that the "modified transport request" recited in the '167 patent be construed as a "message that is modified by a relay server to add target terminal addresses."

A "modified transport request" is best understood in the context of a "transport request," which is a message that is sent by the main server to the first set of terminals in order to initiate a "data transport operation" that allows content to be distributed. *See* '167 patent at 2:44-49. A transport request includes two elements. First, it includes "[d]etails of the file to be transported," such as the "file type and size, time stamps for activation and deactivation of the content, encryption and compression details, etc." *Id.* at 2:51-54. Second, it includes "[t]he addresses of relay servers and terminals that are to be involved in the distribution of the file." *Id.* at 2:55-56. In response to the initial transport request from the main server, the first set of terminals will begin to download content from the main server. *Id.* at 2:65-67. "When one of the first terminals 14 has received a predetermined number of bytes of the file, that terminal 14 *sends a modified version of the original transport request* to its subset of the target terminals 16." *Id.* at 2:67-3:3 (emphasis added). In other words, "each of the first terminals 14 acts as a relay server for distributing the data . . . ." *Id.* at 2:62-63.

Netflix's construction of "modified transport request" is consistent with the claim language, which states as follows:

> wherein terminals *adapted to act as relay servers* are *adapted to modify transport requests* received from the main server or from other relay servers and to transmit the modified transport request to selected target terminals from a set of target terminals identified in the transport request, wherein the *modified transport request further includes addresses of further target terminals for which the recipient of the modified transport request is to act as relay server*.

'167 patent at 8:25-33 (emphases added).

In plain English, the asserted claims require a "modified transport request" to satisfy two requirements. First, the modified transport request must be *modified by a relay server*. Only terminals that are "adapted to act as relay servers" are "adapted to modify transport requests received from the main server." *Id.* Second, the modification to the modified transport request must *add information about target terminal addresses. See id.* ("[W]herein the modified transport request *further includes* addresses of further target terminals for which the recipient of the modified transport request is to act as relay server.") *Id.* (emphasis added).

1        The specification further supports Netflix's construction. It states that the "modified

2   transport request . . . identifies the relevant first terminal 14 as the server address from which its

3   subset of the target terminals 16 should retrieve the data." *Id.* at 3:3-6. The second set of terminals

4   16 may then "receive a list of further target terminals for which it is to act as a relay server" and

5   "[a]t each stage, it is preferred that the 'best' terminals from the list of remaining targets are selected

6   to act as relay servers for the remainder." *Id.* at 3:6-12. Thus, "[e]ach terminal selects its own

7   downstream terminals/relay servers and sends the rest of the target network addresses to these

8   terminals/relay servers as part of the modified transport request." *Id.* at 5:35-38. Through this

9   process, each relay server builds out a portion of the distribution tree: "Once the route to a particular

10  target has been established, the packets of the data file are passed along the defined route via the

11  selected relay servers on the basis of the target terminal address in the handle/header of each

12  packet." *Id.* at 5:49-52.

13       In sum, "the modified transport request further includes addresses of further target

14  terminals" that were not yet part of the distribution tree in the original transport request. '167 patent

15  at 8:30-31. The addresses that are "further include[d]" will eventually receive data from the

16  "selected target terminals." *Id.* In this way, the modified transport request adds target terminal

17  addresses to the distribution tree. Figure 4, *see* p. 6, *supra*, of the '167 patent provides an example

18  of how a distribution tree is built out. For example, node T1 is responsible for selecting T4, T7, and

19  T10 to act as relay servers and sends each a modified transport request with target terminals to

20  which it should distribute. *Id.* at 7:10-20.

21       Netflix's construction is further supported by the prosecution history. For example, in its

22  November 22, 2006, Response to an Office Action at 17, the patentee distinguished the prior art as

23  "a different situation from the present invention, where terminal performance information is used

24  by the main server to select terminals to perform as relay servers in advance (i.e., ***when defining***

25  ***the place of a particular terminal in the distribution tree*** as defined in the original transport

26  request.)" The patentee's response confirms that the original transport request is modified to define

27  the specific location of a terminal in the distribution tree.

28

Plaintiff insists on a "plain and ordinary meaning" for the term "modified transport request"—as though such a term has a plain and ordinary meaning. Reliance on a plain and ordinary meaning, however, does not resolve the parties' dispute as to what a "modified transport request" is or how or why it is created. *See O2 Micro*, 521 F.3d at 1361. Leaning on the plain and ordinary meaning of the term "modified" by itself would broaden the claims to allow any terminal to modify the transport request in any way. This ignores that the modified transport request is not modified by just any terminal, but by a relay server. *See* '167 patent at 2:62-67. It would also fail to capture the way in which a transport request is actually modified. As the claim language makes clear, only "terminals [which are] *adapted to act as relay servers* are adapted to modify transport requests received from the main server or from other relay servers." *Id.* at 8:25-27. Likewise, the claim language requires that modified transport requests "further include[] addresses of further target terminals . . . ." *Id.* at 8:30-31.

### B.    "data" ['167 patent]

| Valjakka's Proposed Construction | Netflix's Proposed Construction |
|---|---|
| Plain and ordinary meaning | content files or parts of content files that are stored by a terminal for subsequent use after retrieval, as distinct from streaming content |

The term "data" should not be given its plain and ordinary meaning because the patentee acted as his own lexicographer in limiting "data" to "content files or parts of content files that are stored by a terminal for subsequent use after retrieval, as distinct from streaming content." *Cont'l Cirs. LLC v. Intel Corp.*, 915 F.3d 788, 796 (Fed. Cir. 2019) ("When the patentee acts as its own lexicographer, that definition governs."). Indeed, Valjakka admits that "sufficient reason exists to require the entry of a definition of a claim term other than its plain and ordinary meaning . . . [when] the patentee has chosen to be his or her own lexicographer . . . ." Dkt. 62 at 3. The '167 patent specification defines "data" as follows:

> *For convenience, data* that is to be distributed from the media storage system 18 *will be referred to herein as "content"* . . . *For the purposes of the present invention*, "content" means *files or parts of files* or equivalents thereof that are stored on a server, downloaded from the server by a client and *stored by the client for subsequent use*, *as distinct from digital broadcast media in which a data*

*stream is transmitted* by a broadcast server and is temporarily buffered by clients and, in some cases by intervening relay units."

'167 patent at 1:58-2:3 (emphases added). *First*, by defining "content" (i.e., "data") "*for purposes of the present invention*," the patentee limited "data" to the definition that it explicitly used in the specification. *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007) ("When a patent . . . describes the features of the 'present invention' as a whole, this description limits the scope of the invention.").

*Second*, the patentee specifically stated that the claimed "data" or "content" is "distinct from digital broadcast media in which a data stream is transmitted by a broadcast server and is temporarily buffered by clients and, in some cases by intervening relay units." '167 patent at 1:67-2:3. As such, the patentee disclaimed streaming content from its definition of data. This disclaimer is supported by the language of the asserted claims, which supports that data is retrieved from a first server and transmitted in full to a target terminal—and thus is not streamed by being temporarily buffered. For example, the claim language states that a main server is "adapted to manage selective retrieval of data from a first server." *Id.* at 7:66-67. The data "to be retrieved by said target terminals are divided into a series of packets for transmission to said target terminals." *Id.* 8:34-36. Finally, "each of said terminals is adapted to communicate directly with said main server *to acknowledge receipt of the last packet of a series* routed thereto." *Id.* at 8:36-38. In other words, the data to be retrieved is divided into a series of packets and then transmitted to the target terminals in full, such that the receipt of the last packet of that series can be acknowledged by the target terminal. *See also id.* at 2:65-67 ("[E]ach of the first terminals 14 begins to *download the file* from the main server 12."); *id.* at 3:13-15 ("When each terminal 14 or 16 has *downloaded the whole file*, it sends a notification message direct to the main server 12 . . . ."); *id.* at 6:31-46 (explaining advantages of the invention's download method over conventional download methods). The lexicography of the patent controls here because the patentee "clearly set forth a definition of the disputed claim term," such that the patentee "clearly express[ed] an intent" to define the term "data" consistent with Netflix's proposed construction, and disclaim streaming content from its definition. *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365-66 (Fed. Cir. 2012).

*Third*, the patentee relied on its definition of "data" to distinguish the invention from prior art that used streaming content. In a May 24, 2006 response to an office action, the patentee specifically distinguished prior art by stating that the prior art "approach is particularly suited for continuous streaming media and is not suited to file downloads of the type with which the present invention is primarily concerned." 05/24/06 Response to OA at 12. In doing so, the patentee excluded the "continuous streaming media" of the prior art from "file downloads" of the "present invention." *See id.* "Prosecution disclaimer can arise from both claim amendments and arguments." *SpeedTrack, Inc. v. Amazon.com*, 998 F.3d 1373, 1379 (Fed. Cir. 2021). "Prosecution history disclaimer plays an important role in the patent system. It promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution." *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013) (internal quotation marks and citations omitted).

Contrary to Plaintiff's assertion, Netflix does not seek to limit data to specific types of files (e.g., audio, text, graphics, video, audio, code). *See* Dkt. 62 at 7. Netflix's construction is consistent with the specification, which requires that any data claimed in the patents—no matter the content (e.g., text, graphics, video, audio, code)—must be data that can be discretely stored in a terminal for subsequent use after retrieval, as distinct from data that is continuously streaming. Valjakka misleadingly relies on the specification's discussion of what content *includes*, while ignoring the specification's clear definition of what content *means*. Dkt. 62 at 7; *compare* '167 patent at 1:58-60 ("data . . . will be referred to herein as 'content', which will be understood to **include** . . . .") *with* '167 patent at 1:64-65 ("content **means** files or parts of files . . . ."). In sum, the Court should decline to adopt the plain and ordinary meaning of "data" for purposes of "the present invention" because the patentee acted as its own lexicographer and explicitly disclaimed streaming content from the scope of the term "data."

**C.**   **"obtaining is based at least in part on the first digital rights management key" ['102 patent]**

| Valjakka's Proposed Construction | Netflix's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning | Indefinite |

The phrase "obtaining is based at least in part on the first digital rights management key" is indefinite because there is no clear antecedent for this "obtaining" phrase: It could refer back to (1) "obtaining an access restricted content from at least one of a content database and a content providing server" or (2) "deriving, using the first digital rights management key…" and mistakenly recite "obtaining" instead of "deriving." As demonstrated in the markup below, the plain language of the claim does not indicate which of these two antecedents of the yellow highlighted claim phrase is correct, and the specification provides no further guidance.



*Option 1: Obtaining an access restricted content …*

Under this interpretation, "the obtaining…" refers back to the first element of the claim: "obtaining an access restricted content from at least one of a content database and a content providing server." In the simplest terms, this makes sense because "the obtaining" would refer back to a prior "obtaining."[1] Read this way, a first DRM key is required to retrieve and validate the fingerprint, which must be done before content payload is retrieved. In this sense, "obtaining an access restricted content" is "based at least in part on the first digital rights management key" as the claim explains. The specification appears to support this reading. Specifically, in one

---

[1] The "obtaining…" phrase in the second claim element is likely not the referent because a plain reading would require obtaining a first DRM key (element 2) based on a first DRM key (claim term at issue), which is illogical.

embodiment, the specification teaches that "the client may access the content using at least in part the first DRM key." '102 patent at 10:31-32.

*Option 2: Deriving, using the first digital rights management key…*

On the other hand, there is an equally plausible reading of the claim in which "the obtaining" refers to the words immediately preceding the phrase: "deriving, using the first digital rights management key, from the access restricted content a fingerprint of the access restricted content." *Id.* at 14:8-10. In this interpretation, patentee simply made a drafting error, mistakenly using the word "obtaining" instead of "deriving." This reading makes sense because it connects two parts of the same claim element and the antecedent referent immediately precedes the term at issue.

It also makes sense when viewed in juxtaposition to claim 1, in which this element repeats the word "deriving" instead of using "deriving" and then "the obtaining." The analogous element in claim 1 reads: "using the first digital rights management key, **obtain** a fingerprint of the access restricted content **wherein the obtaining** is based at least in part on the first digital rights management key." *Id.* at 12:48-51. The specification also appears to support this reading, mirroring the phrasing of claim 1. For example, in one embodiment, the specification teaches that "[t]he client may obtain, in phase 4120, a fingerprint of the content wherein the obtaining may be based at least in part on the first DRM key." *Id.* at 10:32-35.

A person of ordinary skill thus finds no help in the intrinsic record to resolve this ambiguity. And the ambiguity matters to interpreting the metes and bounds of the claim. Under interpretation 1, the derivation of the fingerprint need not be "based at least in part on the first digital rights management key." *Id.* at 14:1-11. Indeed, only "obtaining an access restricted content" must be "based at least in part on the first digital rights management key." *Id.* Under interpretation 2, the requirements of interpretation 1 are reversed. The fingerprint derivation must be "based at least in part on the first digital rights management key" and obtaining an access restricted content need not be based on the "first digital rights management key." *Id.* The "first digital rights management key" is used only to derive information from the access restricted content rather than to obtain the content.

Case 4:22-cv-01490-JST   Document 63   Filed 10/28/22   Page 21 of 27

Plaintiff offers no resolution to this confusion, either in its claim construction brief or even its infringement contentions. Plaintiff's brief recites pages of case law (none of which Plaintiff actually analyzes or links to the term at issue), and its only explanation for the drafting ambiguity is "it is apparent that this claim feature refers to the fingerprint of the access restricted content obtained by the derivation from the first digital rights management key"—effectively declaring that option 2 applies, but without explanation. Dkt. 62 at 8. This does not resolve the ambiguity: The full language of the claim does not clarify whether "obtaining" refers to "deriving" or to the "obtaining" referenced in an earlier step. Plaintiff simply relies on the portion of the specification supporting option 2 while ignoring the portion of the specification that supports option 1.

Plaintiff's infringement contentions are similarly vague. In fact, Plaintiff is silent as to what satisfies this element. Plaintiff states that "[t]he fingerprint of the restricted content is Netflix's unique access key generated for the Netflix user" but does not specify how the fingerprint is "deriv[ed]" or what corresponds to the "obtaining" language in the claim limitation. Infringement Contentions at 42-43. Further, Plaintiff discusses both "provid[ing] unique access to the particular content" and generating a fingerprint, which does not resolve what "obtaining" refers to. *Id.*

In situations such as these, the Federal Circuit instructs that "a claim is indefinite if its language might mean several different things and no informed and confident choice is available among the contending definitions." *Media Rts. Techs., Inc. v. Cap. One Fin. Corp.*, 800 F.3d 1366, 1371 (Fed. Cir. 2015) (internal quotation marks omitted). As such, the claim is insolubly ambiguous and must be rendered indefinite.

### D.    "the digital rights management header" ['102 patent]

| Valjakka's Proposed Construction | Netflix's Proposed Construction |
|---|---|
| Plain and ordinary meaning | Indefinite |

Plaintiff admits that there is no antecedent basis for the term "the digital rights management header" (Dkt. 62 at 10), which appears in the sixth element of claim 10. But, according to Plaintiff, this failure is excusable because a person of ordinary skill in the art would be able to determine what the specified digital rights management header is. *Id.* As explained below, this failure prevents

1   a person of skill in the art from determining the scope of the invention with reasonable certainty.

2   *See Nautilus*, 572 U.S. at 898-99.

3          The term "digital rights management header" appears only once in claim 10. The claim

4   language "provide[s] no definition of the term ['the digital rights management header'] or context

5   from which a definition can be derived." *24/7 Customer, Inc. v. LivePerson, Inc.*, 235 F. Supp. 3d

6   1102, 1108 (N.D. Cal. 2016) (finding the term "said interaction data" invalid for indefiniteness due

7   to lack of antecedent basis). Further, "[t]he specification provides no clarity. *Id.* The specification

8   refers to "a header associated with the user identifier" and "a header associated with the content

9   identifier." '102 patent at 7:16-18, 7:50-52. Claim 10 does not shed light on which header it refers

10  to rendering the term indefinite. *See Nautilus*, 572 U.S. 898 at 898-99 ("A patent is invalid for

11  indefiniteness if its claims, read in light of the specification . . . fail to inform, with reasonable

12  certainty, those skilled in the art about the scope of the invention.").

13         Plaintiff relies on two cases to support its position, neither of which is applicable here. In

14  *Energizer Holdings, Inc. v. International Trade Commission*, the Federal Circuit determined that

15  the term "said zinc anode" was definite, despite a lack of antecedent basis, because the context of

16  the surrounding claim language made "it . . . apparent that the claim can be construed." 435 F.3d

17  1366, 1371 (Fed. Cir. 2006). Here, by contrast, neither the surrounding claim language nor the

18  specification provide context that would make "the digital rights management header" term

19  amenable to construction.

20         And in *Bose Corp. v. JBL, Inc.*, the Federal Circuit found that a "prior recitation of 'an

21  ellipse' . . . provide[d] the antecedent basis for 'an ellipse having a major diameter[]'" because "it

22  would be reasonable ascertainable by those skilled in the art that an ellipse is inherently understood

23  to have 'a major diameter.'" 274 F.3d 1354, 1359 (Fed. Cir. 2001). Here, however, there is no

24  inherent understanding as to whether access restricted content contains a header, or whether the

25  header is associated with a content identifier or a user identifier. As such, the term is ambiguous,

26  and the claim is indefinite.

27

28

### E.    Method claim 10 requires a particular step order ['102 patent]

| Valjakka's Proposed Construction | Netflix's Proposed Construction |
|---|---|
| Plain and ordinary meaning | The DRM keys must be obtained or derived before restricted content is obtained.<br><br>Further, the first DRM key must be obtained and the fingerprint validated before the second and third DRM keys are derived. |

The plain language of the claim requires that two steps must be performed in order: (1) The three DRM keys must be obtained or derived before restricted content is obtained; and (2) the first DRM key must be obtained and the fingerprint validated before the second and third DRM keys are derived. There is no default rule that method steps must be performed in order, but the Federal Circuit has repeatedly held that a "claim 'requires an ordering of steps when the claim language, as a matter of logic or grammar, requires that the steps be performed in the order written, or the specification directly or implicitly requires' an order of steps." *Mformation Techs., Inc. v. Rsch. in Motion Ltd.*, 764 F.3d 1392, 1398-99 (Fed. Cir. 2014) (quoting *TALtech Ltd. v. Esquel Apparel, Inc.*, 279 F. App'x 974, 978 (Fed. Cir. 2008) (per curiam)).

Here, the plain language of the claim demonstrates that certain elements must be sequential in nature. Specifically, the first DRM key must be obtained before a fingerprint is derived from the access restricted content because the derivation of the fingerprint relies on the first DRM key. Then, that fingerprint must be validated. Indeed, Plaintiff admits that "the first DRM key and fingerprint need to be validated before restricted content is accessed." Dkt. 62 at 12. "[I]f the validation is successful," the method continues and the DRM header retrieved from the content is used to derive 2nd and 3rd DRM keys. '102 patent at 14:13-20. In other words, the 2nd and 3rd DRM keys are only derived ***after*** a successful validation of the fingerprint and first DRM key. *See id.* The 2nd and 3rd DRM keys are then used to "retrieve the payload," so they must be derived before that retrieval can happen. *Id.* at 14:21-26. Thus, all the DRM keys must be derived before the restricted content is obtained.

Although the plain language of the claim is enough to demonstrate this ordering, the specification also supports this reading. Specifically, Figure 4, *see* p. 9, *supra*, and the

accompanying description in column 10 of the specification show that the validation/authorization steps happen in a sequence. *See, e.g.*, *id.* at 10:26-29 ("[W]here the validation was successful and the message of phase 460 comprises a first DRM key, **processing advances** from phase 470 to phase 490 where the content server transmits the first DRM key to the client."); *id.* at 10:45-50 ("In case the fingerprints match, **processing advances** to phase 4180 where the client is provided with a positive validation result. Responsive to the positive validation result of phase 4180, the client in phase 4190 proceeds to access the content to retrieve a DRM header . . . .").

Plaintiff's rebuttal does not address this logical reading. Plaintiff simply cites the claim language, pointing out that "the second and third DRM keys are derived from the DRM header." Dkt. 62 at 12. But restating one element of the claim does nothing to rebut the fact that these second and third DRM keys must be obtained after the first DRM key. Indeed, the specification is clear that in order to access the DRM header, a first DRM key must be obtained, and fingerprint validation must occur. It is only after "[u]sing the header the client may be enabled to prepare second and third DRM keys. . . ." '102 patent at 10:53-54. Further, it would make little sense to derive the second and third DRM keys before validation of the fingerprint and first DRM key because processing stops if that validation does not succeed. *Id.* at 10:22-25 ("In case the validation was unsuccessful, for example, where the client does not have access to the content, processing advances from phase 470 to phase 480 and ends."); *id.* at 10:42-44 ("In phase 4160, the server may compare the fingerprints received in phases 4150 and 4130. In case of mismatch, the processing advances to phase 4170 and ends."). This is also why claim 10 recites the steps of using the DRM header to derive the 2nd and 3rd DRM keys after the phrase "if the validation is successful . . . ." *Id.* at 14:13-20. Thus, neither the claim language nor specification support Plaintiff's position that obtaining the first DRM key and fingerprint validation are not required prior to deriving the 2nd and 3rd DRM keys. Dkt. 62 at 12.

**F.      "fingerprint" ['102 patent]**

| Valjakka's Proposed Construction | Netflix's Proposed Construction |
|---|---|
| Plain and ordinary meaning | a bit string, derived (or computed) directly from the content, that uniquely represents the content |

1    Netflix proposes a construction for this term because the claim is densely-worded, and

2  "fingerprint" as used in the claim is a technical term. Without some explanation, the jury will have

3  no guidance in understanding how to apply it to the accused products or prior art. Netflix's proposed

4  construction is consistent with its plain and ordinary meaning and is offered to clarify the term for

5  the jury and prevent scope disputes later in the case. Plaintiff, by contrast, proposes plain and

6  ordinary meaning, but refuses to identify what that plain and ordinary meaning is for the jury and

7  provides scant (if any) explanation of why Netflix's construction is not the plain and ordinary

8  meaning of the term.

9    Consistent with its approach on every other term, Plaintiff avoids clarity, but provides no

10 substantive objection to the majority of Netflix's proposed construction, so it is difficult to discern

11 the nature of Plaintiff's concern. There are three components to Netflix's proposed construction:

12 the fingerprint (1) is a bit string, which functions as a (2) unique identifier, and (3) is derived or

13 calculated from the access restricted content. We address each below.

14    *Bit String.* The only objection Plaintiff raises in its brief analysis of this term is to "bit

15 string." Dkt. 62 at 13. Despite objecting, Plaintiff does not explain why it is inconsistent with the

16 plain and ordinary meaning of the term. *Id.* Further, Plaintiff claims that the term is "common

17 among those skilled in the art," but fails to provide this common understanding or explain why "bit

18 string" does not comport with it. *Id.* A bit string is merely a series of bits. Bits represent the most

19 basic unit of information in computing—'1' or '0,' on or off, etc.—and are used to represent any

20 information stored or processed by computing devices. Thus, there should be no objection to this

21 portion of the construction.

22    *Unique Identifier.* Not only does Plaintiff fail to raise any objection to this aspect of

23 Netflix's construction, but Plaintiff's infringement contentions suggest that the parties agree that

24 the fingerprint is a unique identifier. Infringement Contentions at 42-43 ("The fingerprint of the

25 restricted content is Netflix's unique access key for the restricted content generated for the Netflix

26 user . . . ."). Thus, the parties appear to agree on at the very least the concept underlying this portion

27 of the construction.

28

1    *Derived or Computed from Content.* Plaintiff's brief fails to raise any objection to this

2    aspect of Netflix's proposed construction. To the extent Plaintiff does raise a new objection on

3    reply, it would be at odds with the plain reading of the claim, which requires "***deriving***, using the

4    first digital rights management key, ***from the access restricted content*** a ***fingerprint of the access***

5    ***restricted content***." '102 patent at 14:8-10. In other words, the fingerprint is derived from the access

6    restricted content.

7    The specification echoes this, repeatedly referring to "a fingerprint of the access restricted

8    content," which only makes sense if the fingerprint is tied to the content. *See*, *e.g.*, *id.* at 1:66-67,

9    9:25-26, 10:34-35. In one embodiment, the specification teaches that "the server encrypts the

10   content and streams it to the client, as well as calculates a content fingerprint." *Id.* at 11:19-21. The

11   entire concept of a "content fingerprint" (as opposed to a fingerprint of something else, such as a

12   key) strongly implies that it must be derived directly from the content and represent that content.

13   The specification similarly teaches in an embodiment that the "server queries the content database

14   for a **content fingerprint** of the content . . . ." *Id.* at 11:26-28. In short, whenever the specification

15   discusses what the fingerprint is or what/where it is generated from, it links it to content.

16   Thus, although the claim language already makes this connection between fingerprint and

17   access restricted content, the claim is densely-worded and somewhat hard to follow. Netflix's

18   construction, which is consistent with the plain and ordinary meaning of the term, makes this

19   connection clear without requiring detailed examination of the claims and prevents ambiguity.

20   Plaintiff, by contrast, not only fails to articulate any viable objection to Netflix's

21   construction, but also fails to state what the plain and ordinary meaning is, despite its claim that it

22   would be known to a person of ordinary skill in the art. This is exacerbated by Plaintiff's failure to

23   identify the fingerprint in its infringement contentions. Indeed, according to Plaintiff, *any* "unique

24   access key . . . that is based at least in part on the license" satisfies "fingerprint." Infringement

25   Contentions at 43. Plaintiff appears to prefer to kick the construction can down the road to preserve

26   its ability to mold its allegations to what it uncovers during discovery. Because the parties actively

27   dispute the meaning of this term, it should be decided now, rather than waiting for Plaintiff to reveal

28   its understanding of the term during expert discovery. *O2 Micro*, 521 F.3d at 1360 ("When the

-23-

parties raise an actual dispute regarding the proper scope of these claims, the court . . . must resolve that dispute.").

## V.      CONCLUSION

Netflix respectfully requests that the Court adopt its constructions for the claim terms at issue and render claim 10 of the '102 Patent indefinite.


Dated:  October 28, 2022                          Respectfully submitted,

                                                                  */s/ Sarah E. Piepmeier*
                                                                  Sarah E. Piepmeier, Bar No. 227094
                                                                  SPiepmeier@perkinscoie.com
                                                                  Elise Edlin, Bar No. 293756
                                                                  EEdlin@perkinscoie.com
                                                                  PERKINS COIE LLP
                                                                  505 Howard Street, Suite 1000
                                                                  San Francisco, California 94105
                                                                  Telephone: +1.415.344.7000
                                                                  Facsimile:  +1.415.344.7050

                                                                  Janice L. Ta (appearance *pro hac vice*)
                                                                  JTa@perkinscoie.com
                                                                  PERKINS COIE LLP
                                                                  405 Colorado Street, Suite 1700
                                                                  Austin, Texas 78701
                                                                  Telephone: +1.737.256.6100
                                                                  Facsimile:  +1.737.256.6300


                                                                  ***Attorneys for Defendant***
                                                                  ***NETFLIX, INC.***