1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    LAURI VALJAKKA,                            Case No. 22-cv-01490-JST

8                   Plaintiff,
                                                **CLAIM CONSTRUCTION ORDER**
9           v.
                                                Re: ECF Nos. 62, 63, 64
10   NETFLIX, INC.,

11                  Defendant.

12

13          The parties propose competing constructions of five terms from the two patents at issue in

14   this case and dispute whether a specific claim of one of the patents requires an ordering of steps.

15   ECF Nos. 62, 63, 64.  The Court will construe the terms and determine that the claim requires an

16   ordering of steps.

17   **I.      BACKGROUND**

18          Plaintiff Lauri Valjakka alleges that Defendant Netflix, Inc., infringes numerous claims of

19   two patents: U.S. Patent No. 8,495,167 ("'167 Patent") and U.S. Patent No. 10,726,102 ("'102

20   Patent").  ECF No. 14.  The '167 Patent "relates to improvements in data communications

21   networks and to systems, methods and apparatus employed in such networks."  '167 Patent at 1:6-

22   8.  The '102 Patent "relates to an apparatus, method and/or system for providing restricted content

23   to a user."  '102 Patent at 1:9-11.

24   **II.     JURISDICTION**

25          The Court has jurisdiction under 28 U.S.C. § 1331.

26   **III.    LEGAL STANDARD**

27          **A.      Claim Construction**

28          Claim construction is a question of law to be determined by the court.  *Markman v.*

United States District Court
Northern District of California

1    *Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370

2    (1996).  The "correct construction" is one that "stays true to the claim language and most naturally

3    aligns with the patent's description of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303,

4    1316 (Fed. Cir. 2005) (en banc) (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d

5    1243, 1250 (Fed. Cir. 1998)).

6         Claim terms are "generally given their ordinary and customary meaning," which is "the

7    meaning that the term would have to a person of ordinary skill in the art in question at the time of

8    the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at

9    1312-13.  Claim construction deviates from ordinary and customary meaning only if "a patentee

10   sets out a definition and acts as his own lexicographer" or "the patentee disavows the full scope of

11   a claim term either in the specification or during prosecution." *Thorner v. Sony Comput. Ent. Am.*

12   *LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

13        "Claim construction begins with the words of the claim." *Elkay Mfg. Co. v. Ebco Mfg.*

14   *Co.*, 192 F.3d 973, 977 (Fed. Cir. 1999).  In interpreting the claim language, courts consider the

15   "context in which a term is used in the asserted claim," "[o]ther claims of the patent in question,

16   both asserted and unasserted," and "[d]ifferences among claims." *Phillips*, 415 F.3d at 1314.

17        Claims also "do not stand alone" but rather "must be read in view of the

18   specification." *Id.* at 1315.  "[T]he specification is always highly relevant to the claim

19   construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a

20   disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  Thus,

21   for example, courts "normally do not interpret claim terms in a way that excludes disclosed

22   examples in the specification." *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295,

23   1305 (Fed. Cir. 2007).

24        "[L]imitations from the specification are not to be read into the claims." *Comark*

25   *Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998).  Even "if a patent

26   describes only a single embodiment," the Federal Circuit has "expressly rejected the contention

27   that . . . the claims of the patent must be construed as being limited to that embodiment." *Phillips*,

28   415 F.3d at 1323.  Only where "the specification makes clear that the invention does not include a

United States District Court
Northern District of California

United States District Court
Northern District of California

1    particular feature" should claim language be narrowed based on the specification. *E.I. du Pont De*

2    *Nemours & Co. v. Unifrax I LLC*, 921 F.3d 1060, 1068 (Fed. Cir. 2019).

3         In addition to consulting the specification, "the court should also consider the patent's

4    prosecution history, if it is in evidence." *Markman*, 52 F.3d at 980.  However, "because the

5    prosecution history represents an ongoing negotiation between the [Patent and Trademark Office]

6    and the applicant, rather than the final product," that history "often lacks the clarity of the

7    specification" and therefore "is less useful for claim construction purposes." *Phillips*, 415 F.3d at

8    1317.

9         Finally, courts may consider extrinsic evidence, but "such evidence is generally of less

10   significance than the intrinsic record" – i.e., the claims, specification, and prosecution history.

11   *Allergan Sales, LLC v. Sandoz, Inc.*, 935 F.3d 1370, 1373 (Fed. Cir. 2019).  For example,

12   "dictionaries, and especially technical dictionaries, . . . can assist the court in determining the

13   meaning of particular terminology to those of skill in the art" because they "endeavor to collect the

14   accepted meanings of terms used in various fields of science and technology." *Phillips*, 415 F.3d

15   at 1318.  Courts may also consider treatises and expert and inventor testimony, but they "should

16   discount any expert testimony that is clearly at odds with the claim construction mandated by the

17   claims themselves, the written description, and the prosecution history." *Id.* at 1317-18 (quoting

18   *Key Pharms. v. Hercon Lab'ys Corp.*, 161 F.3d 709, 716 (1998)).

19        **B.      Indefiniteness**

20        A patent "is invalid for indefiniteness if its claims, read in light of the specification

21   delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those

22   skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572

23   U.S. 898, 901 (2014).  "Indefiniteness must be proven by clear and convincing evidence." *Sonix*

24   *Tech. Co. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

25        "[A] claim [can] be indefinite if a term does not have proper antecedent basis where such

26   basis is not otherwise present by implication or the meaning is not reasonably ascertainable."

27   *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008) (citing

28   *Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1370–71 (Fed. Cir. 2006)).  For a

3

1   claim term to have antecedent basis support, an indefinite article (for instance, "a" or "an") must

2   precede a claim term the first time the claim term is used in the claims. Subsequent references in

3   the claims to the claim term must be preceded by a definite article (for instance, "the" or "said").

4   *Sensor Elec. Tech., Inc. v. Bolb, Inc.*, No. 18-CV-05194-LHK, 2019 WL 4645338, at *31 (N.D.

5   Cal. Sept. 24, 2019) (citation omitted).  However, a patentee's "failure to provide

6   explicit antecedent basis for terms does not always render a claim indefinite." *Energizer*

7   *Holdings*, 435 F.3d at 1370 (quoting Manual of Patent Examining Procedure § 2173.05(e)).  A

8   claim lacking explicit antecedent basis is still definite where its meaning "would reasonably be

9   understood by persons of ordinary skill when read in light of the specification." *Id.*

10  **IV.    DISCUSSION**

11      **A.    "modified transport request" ('167 Patent, claims 1, 3-6, 8, 9, 11-17, 19, and
            20)**

12

| Valjakka's Proposed Construction | Netflix's Proposed Construction | Adopted Construction |
|---|---|---|
| No construction necessary | "message that is modified by a relay server to add target terminal addresses" | "transport request that is modified by a relay server to include addresses of further target terminals" |

17      The parties dispute whether terminals that are not adapted to act as relay servers can

18  modify transport requests and transmit those modified transport requests to selected target

19  terminals.  ECF No. 62 at 9-10; ECF No. 63 at 13-16.  Asserted independent claim 1 recites:

20          A data communication network . . . wherein terminals adapted to act
            as relay servers are adapted to modify transport requests received
21          from the main server or from other relay servers and to transmit the
            modified transport requests to selected terminals from a set of target
22          terminals identified in the transport request, wherein the modified
            transport request further includes addresses of further target terminals
23          for which the recipient of the modified transport request is to act as
            the relay server.
24
25  '167 Patent, 8:25-33.  Asserted claims 9, 16, 17, and 19, and 20 contain language that is either

    identical or substantially similar.  *See id.* at 9:27-35, 10:27-36, 11:4-12, 11:60-12:3, 12:44-52.
26
27      The context of the contested term as it appears in claim 1 is sufficient to construe the

    phrase.  By its plain language, claim 1 makes clear that "terminals adapted to act as relay servers
28

4

United States District Court
Northern District of California

United States District Court
Northern District of California

1    are adapted to modify transport requests received from a main server." *Id.* at 8:25-26.  As a matter

2    of grammar, the phrase makes clear that the class of terminals that can modify transport requests is

3    limited to the subset of those terminals that have also been adapted to act as relay servers.  The

4    remainder of the excerpt indicates both (1) that terminals that receive modified transport requests

5    are themselves adapted as relay servers when it is necessary for that recipient server to further

6    modify and transmit an already-modified transport request to further target terminals, and (2) that

7    modification entails the inclusion of the addresses of further target terminals to which the recipient

8    terminal must transfer the request.  Thus, a terminal that both modifies and transmits an existing

9    data transport request is definitionally a relay server.  Other claims in the patent confirm this

10   interpretation.  Asserted independent claim 20, for example, recites:

11       A computer program product for enabling a network terminal to
     operate as a relay server in a data communication network, the data

12   communication network including . . . *computer readable program
     code for causing said network terminal to act as a relay server* for

13   serving data retrieved to at least one target terminal by receiving and
     responding to transport requests sent to said network

14   terminal, . . . *said computer readable program code for causing said
     network terminal to modify transport requests received from the main*

15   *server or from other relay servers and to transmit the modified
     transport request to selected target terminals* . . . .

16

17   *Id.* at 12:9-47 (emphases added).  As the emphasized language makes clear, the code that operates

18   the network both causes a terminal to act as a relay server and causes that relay server to modify

19   and transmit transport requests to target terminals.

20       The specification is also in accord.  The specification teaches that "each terminal is either a

21   node (functioning both as a relay server and a target terminal) or a leaf (functioning only as a

22   target terminal)." *Id.* at 3:29-31.  Accordingly, "terminals that do not also act as relay

23   servers . . . would always be 'leaves', at the end of lists of target terminals." *Id.* at 3:58-60.  The

24   specification also states that, after data is retrieved from the main server by one terminal in the

25   first set of target terminals, that "terminal 14 sends a modified version of the original transport

26   requests to its subset of target terminals 16." *Id.* at 3:2-3.  That modified request "identifies the

27   relevant first terminal as the address from which its subset of the target terminals 16 should

28   retrieve the data," *id.* at 3:4-6, and each terminal in that subset "of terminals 16 may receive a list

1    of further target terminals for which it is to act as the relay server" as part of the modified request,

2    *id* at 3:8-10.  Transport requests are thus only modified by terminals adapted to act as relay

3    servers, i.e., nodes, precisely because relay servers must further transmit those requests to further

4    target terminals.  In other words, modification serves to fashion the transport request for

5    transmission to further target terminals.  That purpose cannot be fulfilled by a terminal that is not a

6    relay server because such a terminal is definitionally a leaf at the end of a list of target terminals.

7         Valjakka's argument to the contrary is unavailing because it misreads the language from

8    claim 1, discussed above, to argue that any terminal may modify a transport request.  ECF No. 62

9    at 10.  However, the term "modified transport request," considered in the context of the asserted

10   claims in view of the specification, refers only to terminals that have been adapted to act as relay

11   servers.[1]  The Court therefore construes "modified transport request" as "transport request that is

12   modified by a relay server to include addresses of further target terminals."[2]

13   / / /

14   / / /

15   / / /

16   / / /

17   / / /

18   / / /

19   / / /

20   / / /

21   / / /

22

---

23   [1] The Court does not address the prosecution history quoted by Netflix because the claims and
24   specification suffice to enable the Court to construe the claim, and because Netflix has not
     submitted that prosecution history to the Court such that it is not "in evidence."  *Markman*, 52
25   F.3d at 980.

26   [2] Netflix's proposed construction uses "message" instead of "transport request" and "add target
     terminal addresses" instead of "include addresses of further target terminals."  The Court modified
27   Netflix's proposed construction so that the language of the term comports with the language of
     claims 1, 9, 16, 17, 19, and 20 of the patent, and because Netflix otherwise offers no argument in
28   support of this specific language.

United States District Court
Northern District of California

6

**B.**     **"data" ('167 Patent, claims 1, 3-6, 8, 9, 11-17, 19, and 20)**

| Valjakka's Proposed Construction | Netflix's Proposed Construction | Adopted Construction |
|---|---|---|
| No construction necessary | "content files or parts of content files that are stored by a terminal for subsequent use after retrieval, distinct from streaming content" | "files or parts of files or equivalents thereof that are stored on a server, downloaded from the server by a terminal and stored by the terminal for subsequent use, as distinct from a stream of files or parts of files or equivalents thereof that is transmitted by a server and is temporarily buffered by terminals" |

Valjakka argues that Netflix's proposed construction improperly limits the term using language that is extrinsic to the patent. ECF No. 62 at 11. Netflix responds that its definition is consistent with the specification, supported by the language of other claims, and further corroborated by the prosecution history.[3] ECF No. 63 at 16-18.

Valjakka's reliance on the phrase "any type of data of interest to users, including but not limited to text, graphics, audio, executable code, etc.," ECF No. 62 at 11 (quoting '167 Patent at 1:58-63, is misplaced. Although this phrase shows that the number of kinds of data at issue is potentially very large, it provides no indication as to the definition of the term itself.

Netflix is correct that this is a case where the patentee "act[ed] as his own lexicographer," *Thorner*, 669 F.3d at 1365. However, Netflix's proposed construction does not reflect the definition of the term that is "clearly set forth" in the patent. *Id.* (quoting *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)). The specification reads, in relevant part,

> [D]ata that is to be distributed from the media storage system 18 will be referred to herein as 'content,' which will be understood to include any type of data of interest to end users, including but not limited to text, graphics, video, audio, executable code etc. . . . For purposes of the present invention, 'content' means files or parts of files or equivalents thereof that are stored on a server, downloaded from the server by a client and stored by the client for subsequent use, as distinct from digital broadcast media in which a data stream is transmitted by a broadcast server and is temporarily buffered by

---

[3] Netflix again quotes from a prosecution history that is not in the record. Regardless, the Court need not rely on that history to construe the term.

United States District Court
Northern District of California

1  clients and, in some cases, by intervening relay units.

2  '167 Patent, 1:58-2:3. This excerpt clearly defines "data" as "content" for purposes of the

3  invention and then defines "content." Thus, applying the transitive property and the patentee's

4  own lexicography, data "means files or parts of files or equivalents thereof that are stored on a

5  server, downloaded from the server by a client and stored by the client for subsequent use, as

6  distinct from digital broadcast media in which a data stream is transmitted by a broadcast server

7  and is temporarily buffered by clients and, in some cases, by intervening relay units."

8  Netflix's proposed construction has an additional flaw. It defines "data" – defined in the

9  patent as "content" – as consisting of "content files or parts of content files." However, the patent

10  defines "content" itself as "files or parts of files." Netflix's definition is therefore "self-

11  referential" and would thus "not help the lay juror," which is a "purpose of claim construction."

12  *Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 528 F. Supp. 2d 967,

13  982 (N.D. Cal. 2007) (citing *United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568

14  (Fed. Cir. 1997)). Accordingly, the Court will not adopt a definition of "data" that includes the

15  word "content."

16  The Court otherwise agrees with Netflix's substitution of the word "terminals" for the

17  word "client." As discussed in the previous section, the patent divides terminals into two

18  categories: (1) terminals that act as both target terminals and relay servers that transmit data to

19  further target terminals, referred to as "nodes," and (2) terminals that act only as target terminals,

20  referred to as "leaves," that do not transmit data further. The specification teaches that, although

21  target terminals that do not act as relay servers download and store data for subsequent use, so too

22  do relay servers store data for subsequent use. The specification states, "As shown in FIG 2C, the

23  main application 32, as employed in . . . those terminals that also act as relay servers, comprises

24  the following modules: A core module 38 interprets received packets and stores data." '167

25  Patent 4:20-24. Figure 2C itself indicates that the core "[s]tores data that belongs to it." ECF No.

26  14-1 at 5. Thus, terminals store data for subsequent use regardless of whether those terminals also

27  act as relay servers.

28  The Court therefore construes "data" as "files or parts of files or equivalents thereof that

United States District Court
Northern District of California

8

United States District Court
Northern District of California

1    are stored on a server, downloaded from the server by a terminal and stored by the terminal for

2    subsequent use, as distinct from a stream of files or parts of files or equivalents thereof that is

3    transmitted by a server and is temporarily buffered by terminals."[4]

4        **C.    "obtaining is based at least in part on the first digital rights management key"**
         **('102 Patent, claims 10 and 11)**
5

| Valjakka's Proposed Construction | Netflix's Proposed Construction | Adopted Construction |
|---|---|---|
| No construction necessary | Indefinite | No construction necessary |

9        Asserted independent Claim 10 of the '102 Patent recites, in relevant part:

10           A method, comprising:

11               obtaining an access restricted content from at least one of a
                 content database and a content providing server;
12

13               obtaining a first digital rights management key from a content
                 database, wherein the obtaining is based at least in part on a
14               query, the query comprising the content identifier and an
                 identifier associated with the user;
15

16               deriving, using the first digital rights management key, from
                 the access restricted content a fingerprint of the access
                 restricted content wherein the obtaining is based at least in part
17               on the first digital rights management key;

18               causing the content providing server to validate the
                 fingerprint . . . , and
19

20               deriving, using the digital rights management header of the
                 access restricted content, from the access restricted content a
                 second and third digital rights management key . . . .
21

22    '102 Patent at 14:1-20.  Netflix argues that the term "the obtaining is based at least in part on the

      first management key" is indefinite because the term lacks a clear antecedent basis.  ECF No. 63 at
23

24    18-21.  Netflix contends that the term could just as well refer to the first element, which begins

25
      _____

26    [4] The Court omitted the phrase "digital broadcast media in which a data" because that phrase is
      self-referential in two ways.  First, it contains the term "media," but the specification teaches that
27    data, media, and content are all equivalent terms: "The network includes a data storage system 10,
      which in this embodiment includes media storage system 18 for *data (i.e. 'media' or*
28    *'content')* that is to be selectively distributed over the network . . . ."  '167 patent at 1:53-56
      (emphasis added).  Second, the phrase contains the term "data," which is the term being construed.

1    with "obtaining an access restricted content," as it could the third element, which begins with

2    "deriving, using the first digital rights management key."  The Court disagrees.

3        Four aspects of the claim indicate that the term refers to the third element, which begins

4    with "deriving, using the first digital rights management key."  '102 Patent at 14:8.  First, each

5    element of the claim begins with a present participle and is separated from the preceding element

6    by a semicolon, and the contested term appears within the third element.  Second, the language of

7    the claim itself makes clear that the first element, "obtaining an access restricted content,"

8    describes an overall process, while the remaining elements describe the steps within that overall

9    process.  Third, the words "derive" and "obtain" are sufficiently synonymous such that the

10   contested term may logically take "deriving" as an antecedent.  *See* Derive, Merriam-Webster

11   Online Dictionary (2022) (defining derive as "to take, receive, or *obtain*, especially from a

12   specified source" (emphasis added)).   Fourth, the element in which the term appears is, as a

13   whole, internally consistent insofar as it recites (1) that a fingerprint is derived using the first

14   digital rights management ("DRM") key and (2) that the process of obtaining that fingerprint is

15   based in part on that key.

16        The specification confirms this interpretation.  The specification teaches,

17
18        Responsive to receipt of the first DRM key in phase 490, the client
         may access the content using at least in part the first DRM key.  This
         is illustrated as phase 4100.  The client may obtain, in phase 4120, a
         fingerprint of the content wherein the obtaining may be based at least
19        in part on the first DRM key.

20   '102 Patent at 10:30-36.  It is thus clear that "deriving," *id.* at 14:8, is the antecedent basis for the

21   contested term.  Accordingly, a person of ordinary skill would reasonably understand the meaning

22   of the claim when read in light of the specification.  No construction of "obtaining is based at least

23   in part on the digital rights management key" is required.

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

10

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

### D.     "the digital rights management header" ('102 Patent, claims 10 and 11)

| Valjakka's Proposed Construction | Netflix's Proposed Construction | Adopted Construction |
| --- | --- | --- |
| No construction necessary | Indefinite | No construction necessary |

Valjakka argues that the meaning of the term "the digital rights management header" in asserted independent claim 10 is reasonably ascertainable by a person of ordinary skill in the art when the claim is read in light of the specification. Netflix argues that the term lacks an antecedent basis and is therefore indefinite. ECF No. 63 at 21-22. Netflix further argues that the specification refers to "a header associated with the user identifier," and "a header associated with the content identifier," but the term in claim 10 does not identify the header to which it refers. *Id.* at 22 (quoting '102 Patent 7:16-18, 7:50-52).

As to the term's lack of an antecedent basis, the Federal Circuit has emphasized that "[w]hen the meaning of the claim would reasonably be understood by persons of ordinary skill when read in light of the specification, the claim is not subject to invalidity upon departure from the protocol of 'antecedent basis.'" *Energizer Holdings*, 435 F.3d at 1370. That the phrase "digital rights management header" does not appear elsewhere in the claim preceded by an indefinite article is therefore not dispositive of the question of indefiniteness. Furthermore, Netflix's assertion that the term is nonspecific is incorrect. The language of the claim makes clear that the term refers to a header associated with the content identifier. The claim recites "deriving, using the digital rights management header *of the access restricted content*." '102 Patent at 14:17-18 (emphasis added). Netflix has thus failed to provide clear and convincing evidence that the claim is indefinite.

Contrary to Netflix's argument, the patent describes both the purpose and function of the digital rights management header associated with a content identifier. Claim 10 itself recites that the method for obtaining access restricted content includes "deriving, using the digital rights management header of the access restricted content, from the access restricted content a second and third digital rights management key." *Id.* 14:17-20. Other portions of the patent place this

11

1   element within the broader context of the invention.  For example, the specification teaches the

2   purpose of the digital rights management header associated with a content identifier,

> [T]he apparatus is in at least some embodiments configured to obtain
> a header associated with the content identifier . . . wherein the header
> associated with the content identifier and the first digital rights
> management key are usable to at least in part obtain access to access
> restricted content.  The header may be obtained by the apparatus, for
> example, by receiving it from the content database.

7   *Id.* at 9:35-42.  The specification further teaches, "Which [DRM] level is used for a specific

8   content item, may be determined from a DRM header of the content, for example." *Id.* 12:12-14.

9   Elaborating on the operation of such a header, unasserted independent claim 1 recites that the

10  apparatus "derive[s] a second and third digital rights management key from the access restricted

11  content using the digital rights management header of the access restricted content wherein the

12  second and third digital rights management keys are applied to retrieve the payload of the access

13  restricted content." *Id.* 12:55-57.  The specification also teaches that the header associated with

14  the content header is generated contemporaneously with the first digital rights management key:

> In an embodiment, in response to a determination that the received
> content identifier and user identifier matches with any combination of
> the stored user identifiers and content identifiers, the validation
> module may generate . . . a first digital rights management key and a
> header associated with the content identifier.

18  *Id.* at 7:47-52.  Intrinsic evidence thus makes clear the purpose and operation of the digital rights

19  management header.  Accordingly, the meaning of claim 10 would reasonably be understood by a

20  person of ordinary skill when read in light of the specification, and the term thus does not render

21  the claim indefinite.  No construction of "digital rights management header" is required.

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

United States District Court
Northern District of California

12

1

2

**E.      Method claim 10 requires a particular step order ('102 Patent, claims 10 and 11)**

| Valjakka's Proposed Construction | Netflix's Proposed Construction | Adopted Construction |
|---|---|---|
| No construction necessary | The DRM keys must be obtained or derived before restricted content is obtained.<br><br>Further, the first DRM key must be obtained and fingerprint validated before the second and third DRM keys are derived. | The DRM keys must be obtained or derived before restricted content is obtained.<br><br>Further, the first DRM key must be obtained and fingerprint validated before the second and third DRM keys are derived. |

The parties dispute whether method claim 10 requires a particular step order.  ECF No. 62 at 15-16; ECF No. 63 at 23-24.  "[A] claim 'requires a particular ordering of steps when the claim language, as a matter of logic or grammar, requires that the steps be performed in the order written, or the specification directly or implicitly requires' an order of steps."  *Mformation Techs., Inc. v. Rsch. in Motion Ltd.*, 764 F.3d 1392, 1398 (Fed. Cir. 2014) (quoting *TALtech Ltd. v. Esquel Apparel, Inc.*, 279 Fed. Appx. 974, 978 (Fed. Cir. 2008)).

The Court agrees with Netflix that claim 10, in view of the specification, requires that (1) DRM keys be obtained or derived before restricted content is obtained, and (2) the first DRM key must be obtained and the fingerprint validated before the second and third keys are derived.  Claim 10 recites that the first fingerprint is "deriv[ed] using the first digital management key," '102 Patent at 14:8, after which the "content providing server . . . validate[s] the fingerprint, and, if the validation is successful," the restricted content is accessed, *id.* at 14:13-14.  Claim 10 further recites that "the second and third digital rights management keys are applied to retrieve the payload of the access restricted content."  *Id.* 14:22-24.  The claim language thus confirms the first component – that DRM keys must be obtained or derived before restricted content is obtained – and it leaves open the possibility of the second component – that the first DRM key must be obtained and the fingerprint validated before the second and third DRM keys are derived.

The specification corroborates the first component and confirms the second component.

1    The specification teaches,

2           In phase 4150, the content database may responsively provide the
            fingerprint to the content server.  In phase 4160, the server may
3           compare the fingerprints received in phases 4150 and 4130.  In case
            of mismatch, the processing advances to phase 4170 and ends.  In case
4           the fingerprints match, processing advances to phase 4180 where the
            client is provided with a positive validation result.
5
            Responsive to the positive validation result of phrase 4180, the client
6           in phase 4190 proceeds to access the content, and optionally also to
            apply the first DRM key to the header, responsive to which the client
7           gains access, phase 4200, to an open DRM header of the content.
            Using the header the client may be enabled to provide the second and
8           third DRM keys, and, optionally, to apply at least one of the second
            and third DRM keys to retrieve payload of the content.
9

10   *Id.* 14:40-56.  This language demonstrates that the validation result provided by the fingerprint

11   must be obtained before the second and third DRM keys are obtained, and that the second and

12   third DRM keys must be obtained before the restricted content is accessed in situations where

13   second and third DRM keys are involved in the process.  Accordingly, claim 10 requires an

14   ordering of steps, and the Court adopts the ordering proposed by Netflix.

15           **F.      "fingerprint" ('102 Patent, claims 10 and 11)**

16

| Valjakka's Proposed Construction | Netflix's Proposed Construction | Adopted Construction |
|---|---|---|
| No construction necessary | a bit string, derived (or computed) directly from the content, that uniquely represents the content | a unique representation of the content derived directly from the content |

20           Valjakka argues that the term "fingerprint" should bear its ordinary meaning because the

21   "term is common among those skilled in the art of working with data and especially secured data."

22   ECF No. 62 at 17.  Netflix contends that fingerprint is a technical term such that, "[w]ithout some

23   explanation, the jury will have no guidance in understanding how to apply it to the accused

24   products or prior art."  ECF No. 63 at 25.  Neither party provides a basis for the Court to

25   determine whether there is, in fact, an ordinary and customary meaning associated with the term as

26   of the effective filing date of the patent in question.  Accordingly, the Court turns to the intrinsic

27   record.  *See V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1310 (Fed. Cir. 2005)

28

United States District Court
Northern District of California

14

1   ("[The intrinsic record] usually provides the technological and temporal context to enable the

2   court to ascertain the meaning of the claim to one of ordinary skill in the art at the time of the

3   invention.").

4          Claim 10 merely describes a "fingerprint of the access restricted content" that is validated

5   by a server in the process of accessing restricted content.  '102 Patent at 14:9-10.   Unasserted

6   claim 1 does the same.  *Id.* at 12:49.  As discussed in previous sections, that fingerprint is derived

7   using the first DRM key.  *See id.* at 14:7-12.  With respect to a particular embodiment, the

8   specification teaches:

9          In phase 580 the client saves the received content, optionally in a
       temporary location and in phase 590 the client obtains from the
10      content a content fingerprint, which is sent along with a content
       identifier to the server in phase 5100.

11

12      In phase 5110 the server queries the content database for a content
       fingerprint of the content . . . .  The server receives the fingerprint
13      from the database in phase 5120.  In phase 5130 the server determines
       whether the fingerprints received in phases 5120 and 5100 are the
       same.  In case they are not, the server informs the client of this in
14      phase 5140, and responsively the client removes the content it stored
       in phase 580.  In case the fingerprints match, phase 5150, the client in
15      phase 5160 moves the content to a final location.

16   *Id.* at 11:22-37.  Thus, when reading claim 10 in light of the specification, it is clear that user's

17   client and the server each obtain a content fingerprint, that the fingerprints are compared, and, if

18   the fingerprints match – *i.e.*, the server validates the fingerprint – the restricted content is accessed.

19   In sum, the patent provides that fingerprints are derived from content, compared with one another,

20   and used to access the content.  It is therefore clear that a specific fingerprint uniquely represents

21   particular content as opposed to a particular user, terminal, or some other component of the

22   invention.

23          Although the plain and ordinary meaning of the term may appear ascertainable from the

24   intrinsic record, the Federal Circuit has cautioned that plain and ordinary meaning "may be

25   inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's

26   'ordinary' meaning does not resolve the parties' dispute." *O2 Micro Int'l, Ltd. v. Beyond*

27   *Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008).  In either circumstance, "claim

28   construction requires the court to determine what claim scope is appropriate in the context of the

patents in suit." *Id.* at 1361; *see also Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1350 (Fed. Cir. 2004) (construing "golden brown" even though colors "are commonly used terms with well-accepted plain definitions that rarely need construction" because they were "precise terms corresponding to very specific portions of the spectrum that require precise definitions and construction"), *rev'd on other grounds*, 546 U.S. 394 (2006); *Toro Co v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1299 (Fed. Cir. 1999) (construing "cover," "included," "attachment," and "removable" according to the "context of the patent documents"). The Court finds the plain and ordinary meaning to be inadequate because it would not resolve the parties' dispute as to whether the term has a particular meaning in the context of the patent. As discussed above, that context makes clear that the term is precise insofar as it refers to representations of access restricted content that are compared with one another and used to access that content.

Accordingly, the Court finds Netflix's proposed construction largely captures the meaning of the disputed term. However, Netflix's proposed construction uses the phrase "bit string," neither word of which appears anywhere in the patent, nor does Netflix support its use of those terms with extrinsic evidence, nor does Netflix provide a basis for the Court to determine whether its proffered definitions of each of "bit" and "string" are accurate. Therefore, the Court construes "fingerprint" as "a unique representation of the content derived directly from the content."

**CONCLUSION**

The Court construes the disputed claim language as follows:

| Term | Claim(s) | Court's Construction |
|------|----------|----------------------|
| "modified transport request" | '167 Patent (claims 1, 3-6, 8, 9, 11-17, 19, 20) | "transport request that is modified by a relay server to include addresses of further target terminals" |
| "data" | '167 Patent (claims 1, 3-6, 8, 9, 11-17, 19, 20) | "files or parts of files or equivalents thereof that are stored on a server, downloaded from the server by a terminal and stored by the terminal for subsequent use, as distinct from a stream of files or parts of files or equivalents thereof that is transmitted by a server and is temporarily buffered by terminals" |

United States District Court
Northern District of California

| Term | Claim(s) | Court's Construction |
|---|---|---|
| "obtaining is based at least in part on the first digital rights management key" | '102 Patent (claims 10 and 11) | No construction necessary |
| "digital rights management header" | '102 Patent (claims 10 and 11) | No construction necessary |
| Method claim 10 requires a particular step order | '102 Patent (claims 10 and 11) | The DRM keys must be obtained or derived before restricted content is obtained.<br><br>Further, the first DRM key must be obtained and fingerprint validated before the second and third DRM keys are derived. |
| "fingerprint" | '102 Patent (claims 10 and 11) | a unique representation of the content derived directly from the content |

**IT IS SO ORDERED.**

Dated:  December 13, 2022



JON S. TIGAR
United States District Judge