1   Sarah E. Piepmeier, Bar No. 227094
    SPiepmeier@perkinscoie.com
2   Elise S. Edlin, Bar No. 293756
    EEdlin@perkinscoie.com
3   PERKINS COIE LLP
    505 Howard Street, Suite 1000
4   San Francisco, California 94105
    Telephone: +1.415.344.7000
5   Facsimile: +1.415.344.7050

6   Janice L. Ta, (admitted *pro hac vice*)
    JTa@perkinscoie.com
7   PERKINS COIE LLP
    405 Colorado Street, Suite 1700
8   Austin, Texas 78701
    Telephone: +1.737.256.6100
9   Facsimile:  +1.737.256.6300

10  Jassiem N. Moore, (admitted *pro hac vice*)
    JassiemMoore@perkinscoie.com
11  PERKINS COIE LLP
    1201 Third Avenue, Suite 4900
12  Seattle, Washington 98101-3099
    Telephone: +1.206.359.8000
13  Facsimile:  +1.206.359.9000

14
    *Attorneys for Defendant*
15  *NETFLIX,  INC.*

16                  **UNITED STATES DISTRICT COURT**

17                 **NORTHERN DISTRICT OF CALIFORNIA**

18                        **OAKLAND DIVISION**

19

20  LAURI VALJAKKA,                    | Case No. 4:22-cv-01490-JST

21          Plaintiff,                 | **DEFENDANT NETFLIX, INC.'S NOTICE
                                       | AND MEMORANDUM OF POINTS AND
22      v.                             | AUTHORITIES IN SUPPORT OF ITS
                                       | MOTION FOR JUDGMENT ON THE
23  NETFLIX, INC.,                     | PLEADINGS**

24          Defendant.                 | Date:      March 2, 2022
                                       | Time:      2:00 p.m.
25                                     | Ctrm:      6, 9th Floor
                                       | Judge:     Honorable Jon S. Tigar
26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION AND MOTION**

TO THE COURT, ALL PARTIES, AND ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on March 2, 2022 at 2 p.m., or as soon thereafter as may be heard, before The Honorable Jon S. Tigar, in Courtroom 6, 9th Floor of the above-entitled court, located at 1301 Clay Street, Oakland, CA 94612, Defendant Netflix, Inc. ("Netflix"), by its attorneys, hereby moves, pursuant to Rule 12(c) of the Rules of Civil Procedure, for an order dismissing with prejudice the Plaintiff's Third Amended Complaint. This motion is based upon this Notice; the following Memorandum of Points and Authorities; the complete files and records in this action; the argument of counsel; and such other matters as the Court may consider.

**STATEMENT OF RELIEF REQUESTED**

Pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, Netflix requests that this Court enter judgment for Netflix on Plaintiff Lauri Valjakka's allegations of patent infringement because the asserted claims are drawn to non-patentable subject matter under 35 U.S.C. § 101 ("Section 101").

# TABLE OF CONTENTS

I.      INTRODUCTION...................................................................................................1

II.     BACKGROUND ....................................................................................................2

        A.      The '102 Patent...........................................................................................2

        B.      The '167 Patent...........................................................................................2

        C.      Relevant Procedural History.......................................................................3

III.    LEGAL STANDARDS ..........................................................................................3

        A.      Section 101 Eligibility................................................................................3

        B.      Judgment on the Pleadings .........................................................................4

        C.      Ripeness of Rule 12(c) Motion ..................................................................4

IV.     ARGUMENT..........................................................................................................5

        A.      The '102 Patent Is Ineligible Under Section 101........................................5

                1.      *Alice* Step One: Claim 10 of the '102 Patent Claims the Abstract
                        Idea of Providing Restricted Access to Content....................................6

                2.      *Alice* Step Two: Claim 10 of the '102 Patent Contains No Inventive
                        Concept...................................................................................................9

        B.      The '167 Patent Is Ineligible Under Section 101......................................12

                1.      *Alice* Step One: Claim 1 of the '167 Patent Claims the Abstract Idea
                        of Distributing Delivery of Content by Dividing and Conquering.........14

                2.      *Alice* Step Two: Claim 1 of the '167 Patent Contains No Inventive
                        Step.......................................................................................................15

                3.      Dependent Claims 3-6 and 11-14 Are Also Invalid ..............................17

        C.      Leave to Amend Would Be Futile..............................................................18

V.      CONCLUSION......................................................................................................19

# TABLE OF AUTHORITIES

**Cases**

*Alice Corp. Pty. v. CLS Bank Int'l*,
    573 U.S. 208 (2014)................................................................................*passim*

*Appistry, Inc. v. Amazon.com, Inc.*,
    No. C15-311 MJP, 2015 WL 4210890 (W.D. Wash. July 9, 2015), *aff'd sub
    nom. Appistry, LLC v. Amazon.com, Inc.*, 676 F. App'x 1007 (Fed. Cir. 2017)........14, 16, 17

*B# on Demand LLC v. Spotify Tech. S.A.*,
    484 F. Supp. 3d 188 (D. Del. 2020)...............................................................7, 11

*Broadcom Corp. v. Netflix Inc.*,
    598 F. Supp. 3d 800 (N.D. Cal. 2022)............................................................14, 15

*BSG Tech LLC v. Buyseasons, Inc.*,
    899 F.3d 1281 (Fed. Cir. 2018) ...........................................................................17

*buySAFE, Inc. v. Google, Inc.*,
    765 F.3d 1350 (Fed. Cir. 2014) ...........................................................................16

*Coho Licensing LLC v. Glam Media, Inc.*,
    No. C 14-01576 JSW, 2017 WL 6210882 (N.D. Cal. Jan. 23, 2017), *aff'd sub
    nom. Coho Licensing LLC v. Oath Inc.*, 710 F. App'x 892 (Fed. Cir. 2018)....................1, 14

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*,
    776 F.3d 1343 (Fed. Cir. 2014) ...........................................................................16

*Data Engine Techs. LLC v. Google LLC*,
    906 F.3d 999 (Fed. Cir. 2018) ...............................................................................4

*Digital Media Techs., Inc. v. Amazon.com, Inc.*,
    No. 4:16CV244, 2017 WL 11700001 (N.D. Fla. July 3, 2017), *aff'd sub nom.
    Digital Media Techs., Inc. v. Netflix, Inc.*, 742 F. App'x 510 (Fed. Cir. 2018)..............*passim*

*Dworkin v. Hustler Mag. Inc.*,
    867 F.2d 1188 (9th Cir. 1989) ...............................................................................4

*Elec. Power Grp., LLC v. Alstom S.A.*,
    830 F.3d 1350 (Fed. Cir. 2016) ..........................................................................4, 12

*Hal Roach Studios, Inc. v. Richard Feiner & Co.*,
    896 F.2d 1542 (9th Cir. 1989) ...............................................................................4

*Harris v. Cnty. of Orange*,
    682 F.3d 1126 (9th Cir. 2012) ...............................................................................4

*Heliotrope Gen., Inc. v. Ford Motor Co.*,
    189 F.3d 971 (9th Cir. 1999).................................................................................4

*In re TLI Commc'ns LLC Pat. Litig.*,
  823 F.3d 607 (Fed. Cir. 2016) ...................................................................... 10

*Int'l Bus. Machines Corp. v. Zillow Grp., Inc.*,
  50 F.4th 1371 (Fed. Cir. 2022) ..................................................................... 18

*Intell. Ventures II LLC v. JP Morgan Chase & Co.*,
  No. 13-CV-3777 AKH, 2015 WL 1941331 (S.D.N.Y. Apr. 28, 2015) ............................ 11

*Internet Pats. Corp. v. Active Network, Inc.*,
  790 F.3d 1343 (Fed. Cir. 2015) ....................................................................... 3

*Mortg. Application Techs., LLC v. MeridianLink, Inc.*,
  839 F. App'x 520 (Fed. Cir. 2021) .................................................................. 19

*OpenTV, Inc. v. Apple Inc.*,
  No. 5:15-CV-02008-EJD, 2016 WL 344845 (N.D. Cal. Jan. 28, 2016) ....................... 9, 10

*Personalized Media Commc'ns, LLC v. Amazon.Com, Inc.*,
  161 F. Supp. 3d 325 (D. Del. 2015), *aff'd sub nom. Personalized Media
  Commc'ns, L.L.C. v. Amazon.com Inc.*, 671 F. App'x 777 (Fed. Cir. 2016) ............... 7, 11

*PersonalWeb Techs. LLC v. Google LLC*,
  8 F.4th 1310 (Fed. Cir. 2021), *cert. denied*, 212 L. Ed. 2d 540, 142 S. Ct. 1445
  (2022) .............................................................................................. 8, 19

*PersonalWeb Techs. LLC v. Google LLC*,
  No. 5:13-CV-01317-EJD, 2020 WL 520618 (N.D. Cal. Jan. 31, 2020) (Davila,
  J.), *aff'd*, 8 F.4th 1310 (Fed. Cir. 2021) ......................................................... 5, 18

*Prism Techs. LLC v. T-Mobile USA, Inc.*,
  696 F. App'x 1014 (Fed. Cir. 2017) .............................................................. 1, 7, 11

*SAP Am., Inc. v. InvestPic, LLC*,
  898 F.3d 1161 (Fed. Cir. 2018) ....................................................................... 4

*Smartflash LLC v. Apple Inc.*,
  680 F. App'x 977 (Fed. Cir. 2017) .................................................................. 16

*Yu v. Apple Inc.*,
  1 F.4th 1040 (Fed. Cir. 2021), *cert. denied*, 212 L. Ed. 2d 10 (Feb. 22, 2022) .......... 18

**STATUTES**

35 U.S.C. § 101 ............................................................................... *passim*

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.      INTRODUCTION**

Abstract ideas that have no inventive concept are not eligible for patent protection under Section 101, and any patent claiming such subject matter is invalid as a matter of law. *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208 (2014). The asserted claims of U.S. Patent Nos. 10,726,102 (the "'102 patent") and 8,495,167 (the "'167 patent") (together, "the Asserted Patents") are directed to such abstract ideas—ideas that existed long before the advent of computers and the Internet. The '102 patent claims the abstract idea of providing restricted access to content using multiple validation rules. But content providers have long sought to restrict how content is accessed, and the idea of requiring secure verification and authentication before granting access to restricted content underlies many aspects of modern life. For example, to see an R-rated movie, a customer must provide both a ticket and identification that proves his/her age. *See Prism Techs. LLC v. T-Mobile USA, Inc.*, 696 F. App'x 1014, 1016–1017 (Fed. Cir. 2017) (finding access control system that provided protected resources only after authenticating client, and checking client authorization, was directed to abstract idea).

The '167 patent claims the abstract idea of dividing and conquering a common task—the distribution of copies of content—among multiple actors. This is no different than a teacher recruiting students to help pass out copies of the latest assignment. *See Coho Licensing LLC v. Glam Media, Inc.*, No. C 14-01576 JSW, 2017 WL 6210882, at *5 (N.D. Cal. Jan. 23, 2017), *aff'd sub nom. Coho Licensing LLC v. Oath Inc.,* 710 F. App'x 892 (Fed. Cir. 2018) (finding invention that split job into smaller pieces distributed among multiple computers was directed to abstract idea). Neither the '102 patent nor the '167 patent add limitations that transform the claimed abstract ideas into something that is patent-eligible. Both patents rely on generic computer hardware and software to perform well-understood and routine computer functions. Accordingly, the Court should grant Netflix's Rule 12(c) motion for judgment on the pleadings and find that the asserted '102 and '167 patents are patent ineligible under § 101.

## II.     BACKGROUND

### A.     The '102 Patent

In general, the '102 patent relates to a method for accessing digital content that is restricted. '102 patent at 1:17-24. More specifically, the patent is directed to "using digital rights management keys to provide access to access restricted content." *Id*. at 1:7-9. When a request for restricted content is received by a "communication arrangement," the patent discloses that a user can obtain a series of digital rights management ("DRM") keys—relating to different layers of DRM—to access restricted content. *Id*. at 1:30-37; Fig. 9. The patent describes this as "caus[ing] a first determination to be performed to yield a positive or negative result." *Id*. at 1:33-35. If that first determination is successful or "positive," the user can obtain a "first digital rights management key" that will allow the user to proceed to additional levels of validation involving a fingerprint check and additional DRM keys. *Id*. at 1:43-67. As the '102 patent admits, "numerous ways of controlling and protecting [] digital content . . . using digital rights management" existed prior to the '102 patent. *Id*. at 1:15-19. Valjakka asserts independent claim 10 of the '102 patent.[1]

### B.     The '167 Patent

The '167 patent is directed to technology for distributing data across a network, and more specifically, across a network that is "arranged in a tree structure." '167 patent at 3:28-29. In this network, network terminals (computing devices connected to the network) serve as nodes of the tree. This includes a main server (i.e., the head node of the tree) that manages the entire network—specifically, the retrieval and forwarding of data through the network. *Id*. at 2:4-7. The patent purports to solve the problem of "extreme spikes in the network load" that result from a main server directly serving content to all terminals in a network (*see id*. at 1:12–17). To alleviate this issue, the patent teaches a main server that distributes data among a subset of devices, which in turn further distribute content to additional downstream devices (*id*. at 2:29-31). Valjakka asserts independent claims 1 and 9 and dependent claims 3-6 and 11-14 of the '167 patent.[2]

---

[1] Claim 11 was also asserted initially, but Valjakka dropped it in its final election of asserted claims on January 10, 2022.

[2] Claims 8, 15-17 and 19-20 were also asserted initially, but Valjakka dropped them in its final election of asserted claims on January 10, 2022

1

### C.     Relevant Procedural History

Valjakka filed its Complaint against Netflix in the Western District of Texas on September 13, 2021, asserting infringement of the '167 patent. Shortly thereafter, Netflix moved to dismiss on venue grounds. ECF No. 13. Valjakka then filed its First Amended Complaint—mooting Netflix's motion to dismiss—to add the '102 patent. ECF No. 14. On March 3, 2022, the parties jointly moved the Court to transfer the case to the Northern District of California, and Judge Alan D. Albright granted the transfer on March 8, 2022. ECF No. 17. On May 12, 2022, Valjakka filed a Second Amended Complaint (ECF No. 39). Netflix again moved to dismiss, this time with respect to Valjakka's willful infringement claims for failure to state a claim. ECF No. 51. The Court granted Netflix's motion to dismiss on October 11, 2022, and allowed Valjakka 28 days to cure its deficiencies. Approximately a month after that deadline, Valjakka filed its Third Amended Complaint on December 14, 2022 (ECF No. 74). Netflix timely filed its Answer and Counterclaims to Valjakka's Third Amended Complaint on December 23, 2022 (ECF No. 75).

The Court held a technology tutorial and *Markman* hearing on November 14, 2022, and December 12, 2022, respectively. The Court issued a Markman Order on December 13, 2022 (ECF No. 73). Trial has been set for February 5, 2024.

## III.     LEGAL STANDARDS

### A.     Section 101 Eligibility

Section 101 provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor." 35 U.S.C. § 101. The Supreme Court has prescribed a two-step framework for determining when a claim is ineligible for patenting. *See Alice*, 573 U.S. 208. First, the Court examines the claim's "character as a whole" to determine whether it is "directed to" an abstract idea. *Internet Pats. Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015). "The 'abstract ideas' category embodies 'the longstanding rule that '[a]n idea of itself is not patentable.'" *Alice*, 573 U.S. at 218 (*quoting Gottschalk v. Benson*, 409 U.S. 63 (1972)). If the claim is an abstract idea, the Court then examines whether the claim contains "significantly more" than that abstract idea. *Id.* at 217-18 (citation omitted). "[I]nsignificant extra-solution activity," such as generic

computer implementation, field-of-use restrictions, or presenting results, are legally insufficient. *Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1010, 1012 (Fed. Cir. 2018); *see also Alice*, 573 U.S. at 222; *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353–54 (Fed. Cir. 2016). Rather, "significantly more" requires that the additional limitations "'transform the nature of the claim' into a patent-eligible application" of the underlying abstract idea. *Alice*, 573 U.S. at 217 (citation omitted).

### B.   Judgment on the Pleadings

Under Rule 12(c), a party may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). The Federal Circuit and this Court have held that the question of patent eligibility "may be, and frequently has been, resolved on a Rule 12(b)(6) or (c) motion where the undisputed facts, considered under the standards required by that Rule, require a holding of ineligibility under the substantive standards of law." *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018) (collecting cases). The governing standard for a Rule 12(c) motion is "functionally identical" to that for a motion to dismiss. *Dworkin v. Hustler Mag. Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989). The standard is "whether the complaint at issue contains 'sufficient factual matter, accepted as true, to state a claim of relief that is plausible on its face.'" *Harris v. Cnty. of Orange*, 682 F.3d 1126, 1131 (9th Cir. 2012) (*quoting Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In deciding such a motion, the Court may consider the pleadings, documents incorporated by reference in the pleadings, and matters of judicial notice. *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999).

### C.   Ripeness of Rule 12(c) Motion

A motion for judgment on the pleadings under Rule 12(c) is ripe for decision when there are no genuine issues of material fact or claim construction issues that need to be resolved to decide the issue of patent eligibility. *See Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1550 (9th Cir. 1989) ("Judgment on the pleadings is proper when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law."). In addition, "when the 'basic character of the claimed subject matter is readily ascertainable from the face of the patent,' courts may determine

1  patent eligibility at the motion for judgment on the pleadings stage." *See PersonalWeb Techs. LLC*

2  *v. Google LLC*, No. 5:13-CV-01317-EJD, 2020 WL 520618, at *7 (N.D. Cal. Jan. 31, 2020)

3  (Davila, J.), *aff'd*, 8 F.4th 1310 (Fed. Cir. 2021).

4  **IV.   ARGUMENT**

5  **A.   The '102 Patent Is Ineligible Under Section 101**

6      The '102 patent is ineligible under Section 101 because it is directed to the abstract idea of

7  providing restricted access to content using multiple validation rules. '102 patent at 1:7-9. The '102

8  patent acknowledges that this idea is not new, and that "[t]here are numerous ways of controlling

9  and protecting [] digital content, for example, using digital rights management methods." *Id.* at

10  1:18-20. "Indeed, as long as content has existed, people have sought to secure who may access it

11  and how it may be used." *Digital Media Techs., Inc. v. Amazon.com, Inc.*, No. 4:16CV244, 2017

12  WL 11700001, at *7 (N.D. Fla. July 3, 2017), *aff'd sub nom. Digital Media Techs., Inc. v. Netflix,*

13  *Inc.*, 742 F. App'x 510 (Fed. Cir. 2018). The only asserted claim recites:

14      10. A method, comprising:

15          ***obtaining an access restricted content*** from at least one of a content

16      database and a content providing server;

17          ***obtaining a first digital rights management key*** from a content database,

    wherein the obtaining is ***based at least in part on a query, the query comprising the***

18      ***content identifier and an identifier associated with the user***;

19          ***deriving***, using the first digital rights management key, from the access

20      restricted content a ***fingerprint of the access restricted content*** wherein the

    obtaining is based at least in part on the first digital rights management key,

21
          ***causing the content providing server to validate the fingerprint***, and, if the

22      validation is successful, accessing the access restricted content and

23          information describing encryption properties of the access restricted content,

24      and

25          ***deriving***, using the digital rights management header of the access restricted

    content, from the access restricted content ***a second and third digital rights***

26      ***management key***,

27          wherein the ***second and third digital rights management keys are applied***

    ***to retrieve the payload of the access restricted content*** and wherein at least one of

28      the second or third digital rights management key is used to encrypt the other key

1    of the second or third digital rights management key,

2         wherein the content is usable without being in an unprotected state.

3    As the added bold italics above illustrate,

4  claim 10 consists of the following generic and

5  routine steps: 1) requesting access to content

6  (yellow), 2) authenticating user identity (green),

7  3) applying rule(s) to ensure that the user is

8  authorized (blue), and 4) if authorized,

9  permitting access to the content (purple). Figure

10  2 (shown right with steps highlighted) captures

11  this generic system. In step 44, the content

12  providing server receives a content request

13  (yellow). Next, the user and content identifiers

14  are authenticated (green). Then, in step 46



15  additional validation rules are applied (blue),

16  which include checking if the content identifier and first DRM key match an existing combination.

17  Claim 10 simply adds the routine steps of validating a fingerprint and applying another set of DRM

18  keys based on predefined rules. Finally, in step 50, access is provided to the content (purple). There

19  is no inventive concept in the method claimed of the '102 patent, which merely recites the

20  performance of these conventional steps with generic computer and network components. Notably,

21  Valjakka's pleadings are devoid of any allegations that the '102 patent contains an inventive idea

22  or is an improvement to computer security. *See* Third Am. Compl. (ECF No. 74).

23    **1.    *Alice* Step One: Claim 10 of the '102 Patent Claims the Abstract Idea**
24    **of Providing Restricted Access to Content**

25    It is well-established that providing restricted access to content using multiple validation

26  rules is an abstract idea. For example, to retrieve valuables from a safety deposit box in the bank, a

27  person must pass multiple forms of validation. She must first present an ID card to verify her

28  identity to the bank. Then, an authorized bank employee must unlock the vault containing the

deposit box. Finally, the owner of the box and the bank employee must both produce keys to unlock the box and reveal its contents. The alleged invention of the '102 patent does nothing more than serve as a vault for restricted content that allows a person to 1) request access to content, 2) authenticate user identity, 3) apply well-known and conventional rule(s) to ensure that the user is authorized, and 4) if authorized, permit access to the content. *Prism,* 696 F. App'x 1014 at 1017 ("Under step one, the district court properly concluded that the asserted claims are directed to the abstract idea of 'providing restricted access to resources.'"); *Digital Media Techs.*, 2017 WL 11700001, at *5 (holding that patent was "directed to the abstract idea of secured content-delivery"); *B# on Demand LLC v. Spotify Tech. S.A.*, 484 F. Supp. 3d 188, 203 (D. Del. 2020) (finding that claims directed to "limiting access to distributed media based on predetermined rules" were directed to an abstract idea).

  *Prism Technologies LLC* is instructive. In *Prism*, the Federal Circuit found that the asserted claims captured "an abstract process that includes: (1) receiving identity data from a device with a request for access to resources; (2) confirming the authenticity of the identity data associated with that device; (3) determining whether the device identified is authorized to access the resources requested; and (4) if authorized, permitting access to the requested resources." 696 F. App'x 1014 at 1017. As discussed above, claim 10 is directed to nearly this identical abstract process except, perhaps, for the use of multiple DRM keys. "That decryption occurs twice[, however,] does not make it any less abstract." *Personalized Media Commc'ns, LLC v. Amazon.Com, Inc.*, 161 F. Supp. 3d 325, 333 (D. Del. 2015), *aff'd sub nom. Personalized Media Commc'ns, L.L.C. v. Amazon.com Inc.*, 671 F. App'x 777 (Fed. Cir. 2016). Thus, claim 10 should likewise be found to be patent ineligible. *See* '102 patent at 14:1-26, Fig. 2.

  Similarly, in *Digital Media Techs.*, the district court found that a patent relating "to the field of managing digital information . . . and accessing the digital information via networked multimedia systems" claimed an abstract idea. 2017 WL 11700001, at *1. To clarify the requirements of the claim, the court provided a real-world example (i.e., a client requesting access to a movie) that contains similar steps to those claimed in the '102 patent. *Id.* at *2-3. First, like in the '102 patent, a client makes a request to a content server to access content. *Id.* at *2 ("MOV's server receive[s]

a request from Anna's tablet for the movie to be sent to the tablet."). Then, the user identity is authenticated. *Id.* ("MOV's server receive[s] authentication information from Anna's tablet . . . MOV's server validate[s] the authentication information."). Next, the server and client device apply multiple validation rules to ensure authorized access to the content. *Id.* at *2-3 (explaining that the client device requests an encrypted content license if certain requirements are met, decrypts the content license using a private key, and then decrypts the protected content using a content key within the content license). Like the '102 patent, these validation rules determine when and how to apply the appropriate digital rights management keys. *Id.*; '102 patent at 14:8-20. In the '102 patent, the first DRM key is used to obtain second and third DRM keys, which are used to retrieve the access restricted content, after validation of a fingerprint. *Id.* Similarly in *Digital Media Techs.*, a private key is used to decrypt a content license and obtain a content key, which is used to decrypt protected content, after "a determination . . . that the protected content is encrypted and requires a content license." 2017 WL 11700001, at *2-3. Finally, after the appropriate authorizations, the client device receives access to the content. *Id.* at *3 ("Anna's tablet used the content key to decrypt the movie . . . Anna can watch the movie pursuant to the usage parameters . . . ."). Claim 10 of the '102 patent is directed to this same abstract process.

In addition, in *PersonalWeb Technologies*, the Federal Circuit found claims relating "to the use of an algorithm-generated content-based identifier" used for "controlling access to data items" to be directed to an abstract idea. *PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1316 (Fed. Cir. 2021), *cert. denied*, 212 L. Ed. 2d 540, 142 S. Ct. 1445 (2022). The claims involved "a three-step process: (1) using a content-based identifier generated from a hash or message digest function; (2) comparing that content-based identifier against something else, that is, another content-based identifier or a request for data; and (3) providing access to, denying access to, or deleting data." *Id.* at 1315 (cleaned up). The '102 patent uses a fingerprint, which is akin to a content-based identifier, in the same manner. *See* Markman Order (ECF No. 73) at 17 (construing fingerprint to mean "a unique representation of the content derived directly from the content"). The fingerprint is derived, validated (i.e., compared to another value), and then used to access content. '102 patent at 10:36-44 (discussing comparison of fingerprints received by the client and the

content database), 14:8-17. Thus, the use of a fingerprint as part of the validation rules used to access content does not make claim 10 any less abstract.

Moreover, simply limiting the use of an abstract idea to a "particular technological environment" of a generic computer is insufficient for patent-eligibility. *Alice*, 573 U.S. at 222-223. Here, applying the abstract idea of restricting content to the digital content context is also patent ineligible. As this Court found in *OpenTV, Inc. v. Apple Inc.*, No. 5:15-CV-02008-EJD, 2016 WL 344845, at *7-*8 (N.D. Cal. Jan. 28, 2016), a patent directed to "granting and automatically renewing conditional access to a product (i.e. broadcast and pay per view content) based on information initially provided by a user" is an abstract idea. In particular, "[g]ranting access to a product (pay per view programming for example) after confirming that the user has paid for the product and provided certain product specific information has been a well-known practice in the cable industry for decades." *Id*. This Court held that simply replacing a method of organizing human activities with a generic computer that more efficiently performs the task of granting restricted access did not make the asserted patent less abstract. *Id. OpenTV* thus demonstrates that applying the abstract idea of restricting access to a particular technological field, as Valjakka attempts to do here, is still patent ineligible. The Court should thus find that the '102 patent is directed to the abstract idea of providing restricted access to content using multiple validation rules —a method of organizing human activity that existed well before the advent of computers and computer networks.

## 2. *Alice* Step Two: Claim 10 of the '102 Patent Contains No Inventive Concept

The limitations of claim 10 do not contain an inventive concept, either individually or as an ordered combination. The Supreme Court in "*Mayo* made clear that transformation into a patent-eligible application requires 'more than simply stat[ing] the [abstract idea] while adding the words 'apply it.'" *Alice*, 573 U.S. at 221. Here, the '102 patent simply takes the abstract idea of providing access to restricted content and then tells a generic computer network to "apply it" using generic software and hardware. For example, claim 10 simply recites generic, well-known computer hardware and software components (e.g., content database, content providing server, digital rights

management keys, and fingerprint) to perform well-understood and routine methods of providing restricted access to content. *See id.* at 1:18-20; Fig. 1 (depicting a "media storage device" 14, a "communication device" 12, a "content access authorization system" 20, a "content provider" 16, and the Internet 18). Indeed, as the specification notes, the content server may be any piece of generic computer equipment:

> It should be noted that in the above, a 'server' may take different forms depending on the embodiment. In particular, alternatively to a fixed computer residing in a network, in some embodiments a server may comprise a peer device to the client device, such as for example where the client device is a tablet or smartphone device, the server may also be a tablet or smartphone device.

*Id.* at 12:30-36; *see also In re TLI Commc'ns LLC Pat. Litig.*, 823 F.3d 607, 612–13 (Fed. Cir. 2016) (finding that server that performed "generic computer functions such as storing, receiving, and extracting data" was conventional). And the claimed communication device used by a user to obtain access to restricted content may comprise almost any generic device with communication capabilities, including a personal computer, smart phone, "tablet device[], set-top boxes, video game consoles etc." *See id.* at 5:19-30. Without more, such conventional components cannot transform Valjakka's patent ineligible abstract idea into a patent-eligible concept. *See, e.g.*, *OpenTV, Inc.*, 2016 WL 344845, at *7.

Further, the steps recited in claim 10 are not inventive. First, requesting access to content is purely conventional. *Digital Media Techs.*, 2017 WL 11700001, at *5 ("[I]t is nothing new for servers and clients to send requests to each other."). Second, authenticating user and content identifiers is not inventive. *OpenTV, Inc*, 2016 WL 344845, at *5 ("The practice of controlling access to information by verifying credentials (via well-known encryption methods) is neither novel nor specific to [certain technological] systems."). Third, making use of common cryptographic tools such as digital rights management keys and a fingerprint does not add significantly more than the abstract idea itself. *See Digital Media Techs.*, 2017 WL 11700001, at *5 (finding it uninventive to "incorporate asymmetric/public-key encryption into an authentication system"); *see also* Plaintiff's Opening Claim Construction Br. (ECF No. 62) at 13 (admitting that use of a "fingerprint is common among those skilled in the art of working with data and especially secured data.").

1    Finally, the application of predefined authorization rules—such as validating a fingerprint, applying

2    rules from a DRM header, or deriving additional DRM keys—does not supply an inventive concept.

3    *B# on Demand LLC*, 484 F. Supp. 3d at 205 (finding no inventive concept in either "implementing

4    the abstract idea of limiting access to distributed media based on predetermined rules via a 'general

5    purpose computer'" or decrypting a data file "in a manner that permits decryption only by [a]

6    particular customer"); *Intell. Ventures II LLC v. JP Morgan Chase & Co.*, No. 13-CV-3777 AKH,

7    2015 WL 1941331, at *14 (S.D.N.Y. Apr. 28, 2015) (finding that claimed features related to

8    "encryption and decryption," "descriptions of different examples of access rules," and "use of an

9    'access mechanism' to enforce the pre-selected rules" did not go beyond well-understood, routine,

10   conventional activity).

11        Moreover, combining the steps recited by claim 10 is not inventive. "As an ordered

12   combination, the claim limitations 'add nothing that is not already present when the elements are

13   considered separately,' but rather elaborate on known, conventional steps that must be performed

14   to access media . . . ." *B# on Demand LLC*, 484 F. Supp. 3d at 204 (quoting *Apple Inc. v. Ameranth,*

15   *Inc.*, 842 F.3d 1229, 1241 (Fed. Cir. 2016)). In *Prism*, as discussed in Section IV.A.1., *supra*, the

16   Federal Circuit found that the asserted claims, which performed similar steps to claim 10, did not

17   contain an inventive concept. 696 F. App'x 1014 at 1018 (internal citation omitted) ("Viewed as

18   an ordered combination, the asserted claims recite no more than the sort of 'perfectly conventional'

19   generic computer components employed in a customary manner that we have previously held

20   insufficient to transform the abstract idea into a patent-eligible invention."). At most, the ordered

21   combination makes use of multiple validation rules that use two layers of encryption, but "[d]ouble

22   encryption is [] not inventive . . . ." *Personalized Media Commc'ns, LLC v. Amazon.Com, Inc.*, 161

23   F. Supp. 3d at 333; *see also See Digital Media Techs.*, 2017 WL 11700001, at *6 (finding that the

24   combination of asymmetric encryption of a content license, encryption of content with a content

25   key from a content license, and an authentication system did not contain inventive concept).

26   Relatedly, "performing an abstract idea twice in a row is not a meaningful limitation." *Id.* at 333–

27   34.

28        In addition, claim 10 merely recites various generic functions without explaining how to

achieve them. The "result-focused, functional character of claim language has been a frequent feature of claims held ineligible under § 101, especially in the area of using generic computer and network technology . . . ." *Elec. Power*, 830 F.3d 1350 at 1356. For example, claim 10 discusses "validat[ing] the fingerprint" but does not explain how validation is done or how to determine if something is valid. '102 patent at 14:12-14. Further, it states that "digital rights management keys are applied to retrieve the payload" but is silent as to how to decrypt restricted content using a key. *Id.* at 14:21-23.

The '102 patent's specification maintains this high-level, functional description. It describes, for example, a "decryption module [that] comprise[s] decryption software . . . designed to facilitate decryption of data." '102 patent at 6:7-10, 5:64-6:1 ("[A] content authorization system 20, includes a content access authorization server 22 which, in turn, includes a processor 24 defining a plurality of modules [interrogation module] 26, [validation module] 28, [calculation module] 30, and [decryption module] 32, which correspond to *functional tasks* performed by the processor 24.") (emphasis added). The patent asserts that previous "digital rights management methods are in general not effective[,]" but fails to explain how its claimed invention improves upon these past methods. *Id.* at 1:20-21. Because the recited claim limitations, when considered individually or as an ordered combination, fail to transform the abstract idea of providing restricted access to content into a patent-eligible application, claim 10 should be held patent ineligible.

### B.   The '167 Patent Is Ineligible Under Section 101

The '167 patent is directed to the abstract idea of distributing the delivery of content among multiple actors. Rather than have a single computer server handle content requests from multiple devices, the '167 teaches distributing the load across additional servers known as relay servers. '167 patent at 2:9-13. This is akin to a professor recruiting a subset of students to help distribute copies of the latest assignment to the full class rather than individually passing out the assignment to each student. All the asserted claims of the '167 patent are directed towards this same abstract idea with minor differences in terminology, and the parties appear to agree that claim 1 is

representative.[3] Claim 1 recites:

> 1. A data communication network comprising: a plurality of terminals; and
>
> *a main server adapted to manage selective retrieval of data from a first server by at least one target terminal* selected from said plurality of terminals, said main server being distinct from said first server; and
>
> a network information database containing terminal performance information, wherein
>
> *at least two of said terminals are adapted to act as relay servers for serving data* retrieved from said first server to at least one target terminal; and wherein
>
> *the main server is adapted to send transport requests direct to at least one first target terminal* on the basis of said terminal performance information, and wherein the main server is further adapted to monitor response times of terminals in the network and in which terminals are selected to act as relay servers for a particular data transfers on the basis of their relative response times, and the first target terminal is adapted to act as relay server; and
>
> wherein each such *transport request includes details of data to be retrieved*, the address of the first server from which the data is to be requested by the first target terminal, the addresses of at least one second target terminal to which the data from the first server to be relayed by the first target terminal and an indication of a relative performance of a further target terminal based on the terminal performance information stored in the network information database; and
>
> wherein terminals adapted to act as *relay servers are adapted to modify transport requests* received from the main server or from other relay servers and to *transmit the modified transport request to selected target terminals* from a set of target terminals identified in the transport request, wherein the modified transport request further includes addresses of further target terminals for which the recipient of the modified transport request is to act as relay server; and
>
> *wherein data to be retrieved by said target terminals are divided into a series of packets* for transmission to said target terminals and each of said terminals is adapted to communicate directly with said main server to acknowledge receipt of the last packet of a series routed thereto.

Fundamentally, claim 1 relates to a network of generic computers in which a main computer or server determines how data is distributed from a media server to various terminals requesting content. *See* '167 patent at 2:14-17 ("All transactions between the media storage system 18 and the

---

[3] Valjakka's Infringement Contentions copy and paste the analysis from claim 1 into the remaining independent claims of the '167 patent. Further, both parties relied on independent claim 1 as representative of the '167 patent's alleged invention in their claim construction briefs. *See* ECF No. 62 at 1-2; ECF No. 63 at 4-5.

terminals 14, 16 are controlled by the main server 12. In particular, all data downloads to the terminals from the media storage system 18 are managed by the main server 12."), 3:42-45 ("FIG.1 may be implemented using an existing, conventional network infrastructure . . . and does not require a new physical network."). As the annotations above show, claim 1 relies on generic computers to perform generic computer functions such as sending and receiving requests, determining performance criteria, forwarding a request to the appropriate computer based on performance criteria, and transmitting data. Thus, claim 1 does not contain an inventive concept. As with the '102 patent, Valjakka's pleadings contain nothing to the contrary.

### 1. *Alice* Step One: Claim 1 of the '167 Patent Claims the Abstract Idea of Distributing Delivery of Content by Dividing and Conquering

Independent claim 1 is directed to the abstract idea of distributing the delivery of content among multiple actors. Several courts, including this Court, have found this divide-and-conquer approach to be abstract. *See Coho Licensing LLC*, 2017 WL 6210882, at *5 ("The Court finds that the asserted claims are directed to a basic concept of divide-and-conquer [and] recite the abstract idea of distributed processing—merely splitting up a job into smaller pieces to be completed by multiple participating computers in the hierarchy. It is a relatively simple and abstract idea . . . ."); *Appistry, Inc. v. Amazon.com, Inc.*, No. C15-311 MJP, 2015 WL 4210890, at *2 (W.D. Wash. July 9, 2015), *aff'd sub nom. Appistry, LLC v. Amazon.com, Inc.*, 676 F. App'x 1007 (Fed. Cir. 2017); ("The patents-in-suit recite the abstract idea of distributed processing akin to the military's command and control system . . . The patents describe systems and methods of using a network of multiple actors to efficiently and reliably process information and/or complete a task by breaking down the job into small pieces, each handled by a different actor organized within an internal hierarchy."); *Broadcom Corp. v. Netflix Inc.*, 598 F. Supp. 3d 800, 806-07 (N.D. Cal. 2022) (similarly finding that divide-and-conquer approach is directed to abstract idea).

Asserted claim 1 of the '167 patent is directed to a method of organizing human activity that is closely analogous to the real-world example of a professor handing out assignments. The professor (the "main server") manages retrieval of assignments from his desk ("retrieval of data from a first server"). The students in the classroom are analogous to "relay terminals" and "target

terminals." The professor initially selects a subset of students to deliver copies of the assignment to different sections of the class (selecting terminals that are "adapted to act as relay servers"). The professor provides a verbal message to each student that details which sections of the class they are responsible for, e.g., "student A take rows 1-3, student B take rows 4-6, and student C take rows 7-9" ("transport request"). That initial set of students can then further divide the task of handing out assignments by selecting a subset of students in their respective sections and providing further instructions, e.g., "student D take rows 10-12" ("relay servers" sending "modified transport requests to selected target terminals"). Eventually, each student will receive a copy of the assignment as the copies flow through the hierarchy of students passing them out. Thus, "[t]he plain language of Claim 1 and the specification make clear that the claim is drawn to the abstract idea of allocating tasks across a system of servers." *Broadcom,* 598 F. Supp. 3d at 807.

*Broadcom* is instructive. In *Broadcom*, the court determined that the '183 patent, teaching "a central processor that receives various jobs and then allocates those jobs to other servers in the system based on the capabilities and availabilities of those computers and what is needed for the jobs," claimed an abstract idea. *Id.* The Court reasoned that this was exactly "the sort of process that can be performed in the human mind, or by a human using a pen and paper," and that "countless other analogs can be found in everyday life stretching back through time . . . ." *Id.* (cleaned up). That reasoning applies here too. The '167 patent teaches a main server that receives various requests for content (i.e., jobs) and then allocates distribution of content to different computer terminals based on performance criteria (i.e., allocates based on computers' capabilities). '167 patent at 7:64-8:10. As explained above, this divide-and-conquer approach to distributing information—which is analogous to technology the Court has already held ineligible—long predates computers. As such, it is an abstract idea that flunks *Alice* step one.

### 2.   *Alice* Step Two: Claim 1 of the '167 Patent Contains No Inventive Step

The plain text of the '167 patent confirms that nothing in claim 1 is remotely a technological advance. "[T]he claims at issue do no more than simply instruct the practitioner to implement the abstract idea of distributed processing akin to command and control on generic computers, connected through generic networks." *Appistry,* 2015 WL 4210890, at *4. Claim 1 describes a

"communication network" comprising generic terminals and servers that send and receive messages, read performance information from a database, and transmit data. '167 patent at 7:64-8:38.

The Court's construction of "data" does not lift this claim from the realm of purely conventional.[4] *See Smartflash LLC v. Apple Inc.*, 680 F. App'x 977, 983 (Fed. Cir. 2017) ("[M]erely storing, transmitting, retrieving, and writing data to implement an abstract idea on a computer does not transform the nature of the claim into a patent-eligible application.") (internal quotation marks and citations omitted). Storing files on a server for subsequent use is no different than storing files in a file cabinet for subsequent use, save for the addition of computers. *See Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014) ("The concept of data collection, recognition, and storage is undisputedly well-known. Indeed, humans have always performed these functions."). Thus, "[t]he claims' invocation of computers adds no inventive concept because the functions performed by the computers at each step of the process are well-understood, routine, and purely conventional." *Appistry*, 2015 WL 4210890, at *4. "That a computer receives and sends [] information over a network . . . is not even arguably inventive." *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014).

Further, the limitations of claim 1 do not contain an inventive concept, either individually or as an ordered combination. An inventive concept must be "significantly more than a patent upon the ineligible concept itself." *Alice*, 573 U.S. at 217-18 (citation omitted). Here, claim 1 recites that the "main server" and "relay servers" determine where to send a "transport request" or "modified transport request" on the basis of "terminal performance information." That is not inventive. '167 patent at 3:42-45 (explaining that the invention "may be implemented using an existing, conventional network infrastructure (such as the Internet or equivalent) . . ."); *see also* 823 F.3d at 612–13 (server that performs "generic computer functions such as storing, receiving, and extracting data" is conventional). Indeed, the '167 patent itself acknowledges the trivial nature of the

---

[4] The Court construed data to mean "files or parts of files or equivalents thereof that are stored on a server, downloaded from the server by a terminal and stored by the terminal for subsequent use, as distinct from a stream of files or parts of files or equivalents thereof that is transmitted by a server and is temporarily buffered by terminals." Markman Order (ECF No. 73) at 16.

1    operation. *See* '167 patent at 5:26-29 ("The performance of different terminals . . . is measured

2    simply by measuring the response time between different terminals and by selecting the terminals

3    with shortest response times."). Additionally, limitations describing the contents of "transport

4    requests" and "modified transport requests" do not transform the claimed abstract idea into a patent-

5    eligible invention. The requests consist of information one would expect in a message sent between

6    networked computers—i.e., server addresses, performance information of other network terminals,

7    file type, file size, etc. *Id.* at 2:49-57 ("The transport request includes . . . file type and size, . . .

8    encryption and compression details, [and t]he addresses of relay servers and terminals . . . ."), 8:16-

9    24. As with "data," the Court's construction of "modified transport request" does not transform the

10   claim into an inventive concept.[5] The construction merely specifies the information contained in

11   the request—i.e., conventional network addresses. *Id.* at 2:49-57.

12           Finally, the limitation explaining that data "are divided into a series of packets for

13   transmission" simply acknowledges how data is transmitted over the Internet. "In effect, the

14   patents' 'numerous limitations' function only to limit the abstract idea of distributed processing

15   akin to command and control to a particular technological environment, namely, networked

16   computers." *Appistry,* 2015 WL 4210890, at *5. "As a matter of law, narrowing or reformulating

17   an abstract idea does not add 'significantly more' to it." *BSG Tech LLC v. Buyseasons, Inc.*, 899

18   F.3d 1281, 1291 (Fed. Cir. 2018).

19                   **3.      Dependent Claims 3-6 and 11-14 Are Also Invalid**

20           The asserted dependent claims offer no inventive step that renders claim 1 patent eligible.

21   Dependent claims 3 and 11 simply extend the abstract idea of distributing the delivery of content

22   among multiple actors to additional intermediate layers of relay servers that distribute data. *E.g.,*

23   '167 at 8:44-46 ("wherein terminals acting as relay servers are adapted to select further downstream

24   target terminals to act as further relay servers . . . ."). Returning to the student analogy, this is no

25   different than student D telling another student, G, to distribute papers to rows 19-21.

26           The remaining asserted dependent claims only describe well-understood and routine

27

28   ───────────────
     [5] The Court construed modified transport request to mean "transport request that is modified by a
     relay server to include addresses of further target terminals." Markman Order (ECF No. 73) at 16.

computer functionality. This includes communicating with a server (claims 5 and 13), relaying data (claims 4 and 12), and using the TCP/IP routing protocol (claims 6 and 14). *See Int'l Bus. Machines Corp. v. Zillow Grp., Inc.*, 50 F.4th 1371, 1380 (Fed. Cir. 2022) (finding that the addition of well-known techniques to a claimed solution did not add an inventive concept); '167 patent at 4:33-41 (explaining that conventional systems contained servers communicating via server sockets that used network protocols such as TCP/IP).

In short, none of the dependent claims "add sufficient substance to the underlying abstract idea" in order to render it patent eligible. *See Yu v. Apple Inc.*, 1 F.4th 1040, 1045 (Fed. Cir. 2021), *cert. denied*, 212 L. Ed. 2d 10 (Feb. 22, 2022). Thus, none of the asserted claims transform the abstract nature of the purported invention.

## C.      Leave to Amend Would Be Futile

Valjakka has had three chances to amend his complaint but has not added, and cannot add, any plausible factual allegations in support of patent eligibility. In *PersonalWeb*, this Court granted a Rule 12(c) motion on Section 101 grounds and denied leave to amend the complaint because the issue of patent ineligibility was a legal one and amendment would have been futile. The patentee there even urged the Court to convert the defendants' motion for judgment on the pleadings into one for summary judgment so that the Court could consider an expert declaration and discovery in support of patent eligibility, but the Court declined patentee's attempt to manufacture a factual dispute as inappropriate where the declaration and evidentiary exhibits were created in response to a motion for judgment on the pleadings. *Id.* (citing *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, No. CV 14-1006-RGA, 2016 WL 4373698, at *4 (D. Del. Aug. 15, 2016) (collecting cases)).

The Federal Circuit affirmed, finding that there were no alleged factual disputes over the specification's disclosure of an inventive concept that could have precluded a judgment on the pleadings: "What is needed is an inventive concept in the non-abstract application realm. . . . None of [patentee's] "improvements in the specification" fit that bill. Instead, they 'lie[ ] entirely in the realm of abstract ideas, with no plausibly alleged innovation in the non-abstract application realm.'" *PersonalWeb*, 8 F.4th 1310 at 1319 (quoting *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d at 1168).

1     The same applies here where the disclosures in the Asserted Patents are sufficient and

2    dispositive of the patent eligibility issue. First, neither patent can escape the realm of abstract ideas

3    because both patents claim fundamental methods of organizing human behavior and add no

4    inventive concepts beyond that. Second, there are no genuine issues of material fact created by the

5    disclosures in the Asserted Patents. Indeed, at no point in this litigation has Valjakka suggested that

6    any Section 101 issues could turn on factual disputes. Third, Valjakka's pleadings—despite three

7    separate attempts to amend those pleadings—are devoid of any allegations that the patents contain

8    an inventive idea. *See* Third Am. Compl. (ECF No. 74). Finally, there is no claim construction

9    dispute that would preclude a finding of patent ineligibility. In fact, Valjakka argued that every

10   claim term should be accorded its plain and ordinary meaning. *See* Valjakka's Opening Claim

11   Construction Br. (ECF No. 62); *see also Mortg. Application Techs., LLC v. MeridianLink, Inc.*, 839

12   F. App'x 520, 524–25 (Fed. Cir. 2021) (affirming Rule 12(c) motion to dismiss on Section 101

13   grounds and noting that patentee failed to raise any claim construction dispute, did not provide any

14   proposed claim constructions beyond the plain and ordinary meaning, and did not explain how any

15   proposed construction would change the Section 101 analysis). As such, judgment on the pleadings

16   should be granted, and the Third Amended Complaint should be dismissed without leave to amend.

17   **V.**   **CONCLUSION**

18    Netflix respectfully requests that the Court grant its motion for judgment on the pleadings

19   and dismiss Valjakka's case with prejudice.

20

21

22

23

24

25

26

27

28

1    Dated: January 17, 2023                    **PERKINS COIE LLP**

2

3                                               By: */s/ Sarah E. Piepmeier*
                                                    Sarah E. Piepmeier, Bar No. 227094
4                                                   SPiepmeier@perkinscoie.com
                                                    Elise S. Edlin, Bar No. 293756
5                                                   EEdlin@perkinscoie.com
                                                    PERKINS COIE LLP
6                                                   505 Howard Street, Suite 1000
                                                    San Francisco, California 94105
7                                                   Telephone: +1.415.344.7000
                                                    Facsimile:  +1.415.344.7050
8
                                                    Janice L. Ta, (admitted *pro hac vice*)
9                                                   JTa@perkinscoie.com
                                                    PERKINS COIE LLP
10                                                  405 Colorado Street, Suite 1700
                                                    Austin, Texas 78701
11                                                  Telephone: +1.737.256.6100
                                                    Facsimile:  +1.737.256.6300
12
                                                    Jassiem N. Moore, (admitted *pro hac vice*)
13                                                  JassiemMoore@perkinscoie.com
                                                    PERKINS COIE LLP
14                                                  1201 Third Avenue, Suite 4900
                                                    Seattle, Washington 98101-3099
15                                                  Telephone: +1.206.359.8000
                                                    Facsimile:  +1.206.359.9000
16
                                                    *Attorneys for Netflix, Inc.*
17

18

19

20

21

22

23

24

25

26

27

28