SPiepmeier@perkinscoie.com
Elise Edlin, Bar No. 293756
EEdlin@perkinscoie.com
PERKINS COIE LLP
505 Howard Street, Suite 1000
San Francisco, California 94105
Telephone: +1.415.344.7000
Facsimile:  +1.415.344.7050

Janice L. Ta (admitted pro hac vice)
JTa@perkinscoie.com
PERKINS COIE LLP
405 Colorado Street Suite 1700
Austin, Texas 78701
Telephone: +1.737.256.6100
Facsimile:  +1.737.256.6300

Jassiem N. Moore, (admitted pro hac vice)
JassiemMoore@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Telephone: +1.206.359.8000
Facsimile:  +1.206.359.9000

Brianna Kadjo, Bar No. 303336
BKadjo@perkinscoie.com
PERKINS COIE LLP
1900 Sixteenth Street, Suite 1400
Denver, Colorado 80202-5255
Telephone: +1.303.291.2300
Facsimile:  +1.303.291.2400

*Attorneys for Defendant*
*NETFLIX, INC.*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| LAURI VALJAKKA, | Case No. 4:22-cv-01490-JST |
| *Plaintiff,* | **DEFENDANT NETFLIX, INC.'S FIRST AMENDED ANSWER TO PLAINTIFF'S THIRD AMENDED COMPLAINT, ADDITIONAL DEFENSES, AND COUNTERCLAIMS** |
| v. | |
| NETFLIX, INC., | |
| *Defendant.* | Judge:    Hon. Jon S. Tigar |

Defendant Netflix, Inc. ("Netflix") hereby files its First Amended Answer, Additional Defenses, and Counterclaims to Lauri Valjakka's ("Mr. Valjakka's" or "Plaintiff's") Third Amended Complaint for Patent Infringement ("Complaint"). The response below reflects the current status of Netflix's knowledge and belief regarding the subject matter of the allegations. Unless specifically admitted below, Netflix denies each and every allegation, claim, and prayer for relief contained in the Complaint. Netflix's use of titles and headings found in the Complaint is solely for ease of reference and should not be construed to admit any allegations contained in them.

<b><u>PARTIES</u></b>

1.     Netflix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 1 of the Complaint and therefore denies on that basis.

2.     Admitted.

3.     Denied.

<b><u>JURISDICTION</u></b>

4.     To the extent paragraph 4 of the Complaint consists of conclusions of law, no response is required. Netflix admits that the Complaint purports to bring an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 1, *et seq.*, but denies that it has committed any acts that would give rise to any cause of action asserted in the Complaint. For purposes of this action only, Netflix admits that this Court has subject matter jurisdiction over this action, but denies all other allegations.

5.     To the extent paragraph 5 of the Complaint consists of conclusions of law, no response is required. For the purposes of this action only, Netflix does not contest personal jurisdiction in this Court with respect to the particular products and particular allegations identified in the Complaint. Netflix denies that it has committed any acts that would give rise to any cause of action asserted in the Complaint. Netflix denies all remaining allegations in this paragraph.

6.     To the extent paragraph 6 of the Complaint consists of conclusions of law, no response is required. Netflix does not contest personal jurisdiction in this Court with respect to the particular products and particular allegations identified in the Complaint. Netflix denies that it has

committed any acts in this District or in the State of California that would give rise to any cause of action asserted in the Complaint. Netflix denies all remaining allegations in this paragraph.

7.     Netflix admits that it is registered to do business in the State of California and has transacted business in this District. Netflix denies that it has committed any acts that would give rise to any cause of action asserted in the Complaint. Netflix denies all remaining allegations in this paragraph.

8.     To the extent paragraph 8 of the Complaint consists of conclusions of law, no response is required. Netflix does not contest personal jurisdiction in this Court with respect to the particular products and particular allegations identified in the Complaint. Netflix denies that it has committed any acts that would give rise to any cause of action asserted in the Complaint. Netflix denies all remaining allegations in this paragraph.

9.     To the extent paragraph 9 of the Complaint consists of conclusions of law, no response is required. Netflix does not contest personal jurisdiction in this Court with respect to the particular products and particular allegations identified in the Complaint. Netflix admits that it advertises and makes its products available within this District. Netflix admits that it has advertised to hire employees to be located in this District. Netflix denies that it has committed any acts that would give rise to any cause of action asserted in the Complaint. Netflix denies all remaining allegations in this paragraph.

10.     Denied.

11.     To the extent paragraph 11 of the Complaint consists of conclusions of law, no response is required. Netflix does not contest that venue is proper in this Court with respect to the particular products and particular allegations identified in the Complaint. Netflix admits that its principal address is 100 Winchester Circle, Los Gatos, CA 95032. Netflix denies that it has committed any acts that would give rise to any cause of action asserted in the Complaint. Netflix denies all remaining allegations in this paragraph.

## THE PATENTS-IN-SUIT

12.     To the extent paragraph 12 of the Complaint consists of conclusions of law, no response is required. Netflix admits that what purports, on its face, to be United States Patent

No. 8,495,167 ("the '167 Patent") entitled "Data Communications Networks, Systems, Methods and Apparatus" and issued on July 23, 2013, naming inventor Lauri Valjakka, is attached to the Complaint as Exhibit A. Netflix lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 12 of the Complaint and therefore denies on that basis.

13.     To the extent paragraph 13 of the Complaint consists of conclusions of law, no response is required. Netflix admits that what purports, on its face, to be United States Patent No. 10,726,102 ("the '102 Patent") entitled "Method of and System for Providing Access to Access Restricted Content to a User" and issued on July 28, 2020, naming inventor Lauri Valjakka, is attached to the Complaint as Exhibit B. Netflix lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 13 of the Complaint and on that basis denies them.

14.     Netflix admits that the Complaint uses the term "patents-in-suit" to refer to the '167 and '102 patents but denies that the '167 and '102 patents are valid or enforceable under the United States Patent Laws.

15.     Netflix lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 15 of the Complaint and on that basis denies them.

**ACCUSED INSTRUMENTALITIES**

16.     Netflix admits that the Complaint uses the terms "Accused Instrumentalities" or "Accused Products" to refer to "Netflix's Open Connect program and Netflix websites (e.g., https://www.netflix.com)," but denies that Netflix's Open Connect program and Netflix's website (https://www.netflix.com) or any other Netflix products and/or services infringe any valid or enforceable claim of the Patents-in-Suit.

**COUNT I**

**(ALLEGED PATENT INFRINGEMENT OF THE '167 PATENT)**

17.     Netflix incorporates its responses to the preceding paragraphs as if fully set forth herein.

18.     Denied.

19.     Denied.

20.     Denied.

21.     Netflix admits that Exhibit D to the Complaint attaches a letter from Lauri Valjakka dated September 29, 2014, purportedly sent via United States Postal Service Certified Mail to Gregory K. Peters of Netflix. Netflix denies every other allegation of paragraph 21.

22.     Denied.

23.     Netflix denies that its products and/or services infringe any valid or enforceable claim of the Patents-in-Suit and that there was or is any need or basis to design around the claims of the '167 Patent once Netflix became aware of the patent and Plaintiff's allegations.

24.     Denied.

25.     Netflix admits that its products and/or services are available to customers throughout the United States and the State of California, including in this District, but denies that any such products and/or services infringe any valid or enforceable claim of the Patents-in-Suit.

26.     Denied.

27.     Netflix admits that Exhibit C to the Complaint attaches an exemplary claim chart. Netflix denies every other allegation of paragraph 27, including that the Accused Products infringe any valid or enforceable claim of the Patents-in-Suit.

## COUNT II

## (ALLEGED PATENT INFRINGEMENT OF THE '102 PATENT)

28.     Netflix incorporates its responses to the preceding paragraphs as if fully set forth herein.

29.     Denied.

30.     Denied.

31.     Netflix denies that its products and/or services infringe any valid or enforceable claim of the Patents-in-Suit and that there was or is any need or basis to design around the claims of the '102 Patent once Netflix became aware of the patent and Plaintiff's allegations.

32.     Denied.

33.     Netflix admits that its products and/or services are available to customers throughout the United States and in the State of California, including in this District, but denies that any such products and/or services infringe any valid or enforceable claim of the Patents-in-Suit.

34.     Denied.

35.      Netflix admits that Exhibit C to the Complaint attaches an exemplary claim chart. Netflix denies every other allegation of paragraph 35, including that the Accused Products infringe any valid or enforceable claim of the Patents-in-Suit.

### PRAYER FOR RELIEF

36.     Netflix denies any factual assertions contained in Plaintiff's Prayer for Relief, and further denies that Plaintiff is entitled to the relief he seeks or any other relief. Netflix denies any express or implied allegation within this paragraph that it has infringed, or is now infringing, any patent, and denies that Plaintiff is entitled to damages, injunctive relief, enhanced or treble damages, attorney's fees, or any other relief. Netflix also denies that this is an exceptional case pursuant to 35 U.S.C. § 285 based on any action taken by Netflix. Netflix denies any liability to Plaintiff, denies that Plaintiff is entitled to any relief from Netflix, and denies each allegation contained in Plaintiff's Prayer for Relief. To the extent that any allegations in the Complaint have not been specifically admitted or denied, Netflix denies them.

### NETFLIX'S ADDITIONAL DEFENSES

37.     Netflix incorporates by reference the foregoing paragraphs in their entirety and asserts the following additional defenses. In asserting these defenses, Netflix does not admit that it bears the burden of proof on any issue and does not accept any burden it would not otherwise bear. Netflix reserves all other defenses pursuant to Rule 8(c) of the Federal Rules of Civil Procedure, the Patent Laws of the United States, and any other defenses, at law or in equity, that now exist or in the future may be available based on discovery and further factual investigation in this case.

### First Additional Defense (Lack of Standing)

38.     Plaintiff lacks clear title and standing to sue for infringement as the rightful owner of the Patents-in-Suit. For example, Plaintiff does not own the '167 Patent and therefore lacks

standing to pursue a claim of patent infringement asserting that patent. Netflix hereby incorporates paragraphs 3-55 of the Counterclaims below.

**Second Additional Defense (Non-Infringement)**

39.     Netflix has not infringed, and does not infringe, under any theory of infringement, any valid, enforceable claim of the Patents-in-Suit, whether directly, indirectly, contributorily, through the doctrine of equivalents, or otherwise, and is not inducing and has not induced others to infringe the Patents-in-Suit. To the extent Plaintiff alleges indirect infringement, Netflix is not and has not knowingly caused indirect infringement by any third party of any valid or enforceable claim of the Patents-in-Suit, and the Accused Products have substantial non-infringing uses.

**Third Additional Defense (Invalidity)**

40.     Each asserted claim of the Patents-in-Suit is invalid for failure to comply with one or more of the statutory requirements specified in Title 35 of the United States Code, including, but not limited to 35 U.S.C. §§ 101, 102, 103, 112, 116, 119, and/or 120.

41.     For example, and without limitation, each of the asserted claims of the '167 Patent are directed to the unenforceable, abstract idea of distributing the delivery of content among multiple actors. Each claim element of the asserted claims recites only features that are well-understood, routine, and conventional, and nothing in the claims transforms the abstract idea into an inventive concept.

42.     For example, and without limitation, each of the asserted claims of the '102 Patent are directed to the unenforceable, abstract idea of providing restricted access to content using multiple levels of validation. Each claim element of the asserted claims recites only features that are well-understood, routine, and conventional, and nothing in the claims transforms the abstract idea into an inventive concept.

43.     For example, and without limitation, at least the following prior art references anticipate and/or render obvious (when considered in combination with each other), the claims of the '167 Patent that are identified in the Complaint: U.S. Patent Nos. 6,912,514; 6,950,431; 6,970,939; 7,139,827; 7222,186; 7,228,416; 7,373,103; 5,905,952; 7,398,312; 6,708,213; 8,392,611; 7,149,797; U.S. Patent Application No. 2006/0114350; and Publication Nos. WO

00/65776; WO 01/22688; HU 222,337; EP 0726663; EP 0863646; EP 0709994; Publications Zegura et al., Application-Layer Anycasting: A Server Selection Architecture and Use in a Replicated Web Service; Kung et al., Hierarchical Peer-to-Peer Networks; Amini et al., Distribution Requirements for Content Internetworking; Green et al., Content Internetworking Architectural Overview; Cisco Systems, Inc., Close Encounters: Cisco end-to-end solution pushes streaming and other feature-rich content closer to end users; Cisco Systems, Inc., Speeding and Scaling Web Sites Using Cisco Content-Delivery Technology White Paper; and Prior Art Systems Cisco Systems, Inc., Cisco Content Delivery Network (CDN); Inktomi Corporation, Inktomi Content Distributor; F5 Networks, Inc., Global-Site Controller; and Starburst Software, Inc., StarBurst OmniCast.

44.     For example, and without limitation, at least the following prior art references anticipate and/or render obvious (when considered in combination with each other), the claims of the '102 Patent that are identified in the Complaint: U.S. Patent Nos. 6,891,953; and 8,359,473; U.S. Patent Application Nos. 2016/0198202; 2003/0161473; 2004/0064714; 2004/0098592; 2002/0018566; 2007/0208711; 2010/0185868; 2008/0071617; 2008/0098212; 2005/0018854; 2010/0174608; 2012/0042389; and Publication No. KR 101103403 B1; Publications William Rosenblatt, William Trippe, Stephen Mooney, Digital Rights Management; Ramya Venkataramu, Analysis and Enhancement of Apple's Fairplay Digital Rights Management; Eric Rescorla, SSL and TLS: Designing and Building Secure Systems; Naganand Doraswamy, Dan Harkins, IPSec: The New Security Standard for the Internet, Intranets, and Virtual Private Networks (Second Edition); H. Krawczyk, M. Bellare, R. Canetti, HMAC: Keyed-Hashing for Message Authentication (RFC 2104); Bruce Schneier, E-Mail Security: How to Keep Your Electronic Messages Private; David K. Gifford, Cryptographic Sealing for Information Secrecy and Authentication; and S. Kent, IP Encapsulating Security Payload (ESP) (RFC 2406); and Prior Art Systems the Apple FairPlay system, the Google WideVine system, and the Microsoft PlayReady system.

45.     The '167 Patent is also invalid due to improper and/or incorrect inventorship, including nonjoinder under 35 U.S.C. §§ 101, 111, 115, 116, 282, and/or pre-AIA 35 U.S.C.

§ 102(f) for Mr. Valjakka's intentional omission of Iiro Karesniemi as a co-inventor of the '167 Patent. Netflix hereby incorporates paragraphs 13-32 and 113-122 of the Counterclaims below.

### Fourth Additional Defense (Failure to Mark)

46.     On information and belief, Plaintiff's claims for recovery are barred or limited, in whole or in part, prior to the date on which Netflix received actual notice of Plaintiff's allegations of infringement concerning the Patents-in-Suit, including under 35 U.S.C. § 287.

### Fifth Additional Defense (Prosecution Admissions & Estoppel)

47.     Plaintiff's claims are barred, in whole or in part, based upon prosecution history estoppel, prosecution history disclaimer, and/or the internally inconsistent litigation positions Plaintiff or his predecessors-in-interest have explicitly or implicitly taken with respect to the Patents-in-Suit in proceedings before the USPTO in the prosecution of the Patents-in-Suit. As a result, Plaintiff is estopped to maintain that the claims of the Patents-in-Suit are of such scope or have effect against any apparatus made, used, or sold by Netflix.

### Sixth Additional Defense (Equitable Doctrines)

48.     Plaintiff's claims and relief sought in his Complaint are barred, in whole or in part, by equitable doctrines including, without limitation, license, waiver, acquiescence, estoppel, and/or unclean hands based on his past actions and omissions, which are contrary to the claims and relief he now seeks. Netflix hereby incorporates paragraphs 13-102 of the Counterclaims below.

### Seventh Additional Defense (Limitation on Damages)

49.     Plaintiff's claims for monetary damages, if any, are limited by the statute of limitations and by 35 U.S.C. §§ 286, 287, and/or 288. Plaintiff is not entitled to any purported damages suffered more than six (6) years prior to the filing of the Complaint.

50.     Plaintiff's claims for monetary damages are also barred because Plaintiff is not entitled to past damages that occurred prior to the assignment agreement for the '167 Patent, signed in 2021, which does not provide a right to sue for past infringement or collect past damages.

### Eighth Additional Defense (Inequitable Conduct)

51.     The Complaint and the purported claims for relief therein are barred because the Patents-in-Suit, and each claim thereof, are unenforceable due to inequitable conduct, as set forth

below in Netflix's Counterclaims. Netflix hereby incorporates paragraphs 13-97 of the Counterclaims below.

## RESERVATION OF RIGHTS

52.    Netflix expressly reserves the right to assert any other legal or equitable defenses to which it is shown to be entitled, including all affirmative defenses under Rule 8(c) of the Federal Rules of Civil Procedure, the Patent Laws of the United States, and any other defenses that may now exist or in the future be available based on discovery or further factual investigation in this case.

## PRAYER FOR RELIEF

WHEREFORE, Defendant Netflix respectfully requests the following relief:

A. A dismissal with prejudice of Mr. Valjakka's Complaint against Netflix;

B. A denial of any and all relief sought by Mr. Valjakka;

C. A declaration that Mr. Valjakka lacks title and standing to sue for infringement because Mr. Valjakka is not the rightful owner of the '167 Patent;

D. A declaration that Netflix has not infringed any of Mr. Valjakka's patent rights and is not directly or indirectly infringing any asserted claim of the Patents-in-Suit;

E. A declaration that the claims of the Patents-in-Suit are invalid for failure to comply with one or more of the statutory requirements specified in Title 35 of the United States Code, including, but not limited to 35 U.S.C. §§ 101, 102, 103, 112, 116, 119, and/or 120;

F. A declaration that the Patents-in-Suit, and each claim thereof, are unenforceable due to inequitable conduct;

G. A judgment that this case is exceptional under 35 U.S.C. § 285;

H. A judgment awarding Netflix its costs and attorneys' fees; and

I.   That Netflix be granted such other and additional relief as this Court deems just, equitable, and proper.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### NETFLIX'S COUNTERCLAIMS

Netflix hereby alleges, on knowledge as to its own actions and upon information and belief as to all other matters, as follows:

### PARTIES

1.      Netflix, Inc. is a Delaware corporation with a principal address of 100 Winchester Circle, Los Gatos, CA 95032.

2.      On information and belief, Plaintiff Lauri Valjakka is a citizen of Finland having an address located at Valtakatu 51, Vapaudenaukio Technopolis 2, 53100 Lappeenranta, Finland.

### JURISDICTION AND VENUE

3.      Subject to Netflix's affirmative defenses and denials, Netflix alleges that this Court has jurisdiction over the subject matter of these Counterclaims under, without limitation, 28 U.S.C. §§ 1331, 1338(a), 2201 *et seq*., and the patent laws of the United States, 35 U.S.C. § 1 *et seq.*

4.      This Court has personal jurisdiction over Mr. Valjakka at least because, in filing patent infringement actions against Netflix in the Northern District of California, Mr. Valjakka has submitted to the personal jurisdiction of this Court.

5.      To the extent venue is proper for Mr. Valjakka's claims, based solely on Mr. Valjakka's filing of this action, venue is also proper for Netflix's counterclaims under 28 U.S.C. §§ 1391 and 1400(b) for purposes of this action. Moreover, Mr. Valjakka has consented to venue in this District at least by bringing this action in this District.

6.      Mr. Valjakka's Complaint alleges infringement of U.S. Patent Nos. 1,495,167 ("the '167 Patent") and 10,726,102 ("the '102 Patent") ("Asserted Patents").

7.      The '167 Patent is titled "Data Communications Networks, Systems, Methods and Apparatus" and apparently issued on July 23, 2013, naming inventor Lauri Valjakka.

8.      The '102 Patent is titled "Method of and System for Providing Access to Access Restricted Content to a User" and apparently issued on July 28, 2020, naming inventor Lauri Valjakka.

9.      Mr. Valjakka holds himself out as the purported owner of the '167 and '102 Patents.

10.     In his Complaint, Mr. Valjakka asserts that Netflix has infringed the '167 and '102 Patents.

11.     Pursuant to 28 U.S.C. § 2201(a), an actual and justiciable controversy has arisen and exists between Netflix and Mr. Valjakka. Netflix is entitled to a judicial determination and declaration that Mr. Valjakka does not have rights, title, and interests in the '167 patent, and therefore lacks standing to assert the '167 Patent against Netflix; that Netflix has not infringed and is not infringing the '167 Patent; and that the '167 Patent is invalid. Netflix is also entitled to a judicial determination and declaration that the '167 '102 Patents are unenforceable at least because of Mr. Valjakka's inequitable conduct and acts of unclean hands before the U.S. Patent and Trademark Office ("USPTO").

12.     Netflix is entitled to a judicial determination and declaration that it has not infringed and is not infringing the '102 Patent, and that the '102 Patent is invalid and unenforceable.

## FACTUAL BACKGROUND

13.     Mr. Valjakka does not have standing to assert the '167 Patent against Netflix or any other defendants in federal court. This is because Mr. Valjakka does not own the '167 Patent, and he has known this fact since at least 2010—more than a decade before filing this lawsuit.

14.     Worse, Mr. Valjakka has known that he has no rights to any underlying invention of the '167 Patent since even before the issuance of that patent. And he was only able to secure issuance of that Patent by submitting incomplete disclosures to the USPTO that made it appear as though he owned full rights to the alleged invention when he did not.

15.     He was also able to secure issuance of the '167 Patent by misrepresenting and failing to disclose the significant contributions of another co-inventor, Mr. Iiro Karesniemi, to the conception and reduction to practice of material aspects of the '167 patent invention. In doing so, Mr. Valjakka convinced the USPTO to remove Mr. Karesniemi as a named inventor on the '167 patent without Mr. Karesniemi's knowledge, permission, or consent. Mr. Valjakka's intentional misrepresentations to the USPTO amount to fraud and render the '167 Patent unenforceable due to his inequitable conduct.

16.     In reality, and as described more fully below, the rights to the invention of the '167 Patent had long been assigned to a company called Suomen Biisi Oy ("Suomen Biisi") through a complicated series of agreements that Mr. Valjakka is well aware of.

17.     Indeed, Mr. Valjakka knew that he had no rights and no title to the alleged invention of the '167 Patent because he and Suomen Biisi were involved in a years-long contract dispute concerning whether an alleged breach of a December 20, 2005 DMTS Utilization Agreement caused rights to the invention of the '167 Patent to revert from Suomen Biisi back to Mr. Valjakka.

18.     On or around January 26, 2009, a Helsinki District Court decisively held that Suomen Biisi was the rightful owner of the '167 Patent, and that no rights had reverted to Mr. Valjakka under the DMTS Utilization Agreement. *See* Exhibit 1 (LV_002216 at 2222–26) (Jan. 26, 2009, Decision from Helsinki District Court); Exhibit 2 (NFX-VALJ-0011077 at 11083–87) (English Translation of Jan. 26, 2009, Decision from Helsinki District Court).

19.     That decision was upheld by the Helsinki Court of Appeal on March 24, 2010. *See* Exhibit 1 (LV_002216 at 2216–21) (Mar. 24, 2010, Decision from Helsinki Court of Appeals); Exhibit 2 (NFX-VALJ-0011077 at 11077–82) (English Translation of Mar. 24, 2010, Decision from Helsinki Court of Appeals).

20.     To this day, no rights in the '167 Patent have reverted back to Mr. Valjakka by operation of the DMTS Utilization Agreement.

### *Iiro Karesniemi Conceived and Reduced to Practice Key Limitations of the '167 Patent*

21.     Around 1997, Mr. Valjakka founded a company called e-3 Solutions Oy (Ltd.) ("e-3 Solutions"). In 2002, Mr. Valjakka hired Mr. Iiro Karesniemi as a software engineer to design, develop, and commercialize the so-called "DMTS" system that is alleged to embody the purported invention of the '167 Patent.

22.     On or around August 2, 2001, Mr. Valjakka filed the European patent application that eventually became European Patent No. 01660145 ("EP01660145"), the European counterpart to the '167 Patent. EP01660145 issued on August 30, 2006 and is titled "Terminals adapted to act as relay servers for distributing packets in a client-server network." The European patent names both Mr. Valjakka and Mr. Karesniemi as co-inventors.

23.     On or around July 30, 2002, Mr. Valjakka and Mr. Karesniemi filed U.S. Patent App. No. 10/208,685 ("'685 Application"), which would eventually become the '167 Patent. The '167 Patent has a similar specification and patent claims and also claims priority to EP01660145.

24.     The '685 Application originally identified both Mr. Valjakka and Mr. Karesniemi as co-inventors. But unlike its European counterpart (EP01660145), when the '167 Patent finally issued over a decade later on July 23, 2013—and after a long and sordid prosecution history—Mr. Valjakka emerged as the sole named inventor. Despite Mr. Karesniemi's significant contributions to the '167 Patent, he was dropped as a co-inventor of the '167 Patent under false pretenses.

25.     During prosecution of the application that ultimately issued as '167 Patent, Mr. Valjakka was aware that Mr. Karesniemi conceived and reduced to practice key aspects of the alleged invention of the '167 Patent. Mr. Karesniemi's contributions enabled Mr. Valjakka to obtain issuance of the '167 Patent. Mr. Valjakka's contributions were non-technical, while Mr. Karesniemi's contributions were so significant that Mr. Valjakka and counsel added Mr. Karesniemi as a co-inventor on both applications.

26.     For example, Mr. Karesniemi made specific and significant contributions to the invention of the '167 Patent, including, on information and belief, by conceiving the definite idea in order to make the data communications network operable and reducing the system to practice. Without Mr. Karesniemi's contributions, there would have been no functional system.

27.     Mr. Karesniemi also helped to draft the patent claims and specification that were eventually submitted with the '685 Application. For example, on information and belief, Mr. Karesniemi helped explain the capabilities of the claimed "target terminal" and what information the "target terminal" needed to receive. Mr. Karesniemi explained that the target terminal needed to receive information about the data being requested, source terminal addresses, and further target terminal addresses. He also clarified that the target terminal requests data as packets from the main server or relay terminal, and relays data after a predefined amount of information is received. He further clarified that the target terminal addresses are included in the data transfer request, and that an acknowledgment is sent to the main server. These contributions from Mr. Karesniemi are significant limitations of at least Claim 1 of the '167 Patent.

28.     Furthermore, Mr. Valjakka justified removal of Mr. Karesniemi as an inventor based on his cancellation of original claims 9 and 26, which address "wherein the relative performances of said further relay servers are indicated in said transport request by ranking the addresses of the further target terminals in an ordered list." During prosecution, the applicants thus acknowledged that Mr. Karesniemi was at least an inventor of the subject matter recited in claims 9 and 26. But the ranking of target terminal addresses in an ordered list in a transport request is not relevant to only claims 9 and 26 because it is also the only solution presented in the specification for accomplishing the method of the independent claims, which requires that the each "transport request includes . . . an indication of a relative performance of a further target terminal based on the terminal performance information stored in the network information database." And thus, Mr. Karesniemi's contributions to original dependent claims 9 and 26 are also inherently a part of his contributions to each of the independent claims.

29.     After Mr. Karesniemi left his employment as a software engineer at e-3 Solutions, Mr. Valjakka continued to ask Mr. Karesniemi for his help in prosecuting the application that led to the issuance of the '167 Patent.

30.     Mr. Karesniemi's contributions as an inventor of the claimed technologies were significant enough for Mr. Valjakka to recognize him as a named co-inventor of the European counterpart to the '167 Patent, EP01660145.

31.     In 2005, Mr. Valjakka even acknowledged in a bill of sale that the "main inventor[s]" of the claimed invention "[are] Lauri Valjakka and hired co-inventor Iiro Karesniemi."

32.     But for Mr. Karesniemi's significant contributions to the conception and reduction to practice of key claim limitations of the '167 Patent, the '167 Patent would not have issued.

### *Mr. Valjakka Assigned the Rights, Title, and Interest in the '685 Application and the Claimed Invention to Suomen Biisi*

33.     On or around November 29, 2001, Mr. Karesniemi executed an employment agreement in which he assigned his rights in the '685 Application and the claimed invention to e-3 Solutions. *See* Exhibit 3 (LV2_001108 at 1116) (Karesniemi Employment Agreement).

34.    In 2003, Mr. Valjakka re-organized e-3 Solutions Oy (Ltd.) as e-3 Systems Ltd. Oy (Ltd.) ("e-3 Systems").

35.    However, when e-3 Systems was formed, Mr. Valjakka did not record any assignment of rights to the '685 Application from e-3 Solutions to e-3 Systems. Mr. Karesniemi's rights to the '685 Application therefore remained with e-3 Solutions.

36.    In 2005, Mr. Valjakka sold e-3 Systems to Suomen Biisi. Despite that sale, e-3 Solutions still held Mr. Karesniemi's rights to the '685 Application. Moreover, at the time of the sale, there was no assignment of Mr. Valjakka's interest in the '685 Application to any other party. As such, the sale of assets from e-3 Systems to Suomen Biisi alone did not transfer any rights in the '685 Application from Mr. Karesniemi or Mr. Valjakka to Suomen Biisi.

37.    Recognizing this problem, Mr. Valjakka attempted to correct the chain of ownership by filing a set of three *nunc pro tunc* agreements to retroactively grant rights to the '685 Application.

38.    On or around August 28, 2007, Mr. Valjakka executed the first *nunc pro tunc* agreement to retroactively assign his rights in the claimed invention to e-3 Solutions, effective October 2, 2002. *See* Exhibit 4 (LV2_000220). Through this first *nunc pro tunc* agreement, both Mr. Valjakka's and Mr. Karesniemi's rights in the clamed invention were transferred to e-3 Solutions.

39.    In the second *nunc pro tunc* agreement, Mr. Valjakka transferred the rights in the claimed invention from e-3 Solutions to e-3 Systems, retroactively effective to June 4, 2003. *See* Exhibit 4 (LV2_000220).

40.    Finally, in the third *nunc pro tunc* agreement, Mr. Valjakka transferred the rights to the claimed invention from e-3 Systems to Suomen Biisi Oy, retroactively effective to November 16, 2005. *See* Exhibit 5 (LV2_000415).

41.    Thus, as of November 16, 2005, Suomen Biisi owned the rights to the '685 Application and the claimed invention of the '167 Patent based on a chain of title that was retroactively created through these three nunc pro tunc agreements. Suomen Biisi obtained the patent rights from e-3 Systems, not from Mr. Valjakka.

42.     Below is a chart showing the chain of title based on the three *nunc pro tunc* agreements that Mr. Valjakka signed and recorded in 2007.  On information and belief, the *nunc pro tunc* agreements were made to effectuate the intent behind the 2005 sale of e-3 Systems to Suomen Biisi..



**In 2009, a Helsinki District Court Held That the 2005 DMTS Utilization Agreement Did Not Revert Rights to the '167 Patent from Suomen Biisi to Mr. Valjakka**

43.     On December 20, 2005, in addition to the Bill of Sale transferring rights from e-3 Systems, Mr. Valjakka separately entered into a so-called "DMTS Utilization Agreement" with Suomen Biisi.  *See* Exhibit 6 (LV2_002913 at 2920).

44.     The DMTS Utilization Agreement governed Suomen Biisi's rights to commercially exploit the DMTS technology. Clause 8 of the DMTS Utilization Agreement provided for a reversion of rights in the DMTS technology from Suomen Biisi to Mr. Valjakka (and Juha Setälä and Pekka Pakarinen) under certain enumerated circumstances, including if Suomen Biisi fails to prosecute the '167 Patent. *Id.*

45.     In 2008, Mr. Valjakka filed suit against Suomen Biisi in the Helsinki District Court asking the court to find that he was the rightful owner of the invention claimed in the issued European Patent EP 1421759 and related pending applications, including the '685 Application that later issued as the '167 Patent, alleging that rights should have reverted to him under Clause 8 of the DMTS Utilization Agreement based on Suomen Biisi's failure to fulfil its financial obligations under the agreement and failure to make payments related to the registration of the patent.

46.     On January 26, 2009, the Helsinki District Court issued its ruling, rejecting Mr. Valjakka's request and finding that the patent rights transferred to Suomen Biisi as of

November 16, 2005, by operation of the nunc pro tuncs that he filed in 2007, a year before he brought suit. Under the nunc pro tunc agreements, Mr. Valjakka transferred his rights to e-3 Solutions in 2002, which later passed through e-3 Systems to Suomen Biisi.  As such, Mr. Valjakka had no rights to transfer to Suomen Biisi under the later-executed DMTS Utilization Agreement— which was executed on December 20, 2005.

47.     The Court thus held that there were no rights that could have reverted under Clause 8 of the DMTS Utilization Agreement because Mr. Valjakka had no rights to transfer under the DMTS Utilization Agreement, since he already assigned all his rights to Suomen Biisi before the effective date of the DMTS Utilization Agreement.

48.     The Helsinki District Court thus conclusively held that Mr. Valjakka was not the rightful owner of EP 1421759 and related pending applications, including the '685 Application that later issued as the '167 Patent.

49.     As a result, the Helsinki District Court found that, "It has been undisputed in the case that according to the patent register, the holder of patent EP1421759 granted to invention concerning 'terminal devices adapted to serve as proxy servers in the distribution of packets in customer/server data networks' is Suomen Biisi Oy."

50.     The Helsinki District Court further found that Mr. Valjakka and Suomen Biisi had held meetings on March 22, 2007, and March 27, 2007, where Mr. Valjakka agreed that it "had been unanimously stated in the meetings that all rights to the e-3 DMTS invention and software belonging to the inventors and other participants in the development as well as the rights belonging to e-3 Solutions Oy and e-3 Systems Oy have been transferred to Suomen Biisi Oy in full."

51.     The Helsinki District Court further found that, "Lauri Valjakka and Iiro Karesniemi have been the inventors."

52.     The Helsinki District Court also ordered Mr. Valjakka to pay Suomen Biisi 4,858 €.

53.     By information and belief, Mr. Valjakka was aware of the Helsinki District Court's ruling as well as the court's order for him to pay Suomen Biisi 4,858 € to compensate for its legal expenses.

54.     On March 24, 2010, the Helsinki Court of Appeal affirmed the Helsinki District Court opinion.

55.     By information and belief, Mr. Valjakka was aware of the Helsinki Court of Appeal's affirmance of the Helsinki District Court's opinion around the time that that appellate opinion was issued.

***Mr. Valjakka Successfully Revived the Abandoned '685 Application by Submitting Incomplete Information About the DMTS Utilization Agreement to the USPTO Alleging That He Had Rights, Title, and Interest to Prosecute the '685 Application***

56.     In December 2009, the USPTO issued a non-final rejection of the '685 Application, but the applicants never responded.

57.     In July 2010, the USPTO sent notice to the applicants that the '685 Application was deemed abandoned for failure to file a timely response.

58.     In December 2010, Mr. Valjakka filed a notice to the USPTO to revive the application. Mr. Valjakka represented that the lack of a response was unintentional, and that two of the three parties with interest in the '685 Application did not receive notification that the patent application had been abandoned.

59.     Mr. Valjakka further submitted statements to the USPTO from the DMTS Utilization Agreement as alleged evidence that the ownership interest in the '685 Application had reverted to him, Juha Setälä, and Pekka Pakarinen based on a contractual obligation that was triggered upon Suomen Biisi's failure to meet his obligations to prosecute the patent.

60.     Mr. Valjakka did not submit a full copy of the DMTS Utilization Agreement or the opinions of the Helsinki District Court and/or the Helsinki Court of Appeal.

61.     Mr. Valjakka thus relied on incomplete statements from the DMTS Utilization Agreement despite knowing and having been told twice by courts in Helsinki that he had no rights, title, or interest in the '685 Application or the claimed invention.

62.     He also relied on statements from the DMTS Utilization Agreement despite knowing that courts in Helsinki had held that Clause 8 of the DMTS Utilization Agreement could not have reverted any rights back to Mr. Valjakka because he had no rights to grant under the DMTS Utilization Agreement in the first place.

63.     In March 2011 the USPTO revived the petition, allowing Mr. Valjakka to continue prosecution of the '685 Application. But for Mr. Valjakka's submission of the select quotes from the UMTS Utilization Agreement, claiming to have reversionary rights in the '685 Application, the Examiner would not have revived the '685 Application.

***Mr. Valjakka Misrepresents Mr. Karesniemi's Contributions to the Claimed Invention of the '167 Patent in Order to Remove Him as a Named Inventor***

64.     On January 24, 2011, in response to a denial for a request for power of attorney, Mr. Valjakka submitted an amendment cancelling dependent claims 9 and 26 of the '685 Application.

65.     In conjunction with the supplemental amendment to cancel claims 9 and 26, Mr. Valjakka also submitted a Request to Correct Inventorship Under 35 U.S.C. § 1.48(b) to remove Mr. Karesniemi as a co-inventor, representing that Mr. Karesniemi's contributions to the invention were limited to the cancelled dependent claims 9 and 26. In doing so, he also intentionally misrepresented and/or omitted Karesniemi's significant contributions to the remaining claims of the '167 patent application.

66.     On or about January 7, 2013, the Examiner issued a Notice of Allowability for the '167 Patent.

67.     On January 7, 2013, Mr. Valjakka recorded a nunc pro tunc assignment retroactively effective as of June 23, 2010, to assign and revert rights in the '685 Application from Suomen Biisi to Mr. Valjakka based on Clause 8 of the DMTS Utilization Agreement and Suomen Biisi's failure to prosecute the '685 Application. For this assignment, Mr. Valjakka recorded the DMTS Utilization Agreement, even though he knew at the time that the Helsinki District Court and Helsinki Court of Appeals had held that he had no rights to grant under the DMTS Utilization Agreement because Mr. Valjakka had already transferred his rights in the '167 Patent to e-3 Systems, e-3 Solutions, and then to Suomen Biisi a month before the DMTS Utilization Agreement was executed. On April 8, 2013, the USPTO again issued a denial for power of attorney because Mr. Valjakka's submissions were lacking Mr. Karesniemi's signature.

68.     On or about May 23, 2013, Mr. Valjakka once again submitted a Request to Correct Inventorship Under 35 U.S.C. § 1.48(b), alleging that the Examiner had failed to expressly act on Mr. Valjakka's previous request to remove Karesniemi as a co-inventor. Mr. Valjakka again intentionally misrepresented Mr. Karesniemi's contributions to the alleged invention of the '167 Patent in order to have him removed as a co-inventor.

69.     The intentional deletion of Karesniemi's name as an inventor of the '167 Patent was done without Karesniemi's knowledge, permission, or consent.

70.     As a result of Mr. Valjakka's request to correct inventorship, Mr. Karesniemi was deleted as a co-inventor of the '167 Patent when that patent issued on July 23, 2013.

## FIRST COUNTERCLAIM

**Declaratory Judgment That the '167 Patent Is Unenforceable Due to Inequitable Conduct**

71.     Netflix restates and incorporates by reference the allegations of its counterclaims in the preceding paragraphs.

72.     The '167 Patent is unenforceable due to inequitable conduct and fraud on the USPTO under 37 C.F.R. 1.56(a) at least because Mr. Valjakka knowingly and intentionally misrepresented and/or failed to disclose full, complete, and accurate inventorship during the prosecution of the application that led to the '167 Patent, and thus Mr. Valjakka knowingly and intentionally misrepresented and/or failed to disclose a material and known basis for invalidity at least under 35 U.S.C. §§ 101, 111, 115, 116, 282, and/or pre-AIA 35 U.S.C. § 102(f).

73.     Each person involved in the prosecution of the '167 Patent, including Mr. Valjakka, owed a duty of candor to the Examiner during prosecution of the '167 Patent.

74.     Each person involved in the prosecution of the '167 Patent, including Mr. Valjakka, had a duty to disclose and notify the Examiner of the correct co-inventors of the '167 Patent.

75.     Mr. Valjakka intentionally and improperly removed Mr. Karesniemi as a co-inventor of the '167 Patent, even though he was aware of Mr. Karesniemi's significant and relevant contributions to the issued claims of that patent.

76.     At the time the patent application for the '167 Patent was filed, Mr. Karesniemi was a software engineer at e-3 Solutions.

77.     On information and belief, during prosecution of the application that ultimately issued as '167 Patent, at least Mr. Valjakka was aware that Karesniemi conceived of and reduced to practice key aspects of the alleged invention of the '167 Patent and enabled Mr. Valjakka to file the provisional application and the applications that led to the issuance of the '167 Patent. For example, Mr. Karesniemi made specific and significant contributions that included the capabilities of the "target terminal" and what information the "target terminal" needed to receive. Mr. Karesniemi contributed that the target terminal needed to receive information about the data being requested, source terminal addresses, and further target terminal addresses. He also contributed that the target terminal requests data as packets from the main server or relay terminal, and relays data after a predefined amount of information is received. He further clarified that the target terminal addresses are included in the data transfer request, and that an acknowledgment is sent to the main server. These contributions from Mr. Karesniemi are significant limitations of at least Claim 1 of the '167 Patent.

78.     But for Mr. Karesniemi's significant contributions to the conception and reduction to practice of key claim limitations of the '167 Patent, the '167 Patent would not have issued.

79.     Mr. Karesniemi's contributions as an inventor of the claimed technologies were significant enough for him to be recognized as a named inventor on the European counterpart to the '167 Patent, EP01660145.  *See* Exhibit 7 (EP01660145).

80.     Indeed, Mr. Valjakka acknowledged that Mr. Karesniemi helped to draft the claims that were eventually submitted in the application for EP01660145.

81.     Even after Mr. Karesniemi left his employment as a software engineer at e-3 Solutions, Mr. Valjakka continued to ask Mr. Karesniemi for his help in revising the specification and claims of EP01660145.

82.     Nonetheless, during the prosecution of the '167 Patent, when Mr. Valjakka was attempting to reclaim ownership of the '685 Application, he filed a supplemental amendment on or around January 24, 2011, to cancel two dependent claims of the '167 Patent, specifically dependent claims 9 and 26.

83.     In conjunction with the supplemental amendment, Mr. Valjakka also submitted a request to remove Mr. Karesniemi, citing the cancellation of dependent claims 9 and 26.   In submitting the request to remove Mr. Karesniemi, Mr. Valjakka implicitly represented that Mr. Karesniemi's contributions to the subject patent application were limited to dependent claims 9 and 26. In doing so, he also intentionally misrepresented and/or omitted Mr. Karesniemi's significant contributions to the remaining claims of the '167 patent application.

84.     On or about January 7, 2013, the Examiner issued a Notice of Allowability to ultimately issue the '167 Patent.

85.     On or about May 23, 2013, Mr. Valjakka once again submitted a Request to Correct Inventorship Under 35 U.S.C. § 1.48(b), alleging that the Examiner had failed to expressly act on Mr. Valjakka's previous request to remove Karesniemi as a co-inventor.

86.     As a result of Mr. Valjakka's request to correct inventorship, Mr. Karesniemi was deleted as a co-inventor of the '167 Patent when that patent issued on July 23, 2013.

87.     The intentional deletion of Karesniemi's name as an inventor of the '167 Patent was done without Karesniemi's knowledge, permission, or consent.

88.     Despite Karesniemi's conception and reduction to practice of key aspects of the invention of the '167 Patent, Mr. Valjakka intentionally mispresented Mr. Karesniemi's contributions to the conception and/or reduction to practice of the alleged invention of the '167 Patent in order to have him removed as a co-inventor to that patent.

89.     The '167 Patent is thus invalid because of nonjoinder of Mr. Karesniemi as a co-inventor under 35 U.S.C. §§ 101, 111, 115, 116, 282, and pre-AIA 102(f).

90.     Mr. Valjakka intentionally misled the Examiner and/or omitted information material to patentability (including inventorship) of the '167 Patent.

91.     On information and belief, other individuals who held a duty of disclosure and duty of candor to the USPTO, including the patent prosecution attorney(s) who represented him, were also aware of Mr. Karesniemi's significant contributions to the '167 Patent, yet misrepresented to and/or withheld that information from the Examiner.

92.     Proper inventorship is material to patentability.

93.     Mr. Valjakka thus committed inequitable conduct before the USPTO through their intentional acts to improperly remove Mr. Karesniemi as a joint inventor on the '167 Patent.

94.     The '167 Patent is also unenforceable due to inequitable conduct and fraud on the USPTO under 37 C.F.R. 1.56(a) at least because Mr. Valjakka knowingly and intentionally submitted incomplete context for evaluating validity of the Utilization Agreement in order to revive the abandoned patent application for the '167 Patent, thereby misrepresenting that he had ownership and title of the '167 Patent.  Mr. Valjakka's failure to disclose the agreements related to the sales and invention of the '167 Patent, and his failure to disclose the decisions of the Helsinki District Court and Helsinki Court of Appeal to the USPTO demonstrate a lack of candor and a reasonable inference of an intent to deceive.

95.     The '167 Patent is also unenforceable due to inequitable conduct and fraud on the USPTO under 37 C.F.R. 1.56(a) at least because, at the time Mr. Valjakka submitted the Utilization Agreement to the USPTO during prosecution of the '167 Patent, he knew that title to the '167 Patent had been transferred to Suomen Biisi, based on at least the decision of the Helsinki Court of Appeal, and that no rights had reverted back to Mr. Valjakka by operation of the DMTS Utilization Agreement.  Mr. Valjakka's failure to disclose the agreements related to the sales and invention of the '167 Patent, and his failure to disclose the decisions of the Helsinki District Court and Helsinki Court of Appeal to the USPTO demonstrate a lack of candor and a reasonable inference of an intent to deceive.

96.     Each of these false representations and/or deliberate omissions were material to patentability, were made with the intent to deceive the USPTO, and were relied upon by the Examiner in reviving the abandoned '167 Patent application and/or ultimately issuing the '167 Patent. But for the submission of these false representations and deliberate omissions, the '167 Patent would not have issued.

97.     Netflix thus seeks a declaratory judgment that the '167 Patent is unenforceable because of Mr. Valjakka's fraud on the USPTO and inequitable conduct.

**SECOND COUNTERCLAIM**

**Declaratory Judgment That Mr. Valjakka's Claims with Respect to the '167 Patent and '102 Patent Are Barred Because of Unclean Hands**

98.     Netflix restates and incorporates by reference the allegations of its counterclaims in the preceding paragraphs.

99.     Netflix specifically incorporates by reference the allegations of its First Counterclaim seeking a declaration of unenforceability due to inequitable conduct in ¶¶ 13-97.

100.     Despite not owning the '167 Patent, Mr. Valjakka has produced documents during the course of this litigation representing that he owns the '167 patent.

101.     Mr. Valjakka's misconduct with respect to the prosecution of the '167 Patent, and his litigation misconduct have immediate and necessary relation to the equity that he seeks with respect to this entire litigation, including both the '167 and '102 Patents.

102.     Because of Mr. Valjakka's inequitable conduct during prosecution of the '167 Patent, and because of Mr. Valjakka's bad faith pursuit of this litigation, Netflix respectfully seeks a declaration that Mr. Valjakka's claims with respect to the '167 Patent and '102 Patent should be barred because of unclean hands.

**THIRD COUNTERCLAIM**

**Declaratory Judgment of Non-Infringement of U.S. Patent No. 8,495,167**

103.     Netflix restates and incorporates by reference the allegations of its counterclaims in the preceding paragraphs.

104.     On or about December 14, 2022, Mr. Valjakka filed his Complaint for Patent Infringement asserting that Netflix infringes the '167 Patent. An actual case or controversy exists between Netflix and Mr. Valjakka as to whether the '167 Patent is infringed by Netflix.

105.     Netflix has not infringed and is not infringing any valid or enforceable claim of the '167 Patent, willfully or otherwise, directly or indirectly, either literally or by application of the doctrine of equivalents. For example, Claim 1[e] requires "wherein each such transport request includes details of data to be retrieved, the address of the first server from which the data is to be requested by the first target terminal, the addresses of at least one second target terminal to which the data from the first server to be relayed by the first target terminal and an indication of a relative

1   performance of a further target terminal based on the terminal performance information stored in

2   the network information database;" and the Accused Products do not infringe this element, at least

3   under Plaintiff's apparent application of the claims. Furthermore, there is no substantial identity

4   between the claims of the '167 Patent and the Accused Products.

5       106.   A judicial declaration of non-infringement of the '167 Patent is necessary and

6   appropriate at this time so that Netflix can ascertain its rights and duties with regard to the parties

7   and with regard to designing, developing, manufacturing, marketing, and selling its products.

8       107.   This is an exceptional case under 35 U.S.C. § 285.

9                              **FOURTH COUNTERCLAIM**

10      **Declaratory Judgment of Non-Infringement of U.S. Patent No. 10,726,102**

11      108.   Netflix restates and incorporates by reference the allegations of its counterclaims in

12  the preceding paragraphs.

13      109.   On or about December 14, 2022, Mr. Valjakka filed his Complaint for Patent

14  Infringement asserting that Netflix infringes the '102 Patent. An actual case or controversy exists

15  between Netflix and Mr. Valjakka as to whether the '102 Patent is infringed by Netflix.

16      110.   Netflix has not infringed and is not infringing any valid or enforceable claim of the

17  '102 Patent, willfully or otherwise, directly or indirectly, either literally or by application of the

18  doctrine of equivalents. For example, the Accused Products do not cause "the content providing

19  server to validate the fingerprint, and, if the validation is successful, access[] the access restricted

20  content" as required by Claim 10 of the '102 Patent, at least under Plaintiff's apparent application

21  of the claims. Furthermore, there is no substantial identity between the claims of the '102 Patent

22  and the Accused Products.

23      111.   A judicial declaration of non-infringement of the '102 Patent is necessary and

24  appropriate at this time so that Netflix can ascertain its rights and duties with regard to the parties

25  and with regard to designing, developing, manufacturing, marketing, and selling its products.

26      112.   This is an exceptional case under 35 U.S.C. § 285.

27

28

**FIFTH COUNTERCLAIM**

**Declaratory Judgment of Invalidity of U.S. Patent No. 8,495,167**

113.     Netflix restates and incorporates by reference the allegations of its counterclaims in the preceding paragraphs.

114.     On or about December 14, 2022, Mr. Valjakka filed his Complaint for Patent Infringement asserting that Netflix infringes the '167 Patent. An actual case or controversy exists between Netflix and Mr. Valjakka as to whether the '167 Patent is invalid.

115.     A judicial declaration is necessary and appropriate so that Netflix may ascertain its rights as to whether the '167 Patent is invalid.

116.     The claims of the '167 Patent are invalid for failure to meet the conditions of patentability and/or otherwise comply with one or more of 35 U.S.C. §§ 101 et seq., e.g., 102, 103, 112, and 132.

117.     For example, the '167 Patent is invalid under 35 U.S.C. § 101 because it is directed to nothing more than the unpatentable abstract idea of distributing the delivery of content among multiple actors. Further, each claim element of the asserted claims recites only features that are well-understood, routine, and conventional, and nothing in the claims transforms the abstract idea into an inventive concept.

118.     The '167 Patent is also invalid as anticipated under pre-AIA 35 U.S.C. § 102 and/or as obvious under U.S.C. § 103 in view of prior art to the patent, including without limitation, U.S. Patent Nos. 6,912,514; 6,950,431; 6,970,939; 7,139,827; 7222,186; 7,228,416; 7,373,103; 5,905,952; 7,398,312; 6,708,213; 8,392,611; 7,149,797; U.S. Patent Application No. 2006/0114350; and Publication Nos. WO 00/65776; WO 01/22688; HU 222,337; EP 0726663; EP 0863646; EP 0709994; Publications Zegura et al., Application-Layer Anycasting: A Server Selection Architecture and Use in a Replicated Web Service; Kung et al., Hierarchical Peer-to-Peer Networks; Amini et al., Distribution Requirements for Content Internetworking; Green et al., Content Internetworking Architectural Overview; Cisco Systems, Inc., Close Encounters: Cisco end-to-end solution pushes streaming and other feature-rich content closer to end users; Cisco Systems, Inc., Speeding and Scaling Web Sites Using Cisco Content-Delivery Technology White

Paper; and Prior Art Systems Cisco Systems, Inc., Cisco Content Delivery Network (CDN); Inktomi Corporation, Inktomi Content Distributor; F5 Networks, Inc., Global-Site Controller; and Starburst Software, Inc., StarBurst OmniCast.

119.    The '167 Patent is also invalid under 35 U.S.C. § 112 as indefinite. At least as would be understood by one of ordinary skill in the art and/or as applied in Mr. Valjakka's Complaint, the claim language is indefinite because it does not have a meaning that can be clearly and definitely determined from the patent, and thus fails to put the public on notice of what is and is not covered by these claims. The '167 Patent fails to satisfy the requirements of 35 U.S.C. § 112(2) due to the claim language being indefinite.

120.    The '167 Patent is also invalid due to improper and/or incorrect inventorship, including nonjoinder under 35 U.S.C. §§ 101, 111, 115, 116, 282, and/or pre-AIA 35 U.S.C. § 102(f) for Mr. Valjakka's intentional omission of Iiro Karesniemi as a co-inventor of the '167 Patent.

121.    Netflix seeks a declaration that the claims of the '167 Patent are invalid pursuant to one or more provisions of Title 35 of the United States Code, including but not limited to §§ 101, 102, 103, 111, 112, 115, 116, 282, and/or pre-AIA 35 U.S.C. § 102(f).

122.    This is an exceptional case under 35 U.S.C. § 285.

## SIXTH COUNTERCLAIM

### Declaratory Judgment of Invalidity of U.S. Patent No. 10,726,102

123.    Netflix restates and incorporates by reference the allegations of its counterclaims in the preceding paragraphs.

124.    On or about December 14, 2022, Mr. Valjakka filed his Complaint for Patent Infringement asserting that Netflix infringes the '102 Patent. An actual case or controversy exists between Netflix and Mr. Valjakka as to whether the '102 Patent is invalid.

125.    For example, the '102 Patent is invalid under 35 U.S.C. § 101 because Claims 10 and 11 are directed to nothing more than the unpatentable abstract idea of providing restricted access to content using multiple levels of validation. Further, each claim element of the asserted

claims 10 and 11 recites only features that are well-understood, routine, and conventional, and nothing in the claims transforms the abstract idea into an inventive concept.

126.   The claims of the '102 Patent are also invalid for failure to meet the conditions of patentability and/or otherwise comply with one or more of 35 U.S.C. §§ 101 et seq., e.g., 102, 103, 112, and 132. For example, the '102 Patent is invalid as anticipated under 35 U.S.C. § 102 and/or as obvious under U.S.C. § 103 in view of prior art to the patent, including without limitation, U.S. Patent Nos. 6,891,953; and 8,359,473; U.S. Patent Application Nos. 2016/0198202; 2003/0161473; 2004/0064714; 2004/0098592; 2002/0018566; 2007/0208711; 2010/0185868; 2008/0071617; 2008/0098212; 2005/0018854; 2010/0174608; 2012/0042389; and Publication No. KR 101103403 B1; Publications William Rosenblatt, William Trippe, Stephen Mooney, Digital Rights Management; Ramya Venkataramu, Analysis and Enhancement of Apple's Fairplay Digital Rights Management; Eric Rescorla, SSL and TLS: Designing and Building Secure Systems; Naganand Doraswamy, Dan Harkins, IPSec: The New Security Standard for the Internet, Intranets, and Virtual Private Networks (Second Edition); H. Krawczyk, M. Bellare, R. Canetti, HMAC: Keyed-Hashing for Message Authentication (RFC 2104); Bruce Schneier, E-Mail Security: How to Keep Your Electronic Messages Private; David K. Gifford, Cryptographic Sealing for Information Secrecy and Authentication; and S. Kent, IP Encapsulating Security Payload (ESP) (RFC 2406); and Prior Art Systems the Apple FairPlay system, the Google WideVine system, and the Microsoft PlayReady system.

127.   The '102 Patent is also invalid under 35 U.S.C. § 112 as indefinite, for lack of written description, and/or enablement, at least under Mr. Valjakka's apparent application of the claims. For example, the specification of the '102 Patent does not provide an adequate written description under 35 U.S.C. § 112(1) for at least the phrase "information describing encryption properties" in Claim 10. The specification does not teach that the patentee had possession of a method to access "information describing encryption properties" as recited in the claims. While "information describing encryption properties" is recited briefly in the specification, there is no description or teaching of what "information describing encryption properties" is. Thus, this claim limitation lacks written description and enablement. The specification does not enable a person of

ordinary skill in the art to make use of the full scope of these claims without undue experimentation. Additionally, at least as would be understood by one of ordinary skill in the art and/or as applied in Valjakka's Amended Complaint, this claim language is indefinite because it does not have a meaning that can be clearly and definitely determined from the patent, and thus fails to put the public on notice of what is and is not covered by these claims. Claim 10 of the '102 Patent fails to satisfy the requirements of 35 U.S.C. § 112(2) due to the identified claim phrase being indefinite.

128.    Netflix seeks a declaration that the claims of the '102 Patent are invalid pursuant to one or more provisions of Title 35 of the United States Code, including but not limited to §§ 101, 102, 103, 111, 112, 115, 116, 282, and/or pre-AIA 35 U.S.C. § 102(f).

129.    This is an exceptional case under 35 U.S.C. § 285.

## PRAYER FOR RELIEF

WHEREFORE, Defendant Netflix respectfully requests the following relief:

A.  Judgment in Netflix's favor on all of its counterclaims;

B.  Judgment declaring that the '167 Patent is unenforceable due to inequitable conduct;

C.  Judgment declaring that Netflix has not infringed and does not infringe any valid or enforceable claim of the '167 Patent;

D.  Judgment declaring that Netflix has not infringed and does not infringe any valid or enforceable claim of the '102 Patent;

E.  Judgment declaring that the '167 Patent is invalid for failure to comply with the requirements of 35 U.S.C. §§ 101 *et seq.*, including at least §§ 101, 102, 103, 111, 112, 115, 116, 282, and/or pre-AIA 35 U.S.C. § 102(f);

F.  Judgment declaring that the '102 Patent is invalid for failure to comply with the requirements of 35 U.S.C. §§ 101 *et seq.*, including at least §§ 101, 102, 103, 111, 112, 115, 116, 282, and/or pre-AIA 35 U.S.C. § 102(f);

G.   Judgment declaring that Netflix is not liable for the relief sought in the Complaint with respect to Mr. Valjakka's patent infringement allegations, denying Mr. Valjakka all such relief, and dismissing Mr. Valjakka's claims with prejudice;

H.   Judgment that all damages, costs, expenses, attorneys' fees, prejudgment and/or post-judgment interest, and other relief sought by Mr. Valjakka be denied;

I.   A declaration that, pursuant to 35 U.S.C. § 285, Mr. Valjakka's conduct in commencing and pursuing this action be found to render this an exceptional case and that Netflix be awarded costs, expenses, disbursements, and attorneys' fees in connection with this action;

J.   Such other and additional relief as this Court deems just and proper.

## **JURY DEMAND**

Netflix respectfully requests a trial by jury on all issues so triable.

Dated: July 6, 2023

**PERKINS COIE LLP**


By: */s/ Elise Edlin*

Sarah E. Piepmeier, Bar No. 227094
SPiepmeier@perkinscoie.com
Elise S. Edlin, Bar No. 293756
EEdlin@perkinscoie.com
PERKINS COIE LLP
505 Howard Street, Suite 1000
San Francisco, California 94105
Telephone: +1.415.344.7000
Facsimile:  +1.415.344.7050

Janice L. Ta, (admitted *pro hac vice*)
JTa@perkinscoie.com
PERKINS COIE LLP
405 Colorado Street, Suite 1700
Austin, Texas 78701
Telephone: +1.737.256.6100
Facsimile:  +1.737.256.6300

Jassiem N. Moore, (admitted *pro hac vice*)
JassiemMoore@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Telephone: +1.206.359.8000
Facsimile:  +1.206.359.9000

*Attorneys for Defendant*
Netflix, Inc.