# Exhibit 1

Page 1

```
 1            UNITED STATES DISTRICT COURT
 2           NORTHERN DISTRICT OF CALIFORNIA
 3                   OAKLAND DIVISION
 4
 5  IN RE MATTER OF:              )
 6  LAURI VALJAKKA,               )
                                  )
 7         Plaintiff,             )
                                  )
 8      vs.                       )  CASE NO.
                                  )  4:22-cv-01490-JST
 9  NETFLIX, INC.,                )
                                  )
10         Defendant.             )
                                  )
11
12
13       VIDEOTAPED DEPOSITION OF LAURI VALJAKKA
14             REMOTE VIA VIDEOCONFERENCE
15                Thursday, June 1, 2023
16                     Volume I
17                   Pages 1 - 188
18
19
20  Stenographically Reported by:
21  HEATHER J. BAUTISTA, CSR, CRR, RPR, CLR
    Realtime Systems Administrator
22  California CSR License #11600
    Oregon CSR License #21-0005
23  Washington License #21009491
    Nevada CCR License #980
24  Texas CSR License #10725
25  Job No.:  6612
```

Page 2

```
 1     VIDEOTAPED DEPOSITION of LAURI VALJAKKA, Volume
 2  I, taken before Heather J. Bautista, CSR No. 11600, a
 3  Certified Shorthand Reporter for the state of
 4  California, with principal office in the county of Santa
 5  Clara, commencing on Thursday, June 1, 2023, 8:06 a.m.,
 6  remotely via videoconference.
 7
 8
 9
10  APPEARANCES OF COUNSEL:
11
12      For Plaintiff:
13          Ramey LLP
            BY:  WILLIAM P. RAMEY, III, ESQ.
14          5020 Montrose Boulevard
            Suite 800
15          Houston, Texas 77006
            Phone: (713) 426-3923 / Fax: (832) 900-4941
16          wramey@rameyfirm.com
17      For Defendant:
18          Perkins Coie LLP
            BY:  ELISE S. EDLIN, ESQ.
19               SARAH E. PIEPMEIER, ESQ.
            505 Howard Street
20          Suite 1000
            San Francisco, California 94105
21          Phone: (415) 344-7000 / Fax: (415) 344-7050
            eedlin@perkinscoie.com
22          spiepmeier@perkinscoie.com
23
    ALSO PRESENT:  Onni Hietalahti
24                 Jennifer Hewitt
                   Dennis Saelee, Videographer
25
```

Page 3

INDEX OF EXAMINATION

|  | PAGE |
|---|---|
| LAURI VALJAKKA | |
| EXAMINATION BY MS. EDLIN | 7 |

Page 4

INDEX OF EXHIBITS

| Exhibit No. | Description | Page |
|---|---|---|
| Exhibit 1 | Defendant Netflix Rule 30(b)(6) Notice of Deposition to Lauri Valjakka | 20 |
| Exhibit 2 | United States District Court, Northern District of California, Oakland Division, Defendant Netflix's Inc.'s Rule 30(b)(6) Notice of Deposition to Lauri Valjakka | 21 |
| Exhibit 3 | Complaint for Patent Infringement | 22 |
| Exhibit 4 | LinkedIn Profile for Lauri Valjakka | 23 |
| Exhibit 5 | 7/23/2013 U.S. Patent US 8.495,167 B2 | 30 |
| Exhibit 6 | 7/28/202 U.S. Patent US 10,726,102 B2 | 31 |
| Exhibit 7 | 5/31/2023 Plaintiff Lauri Valjakka's Second Supplemental Responses and Objections to Defendant Netflix's First Set of Interrogatories (No. 1-20) | 33 |
| Exhibit 8 | 5/30/2023 Plaintiff Lauri Valjakka's Supplemental Responses and Objections to Defendant Netflix's fourth Set of Interrogatories (No. 24) | 35 |
| Exhibit 9 | PR news article | 119 |
| Exhibit 10 | Emobit SCIH STudy Executive Summary | 154 |
| Exhibit 11 | Emobit 2013 CDN Systems, LV2_000987 | 155 |

Page 5

1     Thursday, June 1, 2023
2     8:06 a.m.
3     --oOo--
4          THE VIDEOGRAPHER:  Good morning.  We are on the
5  record at 8:06 a.m.  Today's date is June 1st, 2023.
6  This is the recorded remote video deposition of Lauri
7  Valjakka in the matter of Lauri Valjakka versus Netflix,
8  Inc., Case No. 4:22-cv-01490-JST.
9          This deposition is being held via web
10 conference.  My name is Dennis Saelee.  I'm the
11 videographer with Focus Litigation Solutions.  I am not
12 financially interested in this action, nor am I a
13 relative or employee of any of the attorneys or parties
14 in this matter.
15         The court reporter is Heather Bautista.
16         Counsel, please introduce yourselves and state
17 whom you represent, after which the court reporter will
18 swear in the witness.
19         MR. RAMEY:  Yes.  This is Bill Ramey for the
20 plaintiff, Lauri Valjakka.  We're ready to proceed.
21         MS. EDLIN:  And this is Elise Edlin from
22 Perkins Coie.  I'm here representing Defendant Netflix.
23         I'm also joined by my colleagues, Jennifer
24 Hewitt and Sarah Piepmeier, also -- both at Perkins
25 Coie.

Page 6

1         THE STENOGRAPHER:  Thank you.
2         Good morning.  My name is Heather Bautista, and
3  I am a certified stenographer licensed by the State of
4  California.  My license number is 11600.
5         This deposition and any transcript produced
6  therefrom will be handled pursuant to Federal Rule of
7  Civil Procedure Section 30.
8         As the deposition officer, I will be retaining
9  my duties and responsibilities under the Code.
10        Please raise your right hand, sir, so I can
11 swear you in.
12        Mr. Valjakka?
13        THE WITNESS:  Yes.
14        THE STENOGRAPHER:  Please raise your right hand
15 so I can swear you in.  Thank you.
16                   LAURI VALJAKKA,
17 having been first duly sworn, was examined and testified
18                    as follows:
19        THE WITNESS:  Yes.
20        THE STENOGRAPHER:  Thank you.
21        Please state your full name for the record.
22        THE WITNESS:  Lauri Heikki Tapani Valjakka.
23        THE STENOGRAPHER:  Thank you.
24        Counsel, you can begin.
25        MS. EDLIN:  Great.  Thank you.

Page 7

1                 DIRECT EXAMINATION
2  BY MS. EDLIN:
3       Q.   Good morning, Mr. Valjakka.  All right.
4       A.   Yes.  Call me Lauri.
5       Q.   Lauri.  Nice to meet you, Lauri.
6       A.   Nice to meet you.
7       Q.   So, Mr. Valjakka, can you -- well, you already
8  stated your name for the record.
9            Who's your employer?
10      A.   I am my employer.
11      Q.   And are you --
12      A.   I'm an entrepreneur.  I'm an entrepreneur and a
13 shareholder in the company.  I'm currently working
14 for --
15           (Stenographer clarification.)
16           THE WITNESS:  -- CDN Licensing, LTD, in
17 Finland.
18           MS. EDLIN:  Just one moment.  Okay.
19      Q.   (By Ms. Edlin)  So, sorry, you said you've been
20 working -- you're currently working for CDN Licensing.
21      A.   Yeah.
22      Q.   How long have you been working for CDN
23 Licensing?
24      A.   A bit over two years now.
25      Q.   And what's your role at that company?

Page 8

1       A.   Well, I'm a -- I'm a business developer and --
2  and -- how should I say?  Maybe salesman and marketer.
3       Q.   What product does CDN marketing -- or, sorry,
4  Licensing make?
5       A.   We're actually a -- it's the IP development
6  company which -- which means that based on my inventions
7  and my IPs that -- that I have developed during the
8  years, we will now -- or we have bundled and we can --
9  we can try to exploit them in many ways.  So one is
10 licensing business, and one is developing more IP.  We
11 have few patent applications, and we have granted
12 patents a little bit all over.
13           So there are also other areas that we're
14 developing, but not launchable yet, so my job is to
15 develop those ready for business.
16      Q.   Develop the -- sorry.
17           You said develop those ready for business.
18 What -- what did you mean by that?
19      A.   Well, it's, you know, normal business plan,
20 development first and then funding issues and
21 negotiations with investors and so forth.
22      Q.   I'm going to back up a little bit.  I will come
23 back to CDN Licensing in just a few minutes.
24           But before I -- I really dig in here, can
25 you -- have you been deposed before?

Page 9

1  A.  No.  Never.
2  Q.  Never.  Okay.
3      So I think that before -- before I sort of get
4  started here, then, I think I want to kind of run
5  through a few just general rules here with you.
6      So I'm going to be asking you questions.  I'll
7  be asking you lots of questions and -- and then you'll
8  be answering.  And I do ask that you -- we try as hard
9  as we can not to speak over each other.  I will --
10     (Stenographer clarification.)
11 Q.  (By Ms. Edlin)  So I will -- I'll do the same
12 for you, and I ask that you just try to wait until I've
13 answered -- I've asked the full question before you
14 answer, and that also gives your -- you know, your
15 attorney the opportunity to object if he needs to.
16     Are you okay with that?
17 A.  Yes, I am.
18 Q.  Great.
19     And you understand today that you're -- you're
20 under oath; right?
21 A.  Can you repeat.  I didn't hear the rest.
22 Q.  So you understand that you're under oath today,
23 just like you would be --
24 A.  Yes.
25 Q.  -- if you were in court?

Page 10

1  A.  Yes.
2  Q.  Okay.
3      And is there any reason today that you can't
4  provide accurate and truthful testimony?
5  A.  No.
6  Q.  Okay.
7      You're not on any medication?
8  A.  No.
9  Q.  Okay.
10     And I do ask -- so I -- I ask that if -- if you
11 don't understand part of my question or if I'm not
12 speaking clearly, I just ask that you -- you -- you let
13 me know, and then I can clarify.
14     Does that make sense?
15 A.  Yeah.  That's fine.
16 Q.  Okay.
17     And same -- I know that English isn't your
18 first language.  It's definitely a lot better than my
19 Finnish, but if -- if there's any issue with any terms
20 that I'm using or anything like that, please let me
21 know, and I will -- we'll -- we'll figure out how to
22 translate it for you if we need to.
23     Is that okay?
24 A.  That's okay.
25 Q.  Okay.

Page 11

1      So if -- if I ask you any questions, if you
2  answer those questions, then I'm going to assume that
3  you understood the question.  Okay?
4  A.  All right.
5  Q.  Great.
6      What did you do to prepare -- prepare for your
7  deposition today?
8  A.  Please clarify.  I didn't get that question.
9  Q.  Sorry.
10     What did you do to prepare for the deposition
11 today?  Did you meet with anybody?
12 A.  Yes.  My attorneys, and I have gone through
13 your -- your topics for deposition.
14 Q.  Okay.
15 A.  And I print.
16 Q.  Which of your attorneys were there?
17 A.  Bill Ramey.  We had a meeting over the net.
18 Q.  How long was the meeting?
19 A.  You mean today or yesterday or before?
20 Q.  Okay.
21     So I guess I'll start with how many times did
22 you meet with Mr. Ramey?
23 A.  Maybe two, three times before this deposition
24 event.
25 Q.  And the most recent one, it sounds like, was

Page 12

1  today?
2  A.  Yeah, quick update and with -- with
3  Mr. Hietalahti as well.
4  Q.  Okay.  And -- okay.
5      So Mr. Hietalahti -- I -- I apologize again if
6  I'm mispronouncing anything.  Please correct me.  I will
7  do my best.
8      So Mr. Hietalahti was at the meeting with you
9  and Mr. Ramey today.
10 A.  Yes.
11 Q.  And how long did you meet for today?
12 A.  Maybe 10, 15 minutes.
13 Q.  Okay.
14     And what -- what did you discuss in the meeting
15 today?
16 A.  Well, because this is my first time for
17 deposition, and I wanted to know and go through again
18 how it goes and what I'm supposed to do and -- and so
19 forth; just practical things.
20 Q.  Did you discuss any of the -- anything to do
21 with the case?
22 A.  No, no substance discussions today.
23 Q.  Okay.
24     And what were the updates otherwise, then?
25 A.  Well, just the timely schedules and whatever --

Page 13

1  Q.  Okay.
2  A.  -- how this situation might go and, you know,
3  technically and so forth.
4  Q.  Okay.
5      MR. RAMEY:  Now, Elise, he wasn't under oath at
6  the time and then -- you know, so try not to get too
7  close to the substance of the communications.  So far
8  I'm okay with this, but I don't want him to -- to think
9  he needs to testify about what we talked about
10 substantively prior to the deposition today, please.
11     MS. EDLIN:  Okay.
12     So, but Mr. Hietalahti -- can you -- can you
13 pronounce that for me one more time so I can try to get
14 it right.
15     MR. HIETALAHTI:  "Hietalahti."
16     MS. EDLIN:  "Hietalahti"; is that right?
17     THE WITNESS:  "Hietalahti."
18     MS. EDLIN:  I'll do my best.
19 Q.  (By Ms. Edlin)  So Mr. Hietalahti was at that
20 meeting, though; right?
21 A.  Yes.
22 Q.  And Mr. Hietalahti is not your attorney for
23 this case; correct?
24 A.  He's my Finnish attorney and, of course,
25 supporting me with -- with every cases I have.  So he is

Page 14

1  here and working together with me and Bill Ramey.
2  Q.  Is he your personal attorney in Finland?
3  A.  Yes, and the lawyer of CDN Licensing
4  simultaneously.
5  Q.  Has Mr. Hietalahti been involved in this
6  litigation?
7  A.  In what way?  Please define.  Involved as a
8  lawyer or some other way?
9  Q.  Does he represent you in this litigation?
10     MR. RAMEY:  Objection.  Form.
11     THE WITNESS:  Excuse me?
12 Q.  (By Ms. Edlin)  Sorry.
13     Does -- does he represent you in this case?
14     MR. RAMEY:  Objection.  Form.
15     MS. EDLIN:  Okay.
16 Q.  (By Ms. Edlin)  You can still answer.
17 A.  Well, he -- he's my lawyer, and -- and Bill
18 Ramey is my lawyer, so -- in the United States.
19 Q.  Are you currently involved in any cases in
20 Finland related to the patents that are asserted in this
21 case?
22 A.  No.
23 Q.  Has Mr. Hietalahti represented you in any -- in
24 any cases that involve these patents?
25 A.  No.  Actually, it was -- well, years ago, yes,

Page 15

1  he represented me in Helsinki court, yeah.
2  Q.  And which case was that?
3  A.  That was with Suomen Bissi Oy.
4  Q.  Okay.
5      And that was concerning the patents?
6  A.  No, actually the utilization of my inventions.
7  Q.  Okay.  Okay.
8      So before today, when did you last meet with
9  Mr. Ramey to prepare for this deposition?
10 A.  I think we had a Zoom call yesterday.
11 Q.  How long did you speak for?
12 A.  Maybe for one hour or so.
13 Q.  Was anyone else present on that call?
14 A.  Yes.  Mr. Hietalahti.
15 Q.  And what was the -- what did you discuss on
16 that call?
17 A.  Well, generally speaking, all of the case and
18 also other subjects.  So mostly about this, today's
19 event, sort of preparing for it, because I'm a
20 first-timer, so I've never been in a situation like this
21 before, so it's -- it's -- I needed that kind of
22 preparation.
23 Q.  All right.
24     And then you said there was one other meeting,
25 I believe, before that one.  When was that?

Page 16

1  A.  A week ago.
2  Q.  And how long did you -- how long was the
3  meeting a week ago?
4  A.  I didn't take time, but I could -- I could go
5  back to those files, but, of course, it's -- it's maybe
6  another one hour or one-and-a-half-hour meeting; no
7  longer than that.
8  Q.  And was Mr. Hietalahti also present for that
9  meeting?
10 A.  Yes, he was.
11 Q.  And, again what was -- what was discussed
12 during those -- that meeting?
13 A.  Please repeat and clarify.
14 Q.  What was -- what was the purpose of that
15 meeting?
16 A.  It was also preparing for this -- this case,
17 details and this -- this deposition today.
18 Q.  Okay.
19     Did your attorney show you any documents during
20 your preparation?
21 A.  During the preparation?
22 Q.  Yes.
23     So let's start with -- let's start with the
24 meeting -- the meeting this morning.  Did they show you
25 any documents during that meeting?

Page 25

1  A.  That's right.
2  Q.  And you said that you were a sales -- and what
3  was your role?
4  A.  Business development.
5  Q.  Business development.  Okay.
6      Are you a founder of that business?
7  A.  Yes, one of the founders.
8  Q.  And are you the CEO?
9  A.  No.  Vice president of business development.
10 Q.  And who's the CEO of this one, of CD- --
11 sorry -- CDN Licensing?
12 A.  Mr. Onni Hietalahti.
13 Q.  Are there any other employees?
14 A.  Not -- not yet.  Another partner, though, yes.
15 Q.  And who's the other partner?
16 A.  Matti Saraheimo is also a lawyer, and he's a
17 partner too.
18 Q.  And what -- what is his name -- sorry -- his
19 role?
20 A.  Well, he's a shareholder and original investor.
21 Q.  Okay.
22     And you mentioned that this company was in
23 order to license your current IP and develop more IP; is
24 that correct?
25 A.  Develop more IP, yeah.

Page 26

1      MR. RAMEY:  Objection.  Form.
2  Q.  (By Ms. Edlin)  And also licensing of your
3  current IP; is that right?
4      MR. RAMEY:  Objection.  Form.
5  Q.  (By Ms. Edlin)  So you still answer the
6  questions when your attorney objects.
7      MR. RAMEY:  She is correct.
8  Q.  (By Ms. Edlin)  So I'll just -- I'll repeat the
9  question if I can get there.  Okay.
10     So the purpose of CDN Licensing is to license
11 your intellectual property; is that right?
12 A.  Yes.
13 Q.  And how many patents do you currently own?
14 A.  In the U.S., I have three main patents and a
15 couple of continuations.
16     And then I have one in Canada, one in
17 Australia, two in Japan, and several applications in
18 Europe, and one in the U.S.
19 Q.  Is it -- sorry.
20     You said -- one application in the U.S.; is
21 that what you meant?
22 A.  Yeah.
23 Q.  Okay.
24     How long have you been with CDN?  When was
25 that -- sorry, strike that.

Page 27

1      When -- when did you establish CDN Licensing?
2  A.  2021.
3  Q.  And is CDN Licensing an owner of any of your
4  patents?
5  A.  No --
6      MR. RAMEY:  Objection.  Form.
7      THE WITNESS:  -- I own the patents my- --
8  myself.
9  Q.  (By Ms. Edlin)  Okay.
10     And you mentioned three main U.S. patents as
11 well as continuations.  Can you tell me what those
12 patents are.
13     MR. RAMEY:  Objection.  Form.
14     THE WITNESS:  '167, as we call it, CDN patent,
15 and '102, as we call it, is -- it's -- it's cloud DRM
16 patent.
17 Q.  (By Ms. Edlin)  And what's the third?
18 A.  That's the e-mail solution together with my
19 former employee, Mr. --
20 Q.  Sorry.
21     Did you say a name of your former --
22 A.  E-mail -- e-mail encryption patent.
23 Q.  Can you tell me the patent number for that.
24 A.  Can't remember it myself; it's so fresh.
25 Q.  Do you know when that patent was filed?

Page 28

1  A.  2015.
2  Q.  Okay.
3  A.  Let me check.
4  Q.  Sorry.
5      MR. RAMEY:  Yeah.
6  Q.  (By Ms. Edlin)  When you say, "Let me check,"
7  what are you looking at?
8  A.  I'm looking at the patent number.
9  Q.  On your computer?
10 A.  Yeah.  If you need that.
11 Q.  Are you on the -- is it on the Internet that
12 you're looking or are you looking in your files?
13 A.  In my files.
14 Q.  Okay.
15 A.  For some reason, I cannot open it here.
16 Q.  Let's set that aside for now.  We can come back
17 to it.
18 A.  Yeah, we have to.
19 Q.  Okay.
20 A.  I'll check it when we -- when we have a break.
21 Okay?
22 Q.  Sure.
23     I'm going to just put a couple more files into
24 the chat window.
25 A.  Sorry.  I have a problem actually, now, here

Page 45

1  Q. What is your education background?
2  A. I'm a commercial guy, so I was -- I went to
3  local commercial college, and maybe it could --
4  nowadays, they call it Applied Sciences -- University of
5  Applied Sciences here.
6     So I went through that, the marketing and sales
7  side, and that's my role, but I'm very interested in
8  technology, and -- and technology-wise I'm the sales --
9  sales-made man.
10 Q. Okay.
11    Why did you change the name from IPR Avenue to
12 IPR Technologies?
13 A. Because the role changed.  It was an IP
14 consulting company as IPR Avenue, and then we started to
15 develop source codes, software and testing and
16 researching; that's why.
17 Q. Was it just a name change, or was it a new
18 organization altogether?
19 A. Slightly both, but I would say that change of
20 name and then hiring the engineers.
21 Q. Okay.
22    So you said that IPR Avenue had gone bankrupt.
23 Is that the same for IPR Technologies?
24 A. Yeah, the same company, same trade registry
25 number with the Finnish Trade Registry.

Page 46

1  Q. And the bankruptcy for that was in 2023; is
2  that right?
3  A. Yeah.
4  Q. Okay.
5  A. Quite recently.
6  Q. How recently?
7  A. Excuse me.  I didn't get that question.
8  Q. Sorry.
9     How recently?  When?
10 A. I said May.
11 Q. Okay.
12 A. A month ago, yeah, yeah.  Last month.
13 Q. Okay.
14    And is IPR Avenue and -- is that the same
15 company as IPRA Technologies Limited?
16 A. Yeah.  Yes, they are the same.
17 Q. Okay.
18 A. Same company.
19 Q. Also the same as IPRA Technologies Oy Limited?
20 A. Yes.
21 Q. Okay.
22    So for -- was your role the same in all of
23 these organizations where you're the CEO and founder?
24 A. Yes.
25 Q. Okay.

Page 47

1  And when did IPRA Technologies Oy Limited cease
2  to exist?
3  A. Sorry.  I didn't get that question.  Can you
4  clarify.  When what?
5  Q. Sorry.
6     Does the -- okay.
7     Let's start with the IPR Technologies Limited.
8  Does that -- did that company go bankrupt?
9  A. Yes.
10 Q. When was that?
11 A. May '23.
12 Q. Okay.
13    And then is that the same for the IPRA Oy
14 Technologies?  Are those the same company or are those
15 different companies?
16 A. Yes.  I repeat myself.  It's the same company,
17 and when it got -- went belly up, it went belly up on
18 both names or with both names.
19 Q. Okay.
20    And did the IPRA Technologies Oy, under both
21 names, was there a product that they were -- that they
22 were creating?
23 A. Yes, the Easy Keys.
24 Q. Also the Easy Keys.  Okay.
25    So you said before that the Easy Keys is

Page 48

1  related to security, and it's the DRM research and
2  encryption; is that -- is that correct?
3  A. Yes.
4  Q. So did Easy Keys, to your understanding,
5  practice the claims of the '102 patent?
6  A. It -- yes.  It's built based on that concept.
7  Q. And did you ever sell a version of that product
8  to any -- anyone?
9  A. No.  We were at --
10    (Stenographer clarification.)
11    THE WITNESS:  -- beta phase of software
12 product.  It means that it's test using -- we have -- we
13 had test users around the world, in Asia, in the U.S.
14 and Canada, in Finland, Sweden, in Scandinavian
15 countries, many, and we didn't charge for the betas.
16 That's the normal way.  Even if you launch a product,
17 you may still continue with beta, and everybody's having
18 beta or have to have the beta version before commercial
19 launch, so -- to gather feedback from the users and
20 maybe good ideas, proposals, how to -- how to improve
21 with the performance and usability of the software.
22 Q. (By Ms. Edlin)  Okay.
23 A. So we were at that phase.
24 Q. And when were you at the beta phase for
25 launching the Easy Keys product?

Page 49

1  A.  Three -- it was -- well, actually '21, January,
2  we had the first official beta.
3  Q.  And when did you first start sending it to --
4  to people around the world to test?
5  A.  Well, it's, you know, friend-to-friend talks
6  and business colleagues who wanted to test and, you
7  know, investors and their staff and so forth, '21.
8  Q.  And you never -- nobody ever tested that
9  product prior to 2021?
10  A.  We did, of course, internally and some Finnish
11  State Technology Research Centre people, engineers, they
12  did and evaluated simultaneously the DRM.
13  Q.  Okay.
14  A.  That's the key of the Easy Keys, the
15  encryption, end-to-end encryption.
16  Q.  Okay.
17      And so you said the Finnish State Tech Research
18  on the Easy Keys end-to-end encryption; is that right?
19      MR. RAMEY:  Objection.  Form.
20      THE WITNESS:  Yeah, it's --
21  Q.  (By Ms. Edlin)  Okay.
22      And when was that?
23  A.  2019 and '20.
24  Q.  And can you explain what you mean by the
25  Finnish State Tech Research.

Page 50

1  A.  Finnish Technology Research Centre.  VTT is the
2  Finnish abbreviation.  I'm not sure of the English name,
3  by the way, I need to check it, but very -- very
4  high-tech and very old company, state owned.  But they
5  were just one.  There were many others who tested it --
6  Q.  Okay.
7      (Unreportable cross-talk.)
8  Q.  (By Ms. Edlin)  Okay.
9      When was the earliest that you sent anyone the
10  Easy Keys products to test?
11  A.  The e-mail was first -- yeah, it must have been
12  '20.  '20, first quarter, not -- 2020.
13  Q.  Okay.
14  A.  Not earlier than that.  Internally, we, of
15  course, tested as the software was developed, quite
16  normal, but -- but not any outsiders, if you mean that.
17  Q.  Um-hum.
18  A.  We --
19  Q.  Okay.
20  A.  I -- I need to check.  I can't remember
21  details, to be honest with you.  It's so many years, and
22  different products were ready for testing much later,
23  and we have changed the technology many times with the
24  encryption.  It's fifth generation where we end it.
25  Q.  Are you still working on that product now in

Page 51

1  your role with CDN Licensing?
2  A.  It's at break now.
3  Q.  Okay.
4      Why?
5  A.  Well, need to restructure because of the
6  bankruptcy.  Simple as that.
7  Q.  Okay.
8      MR. RAMEY:  Hey, Elise, we've been going about
9  an hour and 17 minutes total time.  Do you mind if we,
10  in the near future, take a break?
11      MS. EDLIN:  Sure.  Let's -- let's go off the
12  record.  Thank you.
13      THE VIDEOGRAPHER:  We're going off the record.
14  The time is 9:28 a.m.
15      (Recess taken from 9:28 a.m. to 9:44 a.m.)
16      THE VIDEOGRAPHER:  We are back on the record.
17  The time is 9:44 a.m.
18      MS. EDLIN:  Thank you.
19  Q.  (By Ms. Edlin)  Mr. Valjakka, during the break,
20  did you speak with your attorney?
21  A.  Can you repeat the question.
22  Q.  Did you speak with -- with your attorney during
23  the break?
24  A.  No.
25  Q.  Okay.

Page 52

1      And how about with Mr. Hietalahti?
2  A.  We -- we went out the building together.
3  Q.  Okay.
4      Did you speak about the substance of this case
5  or your testimony?
6  A.  No, no.  I was just smoking.  I'm still a
7  smoker.
8  Q.  All right.  Okay.
9      So we have been talking about IPR Avenue, IPRA
10  Technologies and IPRA Technologies Oy; correct?
11  A.  Yeah.
12  Q.  Okay.
13      And for all of those companies, were -- did
14  those companies manage the -- your intellectual property
15  and your patents overall?
16      MR. RAMEY:  Objection.  Form.
17  Q.  (By Ms. Edlin)  Sorry.
18      You still answer, Mr. Valjakka.
19  A.  Yes, I was thinking of the -- of the different
20  roles of different companies and -- and if we start from
21  the history, first history of '167, it was -- from the
22  beginning, every company had a right to exclusively
23  utilize or exploit the inventions, but they actually
24  never owned the inventions all the way through the --
25  the whole history of -- of these different companies.

Page 73

1  server, which is a remote server, and you establish a
2  connection to that server, so that's -- that's the
3  difference.
4       The data is data, and the encryption, whatever
5  encryption they use, is the same. So you can stream
6  from your neighbor's machine, like Netflix, or -- or
7  servicers taken closer to the market, which means
8  relaying and that's -- that's how it worked.
9       Download service, it was just a policy by music
10 record labels those days.
11    Q.   Okay.
12         So when you said you can stream from your
13 neighbor's machine like Netflix, what do you mean by
14 that?
15    A.   If it's a cache system, if it's cached to
16 servers nearby, it could be. It's -- it's just a
17 technology. It doesn't care. If it's a server
18 somewhere, it's the same.
19         Caching, it means you can cache on -- on
20 devices, use devices, or you can cache on servers, which
21 is doing all of the job of servers.
22    Q.   So when you're talking about your neighbor's
23 machine, you're not talking about their computer?
24    MR. RAMEY:   Objection. Form.
25    THE WITNESS:   I didn't get that question right.

Page 74

1     Q.   (By Ms. Edlin) Sorry. I'm trying to
2  understand what you meant by when you said that "You can
3  stream from your neighbor's machine like Netflix." Are
4  you saying your neighbor being someone who lives near
5  you, or are you saying Netflix is your neighbor? Just
6  if you can explain --
7     A.   Sorry. You -- you mentioned Napster. I meant
8  Napster as -- as peer-to-peer network where human
9  interaction was needed. So that was -- that was --
10 that's a different thing.
11    Q.   Okay.
12         So you were not meaning to refer to Netflix
13 there --
14    A.   No, no, no.
15    Q.   -- you were talking about Napster?
16    A.   Sorry. That was -- because you mentioned
17 Napster, for instance, it was just --
18    Q.   Okay.
19         And as far as you know, Netflix doesn't do
20 peer-to-peer; right?
21    A.   I don't know. Actually, I don't have the
22 complete specification. I would like to see it.
23    MR. RAMEY:   So would we.
24    MS. EDLIN:   Okay.
25    MR. RAMEY:   You knew I had to throw that in

Page 75

1  there.
2     Q.   (By Ms. Edlin) Let's see here. So -- okay.
3         Did you transfer any of your ownership from --
4  in Suomen Biisi to anyone else prior to the bankruptcy?
5     A.   No. No.
6         I need, actually, clarification. What would I
7  have transferred? What do you mean by transferring any
8  rights?
9     Q.   I mean did you -- did you withdraw any of your
10 interest in Suomen Biisi prior to the bankruptcy?
11    A.   Yeah.
12    MR. RAMEY:   Objection. Form.
13    THE WITNESS:   Yes, I tried to -- to save the
14 project and -- and, you know, they -- they ended up to
15 let lapse everything, like the '167 application and
16 already granted patents throughout Europe and Russia and
17 China and Japan. They -- they let lapse. They didn't
18 understand they should have maintained and further
19 developed.
20         So I -- I could foresee that because there was
21 no one who -- who would understand much about patents
22 and that process. So the exploitation agreement that I
23 had made with Biisi was an issue before, but I let --
24 that was left totally with Suomen Biisi, and it's
25 bankrupt.

Page 76

1     Q.   (By Ms. Edlin) Okay.
2         So you said you tried to save the project.
3  What did you do to try to save the project?
4     A.   Well, I didn't do anything afterwards, because
5  it bankrupted, and it became impossible.
6     Q.   And beforehand, how did you try to save the
7  project?
8     A.   Well, I -- I sued Mr. Setälä for -- for
9  violation of the agreements and so forth.
10    Q.   And Mr. Setälä was the CEO?
11    A.   Yeah, he was the CEO.
12    Q.   And what was the outcome of that lawsuit?
13    A.   2007, I think.
14    Q.   Sorry.
15         What was the outcome in 2007?
16    A.   I lost, and -- and they win, but the company
17 went bankrupt.
18    Q.   And when you say you lost, what -- what did you
19 lose?
20    A.   Well, I -- my claim was that I had given only
21 the exploitation right for the '167 application, and --
22 and they granted --
23         (Stenographer clarification.)
24    THE WITNESS:   And, you know, I granted -- I --
25 sorry. I lost my thought with this interruption.

Page 77

1  But so I -- I was -- I had made a deal with the
2  exploitation of the -- of the invention, but they said
3  that that's an ownership issue, and they win. So it's a
4  simple -- simplest way to say this way. And that's it
5  and I left the whole -- whole thing for a while.
6      Q.  (By Ms. Edlin)  Okay.
7      And did you transfer your shares in Suomen to
8  anyone else prior to the bankruptcy?
9      A.  I had to check that. I can't remember, to be
10 honest. I just can't remember.
11     Q.  Okay.
12     Prior to Suomen Biisi, what company were you
13 working with?
14     A.  That was my company, e-3 Systems and, you know,
15 e-3 Systems Oy.
16     Q.  And when you say your company, were you the
17 founder?
18     A.  I was one of the founders, yes.
19     Q.  Who were the others?
20     A.  Matti Saraheimo. And -- what are the others?
21 Petri Jarvensivu, yes.
22     Q.  And were you the CEO?
23     A.  Yes, I was.
24     Q.  Did e-3 Systems sell any products?
25     A.  Yes, it did. We launched the Biisi.fi service.

Page 78

1     Q.  Is that the same service that was then
2  transferred to Suomen Biisi?
3     A.  Yes.
4     Q.  Okay.
5     But Suomen Biisi existed prior to that
6  transaction; is that right?
7     A.  It had a different name, but they changed the
8  name. So answer is: Yes, it existed in in- -- it was
9  inactive form.
10    Q.  Who was the owner of that company at the time
11 that you transferred -- sorry.
12    A.  It was Juha Setälä and his company,
13 Interaktivum.
14    Q.  Okay.
15    Why did you sell your business to Suomen Biisi?
16    A.  I think that there were many reasons, actually,
17 to further develop and -- the service and -- and get
18 better funding and so forth; to market the service
19 and -- and -- because current shareholders didn't want
20 to invest more, and it didn't sell so much music
21 products as we wanted, of course. It wasn't profitable
22 yet.
23    Q.  And did the product at the time, the Biisi.fi
24 product, at the time that it was owned by e-3 Systems
25 Oy, did that practice the claims of the '167 patent?

Page 79

1     A.  I think you have to clarify that question. I
2  didn't understand.
3     Q.  Okay.
4     So you said that the product at Suomen Biisi
5  practiced the claims of the '167 patent. Was it the
6  same at the -- the same system before then at e-3
7  Systems, did they also practice the claims then?
8     MR. RAMEY: Objection. Form.
9     THE WITNESS: First, '167 didn't even exist
10 yet. It was an application, patent application. It was
11 published application. And e-3 Systems used quite
12 original source codes of -- of -- of that. We never
13 published how it worked before -- actually, the EPO
14 patent was granted 2006 August 30. So it was the -- it
15 was based on the EP- -- EPO patent distribution model,
16 and -- and we -- we didn't even know if the U.S. will be
17 ever issued.
18    Q.  (By Ms. Edlin)  Um-hum.
19    A.  We had a patent covering all Europe and -- and
20 still I was careful not to publish any technology being
21 used behind the Biisi service before the EPO -- EPO
22 patent was granted.
23    Q.  Um-hum.
24    A.  So that was the history. The -- the U.S.
25 patent, when Biisi later on bankrupted, was abandoned by

Page 80

1  the applicant, Suomen Biisi Oy.
2     Q.  Okay.
3     A.  So the history starts from 2010 onwards for
4  '167. The EPO number was totally different. And there
5  was some changes from that patent application to the
6  U.S. patent application. It wasn't precisely the same.
7     Q.  Okay.
8     So the foreign patent application, the EP
9  patent, was filed in August of 2001; is that right?
10    A.  That's the PCT application.
11    Q.  Okay.
12    A.  And we -- we continued the application as to
13 EPO, which covered all European -- most of the European
14 countries; not all, but most of the European countries.
15    Q.  Okay.
16    A.  And --
17    Q.  And --
18    A.  Yes.
19    Q.  And so you said before that the patent that was
20 filed in the United States in July of 2002 was somewhat
21 different from the prior EP or application?
22    A.  That's right.
23    MR. RAMEY: Objection. Form.
24    Q.  (By Ms. Edlin)  Do you know in which way it was
25 different?

Page 189

1  UNITED STATES DISTRICT COURT
2  NORTHERN DISTRICT OF CALIFORNIA
3  OAKLAND DIVISION
4
5  IN RE MATTER OF:          )
6  LAURI VALJAKKA,           )
7       Plaintiff,           )
8       vs.                  ) CASE NO.
                             ) 4:22-cv-01490-JST
9  NETFLIX, INC.,            )
10      Defendant.           )
                             )
11
12
13      VIDEOTAPED DEPOSITION OF LAURI VALJAKKA
14          REMOTE VIA VIDEOCONFERENCE
15             Friday, June 2, 2023
16                 Volume II
17              Pages 189 - 359
18
19
20  Stenographically Reported by:
21  HEATHER J. BAUTISTA, CSR, CRR, RPR, CLR
    Realtime Systems Administrator
22  California CSR License #11600
    Oregon CSR License #21-0005
23  Washington License #21009491
    Nevada CCR License #980
24  Texas CSR License #10725
25  Job No.:  6613

Page 190

1       VIDEOTAPED DEPOSITION of LAURI VALJAKKA, Volume
2  II, taken before Heather J. Bautista, CSR No. 11600, a
3  Certified Shorthand Reporter for the state of
4  California, with principal office in the county of Santa
5  Clara, commencing on Friday, June 2, 2023, 8:32 a.m.,
6  remotely via videoconference.
7
8
9
10 APPEARANCES OF COUNSEL:
11
12      For Plaintiff:
13          Ramey LLP
            BY:  WILLIAM P. RAMEY, III, ESQ.
14          5020 Montrose Boulevard
            Suite 800
15          Houston, Texas 77006
            Phone:  (713) 426-3923 / Fax:  (832) 900-4941
16          wramey@rameyfirm.com
17      For Defendant:
18          Perkins Coie LLP
            BY:  ELISE S. EDLIN, ESQ.
19          505 Howard Street
            Suite 1000
20          San Francisco, California 94105
            Phone:  (415) 344-7000 / Fax:  (415) 344-7050
21          eedlin@perkinscoie.com
22
23 ALSO PRESENT:  Jennifer Hewitt
                  Dennis Saelee, Videographer
24
25

Page 191

1               INDEX OF EXAMINATION
2                                                     PAGE
3  LAURI VALJAKKA
4      EXAMINATION BY MS. EDLIN                        195

Page 192

INDEX OF EXHIBITS

| Exhibit No. | Description | Page |
|---|---|---|
| Exhibit 12 | 2001 European patent EP1421759 B1 | 204 |
| Exhibit 13 | U.S. Department of Commerce document, LV2_001108 | 216 |
| Exhibit 14 | Typwritten notes,  LV2_002413 | 218 |
| Exhibit 15 | Typewritten notes, LV002372 | 220 |
| Exhibit 16 | 3/27/2023 Valjakka email chain to Karesniemi | 223 |
| Exhibit 17 | 5/19/2003 Valjakka e-mail chain to Karesniemi, Karesniemi000078 | 227 |
| Exhibit 18 | 1/7/2013 Patent Assignment, LV2_002913 | 242 |
| Exhibit 19 | Patient File History, LV2_001136 | 251 |
| Exhibit 20 | Settlement and License Agreement, Google Agreement LV2004315 | 274 |
| Exhibit 21 | Settlement and License Agreement, Google Agreement LV004070 - LV004086 | 279 |
| Exhibit 22 | Akamai Agreement LV004030 | 286 |
| Exhibit 23 | Sony Agreement, LV004038 - LV004057 | 292 |
| Exhibit 24 | Microsoft Agreement LV004058 | 296 |
| Exhibit 25 | RPX Agreement LV003942 to 3986 | 298 |
| Exhibit 26 | Finnish document, LV_000779 | 313 |
| Exhibit 27 | Finish document, LV2_000410 | 313 |
| Exhibit 28 | Plaintiff Certification of Interested Entities or Persons | 314 |
| Exhibit 29 | Finnish document, LV002109 - LV002107 | 322 |
| Exhibit 30 | 8/10/2020 Preliminary Proposal for Litigation Funding, LV2_000600 | 322 |

```
                                                     Page 305
 1   Q.   Sorry.
 2        I'm on a different document now.  I've gone
 3   back to -- so we're looking at the document that you
 4   downloaded just a minute ago that is titled LV2_000799
 5   and had the date 11th of -- sorry, November 5th, 2021,
 6   and it's in Finnish.
 7        MR. RAMEY:  Title, that -- that's the Bates
 8   number, I think, is what she means.  Sorry.
 9        MS. EDLIN:  Sorry.  The file number -- the file
10   name that is in the chat window, the first -- the -- the
11   second-to-last document in the chat.
12        THE WITNESS:  I need a break.
13   Q.   (By Ms. Edlin)  Let's get through these last
14   two documents.
15   A.   That was a joke.
16   Q.   Okay.
17   A.   Tell me what document name I should search for.
18   Q.   Okay.
19        MR. RAMEY:  I don't -- we don't speak Finnish.
20        MS. EDLIN:  Yeah.  Thank you, Bill.
21        MR. RAMEY:  Do you mind -- do you mind if I
22   help get him there?  It's the document that --
23   L-I-S-E-N-S-S-I-S.  You just had it open a second ago.
24        THE WITNESS:  Yeah.
25        MR. RAMEY:  That's the title.  And then the
```

```
                                                     Page 306
 1   last word's "patent."  I know that because we heard you.
 2   Q.   (By Ms. Edlin)  Can you see it now,
 3   Mr. Valjakka?
 4   A.   No.  Actually I -- I got confused totally with
 5   the documents right now.  I have --
 6   Q.   Do you still have Microsoft Teams open on your
 7   computer?
 8   A.   What was that -- let me check if it's this one.
 9        Yes.  I'm back to the Finnish-language
10   document.
11   Q.   Great.
12        Can you please tell me what this document is.
13   A.   Between me and licensing Finland, CDN
14   Licensing -- CDN Licensing Finland.
15   Q.   And what is the title of the document?
16   A.   (Speaking foreign language).
17   Q.   Okay.
18        What does that mean in English, please?
19   A.   It's a licensing agreement, exclusive licensing
20   agreement for -- for a patent.
21   Q.   Okay.
22        And which patent does this licensing agreement
23   relate to?
24   A.   It's relating to '167.
25   Q.   And --
```

```
                                                     Page 307
 1   A.   Yes, it's the only --
 2   Q.   Okay.
 3   A.   -- patent mentioned here.
 4   Q.   Okay.
 5        And if we scroll down in the agreement to the
 6   page that is marked 801 at the bottom right-hand
 7   corner --
 8   A.   Yes.
 9   Q.   -- can you tell me how much you licensed the
10   '167 patent to CDN Licensing for on -- how much did they
11   pay you?
12   A.   License fee for this license is ███████████.
13   Q.   Okay.
14        And let me just -- I mean, if you scroll down
15   in the agreement, it looks like there is an electronic
16   signature for you on the left-hand side.
17        Do you remember signing this document
18   electronically?
19   A.   Yes.  Yes, I do.
20   Q.   And then on the other side, it's for Onni
21   Hietalahti; correct?
22   A.   Yes, correct.
23   Q.   So this is an -- this is an executed document;
24   right?  Both parties have signed this?
25   A.   Yes.
```

```
                                                     Page 308
 1   Q.   And is it correct that it was entered on
 2   November 5th, 2021?
 3   A.   Yes.
 4   Q.   Okay.
 5        And -- and did you -- sorry, I think you said
 6   it was ██████████ that -- that was exchanged for this?
 7   A.   Yes, I did.
 8   Q.   Okay.
 9        If you can look at Page 801 again up -- it's
10   Page 3 of 17.  The third paragraph down, can you explain
11   to me what that says.
12   A.   Third paragraph?
13   Q.   You can summar- -- you can summarize.
14   A.   Yeah.
15        Free translation not official.  ███████████████
16   ████████████████████████████████████████████████████████
17   ████████████████████████████████████████████████████████
18   ████████████████████████████████████████████████████████
19   ████████████████████████████████████████████████████████
20   ████████████████████████████████████████████████████████
21   ████████████████
22   █   ████████████████████████████████████████████████████
23   ████████████████████████████████████████████████████████
24   █   ████████████████████████████████████
25   Q.   And did CDN Licensing receive the payments that
```

Page 313

1    (Recess taken from 1:24 p.m. to 1:45 p.m.)
2        THE VIDEOGRAPHER: We're back on the record.
3  The time is 1:45 p.m.
4        MS. EDLIN: Great.
5        And I realized while we were off the record
6  that I think I forgot to mark the last two as exhibits.
7  LV2_000799 should be marked as Exhibit 26. And
8  LV2_000410 should be marked as Exhibit 27, please.
9        (Stenographer clarification.)
10       (Exhibits 26 and 27 were marked for
11 identification.)
12    Q.   (By Ms. Edlin) All right.
13       So I am putting one more document in the chat
14 right now, Mr. Valjakka. You can go ahead and download
15 that, please.
16    A.   Yes.
17    Q.   And open it up.
18    A.   I'm at it now.
19    Q.   Do you know what this document is?
20    A.   It's a United States District Court for
21 Northern District of California, Oakland Division
22 Plaintiff Certification of Interest -- Interested
23 Entities or Persons.
24    Q.   Have you seen this document before?
25    A.   Yes.

Page 314

1    Q.   Okay.
2        So the document states that other parties named
3  in the action -- other than parties named in the action,
4  the following listed persons, associations of persons,
5  firms, partnerships, corporations, or other entities
6  have a financial interest, in any kind -- in the subject
7  matter in controversy or in a party to the proceeding or
8  any other kind of interest that could be substantially
9  affected by the outcome of the proceeding.
10       Do you see that?
11    A.   Yes.
12       MS. EDLIN: And -- and we can go ahead and mark
13 this as Exhibit 28, please.
14       (Exhibit 28 was marked for identification.)
15    Q.   (By Ms. Edlin) So the three parties that are
16 listed here, can you tell me who they are?
17    A.   Ramey, LLP; and Kenealy Vaidya, LLP; IP Case
18 Group 1, LLC.
19    Q.   And what is Mr. -- or Ramey LLP's interest in
20 the -- in this case?
21    A.   He's my lawyer.
22    Q.   And so does he have a financial interest in
23 this case?
24    A.   Not directly; just as a lawyer.
25    Q.   Is your arrangement with Mr. Lawyer --

Page 315

1  Mr. Ramey that -- that he will have a financial interest
2  depending on the outcome of this case?
3     A.   No. It's -- it's normal lawyers' costs and
4  that's it. That's my answer.
5     Q.   Okay.
6        And who is Kenealy Vaidya, LLP?
7     A.   That is company linked to AiPi, who is the
8  financial -- or -- or the case funder funding entity
9  company, and this is a company that is closely operating
10 with them.
11    Q.   And you said it was AiPi; is that what you
12 said?
13    A.   AiPi company in Virginia.
14    Q.   And they're your -- they're your funder?
15    A.   Yes, they -- they organize funding --
16    Q.   Are they still organizing funding for you?
17    A.   -- of this litigation.
18    Q.   Okay.
19       Are they still organizing the funding of this
20 litigation?
21    A.   Yes.
22    Q.   And is Kenealy Vaidya, LLP, still organizing
23 the funding of this litigation?
24    A.   I understand that they are in collaboration
25 with AiPi --

Page 316

1     Q.   Okay.
2     A.   -- company who is in charge of the funding.
3     Q.   Okay.
4        And then --
5        (Stenographer clarification.)
6     Q.   (By Ms. Edlin) -- IP Case Group 1, LLC, who's
7  that?
8     A.   I think they are subcontracted to AiPi as
9  well --
10    Q.   Okay.
11    A.   -- through part of that arrangement.
12    Q.   Okay.
13       Has the financial interest in this matter
14 changed since this statement was filed, which I believe
15 the date on it is April 27th, 2022?
16    A.   To my knowledge, no.
17    Q.   Okay.
18       And are any of these entities related to CDN
19 Licensing?
20    A.   CDN Licensing is -- is representing me here
21 through the licensing agreement in Finland.
22    Q.   Um-hum.
23       Does CDN Licensing have an interest to the
24 outcome of this case?
25    A.   Yes.

Page 317

1  Q.  And they are not listed on this document, are
2  they?
3  A.  Please repeat.
4  Q.  CDN Licensing is not listed in this corporate
5  disclosure statement pursuant to Civil Legal Rule 3-15
6  in the Northern District of California; correct?
7  A.  Correct.
8  Q.  Are there any other parties at this time that
9  have a financial interest of any kind in this matter or
10 the outcome of the proceedings against Netflix?
11 A.  No.
12 Q.  So it is just Ramey, LLP, Kenealy Vaidya, IP
13 Case Group 1, and CDN Licensing?
14 A.  I mentioned to you AiPi.
15 Q.  Okay.
16     And so you looked -- earlier, we looked at a
17 licensing agreement that made CDN Licensing the
18 exclusive licensee of the -- of the patents-in-suit.  Do
19 you have any similar licensing agreements with any of
20 these other entities?
21 A.  No.
22 Q.  Do you have any agreements with these other
23 entities that describes their interests in the
24 litigation?
25     MR. RAMEY:  Objection.  Form.

Page 318

1     THE WITNESS:  I have made an agreement with
2  AiPi to organize --
3     (Stenographer clarification.)
4     THE WITNESS:  -- the U.S. end of the litigation
5  also including the funding, so --
6  Q.  (By Ms. Edlin)  What do you mean by the U.S.
7  end?
8  A.  Ramey is my lawyer, we have -- we have an
9  agreement with there, and these are normal arrangements.
10 So AiPi is the funder of the litigation.
11 Q.  Okay.
12     AiPi is the funder of the litigation.
13 A.  Yeah, they organize the funding.
14 Q.  And -- and that includes their -- the interest
15 of Kenealy Vaidya and IP Case Group?
16     MR. RAMEY:  Objection.  Form.
17     THE WITNESS:  I don't see -- now you have to
18 repeat the question.  What is the idea of this question?
19     I have agreements with these companies, and I
20 have an agreement separately with -- with AiPi.
21 Q.  (By Ms. Edlin)  Okay.
22     Have you produced these -- these agreements
23 in -- to your attorneys in this case?
24     MR. RAMEY:  Objection.  Form.
25     THE WITNESS:  I think it's -- I haven't, and

Page 319

1  it's disclosed.
2     (Stenographer clarification.)
3  Q.  (By Ms. Edlin)  Okay.
4     So you have agreements with all of these
5  entities that are listed in your corporate disclosure
6  statement, as well as others who are funding this
7  litigation, and you have not produced the agreements.
8  A.  Well, this is actually a question that you
9  should ask my lawyer what -- what should be produced and
10 what not.  It's not --
11 Q.  I'm asking -- I'm asking you.  Did you give
12 these agreements to your lawyer?
13     I need you to answer the question.
14 A.  Is -- is it for Bill?
15 Q.  No, the question is to you.
16     Did you give these agreements to your lawyer?
17 A.  Actually, I -- I have authorized AiPi to -- to
18 cut the deal -- the agreements.
19 Q.  You authorized AiPi to give -- sorry.  I -- you
20 can -- finish your answer.  I'm sorry.
21 A.  I'm not aware if they have produced the
22 agreements to this case.  I'm not sure.
23 Q.  Okay.
24     So you authorized AiPi to give the agreements
25 to your attorney.

Page 320

1  A.  Yes.
2  Q.  And that would be all of the agreements that we
3  are talking about, so an agreement with AiPi, with
4  Kenealy Vaidya and IP Case Group?
5  A.  Yes, to my understanding, yes.
6     MS. EDLIN:  Okay.
7     I'm going to ask, Mr. Ramey, that those get
8  produced immediately, please, and --
9     MR. RAMEY:  Sure, to the extent they're -- they
10 haven't been produced, we'll gladly look and make sure
11 we've produced them if they're relevant to the
12 litigation.
13     MS. EDLIN:  Okay.
14 Q.  (By Ms. Edlin)  Okay.
15     Let's -- let's move on.
16     I think there should be a few more documents in
17 the chat.  Let's start with LV0002102.  It's in the chat
18 window.  You can go ahead and download that.
19 A.  I have opened -- I have to open the first
20 document.
21 Q.  Great.
22     What is this document?
23 A.  It's separate bridge funding and patent
24 rights -- bridge funding for patent rights presentation,
25 confidential documents sent to only some that I have