UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAURI VALJAKKA,<br><br>    Plaintiff,<br><br>v.<br><br>NETFLIX, INC.,<br><br>    Defendant. | Case No. 22-cv-01490-JST<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>Re: ECF No. 79 |

Before the Court is Netflix's motion for judgment on the pleadings. ECF No. 79. The Court will grant the motion in part and deny it in part.

## I. BACKGROUND

Plaintiff Lauri Valjakka alleges that Defendant Netflix, Inc., infringes numerous claims of two patents: U.S. Patent No. 10,726,102 ("'102 patent") and U.S. Patent No. ("'167 patent"). ECF No. 74. The '102 patent "relates to an apparatus, method and/or system for providing restricted content to a user." '102 patent at 1:9–11. The '167 patent "relates to improvements in data communications networks and to systems, methods and apparatus employed in such networks." '167 patent at 1:6–8.

Valjakka initially filed suit in the Western District of Texas on September 13, 2021. ECF No. 1. After the case was transferred to the Northern District of California, ECF No. 16, the Court granted Netflix's motion to dismiss Valjakka's willful infringement claim on October 11, 2022. ECF No. 60. The Court held a *Markman* hearing and issued a claim construction order on December 13, 2022. ECF No. 73. Netflix subsequently filed the present motion on January 17, 2023, ECF No. 79, which the Court took under submission without a hearing on February 24, 2023, ECF No. 24.

## II. LEGAL STANDARD

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Because a Rule 12(c) motion is 'functionally identical' to a Rule 12(b)(6) motion, 'the same standard of review applies to motions brought under either rule.'" *Gregg v. Hawaii*, 870 F.3d 883, 887 (9th Cir. 2017) (quoting *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011). That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A judgment on the pleadings is properly granted when, 'taking all the allegations in the pleadings as true, the moving party is entitled to judgment as a matter of law.'" *Gregg*, 870 F.3d at 887 (quoting *Nelson v. City of Irvine*, 143 F.3d 1196, 1200 (9th Cir. 1998)).

"Challenges to patentability under [35 U.S.C. § 101] may be brought based solely on the pleadings, including on a Rule 12(c) motion for judgment on the pleadings." *Broadcom Corp. v. Netflix Inc.*, 598 F. Supp. 3d 800, 804–05 (N.D. Cal. 2022) (quoting *Open Text S.A. v. Box, Inc.*, 78 F. Supp. 3d 1043, 1045 (N.D. Cal. 2015)). "Section 101. . . defines the subject matter eligible for patent protection" as "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (quoting 35 U.S.C. § 101). The Supreme Court has "long held that this provision contains an important implicit exception: . . . . abstract ideas are not patentable." *Alice*, 573 U.S. at 216 (quoting *Ass'n for Molecular Pathology v. Myriad Genetics*, 569 U.S. 576, 589 (2013)). But "an invention is not rendered ineligible for patent simply because it involves an abstract concept." *Id.* at 217. Courts must distinguish between patents that claim abstract ideas, on the one hand, and patents "that claim patent-eligible *applications* of those concepts," on the other. *Id.* (emphasis added).

To determine whether a patent claims an abstract concept, courts engage in a two-step inquiry. First, courts determine whether the claims at issue are "directed to" an abstract idea. *Id.* "[S]tep one presents a legal question" only, which "does not require an evaluation of the prior art or facts outside of the intrinsic record." *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1372,

2

1374 (Fed. Cir. 2020). This analysis often begins "with an examination of eligible and ineligible claims of a similar nature from past cases." *Amdocs (Isr.) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1295 (Fed. Cir. 2016). "Under this inquiry, [courts] evaluate the focus of the claimed advance over the prior art to determine if the character of the claim as a whole, considered in light of the specification, is directed to excluded subject matter." *Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1378, 1384 (Fed. Cir. 2019) (internal quotation marks and citation omitted). When a claim recites "a desired function or outcome, without providing any limiting detail that confines the claim to a particular solution to an identified problem," the "functional nature of the claim confirms that it is directed to an abstract idea." *Affinity Labs of Tex., LLC v. Amazon.com Inc.*, 838 F.3d 1266, 1269 (Fed. Cir. 2016). The "essentially result-focused, functional character of claim language has been a frequent feature of claims held ineligible under § 101, especially in the area of using generic computer and network technology." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1356 (Fed. Cir. 2016). Finally, there is no need to analyze every claim where "all the claims are 'substantially similar and linked to the same abstract idea.'" *Content Extraction & Transmission LLC v. Wells Fargo Bank*, 776 F.3d 1348, 1348 (Fed. Cir. 2014).

If the claims are directed to an abstract idea, the inquiry proceeds to step two. At step two, courts "consider the elements of each claim both individually and as an ordered combination" to determine "whether [the claims] contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 217, 221 (quoting *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 73, 79 (2012)). "Stating an abstract idea 'while adding the words *apply it*' is not enough for patent eligibility. Nor is limiting the use of an abstract idea 'to a particular technological environment.'" *Id.* at 223 (emphasis added) (first quoting *Mayo*, 566 U.S. at 72; and then quoting *Bilski v. Kappos*, 561 U.S. 593, 610 (2010)). Rather, this test "is satisfied when the claim limitations 'involve more than performance of well-understood, routine, [and] conventional activities previously known to the industry.'" *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1367 (Fed. Cir. 2018) (alteration in original) (quoting *Content Extraction*, 776 F.3d at 1347–48). Both parts of the inquiry are informed by "the claims in light of the written description." *Amdocs*, 841 F.3d at 1299.

3

### III. DISCUSSION

At the outset, the Court notes that Valjakka repeatedly emphasizes the novelty of the inventions claimed in each patent. As to the '167 patent, Valjakka also relies on a Notice of Allowability issued by the United States Patent and Trademark Office ("USPTO") as evidence of novelty. But "whether a claimed process is novel or non-obvious is irrelevant to the [Section] 101 analysis" because "[t]he obligation to determine what type of discovery is sought to be patented must precede the determination of whether that discovery is, in fact, new or obvious." *In re Bilski*, 545 F.3d 943, 958 (Fed. Cir. 2008), *aff'd sub. nom.*, *Bilski v. Kappos*, 561 U.S. 593 (2010); *Parker v. Flook*, 437 U.S. 584, 593 (1978). In that vein, "prior determinations by the USPTO regarding novelty have no bearing on whether the asserted claims are parent eligible under [Section] 101." *Aftechmobile Inc. v. Salesforce.com*, No. 19-cv-05903-JST, 2020 WL 6129139, at *9 (N.D. Cal. Sept. 2, 2020). The Court does not consider Valjakka's arguments as to novelty.

To the extent that Valjakka relies on the Notice of Allowability as demonstrative of patent eligibility, the Federal Circuit has explained that courts and the USPTO "take different approaches in determining invalidity and on the same evidence could quite correctly come to different conclusions." *Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1428 (Fed. Cir. 1988). Consequently, the Notice is of no assistance to this Court's application of binding precedent.

### A. '102 Patent

The "aim" of the '102 patent is "to provide an alternative method of and a system for providing access to access restricted content to a user." '102 patent at 1:22–24. Toward that end, claim 10 recites,

> A method, comprising:
>
> > obtaining an access restricted content from at least one of a content database and a content providing server;
> >
> > obtaining a first digital rights management key from a content database, wherein the obtaining is based at least in part on a query, the query comprising the content identifier and an identifier associated with the user;
> >
> > deriving, using the first digital rights management key, from the access restricted content a fingerprint of the access restricted content wherein the obtaining is based at least in part

4

on the first digital rights management key;

causing the content providing server to validate the fingerprint and, if the validation is successful, accessing the accessing restricted content and information describing encryption properties of the access restricted content, and

deriving, using the digital rights management header of the access restricted content, from the access restricted content a second and third digital rights management key,

wherein the second and third digital rights management keys are applied to retrieve the payload of the access restricted content and wherein at least one of the second or third digital rights management key is used to encrypt the other key of the second or third digital rights management key,

wherein the content is usable without being in an unprotected state.

'102 patent at 14:1–20.

### 1.  *Alice* Step One

Netflix argues that claim 10 is directed to an abstract idea because it "does nothing more than serve as a vault for restricted content that allows a person to 1) request access to content, 2) authenticate user identity, 3) apply well-known and conventional rule(s) to ensure that the user is authorized, and 4) if authorized permit access to the content."  ECF No. 79 at 12.  Valjakka argues that claim 10 "[i]mprov[es] security for media content" via "a specific technique that departs from earlier approaches to solve a specific computer problem" and is therefore not abstract.  ECF No. 83 at 17.

The Court agrees with Netflix.  The specification explains that "[t]here are numerous ways of controlling and protecting . . . digital content, for example, using digital management methods."  '102 patent at 1:18–20.  While claim 10 describes a process obtaining access to restricted content through the use of digital rights management keys, it does not "incorporate[] specific features" that "limit[]" the claim "to a specific process."  *McRO, Inc. v. Bandai Namco Games Am., Inc.*, 837 F.3d 1299, 1316 (Fed. Cir. 2016).  Rather, the claim describes "generic processes" of obtaining digital rights management keys, deriving a fingerprint, validating the fingerprint, accessing the restricted content, and using the restricted content in an unprotected state "without any limitation on how to produce th[ose] result[s]."  *Id.* at 1314; *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d

1135, 1345 (Fed. Cir. 2018). The claim language thus possesses the "essentially result-focused, functional character" typical of claims held to be directed at abstract ideas. *Elec. Power Grp.*, 830 F.3d at 1356; *see Sanderling Mgmt. Ltd. v. Snap, Inc.*, 65 F.4th 698, 703 (Fed. Cir. 2023) (holding claims abstract because they were "not directed to a specific improvement in computer functionality but, instead, to the use of computers as a tool . . . to identify when a condition is met and then to distribute information based on satisfaction of that condition"); *Hawk Tech. Sys., LLC v. Castle Retail, LLC*, 60 F.4th 1349, 1354 (Fed. Cir. 2023) (holding claims abstract because they were directed to the "general abstract ideas" of "displaying images, converting them into a format, transmitting them, and so on"); *Content Extraction*, 776 F.3d at 1347 (holding claims abstract because they entailed "collecting data," "recognizing certain data within the collected data set," and "storing the recognized data in memory"); *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 613 (Fed. Cir. 2016) (holding claims abstract because they were "directed to the abstract idea of classifying and storing digital images in an organized manner"). Accordingly, the Court concludes that claim 10 is "directed to the abstract idea of providing restricted access to resources." *Prism Techs. LLC v. T-Mobile USA, Inc.*, 696 F. App'x 1014, 1018 (Fed. Cir. 2017).

Valjakka's arguments to the contrary are unpersuasive. Valjakka first emphasizes that the method "allows a user to view or listen to the content file without the content file being in an unprotected state, something that was not previously used in way [*sic*] now claimed with these types of DRM keys." ECF No. 83 at 18. But the method recited by claim 10 arrives at that result without any specific process. Instead, the claim recites in a conclusory manner that "the content is usable without being in an unprotected state." '102 patent at 14:20. And, as Netflix points out, ECF No. 84 at 7, even if content obtained using digital rights management keys was not previously usable in a protected state, "a new abstract idea is still an abstract idea." *Synopsis, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1151 (Fed. Cir. 2016).

Second, Valjakka seeks to distinguish the cases on which Netflix relies, including the Federal Circuit's decision in *Prism Techs. LLC v. T-Mobile USA, Inc.*, 696 F. App'x 1014 (Fed. Cir. 2017). Valjakka argues that the method at issue concerned the "authentication of identity data," not the retrieval of restricted content. ECF No. 83 at 19. But Valjakka mischaracterizes

*Prism*, where the claim at issue recited "[a] method for controlling access . . . to protected computer resources." 696 F. App'x at 1016. The Federal Circuit noted that the method consisted of:

> (1) receiving identity data from a device with a request for access to resources; (2) confirming the authenticity of the identity data associated with that device; (3) determining whether the device identified is authorized to access the resources requested; and (4) if authorized, permitting access to the requested resources.

*Id.* at 1017. Similarly, claim 10 entails requesting content via a user-initiated query, deriving and validating a fingerprint to determine whether the user is authorized to access the restricted content, and permitting the user to access that content if so authorized. *Prism* is thus analogous to the case at hand.

Third, Valjakka emphasizes that "[t]he Federal Circuit cautioned a court or party not to rely too much on their precedent when informing *Alice* analysis." ECF No. 83 at 20. While it is true that patent eligibility "must be decided on a case-by-case basis," *CosmoKey Sols. GmbH & Co. KG v. Duo Sec. LLC*, 15 F.4th 1091, 1099 (Fed. Cir. 2021), it is also true that "the decisional mechanism courts . . . apply" in determining patent eligibility "is to examine earlier cases in which a similar or parallel descriptive nature can be seen—what prior cases were about, and which way they were decided." *Amdocs*, 841 F.3d at 1288. The similar nature of this case to those cited above confirms that claim 10 is directed to an abstract idea.

### 2. *Alice* Step Two

Netflix argues that the '102 patent does not supply an inventive concept because it "simply takes the abstract idea of providing access to restricted content and then tells a generic computer network to 'apply it' using generic software and hardware." ECF No. 79 at 14. Valjakka argues that the patent "states a specific improvement to authentication that increases content management security, prevents unauthorized access by a third party or misuse of the content files by the user, is easily implemented using a specific process of digital rights management keys, and can advantageously be carried out with mobile devices such as smart phones and tablets of low complexity." ECF No. 83 at 21.

Even if the result of the method recited is an improvement to authentication, the claim

1  nonetheless "simply instruct[s] the practitioner to implement the abstract idea." *Alice*, 573 U.S. at
2  225. The claim features "generic functional language" that details instances of causing, obtaining,
3  and deriving that somehow result in content being usable in a protected state. *Two-Way Media*
4  *Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1339. (Fed. Cir. 2017). But it "contains
5  no restriction on how the result is accomplished . . . [and] [t]he mechanism" for accomplishing
6  that result "is not described, although this is stated to be the essential innovation." *Intel. Ventures*
7  *I LLC v. Symantec Corp.*, 838 F.3d 1307, 1316 (Fed. Cir. 2016) (quoting *Internet Patents Corp. v.*
8  *Active Network, Inc.*, 790 F.3d 1343, 1348 (Fed. Cir. 2015)). Rather, the claim "simply recites
9  that the abstract idea of [accessing restricted content in a protected state] will be implemented
10 using conventional components and functions generic to [accessing restricted content]." *Affinity*
11 *Labs*, 838 F.3d at 1263. Consequently, the '102 patent "contain[s] no limitations—either
12 individually or as an ordered combination—that transform the claim[] into a patent-eligible
13 application." *Content Extraction*, 776 F.3d at 1348

### B.     '167 Patent

The parties principally dispute the patent eligibility of independent claim 1 of the '167 patent, but they also dispute the eligibility of dependent claims 3, 4, 5, 6, 11, 12, 13, and 14. However, their arguments as to the dependent claims are both cursory and duplicative of their arguments with respect to claim 1. *See* ECF No. 79 at 22–23, ECF No. 83 at 28–29. The parties thus "appear to treat" claim 1 "as representative," and Valjakka "does not present any meaningful argument for the distinctive significance of" the "claim limitations not found in" claim 1. *Berkheimer*, 881 F.3d at 1365. Accordingly, the Court treats claim 1 as representative.

The '167 patent "seeks to provide improved network systems, methods[,] and apparatus whereby network performance is enhanced." '167 patent at 1:18–20. Claim 1 recites:

> A data communication network comprising: a plurality of terminals; and
>
> a main server adapted to manage selective retrieval of data from a first server by at least one target terminal selected from said plurality of terminals, said main server being distinct from said first server; and
>
> a network information database containing terminal

> performance information, wherein
>
> at least two of said terminals are adapted to act as relay servers for serving data retrieved from said first server to at least one target terminal; and wherein
>
> the main server is adapted to send transport requests direct [*sic*] to at least one first target terminal on the basis of said terminal performance information, and wherein the main server is further adapted to monitor response times of terminals in the network and in which terminals are selected to act as relay servers for a particular data transfers on the basis of their relative response times, and the first target terminal is adapted to act as relay server; and
>
> wherein each such transport request includes details of data to be retrieved, the address of the first server from which the data is to be requested by the first target terminal, the addresses of at least one second target terminal to which the data from the first server to be relayed by the first target terminal and an indication of a relative performance of a further target terminal based on the terminal performance information stored in the network information database; and
>
> wherein terminals adapted to act as relay servers are adapted to modify transport requests received from the main server or from other relay servers and to transmit the modified transport request to selected target terminals from a set of target terminals identified in the transport request, wherein the modified transport request further includes addresses of further target terminals for which the recipient of the modified transport request is to act as relay server; and
>
> wherein data to be retrieved by said target terminals are divided into a series of packets for transmission to said target terminals and each of said terminals is adapted to communicate directly with said main server to acknowledge receipt of the last packet of a series routed thereto.

'167 patent at 8:64–9:38.

### 1. *Alice* Step One

Netflix argues that claim 1 "is directed to the abstract idea of distributing the delivery of content among multiple actors." ECF No. 79 at 19. Valjakka argues that the claims "specifically identify how [a] functionality improvement is effectuated in an assertedly unexpected way." ECF No. 83 at 29.

"This case . . . presents a 'close call[] about how to characterize what the claims are directed to." *BASCOM Glob. Int. Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016) (quoting *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1339 (Fed. Cir. 2016)). The

9

1    claim does contain certain "limiting detail[s] that confine[] the claim to a particular solution to an
2    identified problem." *Affinity Labs*, 838 F.3d at 1269.  At the same time, however, the claim is, in
3    some respects, "drawn to the abstract idea of allocating tasks across a system of servers."
4    *Broadcom*, 598 F. Supp. 3d at 807.  As a result, "the claim[] and [its] limitations do not readily
5    lend themselves to a step-one finding that they are directed to a nonabstract idea."  *BASCOM*, 827
6    F.3d at 1349.  The Court therefore "defer[s] [its] consideration of the specific claim limitations'
7    narrowing effect for step two."  *Id.*

### 2.   *Alice* Step Two

Netflix argues that "nothing in claim 1 is remotely a technological advance."  ECF No. 79 at 20.  Valjakka argues that the claim is "directed to a specific improvement in the performance of a content management network."  ECF No. 83 at 26.

The claim language expressly restricts the process by which data is transferred over the network.  The claim requires that (1) a main server manage retrieval of data from a first server by a target terminal; (2) at least two terminals in the network operate as relay servers, which transfer the data from the first server to the target terminal; (3) the main server monitor terminal performance to determine which terminals are optimal for adaptation as relay servers; (4) the network adapt those optimal terminals to act as relay servers; (5) the main server send transport requests to the relay servers, and relay servers further modify those requests include the addresses of further target terminals; (6) data packets be divided for transmission; and (7) each target terminal communicate receipt of all data to the main server.

Although each of these limitations invokes certain generic network processes, the Federal Circuit has explained that "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces."  *BASCOM*, 827 F.3d at 1350.  Such is the case here.  The patent purports to enhance the performance of client/server data networks.  The specification explains,

> In conventional client/server data networks, such as TCP/IP or other routed networks, a main server serves all terminals via a single server socket. This results in extreme spikes in the network load, especially when data is required to be transferred to a large number of clients simultaneously, causing delays in data transmission.

> The present invention seeks to provide improved network systems, methods[,] and apparatus whereby network performance is enhanced.

'167 patent at 1:11–20.

    The patent also expressly ties the limitations of claim 10 to that enhanced performance. Consistent with the elements of claim 1, the network first uses the monitored terminal performance to perform a "dynamic routing," which determines the optimal route through which to transmit data. *Id.* at 5:43.  As part of that routing, "each one of the first set of terminals selects a further two or three 'best' terminals/relay servers from the addresses forwarded to it by the main server and passes the modified transport request on to these terminals, including the details of the other remaining target terminals." *Id.* at 5:38–43.  If a terminal fails, "this is registered in the database and failed deliveries are repeated during the next transfer." *Id.* at 5:46–48.  Next, "[o]nce the route to a particular target has been established, the packets of the data file are passed along the defined route via the selected relay servers on the basis of the target terminal address in the handle/header of each packet." *Id.* at 5:49–52.  This "[a]utomatic routing evenly divides the load over a larger network region, reducing the time window required for any particular data transfer operation." *Id.* at 5:53–55.  Together, the "dynamic routing and distributed data transfer ensures optimal or near-optimal data transfer rates to every terminal in the entire terminal network and dynamic routing ensures data delivery even if part of the network fails." *Id.* at 7:55–58.

    Therefore, although "[t]he solution requires arguably generic components, including network [components] which [transfer data]," the claim "necessarily requires that these components operate in an unconventional manner to achieve an improvement in [network] functionality." *Amdocs*, 841 F.3d at 1300–01; *see id.* at 1301 (holding that the patent contained an inventive concept where it was "tied to a specific structure of various components" and "purposefully arranges the components in a distributed architecture to achieve a technological solution to a technological problem specific to computer networks"); *BASCOM*, 826 F.3d at 1350 (holding that the patent contained the inventive concept of "the installation of a filtering tool at a specific location, remote from the end-users, with customizable filtering features specific to each end user," which permitted the filtering tool to have "both the benefits of a filter on a local

11

1 computer and the benefits of a filter on the [Internet Service Provider] server"); *DDR Holdings,*
2 *LLC v. Hotels.com, LP*, 773 F.3d 1245, 1258–59 (holding that the patent claims "recite[d] an
3 invention that is not merely the routine or conventional use of the Internet" because they
4 "specif[ied] how interactions with the Internet are manipulated to yield a desired result—a result
5 that overrides the routine and conventional sequence of events ordinarily triggered by the click of
6 a hyperlink"). Consequently, "[o]n this limited record, this specific method of [transferring data
7 across a client/server data network] cannot be said, as a matter of law, to have been conventional
8 or generic." *BASCOM*, 827 F.3d at 1350. The Court concludes that, in consideration of its
9 elements as an ordered combination, claim 1 supplies an inventive concept.

10 In its argument to the contrary, Netflix quotes cases for the general proposition that data
11 transfer across a network of servers is not inventive and otherwise cites portions of the patent that
12 feature generic technological processes. *See* ECF No. 79 at 20–22. But Netflix fails to
13 meaningfully engage with the discrete limitations that restrict the claim to a specific process, the
14 elements of the claim as an ordered combination, or the resulting improvement in network
15 functionality over that of conventional client/server data networks when that specific process
16 occurs. The cases on which Netflix relies are readily distinguishable because they concerned
17 patents that lacked these or analogous features. *See Content Extraction*, 776 F.3d at 1348 (holding
18 that the patents failed to supply an inventive concept where a limitation, for example, "merely
19 described generic optical character technology, which [the] plaintiff conceded was a routine
20 function of scanning technology at the time the claims were filed"); *buySAFE, Inc. v. Google, Inc.*,
21 765 F.3d 1350, 1355 (Fed. Cir. 2014) (holding that the patents failed to supply an inventive
22 concept where, "with no further detail," the claim recited that "a computer receives a request for a
23 guarantee and transmits an offer of guarantee in return"); *Broadcom*, 598 F. Supp. 3d at 809
24 (holding that the patent failed to supply an inventive concept because "there [wa]s no disclosure
25 that explains how the claimed method causes computer systems to function in any fundamentally
26 different way from traditional computer systems"); *Appistry, Inc. v. Amazon.com*, No. C15–311
27 MJ, 2015 WL 4210890 (W.D. Wash. Jul. 9, 2015), *aff'd sub. nom.*, *Appistry, LLC v. Amazon.com,*
28 *Inc.*, 676 F. App'x 1007 (Fed. Cir. 2017) ("But the *actual systems and methods* claimed—through

12

1  which efficacy and reliability are achieved—are well understood, routine, and purely
2  conventional . . . ." (emphasis added)).

## CONCLUSION

For the foregoing reasons, Netflix's motion is granted as to Valjakka's claims predicated on the '102 patent and denied as to his claims predicated on the '167 patent. Although Valjakka has already amended his complaint three times, this order represents the first time these issues have come before the Court. Accordingly, the Court grants Valjakka leave to amend the complaint with respect to his claims relating to the '102 patent. *See Gregg*, 870 F.3d at 889. "In light of the plain language of [claim 10] in the ['102] patent, the Court has some doubt that [Valjakka] can amend around this problem." *Broadcom*, 598 F. Supp. 3d at 809. Nonetheless, Valjakka may file an amended complaint within 21 days of the date of this order. Failure to timely file an amended complaint will result in dismissal of Valjakka's claims relating to the '102 patent with prejudice.

**IT IS SO ORDERED.**

Dated: August 22, 2023



JON S. TIGAR
United States District Judge