Sarah E. Piepmeier, Bar No. 227094
SPiepmeier@perkinscoie.com
Elise Edlin, Bar No. 293756
EEdlin@perkinscoie.com
PERKINS COIE LLP
505 Howard Street, Suite 1000
San Francisco, California 94105
Telephone: +1.415.344.7000
Facsimile:  +1.415.344.7050

[Additional Counsel Listed on Signature Page]

*Attorneys for Defendant NETFLIX, INC.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| LAURI VALJAKKA,<br><br>Plaintiff,<br><br>v.<br><br>NETFLIX, INC.,<br><br>Defendant.<br>_____<br>*(And Related Counterclaims)* | **Case No. 4:22-cv-01490-JST**<br><br>**DEFENDANT NETFLIX, INC.'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:     November 30, 2023<br>Time:    2:00 pm<br>Judge:   Honorable Jon S. Tigar |

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on November 30, 2023, at 2:00 p.m., or as soon thereafter as the matter may be heard in courtroom of the Honorable Jon S. Tigar of the United States District Court for the Northern District of California, Oakland Division, Defendant will and hereby does move the Court for summary judgment pursuant to Federal Rule of Civil Procedure 56.

This motion is based on this notice of motion and motion, the supporting memorandum of points and authorities, the accompanying Declaration of Elise Edlin ("Edlin Decl."), including exhibits, and any additional evidence and arguments that are presented.

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ............................................................................................. 1

II.     VALJAKKA'S INFRINGEMENT CLAIMS ARE BARRED BY LACK OF
        STANDING, INEQUITABLE CONDUCT, AND UNCLEAN HANDS....................... 2

        A.      Statement of Material Undisputed Facts ................................................ 2

                1.      Valjakka Manipulated the Chain of Title of the '167 Patent. ................... 2

                        a.      In 2007, Valjakka Properly Retroactively Transferred His
                                Patent Rights to SBO with *Nunc Pro Tunc* Assignments. ............ 2

                        b.      The Asserted Patent's Chain of Title Ends with SBO. ................. 4

                        c.      Valjakka Improperly Revived the '685 Application by
                                Submitting False Statements to the PTO. ..................................... 6

                2.      Valjakka Has Fraudulently Conducted His Litigation Campaign............. 8

        B.      It Is Undisputable That Valjakka Does Not Own the '167 Patent, and the
                Court Should Grant Summary Judgment of No Ownership and Dismiss the
                Infringement Claim for Lack of Standing. .................................................. 9

                1.      There Is No Genuine Dispute of Fact That Valjakka Intended to,
                        and Did, Assign His Rights in the '685 Application to SBO................... 10

                2.      The Utilization Agreement Did Not, and Cannot, Convey Rights in
                        the '685 Application to Valjakka. ............................................................ 11

                3.      Post-SBO Assignments Were Ineffective and Cannot Create a
                        Genuine Issue of Material Fact as to Ownership. ................................... 11

                4.      With No Ownership or Exclusionary Rights, Valjakka Lacks
                        Standing. .................................................................................................. 12

        C.      The '167 Patent Is Unenforceable Due to Valjakka's Inequitable Conduct
                and Unclean Hands. ...................................................................................... 13

                1.      Valjakka Intentionally Deceived the PTO. ............................................. 14

                2.      Valjakka's Misrepresentations and Omissions Are Material................... 16

                3.      The '167 Patent Is Unenforceable Due to Unclean Hands. .................... 16

                        a.      Valjakka's Deceit of the PTO Establishes Unclean Hands.......... 17

                        b.      Valjakka's Repeated Fraudulent Litigation Representations
                                Constitute Unclean Hands............................................................ 17

III.    NETFLIX DOES NOT INFRINGE ANY CLAIM OF THE '167 PATENT................. 18

**TABLE OF CONTENTS (continued)**

Page

D.    Statement of Material Undisputed Facts .................................................................. 18

    1.    The Asserted Claims Require a "Transport Request." ............................ 18

        a.    Valjakka Accuses Netflix's Open Connect Functionality. .......... 18

        b.    Valjakka Does Not Dispute the Accused Content Filling Functionality. ...................................................................... 20

E.    Netflix Does Not Infringe the '167 Patent at Least Because Valjakka Has Failed to Identify a "Transport Request." ............................................................ 21

IV.    CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Calcar, Inc. v. Am. Honda Motor Co.*,
   651 F.3d 1318 (Fed. Cir. 2011)..........................................................................14, 25

*Bd. of Trustees of Leland Stanford Junior Univ. v. Chi-Yi*,
   No. 13-CV-04383-BLF, 2022 WL 17738724 (N.D. Cal. 2022)............................10

*ChriMar Sys. Inc. v. Cisco Sys., Inc.*,
   No. 13-cv-01300-JSW, 2019 WL 8333452 (N.D. Cal. 2019)..............................13

*Dolly, Inc. v. Spalding & Evenflo Cos., Inc.*,
   16 F.3d 394 (Fed. Cir. 1994)...............................................................................24

*Dynacore Holdings Corp. v. U.S. Philips Corp.*,
   363 F.3d 1263 (Fed. Cir. 2004).............................................................................23

*Flow Devices & Sys., Inc. v. Pivotal Sys. Corp.*,
   No. 22-CV-02453-JST, 2023 WL 3559745 (N.D. Cal. 2023)............................13

*Gilead Sci., Inc. v. Merck & Co.*,
   888 F.3d 1231 (Fed. Cir. 2018).............................................................................17

*Gilead Sci., Inc. v. Merck & Co.*,
   No. 13-cv-04057-BLF, 2016 WL 3143943 (N.D. Cal. 2016)............................16

*In re Cirba Inc.*,
   No. 2021-154, 2021 WL 4302979 (Fed. Cir. 2021)..............................................9

*Indep. Wireless Tel. Co. v. Radio Corp. of Am.*,
   269 U.S. 459 (1926).............................................................................................12

*Intell. Sci. & Tech., Inc. v. Sony Elecs., Inc.*,
   589 F.3d 1179 (Fed. Cir. 2009)......................................................................21, 23

*Jim Arnold Corp. v. Hydrotech Sys., Inc.*,
   109 F.3d 1567 (Fed. Cir. 1997).............................................................................10

*Lumenyte Int'l Corp. v. Cable Lite Corp.*,
   1996 WL 383927 (Fed. Cir. 1996)........................................................................15

*Max Sound Corp. v. Google, Inc.*,
   No. 14-cv-04412-EJD, 2017 WL 4536342 (N.D. Cal. 2017)........................12, 13

*Morrow v. Microsoft Corp.*,
   499 F.3d 1332 (Fed. Cir. 2007).........................................................................9, 12

**TABLE OF AUTHORITIES (continued)**

**Page(s)**

*Ohio Willow Wood Co. v. Alps S., LLC*,
  735 F.3d 1333 (Fed. Cir. 2013) ................................................................. 16

*Outside the Box Innovations, LLC v. Travel Caddy, Inc.*,
  695 F.3d 1285 (Fed. Cir. 2012) ................................................................. 16

*Paradise Creations, Inc. v. UV Sales, Inc.*,
  315 F.3d. 1304 (Fed. Cir. 2003) ................................................................ 12

*Pixion, Inc. v. Citrix Sys., Inc.*,
  887 F. Supp. 2d 881 (N.D. Cal. 2012) ...................................................... 21

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
  324 U.S. 806 (1945) ..................................................................... 16, 17, 18

*Quintal Rsch. Grp., Inc. v. Nintendo of Am., Inc.*,
  No. C 13-00888 ........................................................................................ 24

*Speedplay, Inc. v. Bebop, Inc.*,
  211 F.3d 1245 (Fed. Cir. 2000) ................................................................. 10

*Therasense, Inc. v. Becton, Dickinson & Co.*,
  649 F.3d 1276 (Fed. Cir. 2011) ........................................................... passim

*Therasense, Inc. v. Becton, Dickinson & Co.*,
  864 F. Supp. 2d 856 (N.D. Cal. 2012) ...................................................... 14

*TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*,
  529 F.3d 1364 (Fed. Cir. 2008) ................................................................. 24

*Tric Tools, Inc. v. TT Techs., Inc.*,
  72 F. Supp. 3d 1050 (N.D. Cal. 2014) ...................................................... 23

**OTHER AUTHORITIES**

37 C.F.R. 1.137 .............................................................................. 6, 13, 14

MPEP 711.03 ................................................................................. 14, 15, 16

**TABLE OF ABBREVIATIONS**

| Term or Phrase | Abbreviation |
|---|---|
| Plaintiff Lauri Valjakka | Valjakka or Plaintiff |
| Defendant Netflix, Inc. | Netflix or Defendant |
| U.S. Patent No. 8,495,167 | '167 Patent or Asserted Patent |
| U.S. Patent App. 10/208,685 (which ultimately issued as the '167 Patent) | '685 Application |
| United States Patent and Trademark Office | PTO |
| Helsinki District Court and Helsinki Court of Appeal, collectively | Finnish courts |
| December 20, 2005 Agreement between Suomen Biisi Oy and Valjakka | Utilization Agreement |
| CDN Licensing | CDN |
| Iiro Karesniemi (originally listed inventor on '685 Application) | Mr. Karesniemi |
| e-3 Solutions Oy | e-3 Solutions |
| e-3 Systems Oy | e-3 Systems |
| Suomen Biisi Oy | SBO |
| Juha Setälä | Mr. Setälä |
| Pekka Pakarinen | Mr. Pakarinen |
| EP1421759, EU Patent related to the '685 Application and the '167 Patent | EP1421759 |
| Plaintiff's Petition for Revival of an Application for Patent Abandoned Unintentionally Under 37 CFR 1.137(b) | Petition for Revival |
| Open Connect Appliances | OCAs |
| Cache Control Service | CCS |
| Declaration of Elise Edlin in Support of Defendant's Motion for Summary Judgment | Edlin Decl. |

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

## I. INTRODUCTION

3

Over the past decade, Plaintiff Lauri Valjakka has intentionally engaged in an elaborate

4

fraud to prosecute and assert a patent he does not own. Defendant Netflix moves for summary

5

judgment that: (1) Valjakka lacks standing to bring this suit; (2) asserted U.S. Patent No. 8,495,167

6

is unenforceable because of Valjakka's inequitable conduct and unclean hands; and (3) Netflix does

7

not infringe.

8

*Lack of Ownership.* Valjakka did not own the Asserted Patent when he brought this suit

9

and does not own it today. The chain of title for the '167 Patent twists and turns through Valjakka's

10

numerous, short-lived, business ventures. Time and time again, Valjakka unilaterally recorded

11

retroactive assignments as he attempted to cure deficiencies in the (broken) chain of title. Along

12

the way, in 2009, the Helsinki District Court held that the company Suomen Biisi Oy ("SBO")

13

owned the rights to the '685 Application (which would later become the '167 Patent), not Valjakka.

14

Analyzing the chain of title for the '685 Application and interpreting an agreement (the "Utilization

15

Agreement") between Valjakka (individually) and SBO, that Valjakka asserted as the basis of his

16

ownership claim, the Helsinki District Court found that the agreement could not transfer patent

17

rights to Valjakka. The Helsinki Court of Appeal unanimously affirmed this ruling on March 24,

18

2010. At the close of fact discovery, Valjakka finally admitted under oath that he was aware of

19

these rulings when they issued. Nothing has changed to cure Valjakka's lack of ownership.

20

*Inequitable Conduct and Unclean Hands.* None of this deterred Valjakka from ***twice***

21

declaring himself the rightful owner to the Patent and Trademark Office based on the ***same***

22

***Utilization Agreement*** that the Finnish courts explicitly rejected as a transfer of ownership: *first* on

23

December 22, 2010, when he attempted to revive the abandoned application and relied on the

24

Utilization Agreement as ownership-evidence, and *second* on January 7, 2013, when he recorded

25

the Utilization Agreement with the PTO as an assignment to secure his improper ownership. In

26

addition to his false statement that he owned the application rights, Valjakka also misrepresented

27

that the abandonment was unintentional, even though Valjakka admits that SBO deliberately

28

abandoned the patent.

After misrepresenting to the PTO that the Utilization Agreement granted him power to revive the intentionally abandoned patent application—a theory he knew two Finnish courts had conclusively rejected—Valjakka filed more than a dozen meritless lawsuits designed to exploit the high costs of defense and extract nuisance value settlements. In various resulting settlement agreements, Valjakka warranted that he has the sole authority to grant licenses. He never disclosed, however, that after filing these suits, but before any settlements were entered, Valjakka exclusively licensed the '167 Patent to CDN Licensing—a company that is neither a party to this lawsuit, nor included on any of the resulting settlements. So even if he had the power to sue as the patent owner (which he did not), he did not have the power to license because he had granted that to CDN. The only reasonable conclusion from these actions is that Valjakka has intentionally deceived the PTO, many settling litigants, Netflix, and the courts.

***Noninfringement.*** Even if Valjakka had standing and the '167 Patent were enforceable, Netflix does not infringe a single asserted claim. Valjakka has failed to provide evidence that the accused Open Connect system contains a "transport request." Valjakka's expert offers only conclusory opinions that do not create a genuine issue of material fact. Netflix respectfully requests the Court grant Netflix's motion and hold the '167 Patent unenforceable and not infringed.

## II.    VALJAKKA'S INFRINGEMENT CLAIMS ARE BARRED BY LACK OF STANDING, INEQUITABLE CONDUCT, AND UNCLEAN HANDS

### A.    Statement of Material Undisputed Facts

#### 1.    Valjakka Manipulated the Chain of Title of the '167 Patent.

##### a.    In 2007, Valjakka Properly Retroactively Transferred His Patent Rights to SBO with *Nunc Pro Tunc* Assignments.

The 2002 application that resulted in the '167 Patent named two inventors: Valjakka, the CEO of e-3 Solutions Oy, and Mr. Iiro Karesniemi, a software engineer at e-3 Solutions. *See* Edlin Decl. Ex. 1 (LV000822) at 1982–84; Dkt. 116-03 (LV2_001108) at 1116. As named inventors, both had ownership rights to the '685 Application at the time of filing. As part of Mr. Karesniemi's employment contract, he assigned his rights to all inventions made while employed by e-3 Solutions to that entity. Dkt. 116-03 at 1116. But Valjakka did not assign his own rights to the claimed invention until years later, in 2007, when he recorded a *nunc pro tunc* assignment to retroactively

transfer his rights to e-3 Solutions. Edlin Decl., Ex. 1 at 1528–31 (effective 10/2/2002). In other words, prior to the 2007 retroactive assignments, no single person or entity owned all rights to the '685 Application.

In 2003, Valjakka reorganized e-3 Solutions into e-3 Systems. Dkt. No. 116 (Defendant's Amended Counterclaims) at ¶34 ("In 2003, Mr. Valjakka re-organized e-3 Solutions Oy (Ltd.) as e-3 Systems Ltd. Oy (Ltd.)"); Dkt. No. 117 (Plaintiff's Answer to Counterclaim) at ¶34 ("Admitted."). And in November 2005, he sold all assets of e-3 Systems to SBO. Dkt. 116-02 (NFX-VALJ-00011077) at 11086 (English Translation of Jan. 26, 2009, Ruling from Helsinki District Court). Again, at that time the patent rights were divided; Valjakka still personally held his 50%, SBO was not yet the sole rights holder, and Valjakka had not recorded any of the changes of ownership with the PTO. Valjakka did nothing to effectuate the transfer of the '167 Patent rights until 2007. *See id.*, at 11078; Ex. 1 at 1548 (*nunc pro tunc* assignment in 2007). In short, on November 29, 2007, Valjakka retroactively created a chain of *nunc pro tunc* assignments from himself to e-3 Solutions then to e-3 Systems and finally to SBO in order to correct the divided chain of title. *Id.*, Ex. 1 at 1531 (retroactively assigning from Valjakka to e-3 Solutions, effective on October 2, 2002), 1548 (retroactively assigning from e-3 Solutions to e-3 Systems, effective on June 4, 2003), 1550 (retroactively assigning from e-3 Systems to SBO, effective on November 16, 2005); *see also id.*, Dkt. 116-04 (LV2_000220) at 221, 223; Edlin Decl., Ex. 2 (LV2_002826); Dkt. 116-05 (LV2_000415) at 416. As of November 29, 2007, SBO owned **all rights** to the '685 Application. Dkt. 116-05.

The image below illustrates the legitimate chain of title for the '685 Application and resulting '167 Patent, which begins with the *nunc pro tunc* assignments that Valjakka recorded in 2007 to correct the divided ownership at that time, and ends with the transfer to SBO. These retroactive assignments created the necessary path from Valjakka to e-3 Solutions (the owner of Mr. Karesniemi's 50% rights at that time); from e-3 Solutions to e-3 Systems; and from e-3 Systems to SBO. Netflix does not challenge the legitimacy of these transactions:



b.      The Asserted Patent's Chain of Title Ends with SBO.

On December 20, 2005—one month after SBO acquired all of e-3 Systems' assets—Valjakka (acting as an individual) entered into a "Utilization Agreement" with SBO. *See* Dkt. 116-06 (LV2_002913) at 2920. This Agreement governed SBO's rights to use and commercialize the DMTS "*software*" developed by e-3 Solutions and described in the then-pending patent applications. *Id*. at 2919–20. It addresses SBO's use of the software and also purports to transfer undefined "intellectual property rights to the invention" from Valjakka to his SBO co-owners Juha Setälä and Pekka Pakarinen such that the "ownership is divided" with 33.33% owned by each individual. [1] *Id*. at 2919 ¶B.2.

In 2008, after Valjakka became "aware of [SBO's] direct threat of bankruptcy," he filed suit in the Helsinki District Court for an adjudication that he owned the patents-at-issue[2] based on SBO's alleged breach of the conditions in Clause 8 of the Utilization Agreement. Dkt. 116-02 at 11083–87; *id*. That clause provides for a reversion of transferred DMTS *software utilization rights* to Valjakka, Juha Setälä, and Pekka Pakarinen if SBO failed to prosecute the pending patent

---

[1] As discussed in Section II.A.1.a., in 2005, when Valjakka signed the Utilization Agreement, he did not own full rights to the '167 Patent because Mr. Karesniemi's 50% share still resided with e-3 Solutions. And after signing the Utilization Agreement, Valjakka intentionally rejoined the divided ownership by retroactively assigning all rights to SBO via e-3 Solutions and e-3 Systems in 2007, relying on other agreements transferring those assets. This placed ownership of the application squarely with SBO.

[2] The case involved the corresponding EU Patent, EP1421759, and all related applications including the '685 Application that resulted in the '167 Patent.

1   applications or if the company was not funded or declared bankrupt. [3] *Id*.

2        The ***Helsinki District Court rejected Valjakka's claim*** that the Utilization Agreement

3   effected the transfer (and reversion) of patent rights and confirmed the estate of SBO was the

4   rightful owner of the patents-at-issue and the related patent applications. Dkt. 116-02 at 11087,

5   11083. The court explicitly held that the ***Utilization Agreement did not transfer any patent rights***

6   from Valjakka to SBO and therefore could not revert any rights back to Valjakka upon recission

7   under Clause 8:

8   > As the rights of patent holder [e-3 Systems] concerning the invention
>    have been transferred to Suomen Biisi Oy by consecutive deeds of
9   > transfer, the document named the utilization agreement, dated
>    12/20/2005 has not been demonstrated to have prescribed on these
10  > rights. **Thus, the utilization agreement or the possible recission**
>    **thereof has no significance in the assessment of whom the rights**
11  > **to the DMTS invention belong to under the Patents Act.**

12  *Id*. at 11087 (emphasis added).

13        The Helsinki Court of Appeal issued its final determination in March 2010, unanimously

14  affirming the lower court's decision. *Id.* at 11077–82. As such, the Finnish courts confirmed in

15  2010 that the assignment chain of the '685 Application ends with SBO.

16        The image below illustrates the recorded full chain of title for the '685 Application and

17  resulting '167 Patent, with the legitimate transactions labeled in <span style="color:green">**green**</span>. As will be discussed below,

18  all assignments after SBO (labelled in <span style="color:red">**red**</span> and **black**) were ineffective and based on Valjakka's

19  misrepresentations of ownership:

20

21

22

23

24

25

26

---

27  [3] In this Finnish litigation, Valjakka submitted the bills (or "deeds") of sale, supplemental
agreements to the Utilization Agreement, SBO meeting minutes, and an SBO shareholder's
28  proposal, but Valjakka has not produced these relevant and responsive documents to Netflix. *See*
Dkt. 116-02 at 11085–86 (listing documentary evidence in Finnish litigation).



### c. Valjakka Improperly Revived the '685 Application by Submitting False Statements to the PTO.

In 2010 SBO stopped prosecuting the '685 Application and confirmed **intentional** abandonment in a phone interview with the examiner. Edlin Decl., Ex. 1 at 1315 (Notice of Abandonment with reason stated "[a] call was made to applicant's representative Michael Berman (Reg. #51,464) on 7/1/2010 regards status of the application. Mr. Berman confirmed no response was filed in response to non-final rejection mailed on 12/23/2009. Therefore, case is abandoned."). After learning this, in order to continue prosecuting the application, Valjakka crafted an argument that the rights to the '685 Application reverted back to him **upon SBO's abandonment.** In December 2010, **after** Valjakka learned that the Finnish courts determined that **Valjakka is not the lawful owner**, Valjakka filed a Petition for Revival under 37 CFR 1.137(b),[4] declaring himself the

---

[4] 37 C.F.R. § 1.137 only allows revival of "unintentional[ly]" abandoned applications.

owner[5] and that the abandonment was unintentional because Valjakka was not informed of SBO's failure to respond.[6] *Id.* at 1291–92. He based this argument on the 2005 Utilization Agreement between Valjakka and SBO:

> No company. . . had the authority to let the application go abandoned based on the fact that ***all ownership interest in the application was contractually obligated to revert to three (3) parties, Lauri Valjakka, Pekka Pakarinen, and Juha Setälä*** in equal shares in at least the event it was decided to discontinue prosecution of the instant application.

*Id.* at 1291–92 (emphasis added). Valjakka explicitly relied on and included excerpts of the Utilization Agreement to justify this PTO filing—but he never disclosed to the PTO that two Finnish courts had declared that the rights he claimed transferred did not in fact transfer.

Relying on Valjakka's misrepresentations, the PTO granted Valjakka's Petition for Revival on March 4, 2011—with no way of knowing that the Finnish courts previously held that the Utilization Agreement did not transfer rights to Valjakka. *Id.*, Ex. 1 at 1257. And Valjakka admitted in deposition that he was aware when he made those representations to the PTO that the contractual obligations he relied upon in the Petition for Revival were from the same Utilization Agreement that the Finnish courts previously held did not transfer ownership to him. *Id.*, Ex. 3 (Valjakka Dep. Tr. Vol. 2) at 268:19–22.

In January 2013, after Valjakka had induced the PTO to grant the Petition for Revival, he recorded the Utilization Agreement at the PTO as a *nunc pro tunc* assignment from SBO to himself, Pekka Pakarinen, and Juha Setälä, effective June 23, 2010 (six months after the date that SBO failed to respond to the Office Action). Dkt. 116-06 at 2919–20. In 2013, Valjakka also recorded a retroactive assignment from Mr. Pakarinen to himself. *Id.*, Ex. 5 (LV002054) (assignment from

---

[5] Dkt. 116-06 at 2919 ¶B.2. (purporting to divide ownership between Valjakka and his SBO co-owners Juha Setälä and Pekka Pakarinen such that the "ownership is divided" with 33.33% owned by each individual).

[6] Dkt. No. 117 (Plaintiff's Answer to Counterclaim) at ¶56 ("Admitt[ing] that Suomen Biisi abandoned the '685 application (*sic*)"). The PTO denied Valjakka's Petition for Revival and requests to change power of attorney four times because they were lacking Mr. Karesniemi's signature as a co-inventor. *See* Edlin Decl., Ex. 1 at 921, 1062, 1264, and 1288. Although Mr. Karesniemi contributed to more than the cancelled claims and was never removed as a co-inventor from the related patents, Valjakka removed him as an inventor. *Id.*, at 1265; Ex. 4 (EP 1421759B1) (European Patent Specification naming Iiro Karesniemi and Valjakka as inventors).

-7-

Mr. Pakarinen to Valjakka). In 2014, he entered an additional assignment from Mr. Setälä to secure sole ownership, and then he continued his practice of attempting to transfer the alleged patent rights through more of his affiliated companies. *Id.*, Ex. 6 (LV2_000420) (assignment from Mr. Setälä in January 2014); *id.*, Ex. 7 (LV2_000224) (assignment from Valjakka to IPR Avenue Oy in May 2014). He finally recorded an assignment[7] back to himself in 2021. *Id.*, Ex. 8 (LV2_000417) (assignment from IPR Avenue Oy to Valjakka in May 2021).

In sum, Valjakka's revival of the '685 Application, its eventual issuance as the '167 Patent, and the recorded assignments establishing Valjakka's ownership of the '167 Patent all hinged on Valjakka's false assertion to the PTO that the Utilization Agreement reverted patent rights to himself and his two business partners as individuals. Knowing that the Finnish courts twice conclusively rejected that assertion, Valjakka still filed his Petition for Revival nine months later. Because the Finnish courts have been clear that the estate of SBO is the owner of the '685 Application (and the resulting '167 Patent), Valjakka's revival of the '685 Application was improper, and all assignments after the November 2005 assignment to SBO are invalid. Thus, Valjakka never individually owned 100% of the rights to the '685 Application and has never owned any rights to the Asserted Patent.

### 2. Valjakka Has Fraudulently Conducted His Litigation Campaign.

Two years ago, Valjakka began a litigation campaign asserting the '167 Patent against fifteen companies, including Netflix. Edlin Decl. ¶22 (List of Cases Asserting the '167 Patent). Most have settled. *Id.* In November 2021, Valjakka granted CDN Licensing ("CDN") an exclusive license to the Asserted Patent, which gave CDN—***and only CDN***—the right to licensing and settlement revenue from Valjakka's campaign and the right to grant licenses to the patent. Dkt. 126-03 (NFX-VALJ-00011048) (translation of exclusive license between Valjakka and CDN).

Local Rule 3–15 required Valjakka to disclose any entity with a financial interest in the patents; Valjakka did not disclose CDN. Dkt. No. 36. (Plaintiff's Certificate of Interested Entities). Valjakka admitted under oath that CDN had a financial interest in the patent and that he failed to

---

[7] Valjakka's assignments to and from IPR Avenue do not include the right to sue for past damages. *Id.*, Exs. 7-8.

disclose that financial interest to this Court. Edlin Decl., Ex. 3, 316:23–317:7. Valjakka still has not amended his L.R. 3–15 disclosure to identify CDN even after making those admissions.

After Valjakka granted CDN exclusive licensee status, ***Valjakka no longer had the right or ability to grant licenses to the Asserted Patent***.[8] *Id*., Dkt. 126-03. Undaunted, Valjakka signed various settlement license agreements from his campaign in his personal capacity; none even disclose the existence of CDN.[9] In Dkt. 126-08, for example, Valjakka expressly lists all entities with an interest in the patent. *Id*. Eight separate entities with former or current rights as of May 2022 in the patent are listed, CDN is not among them. *Id*.

Further, in agreements, Valjakka falsely represented that he had the exclusive right to grant licenses. *Id*., Dkt. 126-08, at LV004073–74 (§§VI(2),(4)). But even if Valjakka's alleged assignment chain is valid (it is not), CDN—*not Valjakka*—would be the only entity with the right to license the '167 Patent as of the dates of those agreements and currently. To be clear, Valjakka entered into multiple settlement and licensing agreements in which he represented that he had the authority to sign the agreements and grant licenses. ***He did not have that authority***.

**B.     It Is Undisputable That Valjakka Does Not Own the '167 Patent, and the Court Should Grant Summary Judgment of No Ownership and Dismiss the Infringement Claim for Lack of Standing.**

A patent plaintiff must have Article III standing to bring and maintain an infringement suit. A party who lacks exclusionary rights fails to meet the injury-in-fact requirement of Article III standing because he suffers no legal injury when a party makes, uses, or sells the patented invention. *See Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1340–41 (Fed. Cir. 2007). The Federal Circuit has reaffirmed that Article III standing requires holding at least one exclusionary right. *See In re Cirba Inc.*, No. 2021-154, 2021 WL 4302979, at *3 (Fed. Cir. 2021) ("the touchstone of constitutional standing in a patent infringement case is whether a party can establish that it has an exclusionary right in a patent that, if violated by another, would cause the party holding the exclusionary right

---

[8] Netflix does not concede that Valjakka, as an individual, has held any rights in the Asserted Patent at any point after October 2, 2002. However, even viewed in the light most favorable to Valjakka, he affirmatively sold the right and ability to grant licenses to the Asserted Patent to CDN in 2021.
[9] Dkt. 126-07 (LV003942) (Settlement Agreement); Dkt. 126-05 (LV004030) (Settlement Agreement); Dkt. 126-10 (LV004038) (Settlement Agreement); Dkt. 126-09 (LV004058) (Settlement Agreement); Dkt. 126-08 (LV004070) (Settlement Agreement).

1  to suffer legal injury") (internal quotation and citation omitted). Here, Valjakka properly assigned

2  all rights to the Asserted Patent to SBO, and the assignment chain of the '685 Application ends

3  there. Valjakka cannot establish ownership of the '167 Patent, and the Court therefore need not

4  consider the merits of his infringement claim. *See Jim Arnold Corp. v. Hydrotech Sys., Inc.*, 109

5  F.3d 1567, 1574 (Fed. Cir. 1997).

6          **1.      There Is No Genuine Dispute of Fact That Valjakka Intended to, and
7                    Did, Assign His Rights in the '685 Application to SBO.**

8          Valjakka properly assigned his rights in the '685 Application to SBO in the *nunc pro tunc*

9  assignment chain recorded on November 29, 2007. In those three assignments, Valjakka agreed

10 "he sold, assigned, transferred and conveyed . . . the whole and entire right, title and interest in and

11 to the inventions described and claimed in" the '685 Application from himself to e-3 Solutions to

12 e-3 Systems to SBO. Edlin Decl., Ex. 1 at 1531, 1548, 1550; *see also* Dkt. 116-04 at 221, 223, Ex.

13 2, Dkt. 116-05 at 416. An agreement that contains language declaring that the signatory "hereby

14 conveys, transfers and assigns" the patent serves as an automatic assignment of patent rights and

15 does not require any further act to transfer title. *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1253

16 (Fed. Cir. 2000) (citing *Filmtec Corp. v. Allied–Signal Inc.*, 939 F.2d 1568, 1570 (Fed. Cir. 1991)).

17         The Finnish courts conclusively established in 2009 and 2010 that the estate of SBO owned

18 the '685 Application[10]. *See* Dkt. 116-02 at 11083. In those cases, Valjakka "claimed that at some

19 point before [the sale from e-3 Systems to SBO], the patent holder's rights would have been

20 transferred from e-3 Systems Oy to him" allegedly giving Valjakka the right to transfer the '685

21 Application rights to SBO in the Utilization Agreement. *Id*. at 11086. Not so. Indeed, SBO's

22

---

23 [10] Valjakka produced the Finnish court decisions in Finnish, and Netflix produced a certified
translation. Dkt. 116-1 (LV002216) (Valjakka produced Finnish court decisions in Finnish on
24 8/31/2022); 116-02 (Netflix produced certified translation on 6/12/2023). Valjakka also
authenticated the document in deposition and confirmed that he was aware of the opinions at the
25 time the courts issued them. *Id*., Ex. 3 at 264:7–10 (authenticating the order), 268:19–22 (affirming
"[o]f course" Valjakka "would have been aware of those decisions"). The parties have not disputed
26 that these Finnish court decisions are final, conclusive, and enforceable in Finland. Further, under
comity this Court may recognize the Finnish court decisions. *See Bd. of Trustees of Leland Stanford
27 Junior Univ. v. Chi-Yi*, No. 13-CV-04383-BLF, 2022 WL 17738724, at *2 (N.D. Cal. 2022) ("The
doctrine of comity prescribes that a court of this nation recognize the judgment of a court of a
28 foreign nation when the foreign court had proper jurisdiction and enforcement does not prejudice
the rights of United States citizens or violate domestic public policy.") (citations omitted).

records, signed by Valjakka, "unanimously stated in the minutes that . . . the rights belonging to e-3 Solutions Oy and e-3 Systems Oy have been transferred to [SBO] in full." *Id*. The Helsinki District court explained:

> The District Court considers that the deeds of transfer concerning the DMTS invention described above and in the deed of sale dated 11/16/2005 indicate that **all rights related to patenting of the invention have been transferred to Suomen Biisi Oy from 11/16/2005**.

*Id*. at 11087 (emphasis added). In other words, the Finnish court concluded that Valjakka assigned his rights in the '685 Application to SBO in the *nunc pro tunc* assignment chain recorded on November 29, 2007. And Valjakka could not have unilaterally transferred the patent rights in 2005, because prior to the 2007 *nunc pro tunc* assignments Valjakka only owned 50% of the rights. The chain of title for the '685 Application ends with SBO; because SBO intentionally abandoned that application, the '167 Patent should never have issued.

### 2. The Utilization Agreement Did Not, and Cannot, Convey Rights in the '685 Application to Valjakka.

The Utilization Agreement cannot revert the rights Valjakka signed away back to him. Indeed, as the Finnish courts already concluded, the Utilization Agreement on which Valjakka relies is incapable of conveying any ownership rights:

> As the rights of patent holder concerning the invention have been transferred to Suomen Biisi Oy by consecutive deeds of transfer, **the document named the utilization agreement, dated 12/20/2005 has not been demonstrated to have prescribed on these rights**. Thus, the utilization agreement or the possible recission thereof has **no significance in the assessment of whom the rights to the DMTS invention belong to** under the Patents Act.

Dkt. 116-02 at 11087 (emphasis added). Valjakka has pointed to no agreement with SBO that conveys to Valjakka the rights to the '685 Application or the resulting '167 Patent.

### 3. Post-SBO Assignments Were Ineffective and Cannot Create a Genuine Issue of Material Fact as to Ownership.

No alleged assignments following the proper assignment to SBO can transfer rights to the Asserted Patent because these alleged assignments were not executed by the owner of the rights, SBO. Messrs. Pakarinen and Setälä never owned any rights to the '685 Application or to the Asserted Patent as individuals—they could not transfer rights they never had to Valjakka. Edlin

Decl. at Exs. 5–6. Because these assignments and the alleged reversion never transferred any rights back to Valjakka, Valjakka never had the power to assign patent rights from himself to IPR Avenue, *id*. at Ex. 7, or from IPR Avenue back to himself, *id*. at Ex. 8. None of these assignments included the owner of the rights, SBO, so no later transfer occurred. Any rights to the '685 Application remain with SBO, which is not a party to this suit. Valjakka does not own the Asserted Patent.

### 4.    With No Ownership or Exclusionary Rights, Valjakka Lacks Standing.

Valjakka has never owned exclusive rights to the '167 Patent, so this Court does not have jurisdiction. Valjakka lacks any exclusionary rights and fails to meet the injury in fact requirement of Article III standing because he suffers no legal injury when a party makes, uses, or sells the patented invention. *See Morrow*, 499 F.3d at 1340–41; *see also Paradise Creations, Inc. v. UV Sales, Inc.*, 315 F.3d. 1304, 1310 (Fed. Cir. 2003) (finding a lack of *all* exclusionary rights at the time of filing suit is an uncurable defect in standing). Because Valjakka cannot show that he was the owner of the patent when he brought suit, or held any exclusionary rights, Valjakka does not have Article III standing.

In *Max Sound Corp. v. Google, Inc.*, Judge Davila dismissed the infringement claims because the entity from which Max Sound exclusively licensed the patent-at-issue was found to not be the true owner at the time of suit. 147 F. Supp. 3d 948, 952 (N.D. Cal. 2015).[11] Similarly, here, because Valjakka was not—and still is not—the owner of the Asserted Patent when he filed his Complaint, his claims must be dismissed for lack of standing. *See also Indep. Wireless Tel. Co. v. Radio Corp. of Am.*, 269 U.S. 459, 468 (1926) ("[t]he presence of the owner of the patent as a party is indispensable . . . to give jurisdiction under the patent laws."); *Paradise Creations*, 315 F.3d at 1309–10 ("the plaintiff must demonstrate that it held enforceable title to the patent *at the inception of the lawsuit*" to have standing) (emphasis in original). The "clear language from the controlling legal documents" establish Valjakka's lack of standing, while Plaintiff's continued reliance "on nothing more than its own aspirations from weak circumstantial indicators" do not provide a

---

[11] Judge Davila also granted Google's Motion for Fees after dismissal for lack of standing, finding the case "exceptional" because Plaintiffs "relied on nothing more than its own aspirations from weak circumstantial indicators—rather than clear language from the controlling legal documents— to argue that it had standing to assert the" patent at issue. *Max Sound Corp. v. Google, Inc.*, No. 14- cv-04412-EJD, 2017 WL 4536342, at *8 (N.D. Cal. 2017).

1  reasonable basis for furthering his claims against Netflix. *Max Sound Corp. v. Google, Inc.*, No.

2  14-cv-04412-EJD, 2017 WL 4536342, at *8 (N.D. Cal. 2017).

3      Even under Valjakka's theory that Utilization Agreement reverted the '167 rights to him

4  (*i.e.*, if the Court finds that Valjakka has Article III standing), Valjakka would still lack statutory

5  standing because he exclusively licensed the exclusionary rights to the Asserted Patent to CDN in

6  December 2021. *See supra,* Section II.A.2.; *see Flow Devices & Sys., Inc. v. Pivotal Sys. Corp.*,

7  No. 22-CV-02453-JST, 2023 WL 3559745, at *2 (N.D. Cal. 2023) ("'[T]hose who possess

8  exclusionary rights in a patent suffer an injury when their rights are infringed.'") (citations omitted).

9  Thus, Valjakka does not own the asserted patent, has no standing to sue, and his infringement suit

10  must be dismissed.

11  **C.    The '167 Patent Is Unenforceable Due to Valjakka's Inequitable Conduct and Unclean Hands.**

12      Valjakka deceived the PTO by: 1) knowingly misrepresenting ownership of the '685

13  Application in his Petition for Revival; 2) submitting the Utilization Agreement as a known, false

14  basis for the 2013 *nunc pro tunc* assignment; 3) misrepresenting that the '685 Application's

15  abandonment was unintentional; and 4) breaching his duty of candor and good faith to the PTO by

16  omitting the Finnish courts' opinions from the prosecution. Each of Valjakka's intentional,

17  material, and elaborate misrepresentations, omissions, and fraudulent representations to the PTO

18  constitute inequitable conduct for which the Asserted Patent should be found unenforceable.

19      To establish inequitable conduct, an "accused infringer must prove that the patentee acted

20  with the specific intent to deceive the PTO." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d

21  1276, 1290 (Fed. Cir. 2011). Inequitable conduct has "evolved" to "'embrace a broader scope of

22  misconduct, including not only egregious affirmative acts of misconduct intended to deceive both

23  the PTO and the courts but also the mere nondisclosure of information to the PTO.'" *ChriMar Sys.*

24  *Inc. v. Cisco Sys., Inc.*, No. 13-cv-01300-JSW, 2019 WL 8333452, at *7 (N.D. Cal. 2019) (quoting

25  *Therasense*, 649 F.3d at 1287). A finding of "inequitable conduct regarding any single claim . . .

26  [renders] the entire patent [is] unenforceable." *Therasense*, 649 F.3d. at 1287.

27      The PTO may revive an abandoned patent upon petition if the delay is shown to have been

28  "unintentional." 37 C.F.R. § 1.137(a). "The Office usually relies upon the applicant's duty of

candor and good faith and accepts the statement that 'the entire delay in filing the required reply from the due date for the reply until the filing of a grantable petition pursuant to 37 C.F.R. 1.137 was unintentional without requiring further information in the vast majority of petitions." MPEP 711.03 (internal quotation marks omitted).

> [T]he applicant is obligated under 37 C.F.R. 11.18 to inquire into the underlying facts and circumstances when a practitioner provides [the unintentional] statement to the Office. ***In addition, providing an inappropriate statement in a petition under 37 CFR 1.137 to revive an abandoned application may have an adverse effect when attempting to enforce any patent resulting from the application***. *See Lumenyte Int'l Corp. v. Cable Lite Corp.*, 1996 WL 383927 (Fed. Cir. 1996) (patents held unenforceable due to a finding of inequitable conduct in submitting an inappropriate statement that the abandonment was unintentional).

*Id.* (internal citation updated) (emphasis added). "A delay resulting from a deliberately chosen course of action on the part of the applicant is not an 'unintentional' delay within the meaning of 37 C.F.R. 1.137." *Id.*

### 1.   Valjakka Intentionally Deceived the PTO.

Intent to deceive the PTO may be inferred if it is "'the single most reasonable inference able to be drawn from the evidence.'" *Therasense*, 649 F.3d at 1290 (quoting *Star Sci. Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008)). "Because direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence." *Therasense,* 649 F.3d at 1290 (internal quotation omitted). The alleged deceiver must have (i) had actual knowledge of the withheld information; (ii) had actual knowledge of its materiality; and (iii) made a deliberate decision to withhold the information. *Am. Calcar, Inc. v. Am. Honda Motor Co.*, 651 F.3d 1318, 1335 (Fed. Cir. 2011); *Therasense*, *Inc. v. Becton, Dickinson & Co.*, 864 F. Supp. 2d 856, 869 (N.D. Cal. 2012) (remand decision from *Therasense*, 649 F.3d 1276). Valjakka has engaged in an elaborate and deliberate fraud for the pursuit of personal financial gain from a patent he does not own.

As discussed in Section II.A.1.b., Valjakka knew that he did not own any rights to the '685 Application as an individual since, (at the latest), November 29, 2007, because this is when he retroactively assigned his rights to e-3 Solutions with an effective date of October 2, 2002. Edlin Decl., Ex. 1 at 1531; *see also* Dkt. 116-04. The string of *nunc pro tunc* assignments manufactured

1   by Valjakka in 2007 evinces Valjakka's knowledgeable intent to transfer his rights from himself to

2   e-3 Solutions, to e-3 Systems, and finally to SBO, the longstanding rights holder. *See* Edlin Decl.,

3   Ex. 1 at 1531, 1548, 1550; *see also*, Dkts. 116-04, 116-05, Edlin Decl., Ex. 2.

4        Further, Valjakka knew that two Finnish courts had confirmed that ***only*** SBO had the patent

5   rights ***nine months before*** he filed the Petition for Revival and ***eleven years before*** he sued Netflix.

6   There is thus no plausible good faith basis for his representation in the 2010 Petition for Revival

7   that he owned the '685 Application. *See supra* Section II.A.1.c. And he knowingly repeated the

8   misrepresentation in 2013 when he filed the Utilization Agreement with the PTO as his only support

9   for the alleged reversion of rights away from SBO. Dkt. 116-06; Ex. 3 (Valjakka Dep. Tr. Vol. 2)

10  at 268:19–22. The "single most reasonable inference able to be drawn from the evidence" is that

11  Valjakka knew he did not own the '685 Application and intentionally engaged in fraud before the

12  PTO. *Therasense*, 649. F.3d at 1290 (citation omitted).

13       Moreover, SBO ***intentionally*** abandoned the application before Valjakka falsely stated that

14  he was the owner and abandonment was ***unintentional***. SBO was the rightful owner at the time of

15  abandonment (*i.e.*, December 23, 2009), and the PTO confirmed that the '685 Application was

16  deliberately abandoned on a call with SBO's counsel on July 1, 2010 when "Mr. Berman confirmed

17  no response was filed in response to non-final rejection mailed on 12/23/2009." *See* Edlin Decl.,

18  Ex. 1 at 1315. Because Valjakka knew that SBO was, and is, the rights holder, he knew that Mr.

19  Berman had the authority to decide to discontinue the prosecution of the '685 Application. And

20  Valjakka now admits that the '685 Application was intentionally abandoned by SBO. Dkt. No. 117

21  (Plaintiff's Answer to Counterclaim) at ¶56 ("Suomen Biisi abandoned the '685 application (*sic*)").

22       Valjakka breached his duty of candor and good faith by intentionally misrepresenting

23  ownership and unintentional abandonment to the PTO. *See* MPEP 711.03. Valjakka cannot

24  retroactively manufacture a disputed fact regarding intent[12], so the resulting '167 Patent must be

25  held unenforceable. *See Lumenyte*, 1996 WL 383927 at *4.

26  _____

27  [12] Valjakka recently confirmed he will not be asserting an advice of counsel defense to his
    misconduct. Edlin Decl., Ex. 9 (8/15 Email from William Ramey to Elise Edlin) (confirming "Mr.

28  Valjakka is not relying on advice of counsel"). There is no justification for Valjakka's
    misrepresentations to the PTO, and Valjakka has asserted no facts excusing his deceptive intent.

## 2.   Valjakka's Misrepresentations and Omissions Are Material.

Inequitable conduct requires a finding of but-for materiality. *See Therasense*, 649 F.3d at 1291. Unmistakably false statements are "*per se* material to patentability." *Outside the Box Innovations, LLC v. Travel Caddy, Inc.*, 695 F.3d 1285, 1294 (Fed. Cir. 2012) (clarifying the "court recognized" exception to the but-for general rule). "[C]ases of affirmative egregious misconduct" do not require a showing of materiality, and the submission of an unmistakably false affidavit would be an example of such conduct. *Therasense*, 649 F.3d at 1291-93; *see also Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333, 1351 (Fed. Cir. 2013) (noting affirmative conduct on the part of the party's counsel for the withholding of "various pieces of material information" and "several misrepresentations."). Valjakka's false statements concerning ownership of the '685 Application are unmistakably false misrepresentations before the PTO, and therefore they are *per se* material.

Further, the PTO only granted Valjakka's Petition for Revival in 2010 because it accepted Valjakka's untrue statements that he was the owner, that SBO's patent counsel had no authority to decide to discontinue prosecution of the '685 Application, and that the delay was unintentional. *See Therasense*, 649 F.3d at 1291–92. And if the PTO had known what Valjakka knew (*e.g.*, the Finnish courts' conclusive decisions on ownership) the PTO would have never revived the '685 Application and the patent would not have issued. *See id*. at 1296 ("[T]he district court should determine whether the PTO would not have granted the patent but for [Plaintiff's] failure to disclose"). The PTO took Valjakka at his word when he grossly breached his duty of candor. *See* MPEP 711.03. Had Valjakka been forthright with the PTO, the PTO would not have allowed him to revive the application as it would have been apparent that he had no right to do so.

## 3.   The '167 Patent Is Unenforceable Due to Unclean Hands.

Valjakka's deceit and litigation misconduct each separately constitute unclean hands; taken together, they unmistakably constitute egregious misconduct sufficient to invoke the equitable power of this Court to deem the '167 Patent unenforceable. *Gilead Sci., Inc. v. Merck & Co.*, No. 13-cv-04057-BLF, 2016 WL 3143943, at *27 (N.D. Cal. 2016). Unclean hands "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814

1   (1945). The courts have "wide range" to the "use of discretion in refusing to aid the unclean

2   litigant." *Id.* at 815. The remedy for unclean hands is unenforceability of the asserted patents in the

3   "particular lawsuit" and dismissal of the infringement claim(s). *Therasense*, 649 F.3d at 1287.

4

            **a.**     **Valjakka's Deceit of the PTO Establishes Unclean Hands.**

5          As previously discussed, Valjakka has deceived the PTO by 1) knowingly misrepresenting

6   ownership of the '685 Application in his Petition for Revival; 2) submitting the Utilization

7   Agreement as a known, false basis for the 2013 *nunc pro tunc* assignment; 3) knowingly

8   misrepresenting that the '685 Application's abandonment was unintentional; and 4) breaching his

9   duty of candor and good faith to the PTO by omitting the Finnish courts' opinions from the

10   prosecution. *See supra* Section II.A.1. Due to this "improper conduct" before the PTO, this Court

11   has discretion to refuse aid to this unclean litigant and find unenforceability of the Asserted Patent.

12   *Therasense*, 649 F.3d at 1287; *see Precision Instrument Mfg. Co.*, 324 U.S. at 814–15.

13

            **b.**     **Valjakka's Repeated Fraudulent Litigation Representations Constitute Unclean Hands.**

14          Valjakka's unconscionable actions in asserting the '167 Patent are further evidence of

15   unclean hands. Valjakka commenced a litigation campaign with a patent he did not own and then

16   entered into settlement and licensing agreements with defendants in which he falsely represented

17   that he had the authority grant licenses. *See supra* Section II.A.2. He did not have that authority

18   because he gave it to CDN. Edlin Decl., Ex. 10 (NFX-VALJ-00011048) (giving CDN the

19   irreversible, exclusive power to receive settlement and licensing revenue and grant licenses); Ex.

20   11 (LV2_000799). Because these agreements resulted from suits regarding the '167 Patent,

21   Valjakka's misconduct "has immediate and necessary relation to the equity that he seeks in respect

22   of the matter in litigation," and was a "violation[] of conscience" affecting "the equitable relations

23   between the parties in respect of something brought before the court." *Gilead Sci., Inc. v. Merck &*

24   *Co.*, 888 F.3d 1231, 1239 (Fed. Cir. 2018). Valjakka also concealed the CDN license in this

25   litigation for ***a year and a half*** before producing it—and then, only in Finnish—one month from

26   the close of fact discovery. Edlin Decl., Ex. 10 (November 5, 2021 exclusive license produced by

27   Valjakka on May 15, 2023 and translated by Netflix and produced on June 12, 2023). In short,

28   Valjakka began a campaign asserting a patent he did not own; deceitfully entered into settlement

1    and licensing agreements in related cases without authority, and concealed the relevant, exclusive,

2    CDN license from Netflix until the close of fact discovery. This malfeasance "closes the door" of

3    this Court to Valjakka because he has acted with "fraud or deceit as to the controversy in issue."

4    *Precision Instrument Mfg. Co.*, 324 U.S. at 814–15.

5         Netflix respectfully requests the Court grant its motion for summary judgment of

6    unenforceability due to inequitable conduct and unclean hands, and dismiss the infringement claim

7    for lack of standing. If the Court considers the merits of Valjakka's infringement allegations, those

8    claims should be dismissed because, as detailed below, Netflix does not infringe the '167 Patent.

9    **III.    NETFLIX DOES NOT INFRINGE ANY CLAIM OF THE '167 PATENT**

10        **D.    Statement of Material Undisputed Facts**

11             **1.    The Asserted Claims Require a "Transport Request."**

12        All asserted claims[13] of the '167 Patent require a "transport request." The claimed "transport

13   request" must include four items: (1) "details of data to be retrieved," (2) "the address of the first

14   server from which the data is to be requested by the first target terminal," (3) "the addresses of at

15   least one second target terminal to which the data from the first server to be relayed by the first

16   target terminal" and (4) "an indication of a relative performance of a further target terminal based

17   on the terminal performance information stored in the network information database."

18             **a.    Valjakka Accuses Netflix's Open Connect Functionality.**

19        Valjakka has accused Netflix's Open Connect system of infringing the '167 patent.

20   Specifically, Valjakka has accused certain logic performed by Open Connect Appliances ("OCAs")

21   and portions of the Open Connect control plane services. To support his infringement allegations,

22   Valjakka relies on Netflix documents and testimony from Mr. Ishaan Shastri, an Engineering

23   Manager at Netflix. Neither Valjakka nor his expert Dr. Kozek dispute that Netflix's documents or

24   Mr. Shastri's testimony accurately reflect how Open Connect functions. Edlin Decl., Ex. 12 (Kozek

25   Rough Dep. Tr.) at 44:14–45:4. And despite claiming to have reviewed it, Dr. Kozek does not cite

26   to Netflix source code in his expert report. *Id.*, Ex. 13 (Kozek Report) at 5; Ex. 12 at 84:17–18

27   _____

28   [13] *See* limitations [1f], [9f], and [16d] as labeled in Dr. Kozek's infringement report and Valjakka's infringement contentions. '167 Patent at 8:16–24, 9:18–26, 10:15–26.

("I've not included any proper proprietary code in my report.").

Open Connect's main function is to ensure that Netflix's clients can efficiently and effectively stream content. *See id.*, Ex. 14 (NFX-VALJ-00005836) at 5836. Netflix uses OCAs, which are "purpose-built server appliances," and control plane services hosted in AWS to achieve this goal. *Id.* at 5836–37. OCAs are "[t]he building blocks of Open Connect" and "store encoded video/image files and serve these files via HTTP/HTTPS to client devices (for example: set top boxes, mobile devices, or smart TVs)." *Id.* at 5837. The diagram below provides a high-level overview of the systems and devices that are involved:



*Id.* at 5839. The cloud diagram labeled "Netflix in AWS" is also known as the Open Connect control plane. As Mr. Shastri, team lead for the Open Connect control plane, explains, "[t]he control plane for Open Connect [is] the components that are hosted in AWS[.]" *Id.*, Ex. 15 (Shastri Tr.) at 16:25–17:3. Within the control plane, the Steering Service (CODA) is responsible for choosing from which OCA a Netflix customer should stream content. *Id.* at 57:3–6; Ex. 15 (NFX-VALJ-00006360).

The portion of Open Connect Valjakka accuses of infringement is content filling, another service performed by the Open Connect network. For a customer to stream a particular Netflix title from an OCA, the OCA must first obtain that title. Each OCA only "stores a portion of the Netflix catalog" and adds new titles "every day during a window of time that corresponds to [] off-peak hours." *Id.*, Ex. 17 (NFX-VALJ-00005739) at 5767. Adding titles to an OCA is known as "**filling**;"

the "window of time" for adding titles is known as a "fill window." *See id.*; Ex. 14 at 5839.

Occasionally, Open Connect also performs ***out-of-cycle fills***, which it uses to make urgent deployments of a small subset of titles. The out-of-cycle fills use the same fill logic as in-cycle fills, just outside of the regular fill window. *Id.*, Ex. 17 at 5769; Ex. 15 at 120:3–17 (explaining "emergency fill[s]" can happen outside pre-scheduled window to fix issues as soon as possible).

### b. Valjakka Does Not Dispute the Accused Content Filling Functionality.

During the fill process, the Cache Control Service, part of the control plane depicted above, determines which files an OCA should have and where an OCA should get them. *Id.*, Ex. 15 at 72:3–9. Each OCA follows a specific request flow to obtain the titles it should have. *First*, each OCA "communicate[s] at regular intervals with [CCS], requesting (among other things) a manifest file that contains the list of titles they should be storing and serving to members." *Id.*, Ex. 18 (NFX-VALJ-00007308) at 7310; Ex. 15 at 73:2–14. Similarly, during out-of-cycle fills OCAs receive a manifest file (or emergency manifest file) from CCS that lists the titles the OCA needs to obtain. *Id.* at 150:5–12.

*Second*, "[i]f there is a delta between the list of titles in the manifest and what [the OCA is] currently storing, each OCA will send a request . . . that includes a list of the new or updated titles that it needs." Ex. 18 at 7310. Each OCA sends this request to CCS after obtaining the manifest file from CCS. *Id.* CCS responds to the request with "a ranked list of potential download locations, a.k.a., *fill sources*, for each title." *Id.* The fill sources are URLs to a particular file. *Id.*, Ex. 15 at 73:17–20. Finally, the OCA will make a request to one of the URLs that it received from CCS to download the file located at that URL. *Id.* at 139:5–6; Ex. 18 at 7313.

Dr. Kozek does not dispute this. *See id.*, Ex. 13 at 29 ("As stated above, OCAs use fill source manifests from the CCS to determine what titles are needed. . .These manifests are data structures that indicate what titles need to be transferred to a specific OCA."), 36 (quoting Netflix's technology blog, which describes how the fill process works); *see also* Ex. 12 at 163:10–13 ("[M]y understanding is that manifests only contain downloadable IDs. It does not contain network information.").

**E.      Netflix Does Not Infringe the '167 Patent at Least[14] Because Valjakka Has Failed to Identify a "Transport Request."**

"Summary judgment of non-infringement is a two-step analysis. First, the claims of the patent must be construed to determine their scope, as a question of law. Second, 'a determination must be made as to whether the properly construed claims read on the accused device.'" *Pixion, Inc. v. Citrix Sys., Inc.*, 887 F. Supp. 2d 881, 887 (N.D. Cal. 2012) (quoting *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1304 (Fed. Cir. 1999)). Valjakka fails to show that the Open Connect system contains the claimed transport request, which must contain four items: (1) "details of data to be retrieved," (2) "the address of the first server," (3) "the addresses of at least one second target terminal," and (4) "an indication of a relative performance of a further target terminal." '167 Patent at 8:16-24, 9:18-26, 10:15-26. In particular, Valjakka fails to identify items (2)-(4). Valjakka accuses two manifest files, the desired and emergency manifests, as being the claimed "transport requests" but fails to show that a manifest file contains the required contents of a "transport request." Edlin Decl., Ex. 13 at 32 ("A 'desired manifest' and, when needed, an 'emergency manifest' are transport requests . . . .").

A "patentee's expert must set forth the factual foundation for his infringement opinion in sufficient detail for the court to be certain that features of the accused product would support a finding of infringement." *Intell. Sci. & Tech., Inc. v. Sony Elecs., Inc.*, 589 F.3d 1179, 1183 (Fed. Cir. 2009). As discussed in Section III.A.1.b., there is no dispute that *a manifest file only contains content titles*. *See* Edlin Decl., Ex. 18 at 7310; Ex. 15 at 141:5–15, 180:18–24; Ex. 19 (NFX-VALJ-00007296) at 7296; Ex. 13 at 32 ("[M]anifests are data structures that indicate *what titles* need to be transferred . . . .") (emphasis added); Ex. 12 at 163:10-13. Thus, a manifest file contains—at most—"details of data to be retrieved." Valjakka has not shown, or even attempted to show, where the remaining elements can be found in the manifest file. *See id.*, Ex. 13 at 32–34; *see also Pixion, Inc*, 887 F. Supp. 2d at 887 ("An accused infringer may establish that summary judgment is proper … by showing that the evidence on file fails to establish a material issue of fact essential to the

---

[14] There are multiple reasons why Netflix does not infringe the '167 Patent; this Motion focuses only on Valjakka's wholesale failure to identify a "transport request."

1   patentee's case.") (cleaned up).

2        In addition, Dr. Kozek's citation to Netflix documentation contradicts his allegations. *See,*

3   Edlin Decl., Ex. 13 at 33 (citing NFX-VALJ-00007308 at 7311).[15] The cited document explains

4   that "each OCA will send a request . . . that includes a list of the new or updated titles that it needs"

5   ***after*** retrieving a manifest file and determining what those new titles are. *Id.*, Ex. 18 at 7310. Then,

6   after receiving that request, CCS returns "a ranked list of potential download locations, aka *fill*

7   *sources*, for each title." *Id.* In other words, the location of content (*i.e.*, fill source) is not stored in

8   a manifest file. Instead, each OCA retrieves fill sources in a subsequent request that is separate

9   from the request to retrieve the manifest file. There is no indication from Dr. Kozek or Netflix's

10  documentation that this location information, or any other information the claimed "transport

11  request" must contain, is stored in the manifest file.

12       During his deposition, Dr. Kozek conceded this point and revised his theory to allege that

13  data from two separate requests, the request for a manifest file and the subsequent request for

14  download locations, constitute the "transport request." Ex. 12 at 138:3–13 ("Q. So to be clear, on

15  page 32, you are not saying that the manifest file alone satisfies the transport request limitation; is

16  that right? . . . [A.] On page 32 I believe I say that . . . the manifests are the beginning of such a

17  request and . . . together with the location . . . information constitute the transfer request."), 150:4–

18  21. Setting aside the improper attempt to introduce a new theory after submitting his report, Dr.

19  Kozek does not explain how two pieces of information (a manifest file and a set of URLs) from

20  two separate requests constitute a single "transport request" that contains four pieces of

21  information. Thus, Dr. Kozek's second shot at an infringement read also misses—even under his

22  own understanding of the claim language. *See id.* at 18:15–21 ("Q. And so when the first terminal

23  receives a transport request, it will contain those four items that we just discussed; right? . . . [A.]

24  The transport request will contain all these items in one form or another; correct.").

25       Dr. Kozek further admitted that he did not believe that it was "germane to the question" of

26

---

27  [15] In his report, Dr. Kozek annotates the quotation from Netflix's document to add the unsupported claim that "master OCAs and at least one second OCA can be selected based on their relative
28  performance." Ex. 13 at 33. This statement does not appear in Netflix's documentation, and Dr. Kozek does not explain his basis for including it in the annotated quotation.

infringement to explain how Netflix's Open Connect system infringes. *Id.* at 192:13–24 ("I'm providing the what it's doing ***not to how it's doing it*** precisely because only the what it's doing is germane to the question of whether whether (*sic*) this code is actually practicing the invention . . . [s]o whether or not I mention the specific way, how Netflix engineers opted to architect their code leaves my conclusions the same . . . .") (emphasis added), 193:4–194:3.

> It is well settled that an expert's unsupported conclusion on the ultimate issue of infringement is insufficient to raise a genuine issue of material fact, and that a party may not avoid that rule simply by framing the expert's conclusion as an assertion that a particular critical claim limitation is found in the accused device.

*Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1278 (Fed. Cir. 2004). Because Valjakka fails to "pinpoint where [claim] elements are found in the accused device[]," such that a reasonable jury could find literal infringement, summary judgment of noninfringement is proper. *Intell. Sci. & Tech.*, 589 F.3d at 1184–85 (affirming summary judgment of noninfringement and holding that "opaque identification is not enough to permit any reasonable juror to" find infringement).

In addition, Dr. Kozek's allegation that the claim is met under the doctrine of equivalents is conclusory and baseless. Under the doctrine of equivalents, "an accused infringer need only show the absence of a single claim limitation, or its equivalent, from the accused device. The Court, thus, must compare the equivalence of each limitation in the claim to each element of the accused device, not the entire patent to the entire product." *Tric Tools, Inc. v. TT Techs., Inc.*, 72 F. Supp. 3d 1050, 1054 (N.D. Cal. 2014) (cleaned up).  Dr. Kozek alleges that the:

> [D]esired manifest and emergency manifest along with the downloaded location information files and fill policy for master OCAs and a second (target terminal) OCA to fill from a (first terminal) OCA on the CCS are equivalent [to] the 'each such transport request includes details of data to be retrieved, the address of the first server from which the data is to be requested by the first target terminal, the addresses of at least one second target terminal to which the data from the first server to be relayed by the first target terminal.'

Edlin Decl., Ex. 13 at 33. But Valjakka cannot simply claim—with zero support—that the entire Open Connect fill process is "substantially the same" as a single "transport request." "[W]here the moving party has demonstrated its entitlement to summary judgment of no literal infringement, the

plaintiff then has the burden of producing '*particularized testimony and linking argument* on a limitation-by-limitation basis that create[s] a genuine issue of material fact as to equivalents.'" *Quintal Rsch. Grp., Inc. v. Nintendo of Am., Inc.*, No. C 13-00888 SBA, 2015 WL 4396464, at *12 (N.D. Cal. 2015) (quoting *AquaTex Indus., Inc. v. Techniche Sols.*, 479 F.3d 1320, 1328–29 (Fed. Cir. 2007)) (emphasis added). Valjakka has not produced any testimony or linking argument required to assert infringement under the doctrine of equivalents.

Dr. Kozek does not explain how this multi-step process is the same as a "transport request" and admits that fill policies are not even sent to an OCA. Edlin Decl., Ex. 12 at 153:22–23 ("I believe the fill policy is not a data item that is being explicitly sent . . ."). Dr. Kozek also fails to identify any specific component as the claimed "details of data be retrieved," "the address of the first server from which the data is to be requested," "the addresses of at least one second target terminal to which the data from the first server to be *relayed* by the first target terminal," or "an indication of a relative performance of a further target terminal." Dr. Kozek merely concludes that the function, way, and result are substantially the same. *See* Edlin Decl., Ex. 13 at 34 ("The way this is accomplished is substantially the same.") Dr. Kozek's conclusory "analysis" does not even bother to address several limitations that the "transport request" must contain—effectively reading them out of the claim. *See id.* Valjakka's allegations are "entirely . . . insufficient to create a question of fact under the doctrine of equivalents." *Quintal Rsch. Grp., Inc.*, 2015 WL 4396464, at *13; *TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1377 (Fed. Cir. 2008) ("[T]here need not be a one-to-one correspondence between elements of the accused device and the claimed invention, [but] that does not condone ignoring a claimed limitation in assessing infringement under the doctrine of equivalents."); *see also Dolly, Inc. v. Spalding & Evenflo Cos., Inc.*, 16 F.3d 394, 398 (Fed. Cir. 1994) ("The doctrine of equivalents is not a license to ignore claim limitations.").

Finally, Dr. Kozek compares the Open Connect system to the wrong claim limitation. *See, e.g.*, Edlin Decl., Ex. 13 at 34 ("The way this is accomplished is substantially the same. The claim states that the main server is adapted to *send transport requests* . . .") (emphasis added). The limitation reciting the contents of a "transport request," however, is distinct from the limitation discussing how the "main server is adapted to send transport requests." *Compare* '167 Patent at

8:8–15 ("the main server is adapted to send transport requests direct to at least one first target terminal . . .") *with* '167 Patent at 8:16–24 ("wherein each such transport request includes . . ."). Valjakka has failed to provide *any* evidence (conclusory or otherwise) that any portion of the Open Connect system is substantially the same as a "transport request." Thus, the Court should grant summary judgment of noninfringement. *Am. Calcar, Inc.*, 651 F.3d at 1338–39 ("[G]eneralized testimony as to the overall similarity between the claims and the accused infringer's product . . . does not suffice to create a genuine issue of material fact.").

## IV.    CONCLUSION

Netflix respectfully requests the Court grant this motion for summary judgment of unenforceability and dismiss the infringement claim for lack of standing. However, if the Court considers the merits of Valjakka's infringement allegations, Netflix respectfully requests that the Court grants its motion for summary judgment that Netflix does not infringe the '167 Patent.

1

2   Dated: September 15, 2023          **PERKINS COIE LLP**

3

4                                      By: */s/ Sarah E. Piepmeier*

5                                          Sarah E. Piepmeier, Bar No. 227094
                                           SPiepmeier@perkinscoie.com
                                           Elise Edlin, Bar No. 293756
6                                          EEdlin@perkinscoie.com
                                           PERKINS COIE LLP
7                                          505 Howard Street, Suite 1000
                                           San Francisco, California 94105
8                                          Telephone: +1.415.344.7000
                                           Facsimile:  +1.415.344.7050
9
                                           Janice L. Ta, (admitted *pro hac vice*)
10                                         JTa@perkinscoie.com
                                           PERKINS COIE LLP
11                                         405 Colorado Street Suite 1700
                                           Austin, Texas 78701
12                                         Telephone: +1.737.256.6100
                                           Facsimile:  +1.737.256.6300
13
                                           Jassiem N. Moore, (admitted *pro hac vice*)
14                                         JassiemMoore@perkinscoie.com
                                           PERKINS COIE LLP
15                                         1201 Third Avenue, Suite 4900
                                           Seattle, Washington 98101-3099
16                                         Telephone: +1.206.359.8000
                                           Facsimile:  +1.206.359.9000
17
                                           Brianna Kadjo, Bar No. 303336
18                                         BKadjo@perkinscoie.com
                                           PERKINS COIE LLP
19                                         1900 Sixteenth Street, Suite 1400
                                           Denver, Colorado 80202-5255
20                                         Telephone: +1.303.291.2300
                                           Facsimile:  +1.303.291.2400
21
                                           Rachael D. Lamkin (SBN 246066)
22                                         Karan Singh Dhadialla (SBN 296313)
                                           BAKER BOTTS L.L.P.
23                                         101 California Street, Suite 3200
                                           San Francisco, CA 94111
24                                         Tel: (415) 291-6200
                                           Fax: (415) 291-6300
25                                         rachael.lamkin@bakerbotts.com
                                           karan.dhadialla@bakerbotts.com
26

27                                         *Attorneys for Defendant NETFLIX, INC.*

28