# EXHIBIT A

Page 1

```
 1            UNITED STATES DISTRICT COURT
 2           NORTHERN DISTRICT OF CALIFORNIA
 3                   OAKLAND DIVISION
 4
 5 LAURI VALJAKKA,            )
                              )
 6       Plaintiff,           )
                              )
 7    vs.                     ) Case No.:
                              ) 4:22-cv-01490-JST
 8 NETFLIX, INC.,             )
                              )
 9       Defendant.           )
10 _____)
11
12
13
14
15          VIDEOTAPED DEPOSITION OF
16               ROBERT F. HELD
17             Appearing Remotely
18         Friday, September 8, 2023
19
20
21
22
23
24 Stenographically reported by:
   EMILY SAMELSON, CSR No. 14043
25 Focus Job No.: 7732
```

Page 2

```
 1            UNITED STATES DISTRICT COURT
 2           NORTHERN DISTRICT OF CALIFORNIA
 3                   OAKLAND DIVISION
 4
 5 LAURI VALJAKKA,            )
                              )
 6       Plaintiff,           )
                              )
 7    vs.                     ) Case No.:
                              ) 4:22-cv-01490-JST
 8 NETFLIX, INC.,             )
                              )
 9       Defendant.           )
10 _____)
11
12
13
14
15
16
17
18       Videotaped Deposition of ROBERT F. HELD,
19 taken on behalf of Defendant, all parties appearing
20 remotely, commencing at 8:03 a.m. and ending at
21 4:52 p.m. on Friday, September 8, 2023,
22 stenographically reported before Emily Samelson,
23 CSR No. 14043.
24
25
```

Page 3

```
 1                A P P E A R A N C E S:
 2              (All parties appearing remotely)
 3 For Plaintiff:
 4    RAMEY LLP
      BY:  WILLIAM P. RAMEY III, ESQ.
 5    5020 Montrose Boulevard, Suite 800
      Houston, Texas 77006
 6    713.426.3923
      wramey@rameyfirm.com
 7
 8 For Defendant:
 9    PERKINS COIE LLP
      BY:  ELISE EDLIN, ESQ.
10    505 Howard Street, Suite 1000
      San Francisco, California 94105
11    415.344.7000
      eedlin@perkinscoie.com
12
13
14 Also Present:    Angela Griggs, Esq.
                   Nisha Mody, PhD
15
   Videographer:   Reggie Nand
16
```

Page 4

```
                   INDEX OF EXAMINATION

   EXAMINATION BY                             PAGE
     BY MS. EDLIN                                7
     BY MR. RAMEY                              278
     BY MS. EDLIN                              288
     BY MR. RAMEY                              289
     BY MS. EDLIN                              289


                       --oOo--
```

|   | Page 5 |
|---|---|
| | INDEX OF EXHIBITS |
| NUMBER | PAGE |
| Exhibit 1 | Defendant Netflix, Inc.'s Amended Rule 36(b)(1) Notice of Deposition To Bob Held — 19 |
| Exhibit 2 | Expert Report of Robert F. Held, Dated July 7, 2023 (Highly Confidential, Attorneys' Eyes Only, Subject to Protective Order) — 20 |
| Exhibit 3 | Supplemental Expert Report of Robert F. Held, Dated July 15, 2023 (Highly Confidential, Attorneys' Eyes Only, Subject to Protective Order) — 20 |
| Exhibit 4 | ▉▉▉▉ Agreement (Confidential, Attorneys' Eyes Only) (LV004030-4037) — 63 |
| Exhibit 5 | ▉▉▉▉ Agreement (Confidential, Attorneys' Eyes Only) (LV004058-4069) — 64 |
| Exhibit 6 | ▉▉▉▉ Agreement (Confidential, Attorneys' Eyes Only) (LV004038-4057) — 65 |
| Exhibit 7 | ▉▉▉▉ Agreement (Confidential, Attorneys' Eyes Only) (LV004070-4086) — 66 |
| Exhibit 8 | ▉▉▉▉ Agreement (Highly Confidential, Attorneys' Eyes Only) (LV003942-3986) — 66 |
| Exhibit 9 | ▉▉▉▉ Agreement on ▉▉▉▉ to a Patent, Dated 11/5/2021 (Highly Confidential, Attorneys' Eyes Only) (LV2_000799 to 816) (NFX-VALJ-00048 to 65) — ▉ |

///

|   | Page 6 |
|---|---|
| | INDEX OF EXHIBITS (CONT'D) |
| NUMBER | PAGE |
| Exhibit 10 | Excel Spreadsheet, Multiple Tabs (Electronically Named as NFX-VALJ-00011557) — 135 |
| Exhibit 11 | United States Securities and Exchange Commission Form 10-K — 194 |
| Exhibit 12 | Website Printout — 284 |

--oOo--

REPORTER'S NOTE: Quoting of documents throughout the transcript are transcribed verbatim as read on the record and do not necessarily reflect exact quoting of the document as written.

---

Page 7

Friday, September 8, 2023; 8:03 a.m.
--oOo--

THE VIDEOGRAPHER: We're on the record. The time is 8:03 a.m. Today's date is September 8, 2023.

This is the video-recorded deposition of Bob Held in the matter of Lauri Valjakka versus Netflix.

This proceeding is held via Zoom. My name is Reggie Nand, and I'm the videographer. The court reporter today is Emily Samelson.

Counsels, please introduce yourselves, after which the court reporter will swear in the witness.

MS. EDLIN: Good morning. This is Elise Edlin for defendant, Netflix, Inc.

MR. RAMEY: And good morning. This is Bill Ramey for the plaintiff, Lauri Valjakka, and we're ready to proceed.

ROBERT F. HELD,
having first been duly sworn, was
examined and testified as follows:
EXAMINATION
BY MS. EDLIN:
Q   Good morning, Mr. Held.

Page 8

I should also note, just for the record, I also am joined here today with my colleague Angela Griggs, and Dr. Nisha Mody is also here.

But good morning, Mr. Held. How are you?
A   I'm doing well, thanks.
Q   Thank you. Well, my name is Elise. I am counsel for Netflix. And I -- I guess, have you -- sorry.

If you can just state your name for the record.
A   It's Robert F. Held.
Q   And Mr. Held, have you been deposed before?
A   Yes.
Q   How many times would you say that you've been deposed before?
A   Three.
Q   Three times?
A   Three times.
Q   Oh, okay. And what were -- what were the -- what was your purpose in those depositions?
A   A fact witness in the first one, a licensing expert in the second one, and a licensing and damages expert in the third one.
Q   And -- okay. So I guess I'm going to go through just a couple just general sort of rules

Page 57

1  Mr. Held's analysis is your work product?
2         MR. RAMEY:  We'll handle this, as you said,
3  later on.  I've got my objection on the record.
4  You've got your request on the record.  We'll deal
5  with it later on.  Or we can stay on the record and
6  discuss it, but I think we'll stand on what we've
7  provided in our responses.
8         MS. EDLIN:  All right.  Let's move back to
9  the report.
10 BY MS. EDLIN:
11    Q   Okay.  Mr. Held, before this case, have you
12 done any prior work with Mr. Ramey?
13    A   No.
14        MR. RAMEY:  And I would just caution the
15 witness that, if there is any prior work, that that
16 work is covered by protective orders in other cases.
17 So you can't really testify about it right now.
18        MS. EDLIN:  Okay.  I'm asking the witness,
19 not you, Mr. Ramey, but --
20        MR. RAMEY:  I was cautioning the witness.
21 That, I'm allowed to do.  But he answered it, "No."
22 BY MS. EDLIN:
23    Q   Have you done any prior work for
24 Mr. Valjakka?
25    A   No.

Page 58

1     Q   And have you done any prior work against
2  Netflix?
3     A   No.
4     Q   Okay.  Okay.  Let's turn to your report,
5  if we can look at page 10.
6         And I think this is -- here, you were
7  talking about the parties to this case; right?
8     A   Well, my page 10 starts with Netflix.
9     Q   Okay.  Great.  So what's your -- what's
10 your familiarity with Netflix prior to this case?
11    A   I had a subscription.
12    Q   What's your favorite show?
13        MR. RAMEY:  He uses Open Connect, by the
14 way.
15        THE WITNESS:  Everybody does.
16        MS. EDLIN:  Bill, please keep it to
17 objections.
18 BY MS. EDLIN:
19    Q   I'm sorry.
20    A   What's my favorite show?
21    Q   Yeah.
22    A   It's actually not on Netflix.
23    Q   Okay.
24        MR. RAMEY:  And it's not in your report
25 either, is it?  And we're here to talk about what's

Page 59

1  in his report.
2         MS. EDLIN:  Netflix is discussing his
3  report, and I -- okay.  Here we go.
4         MR. RAMEY:  Let's stick to the report,
5  Elise.  I mean, this is -- we're not here to talk
6  about what's his favorite show.
7  BY MS. EDLIN:
8     Q   When -- if you turn to page 9 of your
9  report, I believe this section you are talking about
10 plaintiff, Mr. Valjakka; is that correct?
11    A   What paragraph are you starting from?  I
12 just want to make sure we're lined up here, because
13 Adobe updated.
14    Q   So let's look at paragraph 20 of your
15 report.
16    A   Okay.
17    Q   Of your original report.
18        And it says here -- do you see where I'm
19 referring to, the first sentence, "From 2020 until
20 the current time Mr. Valjakka has also been working
21 for CDN Licensing as Vice President of Business
22 Development"?
23        Do you see that?
24    A   Yes.
25    Q   Okay.  How did you get the information that

Page 60

1  you have in your report about Mr. Valjakka's role at
2  CDN Licensing?
3     A   From his deposition.
4     Q   Did you obtain any other information from
5  anyone else about his role at CDN Licensing other
6  than his deposition?
7     A   Not that I recall.
8     Q   Are you aware that Mr. Valjakka is also the
9  owner of CDN Licensing?
10    A   I believe he said that in his deposition.
11 Yes.
12    Q   Do you know if there are any other owners
13 of CDN Licensing?
14    A   I'm not aware of any others.
15    Q   Okay.  And it says here that "The purpose
16 of the company is to 'develop more IP' and to
17 'license your intellectual property'"; is that
18 right?
19        MR. RAMEY:  Objection.  Form.
20        THE WITNESS:  That's what it states in my
21 report.
22 BY MS. EDLIN:
23    Q   Are you aware of any other purpose for
24 CDN Licensing?
25        MR. RAMEY:  Objection.  Form.

Page 61

1  THE WITNESS: No.
2  BY MS. EDLIN:
3  Q  Do you -- do you know if CDN Licensing has
4  ever licensed Mr. Valjakka's intellectual property
5  to others?
6  MR. RAMEY: Objection. Form.
7  THE WITNESS: Yes. I go through that in my
8  report.
9  BY MS. EDLIN:
10  Q  You address whether or not CDN Licensing
11  has licensed the patents-in-suit?
12  MR. RAMEY: Objection. Form.
13  THE WITNESS: In my Georgia-Pacific
14  factor -- give me a couple minutes here to find
15  that.
16  Yes. It's -- they're all outlined in my
17  Georgia-Pacific Factor 1. The reason why I wanted
18  to read it was to make sure it was CDN and not
19  Mr. Valjakka.
20  BY MS. EDLIN:
21  Q  So you said you were looking at
22  Georgia-Pacific Factor 1; is that right?
23  A  Yes.
24  Q  Okay. So it looks like -- so in Factor 1,
25  in paragraph 61, you talk about Mr. Valjakka

Page 62

1  entering into an ▮▮▮▮▮▮▮▮▮ with CDN
2  Licensing for the '167 and the '102 patents;
3  correct?
4  A  Yes. As it states in my report,
5  paragraph 61, "Notes the plaintiff also entered
6  into ▮▮▮▮▮▮▮ agreements for the '167
7  patent and the '102 patent with CDN Licensing
8  Finland Oy in 2021."
9  Q  But what I'm asking about right now is
10  whether CDN Licensing has ever licensed the patents.
11  MR. RAMEY: Is that a question?
12  Objection. Form.
13  MS. EDLIN: Yes.
14  BY MS. EDLIN:
15  Q  To your knowledge, has CDN Licensing ever
16  licensed these patents under their ▮▮▮▮▮▮▮
17  agreement?
18  MR. RAMEY: Objection. Form.
19  THE WITNESS: The licenses that I outline
20  in Georgia-Pacific Factor 1 were done. The transfer
21  of the rights for the two patents was done in 2021.
22  I don't have the exact date in here. But the other
23  agreements that he did were done at the end of '21,
24  '22, '22, '22, '22. So he licensed them one, two,
25  three, four, five times.

Page 63

1  BY MS. EDLIN:
2  Q  So let me make sure I've got this correct.
3  Are you saying that these licenses with the
4  five companies -- so ▮▮▮▮▮▮▮▮▮▮▮▮▮
5  ▮▮▮▮▮▮▮▮▮ -- those were entered after Mr.
6  Valjakka had granted CDN Licensing an ▮▮▮▮▮▮
7  ▮▮▮▮ to the '167 patent?
8  MR. RAMEY: Objection. Form.
9  THE WITNESS: That's my understanding.
10  BY MS. EDLIN:
11  Q  Okay. Let's just take a look at those
12  license agreements.
13  If we can -- I'm going to put -- the first
14  one is ▮▮▮▮▮ that you discuss. And -- sorry. I'm
15  just getting back to the chat.
16  So we have ▮▮▮▮▮ agreement that is -- give
17  me one second -- it is Bates-stamped LV004030.
18  Do you see this agreement?
19  A  Yes. I have it up.
20  MR. RAMEY: This is Held 4, you said?
21  MS. EDLIN: Yes. Let's mark this as
22  Held Exhibit 4.
23  MR. RAMEY: Thank you.
24  (Exhibit 4 was marked for identification.)
25  ///

Page 64

1  BY MS. EDLIN:
2  Q  And so what is this document?
3  A  It's titled "Confidential ▮▮▮▮▮▮▮▮
4  Agreement ▮▮▮▮▮▮▮."
5  Q  Okay. And this is -- who are the parties
6  to this agreement?
7  A  Plaintiff Lauri Valjakka and ▮▮▮▮▮.
8  Q  Okay. And is CDN Licensing a party to this
9  agreement?
10  A  On a search of CDN, I don't see it listed
11  in here.
12  Q  Okay. You can set that aside. Let's look
13  at the next one, which is -- apologies -- ▮▮▮▮▮.
14  MS. EDLIN: So I'm going to mark Exhibit 5,
15  Held Exhibit 5, and it is in the chat window now.
16  (Exhibit 5 was marked for identification.)
17  BY MS. EDLIN:
18  Q  If you could go ahead and open that up.
19  A  I have it open.
20  Q  Okay. And what is this document?
21  A  It's titled "▮▮▮▮▮▮ Agreement."
22  Q  And who are the parties to this settlement
23  agreement?
24  A  Lauri Valjakka is "the Plaintiff," and
25  ▮▮▮▮▮▮▮▮▮ is just "▮▮▮▮▮."

```
                                                Page 221
 1      Row E states incremental profit margin
 2 attributable to ████████████████████.
 3   Q    And that is, in this case, what your
 4 royalty rate is; right?
 5   A    Yes.
 6   Q    Okay.  And you did not decrease it any
 7 further for any specific functionality within that
 8 OC technology; right?
 9        MR. RAMEY:  Objection.  Form.
10 BY MS. EDLIN:
11   Q    Yes or no?
12        MR. RAMEY:  Circle back.
13        THE WITNESS:  No.  As I previously
14 explained in the main report, there were no other
15 Georgia-Pacific factors that indicated we should.
16 And that's following case law that we cite in the
17 report where the judge in the Honeywell case, I
18 think it was -- let me just get that correct.
19 Also -- yeah, Honeywell case.
20        Paragraph 156 of my original report, where
21 they determined a reasonable royalty rate based on
22 figuring out the differences in the profit margins.
23        And it states in the last two sentences
24 "Although the Court eventually decided after the
25 GP factor analysis that no adjustment to the
```

```
                                                Page 222
 1 ███ percent base royalty will be made."
 2        And we followed that court case and we did
 3 the same methodology.  So no further adjustment was
 4 made to the ███ percent.
 5        MS. EDLIN:  Okay.
 6        MR. RAMEY:  We've been going on another
 7 18 minutes.
 8        MS. EDLIN:  Let's go off the record.
 9        MR. RAMEY:  Thank you, ma'am.
10        THE VIDEOGRAPHER:  We're off the record.
11 The time is 2:52 p.m.
12        (Break taken.)
13        THE VIDEOGRAPHER:  We're on the record.
14 The time is 3:06 p.m.
15        MR. RAMEY:  One thing real quick.  I
16 was -- I think the record time is wrong.  Do you
17 mind reviewing that real quick?  You don't have to
18 stop us or anything.  Just check that time.  We
19 think it was about five -- about -- yeah, we think
20 it was about an hour and 35 minutes left.  Sorry.
21        Sorry, Elise.
22        THE VIDEOGRAPHER:  Yes.  Total time was
23 five hours and 35 minutes.
24        MR. RAMEY:  Okay.  So 25 minutes left.
25 Okay.  1:25.  All right.  Thank you.
```

```
                                                Page 223
 1 BY MS. EDLIN:
 2   Q    Okay.  Let's turn to -- I would like
 3 to talk about Georgia-Pacific Factor 1 in your
 4 analysis.
 5        And going back at your report, that is
 6 page -- sorry.
 7   A    Still scrolling up.  Yours is faster than
 8 mine.  It's page 19.
 9   Q    Page 19.  Okay.
10        "Georgia-Pacific Factor 1:  The royalties
11 received by the patentee for the licensing of the
12 patent-in-suit, proving or tending to prove an
13 estimated" -- "established royalty."
14        We already talked about all of the licenses
15 that are listed in this section of your report
16 earlier today.
17        Do you remember that?
18   A    I'm sorry.  We already talked about --
19 well, we skipped --
20   Q    The licenses --
21   A    That are in Georgia-Pacific Factor 1?
22   Q    Yes.
23   A    Yeah.  We sort of skimmed through them.
24   Q    Okay.  And it's your position that none of
25 these licenses are relevant to the hypothetical
```

```
                                                Page 224
 1 negotiation; right?
 2   A    Correct.  These are all settlement licenses
 3 that resulted from litigation except for the -- not
 4 ████████████████████ one, which we're not
 5 quite sure where it came from.
 6   Q    Sorry.  We're talking about GP Factor 1, so
 7 Valjakka's licenses, not Netflix's licenses.
 8   A    Yeah.  All right.  I'm sorry.
 9   Q    Okay.
10   A    Yeah.  These were all -- these were all
11 settlement licenses that resulted from litigation.
12   Q    Okay.
13   A    Because they're not on -- they're not arm's
14 length transactions as in the hypothetical
15 negotiation between Mr. Valjakka and Netflix.
16   Q    Okay.  ==The CDN license is not a settlement==
17 ==license, though; right?==
18        MR. RAMEY:  Objection.  Form.
19        THE WITNESS:  Sorry.  So what I've outlined
20 under GP 1 were five license agreements executed
21 in '21, '22, all resulted from settlements of
22 litigation.
23        But then also in paragraph 61, "The
24 plaintiff also entered into ████████████████
25 agreements for the '167 patent and the '102 patent
```

```
                                               Page 225
 1  with CDN Licensing Finland Oy.  However, CDN
 2  Licensing Finland Oy was cofounded by Mr. Valjakka
 3  for the purpose of licensing his IP.  Therefore,
 4  the licensing fees in these two agreements do not
 5  reflect the market value of the patents in an arm's
 6  length transaction and hence are not comparable to
 7  the value that would be negotiated in a hypothetical
 8  negotiation.  So my analysis under this factor
 9  therefore focuses on the" --
10          (Reporter clarification.)
11          THE WITNESS:  I apologize again.
12          From where?
13          (Reporter clarification.)
14          THE WITNESS:  "My analysis under this
15  factor therefore focuses on five license agreements
16  discussed below."
17  BY MS. EDLIN:
18     Q    Okay.  Is it accurate that -- well, strike
19  that.
20          Has any company ever paid more than
21           for a license to the '167 patent?
22     A    The --
23          MR. RAMEY:  Objection.  Form.
24          Sorry about that.
25          THE WITNESS:  No, that's all right.
```

```
                                               Page 226
 1          If we look at my report, I believe it
 2  was RPX -- no.
 3  BY MS. EDLIN:
 4     Q    Has any single company ever paid more
 5  than           for a license to the '167 patent?
 6          MR. RAMEY:  Objection.  Form.
 7          THE WITNESS:  I'm sorry.  Can you restate
 8  it, please?
 9  BY MS. EDLIN:
10     Q    Has any single company ever paid more than
11           for a license to the '167 patent?
12          MR. RAMEY:  Objection.  Form.
13          THE WITNESS:  Not per the data that was
14  given to us.
15  BY MS. EDLIN:
16     Q    Has any company ever sold the patent for
17  more than           euros?
18          MR. RAMEY:  Objection.  Form.
19          THE WITNESS:  That doesn't make sense.
20  Has any company ever sold the patent for more than
21           Euros?  I don't follow the logic in that.
22  BY MS. EDLIN:
23     Q    You understand that the patent has been
24  transferred between multiple owners over the course
25  of the last 20 years; right?
```

```
                                               Page 227
 1          MR. RAMEY:  Objection.  Form.
 2          THE WITNESS:  Yes.
 3  BY MS. EDLIN:
 4     Q    Have any of those transactions been a
 5  purchase of the patent for more than           euros?
 6     A    We did not analyze the interparty
 7  transactions between the owners and the owners'
 8  companies.  They were not arm's length transactions.
 9  And neither are the ones that are in the GP 1 here.
10  They're all settlement in litigation.
11     Q    Is it your position that the CDN license is
12  not representative of the value of the '167 patent?
13          MR. RAMEY:  Objection.  Form.
14          THE WITNESS:  And you're referring to
15  paragraph 61?
16  BY MS. EDLIN:
17     Q    Uh-huh.
18     A    Where the plaintiff entered into an
19                    agreement with CDN Finland Oy?
20     Q    Right.
21     A    No.
22          Sorry.
23          That was a transfer of patent rights from
24  one entity controlled by Mr. Valjakka to another
25  entity controlled by Mr. Valjakka.  So again, it's
```

```
                                               Page 228
 1  not an arm's length transaction.
 2     Q    And so because it's not an arm's length
 3  transaction, you don't believe that it represents
 4  the market value of the patent; is that right?
 5          MR. RAMEY:  Objection.  Form.
 6          THE WITNESS:  Not at all.  Has no bearing
 7  on the market value of the patent.
 8          There was no -- there was no basis in the
 9  transfer other than the transfer from one company to
10  another.  There was no basis that it would be used
11  in product.  There was no value other than it was
12  transferred to CDN Licensing Oy per Mr. Valjakka
13  for the purpose of licensing his IP.
14          So there's no basis in value that anything
15  could be attributed to for that other than a
16  transfer between two companies.
17          It's not an arm's length transaction
18  between a prospective licensor and a prospective
19  licensee where the licensee would be using it and
20  implementing it into a system, product, or service
21  which would then generate value for the licensee
22  and, therefore, the licensee pays royalties back
23  to the licensor.  So it's not a representative
24  transaction of value.
25  //
```

Page 229

BY MS. EDLIN:

Q    Let me just break that apart a little bit. That was a little bit long.

So is it your position now that the ▮ euros that Mr. Valjakka received from CDN Licensing for its ▮ to the '167 patent is not representative of the value of the '167 patent?

MR. RAMEY:  Objection.  Form.

THE WITNESS:  Mr. Valjakka transferred the rights from one entity owned by Mr. Valjakka to another entity owned by Mr. Valjakka, which is not an arm's length transaction between the licensor and licensee.  Therefore, whatever value was delineated in that agreement, which you said was ▮ has no bearing on the value.

BY MS. EDLIN:

Q    And is it your position that the actual value of the '167 patent is much higher than the ▮ euros that was paid by CDN Licensing for the ▮ to the '167 patent?

MR. RAMEY:  Objection.  Form.

THE WITNESS:  Yes.

BY MS. EDLIN:

Q    Okay.  Let's just take a quick look at that license again.  I believe we marked it as ▮

Page 230

A    Is it still in the -- there it is.

Okay.  I'm in it.

Q    So you mentioned a couple times now that Mr. -- that CDN -- the purpose of CDN Licensing is to license Mr. Valjakka's patents; is that right?

A    That's what Mr. Valjakka stated in his deposition.

Q    Okay.  Did you review this license when you were forming your analysis -- your opinions?

MR. RAMEY:  Objection.  Form.

THE WITNESS:  Not that I recall.

BY MS. EDLIN:

Q    So is this the first time you've seen this license agreement?

MR. RAMEY:  Objection.  Form.

THE WITNESS:  Yes.

BY MS. EDLIN:

Q    Okay.  So prior to sitting here today, you had not reviewed the license agreement between Mr. Valjakka and CDN Licensing?

MR. RAMEY:  Objection.  Form.

THE WITNESS:  My staff reviewed this one.

BY MS. EDLIN:

Q    Okay.  So if you can just take a look at the fifth paragraph down from the licensee's

Page 231

address, it begins with "The licensor is aware that the patent may be subject to demands concerning the reversal of the legal action."

Do you see that?

A    Yes.

Q    And do you see where it states that -- it talks about creditors of IPRA Technologies and Lauri Valjakka?

Do you see that?

A    Yes.  That's in the first sentence.

Q    And do you see the next sentence?  Can you read that last sentence there?

A    "The parties note that the purpose of the transfer in this agreement is the use of the license and sales revenues obtained from the patent.  Also to cover the debts of Lauri Valjakka and IPRA Technologies Ltd Oy."

Q    Okay.  And that doesn't change your opinion, though, about the value of this license; right?

MR. RAMEY:  Objection.  Form.

THE WITNESS:  This license has no bearing on the value of the patent.  It's not an arm's length transaction.  And this, what you just pointed me to in here, even further, it's not an arm's

Page 232

length transaction because it was between an entity controlled by the same owner, one.

But two, what you pointed me to here also tells me that it's to cover the debts of Lauri Valjakka, which may be the ▮, again, which has no bearing on the value of the patent.

BY MS. EDLIN:

Q    Okay.  And the value of the patent, you think, is actually much higher; right?

MR. RAMEY:  Objection.  Form.

THE WITNESS:  Yes.  Per my damages analysis.

BY MS. EDLIN:

Q    Okay.  Did you or your staff write this section of your report?

MR. RAMEY:  Objection.  Form.

THE WITNESS:  What's -- I wrote my report.  You didn't even refer to a section.

BY MS. EDLIN:

Q    I'm sorry.  Did your staff write this section of your report that we are looking at under your Georgia-Pacific Factor 1 analysis?

MR. RAMEY:  Objection.  Form.

THE WITNESS:  Are you talking about all of GP 1?

Page 293

1  was just curious what would come up two days ago
2  when I searched it.
3       So I don't rely on Google to provide me
4  formulas for the basis of my damages.
5  BY MS. EDLIN:
6    Q   So when you searched on Google, what did
7  you enter into the search field?
8       MR. RAMEY:  Objection.  Form.
9       THE WITNESS:  I believe something along
10 the lines of -- well, markup, the markup method for
11 determining revenues from cost, probably.
12 BY MS. EDLIN:
13   Q   And --
14   A   So again, this is a standard accounting
15 formula.  This reference I found, whether it bears
16 any witness or not, I only printed it out because I
17 was curious.  We could probably very easily find
18 references to this formula in any accounting book
19 which would have been peer reviewed and multiple
20 other sources, which I'm happy to do and search and
21 provide all those so that we can put this to bed,
22 because it's a standard accounting formula.
23   Q   You didn't rely on any of those other books
24 or sources that you are mentioning now when you
25 drafted your report; right?

Page 294

1    A   I have a PhD in economics on my team.
2    Q   You are not a PhD in economics; right?
3    A   That's correct.
4    Q   And --
5    A   But you don't have to be a PhD in economics
6  to understand that revenue equals cost over 1 minus
7  gross margin.
8       Plus, I do have an MBA, and I almost had a
9  master's in finance if they had let me double major,
10 but Drexel wouldn't.
11   Q   So --
12      THE WITNESS:  How much time do we have
13 left, Reggie?
14      THE VIDEOGRAPHER:  We're over seven
15 minutes.
16      MS. EDLIN:  Okay.
17 BY MS. EDLIN:
18   Q   Well -- and just last question.
19      You didn't print this out or search for
20 this source until after you submitted your report,
21 two days ago?
22      MR. RAMEY:  Objection.  Form.
23      THE WITNESS:  Yeah.  That's what I said a
24 couple minutes ago.  Because as I was preparing for
25 this, I noticed it was a missed cite.

Page 295

1       MS. EDLIN:  Okay.  That is all, then.
2  Thank you.
3       THE WITNESS:  Okay.  Thank you.
4       MR. RAMEY:  Mr. Held, thank you very much
5  for coming today.
6       No further questions.  We'll reserve the
7  rest for trial.
8       THE WITNESS:  Thank you.  Am I permitted
9  to leave or --
10      MR. RAMEY:  Hold on a second.  Let's let
11 him sign off real quick.
12      THE WITNESS:  Sorry.  I thought he had.
13      THE VIDEOGRAPHER:  We're off the record.
14 The time is 4:49 p.m.
15      (Off the record.)
16      MS. EDLIN:  I would like this expedited and
17 the rough as soon as possible.
18      THE STENOGRAPHIC REPORTER:  Do you have a
19 date you need the final by?
20      MS. EDLIN:  What's the soonest we can get
21 it?
22      THE STENOGRAPHIC REPORTER:  I can have
23 it Monday if that's what you need.
24      MS. EDLIN:  I don't want to ruin your
25 weekend.  We can make it Tuesday or Wednesday.

Page 296

1  Wednesday next week is fine.
2       THE STENOGRAPHIC REPORTER:  Mr. Ramey,
3  do you need a rough draft or an expedite?
4       MR. RAMEY:  No.
5       (Deposition concluded at 4:52 p.m.)
6                --oOo--

Page 297

1   I, ROBERT F. HELD, do hereby declare under
2  penalty of perjury that I have read the foregoing
3  transcript, that I have made any corrections as
4  appear noted, in ink, initialed by me, or attached
5  hereto; that my testimony as contained herein, as
6  corrected, is true and correct.
7
8
9  EXECUTED this_____day of _____, 20___, at
10 _____,_____.
                (City)              (State)
11
12
13
14
15
16         _____
                   ROBERT F. HELD
17
18
19
20
21
22
23
24
25

Page 298

1                    ERRATA SHEET
2  To add testimony, indicate "Add" and print the exact
   words you wish to add.  To delete testimony,
3  indicate "Delete" and print the exact words you wish
   to delete.
4
5  Deposition of:  ROBERT F. HELD
   Proceedings Date:  Friday, September 8, 2023
6
7  I, have the following changes to my proceedings
   transcript:
8
9  PAGE     LINE     CHANGE TESTIMONY TO READ AS FOLLOWS:
10 ____     ____     _____
11 PAGE     LINE     CHANGE TESTIMONY TO READ AS FOLLOWS:
12 ____     ____     _____
13 PAGE     LINE     CHANGE TESTIMONY TO READ AS FOLLOWS:
14 ____     ____     _____
15 PAGE     LINE     CHANGE TESTIMONY TO READ AS FOLLOWS:
16 ____     ____     _____
17 PAGE     LINE     CHANGE TESTIMONY TO READ AS FOLLOWS:
18 ____     ____     _____
19 PAGE     LINE     CHANGE TESTIMONY TO READ AS FOLLOWS:
20 ____     ____     _____
21 PAGE     LINE     CHANGE TESTIMONY TO READ AS FOLLOWS:
22 ____     ____     _____
23 PAGE     LINE     CHANGE TESTIMONY TO READ AS FOLLOWS:
24 ____     ____     _____
25 ///

Page 299

1                ERRATA SHEET, PAGE 2
2  To add testimony, indicate "Add" and print the exact
   words you wish to add.  To delete testimony,
3  indicate "Delete" and print the exact words you wish
   to delete.
4
5  Deposition of:  ROBERT F. HELD
   Proceedings Date:  Friday, September 8, 2023
6
7  I, have the following changes to my proceedings
   transcript:
8
9  PAGE     LINE     CHANGE TESTIMONY TO READ AS FOLLOWS:
10 ____     ____     _____
11 PAGE     LINE     CHANGE TESTIMONY TO READ AS FOLLOWS:
12 ____     ____     _____
13 PAGE     LINE     CHANGE TESTIMONY TO READ AS FOLLOWS:
14 ____     ____     _____
15 PAGE     LINE     CHANGE TESTIMONY TO READ AS FOLLOWS:
16 ____     ____     _____
17 PAGE     LINE     CHANGE TESTIMONY TO READ AS FOLLOWS:
18 ____     ____     _____
19 PAGE     LINE     CHANGE TESTIMONY TO READ AS FOLLOWS:
20 ____     ____     _____
21
22
23 _____    _____
   ROBERT F. HELD                       Date
24
25

Page 300

1       I, the undersigned, a Certified Shorthand
2  Reporter of the State of California do hereby
3  certify:
4       That the foregoing proceedings were taken
5  before me at the time and place herein set forth;
6  that any witnesses in the foregoing proceedings,
7  prior to testifying, were duly sworn; that a
8  verbatim record of the proceedings was made by me
9  using machine shorthand which was thereafter
10 transcribed under my direction; that the foregoing
11 transcript is an accurate transcription thereof.
12      Further, that if the foregoing pertains to
13 the original transcript of a deposition in a federal
14 case, before completion of the proceedings, review
15 of the transcript [ ] was [X] was not requested.
16      I further certify I am neither financially
17 interested in the action nor a relative or employee
18 of any attorney or any of the parties.
19      IN WITNESS WHEREOF, I have this date
20 subscribed my name.
21
22      Dated:  12th of September, 2023
23
24                    _____
                           EMILY SAMELSON,
25                         CSR No. 14043