REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

William P. Ramey, III (appearance *pro hac vice*)
wramey@rameyfirm.com
RAMEY LLP
5020 Montrose Blvd., Suite 800
Houston, Texas 77006
Telephone:  +1.713.426.3923
Facsimile:  +1.832.689.9175

Susan S.Q. Kalra, Bar No. 167940
skalra@rameyfirm.com
Ramey LLP
5020 Montrose Blvd., Suite 800
Houston, Texas 77006
(800) 993-7499
(832) 900-4941 (facsimile)

Attorneys for Plaintiff
*LAURI VALJAKKA*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| LAURI VALJAKKA,<br><br>Plaintiff,<br><br>v.<br><br>NETFLIX, INC.,<br><br>Defendant. | Case No. 4:22-cv-01490-JST<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT NETFLIX, INC.'S MOTION TO EXCLUDE PORTIONS OF THE OPINIONS AND TESTIMONY OF ROBERT HELD**<br><br>Date: November 30, 2023<br>Time: 2:00 pm<br>Judge: Honorable Jon S. Tigar<br>Crtrm: 6 – 2nd Floor |

**TABLE OF CONTENTS**

I.      INTRODUCTION .......................................................................................... 1

II.     FACTUAL BACKGROUND .......................................................................... 1

        A.      PATENT-IN-SUIT AND HYPOTHETICAL NEGOTIATION ........... 1

        B.      NETFLIX'S OPEN CONNECT SYSTEM ......................................... 3

        C.      VALJAKKA'S DAMAGES ............................................................... 3

III.    LEGAL STANDARD ................................................................................... 4

        A.      Admissibility of Expert Testimony.......................................................... 4

        B.      Damages: Reasonable Royalty................................................................ 5

IV.     ARGUMENT ............................................................................................... 6

        A.      NETFLIX'S MOTION MISCHARACTERIZED, MISINTERPRETED,
                AND MISUNDERSTOOD MR. HELD'S METHOD OF ROYALTY
                RATE DETERMINATION ................................................................. 6

                1.      Mr. Held's Two-Step Apportionments Have Taken Into Account
                        The Contributions Of The Other Cost Items Listed In The Cost Of
                        Revenue And Marketing Costs, As Well As The Contributions Of
                        Other Non-Infringing Technological Advancements Made By
                        Netflix ....................................................................................... 6

                2.      Mr. Held Has Used The Available Data Consistently And
                        Reasonably, And The Adjustments He Made Render The
                        Determined Royalty Rate Highly Conservative........................ 10

        B.      MR. HELD CORRECTLY AND RELIABLY DETERMINED THE
                ROYALTY BY APPLYING A SCIENTIFIC METHOD BASED ON
                CASE-SPECIFIC FACTS ABOUT NETFLIX'S INFRINGEMENT................. 13

                1.      Mr. Held Applied A Scientific Method To Estimate The Revenue
                        Generated By Open Connect Technology ................................. 13

                2.      Netflix mischaracterized Mr. Held's royalty base estimate .................... 15

        C.      THE APPROPRIATE PARTY TO THE HYPOTHETICAL LICENSE
                NEGOTIATIONS IS IN DISPUTE ....................................................... 18

        D.      MR. HELD'S REPORT AND TESTIMONY SHOULD NOT BE
                EXCLUDED ..................................................................................... 19

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

V.      MR. HELD SHOULD BE GIVEN AN OPPORTUNITY TO UPDATE OR
        REVISE HIS REPORT, IF WARRANTED ........................................................................ 19

VI.     CONCLUSION .............................................................................................................. 19

# TABLE OF AUTHORITIES

## Cases

*Apple, Inc. v. Motorola, Inc.*,
  757 F.3d 1286 (Fed. Cir. 2014) ................................................................................................. 5

*CSIRO v. Cisco Sys.*,
  809 F.3d 1295 (Fed. Cir. 2015) ................................................................................................. 5

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) ............................................................................................................. 4, 5

*Ericsson, Inc. v. D-Link*,
  773 F.3d 1201 (Fed. Cir. 2014) ................................................................................................. 5

*Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*,
  Case No. 477, 2006 WL 1329999 (N.D. Cal. May 15, 2006) ................................................... 5

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136  (1997) ................................................................................................................. 4

*GPNE Corp. v. Apple, Inc.*,
  No. 12-CV-02885-LHK, 2014 U.S. Dist. LEXIS 5323, 2014 WL 1494247 (N.D. Cal. Apr. 16,
  2014) ...................................................................................................................................... 17

*Honeywell Int'l, Inc. v United States*,
  107 Fed. Cl. 659, 2012 U.S. Claims LEXIS 1539 (2012) ......................................................... 7

*i4i Ltd. v. Microsoft Corp.*,
  598 F.3d 831 (Fed. Cir. 2010) ................................................................................................... 5

*Kennedy v. Collagen Corp.*,
  161 F.3d 1226  (9th Cir.1998) ................................................................................................... 4

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999) ................................................................................................................. 5

*Messick v. Novartis Pharm. Corp.*,
  747 F.3d 1193 (9th Cir. 2014) ................................................................................................... 5

*Primiano v. Cook*,
  598 F.3d 558 (9th Cir. 2010) ..................................................................................................... 5

*RSA Protective Techs., LLC v. Delta Sci. Corp.*,
  No. LA CV19-06024 JAK (PLAx), 2021 U.S. Dist. LEXIS 209394 (C.D. Cal. Oct. 20, 2021)
  ............................................................................................................................................... 19

*Summit 6, LLC v. Samsung Elecs. Co.*,
  802 F.3d 1283 (Fed. Cir. 2015) ............................................................................................... 19

*Tektronix, Inc. v United States*,
  552 F.2d 343 (Ct. of Claims 1977) ........................................................... 7

*United States v. Hankey*,
  203 F.3d 1160  (9th Cir. 2000) ................................................................. 5

*United States v. Prime*,
  431 F.3d 1147 (9th Cir. 2005) .................................................................. 5

*VirnetX v. Cisco Sys.*,
  767 F.3d 1308 (Fed. Cir. 2014) ........................................................... 5, 17

**Rules**

Fed. R. Evid. 702 .................................................................................. 4, 5

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiff Lauri Valjakka ("Valjakka") hereby opposes Defendant Netflix, Inc.'s ("Netflix") Motion To Exclude Portions Of The Opinions And Testimony Of Robert Held ("Motion"). As explained below, the Motion should be denied.

## I.    INTRODUCTION

Netflix's motion to exclude portions of the opinions and testimony of Plaintiff's damages expert, Robert Held, is meritless on all grounds. His opinions and testimony are based on the best evidence of the value of the patent-in-suit at the time of the hypothetical negotiation, and his methodology is legally sound. But because Netflix does not like the damages numbers that Mr. Held will provide to the jury, Netflix criticizes Mr. Held's analysis and improperly seeks to exclude his reliable methodologies.

Netflix incorrectly argues that Mr. Held fails to apportion between patented and non-patented features of Open Connect. To the contrary, Mr. Held's analysis typifies a model damages analysis by apportioning the revenue and profits to reflect the value of the patent. He then multiplies the reasonable royalty rate by the royalty base - the revenue associated with the Accused Products.  The Federal Circuit has repeatedly found that a damages expert can account for the value of the patented features through apportionment of either the base or the rate.  As will be demonstrated below, Mr. Held appropriately defined the base, and then apportioned the profit margin twice to determine the reasonable royalty rate based on the contribution of the Accused Products.

Netflix's efforts to exclude portions of Mr. Held's report and testimony should be denied.

## II.    FACTUAL BACKGROUND

### A.    PATENT-IN-SUIT AND HYPOTHETICAL NEGOTIATION

Valjakka alleges Netflix infringes U.S. Patent No. 8,495,167 ("the '167 patent"), entitled "Data Communications Networks, Systems, Methods and Apparatus". Valjakka submitted filed the patent application to the USPTO on July 30, 2002, and the '167 patent was duly issued by the United States Patent and Trademark Office on July 23, 2013. ('167 Patent, ECF 74-1.)  The '167

1  patent "relates to improvements in data communications networks and to systems, methods and

2  apparatus employed in such networks." (Claim Construction Order, ECF 73 at 1:20-22; '167

3  Patent, ECF 74-1 at 1:6-8.)

4          Valjakka alleges that Netflix infringes the '167 patent by "making, using, testing, selling,

5  offering for sale and/or importing into the United States" Netflix's Accused Products, which

6  include Netflix's Open Connect program and Netflix websites (e.g. https://www.netflix.com)

7  (Valjakka's Third Amended Complaint ("TAC"), ECF 74, ¶¶ 16, 18). Netflix's Open Connect

8  platform was officially announced on June 4, 2012. [1]

9          The '167 patent is directed to providing improved data communications networks,

10 methods of operating data communications networks, network servers, network terminals and

11 computer programs. ('167 Patent, ECF 74-1 at 1:24-27.)  Independent Claims 1 and 9 require a

12 main server that controls the distribution of data among terminals, terminals that can themselves

13 act as relay servers to send data downstream, and a network information database that contains

14 terminal performance information. ('167 Patent, ECF 74-1 at Claims 1 and 9.)  In summary, the

15 main server selects and sends a "transport request" to each of a first set of terminals based on the

16 terminals with the best performance. (*Id*. at 5:3-5.) A "transport request" includes "Details of the

17 file to be transported. These will generally include, for example, the file type and size, time

18 stamps for activation and deactivation of the content, encryption and compression details, etc.

19 The addresses of relay servers and terminals that are to be involved in the distribution of the file."

20 (*Id.* at Col. 2, lines 44-56.)

21          It is not necessary for the terminals to know the entire network address space of the

22 network, since the target terminal addresses are included in the transport requests. As part of the

23 transport request, the main server sends the addresses of other target terminals to the first set of

24 target terminals/relay servers. Each terminal selects its own downstream terminals/relay servers

25 and sends the rest of the target network addresses to these terminals/relay servers as part of the

26

27  ──────────────

28  [1]  Defendant Netflix, Inc.'s Patent L.R. 3-9 Supplemental Responsive Damages Contentions,
    ECF 108-2, at 6:22-25 (Ex. L).

modified transport request. Thus, each one of the first set of terminals selects a further two or three "best" terminals/relay servers from the addresses forwarded to it by the main server and passes the modified transport request on to these terminals including the details of the other remaining target terminals. Because of this dynamic routing, the main server does not need to know explicitly which terminals deliver content data and which terminals receive content data. (*Id*. at 5: 30-45.)

### B. NETFLIX'S OPEN CONNECT SYSTEM

Valjakka contends that Netflix's Open Connect system infringes the '167 patent. Open Connect's main function is to ensure that Netflix's clients can efficiently and effectively stream content. (*See* Ex. 14 to Riggs Decl., ECF 162-15 (NFX-VALJ-00005836) at 5836.) Valjakka's "infringement read only accuses the 'content filling' logic performed by Open Connect Appliances ("OCAs") and portions of the Open Connect control plane" (Motion, at 2:11-14). As set forth at length in Dr. Kozek's report (Exhibit A to Ramey Declaration, at pp.14-109), it is the Open Connect system as a whole, that infringes the '167 patent. "Netflix's Open Connect system is the content delivery system behind Netflix's streaming service" (Motion, 2:10-11), and "it is the OCA [Open Connect Appliances] devices and the functions it performs through networking that has improved the speed and efficiency of data communications in CDN system" (Kozek Report, Exh. A to Ramey Declaration).

Mr. Held's opinion that Netflix's entire Open Connect system is the smallest saleable patent practicing unit ("SSPPU") is supported by his review of documents and his interview with Dr. Kozek. (See Held Depo, Ex. 3 to Griggs Decl., ECF 179-4, at 109:13-22; Held Report., ¶¶ 5, 114, 117, 138-141, 144, 202.)

### C. VALJAKKA'S DAMAGES

As is detailed below, Valjakka's damages expert. Mr. Held, performed an analysis of Valjakka's damages, employing a "hypothetical negotiation" analysis using the factors set forth in *Georgia-Pacific Corp. v. United States Plywood Corp*., 318 F. Supp. 1116, 166 U.S.P.Q. 235, (S.D.N.Y. 1970), and applied both contemporaneous and "Book of Wisdom" evidence. (Held Report, Section VI; Supplemental Held Report.) After applying the methodology described in his

1    Report and detailed below, Mr. Held arrived at a reasonable royalty of ██████ million.

2    **III.    LEGAL STANDARD**

3        **A.    Admissibility of Expert Testimony**

4        Under Federal Rule of Evidence 702, an expert may testify if: (a) the expert's scientific,

5    technical, or other specialized knowledge will help the trier of fact to understand the evidence or

6    to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony

7    is the product of reliable principles and methods; and (d) the expert has reliably applied the

8    principles and methods to the facts of the case. Fed. R. Evid. 702.

9        To be admissible, expert evidence must be "not only relevant, but reliable." *Daubert v.*

10   *Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).  "[R]elevance means that the evidence will

11   assist the trier of fact to understand or determine a fact in issue." *Cooper v. Brown*, 510 F.3d 870,

12   942 (9th Cir. 2007).  Under *Daubert*, the district court acts as a "gatekeeper," excluding "junk

13   science" that does not meet the standards of reliability required under Rule 702. *Gen. Elec. Co. v.*

14   *Joiner*, 522 U.S. 136, 142 (1997); *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1229-30 (9th

15   Cir.1998). The court accomplishes this goal through a preliminary determination that the

16   proffered evidence is both relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S.

17   579, 589-95 (1993). Scientific evidence is deemed reliable if the principles and methodology used

18   by the expert proffering it are grounded in the methods of science. *Daubert*, 509 U.S. at 592

19   ("The proponent need not prove that the expert's testimony is correct, but that the methodology

20   used by the expert was proper."). The Supreme Court has provided five nonexclusive factors to

21   consider when assessing whether the methodology upon which an expert rests his opinion is

22   scientifically reliable. These factors are: (1) whether the expert's theory can be or has been tested;

23   (2) whether the theory has been subject to peer review and publication; (3) the known or potential

24   rate of error of a technique or theory when applied; (4) the existence and maintenance of

25   standards and controls; and (5) the degree to which the technique or theory has been generally

26   accepted in the scientific community. *Daubert*, 509 U.S. at 593-94. The test for determining

27   reliability is flexible and can adapt to the particular circumstances underlying the testimony at

28

1   issue. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150-51 (1999).

2       A trial court has broad latitude in determining whether an expert's testimony is reliable

3   and also in deciding how to determine the testimony's reliability. *United States v. Hankey*, 203

4   F.3d 1160, 1167 (9th Cir. 2000). However, the Court's inquiry must "focus[ ] solely on [the]

5   principles and methodology, not on the conclusions that they generate." *United States v. Prime*,

6   431 F.3d 1147, 1153 (9th Cir. 2005). "Only if the expert's opinion is so fundamentally

7   unsupported that it can offer no assistance to the jury must such testimony be excluded."

8   *Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc*., Case No. 477, 2006 WL 1329999, at *3

9   (N.D. Cal. May 15, 2006).

10       In the Ninth Circuit, Rule 702 "should be applied with a 'liberal thrust' favoring

11   admission." *Messick v. Novartis Pharm. Corp*., 747 F.3d 1193, 1196 (9th Cir. 2014) (citing

12   *Daubert*, 509 U.S. at 588). When an expert satisfies Rule 702, "the expert may testify and the jury

13   decides how much weight to give that testimony." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir.

14   2010).

15       **B.      Damages: Reasonable Royalty**

16       Judicial restraint is "particularly essential in the context of patent damages," and

17   "questions regarding which facts are most relevant or reliable to calculating a reasonable royalty

18   are 'for the jury.'" *Apple, Inc. v. Motorola, Inc*., 757 F.3d 1286, 1315 (Fed. Cir. 2014); overruled

19   on other grounds by *Williamson v. Citrix Online*, 792 F.3d 1339, 1349 (Fed. Cir. 2015).

20       "[D]amages models are fact-dependent," *CSIRO v. Cisco Sys*., 809 F.3d 1295, 1302 (Fed.

21   Cir. 2015), and "[q]uestions about what facts are most relevant or reliable to calculating a

22   reasonable royalty are for the jury," *i4i Ltd. v. Microsoft Corp*., 598 F.3d 831, 856 (Fed. Cir.

23   2010). Courts have acknowledged "the difficulty that patentees may face in assigning value to a

24   feature that may not have ever been individually sold," and noted that "it is well-understood that

25   this process may involve some degree of approximation and uncertainty," and "absolute

26   precision" is not required. *VirnetX v. Cisco Sys*., 767 F.3d 1308, 1328 (Fed. Cir. 2014).

27   Apportionment may occur in the royalty base, royalty rate, or a combination thereof. *Ericsson,*

28   *Inc. v. D-Link*, 773 F.3d 1201, 1226 (Fed. Cir. 2014).

## IV.    ARGUMENT

### A.    NETFLIX'S MOTION MISCHARACTERIZED, MISINTERPRETED, AND MISUNDERSTOOD MR. HELD'S METHOD OF ROYALTY RATE DETERMINATION

In its Motion, Netflix states that Mr. Held "never apportions either his royalty base or royalty rate to account for the non-infringing functionalities of Open Connect" (Motion at p. 10) and "attributes all revenues and profit margins of Open Connect to the '167 patent, rendering both his royalty rate and royalty base unreliable." (Motion at p. 8.) Netflix's inaccurate arguments are based on its mischaracterization, misinterpretation, and misunderstanding of Mr. Held's opinions in his Report and his deposition testimony. For example, Netflix repeatedly uses phrases such as "100% of profits", "all profits, and "all revenues and profit margins" (see Motion at 1:15, 2:22; 5:5; 8:19 and 24; and 10:20). These phrases mischaracterize the apportioned incremental contribution margin of ███ determined in the Held Report, which accounts for barely ██ of the contribution profit margin of the Open Connect-generated revenue, as will be discussed in greater detail below.

### 1.    Mr. Held's Two-Step Apportionments Have Taken Into Account The Contributions Of The Other Cost Items Listed In The Cost Of Revenue And Marketing Costs, As Well As The Contributions Of Other Non-Infringing Technological Advancements Made By Netflix

Mr. Held started his calculation of the apportioned incremental profit margin with the contribution profit margins of domestic streaming revenue that were published by Netflix in its own SEC filing until 2019.[2] As set forth in Mr. Held's Report (at p. 52, fn. 154); page 18 of Netflix's 2016 10K (Exhibit B to Ramey Decl.) explains that it uses contribution profit margins to measure the profitability of its streaming business: "we define contribution profit (loss) as revenues less cost of revenues and marketing expenses incurred by the segment. We believe this is an important measure of our operating segment performance as it represents each segment's performance before global corporate costs."

Mr. Held cited objective support for his damages methodology. Mr. Held's methodology

---

[2] As explained in paragraph 159 of the Held Report, Netflix has not reported the revenue and contribution profits of domestic streaming business since 2020.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1  was guided by *Tektronix, Inc. v United States*, 552 F.2d 343 (Ct. of Claims 1977) and *Honeywell*

2  *Int'l, Inc. v United States*, 107 Fed. Cl. 659, 2012 U.S. Claims LEXIS 1539 (2012). Mr. Held's

3  analysis took a two-step process to apportion the contribution profit margin, to conclude the

4  ███% as the incremental profit margin attributable to Open Connect technology, as shown in

5  Supplemental Report Exhibit 8a, which is inserted below for easy reference.

6        The first step in Mr. Held's analysis is to attribute the normal contribution profit margin to

7  all other factors besides Open Connect technology, including all those items listed in NFX-VALJ-

8  00007111 (Exhibit C to Ramey Declaration) such as content creation and acquisition, studio

9  operations, payment processing, music rights, and cloud infrastructure, marketing, among several

10  others. The normal profit margin, as explained in the Held Report (at ¶¶ 163-166), is the average

11  contribution profit margin during the pre-Open Connect period in Q4 2011 and 2012. Because the

12  rollout or implementation of Open Connect technology is deemed to be completed by the start of

13  2016 (Held Report, ¶ 161, 200, Exhibit D to Ramey Declaration, NFX VALJ-00006391 in NFX-

14  VALJ-00006360), the average contribution profit margin from 2016 to 2019 is assumed to have

15  included the full contribution of the Open Connect technology[3].

16        By subtracting the normal contribution profit margin of ███% from the post- Open

17  Connect rollout margin of ███%, Mr. Held has fully credited the contribution of other factors

18  besides Open Connect technology, as demonstrated in row [C] of the Supplemental Exhibit 8a of

19  the Supplemental Held Report. In other words, by calculating the incremental profit margin in

20  row [C], Mr. Held has fully considered the contribution of all other factors listed in the cost of

21  revenue and in the marketing cost such as content creation and acquisition, studio operations,

22  payment processing, music rights, and cloud infrastructure, marketing, among several others.

23

24

25

26

27  ─────────────────────

28  [3] As explained in Held Report, Netflix has not reported the revenue and contribution profits of
    domestic streaming business since 2020.

After crediting the contribution of all other factors listed in the cost of revenue and marketing costs, Mr. Held applied the second step to further apportion the contribution profit margin by considering the additional contribution of Netflix's efforts in and progress of other technologies and engineering solutions, including those non-infringing technological advancements used in their Open Connect system. Mr. Held pointed this out specifically in paragraph 173 of his report: "Netflix has been investing in developing various technology and engineering solutions, and the incremental profit margin over the periods could well have reflected the performance enhancements achieved from other technology and engineering developments". For this step, Mr. Held relied on the data of 7 Cost Centers as produced by Netflix in response to Interrogatory No. 6, dated 6/14/2023 (Exh. E to Ramey Decl.). As discussed in paragraph 177 of the Held report, "the Cost Centers in the Summary tab of the Excel file represent the major categories of 'cost incurred' to generate the total revenues in other tabs of the file", and "the technology and engineering solutions developed by other Cost Centers in the Summary tab are also of the same significance in terms of their roles in generating the total revenue for Netflix", as compared to the "Streaming Delivery" Cost Center or "Open Connect Engineering" department.

Accordingly, based on such data directly produced by Netflix in response to Interrogatory No. 6, Mr. Held calculated that among the seven Cost Centers that developed the technology and engineering solutions to generate the total revenues, the contribution attributable to Open Connect

1  is ███%, as shown in row [D] of his Supplemental Exhibit 8a above. By using ███% to further

2  apportion the incremental profit margin of 21.8% in row [C], Mr. Held has taken into

3  consideration all other non-infringing technological advancements in technology and engineering

4  made by Netflix.

5       In short, after fully considering the contributions of all other factors and other

6  technological advancements including those non-infringing technologies used in Open Connect,

7  Mr. Held determined only ███ in incremental contribution profit margin is attributable to the

8  Open Connect technology as shown in row [E] of the Supplemental Exhibit 8a.

9       As demonstrated in the Held Report, Mr. Held derived the Open Connect -generated

10  revenue from the domestic streaming revenue. Essentially, Open Connect -generated revenue is a

11  subset of the total domestic streaming revenue. As shown in the Supplemental Exhibit 8a, the

12  contribution profit margin of the domestic streaming business during the post- Open Connect

13  period of 2016 to 2019 was ███%. In other words, the Open Connect -generated revenue derived

14  by Mr. Held from the domestic streaming revenue of Netflix had a ███ contribution profit

15  margin. By contrast, the reasonable royalty rate determined by Mr. Held is ███, which is the

16  incremental profit margin attributable to the Open Connect technology out of the ███ of total

17  contribution profit margin of Open Connect -generated revenue.

18       Therefore, the royalty rate of ███% determined by Mr. Held represents only ███%

19  ███████████, or barely ███ of the total contribution margin of the Open Connect -generated

20  revenue.

21       The foregoing clearly demonstrates that Netflix's use of phrases such as "100% of profits"

22  or "all profits" in an attempt to argue that Mr. Held failed to apportion either his royalty base or

23  royalty rate to account for the non-infringing functionalities of Open Connect are inaccurate. The

24  fact is that Mr. Held credited about ███ of the total contribution profit margin of the Open

25  Connect -generated revenue to all other cost items and other non-infringing technological

26  advancement made by Netflix.

27

28

2.    **Mr. Held Has Used The Available Data Consistently And Reasonably, And The Adjustments He Made Render The Determined Royalty Rate Highly Conservative**

In addition to mischaracterizing and misinterpreting Mr. Held's incremental profit margin and royalty rate calculations, Netflix also argues that Mr. Held failed to use "Netflix's revised data" that reclassified certain cost items, which, as Netflix further alleged, "results in a significant decrease in contribution margins for years 2016-2018". (Motion, at p. 6). However, Netflix's allegation is baseless and misleading, because while the Motion points to the fourth quarter 2018 reclassification ("the 2018 reclassification"), it either intentionally ignored or unintentionally missed another reclassification in 2013 ("the 2013 reclassification"). By considering the effects of the 2013 reclassification, the so-called reduced margins for 2016 and 2017 as argued in the Motion will have no impact on the calculation of the incremental profit margin in Supplemental Exhibit 8a.

**The 2018 reclassification**: On page 63 of the 2018 10K filed by Netflix (Exhibit F to Ramey Declaration), it described the 2018 reclassification as follows:



classification.

**The 2013 reclassification**: on page 51 of the 2013 10K filed by Netflix (Exhibit G to Ramey Declaration), it discusses the 2013 reclassification:

2. Reclassifications and Changes in Estimates Certain prior year amounts have been

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Comparing the 2018 and 2013 reclassifications, it is obvious that in 2013, Netflix decided to reclassify certain "payroll and related expenses" "associated with corporate marketing personnel" as "General and administrative", while "Historically these costs were substantially recorded in the Domestic streaming segment and impacted segment contribution profit." The 2013 reclassification affected the domestic streaming segment and impacted segment contribution profit of 2011 and 2012, and also mandated how the domestic streaming segment contribution profits would be reported for years from 2013 to 2017, until the 2018 reclassification took effect.

The 2018 reclassification essentially reversed what the 2013 reclassification did, by re-reclassifying these similar expense items back into the Cost of revenues and Marketing cost, which means moving them out from the category of "General and administrative expenses". As a result of the 2018 reclassification, Netflix revised the domestic streaming business contribution profit numbers for 2016 and 2017 only, but not for 2011 to 2015. In other words, the numbers reported for 2011 to 2015 are still based on the 2013 reclassification.

Based on Netflix's changes in accounting rules or policies in 2013 and 2018, which reclassified certain cost items in 2013 and then re-reclassified similar cost items in 2018, the data used by Mr. Held to calculate the incremental profit margin in Supplemental Exhibit 8a represents the most reasonable and consistent way to deal with the changes in accounting rules.

By contrast, the Motion, which relies on the report of Netflix's rebuttal damages expert, Nisha Mody (Exhibit M), used the revised contribution profit data based on the 2018 reclassification for the post-Open Connect period from 2016 to 2019, while for the pre- Open

1   Connect period from Q4 2011 to 2012, it still used the contribution profit data reported under the

2   2013 reclassification. The inconsistency in accounting rules between the pre- and post- Open

3   Connect periods renders the contribution profit margin data across two periods incompatible As a

4   result, had the incremental profit margin been calculated based on the data as suggested in the

5   Motion and Ms. Mody report, it would mean that the calculated incremental profit margin were

6   based on two incomparable profit measures - the difference between apples and oranges.

7       Also, Netflix's Motion and Ms. Mody conveniently ignored the effects of a much more

8   significant change in accounting rule during the period, which could have increased the

9   contribution profit margin for the pre- Open Connect period, while lowering the contribution

10  profit margin for the post- Open Connect period. As discussed in great detail in paragraph 168

11  through 172 of the Held report, Netflix had expensed all of the Open Connect -related

12  development and deployment costs since at least Q3 2015, but not all such costs were expensed

13  during the pre- Open Connect period of Q4 2011 to 2012. Such a change in accounting rules

14  would certainly increase the profitability of the pre- Open Connect period and reduce the

15  profitability for the post- Open Connect period, making the incremental profit margin calculated

16  in row [C] of Supplemental Exhibit 8a much lower than it could have been but for this change in

17  accounting rules.

18      In short, in light of the two reclassifications and the change in accounting rule for Open

19  Connect -related development and deployment costs, Mr. Held's method to calculate the

20  incremental profit margin represents the most consistent way to deal with the changes in

21  accounting rules.

22      Additionally, Netflix argues that Mr. Held "limit[ed] Netflix's total costs to seven cost

23  centers" (Motion at p. 14) was improper, because "the costs of revenue include much more than

24  the seven cost centers that Mr. Held uses to represent Netflix's total costs of revenue." (Motion at

25  p. 15.) Netflix concludes that Mr. Held was "under-reporting [ ] significant data" as a result.

26  Netflix also argues that Mr. Held should have "properly considered all costs and expenses",

27  which means "multiplying the incremental profit margin by OC Cost Center as a Percent of Total

28  Costs and Expenses." (Motion at p. 15.)

These arguments demonstrate that Netflix (and its expert, Ms. Mody), lack a basic understanding of Mr. Held's methodology, especially his use of the data in the 7 cost centers. Moreover, using the method suggested by the Motion, *i.e*, "multiplying the incremental profit margin by OC Cost Center as a Percent of Total Costs and Expenses", would result in double counting the effects of other cost items.

As discussed above, Mr. Held introduced the data of the 7 cost centers in an effort to further apportion the incremental profit margin and to credit Netflix for other non-infringing technological advancements made through their engineering development, on top of or in addition to the first apportionment made through calculating the incremental profit margin. The first apportionment had already taken into account all of the contributions of other cost items incurred by Netflix such as the cost of revenue and marketing cost. As a result, Mr. Held's method has fully considered the effects of such other cost items in the first apportionment, and he introduced the data of 7 cost centers to further apportion the incremental profit margin to credit Netflix for other non-infringing technological advancement made.

The method suggested in the Motion, and based on the Mody report, seems to require that Mr. Held apportion the incremental profit margin by "OC Cost Center as a Percent of Total Costs and Expenses" after the incremental profit margin has taken into account all other cost items in cost of revenue and marketing cost. Netflix's suggested approach would essentially double count the effects of the such other cost items, which would dramatically lower the number of the calculated incremental profit margin attributable to the Open Connect technology. In effect, double counting is the primary reason why the Motion and Ms. Mody reached the conclusion that the "royalty rate would decrease from ████████ a mere ██████████, at p. 15.)

**B.    MR. HELD CORRECTLY AND RELIABLY DETERMINED THE ROYALTY BY APPLYING A SCIENTIFIC METHOD BASED ON CASE-SPECIFIC FACTS ABOUT NETFLIX'S INFRINGEMENT**

**1.    Mr. Held Applied A Scientific Method To Estimate The Revenue Generated By Open Connect Technology**

Despite the fact that Valjakka repeatedly asked Netflix to produce the domestic streaming revenue allocated to the Open Connect technology, Netflix failed to produce any such data.

1   Netflix admits that it "does not report revenues or profit margins related to Open Connect, the

2   technology supporting its streaming service, and does not attribute any portion of its revenue

3   directly to Open Connect." (Motion at p. 3.) This fact is supported by Netflix executives. When

4   asked during her deposition whether Netflix has ever calculated or estimated revenue or profits

5   specifically associated or generated by the Open Connect technology, Netflix's Senior Director

6   and Corporate Controller Helen Ponce answered "As far as I'm aware, no". (Exhibit H to Ramey

7   Declaration [Excerpts from the TX of Helen Ponce], at 70:19,.)

8          However, on the next page of its Motion (p. 4), Netflix contradicts its own admissions,

9   arguing that in his estimation of Open Connect -generated revenue, Mr. Held did not use the

10  revenue data produced by Netflix ("Netflix produced revenue data for the full alleged damages

11  time period"), and argues that Mr. Held ignored "that produced revenue and substituted his

12  unsupported 'marking up' formula to calculate a percentage of revenue". The fact is that Netflix

13  produced only total revenue (including Subscription or Ancillary Revenues) from Q3 2015 to Q1

14  2023 (NFX-VALJ-00007111) (Exhibit I to Ramey Declaration) and Mr. Held had to rely on the

15  2011 to 2019 domestic streaming revenue data reported in Netflix's SEC filings to derive the OC-

16  generated revenue by applying a basic gross profit margin calculation formula to the data in NFX-

17  VALJ-00011557 and the data reported in Netflix SEC filings.

18         What Netflix describes as an "unsupported" marking up formula was actually a simple

19  rearrangement of the gross profit margin calculation. Introductory college finance textbooks teach

20  the gross profit margin or gross margin calculation as:

21         Gross margin = 1 - (Cost of Revenue/Revenue)

22         Rearranging the formula to derive the revenue from the data of gross margin and cost of

23  revenue, the formula would simply be:

24         Revenue = Cost of revenue/(1-Gross margin)

25         This is the formula Mr. Held presented in paragraph 195 of the Held Report as the

26  estimation of Open Connect-generated revenue. Business professionals and financial analysts

27  refer to this as a markup from cost of revenue to determine the revenue, see ___ (need a citation).

28         There is nothing "unsupported" with this formula, because it's a simple re-arrangement of

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

the gross margin formula as set forth above. It is important to bear in mind that the cost of revenue is defined as "costs that are directly related to creating the products that a reporting entity sells, or providing the service that generates service revenue", as cited by paragraph 193 of the Held Report[4]. Meanwhile, the Open Connect -related costs are categorized by Netflix as part of cost of revenue that directly contributes to generating streaming revenue.  As a result, using the formula to estimate Open Connect -generated revenue is legitimate and justified based on solid theories in finance.

Netflix's Motion further demonstrates that its failure to understand or apply basic methods and finance theories is also directly reflected by its misstatement about the formula for gross margin calculation. Despite the fact that Netflix's Motion cites Mr. Held's formula (at p, 11), on the next page (Motion at 12:6-7) Netflix shows "total gross margins (derived from total revenue and total costs)". This misapplies the formula and is simply incorrect. Total gross profits are derived by subtracting total cost of revenue from total revenue, as Netflix did in NFX-VALJ-00007111 (Exhibit I to Ramey Declaration). Total costs include much more than total cost of revenue: it also contains cost items such as general administration, marketing, research and development, and a long list of other operating cost items. In other words, gross margins are not derived from total revenue and total costs. Gross margin is derived from total revenue and total cost of revenue.

Applying its incorrect understanding of the gross margin calculation, Netflix then chooses several incorrect cost items to support its argument, including marketing cost or R&D (see Motion, at 12:8-9. Contrast NFX-VALJ-00011557, in which neither category is included as part of the cost of revenue).

**2.    Netflix mischaracterized Mr. Held's royalty base estimate**

In his report, Mr. Held estimated the Open Connect -generated revenue as percentages of total streaming revenue, which are █████ for Q3-Q4 2015 and ██████ Q1 2016. He then

---

[4]  The Held Report is submitted as Exhibit J, the Supplemental Held Report is submitted as Exhibit L.

1  applied the ███ to the damage period. Netflix interpreted this by saying that "notably, ███ is

2  the highest percentage he could have selected had he applied his formula to other quarters", and

3  that "Mr. Held could not explain why he kept this percentage flat" (Motion, at pp. 12-13.)

4  However, such statements completely missed the fundamental reason *why* ███ is applied to the

5  rest of the damage period.

6          Mr. Held explained his reasoning in his Report. For example, paragraph 200 states:

7          "It is important to point out that the OC rollout was deemed to have been completed as of

8  Q1 2016, as I discussed above when I calculated the incremental profit margin. As a result, I

9  assume that the percentage of the OC-generated revenue over total streaming revenue in Q1 2016

10 would reflect the normal or intrinsic contribution of the Open Connect to the total streaming

11 revenue. In other words, before Q1 2016, the contribution of the Open Connect is deemed to be

12 transitory or dynamic, because additional OC installations were still being deployed into the

13 network. Since Q1 2016, it is assumed the Open Connect had reached the status of being nearly

14 fully deployed."

15         In other words, the date of Q1 2016 was not chosen arbitrarily, and application of the

16 ███ rate is based on solid economics in that by Q1 2016, the contribution of the Open Connect

17 technology had been fully incorporated into the streaming video delivery business of Netflix. In

18 fact, Mr. Held's application ███ to the damage period represents an *underestimation* of the

19 Open Connect technology's contribution to Netflix's domestic streaming revenue, because the

20 Open Connect technology's contribution would become larger when a steadily-increasing volume

21 of streamed video had been delivered through or transacted by the Open Connect technology. In

22 other words, the ███████ have been scaled up based on the increased domestic

23 streaming video volume and revenue as they grew. It does not make any economic sense that

24 when the Open Connect technology is used more intensively and frequently, its contribution

25 would remain at a flat percentage. However, Mr. Held opted for this conservative estimate by

26 ███████ to the damage period, which essentially gave Netflix the benefit of a much higher

27 share in profits than it otherwise would have.

28         Finally, Netflix's Motion argues that Mr. Held failed to further apportion the Open

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Connect -generated revenue to calculate the royalty base. This argument is contradicted by Mr. Held's Report. In it, Mr. Held provided detailed explanations to support his apportionment, including in paragraphs 138 to 143 under the GP 13 analysis on SSPPU, and also in paragraph 202. Based on all of these analyses, Mr. Held concluded that no further apportionment is needed, because "the SSPPU is the OCA device and the functions it performs in the CDN system. It's not merely the OCA device standalone, nor one or some of the functions it performs. It's the entirety of the OCA device and the functions it performs in and for the CDN system." (Exhibit J Held Report at ¶ 202). This was also supported by the analysis and statements of the technical expert Dr. Tibor Kozek. (See Exhibit J, Held Report, ¶ 139: "an OCA device, is an important component of the patented communication network, the asserted claim, the claim 1 of the '167 patent, actually covers the functions of an OCA device that are performed or operated through communicating with a network of other servers, terminals, or computer programs. In other words, the focus is not an isolated or standalone OCA hardware device; instead, it is the OCA devices and the functions they perform through networking that has improved the speed and efficiency of data communications in CDN system….")

   *GPNE Corp. v. Apple, Inc*., No. 12-CV-02885-LHK, 2014 U.S. Dist. LEXIS 5323, 2014 WL 1494247, at *10 (N.D. Cal. Apr. 16, 2014), cited by Netflix (Motion, at p. 8) does not contradict Mr. Held's analysis. In that case, neither party contested that "the patent's contribution to the art is a signaling technique performed by the baseband processor." The court rejected the plaintiff's proffered smallest salable patent-practicing unit as the "entire device" where the asserted claim recited a "node in a data network," and the plaintiff attempted to persuade the court that the device was an iPhone or an iPad and "a memory," in addition to a baseband processor, which directly implemented the patented invention. Unlike *GPNE*, the invention is an innovative data communication network, and not a single OCA device. Indeed, *VirnetX, Inc. v. Cisco Sys.,* 767 F.3d 1308, 1326–29 (Fed. Cir. 2014), also cited by Netflix (Motion, at p. 8) does not completely foreclose the fact that in rare occasions, even where claims are drawn to an individual component of a muti-component product, it may be appropriate to base damages may on the value of the multi-component product.

### C.    THE APPROPRIATE PARTY TO THE HYPOTHETICAL LICENSE NEGOTIATIONS IS IN DISPUTE

Netflix argues that at the time of the hypothetical negotiation between the parties, Juha Setala owned one third of the patent rights and was just as much an owner of the patent as Mr. Valjakka, giving Mr. Setala the right to make, use, offer to sell, and sell the patented invention without the consent of any other co-owner. (Motion, at p. 16, citing 35. U.S.C. § 262.) Netflix concludes that Valjakka was not the only party to a hypothetical negotiation with Netflix.

Netflix does not dispute that the date of the hypothetical negotiation would have been July 23, 2013, when the '167 patent was issued. (Held Report, ¶ 56.) Netflix does not argue that Valjakka was not **an** appropriate party to a hypothetical negotiation. In fact, Netflix admits that Valjakka was at least a co-owner of the '167 patent at the time of the hypothetical negotiation. (Motion at p. 16.)

Ownership of the '167 patent at the relevant time is an issue that is presently before the Court in Netflix's Motion for Summary Judgment (ECF 162). The Declaration of Juha Setala ("Setala Declaration") filed by Valjakka in support of the latter's response to Netflix's summary judgment motion sets forth Setala's knowledge regarding ownership of U.S. Patent Application 10/208,685, which was later issued as the '167 patent. The Setala Declaration explains the facts supporting Valjakka's position (and Setala's belief) that Valjakka's intellectual property rights, including his rights in the '685 application, had been re-assigned to Valjakka (Setala Declaration, ¶¶ 5-9). Setala also attests that between 2008 and 2014, he would not have engaged in licensing negotiations with Netflix, and had Netflix approached Setala for such a purpose, Setala would have referred Netflix to Valjakka. (Setala Declaration, ¶¶ 10-11.)

Mr. Held, who is not an attorney, based his statement regarding Valjakka's ownership, specifically that Valjakka was the appropriate party to a hypothetical negotiation with Netflix, on documents he reviewed.  See Held Report, fns. 45-47. Whether Mr. Held's position was based on a factual mistake will be determined when this Court adjudicates Netflix's Summary Judgment Motion. Even if Mr. Held's data was incorrect, however, it goes to the weight of Mr. Held's opinion, and does not warrant exclusion.

### D.    MR. HELD'S REPORT AND TESTIMONY SHOULD NOT BE EXCLUDED

In summary, Mr. Held's report is based on reasonable methodology. The opinions expressed in his report and in his deposition testimony are based on data, facts, and evidence tied to the facts of the case. Netflix's arguments for excluding Mr. Held's report and testimony are based on assumptions such as the proper parties to be involved in a hypothetical negotiation, and use of or interpretation of data such as the appropriate data to be used to consider what categories of costs should be taken into account in apportioning the royalty base. However, in the event that the Court finds to the contrary, to "the extent [the expert's] credibility, data, or factual assumptions have flaws, these flaws go to the weight of the evidence, not to its admissibility." *RSA Protective Techs., LLC v. Delta Sci. Corp.*, No. LA CV19-06024 JAK (PLAx), 2021 U.S. Dist. LEXIS 209394, at *28 (C.D. Cal. Oct. 20, 2021), citing *Summit 6, LLC v. Samsung Elecs. Co.,* 802 F.3d 1283, 1299 (Fed. Cir. 2015).

### V.    MR. HELD SHOULD BE GIVEN AN OPPORTUNITY TO UPDATE OR REVISE HIS REPORT, IF WARRANTED

To the extent that Netflix complains of "mathematical and data errors" in Mr. Held's report (Motion at pp. 16-17), Mr. Held should be permitted to correct them, if he feels it warranted, and to the extent they cannot be addressed through cross-examination at trial. As Netflix acknowledges (Motion at 17:8-11), Mr. Held testified during his deposition that changes to the mathematical inputs may change, but the methodology and formulas would not. Therefore, allowing "corrections based on math and data" (*id.* at 11-12) if Mr. Held determines any such corrections are warranted, would not prejudice Netflix, but would serve to provide the trier of fact with updated data.

### VI.    CONCLUSION

For the foregoing reasons, Valjakka respectfully requests that the Court deny Netflix's motion to exclude Mr. Held's reasonable royalty opinions, including any argument or testimony related thereto at trial.

Dated: October 6, 2023                    Respectfully submitted,

1

2
RAMEY LLP

3
By:    /s/ William P. Ramey, III

4
William P. Ramey III (Admitted *pro hac vice*)
5020 Montrose Blvd., Suite 800

5
Houston, Texas 77006
Telephone: (713) 426-3923

6
Fax: (832) 689-9175
Email: wramey@rameyfirm.com

7

8

9
By:    /s/ Susan S.Q. Kalra
Susan S. Q. Kalra CA SBN 167940

10
5020 Montrose Blvd., Suite 800
Houston, TX 77006

11
Telephone: (800) 993-7499
Fax: (832) 900-4941

12
Email: skalra@rameyfirm.com

13

14
***Attorneys for Plaintiff***
***LAURI VALJAKKA***

15

16

17

18

19

20

21

22

23

24

25

26

27

28