# Exhibit C

```
             UNITED STATES DISTRICT COURT

           NORTHERN DISTRICT OF CALIFORNIA

                  OAKLAND DIVISION


LAURI VALJAKKA,

          Plaintiff,

vs.                          CASE NO. 4:22-cv-01490-JST

NETFLIX, INC.,

          Defendant.

_____/




        REMOTE VIDEO DEPOSITION OF LAURI VALJAKKA

           PURSUANT TO RULE 30(b)(6)



     Date:        Thursday, October 12, 2023

     Time:        7:08 a.m. PST

     Location:    via Zoom videoconference

     Reported by: Christina Bicocca

                  CSR No. 12932
```

1

```
            INDEX
EXAMINATION BY:                    PAGE
Ms. Lamkin ........................  6
Mr. Zito .......................... 84


           EXHIBITS
DEFENDANT'S                         PAGE
1   Email Bates stamped LV-CUVTA-000144   10
    to LV-CUVTA-000145

2   Email Bates stamped LV-CUVTA-000257   19
    to LV-CUVTA-000258

3   Email Bates stamped LV-CUVTA-000306   23
    to LV-CUVTA-000308

4   Email chain Bates stamped      40
    LV-CUVTA-000033 to LV-CUVTA-000038

5   Plaintiff Lauri Valjakka's Responses   51
    and Objections to Defendant Netflix,
    Inc.'s Amended CUVTA Discovery

6   Email chain Bates stamped      61
    LV-CUVTA-000050 to LV-CUVTA-000058

7   Email chain Bates stamped      69
    LV-CUVTA-000266 to LV-CUVTA-000276
          --oOo--
```

2

```
                    APPEARANCES
      (all appearances present via Zoom videoconference)
For the Plaintiff Lauri Valjakka:
     WHITESTONE LAW
     1850 Towers Crescent Plaza
     Suite 550
     (703) 261-9101
     Tysons, Virginia 22182
     BY:  JOSEPH ZITO
          ATTORNEY AT LAW
          jzito@whitestone law
     BY:  KENNETH SHEETS
          ATTORNEY AT LAW
          ksheets@whitestone law
     BY:  WEIR L KING III
          ATTORNEY AT LAW
          wking@whitestone law


For the Defendant Netflix:
     BAKER BOTTS, LLP
     101 California Street, Suite 3200
     San Francisco, California 94111
     (415) 291-6200
     BY:  RACHAEL D LAMKIN
          ATTORNEY AT LAW
          rachael lamkin@bakerbotts com
     BY:  LAUREN J DREYER
          ATTORNEY AT LAW
          lauren dreyer@bakerbotts com

AND

     PERKINS COIE, LLP
     505 Howard Street, Suite 1000
     San Francisco, California 94105
     (415) 344-7000
     BY:  ELISE S EDLIN
          ATTORNEY AT LAW
          eedlin@perkinscoie com
     BY:  SARAH PIEPMEIER
          ATTORNEY AT LAW
          spiepmeier@perkinscoie com
```

3

```
                    APPEARANCES
                    (continued)
The Videographer:
     CARRIE RAPAPORT


Also Present:

     CALEB BEATTY, law student
     JOHN HODGES, law student
```

4

1 (Pages 1 to 4)

Page 5:

```
 1              ZOOM VIDEOCONFERENCE
 2       Thursday, October 12, 2023; 7:08 a m  PST
 3                    --oOo--
 4       THE VIDEOGRAPHER:  Good morning, ladies and
 5  gentlemen  We are on the remote video record on
 6  Thursday, October 12, year 2023, at 7:08 a m , Pacific
 7  Standard Time   I am Carrie Rapaport in association with
 8  Discovery Court Reporters in Raleigh, North Carolina
 9  This is a matter pending before the United States
10  District Court, Northern District of California, Oakland
11  Division in the case captioned Lauri Valjakka versus
12  Netflix, Inc , Case Number 4:22-cv-01490-JST
13       This is the start of Media One, Volume One, of
14  the deposition of Lauri Valjakka being taken on behalf
15  of the defendant
16       Starting with the questioning attorney, I will
17  now ask counsel to identify yourselves, state whom you
18  represent and whether co-counsel or your client are in
19  attendance
20       MS  LAMKIN:  Good morning  My name is Rachael
21  Lamkin from Baker Botts, and with me is Lauren Dreyer
22  from Baker Botts, and Elise Edlin and Sara Piepmeier
23  from Perkins Coie  We all represent the defendant
24  Netflix
25       MR  ZITO:  Good morning  This is Joseph Zito
```

Page 6:

```
 1  With me is Mr  Ken Sheets, who is also representing
 2  plaintiff  Also, with me is Attorney Weir King, who is
 3  also with the Whitestone Law Firm, and in the back of
 4  our room are two law students, Caleb Beatty and John
 5  Hodges  And we also have Mr  Valjakka, our client, in
 6  attendance
 7       THE WITNESS:  I am here  Lauri Valjakka,
 8  plaintiff, and located in Finland
 9       THE VIDEOGRAPHER:  Thank you so much  Will
10  the court reporter please swear in the witness at this
11  time
12       THE REPORTER:  Raise your right hand please,
13  Mr  Valjakka
14       THE VIDEOGRAPHER:  Mr  Valjakka, would you
15  please raise your right hand for the
16            LAURI VALJAKKA,
17  called as a witness, after having been first duly sworn
18  by the Certified Shorthand Reporter to tell the truth,
19  the whole truth, and nothing but the truth, testified as
20  follows:
21       THE VIDEOGRAPHER:  Thank you  Please proceed,
22  Counsel
23       EXAMINATION BY MS  LAMKIN
24  Q   Good evening, Mr  Valjakka
25  A   Good evening
```

Page 7:

```
 1  Q   I just mentioned my name is Rachael Lamkin.  I
 2  represent Netflix in this matter.  I think you have been
 3  deposed in this case over two days; is that correct?
 4  A   That's right.
 5  Q   And other than those two days, Mr. Valjakka,
 6  have you ever been deposed?
 7  A   No, not ever before.
 8  Q   You understand that you're under oath today
 9  for this deposition?
10  A   Yes, I do.
11  Q   Do you have an understanding of what it means
12  to be under oath?
13  A   I do.
14  Q   What's your understanding?
15  A   Well, this is court hearing, actually.
16  Q   You understand that your oath means that you
17  have to tell the truth today?
18  A   Yes, I do.
19  Q   Mr. Valjakka, English is a second language to
20  you; correct?
21  A   Well, I speak Finnish natively, and English is
22  a foreign language to me, but I speak somewhat good, so
23  I think I can cope.
24  Q   You speak quite well.  I'm going to make every
25  effort to be slow and clear, but if you don't understand
```

Page 8:

```
 1  my questions, will you please let me know.
 2  A   Thank you.
 3  Q   That's a yes?
 4  A   Yes.
 5  Q   Okay.  Great.  Is there anyone in the room
 6  with you, Mr. Valjakka?
 7  A   No, I'm alone.
 8  Q   What did you do to prepare for this
 9  deposition, Mr. Valjakka?
10  A   Well, I read the material, true, and that's
11  it.
12  Q   Which materials did you read?
13  A   Well, this motion and all -- the case and what
14  we are handling today and my memories and a certain
15  amount of emails and my Finnish local lawyer, we
16  discussed.
17  Q   Do you remember which emails you read?  Do you
18  have a vague sense of their subjects?
19  A   Just dealing with the preparation of this
20  deposition.
21  Q   Who were those emails from?
22  A   From Onni Hietalahti, my local Finnish lawyer.
23  Q   Anyone else?
24  A   Of course, the U.S. lawyers CC'd or replying.
25  Q   Okay.  We are going to look at some emails
```

**Page 9**

1  today, and when we do, will you indicate if those emails
2  are some -- were included in the emails that you looked
3  at in preparation?
4      A  Yes.
5      Q  When did you meet with your local lawyer Onni
6  to prepare for this deposition?
7      A  I didn't meet him.  We spoke over the phone.
8      Q  When did you do that?
9      A  Yesterday.
10     Q  How long was that phone call?
11     A  Can't remember.  A few minutes, maybe.
12     Q  Less than ten?
13     A  Less than ten, definitely.
14     Q  Did you speak with anyone else besides Onni?
15     A  No.
16     Q  You mentioned that Onni Hietalahti is your
17  local Finnish lawyer; correct?
18     A  That's right.
19     Q  He is also the CEO of CDN Licensing; right?
20     A  Yes.
21     Q  What are his duties as the CEO of CDN
22  Licensing?
23     A  Actually, since the company is small, he
24  administrates it in every way.
25     Q  What does that mean, he administrates it?

**Page 10**

1      A  Well, he is brokerist, and he has got the
2  law -- law side and he acts as the CEO and the board
3  chairman.
4      Q  Understood.  Do some of his duties include
5  communicating with the lawyers in the United States?
6      A  Yes, of course.
7      Q  Does he communicate with William Ramey?
8      A  Yes.
9      Q  Does he communicate with Eric Morehouse?
10     A  Yes.
11     Q  Does he communicate with anyone else from
12  AIPI, besides Eric Morehouse?
13     A  Yes.
14     Q  Who does he communicate with?
15     A  I think mostly Ken Sheets.
16     Q  Ken Sheets, who is present here today?
17     A  Yes.
18         (Whereupon, Deposition Exhibit 1 was
19         marked for identification.)
20     Q  (By Ms. Lamkin) Mr. Valjakka, I've marked as
21  Exhibit 1 a document with the Bates range
22  LV-CUVTA 000144 to 145 and placed that in the chat.
23     Will you please review that document.
24     MR. ZITO:  What's that (inaudible)?
25     THE WITNESS:  Excuse me.  I didn't get that

**Page 11**

1  question.  What document?  Where?
2      Q  (By Ms. Lamkin) If you go, Mr. Valjakka, to the
3  chat functionality at the bottom of the screen and click
4  on that --
5      A  Okay.
6      Q  -- there is a document there that you can open
7  and review.  Do you see that?
8      MR. ZITO:  We didn't get that.
9      THE VIDEOGRAPHER:  I don't see it either.
10     MS. LAMKIN:  It looks like it's still
11  spinning.
12     THE WITNESS:  Now -- now updated.
13     MS. LAMKIN:  Will you please open --
14     MR. ZITO:  Okay.  Do you have that?  Let's
15  see.  See on this side.
16     THE WITNESS:  I have to download.  I have to
17  download it before I can see it.  Is that okay?
18     Q  (By Ms. Lamkin) Of course.
19     A  Yes, I am reading that document now.
20     Q  Do you recognize this document, Mr. Valjakka?
21     A  Let me see.
22     MR. ZITO:  This is a good thing.
23     THE WITNESS:  Yeah, I can see it now.  I
24  recognize it.
25     Q  (By Ms. Lamkin) What is this document,

**Page 12**

1  Mr. Valjakka?
2      A  My email to Mike Hertzberg, and Onni
3  Hietalahti and Matti Saraheimo were CC'd.
4      Q  Can you spell Mike's last name for the record?
5      A  Michael Hertzberg.
6      Q  Can you spell it please, sir?
7      A  Excuse me?
8      Q  Can you spell Mike's last name?  It's not on
9  the email.
10     A  H-E-R-T-Z-B-E-R-G.
11     Q  Thank you.  And the recipient of your email is
12  Trade Strategies.  Do you see that, sir?
13     A  That's his email.
14     Q  Okay.  What is Trade Strategies?
15     A  It's a company in the U.S.
16     Q  If you look at the first line, you write to
17  Mike, quote, "I am coming back to the subject of
18  terminating partly the IP rights from iPRA to myself
19  about a year ago," unquote.
20         What are you referring to there when you are
21  talking about terminating the iPRA to yourself?  Which
22  IP rights?
23     A  The utilization of the inventions I had
24  authorized or licensed to IPR to -- to export
25  commercially.

1    Q   Did those IP rights include the patents that
2   you have asserted against Netflix in this litigation?
3    A   Yes, U.S. 167.
4    Q   And why were you terminating partly the IP
5   rights from iPRA?
6    A   It's because there are various IP rights, and
7   they all have individual statuses and needed to be more
8   precise to take up everything.  So I -- I expressed
9   myself to my colleague and partner this way.  He knew
10   about that.
11    Q   And why did he know about that?
12    A   I'm talking about different IPRs, IP rights.
13   He knew of various rights and various situations.
14   That's what I meant.
15    Q   Why does Mike know about the IP rights for
16   iPRA?
17    A   Well, he is a shareholder of iPRA
18   Technologies --
19    Q   Like, was a shareholder --
20    A   -- or he has an interest.  Excuse me.
21    Q   Mike was -- it's okay, sir.
22        Mike was a shareholder in iPRA?
23    A   Yes.
24    Q   And iPRA went bankrupt; correct?
25    A   That's -- that's right.

13

1   in the process.  It's still in the process of -- with
2   the U.S. PTO.
3    Q   Sir, what did you mean when you said it became
4   helpful during the settlement negotiations with some of
5   the defendants to transfer the 102 into CDN Licensing?
6    A   Yeah.  Some -- some may have commanded
7   something.  I don't know in details, some that were
8   settled -- some defendants that were settled actually
9   suggested that, and it was maybe a term from them --
10   from their perspective, I don't know, but to my
11   understanding, I didn't refuse that because I didn't
12   have a reason.
13    Q   Some of the defendants suggested that you
14   transfer the 102 into CDN Licensing?
15    A   Yeah, could be so, but I -- I wasn't
16   negotiating, so I don't know the details.
17    Q   Who was negotiating?
18    A   Through AIPI Solutions.
19    Q   Who within AIPI was negotiating with the
20   defendants?
21    A   My contact is Eric Morehouse.
22    Q   You go on in this paragraph to say, quote,
23   "One important reason is the Finnish taxation, Onni's
24   workload, re the patent litigation and collaboration
25   with Eric Morehouse and his team," unquote.

15

1    Q   You go on to say at the end of the second
2   line, quote, "It became helpful during the initial
3   settlement negotiations with some defendants that also
4   the U.S. DRM Patent '102 have been recently transferred
5   to a NewCo CDN Licensing," unquote.
6        What did you mean when you said it became
7   helpful during the settlement negotiations to transfer
8   the 102 to CDN Licensing?
9    A   That was dealing -- the funding of the CDN
10   License in Finland.
11    Q   Why was it helpful during the settlement
12   negotiations?
13    A   Oh, the eyes of the investor or loan giver, it
14   would be more valuable if there was more than just one
15   IP listed as licensed to operate in terms of funding and
16   expected proceeds to be a funder and so on.
17    Q   The funders wanted you --
18    A   Both.
19    Q   The funders wanted you to create CDN Licensing
20   and transfer the patents into that entity?
21    A   No.  We -- we did that in the sense of
22   marketing, actually, and to make it look like that
23   because it was easy, easy.  It had a clear and nice
24   possibility through what we are doing now, you see, is
25   the rewriting of some of these claims and so forth.  It's

14

1        What are you referring to here when you say,
2   "Onni's workload re the patent litigation and
3   collaboration with Eric Morehouse and his team"?
4    A   Well, two separate issues.  Finnish taxation
5   means if there should be any proceeds to Finland, to me
6   as an individual, the Finnish taxation would go as high
7   as 57 percent.  It's progressive taxation, so it's --
8   57 percent is much more than if it's a company where I
9   am a significant stakeholder with 70 percent of shares,
10   and the taxation rate is between 20 and 25, relatively
11   big difference.  So that was only wise and quite normal
12   procedure in similar cases with many other companies and
13   investors and -- inventors.  Onni --
14    Q   I'm asking you specifically, sir, about the
15   other part.  Excuse me.  I'm sorry.  I'm asking you
16   specifically about Onni's collaboration with Eric
17   Morehouse and his team --
18    A   That's the second part --
19    Q   Can you tell me about Onni's --
20    A   Two different --
21    Q   Can you tell me about Onni's --
22    A   -- questions in your one question.
23    Q   Sir, it would help --
24    A   If you may --
25    Q   Sir, it would help --

16

4  (Pages 13 to 16)

Page 17:

```
 1      A   If you allow me to comment --
 2          (Simultaneous conversation.)
 3      THE REPORTER:  Excuse me.
 4      Q   (By Ms. Lamkin) All right.  Go ahead.
 5      A   The next part of my answer dealing with Onni's
 6  workload, any of the patenting process, to clear out the
 7  later written history of ancient hard drives.  It's --
 8  it's a big workload for my local Finnish attorney or
 9  lawyer, and communicating, including time difference
10  calls is also extra burden, so it's difficult and time
11  consuming for Onni Hietalahti.
12      Q   What sort of collaboration did Onni do with
13  Eric Morehouse and his team?
14      A   What the lawyers do.  They try to understand
15  each other and then produce something which is relevant
16  to the potential cases.  Quite normal.
17      Q   Did Onni collaborate with Eric Morehouse and
18  his team on the Netflix litigation?
19      A   Yes.
20      Q   Did Onni collaborate with Eric Morehouse and
21  his team about the infringement portion of the Netflix
22  case?
23      A   Yes.
24      Q   Did Onni collaborate with Eric Morehouse and
25  his team regarding the recent opposition to Netflix
```

17

Page 18:

```
 1  summary judgment?
 2      MR ZITO:  Yeah  I'm going to object here
 3  that you are asking for speculation or his understanding
 4  of what third parties did  He can answer to the extent
 5  that he has knowledge  Go ahead and answer
 6      Q   (By Ms  Lamkin) Mr  Valjakka, did Onni
 7  collaborate with Eric Morehouse and his team regarding
 8  the opposition to Netflix summary judgment motion?
 9      A   I think the answer is yes, but there are so
10  many people involved  I don't see everything he is
11  doing, but I think the answer is yes without knowing the
12  details
13      Q   Did Onni frequently collaborate with Eric
14  Morehouse and his team wherein you were not involved in
15  these communications?
16      A   Could have been  I don't -- I don't know  I
17  don't see every -- every communication, and I don't need
18  to see every communication, so I think it's quite normal
19  if they communicate between each other  I wouldn't
20  wonder  I see things that are important, me to react or
21  comment
22      MS LAMKIN:  Understood
23      Mr  Valjakka, I'm going to mark as Exhibit 2 a
24  document bearing the Bates range LV-CUVTA 000257 to 258
25  ///
```

18

Page 19:

```
 1          (Whereupon, Deposition Exhibit 2 was
 2          marked for identification.)
 3      Q   (By Ms. Lamkin) Could you please download and
 4  review that document, Mr. Valjakka?
 5      A   I see the document now.
 6      Q   Do you recognize this document?
 7      A   Yes.
 8      Q   What is it, Mr. Valjakka?
 9      A   It's, again, to Michael A. Hertzberg --
10      Q   Did you review --
11      A   -- CC'd to Onni Hietalahti and Matti
12  Saraheimo.
13      Q   Did you review either the email that's
14  Exhibit 1 or the email that's Exhibit 2 as part of your
15  preparation for your deposition today?
16      A   Excuse me.  Can you repeat the question?
17      Q   Yes.  Did you review the email at Exhibit 1 or
18  the email at Exhibit 2 as part of your deposition
19  preparation?
20      A   No.
21      Q   Exhibit 2 is another email to the same Mike
22  that was in Exhibit 1; correct?
23      A   Correct.
24      Q   You write in the first paragraph, quote, "I
25  tried till last minute to avoid iPRA go belly-up and
```

19

Page 20:

```
 1  spent all the time with negotiating a funding case,"
 2  unquote.  What do you mean, sir, when you say
 3  negotiating a funding case?
 4      A   We had -- for iPRA Technologies we had a loan
 5  decision from a local Finnish institution of 5 million
 6  euros, but the guarantee paperwork didn't work or come
 7  in time and that ruined the case.  So we didn't get that
 8  survival or bridge loan, actually, to get to product of
 9  the EEZY KEYZ to the market.
10      Q   And in this email, you're offering Mike a
11  percentage in CDN Licensing; correct?
12      A   Yeah --
13      Q   Did Mike ever --
14      A   -- my personal share.
15      Q   Did Mike ever receive equity in CDN Licensing?
16      A   Actually, I wrote him an email confirming
17  that, but he hasn't returned yet --
18      Q   He hasn't responded --
19      A   -- so it's -- it's not done yet or executed --
20      Q   He hasn't --
21      A   -- if you like.
22      Q   He hasn't responded to your offer of equity?
23      A   We spoke over the phone but no written final
24  document over that.  So he should sign, actually, maybe
25  an agreement before it's official and so on.
```

20

DISCOVERY COURT REPORTERS      www.discoverydepo.com      1-919-424-8242

1    Q   Is it fair to say --
2    A   It's a deal if I say so, and he has accepted
3  by phone.
4    Q   Is it fair to say, Mr. Valjakka, that you're
5  offering him equity in CDN Licensing because of IPRA's
6  bankruptcy?
7    A   It's not just because of that bankruptcy.
8  It's some opportunities I see Mike could help with in
9  the U.S. market or Canada and Japan where he is
10  specialized.  So that's dealing with the EEZY KEYZ
11  end-to-end encryption technology platform.  So that is
12  unclear at the moment, but that could be a part of the
13  company's activities in the future.  So it's not just
14  the bankrupt.  That part is that he also is aware of
15  this patent litigation, and he has been contacting me
16  with people in the United States.
17    Q   Who has he been connecting you with in the
18  United States?
19    A   Mr. Eric Morehouse.
20    Q   Is that how you originally met Mr. Morehouse
21  was through Mike?
22    A   Yes.
23    Q   When did Mike introduce you to Mr. Morehouse?
24    A   Maybe about three years ago or so.  I can't
25  remember precisely.

21

1    Q   Did Mike introduce you to Mr. Morehouse before
2  you filed any of your patent litigations for the 167 and
3  102?
4    A   Yes.
5    Q   In the second paragraph of Exhibit 2 you
6  write, "To compensate in that case I mentioned when we
7  spoke that from the remaining elements, I can give you a
8  compensation from CDN Licensing, which is the company
9  that runs now the patent litigation campaign in the
10  U.S., together with Eric's AIPI, on a return share
11  deal," unquote.
12       Do you see that sentence, sir?
13    A   Yes.
14    Q   Eric's AIPI; is that Eric Morehouse?
15    A   Yes.
16    Q   And does Mr. Morehouse run the litigation
17  campaign in the U.S.?
18    A   He is organizing the funding at the U.S. end
19  and organizing the lawyers and the network needed.
20    Q   Mr. Morehouse is also involved in litigation
21  strategy, is he not?
22    A   Yes.  We discuss about that, of course, with
23  the funder's representative.
24       MS. LAMKIN:  I'm going to mark as Exhibit 3 a
25  document bearing the Bates range LV-CUVTA 000306.

22

1       (Whereupon, Deposition Exhibit 3 was
2       marked for identification.)
3    Q   (By Ms. Lamkin) Please download that document,
4  Mr. Valjakka, and let me know when you're ready for
5  questions.
6    A   Okay.  I'm ready.
7    Q   Great.  Do you recognize this document
8  Mr. Valjakka?
9    A   Yes, I do.
10    Q   What is it?
11    A   It's an email sent by me to -- to Matti
12  Saraheimo and Onni Hietalahti.
13    Q   Did you review this email as part of your
14  deposition preparation?
15    A   No.
16    Q   Mr. Valjakka, in the subject line there is a
17  capital V and a capital L.  Do you know what that
18  capital V and that capital L means?
19    A   It's a reply in Finnish, mustaus lahudus
20  (phonetic), replying sending.
21    Q   Thank you.  On this first page, halfway
22  through, there is an email address for E. Morehouse.  Is
23  that Eric Morehouse?
24    A   Yes.
25    Q   If you turn the page, sir, to the document

23

1  bearing the Bates range 307.
2    A   Excuse me.  Can you repeat the question?
3    Q   Yes.  Yes, I sure can.  I'm referring to the
4  Bates numbers at the bottom of the page.  Those are the
5  numbers that your lawyers stamp on the document.  So at
6  the bottom of the page, do you see where it says
7  LV-CUVTA 000306?
8    A   Yes, I see.
9    Q   And if you turn the page, that page is stamped
10  307.  I'm going to ask you questions about that page.
11       Does the -- is the email on page 307 an email
12  from you to Mr. Eric Morehouse?
13    A   Yes.
14    Q   I'm sorry, did you respond?  I didn't hear
15  you.
16    A   I said yes.
17    Q   Okay.
18    A   It is my email to Eric Morehouse.
19    Q   The first sentence you write, quote, "I
20  haven't seen a reply to my request for clarifying the
21  funding situation of the campaign," unquote.  What did
22  you mean by that sentence, sir?
23    A   I was expecting a funding situation update and
24  the plan for the next steps or future.
25    Q   Were you asking AIPI for more funding for your

24

6 (Pages 21 to 24)

**Page 25**

1  campaign against Netflix?
2      A   Actually, no, but what we had been discussing
3  before.  I was expecting a report, actually.  And since
4  it didn't appear, I asked for it.
5      Q   What report were you expecting, sir?
6      A   You know, clarifying the funding situation of
7  the current and the future leads.
8      Q   What, specifically, report were you asking
9  for?
10     A   That's general question, actually.
11     Q   And what was your question?  What
12 clarification did you want?
13     A   Clarifying the funding situation currently and
14 for the future.
15     Q   Were you asking for more funding from AIPI for
16 the litigation campaign against Netflix?
17     A   It's just not against Netflix.  If you -- if
18 you mean that, it's not that.  We have --
19     Q   But your answer --
20     A   We have an idea and have had the idea of
21 larger campaign and then -- and we have settled several
22 defendants.  So I think it's not only but it's
23 including, of course, Netflix part of the work.
24     Q   So your answer is yes, sir, you were asking
25 for more funding from AIPI?

25

**Page 26**

1      A   I wasn't asking for more funding.  I was
2  asking to update that the funding is in place and what
3  we had agreed in 2021.
4      Q   What had you agreed in 2021?
5      A   That they manage to get the necessary funding,
6  whatever it is --
7      Q   So --
8      A   -- for the campaign and its needs.
9      Q   In 2021 AIPI and you had an agreement that
10 they would fund the litigations involving the 102 and
11 167 patent; correct?
12     A   Correct.
13     Q   When was the last time that AIPI provided
14 funding for the litigation?
15     A   I think quite recently.
16     Q   When?
17     A   A few weeks ago or less than few weeks ago.
18     Q   How much funding did they provide?
19     A   I don't know, but not to us.  They paid for
20 the lawyer, legal services.
21     Q   <mark>They paid for Bill Ramey?</mark>
22     A   <mark>Yes.</mark>
23     Q   The next sentence you say is, quote, "I am
24 disappointed of lacking the preparation for the new
25 filings against the long list of CDN operators that

26

**Page 27**

1  infringed the patent, patent 167," unquote.  What do you
2  mean by, "lacking the preparations for the new filings"?
3      A   I mean evaluation reports on my listed
4  potential infringers.
5      Q   You provided AIPI a list of potential
6  infringers?
7      A   Yes, I did.
8      Q   And you were waiting for their opinion on that
9  list?
10     A   You see, it's a process to evaluate if there
11 is an infringement.  So potential infringers, they use
12 technology that infringed the patent.  So those
13 evaluations are the preparations --
14     Q   Does AIPI --
15     A   -- research.
16     Q   I don't mean to interrupt you, sir.  When you
17 pause, I get confused, so I apologize.  I don't mean to
18 interrupt you.
19     A   It's part of the services.  That's what they
20 do, AIPI Solutions.  If you go to their website, you can
21 see the services listed and explained.  So that's one
22 part of their work, what they do, quite naturally.
23 First, check up if there is an infringement and then
24 evaluate it and how much and what -- what is this worth?
25 Is it a real thing worth investing in, which is the

27

**Page 28**

1  other part, to find the funding and invest in those
2  cases.  That's their profession to my understanding.
3      Q   And does that service include ongoing
4  advisement as to the strategy of the litigation?
5      A   Excuse me.  You have to repeat --
6          MR. ZITO:  I'm going to --
7          THE WITNESS:  What is ongoing?
8          MR. ZITO:  I'm objecting.
9          MS. LAMKIN:  Continuing.
10         MR. ZITO:  I need to interject an objection
11 here and an instruction.  You can answer yes or no, as
12 far as advice that would be of legal nature, not
13 investment nature, but I caution the witness not to
14 discuss any of the substance of any advice of a legal
15 nature that you got from -- if you got any advice of a
16 legal nature from AIPI.  Thank you.
17         Now, go ahead and answer the question.
18     Q   (By Ms. Lamkin) Yes or no, Mr. Valjakka:  Does
19 AIPI provide --
20     A   Answer --
21     Q   -- provide -- just a moment, sir.
22         <mark>Yes or no:  Does AIPI provide ongoing advice</mark>
23 <mark>as to the litigation strategy?</mark>
24     A   <mark>Yes.</mark>
25     Q   Thank you.  In the next paragraph you say,

28

7 (Pages 25 to 28)

**Page 29**

1   "The funding side is still unanswered, and I have no

2   options," unquote.  What did you mean by that?

3      A   I need to -- excuse me.  I need to read the

4   whole chapter to get the idea of or context.  To me, it

5   appears that I have been -- because I haven't been

6   answered of these things, the funding situation --

7   situation in this litigation we need to start searching

8   for other administers.

9      Q   You were communicating --

10      A   -- that they changed the agreements.  So it's

11   normal conversation I would say.

12      Q   You were communicating to AIPI that if they

13   didn't provide more funding, you would have to seek

14   additional litigation funding?

15      A   No, that -- that was not the way or tone.  The

16   idea was that since we are not assured of -- that this

17   is confirmed and fixed funding, so we need to prepare

18   for other options as well.

19      Q   What would those other options be?

20      A   Some local -- local Finnish investors and Omni

21   Bridgeway was one option Mr. Hietalahti had discussed

22   with . . .

23      Q   You talked to Omni Bridgeway about providing

24   additional litigation funding; correct?

25      A   Yeah.  That was one contact Mr. Hietalahti

**Page 30**

1   had, and he communicated with them --

2      Q   You also spoke with Burford --

3      A   -- and I communicated locally here.

4      Q   You also spoke with Burford Capital; correct?

5      A   Yeah, at some point, yes, that's true, but

6   that's a long time ago.

7      Q   Who did you speak with recently about

8   providing additional litigation funding?

9      MR. ZITO:  Objection, vague.

10      THE WITNESS:  Actually, I haven't recently

11   spoken with anyone.

12      Q   (By Ms. Lamkin) When did you speak with Omni

13   Bridgeway?

14      A   I didn't.  Mr. Hietalahti did, and that's a

15   long time ago, maybe a year, so I don't know.  They may

16   have had some communication in between.  I can't

17   remember.

18      Q   Did Omni Bridgeway provide any additional

19   litigation funding?

20      A   No, not yet.

21      Q   Has any entity other than AIPI provided any

22   litigation funding for your lawsuit against Netflix?

23      A   There is no specified funding for the

24   litigation against Netflix.  There is a general funding

25   in question of the campaign.  So it's -- I don't see any

**Page 31**

1   specific funding, especially for -- against Netflix.

2      Q   Has any entity -- entity or person other than

3   AIPI provided funding for the campaign?

4      A   In Finland, for the Finnish side, for CDN,

5   yes.

6      Q   Who was that?

7      A   CDN Licensing is private investor.

8      Q   What are their names?

9      A   His name, I don't even remember his company's

10   name.

11      MR. ZITO:  I'm going to object.  This is

12   outside of the scope.  I believe the scope of this --

13   this discovery is proceeds from -- well, the proceeds

14   from the Netflix is how it's narrowly described, the

15   proceeds from the U.S. campaign, and I am unclear as to

16   whether or not Finnish investing in Finnish litigation,

17   if that's what he's talking about or if this is Finnish

18   investing in U.S. litigation --

19      MS. LAMKIN:  Your speaking objections are

20   improper.

21      MR. ZITO:  (Inaudible.)

22      MS. LAMKIN:  Your speaking objections are

23   improper.  You've made your objection.

24      MR. ZITO:  I'm clarifying as to what was

25   within the scope.

**Page 32**

1      Q   (By Ms. Lamkin) Mr. Valjakka, what's the name

2   of the person in Finland that provided funding to CDN

3   Licensing?

4      MR. ZITO:  Objection, outside the scope.

5      Q   (By Ms. Lamkin) Mr. Valjakka?

6      MR. ZITO:  (Inaudible.)

7      THE REPORTER:  I'm sorry.  I didn't hear that.

8      Q   (By Ms. Lamkin) Mr. Valjakka, are you going to

9   answer my question?

10      A   Excuse me.  I have a slight technical problem.

11      MS. LAMKIN:  Why don't we go off the record

12   while you fix your technical problem.

13      THE WITNESS:  Yeah, I hope so.

14      MS. LAMKIN:  Is that all right?

15      THE WITNESS:  Yeah.

16      THE VIDEOGRAPHER:  Thank you.  We are now

17   going off the video record.  The time is 7:55 a.m.

18      (Whereupon, a break was taken from

19      7:55 a.m. to 8:09 a.m.)

20      THE VIDEOGRAPHER:  We are now on the video

21   record.  The time is 8:09 a.m.

22      Q   (By Ms. Lamkin) Mr. Valjakka, you know you're

23   still under oath?

24      A   Yeah.

25      Q   You said you were having technical

**Page 33**

1   difficulties.  What were the difficulties?
2        A   Yeah, I had technical difficulty.
3        Q   What was the difficulty?
4        A   I don't know, actually.  It was -- I was first
5   suspecting somebody monitoring this event because this
6   is not encrypted properly, so -- so I would suggest for
7   the operator of this technology to consider an
8   end-to-end encryption to this evidence because this
9   is -- I have to go to my logs later on.  I don't have
10  time now.  So I will check if there is somebody trying
11  to interfere in this session.
12       Q   Why did you believe someone was trying to
13  interfere with this session?
14       A   Well, it looked like the screen went crazy,
15  and there could be millions of reasons.  I'm not
16  suspecting a first option as a hacker, but there --
17  there was something abnormal.
18       Q   What looked abnormal to you, sir?
19       A   That opened something that I didn't command to
20  open.
21       Q   What opened?
22       A   Applications.
23       Q   Which?
24       A   PowerPoint application and my file system, but
25  now it's calm.  It's okay.  I didn't reboot.  I just

**Page 34**

1   checked the virus detection and no alert.  Something
2   went --
3        Q   Did you communicate --
4        A   -- was wrong.
5        Q   Did you communicate with anyone over the
6   break, Mr. Valjakka?
7        A   No, no.  No, no, no.  I can do this myself.
8        Q   Are you communicating with anyone during the
9   deposition?
10       A   No.
11       Q   When we -- right before we broke, the question
12  I asked you before you had technical difficulty was:
13  What is the name of the investor in Finland investing in
14  CDN Licensing?
15       A   Actually, I don't know the person, and he has
16  got a company, the name of which I forgot.  I didn't
17  have time to check the documents.  I would find it
18  easily, but Tony was his first name.  I don't remember
19  his surname.  He has --
20       Q   Can you spell --
21       A   -- companies that he invested in CDN Licensing
22  in terms of a loan with interest.
23       Q   Does he own equity in CDN Licensing?
24       A   No.
25       Q   What is the form of his investment?

**Page 35**

1        A   I think the original was 200,000 euros.
2        Q   Other than this individual in Finland and
3   AIPI, has CDN Licensing received any other funding?
4        A   AIPI is a funder -- is not a funder of CDN
5   Licensing.  So it's -- it's this -- Mr. Tony is the only
6   investor in -- aside -- aside we founders.
7        Q   What entity does AIPI fund?
8        A   Lauri Valjakka's patent litigation campaign in
9   the United States of America.  I have an agreement with
10  AIPI Solution, not CDN Licensing.  And the patents are
11  assigned to me.  So I am the other part -- party of the
12  agreement with the funding in the U.S.
13       Q   AIPI's funding agreement is with you
14  personally; correct?
15       A   It's more than funding agreement.  It's also
16  agreement to help with -- with, you know, evaluations
17  and networking and so forth.  One important part is, of
18  course, the lawyers, and that's been done the way we
19  agreed.
20       Q   What do you mean when you say one important
21  part is the lawyers?  Do you mean paying --
22       A   Yeah, organizing --
23       Q   -- or billing the law firms?
24       A   -- the legal help in the U.S. and organizing
25  the funding.  That's the case.

**Page 36**

1        Q   What other services does AIPI provide to you?
2        A   Well, all kinds of services have been placed
3   during the past two years, like claim charge evaluations
4   and networking to people who can do technical things and
5   evaluate those and so forth, patent-related issues.  So
6   all services they list in their website are included in
7   the agreement -- not all, of course, used but some of
8   them.  Funding is the one side, and the networking is
9   the other side and managing the networking.
10       Q   Does AIPI supervise your technical experts in
11  this case?
12       A   No.
13       Q   Who does that?
14       A   I do with my local Finnish team.
15       Q   You and your Finnish attorneys manage the
16  technical experts in this case?
17       A   No.  My technical advisors and my network here
18  in Finland is number one evaluation team.
19       Q   What are the names of the people on that team?
20       A   One of them is Ahti Muhonen.
21       Q   Can you spell that for the court reporter,
22  please?
23       A   A-H-T-I, M-U-H-O-N-E-N.
24       Q   Who else is on your Finnish team?
25       A   He used to work for Nokia Mobile and was the

**Page 37**

```
 1   chair of their IP director group for about 12 years, and
 2   he's -- he's a guy who has filed approximately 180
 3   patent applications, and he is the first mentioned
 4   inventor of about 140 U S  patents, issued patents
 5   and --
 6        Q   Who else on your Finnish team, sir?
 7        A   There are my software engineers within the
 8   team of various companies  And for instance, Misa
 9   Munday (phonetic), who is one of my advisors and
10   software engineer, inventor, and Harri Hursti, who is --
11   who is working in the U S  He is advisor for NSA, FBI,
12   CIA, and Pentagon
13        Q   What are your current sources of income,
14   Mr Valjakka?
15        A   I am a pensionist  I am a senior citizen
16   these days and that's -- that's how I try to cope,
17   and -- and CDN has -- CDN Licensing Finland has been my
18   previous provider
19        Q   When was the last?
20        A   2021 and 2022 but now now
21        Q   You have not received any money from CDN
22   Licensing in 2023?
23        A   No
24        Q   Why is that?
25        A   It's -- the company situation is so
```

**Page 38**

```
 1        Q   The company situation is what, sir?
 2        A   It's actually, currently, on hold in regards
 3   of this litigation so . . . .  So there is no income
 4   from CDN Licensing currently.
 5        Q   Between --
 6        A   And whenever there has been, we have produced
 7   to you literally quite recently.  So please review those
 8   documents, and you'll see I cannot remember every
 9   detail.
10        Q   But you do know you haven't received any
11   income from CDN Licensing in 2023?
12        A   Yes, that's correct.
13        Q   And for the money that you received from CDN
14   Licensing in '21 and '22, where did that money come
15   from?
16        A   Partly from the company loan and then the
17   settlement agreements share that was a net payment to
18   CDN Licensing from the U.S.
19        Q   So the two sources of income -- I just want to
20   make sure I understand them.  The two sources of income
21   for money that you received from CDN Licensing in '21
22   and '22, the first source was from this 200,000 euro
23   loan that we were just talking about from the investor
24   in Finland; is that correct?
25        A   Yes.
```

**Page 39**

```
 1        Q   And the second source of income is from
 2   settlement proceeds from the campaign asserting the 167
 3   and the 102?
 4        A   Yes
 5        Q   I just want to be perfectly clear   CDN
 6   Licensing and you both received some of the settlement
 7   proceeds from the other defendants in this litigation
 8   campaign?
 9        A   Yes, after the U S  costs first taken away and
10   that we -- we recorded its net proceeds after the costs
11   and everything in the U S   First, the money goes to the
12   lawyer and then they reduce their -- their costs, and
13   then what is next after everything comes to CDN Finland
14   Now that's -- we regard as net proceeds
15        Q   Where is AIPI in that process?
16        A   Well, they organize this funding, and they
17   control where the money goes and how it comes to Finland
18   after -- after reducing all the U S  costs, whatever
19   they might be
20        Q   So the money goes -- from the defendants that
21   settled, the money goes first to Bill Ramey, then to
22   AIPI, and then to CDN Licensing; is that correct?
23        A   That's correct, but --
24        Q   How much money -- how much money has CDN
25   Licensing received so far in this campaign?
```

**Page 40**

```
 1        A   I can't remember precise sums, but you have
 2   the answer in written, you know, official replies  So
 3   check out from there, but something like 500,000-plus
 4        Q   AIPI recommended Bill Ramey to you; correct?
 5        A   Correct
 6        Q   And you hired Bill Ramey because of AIPI's
 7   recommendation?
 8        A   Yes
 9        Q   And Mr Ramey is paid by the hour; correct?
10        A   Yes
11        Q   Mr Ramey does not receive a percentage of the
12   litigation proceeds; correct?
13        A   Correct
14        MS LAMKIN:  I'm marking as Exhibit 4 a
15   document bearing the Bates range LV-CUVTA 000033 to 38
16            (Whereupon, Deposition Exhibit 4 was
17            marked for identification )
18        Q   (By Ms Lamkin) Mr Valjakka, same process
19   Please download and review, and let me know when you're
20   ready for questions
21        A   Yeah  In momento (Spanish)
22        Q   Mr Ramey (sic), why did you get up -- I'm
23   sorry  Mr Valjakka, why did you get up?
24        A   I just fetched something to drink
25        Q   Okay
```

**Page 41**

1    A   Sorry.

2    Q   It's okay.

3    A   And downloaded this document which is from

4    Onni Hietalahti to William Ramey, myself and the group

5    listed --

6    Q   The group at AIPI?

7    A   Group of AIP and -- yeah.  And Mr. Cutalano

8    and Matti Saraheimo.

9    Q   Do you recognize this document?

10   A   I'm just trying to get some understanding,

11   what it's all about.

12       MR. ZITO:  Still (inaudible).  This is

13   privileged.

14       THE WITNESS:  I don't see -- I don't see any

15   content before -- hmm.

16   Q   (By Ms. Lamkin) Production --

17   A   Note to self -- note to self, electronic

18   filing, California Northern District.  That's 000036.

19   Q   Looking at that page, Mr. Valjakka, ending in

20   36, this is an email where Bill Ramey is forwarding

21   something from the court in the Netflix matter; correct?

22   A   I have never seen this before, so I would like

23   to spend a little time to review it first if you allow

24   me.

25   Q   Of course.  Of course.  This is your name in

**Page 42**

1    the recipient box; correct?

2        MR. ZITO:  Ramey forwarded it.  (Inaudible)

3        THE REPORTER:  I'm sorry.  Defense -- I mean

4    Plaintiff's Counsel, did you say something?

5        MR. ZITO:  I was trying to figure out which

6    page number we were looking at.  I have it now.  Thank

7    you.

8    Q   (By Ms. Lamkin) Mr. Valjakka, did you receive

9    this email?

10   A   Not -- I haven't seen this email before in my

11   life.

12   Q   Your name is in the recipient box, but you

13   don't think you read it?

14   A   No.

15   Q   Is that your name in the recipient box,

16   Mr. Valjakka?

17   A   Yes.  For some reason --

18   Q   But you don't believe you read the email?

19   A   I should see maybe the end.

20   Q   If you turn the next page, Mr. Valjakka, to

21   the Bates range ending in 37, I'm going to read the

22   first two lines into the record.  It says, quote, "The

23   Court issued its ruling from the bench and parties are

24   advised that they may obtain copies of the transcript of

25   the proceeding, which will serve as the written order,"

**Page 43**

1    unquote.  Do you see that sentence, sir?

2    A   Yeah.

3    Q   Did you read the transcript of the preliminary

4    hearing that served as the Court's order?

5    A   Actually, I didn't.

6    Q   You did or did not, sir?

7    A   Did not.

8    Q   Did your attorney -- did your attorney send

9    you the transcript of the PI hearing?

10   A   I'm sure they did.

11   Q   Sir, are you guessing?  Do you know whether or

12   not your attorney sent you the transcript of the PI

13   hearing?

14   A   I'm not guessing.  He must have sent it to me.

15   Q   Why do you believe he must have sent it to

16   you?

17   A   Otherwise, it would be weird if -- if didn't,

18   but I haven't actually seen this myself before now.

19   Q   But you do not know whether or not your

20   attorneys actually sent you the transcript from the PI

21   hearing; correct?

22   A   I know of this, but I don't remember seeing

23   this specific email.

24   Q   Sir, I'm asking you about the email.  I'm

25   asking you about the transcript of the PI hearing.  Did

**Page 44**

1    your attorneys send you the transcript of the PI

2    hearing; correct?

3    A   Yes, they did.

4    Q   When?

5    A   I can't remember.

6    Q   Your testimony under oath here today, though,

7    is that your attorneys --

8    A   I can't remember.

9    Q   -- sent you --

10   A   I get millions of emails every day.  Please.

11   I can't remember the date.

12   Q   Do you know for a fact that your attorneys

13   sent you the transcript of the PI hearing?

14   A   Yes.

15   Q   For a fact, your attorneys sent you the

16   transcript of the PI hearing?

17       MR. ZITO:  Asked and answered.

18       THE WITNESS:  I was informed by phone --

19   through phone conversation, but I didn't read it.

20   Q   (By Ms. Lamkin) Sir, it's a different question.

21   Please answer my question.  Do you know for a fact that

22   your attorneys sent you the transcript of the PI

23   hearing?

24   A   Well, answer is no.

25   Q   Thank you.  Well, your testimony here today is

LAURI VALJAKKA                                            October 12, 2023

**Page 45**

1    that you had a phone -- please just answer yes or no;

2    don't tell me the substance.

3         Your testimony here today is that your

4    attorneys had a phone call with you about the substance

5    of the transcript of the PI hearing?

6         Mr. Valjakka?

7    A    I don't -- I don't understand the concept now

8    or context of this question at all.  So what should I

9    know or not?

10   Q    My question is this:  Do you have any

11   knowledge of the transcript, the contents of the

12   transcript from the Court's PI hearing?

13   A    I have -- yes.  The answer is yes.

14   Q    And how did you obtain that knowledge?

15   A    I received the link, link to the documents.

16   Q    You received a link to the transcript of the

17   PI hearing?

18   A    Yes.

19   Q    Who sent you that link?

20   A    Bill Ramey.

21   Q    When did Bill Ramey send you a link to the

22   transcript of the PI hearing?

23   A    I can't remember.  Really hard to remember all

24   the details.  Truly, there is a lot of communication

25   everywhere.

45

**Page 46**

1    Q    But your testimony here today, under oath, is

2    that Bill Ramey sent you a link to the transcript of the

3    PI hearing?

4    A    I have to ask for a consultancy with my lawyer

5    because I don't understand the question and the

6    relevancy.  So I have to understand why are you asking

7    this question and what it means.

8    Q    Sir, the Court issued an injunction against

9    you, and the Court said that the order -- the actual

10   injunction is contained in the transcript.  So it's

11   material to your compliance with the Court's injunction

12   that you knew what the actual order was.  And so I'm

13   asking you:  Did you read the transcript for the Court's

14   PI hearing?

15   A    I didn't -- I didn't read it --

16   Q    Was it sent to you?

17   A    -- but I am aware of it.

18   Q    Was the transcript sent to you, sir?

19   A    A link to it, yes.

20   Q    Bill Ramey sent you a link to the transcript?

21   I know I've asked it.  I just want to end this line of

22   inquiry.  Is that a yes?

23   A    Yes.

24   Q    And upon receiving that link, did you read the

25   transcript?

46

**Page 47**

1    A    No.

2    Q    How did you understand the scope of the

3    Court's order if you didn't read the transcript?

4    A    Because it was explained to me.

5    Q    What was explained to you?

6    A    What it means.

7    Q    What specifically was explained to you?

8         MR. ZITO:  I'm going to caution that we are

9    getting into the area of legal advice and privileged

10   communication.  Without specifically stating what

11   attorneys said to you, you can answer to the extent of

12   what you understood the preliminary injunction to be,

13   but don't -- don't say specifically what any attorney

14   specifically said to you.

15        THE WITNESS:  Okay.  I understood the

16   disposition that if there should be any proceeds from the

17   United States, they would be put in the hold for U.S.

18   costs, including whatever related to this case, and

19   that's how it has been always.  We don't get anything

20   here to Finland after -- before the costs.  It doesn't

21   change anything.

22   Q    (By Ms. Lamkin) Your understanding is that

23   wherever the remaining settlement proceeds are, they had

24   to stay put; correct?

25   A    No.  I understand it's dealing with Netflix

47

**Page 48**

1    and nothing else.

2    Q    What do you mean by that, sir?

3    A    If there should be some proceeds from Netflix

4    that -- that would deal -- that would be dealing with

5    this, or if it's outside the net income.  I don't

6    understand how it -- how else it could be first.  Money

7    don't come to Finland.

8         Second, it is what is left of the U.S.

9    responsibilities might come to Finland, and that was the

10   CDN Licensing -- CDN Licensing's role, not me.  I don't

11   want to pay 57 percent, by the way.  So we'll see.

12   Q    What did you mean when you said your

13   understanding was that it was limited to Netflix?

14   A    Who else?

15   Q    Do you understand that the injunction applies

16   to all the settlement monies paid by all the defendants?

17   A    No.

18   Q    That was not explained to you?

19   A    No.  What I understand is this case is

20   between me and Netflix --

21   Q    I'm asking about the injunction.

22   A    -- not any -- not any other defendant or

23   settled parties.

24   Q    So you do not understand that the injunction

25   applies to all monies to settle the cases for all

48

12 (Pages 45 to 48)

**Page 49**

1    defendants in this campaign?

2         A   How -- how could it be?  If there should be

3    something that would be -- should be recovered or

4    covered by the proceeds in the U.S. -- the U.S. cost

5    comes first, whatever it is, Netflix, legal costs or

6    whatever -- whatsoever costs will be first taken away

7    from the top and then net income would appear in a bank

8    account in Finland.

9         Q   I'm going to mark as Exhibit 5 --

10        A   That is the original idea and original

11   agreement.  So I don't see the point of this whole

12   thing.

13        Q   You don't see the point of what whole thing,

14   sir?

15        A   I don't see the point that you asked me to --

16   are you asking me to pay back what ▓▓▓ has paid or

17   ▓▓▓ or ▓▓ or ▓▓▓▓▓▓▓▓▓)?  What is your

18   point?

19        Q   Sir, I'm just asking if you understand the

20   scope of the PI?

21        A   That's not the scope.  I don't understand.  I

22   understand it's dealing with Netflix; nothing else.

23        Q   And which of your attorneys -- just by name,

24   not substance, which of your attorneys explained the

25   Court's preliminary injunction to you?

**Page 50**

1         A   My level -- I never made something like this

2    before in my life, so I don't quite understand this --

3    the whole -- whole idea of this preliminary injunction,

4    but what we are talking about here now is maybe the CDN

5    Licensing's role of this.  We didn't know anything of

6    this opportunity or this kind of thing when we

7    established it, so I don't know.

8         Q   Which of your attorneys --

9         A   Agreement with -- agreement with AIPI

10   Solutions includes the cost of the U.S. part.  U.S. side

11   costs shall always be reduced first and paid first, and

12   then what is the net income, it -- or proceed will come

13   to Finland and that's the deal.  That's how we did it.

14        Q   Sir, my question --

15        A   That's the purpose of everything.  That's the

16   purpose of -- other purpose of --

17        Q   Mr. Valjakka, I only have three hours.  I need

18   you to, please, answer the question that I am asking

19   you.

20            What is the name of the attorney that

21   explained the Court's preliminary injunction order to

22   you?

23        A   Bill Ramey.

24        Q   Anyone else?

25        A   No.

**Page 51**

1         MS. LAMKIN:  I have marked as Exhibit 5 a

2    document documented titled Plaintiff Lauri Valjakka's

3    Responses and Objections to Defendant Netflix Amended

4    CUVTA Discovery.

5            (Whereupon, Deposition Exhibit 5 was

6            marked for identification.)

7         Q   (By Ms. Lamkin) Please download, sir, and let

8    me know when you're ready for questions.

9         A   I have downloaded this and received.

10        Q   Do you recognize this document, sir?

11        A   Yes.

12        Q   What is it?

13        A   It's Plaintiff Lauri Valjakka's Responses and

14   Objections to Defendant Netflix Incorporation's Amended

15   C-U-F-V-T-A Discovery.

16        Q   Did you draft the responses in this document?

17        A   My lawyers drafted and I have seen this.

18        Q   The lawyers drafted the responses in this

19   document?

20        A   I am a partner in drafting it.

21        Q   Are the responses in this document true?

22        A   Excuse me.  I have to spend a little time to

23   read it through, see that this is the final version.

24            Yes.

25        Q   Sir, was that an answer to my question?  Are

**Page 52**

1    you saying "yes" to the question --

2         A   Yes.

3         Q   -- or that yes, the responses are true?

4         A   The answer is yes.

5         Q   Sir, if you could please turn to page 4.

6         A   Yes.

7         Q   At the bottom of page 4, I'm going to read

8    RFA1 into the record.  Quote, "The monies Mr. Valjakka

9    received from settlements in this litigation comprise

10   the entirety of Mr. Valjakka's net worth," unquote.

11            And then do you see the response?  The

12   response says, quote, "Not admitted.  Mr. Valjakka has

13   not received any monies from this litigation," unquote.

14   Is that true, Mr. Valjakka, that you have received no

15   money from this litigation?

16        A   No money from the Netflix litigation.  Yes,

17   that's correct.

18        Q   If you could turn the page, sir.

19        A   Excuse me?

20        Q   Turn the page to page 5, please, sir.

21        A   Yes, I am on page 5.

22        Q   Do you see RFA2 where it says, "Admitted,

23   Mr. Valjakka earns all of his income from CDN

24   Licensing."  Do you see that?

25        A   Yes.

1     Q   So your two sources of income are your pension
2  and CDN Licensing; correct?
3     A   Correct.
4     Q   You have no other sources of income?
5     A   Correct.
6     Q   If you look at the bottom of page 5, it says,
7  "Mr. Valjakka understands that the lawyers from Kenealy
8  Vaidya, LLP, have been paid on an hourly basis for this
9  action"; is that true?
10    A   Yes.
11    Q   What is the role of Kenealy Vaidya, LLP?
12    A   Excuse me.  I didn't hear well.
13    Q   What is this law firm's role?
14    A   Ramey, LLP.
15    Q   This is a separate law firm, sir.  Kenealy
16 Vaidya, LLP.
17    A   That's -- that's another company in connection
18 to AIPI.  They have been --
19    Q   What do they do?
20    A   They have been assisting.
21    Q   In what way?
22    A   Details I cannot say but preparation in some
23 way.
24    Q   You don't know what this law firm does?
25    A   Before -- you have to ask AIPI people to

53

1  clarify what the details are  I don't know  It's not
2  my stuff
3     Q   Why are you directing me to ask AIPI?  What do
4  you know about the relationship between AIPI and Kenealy
5  Vaidya, LLP?
6     A   Eric Morehouse is the link
7     Q   How so?
8     A   That's how I understood it, and they have
9  freedom to use subcontracted service providers as much
10 as they want as it's relevant
11    Q   What's the relationship between Eric Morehouse
12 and Kenealy Vaidya, LLP?
13    A   I don't know the details  I have an agreement
14 with AIPI Solutions
15    Q   On the next page, sir, page 6
16    A   Yes, I am there
17    Q   At the top it says Mr  Valjakka understands
18 that IP Case Group, LLC, is a company owned and funded
19 by AIPI  Is that true?
20    A   Yes
21    Q   How did you come to that understanding?
22    A   Because it was what I was told
23    Q   Which entity, Case Group or AIPI, are the
24 recipient of the litigation funds in this campaign?
25    A   In my agreement it's AIPI

54

1     Q   What does IP Case Group receive in this
2  campaign?
3     A   I have no idea.
4     Q   Do you have an agreement with IP Case Group?
5     A   No.  I have an agreement with AIPI Solutions.
6     Q   And it's your understanding that AIPI, not IP
7  Case Group, is the entity that receives litigation funds
8  from this campaign?
9     A   I don't -- I don't understand that.  It's --
10 it's AIPI's responsibilities, and that's not my -- my --
11 under my control anyhow.
12    Q   In the middle of page 6 it says, quote, "CDN
13 Licensing Oy is currently dissolved," unquote.  Is that
14 true, sir?
15    A   That's true.
16    Q   If Netflix or any other entity pays money as a
17 royalty on the 167 patent, how will you receive that
18 money?
19    A   I could name -- I would say that -- sorry.  My
20 Finnish thinking.  Back to the start.  So first, the
21 money comes to the U.S. lawyer, and as I explained, what
22 is left of the costs after the costs in the U.S. will
23 appear to Finland.
24    Q   Would you receive that money in your personal
25 capacity?

55

1     A   It's not wise.  I would use a company to
2  receive it.  I could name -- according to Finnish laws,
3  I can name whoever to receive, even Santa Claus if I so
4  wanted.
5     Q   Which company --
6     A   I could say pay to -- pay to -- if Netflix is
7  to pay, I would say -- name anyone, any entity that I am
8  interested in or in connection.  I don't have to own
9  that company even, but it's unwise so I had --
10    Q   Do you have a specific company in mind to
11    A   I would say -- I would say it's not wise to
12 take to personal account because of the taxation
13 reasons.  Would you like to pay 57 percent of possible
14 proceeds yourself?  No, I wouldn't.  So 20 percent or
15 25 percent for the company is much wiser.  It's
16 different but still, much wiser.
17    Q   Mr. Valjakka, do you have a specific company
18 in mind to receive litigation funds on your behalf?
19    A   It used to be CDN Licensing, but let's see
20 first what the outcome of this all shall be.
21    Q   Sir, please answer the question that I am
22 asking.
23        Do you have a specific company in mind to
24 receive the litigation funds?
25    A   No.

56

14  (Pages 53 to 56)

LAURI VALJAKKA                                                    October 27, 2023

1    Q   Okay.  And do you have the dissolution papers
2  for CDN Licensing?
3    A   Yes.  I have signed it.
4    Q   Did you give the dissolution papers to your
5  attorneys?
6    A   Yes.
7    Q   You gave the dissolution papers for CDN
8  Licensing to your counsel?
9    A   Yes.
10   Q   Which counsel?
11   A   Onni Hietalahti.
12   Q   Did you give the dissolution papers to any of
13 your U.S. counsel?
14   A   He may have but not me.  I'm sure he did.
15   Q   Why are you sure?
16   A   That was expected, so yes, I'm sure he did.
17   Q   Please turn to page 7.
18   A   Yes.
19   Q   The last sentence says, quote, "Forming CDN
20 Licensing also assisted in obtaining financial
21 investment for litigation from Scarabaeus Sacer Oy in
22 2022," unquote.  Do you see that sentence?
23   A   Sorry.  I was a bit behind you.  That's the
24 investor, Scarabaeus Sacer Oy in 2022, yes.
25   Q   That's the company that you were thinking of

                                                        57

1    A   Yes, yes.
2    Q   Was Eric Morehouse involved in the decision to
3  form CDN Licensing?
4    A   No.
5    Q   And whose idea was it to cancel the license to
6  CDN Licensing?
7    A   I think it was Onni Hietalahti's decision, but
8  I don't know whose idea it was originally but -- because
9  of the situation, so that's --
10   Q   Because of what situation?
11   A   Well, with this evaluation of
12 responsibilities.  So I don't know whose idea it was.
13 My answer is I don't know.
14   Q   This is a yes-or-no question.  Was Bill Ramey
15 involved in the decision to cancel CDN Licensing?
16   A   No.
17   Q   Was Eric Morehouse involved in the decision to
18 cancel CDN Licensing?
19   A   No.
20   Q   I just want to be really clear on this.  Was
21 Bill Ramey involved in the decision to cancel CDN
22 Licensing?
23   A   No.  It's a Finnish company.  It has to be
24 decided here between the shareholders, over here,
25 decide -- or we had to decide ourselves so shareholders'

                                                        59

1  earlier that gave 200,000?
2    A   Yes, yes, yes.  I just forgot the name.
3    Q   How did you receive funds from CDN Licensing
4  in 2021?
5    A   I think it was partly from the early
6  settlements or -- or the loan.  I can't remember which
7  happened first, but you have my answers, and I think the
8  details are there.
9    Q   Whose idea was it to form CDN Licensing?
10   A   I think we came -- we alternated, maybe Onni
11 and me and Matti Saraheimo, and decided that should be
12 another company to -- to get the funding for it and to
13 minimize the taxation if -- if we are receiving any
14 proceeds from any -- any patent litigation, so --
15   Q   Don't tell me the substance of --
16   A   It wasn't anyone's specific idea.  It was a
17 joint decision after thinking it over, what should be
18 done and what not.  I asked the guys for a meeting, and
19 we had that meeting, and in that we decided to establish
20 the company.
21   Q   This is a yes-or-no question.  Was Bill Ramey
22 involved in that decision?
23   A   No.  We didn't know Bill Ramey at that time.
24   Q   You formed CDN Licensing before AIPI
25 introduced you to Bill Ramey?

                                                        58

1  decision.
2    Q   Mr. Ramey (sic), we have been going about
3  another hour.  Do you want to take a ten-minute break?
4    A   Yeah.
5    Q   And I apologize --
6    A   That's fine.
7        MS. LAMKIN:  -- I said Mr. Ramey.
8  Mr. Valjakka.  Okay.  Come back in ten minutes.
9        THE VIDEOGRAPHER:  Thank you.  We are now
10 going off the video record.  The time is 9:01 a.m.
11       (Whereupon, a break was taken from
12           9:01 a.m. to 9:13 a.m.)
13       THE VIDEOGRAPHER:  We are now back on the
14 video record.  The time is 9:13 a.m.
15       Please proceed, Counsel.
16   Q   (By Ms. Lamkin)  Thank you.  Mr. Valjakka, did
17 you speak with anyone during the break?
18   A   No.
19   Q   No text message?
20   A   No, nothing.
21   Q   Mr. Valjakka, do you know when the trial date
22 is for the Netflix trial?
23   A   I was informed February 23, 2024.
24   Q   February 2024?
25   A   Yes.

                                                        60

                              15 (Pages 57 to 60)

1    MS LAMKIN: I'm going to mark as Exhibit 6 a
2  document bearing the Bates range LV-CUVTA 000050 to 58
3            (Whereupon, Deposition Exhibit 6 was
4            marked for identification )
5    THE WITNESS: Yes, I see this document
6    Q  (By Ms Lamkin) Could you please turn to Bates
7  range 55 and 56
8    A  55 in front of me
9    Q  Okay  Who drafted this document?
10   A  Onni Hietalahti
11   Q  Did Bill Ramey assist in the drafting of this
12  document?
13   A  Actually, I don't know
14   Q  Is it possible that Bill Ramey --
15   A  Could be --
16   Q  Is it possible that Bill Ramey participated in
17  the drafting of this document?
18   A  Cannot remember or not  I have to say so
19   Q  Sir, my question is this:  Is it possible that
20  Bill Ramey participated in the drafting of this
21  document?
22   A  No
23   Q  Why do you say that?
24   A  It came from Onni Hietalahti, and he sent it
25  to me and -- for reviewing before electronically

61

1  money to be returned?
2    A  Enough time for getting the money and paying
3  it back.
4    Q  Intentionally picked to be after the Netflix
5  trial; correct?
6    A  No, it's not related just to that.  It's
7  included, but there are other -- other things going on
8  as well, and that's not just directly from that.  I say
9  no.
10   Q  The fact that the Netflix trial is in February
11  of 2024 was not part of the reason that March 2024 was
12  picked in this document?
13   A  No.
14   Q  What were the reasons that March 2024 was
15  selected as the payment date?
16   A  Enough time for me.
17   Q  To do what?
18   A  The other businesses.
19   Q  What other businesses?
20   A  Maybe various.  So I'm not willing to share
21  that information here.  It's not relevant to this case.
22   Q  Sir, what other businesses?
23     MR. ZITO:  Objection, outside the scope.
24   Q  (By Ms. Lamkin) Mr. Valjakka?
25   A  I have many plans and some -- some ideas under

63

1  signing.
2    Q  If you turn to the document ending in page 56.
3    A  Page 56, yes.
4    Q  At the top it says:  The Licensor shall return
5  the License fee to the Licensee.  What does that mean,
6  sir?
7    A  That means that I, as the Licensor, shall
8  return the Licensee, CDN Licensing Finland, the amount
9  mentioned.
10   Q  It means CDN Licensing will return the money
11  to you personally; correct?
12   A  Let me spend a little time with the document
13  again.
14       Yes.
15   Q  Did you review this document before you signed
16  it, Mr. Valjakka?
17   A  Yes, I did.
18   Q  Did you understand this document before you
19  signed it?
20   A  Yes.
21   Q  Do you see the next line that says:  The
22  return payment shall be made to the Licensee's bank
23  account by 31st March 2024.  Do you see that?
24   A  Yes.
25   Q  Why is March 2024 the date picked for the

62

1  way for -- for business entry at the moment.  I don't
2  know how it comes, but I'm preparing for other things,
3  as well.  This is not just one thing that I am doing.
4    Q  And that's the reason you pitched -- picked
5  March of 2024 is because of these other things --
6    A  No.  We negotiated and agreed this is -- this
7  is enough time for me.
8    Q  Who did you negotiate with?
9    A  The CDN Licensing Finland shareholders.  Matti
10  Saraheimo and Onni Hietalahti and myself, we had a
11  meeting over this.
12   Q  And in this meeting you determined that March
13  2024 was the date that the money should be returned?
14   A  Yes.
15   Q  And what would be the source of that money?
16   A  Could be any -- anything that proceeds.
17   Q  Like what?
18   A  Some -- some businesses that I'm not going to
19  explain here.
20   Q  Sir, this is --
21   A  It could be also this case.  It could be
22  also -- I admit, it could be also this case.
23   Q  The Netflix trial is the only immediate source
24  of income --
25   A  No.

64

16 (Pages 61 to 64)

1      Q   -- under --
2          (Simultaneous conversation.)
3          THE REPORTER:  I'm sorry.  Could you repeat
4      the question.
5      Q   (By Ms. Lamkin) The Netflix trial in February
6      is the only other source of income, other than your
7      pension, that you currently have; correct?
8      A   Yes, but there are also various options for
9      other incomes that I am developing.
10     Q   Did you and Onni discuss reviving CDN
11     Licensing after the Netflix litigation?
12     A   We haven't agreed anything upon that.
13     Q   The question is whether or not you discussed
14     it.
15     A   Actually not.  We just canceled this deal and
16     decided -- let's see what happens.  We are preparing
17     other ways to cover the responsibilities, explained by
18     Onni Hietalahti.
19     Q   You and Onni never discussed reviving CDN
20     Licensing after the litigation?
21     A   We may have discussed and -- but no decisions,
22     anyhow, and we decide -- we discussed a lot, so it could
23     be that it's an option, but nothing has been decided --
24     Q   Sir, my question --
25     A   -- and will not be decided before this case is

                                                          65

1      over.
2      Q   Sir, it's a yes-no question.  Did you and
3      Onni discuss reviving CDN Licensing after the
4      litigation?
5      A   No.
6      Q   Sir, if you could please turn to the page
7      ending in 50.  Do you recognize this email?
8      A   Sorry.  What page?
9      Q   Ending in 50, the first page.
10     A   50.  The first page.
11     Q   The first page of this document, sir.
12     A   Yep.
13     Q   Do you recognize this document?
14     A   Yes, I do.
15     Q   What is it?
16     A   It's the cancellation agreement, 167 and 102
17     licenses, and it's dealing with --
18     Q   This is --
19     A   -- something to consider and mentioning that
20     here are the canceling -- cancellation agreements are
21     what Bill wants to put forward as soon as possible, as
22     signed, and that for us, something to consider, this
23     form --
24     Q   This is an email from Onni to you?
25     A   Onni to me and Matti Saraheimo.

                                                          66

1      Q   Okay.  What is this opening salutation spelled
2      T-E-R-V-E?  What does that mean?
3      A   Excuse me.  What?
4      Q   The first word in the email, T-E-R-V-E, what
5      does that word mean?
6      A   It's in Finnish, "Hi."
7      Q   Hi.  Okay.
8      A   Yeah.
9      Q   Sir, could you please translate the first --
10     could you please translate the first sentence in this
11     document, in this email.
12     A   Here are the cancellation agreements, which
13     Bill wants to forward onwards as soon as possible, as
14     signed.
15     Q   Bill Ramey?
16     A   Yes.
17     Q   Bill Ramey wanted these cancellation
18     agreements signed?
19     A   He wanted to proceed them or forward them
20     onwards after we did it, or signed them.
21     Q   Sir, it's a yes-or-no question:  William Ramey
22     wanted these agreements signed; correct?
23     A   Yes.
24     Q   Okay.  Could you please read the next line
25     starting with M-E-I-L-L-E.  What is that sentence?

                                                          67

1      A   For us to consider
2      Q   Could you just please translate the first
3      sentence under that
4      A   How shall we return the licenses to effect
5      after the trial to bind the company and Lauri, so
6      something to consider  It doesn't mean the licensee
7      should be -- license should be revived or the agreements
8      would be revived but how to compensate actually  So
9      that's -- that's the meaning of it
10     Q   And it says how to restore the licenses after
11     the trial in a binding manner for the company and Lauri;
12     correct?
13     A   Yeah  So the company responsibilities must be
14     sorted out, one way or another, even though these
15     license agreements have been canceled, so
16     Q   And which company is Onni referring to?
17     A   CDN Licensing Finland Oy  And I'm as -- a
18     private person, individual mentioned, and so since it's
19     no longer effective, there must be another way to
20     compensate or pay the -- pay the -- or cover the
21     responsibilities  Simple as that
22         MS LAMKIN:  I'm going to mark as Exhibit 7 a
23     document bearing the Bates range LV-CUVTA 000266, ending
24     in 276
25     ///

                                                          68

                                    17 (Pages 65 to 68)

1    (Whereupon, Deposition Exhibit 7 was

2    marked for identification )

3    THE WITNESS: I am at -- there

4    Q   (By Ms  Lamkin) Do you recognize this document?

5    Have you seen this?

6    A   Maybe Onni has forwarded it to me

7    Q   In April of 2023 Onni was trying to obtain

8    funding from Omni Bridgeway for CDN Licensing; correct?

9    A   Yes

10   Q   And was Onni successful in receiving funding

11   from Omni Bridgeway?

12   A   We didn't proceed with this, and maybe they

13   are still waiting for them

14   Q   I'm sorry  Sorry

15   A   The answer is no

16   Q   And do you know why?

17   A   We haven't completed the questionnaires from

18   that

19   Q   Why?

20   A   We can see it's relevant at this point   We

21   thought that it would be maybe better

22   Q   Better than what?

23   A   Try to find our -- our cases here in Finland,

24   locally, if possible, on AIPI

25   Q   Why were you seeking funding other than from

69

---

1    AIPI?

2    A   Actually, that was -- initial contacts were

3    before AIPI so . . .

4    Q   So this email is dated April 25, 2023;

5    correct?

6    A   No, this is quite recent, but there were

7    contacts between Onni and Omni, I think already screen

8    time 2021, before AIPI deal was signed.  That was the

9    organization's --

10   Q   Did you try to obtain -- did you try to obtain

11   financing from groups other than AIPI within the last

12   year?

13   A   For the Finnish side of the cost structure

14   covering, we have discussed here but actually not done

15   anything.

16   Q   Sir, my question is this:  Within the last

17   year, did you try to seek funding from groups other than

18   AIPI?

19   A   No.

20   Q   No, you did not?

21   A   For other purposes.  You see, I have many

22   projects going on.  So for other purposes yes, and for

23   this patent litigation campaign no.

24   Q   Sir, this document said in the second

25   paragraph, "We agreed to reconnect if we take our

70

---

1    complaint past Markman or IPR "  What does Markman or

2    IPR mean?

3    A   If I completely understand, it means --

4    Markman means claim charge corporation and how it's

5    evaluated, and IPR is inter partes research, so

6    Q   The next sentence says, "One of our complaints

7    has now passed a successful claim construction hearing

8    in January "  Which complaint is being referred to here?

9    A   Let me see

10   Q   Is that the Netflix complaint?

11   A   Let me -- let me first check some facts  I

12   think that was -- generally, there were several cases,

13   and he is referring afterwards to them  You should read

14   the whole chain of these emails before answering for the

15   first one  So this is a little -- I feel a little bit

16   inconvenienced  You're asking from the top and then

17   going to the past because -- can't remember everything,

18   so this is --

19   Q   Sir, I'm happy to go off the record

20   A   It's not --

21   Q   Happy to go off the record

22   A   It's not in chronological order

23   Q   I'm happy to go off the record so you can read

24   this document

25   A   Yes

71

---

1    Q   Would you like to do that?

2    A   Yes.  Let's have ten minutes, reading break.

3    MS. LAMKIN:  Okay.

4    THE VIDEOGRAPHER:  All right.  So off the

5    record then?

6    MS. LAMKIN:  Yes.

7    THE COURT:  Okay.  Thank you.  Thank you.  We

8    are now going off the video record.  The time is

9    9:36 a.m.

10   (Whereupon, a break was taken from

11   9:36 a.m. to 9:45 a.m.)

12   THE VIDEOGRAPHER:  We are now back on the

13   video record.  The time is 9:45 a.m.

14   Q   (By Ms. Lamkin) Mr. Valjakka, did you get a

15   chance to review Exhibit 7, Bates range 266 to 276?

16   A   Yes.

17   Q   Do you feel comfortable answering questions

18   about the document?

19   A   Yes.

20   Q   On the first page, Bates range ending in 266,

21   you write or Onni writes, quote, "We may need to discuss

22   acquisition of additional funding to take this one case

23   through a possible jury trial," unquote.  Do you know

24   which case he is talking about?

25   MR. ZITO:  Calls for speculation.

72

---

18 (Pages 69 to 72)

1    THE WITNESS:  All possible cases, including
2    Netflix, of course.  Yes.
3        Q    (By Ms. Lamkin)  Netflix is currently the only
4    case in the campaign scheduled for trial; correct?
5        A    Correct.  If you look at the first email, it's
6    2020 and before we had any deal with -- or I had any
7    deal with AIPI.  So these --
8        Q    Correct, but --
9        A    -- discussions have started long since.
10       Q    Correct.  But the email that we're talking
11   about Onni sent April 5, 2023; correct?
12       A    Correct, yes.
13       Q    And he's talking about additional funding to
14   take a case through a possible jury trial; correct?
15       A    Yes.
16       Q    That's a jury trial in the United States?
17       A    Yes.
18       Q    So Onni is asking for additional funding for a
19   jury trial in the United States; correct?
20       A    Yes.
21       Q    Why weren't you seeking funding from AIPI?
22       A    Well, the extensions, you know, we -- I
23   mentioned earlier we had a long list of CDN operators
24   potentially infringing this 167 patent.
25       Q    Sir, my question is this:  Why weren't you

73

1    seeking the funding from AIPI?
2        A    We had.  We had.
3        Q    This email seeks funding for U.S. litigation
4    in 2023; right, not AIPI; correct?
5        A    Yes.  This is --
6        Q    Why --
7        A    -- Onni's reply discussion.
8        Q    Correct.  Why weren't you seeking the money
9    from AIPI?
10       A    To the extent that list of potential other
11   infringers and, you know, covering every aspect of it we
12   had learned.
13       Q    Sir, please answer the question that I am
14   asking you, please.  Why weren't you seeking the money
15   from AIPI?
16       A    Why would we not be seeking or why would we be
17   seeking?
18       Q    One more time, sir.  Why weren't you seeking
19   the money from AIPI?
20       A    After I made -- I fell off.  I don't
21   understand the question.
22       Q    You don't understand the question.  That's
23   your testimony under oath?
24       A    No.  Can you slowly repeat again why . . .
25       Q    Was there a point over the last year where

74

1    AIPI refused to give you additional money?
2        A    No, no.  They wanted to focus on the Netflix.
3    I wanted to extend to that list above the infringers.
4    That is my --
5        Q    Sir, my --
6        A    -- intention --
7        Q    -- question is this.
8        A    -- for seeking the further funding.
9        Q    Sir, my question is this:  Was there a point
10   over the last year when AIPI refused to provide
11   additional funding?
12       A    Actually, there was not a point to refuse but
13   a point where things didn't happen, and they said they
14   wanted to focus on Netflix case and no other cases --
15       Q    Sir, yes or no --
16       A    -- simultaneously, yes.
17       Q    Yes or no:  Was there a point over the last
18   year when AIPI refused to provide additional funding?
19       A    I have to say this is the wrong question.
20   They never refused.  They said they focus on this case
21   and no other.  Yes, there was a point when they said no
22   for other cases over the last year.  That's correct.
23       Q    What was the reason they gave for refusing to
24   fund other cases asserting the 167 and 102 patent?
25       A    It's a matter of resources and available

75

1    funding.
2        Q    What reason did they give you?
3        A    Actually, they said that they are negotiating
4    but no further details.
5        Q    They are negotiating with whom?
6        A    Funders, investors.
7        Q    Additional investors outside AIPI?
8        A    Outside AIPI in their network.
9        Q    Is AIPI going to fund additional assertions of
10   the 167?
11       A    We haven't agreed upon that yet.
12       Q    Has AIPI committed to funding assertions other
13   than the Netflix litigation?
14       MR. ZITO:  Objection, far outside the scope.
15   Future business plans would be a highly confidential
16   area, and I'm not going to allow you to proceed too much
17   further in this direction.
18       Q    (By Ms. Lamkin)  Mr. Valjakka?
19       A    Yes.  What?
20       Q    Yes, AIPI has committed to additional
21   assertions beyond Netflix?
22       A    At the moment, no.
23       Q    Originally, your agreement with AIPI covered
24   the entire campaign; correct?
25       MR. ZITO:  Vague, ambiguous.

76

19 (Pages 73 to 76)

**Page 77**

1    THE WITNESS: Yes, and they did so --
2    Q  (By Ms. Lamkin) Why did they change the scope
3    of their funding?
4    A  -- for the time being.
5    MR. ZITO:  Objection, mischaracterizes --
6    Q  (By Ms. Lamkin) Why did they do that?
7    MR. ZITO:  Objection, asks for speculation on
8    the motivations with a third party.
9    Q  (By Ms. Lamkin) Mr. Valjakka?
10   A  I don't know.
11   Q  Have you been successful in receiving any
12   funding from AIPI's funding?
13   A  Yes, we got that loan for CDN Licensing.
14   Q  Which loan?
15   A  That was that 200,000 we handled a couple of
16   hours ago.
17   Q  Other than that, have you been successful in
18   obtaining any litigation funding for your campaign other
19   than AIPI?
20   A  No.
21   Q  Sir, who are your attorneys for this
22   deposition today?
23   A  Oh, there is Joe Zito and Ken Sheets and so
24   on.
25   Q  Do you have an engagement agreement with Joe

**Page 78**

1    Zito?
2    A  Well, through AIPII.
3    Q  Do you have an engagement agreement with Joe
4    Zito?
5    A  Personally, I don't, but I had the AIPI
6    agreement, which includes Joseph Zito.
7    Q  Is Mr. Joe Zito named in your agreement with
8    AIPI?
9    A  No.
10   Q  Who are your other attorneys here today,
11   besides Joe Zito?
12   A  Here today, Ken Sheets.
13   Q  Do you have an engagement agreement with Ken
14   Sheets?
15   A  Through AIPI.
16   Q  Do you yourself have an engagement agreement
17   with Ken Sheets?
18   A  No, not in person.
19   Q  Does your AI agreement mention Ken Sheets?
20   A  No.  It's otherwise expressed in -- verbally
21   in the agreement.
22   Q  What does it say?  Which passage are you
23   referring to?
24   A  They have the freedom to choose the lawyers
25   and assistant paralegals and whoever, as long as the

**Page 79**

1    case is well projected and organized.  It's quite
2    normal.
3    Q  Does Joe Zito represent you or AIPI?
4    A  He represents me.
5    Q  How do you know that?
6    A  We have so agreed.
7    Q  In writing?
8    A  No.
9    Q  How have you --
10   A  It's under the agreement with AIPI.  I was
11   informed that he is the lawyer, and that's okay with me.
12   Q  Does Joe Zito represent AIPI?
13   A  He represents me and that's the meaning of
14   this participation.  He represents me.
15   Q  Sir, please --
16   A  Yes.
17   Q  Please answer the question I'm asking.
18   A  Yes, he does.  Yes, he does.
19   Q  Joe Zito represents AIPI.
20   A  No, me.
21   Q  Sir, if you could please return back to
22   Exhibit 6, the one starting in LV-CUVTA 000050.
23   A  I'm here.
24   Q  And I'm sorry to ask you but it is Finnish.
25   Could you please translate one more time the sentence

**Page 80**

1    beginning in Miten, M-I-T-E-N?
2    A  How should we explain this to the pharmacy guy
3    who is actually --
4    Q  And what is --
5    A  -- the loan giver.
6    Q  Pharmacy means loan giver?
7    A  He is a former pharmacy owner of a pharmacy
8    chain, and he is the inventor -- investor, sorry.
9    Q  What is this person's name?
10   A  Tony.  I don't remember his surname.
11   Q  Is this the investor we spoke of earlier that
12   provided --
13   A  Yes, yes.
14   Q  -- $200,000 loan?
15   A  Yes.
16   Q  Okay.  And then the very first sentence in
17   that, "Miten palautetaan," that sentence --
18   A  Excuse me.  What line?
19   Q  So -- so you have -- you have the sentence --
20   the "Terve," the "hi," the salutation; right?  Hello?
21   A  Yes, right here.
22   Q  And then you have the sentence that starts,
23   "Tassa"; right?
24   A  Yes.
25   Q  And then you have the sentence that says

20  (Pages 77 to 80)

**Page 81**

```
 1   something like -- shall we consider, or shall we ponder?
 2   "Meille pohdittavaa"; right?
 3       A   Sorry  I dropped out again  So what are you
 4   referring to?  What sentence?  Where?
 5       Q   The third  After the salutation, "Terve,"
 6   means hi; right?  Then you have a sentence that starts
 7   "Tassa"; right?
 8           THE VIDEOGRAPHER: Uh-oh, what did we close?
 9           THE WITNESS: Hello  Are you there still?
10       Q   (By Ms  Lamkin) Yeah  I'm here
11       A   Okay  I'm sorry  I didn't get that question
12   at all  Where should I go?
13       Q   That's all right  Let me just share my
14   screen  Can you see my screen, sir?
15       A   Yes
16       Q   Do you see --
17       A   Yeah, this first sentence
18       Q   -- the sentence that I have highlighted?
19       A   Okay
20       Q   Can you translate that please?
21       A   How can we revive the license after the trial
22   so that affine company and Lauri?
23       Q   How can we revive CDN Licensing after the
24   trial?
25       A   No  This means -- in Finnish language it
```

**Page 82**

```
 1   should be not translated literally word by word.  It
 2   should be translated, the meaning.  The concept is how
 3   can we, without having the canceled agreements revived
 4   again, compensate to company and to Lauri so that it
 5   binds similar -- similar responsibilities to be covered,
 6   as if CDN Licensing agreements were still effective.
 7           So this is more complex, and there are layers
 8   in the same.  So you cannot translate Finnish language
 9   directly word by word to English because you lose the
10   context completely and the idea completely.  You can ask
11   any translator.  That's why our language is so beautiful
12   because you need to first consider half an hour before
13   replying.  That's -- that -- many foreigners think that
14   we are not talkative or social.  We process things in
15   our heads before we answer.  So these are easy questions
16   when I say yes or no, but this is a complex question.
17   This is really complex and only Finns can understand the
18   right way, straightaway, without explaining, like I am
19   trying here right now.  Similar terms and similar
20   responsibilities without the canceled agreements being
21   effected.  How can we --
22       Q   The entity --
23       A   -- revive those responsibilities to be
24   covered?  So this is extremely important to understand
25   correctly.
```

**Page 83**

```
 1       Q   The entity that would be revived is CDN
 2   Licensing; correct?
 3       A   It's not CDN Licensing.  It's -- it's what --
 4   what was the deal about.  So CDN Licensing agreements
 5   will never be effective again, but we need to cover the
 6   responsibilities for the company and to Lauri similarly
 7   as they were, without adding these -- that was the
 8   question from -- from Onni Hietalahti, a good question.
 9       Q   What would be revived?
10       A   We have no answers yet.  We will see.
11           MS. LAMKIN: Mr. Valjakka, I appreciate your
12   time.
13           Mr. Zito, do you have any redirect?
14           MR. ZITO: Yes, I have just a couple.  For
15   clarification, I don't represent AIPI.  I don't know
16   that AIPI is actually being represented here today.
17   This is a deposition of Mr. Valjakka, so Mr. Valjakka
18   will be the person being represented by somebody, not
19   AIPI, not Ramey, not any other third parties, for
20   clarification.
21           Secondly, without revealing any
22   attorney-client privilege, Mr. Valjakka -- I asked
23   Mr. Valjakka if he would like me to represent him.  He
24   said yes.  That's a representation agreement.  I don't
25   need anything in writing.  My representative of
```

**Page 84**

```
 1   Mr Valjakka today is completely separate and apart from
 2   any representative -- representation or
 3   non-representation of Mr  Valjakka in any litigation  I
 4   just wanted to clarify that
 5           EXAMINATION BY MR  ZITO
 6       Q   One other thing I wanted to ask about -- find
 7   my questions  I have them written down
 8           It seemed unclear to me, your understanding of
 9   how you would be involved in implementing the
10   preliminary injunction  Do you personally have any
11   money or assets that are in the U S  now?
12       A   No
13       Q   Do you know anybody that owes you any money or
14   things you would claim belong or are owed to you in the
15   U S ?
16       A   Not outside the claims  So I don't -- nobody
17   owes me in the U S
18       Q   What is your understanding of the injunction
19   that was entered by the court?  If you had some money in
20   a bank account in the U S , say $10,000, would the
21   injunction prevent you from sending that money overseas
22   to Sweden?
23       A   Yeah, it would prevent  That's my
24   understanding
25       Q   Would it matter the source of the money that
```

DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

**Page 85**

1    was put into a bank account in your name in the U S ?

2    A  I understand it's the proceeds from the

3    litigation, if there were some funds

4    Q  Let's assume the money came from some other

5    source  A relative of yours passed away and left you

6    $10,000 in a bank account  From your understanding, as

7    explained to you by counsel or not counsel, would you be

8    able to transfer that money back to Finland?

9    A  Yes, I should be

10    Q  Who else, if anyone, is in charge of

11    implementing the restrictions of the preliminary

12    injunction on you and/or CDN and/or others?

13    A  Well, I'm -- I'm the only one now to receive

14    any proceeds to Finland, but of course, I have Onni

15    Hietalahti and Matti Saraheimo to be compensated from me

16    or from some company or whatever arrangement, possible

17    net -- net proceeds to Finland  And I should be then

18    responsible for -- for covering their shares of that and

19    that's my responsibility, but the company was

20    established to avoid -- wane taxes and to get funding

21    for the Finnish side of the patent litigation campaign

22    Q  When you discussed the meaning and the

23    implications of the preliminary injunction, was Onni

24    involved in those discussions, along with others?

25    A  He and I wondered what this means in practice

**Page 86**

1    because he is a Finnish lawyer.  He is not an American

2    lawyer, and -- and we have asked these questions, but

3    they have remained unanswered.  According to Finnish

4    laws, they should have somebody who wants to send

5    something over me legally in Finland should have a

6    separate court order, court rule in Finland, according

7    to Finnish laws.

8    By Finnish laws, U.S. injunction of sorts

9    would cover only the U.S. funds that I might have some

10    kind of a connection or control, not the Finnish.  It

11    would require separate -- that's how we solve.  We have

12    actually asked this question because this has so far

13    been -- been theoretical.  I don't have answers, and

14    Onni doesn't have answers.

15    Q  Who, if anyone, would you consult with before

16    moving from -- moving money from the United States to

17    Finland?

18    A  The money comes first to lawyers and to AIPI

19    according to agreement, and then when the U.S. expends

20    this and cost of this campaign would be covered and the

21    net income would be transferred to me or the one that I

22    made to receive the money.

23    Q  Would you rely upon the U.S. lawyers to

24    determine whether or not such transfer would or would

25    not violate the preliminary injunction that's in place?

**Page 87**

1    MS. LAMKIN:  Objection, leading.  Mr. Zito,

2    I'm giving you room here, but these questions are all

3    leading.  It's your witness.

4    THE WITNESS:  Well, I have an agreement and I

5    respect it, so I would respect that everything happens

6    correctly.  So I don't have to worry about that.  We

7    don't receive any money to Finland first.  We get it the

8    last, receive -- last recipient.  So we don't have to

9    worry about that.  I don't have to.

10    MR. ZITO:  I don't have any additional

11    follow-up questions.

12    MS. LAMKIN:  None here.

13    MR. ZITO:  We can go off the record now.

14    THE VIDEOGRAPHER:  Anyone else?  All right.

15    Before we do go off the video record, did

16    anyone need transcript copies or video copies, as well?

17    THE WITNESS:  I do.

18    MS. LAMKIN:  We need all of those things,

19    Carrie, and a rush on the rough, please.

20    THE VIDEOGRAPHER:  And -- all right.  That's

21    said, today's deposition is now concluded.  We are going

22    off the video record at 10:12 a.m.

23    (Whereupon, the video remote

24    deposition of LAURI VALJAKKA

25    concluded at 10:12 a.m.)

**Page 88**

1    CERTIFICATE

2    I, Christina Bicocca, CSR No. 12932, do hereby

    certify:

4    That prior to being examined, the witness

5    named in the foregoing deposition was by me duly sworn

6    to testify to the truth, the whole truth, and nothing

7    but the truth;

8    That said deposition was taken down by me in

9    shorthand at the time and place therein named and,

10    thereafter, reduced to computerized transcription under

11    my direction and supervision.

12    I further certify that I am not interested in

13    the outcome of this action.

14

15    Witness my hand this 24th day of October,

16    2023.

17

18    _____

19    CHRISTINA BICOCCA

    CSR No. 12932