UNITED STATES DISTRICT COURT   *ORIGINAL*

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable JON S. TIGAR, Judge

| | | |
|---|---|---|
| LAURI VALJAKKA, | ) | **Claim Construction** |
| | ) | **Hearing** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. C 22-01490 JST |
| | ) | |
| NETFLIX, INC., | ) | Pages 1 - 50 |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Monday, December 12, 2022 |

### REPORTER'S TRANSCRIPT OF ZOOM WEBINAR PROCEEDINGS

### APPEARANCES VIA ZOOM WEBINAR:

For Plaintiff:          Ramey LLP
                        5020 Montrose Boulevard, Suite 800
                        Houston, Texas  77006
                   BY:  SUSAN S.Q. KALRA,
                        WILLIAM P. RAMEY, ATTORNEYS AT LAW


For Defendant:          Perkins Coie LLP
                        3150 Porter Drive
                        Palo Alto, California  94304
                   BY:  JASSIEM MOORE,
                        SARAH PIEPMEIER, ATTORNEY AT LAW



(Appearances continued next page)

Reported By:       Raynee H. Mercado, CSR No. 8258

    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

```
1    Monday, December 12, 2022                          2:00 p.m.

2                        P R O C E E D I N G S

3                          (Zoom Webinar)

4                            --o0o--

5

6         THE CLERK:  Your Honor, now calling civil matter

7    22-1490, Lauri Valjakka v. Netflix, Inc.

8         If counsel could please state their appearances for the

9    record, starting with counsel for plaintiff.

10        Mr. Ramey, you're muted.

11        MR. RAMEY:  My apologies, Your Honor.  Good

12   afternoon.  Bill Ramey for the plaintiff, Lauri Valjakka.

13   We're ready to proceed, Your Honor.

14        MS. PIEPMEIER:  Good --

15        Counsel, would you like to identify your other colleague

16   before I proceed?

17        MR. RAMEY:  Okay.  She did get on there.  I'm sorry.

18   I didn't see her before.

19        With me today, I'm lucky to have Susan Kalra.

20        THE COURT:  Thank you, Counsel.

21        MS. PIEPMEIER:  Good afternoon, Your Honor.  Sarah

22   Piepmeier from Perkins Coie.  I'm here on behalf of Netflix.

23   And I'm with my colleague, Mr. Jassiem Moore, arguing his

24   first *Markman* hearing today.

25        We're also joined, though not on video, by in-house
```

1   counsel for Netflix.  We have Laura Charrington, the Director

2   of Patent Litigation; and Emily Hasselburg, Patent Litigation

3   Counsel on succumbent [sic].  And we're also ready to proceed,

4   Your Honor.

5       Thank you.

6           **THE COURT:**  Very good.

7       Does Netflix stand on the objection contained in its

8   notice at Docket Number 69?

9           **MS. PIEPMEIER:**  Your Honor, we stand on the objection

10  to the extent that it was served late.  We do not have any

11  objections to the substantive materials and defer to Your

12  Honor on whether it would be helpful to have counsel use his

13  slides.

14          **THE COURT:**  I would just remind Netflix that your

15  lawyer had not been admitted pro hac vice, and he was

16  permitted to argue without a peep from the other side.  So

17  when I saw their response to your notice come in, I simply

18  assumed that the objection had been withdrawn.

19      In any event, they can use their slides.  That's fine.

20          **MS. PIEPMEIER:**  Thank you, Your Honor.

21          **THE COURT:**  Mr. Ramey, go ahead.

22          **MR. RAMEY:**  Yeah.  Thank you, Your Honor.  Bill

23  Ramey.

24      To get started today, Your Honor, I wanted to share my

25  screen, which I'm always very good at this, so --

```
 1                    (Demonstrative published.)
 2          MR. RAMEY:  I think we all can see this one now.
 3     Lauri Valjakka's -- so it's our plaintiff's claim
 4   construction presentation, Your Honor.
 5     And I'm not going to spend any time going through the
 6   background of the patent.  I think we did that during the
 7   tutorial with this Court.
 8     I want to --
 9          THE COURT:  Mr. Ramey?
10          MR. RAMEY:  Can you not hear me?
11          THE COURT:  I can hear you just fine.
12     If you have not already done so, would you please email a
13   copy of these PowerPoint slides to Ms. Lee when today's
14   hearing is over.
15          MR. RAMEY:  Yes, Your Honor.  Our apologies.  I think
16   that was done moments before the hearing started.  So it's --
17   I think, I believe so --
18          THE COURT:  Well, regardless -- oh, terrific.
19          MR. RAMEY:  Oh.
20          THE COURT:  As long as we're all -- we can all be
21   confident that it happened at some point, that would be great.
22     Go ahead.
23          MR. RAMEY:  Yes.  Yes, Your Honor.
24     So I'll go, you know, back to the tutorial, I think I
25   won't spend any time on the background.  We'll get right to
```

1    the first claim, to modified transport request.

2                    (Demonstrative published.)

3              **MR. RAMEY:**  And what first struck me about this term

4    they want to construe was that they wanted the term "modified

5    transport request" construed rather than "transport request."

6         And that jumped out at me first because nowhere does

7    Netflix claim that any of these terms are ambiguous or not

8    able to be understood or that they're specifically defined in

9    the specification.

10        So that was my first -- relative to what they were doing.

11   "Modified" is a term we all understand.  So if we wanted to go

12   to what a "transport request" is, that's defined fairly

13   explicitly at column 2 of the '167 patent, Your Honor, lines

14   51 through 56.  And that tells the details of what's in a

15   modified transport request.  And so then we're just talking

16   about a modified set of data that includes that information.

17        So then I went directly to defendant's proposed

18   construction, and I saw the word -- first thing they put is

19   "message."  And "message" isn't anywhere in the term "modified

20   transport request," nor is it found anywhere in this patent

21   when they're referring to modified transport request.

22        And then so that's how we originally landed on plain and

23   ordinary meaning is that this is not a term that needs to be

24   understood.  "Transport request" is explicitly defined in the

25   patent.  And "modified" is a term that we all understand.  So,

1   well, there's really no reason to modify what the patentee has

2   already used.

3       Going on down further, you know, we talk a little bit

4   about why do we think that they're trying to import this

5   message limitation.  A message limitation would almost

6   indicate another element in the claim, Your Honor.  And I

7   don't think that the claim -- well, I know the claim doesn't

8   specify another element.  It's merely talking about a modified

9   transport request.

10      When they talk about a message being at the start of that

11  construction, that would add a term that's not found anywhere

12  in the patent or in the claim itself.

13      So that again reverts me back to the plain and ordinary

14  meaning because we -- the danger of redrafting is simply too

15  high in changing what the patentee had invented.

16      And so that's -- that's simply why we're at modified --

17  plain and ordinary meaning.

18      With that, I'd pass it over to the other side.

19          **THE COURT:**  Well, let me ask you a question about a

20  different limitation.

21          **MR. RAMEY:**  Yes, Your Honor.

22          **THE COURT:**  Which is whether any terminal could

23  modify a transport request or only a terminal that's been

24  adapted to act as a relay server.  Because that's a limitation

25  that I think is found in the text of the patent.  And

```
 1    that's --
 2            MR. RAMEY:  I think --
 3            THE COURT:  And it seems to me, since you're saying
 4    that there doesn't need to be any construction, you might feel
 5    otherwise.
 6            MR. RAMEY:  Well, I think that the -- the ones that
 7    are adapted I think are necessary for this.  But I also think
 8    the main server can modify a transport request if it had to.
 9    It's the one that sends out the original.  So I'm not sure --
10            THE COURT:  Right.
11                    (Simultaneous colloquy.)
12            MR. RAMEY:  -- so limited --
13            THE COURT:  Think of this dataflow like the veins, if
14    that's the right word, of a tree.  And the data goes along.
15    When it gets to the leaves of the tree, when it gets all the
16    way out, those terminals have not been modified to act as
17    relay servers, correct?
18            MR. RAMEY:  Yes, Your Honor.  I think that's correct.
19            THE COURT:  The endpoint terminals have not been
20    modified to act as relay servers.
21            MR. RAMEY:  Correct, Your Honor.
22            THE COURT:  Those -- those terminals do not modify
23    transport requests, correct?  Those endpoint terminals.
24            MR. RAMEY:  That's correct, Your Honor.
25            THE COURT:  Thanks.
```

1          All right.  That was very fast.

2          Who would like to respond for Netflix on this term?

3              MR. MOORE:  I will be responding for Netflix, Your

4     Honor.  Jassiem Moore.

5              THE COURT:  Oh, that's right.  Ms. Piepmeier said

6     you're going to do the whole thing.  I don't need to ask that

7     question.  I can just say "Mr. Moore."

8              MR. MOORE:  I may call on Ms. Piepmeier at times for

9     some help.

10         I'll go ahead and share my screen.

11                         (Demonstrative published.)

12             MR. MOORE:  So to begin, Your Honor, Netflix believes

13    this construction is warranted to help clarify the meaning of

14    this term for the jury.  The claim language is somewhat

15    difficult to parse, and Netflix believes that the construction

16    will assist the jury in understanding what a modified

17    transport request is and what a modified transport request

18    contains.

19         And to that end, Netflix believes that its construction is

20    in line with the claim language, the specification, and

21    statements made by the patentee during prosecution history.

22         So starting with that claim language, on Slide 7, we see

23    that the claim language requires -- has two requirements that

24    Netflix's construction helps to clarify.

25         That first requirement is what is doing the modifying of

1    the transport request.  And that is a relay server.  And you

2    can see on that first set of highlights that a terminal adapts

3    to act as relay server, as Your Honor pointed out, is the one

4    that is adapted to modify the transport requests.

5        The second requirement is that the modification itself is

6    the addition of target terminals.  And we can see that from

7    the next set of highlights.

8        First this relay server that is doing the modifying

9    selects a -- a target terminal that will itself act as a relay

10   server, and then it adds the addresses that will be served by

11   that newly selected relay server, so the addresses that the

12   newly selected relay server will relay information to.

13           **THE COURT:**  Mr. Moore, would you give me just a

14   moment?  I want to pull up the '167 patent and look at it on

15   my desk for a second.

16           **MR. MOORE:**  Will do, Your Honor.

17           **THE COURT:**  Oh, I'm looking at the wrong patent.

18   That's why I'm not finding what I need.

19                  (Pause in the proceedings.)

20           **THE COURT:**  That's interesting.  I hadn't really

21   focused on this further address -- "further includes

22   addresses" language in column 8.

23       Okay.  Go ahead.

24           **MR. MOORE:**  And so just continuing on, Your Honor,

25   not only does the claim language support Netflix construction

1    that the modified transport request must be modified by a

2    relay server and that is adding target terminal addresses, and

3    this is also supported by the language in the specification

4    which talks about that first set of terminals that is going to

5    act as a relay server.

6        And so if we look at Figure 4 here on Slide 10 --

7                (Demonstrative published.)

8        **MR. MOORE:**  -- those terminals T1, T2, and T3, they

9    are acting as that first set of relay servers, would be

10    modifying the original transport request.

11        And they are then selecting a downstream relay server.

12    For example, T1 may be selecting T4.  And they are adding the

13    addresses that that relay server will relay data to.  So T1

14    will be adding T13, T22, and T31 for T4 to act as a relay

15    server for.

16                (Demonstrative published.)

17        **MR. MOORE:**  And the patentee's statements from the

18    prosecution history just add further support for this

19    construction.  When discussing the invention of the '167

20    patent, the patentee pointed out that when the main server

21    selects terminals to perform with these relay servers, it's

22    defining their place in the distribution tree --

23        **THE COURT:**  Mr. Moore, has the prosecution --

24        **MR. MOORE:**  Yes, Your Honor.

25        **THE COURT:**  Has the prosecution history for this

1    patent been submitted to be part of the record in this case?

2            **MR. MOORE:**  I don't recall off the top of my head,

3    Your Honor.  We may have included that with the briefing?

4            **THE COURT:**  I think the answer is no, which is why I

5    asked the question.

6            **MR. MOORE:**  Apologies for that, Your Honor.

7            **THE COURT:**  Anyway, so it's tough for me to rely on

8    it.  That's my -- that's why I say that.

9            **MR. MOORE:**  Understood.

10     And even without the prosecution history, Netflix's

11   construction can rest on the language of the claims and

12   language in the specification.

13           **THE COURT:**  Got it.

14                   (Demonstrative published.)

15           **MR. MOORE:**  And moving on to Slide 10, I'll just make

16   this brief.  This is just kind of a quick animation to sort of

17   sum up what we've been talking about.

18     So the first transport request is sent to identify those

19   first relay servers, which then select from a subset of

20   terminals a next set of relay servers and then add the target

21   terminals that those relay servers will be relaying data to.

22     And for those reasons, Your Honor, Netflix's construction

23   should be adopted.

24           **THE COURT:**  Thanks.  I would like another second.  I

25   want to -- I keep thinking of other things I wish I had up on

```
 1   my screen.
 2                   (Pause in the proceedings.)
 3          THE COURT:  Okay.  Very good.  Thanks.
 4       Mr. Ramey or Ms. Kalra?
 5          MR. RAMEY:  Sure.
 6                   (Demonstrative published.)
 7          MR. RAMEY:  Your Honor, I don't have anything more to
 8   say except that what we -- oh, I'm sorry.  I'm back on the
 9   previous term.  Sorry.  We'll move on to "data."  That's fine.
10   My apologies.
11       "Data," going to "data."  "Data," we propose plain and
12   ordinary meaning simply because this is a term that's well
13   understood in the art for everything.
14       And -- and in contradiction to what Netflix says, there is
15   really no limitation which can be found most explicitly at
16   ECF14-1, Exhibit A, column 1, lines 58 to 63, where it
17   specifically says that:  For convenience, data that is to be
18   distributed from the media scanner system 18 will be referred
19   to herein as content which will be understood to include any
20   type of data of interest to end users.
21       And so that's it.  They left that part out, but it's any
22   type of data.  And then it says "including but not limit to,"
23   and it provides a subset of different things.  And I think
24   the --
25          THE COURT:  Well, in column 1 -- in column 1 of the
```

1   patent at lines 58 to column 2, line 3, it says, "Data that is

2   to be distributed from the media storage system will be

3   referred to herein as content."  And then it -- and then

4   later -- it does have some expansive language in that

5   sentence, but then later on, that portion of the patent goes

6   on to say, "for purposes of the present invention, 'content'

7   means files or parts of files or equivalents thereof that are

8   stored on a server," et cetera.

9        I mean, so the -- isn't is the patentee acting as his

10   own -- is your client a man?  I want to use the right pronoun.

11   It was the wrong way of asking that question.  What pronoun

12   does your client use?

13        **MR. RAMEY:**  I would say he uses -- I've never asked

14   him that.  But he's a man, I want to say.  He -- Mr. Valjakka.

15        **THE COURT:**  You're using "he" so I'm going to take my

16   cue from you.

17        So he has acted as his own lexicographer here, hasn't he?

18   I mean, he's defined -- it's sort of a transit of property.  A

19   is to B as B is to C.  So he says this is what "data" means,

20   it means content.  And here's what "content" means.  And he's

21   got some specific language.  Isn't that what "data" means for

22   the purposes of this patent?

23        **MR. RAMEY:**  I think you could read it broader, and I

24   think that's what we were trying to do through the entire

25   specification.  We weren't trying to limit it down.

```
 1          But I think being -- if you -- I guess what -- what we're

 2    saying is that the definition that I read to the Court,

 3    data -- the content isn't limited.  The content can be any

 4    form of data.

 5          So -- so the last sentence that I didn't read to you was

 6    that content would generally comprise a data file of some

 7    type.  So that's where it takes that -- the definition of --

 8    what the -- the detention of content and blows it back up to

 9    being as big as it could be.  And so then it wraps what data

10    is into what content is.  So it could be any type of data

11    could be in the content.

12              THE COURT:  Interesting.

13              MR. RAMEY:  It's -- it's --

14              THE COURT:  Can you -- can you and I agree that taken

15    to its farthest extreme, the word "data" is a word of almost

16    unimaginable breadth?

17              MR. RAMEY:  I can, yes, Your Honor.  Yes, Your Honor.

18              THE COURT:  Okay.

19              MR. RAMEY:  And I think that's what we were trying to

20    get to.

21          And then I guess the last point that I really wanted to

22    make on -- on this point, Your Honor, was that Netflix puts

23    forward a fairly broad definition except they try to cut off

24    streaming content, and of course that's a -- we think

25    improper.
```

1    Because if you go to our patent, what you'll really -- one

2    of ordinary -- digital broadcast media is for live on-air

3    performances such as radio and Internet radio as one skilled

4    in the art would know.

5    And we describe digital broadcast media in which a data

6    stream is transmitted by a broadcast server and is temporarily

7    buffered by clients in some cases, by innervating relay units.

8    And that's at the '167 patent, column 2, lines 1 through 3.

9    So we don't see -- in addressing Netflix's argument, we

10   don't see streaming content being outside the scope of the

11   term "data."

12   It's true there's not an explicit definition in the patent

13   for digital broadcast media, but it's something that was

14   understood in the art.

15   And we did include a prior patent in submission of its

16   application to the USPTO, the '810 patent, and that's -- it's

17   attached at Exhibit A, and that specifically defines what

18   digital broadcast media is.

19   **THE COURT:**  So the portion of the patent I was

20   pointing to a moment ago at the bottom of column 1 going up

21   onto top of column 2 --

22   **MR. RAMEY:**  Yes Your Honor.

23   **THE COURT:**  -- does contain the phrase "as distinct

24   from digital broadcast media," and then it continues.

25   What do you think the purpose of the phrase "as distinct

1    from" is in that part of the patent?

2            **MR. RAMEY:**  Yes, Your Honor.  I think we were

3    100 percent saying we don't cover on-air Internet radio.

4            **THE COURT:**  Um-hmm.

5            **MR. RAMEY:**  And I think that was --

6                        (Simultaneous colloquy.)

7            **THE COURT:**  I have not looked -- I have not looked to

8    see.  So I apologize if I should already know the answer to

9    this question.  Is the term "broadcast server" defined

10   anywhere in the patent?  Do you know?

11           **MR. RAMEY:**  Your Honor, I apologize.  I can try to

12   find that out real quick.

13           **THE COURT:**  Oh, no.  I can go on Google patents and I

14   can find it if you don't know.  I'll do it while we're

15   talking.

16           **MR. RAMEY:**  I'm sure that it's -- it's talked about,

17   I guess, you know.  But broadcast server -- broadcast server

18   is what you said, right, Your Honor?  I'm sorry.

19           **THE COURT:**  I did.

20           **MR. RAMEY:**  Yeah.

21           **THE COURT:**  That's fine.  If you don't know, you

22   don't know.

23       Please, though, finish your argument about this claim

24   term.

25           **MR. RAMEY:**  Yeah.  So that's why we think that

1    Netflix proposed terms -- or proposed construction should be

2    rejected, the plain and ordinary meaning be allocated based on

3    the argument that I just made.

4        We definitely think that it -- you know, we -- there can

5    an exclusion for what the Court just said as it seemed to, you

6    know, digital -- I mean, sorry -- live on-air performances

7    such as Internet radio.  But that's -- that's our point, Your

8    Honor.

9        **THE COURT:**  All right.  Very good.  Thanks.

10       Mr. Moore.

11       **MR. MOORE:**  Thank you, Your Honor.  Let me just pull

12   up the slides.

13                   (Demonstrative published.)

14       **MR. MOORE:**  So for the term "data," Your Honor,

15   Netflix's construction simply is in line with the definition

16   provided by the patentee within the specification.

17       As Mr. Valjakka put forth in its brief, when a patentee

18   acts as its own lexicographer, that definition should control

19   and that is the case here.

20                   (Demonstrative published.)

21       **MR. MOORE:**  In contrast to what Mr. Ramey has

22   suggested, Netflix's construction is not limiting what --

23       **THE COURT:**  Now, the term -- the term "streaming

24   content," exactly that phrase, that doesn't appear anywhere in

25   this patent, does it?

```
 1              MR. MOORE:  It does not, but it was an attempt to --

 2              THE COURT:  Isn't it -- isn't that language broader

 3    than the language that I read to Mr. Ramey?  Which I --

 4                        (Simultaneous colloquy.)

 5              THE COURT:  -- assume is not the source of that

 6    phrase.  You think it's not.

 7              MR. MOORE:  It's not, Your Honor.  Because that first

 8    part -- let me just go back to the construction.

 9                        (Demonstrative published.)

10              MR. MOORE:  That first part of the construction

11    already distinguishes it from streaming content because we are

12    talking about files that are stored, then subsequently used

13    after retrieval.  Whereas when you're streaming content, you

14    are not waiting for like a full file download to complete, you

15    are getting content on like a first-come-first-serve basis and

16    using that content at that time --

17              THE COURT:  Right.

18              MR. MOORE:  -- rather than waiting for a full file

19    download to continue --

20                        (Simultaneous colloquy.)

21              THE COURT:  This goes back to that "stored for

22    subsequent use" language in the patent.

23              MR. MOORE:  Exactly, Your Honor.

24              THE COURT:  Yeah.  Okay.

25              MR. MOORE:  And so adding the "as distinct from
```

1    streaming content" was simply a way to kind of clarify what

2    this first portion of the construction has captured and also

3    referenced the --

4                        (Demonstrative published.)

5        **MR. MOORE:**  -- the discussion of digital broadcast

6    media and data streams that are broadcast which the

7    specification does talk about.

8        **THE COURT:**  All right.

9        If I go your way, I have to say I'm probably likely just

10   to import the language, the exact language from the patent

11   because I don't know what the difference is.  I don't know

12   what the potential differences are between your simplified

13   phrase and the longer phrase in the patent, and I would worry

14   that closing argument would roll around in my trial and that's

15   the point when I would find out what the differences were and

16   I might regret my construction.

17       So but I take your point that it's potentially not an

18   unfair characterization of this language just to call it

19   streaming content.

20       **MR. MOORE:**  Thank you, Your Honor.  And Netflix is

21   amenable to that.  I think we were attempting to simplify the

22   construction to avoid it being too wordy or unwieldy.

23       But there -- there's nothing else on Netflix's side, Your

24   Honor.

25       **THE COURT:**  All right.

1    Let's turn to -- well, I have my notes in a certain order,

2    but you may have your terms in a different order.  So let's go

3    to the next term.

4        Mr. Ramey, your microphone is muted.

5        **MR. RAMEY:**  So we simply proceeded down the -- in the

6    order that I had it -- the plaintiff had it briefed in its

7    opening brief.  So the next term was:  Obtaining is based at

8    least in part on the first digital rights management key.

9        And this one, we -- we again said this should be plain and

10   ordinary meaning simply because none of the terms in there

11   need to be construed and no one has accused of them being

12   ambiguous.  And we haven't defined any of those terms

13   anywhere.  And we don't see why they need to have a special

14   construction on them.

15       We -- we take from reading Netflix's response that they

16   say they had to perform in a certain manner.  But typically,

17   method steps, unless there's clearly distinct that one step

18   has to perform before another, don't have to be performed in

19   any certain order and they can just be performed as they --

20       **THE COURT:**  Right.

21       **MR. RAMEY:**  -- go down unless there's a distinct --

22   and so that's -- that's simply --

23       **THE COURT:**  I think -- let's get to that.  Do we need

24   to have --

25       **MR. RAMEY:**  Okay.  I'm fine.

```
 1            THE COURT:  -- method steps at a later point.

 2        I think you're likely to win this point in the sense that

 3    the Court is likely to hold that there's no construction

 4    necessary of this term.

 5            MR. RAMEY:  With that I'm going to mute myself.

 6            THE COURT:  Yeah, you could probably take a knee on

 7    this one and I could just hear from Mr. Moore.

 8        Mr. Moore?

 9            MR. MOORE:  My colleague, Ms. Piepmeier, will

10    actually be taking this one, Your Honor.

11            THE COURT:  Oh, great.  As soon as the tentative goes

12    the other way, Piepmeier gets called onto the field.

13        Ms. Piepmeier, your microphone also is muted.

14                    (Demonstrative published.)

15            MS. PIEPMEIER:  Thank you, Your Honor.

16        I do love a challenge, and especially a low-risk challenge

17    since it can't get any worse than -- than losing.

18        So let me focus just on "obtaining" and then we can go to

19    the other arguments later.

20                    (Demonstrative published.)

21            MS. PIEPMEIER:  Your Honor, the -- the issue here is

22    the phrase "obtaining is based at least in part on the first

23    digital rights management key."

24        And Mr. Ramey just commented that he didn't hear us

25    arguing that there was any ambiguity.  In fact ambiguity is
```

1    the heart of this argument.

2         The issue, Your Honor, and I've got up on Slide 18 on the

3    screen the first three elements of claim 10 which is the sole

4    independent asserted claim of the '102 patent.  And I haven't

5    put the whole claim on the slide simply because it's too long

6    and I want to be able to focus on what we think is the core

7    ambiguity here.

8         So the issue, Your Honor, is that the words "be obtaining"

9    in the second half of element C of claim 10 doesn't have an

10   antecedent basis.  And there's no dispute about that.  It's

11   not clear what "be obtaining" refers to here.

12        You have two prior elements that begin with the word

13   "obtaining."  And then you have the beginning of element C

14   which begins with "deriving."  And so what does "be obtaining"

15   refer to here?

16        Because we have an antecedent basis without a clear

17   reference, it is indefinite if we can't figure out what it

18   refers to.

19        So we have identified -- and by "we," I mean collectively

20   we, Your Honor -- have identified two different options that

21   it could be referring to.  The phrase could be referring to

22   the element A:  Obtaining an access-restricted content from at

23   least one of a content database in a content providing server.

24        Alternatively, it could be based on the first half of

25   element C.  Unfortunately that begins with the word

1   "deriving," not "obtaining," and so that's not a clear

2   reference.

3          **THE COURT:**  Although the Merriam-Webster online

4   dictionary gives "obtain" as one of its definitions of the

5   word "derive."

6          **MS. PIEPMEIER:**  Your Honor, and I think that's

7   precisely the ambiguity here, is that it could be referring to

8   that.  It could also be referring to the first "obtaining" in

9   the -- in the claim element.

10      The reason it can't be referring to the second

11  "obtaining," I believe, is that the "obtaining" we're talking

12  about -- I'm sorry there's so many "obtainings."  There's

13  almost as many "obtainings" as there are "access-restricted

14  contents" in this claim.  So it get a little confusing.

15      But the reason we don't think it refers to element B and

16  we haven't listed that as a third option is because it would

17  be duplicative of the digital rights management key.  You're

18  actually obtaining that key in element B.

19      So let me say -- let me go on to the next slide and

20  explain to Your Honor why I believe that we collectively

21  believe there's an ambiguity here, why it's not just Netflix

22  pointing that out.

23      So I've put on the left hand of Slide 19 the same claim

24  elements we were just looking at.

25                    (Demonstrative published.)

1          **MS. PIEPMEIER:**  In plaintiff's reply brief on page 4,

2   plaintiff states with regard to this section of the brief,

3   with regard to this specific argument:  Here the claimed

4   method step has an antecedent basis of obtaining an

5   access-restrictive content from at least one of a content

6   database in a content providing server.

7          That is element A.

8          So in its responsive brief at page 4, plaintiff says that

9   "be obtaining" refers to column 2, element A.

10          In its opening brief, however, about a month earlier,

11   plaintiff told us on page 8, again in regard to the same

12   argument:  Thus it is apparent that the claim feature refers

13   to the fingerprint of the access-restricted content obtained

14   by the derivation from the first digital rights management

15   key.

16          So, Your Honor, plaintiff itself -- himself, theirselves,

17   does not appear to agree with what "be obtaining" refers to,

18   and that is the heart of the ambiguity that we have here

19   because of the lack of antecedent basis.

20          And for that reason, Your Honor, we believe this term

21   should be -- should be rendered indefinite.

22          **THE COURT:**  Thank you.

23          **MS. PIEPMEIER:**  I will note, Your Honor, to -- to

24   your -- I'm sorry to interrupt.  Did Your Honor have a

25   question?

 1          **THE COURT:**  No.

 2          **MS. PIEPMEIER:**  I will note to your point about the

 3     Merriam-Webster online dictionary, that claim 1 has a slightly

 4     differently phrasing for this element and uses the word

 5     "obtain" and "obtaining" as opposed to "derive" and

 6     "obtaining."

 7          That is one reason why it could be element C, but again it

 8     could also be element A because that is actually an

 9     "obtaining" and it works within the language of the claim.

10          So here we have a situation where there is no clear

11     answer.

12          And I would also note, Your Honor, that the case law that

13     plaintiff has cited is completely not on point here.  I don't

14     think plaintiff raised it, but if Your Honor had any questions

15     about that, I'd be happy to answer them.

16          **THE COURT:**  I don't.  Thanks.

17          **MS. PIEPMEIER:**  Thank you, Your Honor.

18          **THE COURT:**  All right.  Mr. Ramey.

19          **MR. RAMEY:**  Yes, Your Honor.  Just one second.  Where

20     did it go?  Where'd it go?

21                    (Demonstrative published.)

22          **MR. RAMEY:**  So okay.  Going back to now, Your Honor,

23     the -- the next term, the "digital rights management" header.

24          It is a term that's not explicitly defined in the claim

25     and it does lack antecedent basis.  But here we would say that

1    it's not indefinite because it's that one of ordinary skill in

2    the art would understand from the -- the number of times that

3    it was used in the specification and the way that it's used in

4    the claim what the digital rights header is and it's not

5    rendered indefinite.

6        I mean there really -- antecedent basis is a patent

7    drafting rule that requires certain things get patent -- at

8    the patent office.  It's not uncommon that one slip through

9    the drafting process that have slightly mismatched antecedent

10   basis issues.  And this is one of them.

11       And, you know, but we think one of ordinary skill in the

12   art would understand what the term means from the disclosure

13   of the specification in the patents.

14       And it's that -- it's that simple as I can get on it, Your

15   Honor.

16           **THE COURT:**  All right.  Thanks.

17       Mr. Moore?

18           **MR. MOORE:**  Ms. Piepmeier will actually also be

19   handling this one.

20           **THE COURT:**  Ms. Piepmeier.

21               (Demonstrative published.)

22           **MS. PIEPMEIER:**  Thank you, Your Honor.

23       I will be handling, just for convenience, the rest of the

24   terms on the '102 patent.

25       I don't think I'm smart enough to understand the '167, so

1    Mr. Moore will handle that one for us.

2        Let me turn to "digital rights management" header and the

3    ambiguity that we're finding as a result of the lack of

4    antecedent basis.

5        Just so Your Honor has it in context, the way the claim

6    term appears in the claim is in the middle of this same

7    deriving -- I'm sorry -- in the middle of the second deriving

8    clause in claim 10.  So it's deriving using the Digital Rights

9    Management header.

10       So what is the Digital Rights Management header, we ask.

11       If you look at claim -- I'm sorry -- it's slide 24, the

12   specification tells us in column 7 that it could be one of two

13   things.  It could a header associated with a user identifier,

14   or it could be a header associated with the content

15   identifier.

16       And unfortunately nothing in the claim language tells us

17   which this is.  It doesn't tell us which header or what type

18   of header we're talking about here.  We just know that there

19   is a header.  We don't know anything about what that header

20   is.

21       So the specification doesn't resolve the ambiguity for us.

22   The claim language itself does not resolve the ambiguity for

23   us.

24                   (Demonstrative published.)

25            **MS. PIEPMEIER:**  And, in fact, we have a similar issue

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1    where plaintiff seems confused as well about what this DRM

2    header is.  In plaintiff's opening brief at pages 10 to 11,

3    again discussing this claim term, plaintiff tells us that it

4    must be a header associated with a user identifier.

5        Approximately a month later in their responsive brief,

6    Your Honor, at page 4, again on this same claim term,

7    plaintiff states:  Additionally claim 10 itself clarifies

8    which header the claim is referring to, the content header.

9        So we have an issue here, Your Honor, again where there is

10   a clear ambiguity that plaintiff itself doesn't resolve.  The

11   claim doesn't resolve it, the specification doesn't resolve

12   it, and plaintiff can't tell us which it is.

13       And so for those reasons, Your Honor, we don't -- the DRM

14   header is not something that is identified in the claim, it

15   lacks an antecedent basis, and it should be indefinite.

16       I did, Your Honor, very briefly want to refer to the --

17   the case that plaintiff cites because it was in the slides

18   that you just saw.  Plaintiff cited the *Bose* case, Your Honor.

19   And I just want to specify why that case is not on point here.

20       The -- claim term at issue in the *Bose* case was "major

21   diameter of said ellipse."  And the Court ruled that it was

22   inherent that every ellipse had a major diameter, and so the

23   words "an ellipse" was the antecedent basis of "major diameter

24   of said ellipse."

25       That's completely different than the situation here.  We

1    don't have a referent up above in the claim talking about a

2    DRM header.  We don't have an inherency issue or anything like

3    that.

4        And so, Your Honor, I don't believe that they can resolve

5    this in their briefing, that the claim resolves it, that the

6    specification resolves it, or that their cited case law

7    resolves the ambiguity.

8        And for that reason, Your Honor, we believe it should be

9    rendered indefinite.

10           **THE COURT:**  Thanks.

11          **MR. RAMEY:**  Your Honor, if I might, may I go back and

12    make one more argument on the past digital rights management

13    header?

14           **THE COURT:**  Sure.  We have tons of time.

15          **MR. RAMEY:**  Okay.  Perfect.

16            (Demonstrative published.)

17          **MR. RAMEY:**  The -- regardless of plaintiff's briefing

18    in either their opening brief or the reply, the claim language

19    itself of the '102 patent, column 14, lines 17 through 20,

20    specifies that -- further specifies it, for -- going not to

21    the plain and ordinary meaning, that it's the content, you

22    know, that the deriving using the digital rights management

23    header of the access-restricted content from the

24    access-restricted content is second and third digital rights

25    management key.

1     So if we didn't want to limit the claim in any way or

2     limit the term in any way, we would limit it to what the claim

3     specifies it has to be.

4     And with that I'll go on to the next term if you're okay

5     with that, Your Honor.

6           **THE COURT:**  That's fine.

7                 (Demonstrative published.)

8           **MR. RAMEY:**  There it goes.  Okay.

9     So we talked about -- here the requiring a particular step

10    order again, this -- this sort of goes back to our same term

11    before that how the DRM keys -- this is just basic steps for

12    how the different orders -- how the different elements are

13    performed within claim 10 and 11.

14    And our point is that here there shouldn't be any specific

15    order because if you go down to and look at, for instance, how

16    the second, third digital rights key are -- are derived, the

17    claim term itself in that -- in that language says deriving

18    using the digital rights management header of the

19    access-restricted content, what I just read from, from the

20    access-restricted content a second and third digital rights

21    management key.

22    So these are derived after the previous -- after the first

23    parts of the step are performed.  So we don't think that you

24    have to perform the steps of -- of accessing -- pardon me --

25    the access steps every time you pass through that -- that

1  obtaining step, every time you pass through the method.

2      It's just so it -- the claim language itself again

3  specifies exactly how those different DRM keys are obtained

4  and when the fingerprint is validated, and the remainder we

5  don't have to repeat every one of those steps each time.

6      Thank you, Your Honor.

7          **THE COURT:**  Give me just a moment, please.

8          **MR. RAMEY:**  Yes, Your Honor.

9                  (Pause in the proceedings.)

10         **THE COURT:**  Well, besides the arguments contained in

11  the briefs, it just occurs to me that how can the steps not be

12  required to be in order if two of the three management keys

13  are referred to as the second and third keys?  I mean how is

14  that possible?  I'm sure this is a dumb question that I'm

15  asking you because it is so simple and it is child-like

16  almost.

17      But how can you have something be the second of anything

18  if the first has not already come into being?

19          **MR. RAMEY:**  I think that's --

20          **THE COURT:**  Let's say you come to my house for

21  coffee.  And I walk in and we've not spoken yet.  You have

22  been offered nothing to eat or drink.  And I say, "Mr. Ramey,

23  here is a glass of water and your second orange."  How could

24  it be your second orange?  You haven't gotten a first orange.

25      So I'm sure I'm missing something.  And again, if the

```
1    question is as dumb as I suspect it is, I apologize.

2         Go ahead and tell me why this comes out your way.

3         MR. RAMEY:  No.  I think -- I think maybe we're --

4    we're saying the same things, obtaining -- if you go to the

5    claim language itself, it's obtaining a first digital rights

6    management key from a content database, right?  Wherein --

7         THE COURT:  Right.

8         MR. RAMEY:  -- the words "obtaining" is basically in

9    part on a clarity, the clarity comprises a blah-blah-blah, and

10   then deriving using the first --

11        THE COURT:  Mr. Ramey?  Mr. Ramey, you have to slow

12   down or the court reporter -- or your portion of the

13   transcript will be illegible, which I know you don't want.

14        MR. RAMEY:  Deriving using the first digital rights

15   management key from the access-restricted content a

16   fingerprint of the access-restricted content.

17        Then we go down:  Causing the content providing server to

18   validate the fingerprint.

19        Then we go down further to the next one:  Information

20   describing encryption properties of the access-restricted

21   content.

22        Then we go down to the deriving using the DMR key header,

23   the access-restricted content, the second and third digital

24   rights management key.  So it does flow down in a steps like

25   this, but you don't need to redo the fingerprint each time, I
```

```
 1    think it is what we're saying.  We're -- we're going down --
 2            THE COURT:  Yes.  Okay.  I think I apprehend your
 3    point.
 4        Your point --
 5            MR. RAMEY:  We have --
 6                     (Simultaneous colloquy.)
 7            THE COURT:  Your point is that you agree that there
 8    does need to be a first digital rights management key first,
 9    and that subsequent to that, there could be a second and third
10    digital rights management key.  But your point is if there are
11    later keys, you don't need to go back and start from the
12    beginning and have another first one; is that your point?
13            MR. RAMEY:  Yes, Your Honor.  Because we don't need
14    to do the -- the validation the same way, correct.
15            THE COURT:  Well, then we're going to stay with
16    single-digit ordinals, if that's the right word.  I think in
17    your construction, you are referring to a third and a fourth
18    and then a fifth and a sixth and then a seventh and an eighth
19    digital rights management key.
20        Because it's not that we have to do the first step again.
21    The first step has already occurred.  I agree with you that
22    the patent suggests that first step only needs to occur once.
23        But as I hear what you're saying, as it pertains to the
24    second and third digital rights management keys in claim 10,
25    those keys cannot be created until the first digital rights
```

1    management key described at the beginning of the claim.

2       Is that wrong?

3          **MR. RAMEY:**  That was a whole -- pardon me, just one

4    second, Your Honor.  Let me think about that.

5       No, Your Honor, I do not think that's incorrect.

6          **THE COURT:**  All right.

7       Ms. Piepmeier, you might want to take a knee on this one.

8          **MS. PIEPMEIER:**  I'll give it my best shot, Your

9    Honor.  And then I -- and then I can --

10         **THE COURT:**  Well, let me -- before you do, I want to

11   read you something.

12         **MS. PIEPMEIER:**  Please.

13             (Demonstrative published.)

14         **THE COURT:**  What if the Court's construction of this

15   term were:  "The DRM keys must be obtained or derived before

16   restricted content is obtained.  Further, the first DRM key

17   must be obtained and fingerprint validated before the second

18   and third DRM keys are derived." What if that were --

19         **MS. PIEPMEIER:**  Your Honor.

20         **THE COURT:**  What if that were the Court's tentative?

21         **MS. PIEPMEIER:**  Your Honor, if that's the Court's

22   tentative, I don't think you need to hear anything more from

23   me.  But if there's anything that you'd like me to address --

24         **THE COURT:**  No.

25         **MS. PIEPMEIER:**  -- I'd be happy to.

```
 1            THE COURT:  I don't think I need further argument on

 2    the point.  I think your opponent has mostly conceded the

 3    point.  And anyway that's where I was before the hearing

 4    started so that's unlikely to change.

 5        Let's go on to the next one.

 6            MS. PIEPMEIER:  Thank you, Your Honor.

 7            THE COURT:  Fingerprint.

 8        Mr. Ramey, your microphone is muted.

 9                        (Demonstrative published.)

10            MR. RAMEY:  So to fingerprint, Your Honor, thank you

11    very much.  If this -- you know, "fingerprint" is a well

12    understood and very common term that we all know and we don't

13    think it needs any construction, any at all beyond the plain

14    and ordinary meaning.

15        Here, this is not used in a -- in a complex manner.  And

16    when you put in defendant's words, you know, the bitstream

17    derived are computed directly for the content that uniquely

18    represents the content, that seems to me to be more than a

19    fingerprint might need to be.  And I just don't think that

20    one -- that one needs to change the words of the patentee in

21    this particular case, and the fingerprint is a term that can

22    survive on its own.

23            THE COURT:  All right.

24            MR. RAMEY:  Thank you.

25            THE COURT:  Thanks.
```

1    Ms. Piepmeier.

2        **MS. PIEPMEIER:**  Yes.  Thank you, Your Honor.

3            (Demonstrative published.)

4        **MS. PIEPMEIER:**  First of all, the word "fingerprint"

5    may have a term that everyone understands.  It may not be the

6    same term in the context of this patent as it is when we're

7    talking about, you know, a crime I may have committed where my

8    fingerprint becomes relevant or something like that.

9        The issue here, Your Honor, is that a juror, a lay juror

10   coming to this patent, which admittedly is -- is a little bit

11   dense, is not going to know how one of ordinary skill in the

12   art is going to understand the term "fingerprint."  It is not

13   you know the CSI fingerprint.  It is a fingerprint in

14   computing terms.

15       And what I have not heard from plaintiff is any attempt to

16   explain what that plain and ordinary meaning is.

17       We are not making the argument, Your Honor, that there is

18   a specific construction in the specification.  We're making

19   the argument that we have to tell the jury what a fingerprint

20   is.  And I would submit, Your Honor, that Netflix believes

21   that its proposed construction is consistent with the plain

22   and ordinary meaning.  And if plaintiff could engage with us

23   on any aspects of this, maybe we could have even come to a

24   compromise.

25           **THE COURT:**  Well, let me ask you this.  How strongly

1  do you feel about bitstream, which is a phrase that doesn't

2  appear in the patent?  What if the construction were "the

3  unique representation of the content derived directly from the

4  content"?  Which is pretty close to your proposed

5  construction, it just doesn't have this weird phrase that I

6  can't find anywhere in the patent.

7          **MS. PIEPMEIER:**  Your Honor, that's a fair point.  And

8  I will say that we meant bitstream to be, how do I say this,

9  unoffensive and somewhat vague.  It really is just meaning to

10  indicate 1s and 0s, right?  It's just -- it's some kind of --

11         **THE COURT:**  Yeah.

12         **MS. PIEPMEIER:**  -- input.

13     So I'm not wedded to the term "bitstream" at all.  And we

14  didn't -- we, you know, submit that it wasn't something we

15  pulled from the specification.  It really was just intended to

16  explain the context of what we're talking about here.

17         **THE COURT:**  Yeah.  So but my main question is what if

18  the Court were to construe the term as "a unique

19  representation of" -- I mean, first of all, let me back up.

20     There's no evidence in the record on any of these terms as

21  to what a person of ordinary skill in the art would think.  So

22  it doesn't mean that the court can't ask that question.

23  Sometimes the court is able to apprehend from the

24  specification itself or the claims themselves what a person of

25  ordinary skill in the art would think, but sometimes not.

1    And as to the term "fingerprint," I agree with you.  It's

2  not obvious to a reader of the patent what the term means.  So

3  it does -- I agree it needs some construction.

4    And so the construction I read to you earlier is where I

5  am as of right now, and that is to construe the term as "a

6  unique representation of the content derived directly from the

7  content."

8    And I would just ask what is there, if anything, in the

9  patent that I'm not picking up in that construction?

10    **MS. PIEPMEIER:**  Your Honor, I don't think you're

11  missing anything with that construction.  And if bitstream is

12  the objection, we're happy to jettison it.  It really was not

13  intended in any way to be a limitation or a narrowing.  It was

14  just intended to provide context to the rest of the

15  construction.

16    **THE COURT:**  Right.  Well, I love it when people fight

17  back.  I like to give them the opportunity in case I'm messing

18  up.  I don't want to put something that's a big mess-up in a

19  an order.

20    All right.  Well, I don't think I need further -- then I

21  probably don't need further argument then on that point

22  because that's how it's likely to come out.

23    Mr. --

24    **MR. RAMEY:**  Your Honor?

25    **THE COURT:**  Mr. Ramey, yeah, let me just -- I was

1    going to turn to you anyway.  Let me just say, is there

2    something about that construction that you think does violence

3    to your patent?

4              MR. RAMEY:  No, Your Honor.  But I wonder maybe

5    there's one cite for the patent that might make you -- you

6    said were the unique representation that's derived from the

7    content.

8              THE COURT:  Right.

9              MR. RAMEY:  In the patent at column 10, lines 30 to

10   47 --

11             THE COURT:  Hang on a second.

12             MR. RAMEY:  -- it says --

13             THE COURT:  Hang on.

14             MR. RAMEY:  Yes, Your Honor.  Yes, Your Honor.

15                  (Pause in the proceedings.)

16             THE COURT:  Yes.  Go ahead.

17             MR. RAMEY:  Yes, Your Honor.  It says, "The client

18   may obtain in phase a fingerprint of the content wherein the

19   obtaining may be based at least in part on the DRM key."

20        So I mean to the extent -- that -- that may be more of a

21   definition if you were meaning to say that it was based in

22   part on the content.

23        Here we have -- I mean I'm just thinking -- taking what

24   the Court is saying the construction is.  It's a little -- I

25   mean this is slightly different, I guess.  But --

```
 1            THE COURT:  Is the problem that you think that the
 2   obtaining of the fingerprint from the first DRM key means that
 3   the fingerprint will not have been derived directly from the
 4   content?
 5            MR. RAMEY:  I -- I have that -- I worry about that,
 6   Your Honor, but --
 7            THE COURT:  Well --
 8            MR. RAMEY:  -- I don't.
 9            THE COURT:  -- I'm inviting you to -- I'm inviting
10   you to tell me yes or no.  I mean I've got to tell you, you
11   said you're worried about it.  My question is are you worried
12   about it enough you think it changes the construction?
13            MR. RAMEY:  No, Your Honor.  I think your
14   construction is broader actually so I actually prefer that now
15   that I read it again.
16            THE COURT:  I thought that might be where this wound
17   up.  Okay.
18            MR. RAMEY:  Pardon me, Your Honor.
19            THE COURT:  No, it's good.  We all like word games.
20   That's why I went to law school.  Then we found ourselves
21   construing a patent so you have to do a lot of it.
22         Ms. Piepmeier?
23            MS. PIEPMEIER:  Your Honor, may I offer -- I don't
24   know if this is directly responsive to the colloquy that Your
25   Honor just had with counsel, but I wonder as I look at the
```

1  claim language in claim 10 if it would be clearer if we said

2  Your Honor's proposed construction or tentative construction

3  and instead of using the word "content," we said

4  "access-restricted content" because that is how it appears in

5  that portion of the claim.

6      I don't know if that --

7      **THE COURT:**  I don't think -- I think you're mostly

8  winning.  I don't think Mr. Ramey wants me to limit this

9  construction any further.  I like mine.  I think we're good.

10     I mean, unless -- but, well, I shouldn't cut you off in

11 that way.  If counsel agree on that limitation, then I would

12 adopt it.  I almost always adopt agreements.

13     Mr. Ramey?

14     **MR. RAMEY:**  Your Honor, I would prefer to have your

15 proposed construction.  Your preliminary construction.  Pardon

16 me.

17     **THE COURT:**  It's only 2:54.  What else are we going

18 to do?

19     Ms. Piepmeier, you look as though there's something you'd

20 like to raise with the Court.

21     **MS. PIEPMEIER:**  I was going to see if it would be

22 helpful to put up a couple of portions from the specification

23 where it shows how the fingerprint of the access-restricted

24 content is used, if that's helpful.

25     I say that only because I wonder if down the road we might

 1    have an argument before the jury about whether content is

 2    broader or narrower or whether it's unencrypted or encrypted,

 3    and I wonder if further clarity at this point might be

 4    helpful.

 5             **THE COURT:**  I won't stop you.  I've got a lot of -- I

 6    have a lot of wiggle room on my calendar today.  I will say

 7    with the exception of "bitstream," I adopted your proposed

 8    construction.  That's what just happened.  So I'm -- I'm --

 9                      (Demonstrative published.)

10             **THE COURT:**  It might be tough to move me off that

11    construction, but you're welcome to take a shot.

12             **MS. PIEPMEIER:**  Your Honor, I -- I appreciate that.

13    And I'm saying that mostly in response to the claim language

14    question that counsel raised.  And I just wanted to see if

15    this might end up with further clarity down the line.

16        The specification --

17             **THE COURT:**  My -- so let me ask you a question about

18    these excerpts.  I gather these are embodiments that are in

19    the patent, right?

20             **MS. PIEPMEIER:**  That is correct, Your Honor.

21             **THE COURT:**  So in order to process this argument, I'd

22    have to go back through the patent and make sure that I wasn't

23    importing a limitation from a particular embodiment?  I'd have

24    to be satisfied that there was something about the more

25    general language of patent that made that appropriate?

```
 1            Does that make sense?
 2            MS. PIEPMEIER:  It does, Your Honor.  And I
 3     believe --
 4                      (Demonstrative published.)
 5            MS. PIEPMEIER:  -- that the embodiments that I just
 6     put up --
 7            THE COURT:  Oh, there we go.
 8            MS. PIEPMEIER:   -- from before align directly with
 9     the claim language, which is the question that I was trying to
10     address a moment ago that counsel raised.
11         It says "deriving using the first digital rights
12     management key from the access-restricted content a
13     fingerprint of the access-restricted content."  And so that is
14     element C of claim 10.
15         That is what I was referring to when I wondered if it
16     might be helpful to be a little more precise in this
17     construction.  I hate adding more words.  And I take Your
18     Honor's point that you are, other than "bitstream," adopting
19     our construction.  But I --
20            THE COURT:  Now you're doing the thing I like which
21     is you're fighting back in a way that's -- that's more than
22     plausible.
23         The claim language just says what it says.  And it really
24     does act as a frame on the excerpts of the specification you
25     were showing earlier.
```

1          So, Mr. Ramey, I don't know what I'm going to do about

2     this.  Obviously this argument is being raised for the first

3     time at a hearing because it wasn't contained in the briefs.

4     That's not normally -- I wouldn't normally issue an order

5     based on that.

6          But I do wonder if you want to respond to Ms. Piepmeier's

7     point that the claim language itself from claim 10 indicates

8     that the fingerprint is not derived from just any content but

9     it's derived from access-restricted content.

10          **MR. RAMEY:**  Your Honor, I think that -- that the

11     easiest explanation or the easiest response is that if you

12     were to put in the access-restricted content into the actual

13     construction of "fingerprint," you would render the other

14     terms around "fingerprint" as used in the top green that we're

15     seeing right here, almost superfluous.  It would be

16     "access-restricted" all over the place.

17          And so I just don't -- you know, it's going to take away

18     from clarity.  And the jury is going to understand well enough

19     when you talk about from the access-restricted content of a

20     fingerprint of the access-restricted content rather than from

21     the Court's construction, which I have written down here.

22     That would just be too many "access-restricted contents" in

23     one line.

24          **THE COURT:**  I think to boil your point down to its

25     essence, it is that it would not be possible for the jury to

1    find infringement if there weren't access of some -- if there

2    weren't derivation from access-restricted content because that

3    language is already in the claim.  Is that your point?

4            MR. RAMEY:  In many -- yes, Your Honor, many places.

5        And so the fingerprint specifically specified, that top

6    green box that we're looking at, as being a fingerprint of the

7    access-restricted content already.  So, you know, it's a

8    unique identifier.  It's still of access-restricted content.

9            THE COURT:  Yeah.

10       Ms. Piepmeier.

11           MS. PIEPMEIER:  Your Honor, I think I presaged a

12   letter while ago that there are way too many access-restricted

13   contents in this claim.  So I agree with counsel on that

14   observation.

15       If -- if that is an understanding and that is something

16   we're all on the same page about, I think that's fine.  I just

17   didn't want the construction to be, you know, vague down the

18   line.

19       I think that --

20           THE COURT:  You can put --

21           MS. PIEPMEIER:  -- probably --

22           THE COURT:  You can put what Mr. Ramey just said in

23   your trial notebook.

24           MS. PIEPMEIER:  I -- well --

25           THE COURT:  Because it was pretty clear as a

1    concession on infringement.

2            **MS. PIEPMEIER:**  I would agree with Your Honor.  Thank

3    you.

4            **THE COURT:**  Okay.

5        All right.  Other points folks wish they'd made about

6    anything before we wrap up the hearing?  Mr. Ramey?

7            **MR. RAMEY:**  Nothing from plaintiff, Your Honor.

8            **THE COURT:**  Thanks.

9        Ms. Piepmeier, Mr. Moore?

10           **MS. PIEPMEIER:**  Your Honor, I have one point that I

11   would seek Your Honor's guidance on, and this may not be the

12   appropriate forum.

13       We discussed in the tutorial that plaintiff had not yet

14   filed an amended complaint in response to Your Honor's

15   ordering the dismissal of our willful -- of the willful

16   infringement claims that were brought in the second amended

17   complaint.

18       We have had eight communications with plaintiff's counsel

19   since November 14th regarding that, and they have yet to file

20   it.

21       Your Honor, I'd be delighted to -- to, you know, have a

22   separate CMC to address this issue if that's necessary, but I

23   wanted to seek Your Honor's guidance because we should try to

24   close the pleadings before we go too far.

25           **THE COURT:**  Yeah.

1          **MR. RAMEY:**  My -- my --

2          **THE COURT:**  Mr. Ramey.

3          **MR. RAMEY:**  Yeah.  My understanding was we had sent a

4    draft of a -- of an amended complaint to you.  And I -- I'm

5    not -- if we got that back from y'all, I'm not aware of that.

6    And so that's -- that's all we were waiting for.

7          **MS. PIEPMEIER:**  Mr. Ramey, we responded to you

8    48 hours after you sent it, and then we sent you seven

9    additional emails after that asking for status.

10          **MR. RAMEY:**  Then probably we'll figure out where it

11    is and get it on file.

12          **THE COURT:**  Well, let's do this, because we all have

13    better things to do.

14      It's easy when you've been a judge a long time to have a

15    horrible temperament and sound schoolmarmish and criticize

16    people for organizational mistakes and things like that.

17      I think when judges become like that, they have just spent

18    too many years where they never had enough time.  They had so

19    many things to do on their desk every day and they didn't get

20    to all of them.  It just made them grouchy because they felt

21    that maybe people did not understand the opportunity cost of

22    time.  "Opportunity cost" is a term from economics.

23      Money is just opportunity cost.  If you spend $5 at

24    Starbucks, you can't spend it at Office Depo, you already

25    spent it.  Same thing, time works like that.

1    So if you have a summary judgment motion on your desk and

2    you're trying to decide that and you're preparing for a

3    sentencing, if you have a CMC, that's time you can't spend on

4    the summary judgment motion or the sentencing, you're never

5    going to get it back.

6       But sometimes people just need to have a CMC.  That's all.

7       Here's what we're going to do:  I'll bring my calendar up

8    on another screen.  Today is Monday.  I have a -- looks like

9    kind of a big hearing on Thursday.  Hold on, let me pull that

10    up hearing up, see what it's about.

11                    (Pause in the proceedings.)

12       **THE COURT:**  Oh, I don't think that hearing will take

13    too long.  I could talk to all of you on Thursday morning at

14    10:00 o'clock.  If it turned out that there were either a

15    second amended, if that's the right word, complaint, whatever

16    the number is, on file or a stipulation that resolved --

17    otherwise resolved the parties' dispute, our hearing would be

18    vacated.

19       Otherwise you would tell me why none of that had happened.

20       **MR. RAMEY:**  Your Honor, I'm thinking --

21       **THE COURT:**  And we could figure out what to do.

22    Yeah?

23       **MR. RAMEY:**  I'm thinking it'll be on file this

24    afternoon.

25       **THE COURT:**  Well, that will be good.  But you know

1   what, it's not on file yet.

2           **MR. RAMEY:**  No.  My apologies on --

3                   (Simultaneous colloquy.)

4           **THE COURT:**  No, no, no, no, no.  My question is, are

5   you available Thursday at 10:00 a.m.?  That's the question.

6           **MR. RAMEY:**  Yes, Your Honor.  I'm -- I checked my --

7   I will be here 100 percent.

8           **THE COURT:**  Ms. Piepmeier, Mr. Moore, is either of

9   you available Thursday at 10:00 a.m.?

10          **MS. PIEPMEIER:**  I have a conflict, Your Honor.  I

11  will cancel it if this complaint is not on file and we need to

12  speak with Your Honor.

13          **THE COURT:**  Terrific.

14      Ms. Lee, would you just set a case management conference

15  Thursday at 10:00 a.m. by Zoom in this case.

16          **THE CLERK:**  Yes, sir.

17          **THE COURT:**  And if something is filed that obviates

18  the need for our conference in the meantime, we'll just vacate

19  it.

20          **THE CLERK:**  Yes, sir.

21          **THE COURT:**  Anything further we need to talk about

22  today?

23          **MR. RAMEY:**  Not from plaintiff, Your Honor.

24          **MS. PIEPMEIER:**  Not from Netflix.  Thank you, Your

25  Honor.

1          **THE COURT:**  Thank you.

2      That concludes this hearing.

3          (Proceedings were concluded at 3:03 P.M.)

4                      --o0o--

5

6

7              <u>**CERTIFICATE OF REPORTER**</u>

8

9          I certify that the foregoing is a correct transcript

10     from the record of proceedings in the above-entitled matter.

11     I further certify that I am neither counsel for, related to,

12     nor employed by any of the parties to the action in which this

13     hearing was taken, and further that I am not financially nor

14     otherwise interested in the outcome of the action.

15

16     _____

17         Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

18             Thursday, November 16, 2023

19

20

21

22

23

24

25