1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3     Before The Honorable Jon S. Tigar, District Judge

4

5  VALJAKKA,                    )
                                )
6          Plaintiff,           )
                                )
7  vs.                          )   No. C 22-01490-JST
                                )
8  NETFLIX, INC.,               )
                                )
9          Defendant.           )
   _____)

10
                              Oakland, California
11                            Tuesday, November 28, 2023

12
   TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
13           RECORDING 2:00 - 2:36 = 36 MINUTES

14

15 APPEARANCES:

16 For Plaintiff:
                              Ramey, LLP
17                            5020 Montrose Boulevard
                              Suite 800
18                            Houston, Texas 77006
                       BY:    WILLIAM P. RAMEY, ESQ.
19                            SUSAN S.Q. KALRA, ESQ.

20 For Defendant:
                              Baker Botts, LLP
21                            101 California Street
                              Suite 3200
22                            San Francisco, California
                                 94111
23                     BY:    RACHEL D. LAMKIN, ESQ.

24          (APPEARANCES CONTINUED ON THE NEXT PAGE.)

25

2

1 | APPEARANCES:  (Cont'd.)

2 | For Defendant:

3 |                              Netflix, Inc.
   |                              100 Winchester Circle
   |                              Los Gatos, California 95032
4 |                         BY:  LAURIE CHARRINGTON, ESQ.
   |                              ASA WYNN-GRANT, ESQ.
5 |
   |                              Perkins Coie, LLP
6 |                              505 Howard Street, Suite 1000
   |                              San Francisco, California
7 |                              94117
   |                         BY:  SARAH E. PIEPMEIER, ESQ.
8 |
   | For AiPi, LLC:
9 |
   |                              Whitestone Law
   |                              1850 Towers Crescent Plaza
10|                              Suite 550
   |                              Tysons, Virginia 22182
11|                         BY:  JOSEPH ZITO, ESQ.

12|
   | Transcribed by:              Echo Reporting, Inc.
13|                              Contracted Court Reporter/
   |                              Transcriber
14|                              echoreporting@yahoo.com

15|

16|

17|

18|

19|

20|

21|

22|

23|

24|

25|

3

                    P-R-O-C-E-E-D-I-N-G-S

                         --oOo--

          THE CLERK:  Your Honor, now calling civil matter
22-1490, Lauri Valjakka v. Netflix, Inc.

     If Counsel could please state their appearances for the
record, starting with counsel for Plaintiff.

          MR. RAMEY (via Zoom):  Good afternoon, your Honor.
Bill Ramey for the Plaintiff, Mr. Lauri Valjakka.

          MS. KALRA (via Zoom):  Good afternoon, Susan
Kalra, also with Ramey, LLP, representing the Plaintiff,
Lauri Valjakka.

          MS. LAMKIN (via Zoom):  Good afternoon, your
Honor.  Rachel Lamkin with Baker Botts representing Netflix.
With me today is Laura (sic) Charrington -- Laurie
Charrington and Asa Wynn -- goodness gracious, I'm so
nervous, how do you forget your client's name?  Asa Wynn-
Grant, in-house for Netflix.  Also with me is Sarah
Piepmeier from Perkins Coie.

          THE COURT:  Welcome.

     Ms. Lee, is this being recorded?

          THE CLERK:  Yes, sir, it is being recorded.

          THE COURT:  Very good.  Okay.

     So, this is a case management conference.  In general,
we don't make substantive -- I don't make substantive

4

1   decisions at case management conferences, I mostly use them

2   for scheduling.  I do try though to sometimes anticipate the

3   future and figure out what some likely outcomes or

4   possibilities are in the litigation to guide scheduling and

5   other decisions that we might make.

6       I want to start by just listing the subjects that I

7   want to talk about without discussing any of them in detail,

8   and then asking this group whether there are other topics

9   that you were hoping to discuss, again, without yet

10  discussing any of those topics substantively.

11      We need to talk about scheduling.  Netflix has

12  suggested that the trial be postponed by some number of

13  months.  The Court's probably going to grant that request.

14  As I sit here now, I'm not inclined to sever the CUVTA

15  counterclaim, or otherwise bifurcate the trial.  I'm not a

16  fan of bifurcation, generally.  This isn't a particularly

17  large case and the summary judgment hearing later this week

18  may provide some additional clarity on what will really be

19  at issue.  But anyway, we need to choose another trial date.

20      There is a -- a question has arisen regarding whether

21  the Whitestone Law firm and Mr. Zito have a conflict.  We

22  need to talk about that.

23      Netflix has indicated an intent to strike Valjakka's

24  answer to Netflix's CUVTA counterclaim.  I know I said I

25  wasn't going to talk about substance, but my question is,

5

1  why is the earlier answer even affected?  Under Rule 15 I

2  think they have the ability to file an amended answer as of

3  right, and then did that, and now the old answer is no more.

4  Maybe I -- I haven't even read the motion, so maybe I'm

5  missing the point of the motion.

6       Netflix has talked about compliance with the Court's

7  preliminary injunction order, but there's already an order

8  to show cause on calendar on January 25th.  I don't think we

9  need to do anything about that.

10      They've talked about joinder of AiPi.  That motion is

11 also on calendar for January 25th, 2024, at least according

12 to the cover sheet of the motion.  Assuming that's correct,

13 we don't need to talk about that either.

14      A question has arisen regarding Ms. Kalra's ability to

15 serve as local counsel for purposes of pro hac vice, which

16 if left unresolved will call into question Mr. Ramey's pro

17 hac vice's status.  And I intend not to do much about that

18 today, I'll do a little bit, but mostly just set an hearing

19 on motion for an order to cause as to why the pro hac vice

20 status should not be revoked.  And then the parties can say

21 whatever they want in writing and then I can figure out what

22 to do.

23      I want to talk about ADR.  I'll say more about that

24 when we actually get to it.

25      And, just catching a loose thread, I wonder what

6

1  happened with the IPR, whether there was a decision to

2  institute earlier this year.  I just sort of stopped paying

3  attention to that and now I'm remembering that I wonder.

4      Anyway, in a sort of rambling fashion, those are my

5  topics; Mr. Ramey, do you have anything to add to that list?

6          MR. RAMEY:  (Inaudible response.)

7          THE COURT:  Mr. Ramey, your microphone is muted.

8          MR. RAMEY:  No, your Honor, I think that pretty

9  much covers it.  I think our admitted answer we put on the

10 docket has all of the information we needed to put before

11 the Court.

12         THE COURT:  Okay.  Ms. Lamkin, is there anything

13 else on your list?

14         MS. LAMKIN:  No, your Honor, that's thorough.

15         THE COURT:  Mr. Zito, you're here today on behalf

16 of AiPi; is that true?

17         MR. ZITO (via Zoom):  That's correct, your Honor.

18         THE COURT:  Do you have anything to add to that

19 list?

20         MR. ZITO:  No, your Honor.

21         THE COURT:  Okay.  Well I didn't put these things

22 in any particular order in my notes, so I'll just attack

23 them haphazardly.

24      Let's take a piece of low-hanging fruit first.  What is

25 the status of the inter partes review requests?

7

1        MR. RAMEY:  Your Honor, this -- if I may take that

2  for the Plaintiff?  The matter was instituted.  The hearing

3  is April, and I don't have the exact date in front of me,

4  but it is April of 2024.

5        MS. PIEPMEIER:  Your Honor --

6        MR. RAMEY:  And then the -- I'm sorry, Sarah.

7        THE COURT:  Mr. Ramey, why don't you finish and

8  then I'll hear from Ms. Piepmeier.

9        MR. RAMEY:  And that -- that hearing -- with a

10  written decision would issue from that -- soon after that,

11  or the final written decision would come in April.  My

12  apologies.  The final written decision.

13        THE COURT:  Okay.  Ms. Piepmeier.  Am I saying

14  your name correctly?  Is it Pip or Piep?

15        MS. PIEPMEIER:  It's Piepmeier.  It's one of those

16  German ones where the second vowel is what determines the

17  pronunciation.  Thank you, your Honor.  And I apologize, Mr.

18  Ramey, I didn't mean to speak over you.  I thought you were

19  done.  I certainly didn't mean to interrupt you.

20     I think you may have clarified it, but my understanding

21  is that the oral hearing, the trial in the PTAB is actually

22  within the next two months and then the final written

23  decision, as you said, will issue in April.

24        THE COURT:  Okay.  So that's -- so that happened.

25  I should put that in my notes and I will.  But no one made a

8

1  motion for a stay, so it's just happening out there in the

2  universe.

3      Am I -- let's take next the question of Netflix's

4  motion -- the intended motion to strike Valjakka's answer to

5  Netflix's CUVTA counterclaim.  What would the basis of that

6  motion be if it's filed?

7          MS. LAMKIN:  Your Honor, you correctly note that

8  they filed an amended answer, which obviates the first one.

9  The amended answer is still, frankly, in adequate.  However,

10  Netflix, as the Court knows, intends to join AiPi and assert

11  counterclaims against AiPi.  So we can wait until the Court

12  decides that issue and then wrap all of it up with an

13  amended counterclaim that includes AiPi.  And then both Mr.

14  Valjakka and AiPi could respond to that amended

15  counterclaim, or set of counterclaims.  Just for judicial

16  efficiency.

17          THE COURT:  Well these are decisions Netflix can

18  make.  I'm just going to write in my notes, "Currently not

19  intending to file," so I don't have to worry about that

20  motion at the moment coming down the pike.

21      Mr. Ramey, I indicated a moment ago I was not inclined

22  to bifurcate the CUVTA and infringement issues, but that's a

23  tentative conclusion on my part.  Do you want to be heard?

24          MR. RAMEY:  Yes -- yes, your Honor, if I may?

25  Briefly, just as a matter of this CMC, Mr. Valjakka believes

9

1  there's always an issue of inequitable conduct that's --
2  that's part of an infringement case.  The defendant is
3  always allowed to raise inequitable conduct issues.  The
4  CUVTA issue though, as we've send in our brief, requires a
5  whole bunch of different things to occur.  There has to, as
6  we've said, be a prevailing party.  And then there has to be
7  a motion under 285 that has to then be considered by the
8  Court, both parties can respond.

9      So we're talking about a protracted briefing process,
10  even if Netflix were to declare to, at some point, to be a
11  prevailing party.  And that's why we don't think it's
12  appropriate to try to the CUVTA issues along with the
13  primary infringement, which as a defense to that would be,
14  the unclean hands.  And that's the basic argument, your
15  Honor.

16          THE COURT:  You know, it's not crazy.  Your point
17  that there would be -- that it would be difficult -- it
18  would substantively prejudice Valjakka's infringement claims
19  to have been painted with the brush of a CUVTA counterclaim.
20  That's not a -- that's not a crazy point.

21      I think I'll -- I'm not -- I'm not denying anything.
22  There's no motion in front of me, I don't think.  But I'm
23  not going to -- I'm not going to bifurcate on my own motion
24  today.  What I would say to you is, once we have a trial
25  date in place, as that trial approaches, you could file a

10

1  motion to bifurcate.  And, as I say, I don't think -- I

2  don't think those are frivolous arguments.

3          MR. RAMEY:  Thank you, your Honor.  We -- just for

4  the Court's knowledge, we do intend to file a motion to

5  bifurcate.  If we could keep the February 5th trial date, we

6  can get that on file in the next week or so, your Honor.

7  But I did hear the Court say you're --

8          THE COURT:  I don't think we're going to be trying

9  anything on February 5th.

10         MR. RAMEY:  Yes, your Honor.

11         THE COURT:  I don't think that's going to happen.

12    Let's talk about the concerns that Mr. Valjakka has

13  raised, with regard to Mr. Zito's representation of AiPi.

14  Mr. Zito, do you dispute the assertion that you have

15  represented Mr. Valjakka in this proceeding?

16         MR. ZITO:  Yes, I would dispute that we have

17  formally represented Mr. Valjakka in this proceeding.  We

18  thought we'd been asked to, but then we were told not to,

19  long before the CUVTA (sic) -- the joinder issue came about.

20  And we did participate in defending Mr. Valjakka in a

21  deposition.  So we did represent him in the defense of a

22  deposition.  We have not represented him in the -- to the

23  extent of making an appearance in this case.  Okay.

24         THE COURT:  Well the deposition was taken in this

25  case, correct?

1        MR. ZITO:  Correct.  Correct.  And that's why I

2 wanted --

3        THE COURT:  And the deposition -- and the

4 deposition took place on October 12th of this year, true?

5        MR. ZITO:  That's correct.

6        THE COURT:  You were there, right?

7        MR. ZITO:  That's correct.

8        THE COURT:  Kenneth Sheets (phonetic) was there.

9        MR. ZITO:  That's correct.

10        THE COURT:  We Are King (phonetic) was there.  No

11 one from -- no one from Mr. Ramey's firm was there, correct?

12        MR. ZITO:  That's correct.

13        THE COURT:  And you said -- you introduced

14 yourself, you introduced your colleagues from the Whitestone

15 Law firm and you described Mr. Valjakka as your client,

16 correct?

17        MR. ZITO:  That's correct and that's why I wanted

18 to clarify.  We represented him at the deposition in this

19 case, but I wanted to -- because of the pro hac issues, I

20 wanted to clarify, we had not made an appearance formally in

21 the court.  But, yes, we did represent him.  I'm not -- I'm

22 not saying we did not.

23        THE COURT:  Well I'm not -- I don't -- I'm not,

24 today, expressing any view as to whether it's okay to

25 represent Mr. Valjakka at his deposition and also represent

12

1 AiPi.  I don't know enough about the facts, but clearly

2 there -- it seems -- I don't want to say clearly -- it

3 appears to me that there has been simultaneous

4 representation of those entities during the pendency of this

5 litigation, and it appears that you and Mr. Ramey, and

6 potentially Mr. Valjakka, I don't know, may have a dispute

7 of some kind about your ability to continue in one or more

8 of those capacities.

9      Mr. Ramey, you've said in your CMC, your portion of the

10 CMC statement, that you intend to file a motion to

11 disqualify Whitestone Law; is that still your intention?

12           MR. RAMEY:  (Inaudible response.)

13           THE COURT:  Mr. Ramey, you have muted your

14 microphone again.  I can't hear you.

15           MR. RAMEY:  Yes, your Honor.  I have unmuted now

16 and I won't take (sic) it on mute again.  Yes, my client Mr.

17 Valjakka has asked me to file a motion to disqualify the

18 Whitestone Law group, including Mr. Zito.  I've recommended

19 to the client that we get guidance from the Court at the CMC

20 before we did that, and that's the only reason we haven't

21 filed it yet, your Honor.

22           THE COURT:  Well, I don't have any guidance to

23 give you.  If you -- you know, I don't have -- I do

24 sometimes give people a sneak preview, frankly, but I do it

25 incredibly infrequently and never on a matter like a

13

1  conflict issue.  I think it's very important for courts to
2  be careful, very careful, in conflict matters, even more
3  careful than they normally are, not to engage in
4  prejudgment.  So I look forward to learning more.
5      I think what we should do is set a date by which you
6  intend to have that motion on file.  And I think that date
7  should be very soon, because there is already a motion on
8  file to join AiPi as a party, Mr. Zito's client.  So my
9  question to you is, how soon could you get that motion on
10 file?
11         MR. RAMEY:  Yes, your Honor.  I'm looking at the
12 calendar now.  December 12th, your Honor?  Would that be
13 acceptable to the Court?  That's in two weeks.
14         THE COURT:  It's fine with me.  It's fine with me.
15 Does anyone -- well, you can file -- yes, that sounds great.
16 Why don't you file your motion by December 12th and that
17 will just be in the minutes that you're going to do that.
18 If that produces a need on anyone else's part to ask for a
19 scheduling adjustment of some kind, then they'll ask you,
20 and then if they get satisfaction they'll file a stipulation
21 and if they don't, then they'll ask me, I guess.  Today my
22 goal is to get as many things scheduled that are not
23 scheduled as possible.
24     We're marching right through this.  I think the only
25 two things left is this question about pro hac vice and the

14

1  question of ADR.

2      So, on pro hac vice, it has been represented in, I

3  think, more than one application to the Court, Mr. Kalra,

4  that you maintain an office on Twin Dolphin Drive in Redwood

5  City.  My question for you -- and your microphone is muted

6  right now -- my question for you is, do you maintain an

7  office at 303 Twin Dolphin Drive, Suite 600 in Redwood City?

8          MS. KALRA:  I do.  And I have for the better part

9  of three years now, I think, had that particular office

10  address.

11          THE COURT:  I see.  And --

12          MS. KALRA:  Sorry --

13          THE COURT:  What kind of furniture do you have in

14  that office?

15          MS. KALRA:  I have a desk, a chair.  I have a

16  printer that I purchased.  I have all kinds of office

17  accoutrements, monitors and keyboards and paper and --

18          THE COURT:  And so if I wanted -- if I wanted to

19  receive legal advice from you, I could come and physically

20  sit in your office on Twin Dolphin Drive and receive the

21  legal advice there?

22          MS. KALRA:  You could.  You'd have to make an

23  appointment first, because there's a reception desk that

24  kindly keeps people at bey --

25          THE COURT:  Very good.

1          MS. KALRA:   -- without my permission.

2          THE COURT:   And is Suite 600 yours or are there

3    other office holders within Suite 600?

4          MS. KALRA:   There are many office holders within

5    Suite 600, and so the way it works is we rent -- or lease --

6    a particular office space, and you can rent for six months,

7    a year, whatever it is, whatever your lease term is.   I

8    believe our lease is currently scheduled to expire in

9    January and so we're going to need to renegotiate with the

10   landlord for what the next six months to 12 months looks

11   like for occupying that space.

12         THE COURT:   I'd like to place on this record that

13   I engaged in a little ex-parte work.   I typed into the

14   search engine, I typed into the DuckDuckGo search engine 303

15   Twin Dolphin Drive, Suite 600, Redwood City 94065 and

16   according to the web pages of the various entities I'm about

17   to identify, each of them also maintains an office at that

18   address.   A financial planner named Deborah Freeman, who

19   works for a company called -- or is associated with a

20   company called Thrivent.   A criminal defense firm called

21   Nicholson Law Offices.   A company called Accelerance, which

22   ends with C-E, and it provides software outsourcing

23   services, and a North American office, a North American

24   headquarters of the Thai beer called Tsingtao beer.   That's

25   a very interesting collection of office mates that you have.

16

1        MS. KALRA:  Yes.

2        THE COURT:  I take these representations from you,

3   as an officer of the court, even though you're not under

4   oath, and I don't think that I have currently have a basis

5   for issuing an order to show cause with regard to anybody's

6   pro hac vice status, and so I don't intend to do that.  I

7   don't intend to take any -- I currently don't intend to take

8   any further steps with regard to that issue.  Okay.

9        Now, I want to talk about ADR, and this part of the

10  discussion will be a little more rambling.  I know you

11  already talked to Jill Kopeikin, the head of ADR.  I hope

12  that was a productive exercise.  I never know, because of

13  course I don't talk to mediators about what happened in the

14  mediation session.  But, bear with me just a few minutes

15  while I give you some thoughts about where you find

16  yourselves.

17       It might be that after the summary judgment hearing,

18  which is scheduled for two days from now, that the motion is

19  denied and that the infringement claim will move forward.

20  This is an interesting case, because there are claims moving

21  in either direction with fairly significant transaction

22  costs attached to each of them, including in the

23  counterclaim.

24       The value of the case, which I don't need to tell a

25  very very experienced -- or two very very experienced

17

1  defense firms -- the law firm that represents non-practicing
2  entities and a litigation funder, but I'll say it anyway,
3  the value of a case is a reasonably likely plaintiff's
4  verdict, multiplied by the probability the verdict will
5  occur, minus transaction costs for the plaintiff, plus
6  transaction costs for the defendant.  It's a horrible
7  inescapable equation.
8       So, if your claim is worth $1,000,000 and it's a 50/50
9  proposition, meaning there's a 50-percent chance that the
10 jury will find in your favor and a 50-percent chance that
11 they won't, and assuming there's no quarrel about the amount
12 of the damages, even though there usually is, but just to
13 make it simple, well then your claim is worth $500,000.  And
14 the defendant, even though they think they didn't do
15 anything wrong, have a $500,000 problem, because there's a
16 50-percent chance they'll be ordered to pay $500,000.
17      Now, if you're the plaintiff, you think this is very
18 lousy, because actually if I've been harmed in the amount of
19 $1,000,000, $500,000 doesn't seem like a lot of money.  And
20 if you're a defendant it also seems horrible, because you
21 don't think you've done anything wrong.  There's a 50-
22 percent chance the jury will see it otherwise.
23      So people start off in a bad place, but then it gets
24 much worse.  It gets much much worse, because to prosecute
25 the claim, make up a number.  These numbers are cheaper than

18

1  what usually happens in a patent case, but they're easy, so
2  they're good for a hypothetical, but let's say that it would
3  cost $300,000 to prosecute the claim.  Your case is worth
4  $200,000.  Your million-dollar claim is worth $200,000,
5  because you have to pay the three.  That's not contingent.
6  You have to pay the three for a 50-percent chance of getting
7  a million.  The defendant has an $800,000 problem.  It's
8  deafening.  It's suffocating, actually, when you think about
9  it.  And so many people find themselves in this situation
10 and they don't think about it in advance.  You know, it
11 works out.  It also explains why most people settle their
12 cases.

13      So what can a case management judge do?  Not very much
14 really, actually.  You can encourage people, when you get
15 the opportunity, to focus their energies on doing activities
16 that either prepare them for trial directly or provide case
17 value information and steer them away from activities that
18 don't do those things, because those are fruitless
19 transaction costs that create drag.

20      You can try to reduce the amount of transaction costs,
21 because for whatever reason, as transaction costs move up
22 and the value of the -- people learn more about the value of
23 the case, but the value of the case doesn't change because
24 transaction costs make it harder for people to settle,
25 because people become wedded to sunk costs, even though

1 economists would say to you sunk costs are irrelevant, which

2 is not human psychology. But we, actually as you know from

3 you experience with me, we don't wind up talking about a lot

4 of this stuff actually, it's just out there happening.

5     So where might you be very soon? You might be in a

6 world very soon, maybe, we've already said maybe the motion

7 -- summary judgment motion is denied, and then you live in a

8 world of complexity, right, counterclaims, affirmative

9 claims, but if that motion is granted, I wonder what life

10 there is left in this case. I wonder what the point is,

11 really.

12     I thought before I started the conference I was going

13 to be able to say that in a more eloquent way, but that's

14 not what happened. I get it. I think I get it. I think I

15 get what happened. Somebody kicked the wrong bear. My

16 guess is the point has been made.

17     So what I'm saying to you is that, if that summary

18 judgment motion gets granted, I think you can expect to be

19 ordered back to Jill Kopeikin, because I will be -- you can

20 spend your time, all of you, however you want. That's fine.

21 But I'm not -- I think I -- I think at that point I might

22 wonder whether the Court's time is being used productively.

23     You're free to tell me this is too heavy handed,

24 because as I hear myself say that, I think it might be, but

25 I don't have anything more to say on this topic.

20

1      Mr. Ramey, any thoughts about all of this?

2            MR. RAMEY:  No, your Honor.  We hope that you deny

3  the motion for summary judgment on Thursday and we hope you

4  put us with the first -- we have continued to try to resolve

5  this issue with Netflix.  We always have had an open

6  invitation to resolve this.

7            THE COURT:  Thanks, Mr. Ramey.  Ms. Lamkin, any

8  thoughts?

9            MS. LAMKIN:  Only briefly, your Honor.  And,

10 actually, thank you for your time sort of telegraphing how

11 the Court is seeing these issues.

12     I haven't spoken to Netflix, so this would be a

13 personal view, your Honor, so if this personal view doesn't

14 sit well with you, it's not my client's fault.  But in my

15 view, some real wrongs have been done here, including as we

16 see most recently in AiPi's opposition to our motion to

17 join, what is essentially an admission that they've engaged

18 in the unauthorized practice of law.  Again, my client may

19 feel differently, but I think there is some light that needs

20 to be shed on the activities in this case, on the activities

21 of AiPi and possibly the conjoining activities of the Ramey

22 firm and AiPi.  But your point is well taken and this is

23 just a personal note, as an officer of the court, about what

24 I think is important.

25            THE COURT:  Thanks.

21

1    Okay, is there anything that was on our to-do list that

2 we've not done so far?

3        MR. RAMEY:  Yes, your Honor.  You had talked about

4 scheduling possibly for a different trial date that you

5 would --

6        THE COURT:  Oh, yes.  My goodness, almost the main

7 event.  Well, in the range that the parties are talking

8 about, my calendar is pretty clear right now.  Have the

9 parties discussed a potential trial date among themselves?

10        MS. PIEPMEIER:  Your Honor, this is Sarah

11 Piepmeier, if I can address that briefly.  I just want to

12 clarify one thing.  When your Honor says the range that

13 you're talking about, I believe what was in the CMC

14 statement was six months from the time that the joinder

15 motion was decided.

16        THE COURT:  Right.

17        MS. PIEPMEIER:  And I understand that your Honor

18 intends to take that up on January 25th at the hearing

19 that's already scheduled.  So when your Honor says "the

20 range," are you thinking six months after February --

21        THE COURT:  I can't -- people do this all of the

22 time.  Lawyers do this all of the time.  They submit

23 scheduling requests and they say, "And this other thing, the

24 deadline should be 30 days after this other thing that is

25 contingent."  And of course, we can't enter that into a

22

1 calendar.  So my -- what I'm going to do today is, I'm going

2 to give you a trial date and then if we need to move the

3 trial date because there is some motion that you needed me

4 to decide and I didn't decide it yet, or for some other

5 reason, then we'll take that up.  But I -- my goal would be

6 to decide that motion, reasonably promptly after it went on

7 calendar, which statistically is pretty likely.  So, I don't

8 know, we could add 30 days and then six months an then we'd

9 be in late August, something like that.

10          MS. PIEPMEIER:  Thank you, your Honor.  And I

11 probably didn't speak very plainly, which is what I should

12 have done.  When you said, "In that range, my calendar looks

13 open."  I was just trying to figure out what that range is.

14 And I was --

15          THE COURT:  August --

16          MS. PIEPMEIER:  Six months from whatever that may

17 be.

18          THE COURT:  August, September.

19          MS. PIEPMEIER:  Thank you, your Honor.  And, to

20 answer your Honor's question, we have not discussed specific

21 dates with Plaintiff, because their position was that the

22 trial date should not be moved.  But --

23          THE COURT:  How about September 9th, 2024?

24          MS. PIEPMEIER:  Your Honor, that from my

25 perspective, sounds great.  I, obviously, have not spoken to

23

1  Netflix about it and we would want to check with our

2  experts, obviously, but from my perspective, that sounds

3  great.

4         THE COURT:  Using that as a starting point in your

5  discussions, why don't the parties talk about it further and

6  then submit a stipulation, if you can reach one, by December

7  5th, which is in a week.  And if you can't reach one for

8  some reason, explain to me what your competing positions

9  are.

10        MS. PIEPMEIER:  Thank you, your Honor.

11        THE COURT:  And then, you can assume that --

12        MR. RAMEY:  Your Honor?

13        THE COURT:  Just hold on one second.

14        MR. RAMEY:  I'm sorry, your Honor.

15        THE COURT:  You can assume that all of the other

16  deadlines in the case scheduling order will move backward by

17  exactly the same number of days.  And so in determining

18  whether that date is convenient, you should also -- all of

19  you should determine whether the other deadlines, once they

20  have been changed in that manner, are also convenient.

21     Yes, Mr. Ramey?

22        MR. RAMEY:  Your Honor, I'm sorry, I didn't mean

23  to -- to cut you off.  I do have another trial scheduled

24  during that week of September 9th, but I think it's likely

25  stayed.  I was trying to verify that.  I apologize for

24

1  talking, I was trying to verify that as I was talking.

2          THE COURT:  That's fine.  That's fine.  It's not a

3  -- it's not a golf tournament, people can talk while I'm

4  talking, it doesn't throw me off my game.  We can move it

5  back, that's fine.  Do you want to move it to September

6  23rd, just to be on the safe side?

7          MR. RAMEY:  Or even August?  Everybody likes to

8  get out of Houston, Texas in August, your Honor.

9          THE COURT:  Well, why don't you all talk.

10          MR. RAMEY:  September 23rd is fine for us, as

11  well, your Honor.

12          THE COURT:  Oh no, I mean I think you all need to

13  talk anyway, because you need to talk to your experts, as

14  Netflix's counsel said, and you got to -- everybody has got

15  to look at their calendar.  So, late August is fine with me,

16  too.  I don't -- I'm indifferent.  But why don't you all

17  talk and then get something on file in a week and we'll take

18  it from there?

19          MS. PIEPMEIER:  Thank you, your Honor.

20          MR. RAMEY:  Thank you.

21          THE COURT:  Now I think we may have actually run

22  the list.  Mr. Ramey, anything further?

23          MR. RAMEY:  No, your Honor.  Do you want to put a

24  date on the docket for the -- to file the motion to

25  bifurcate?  That probably doesn't need to be worried about

25

1  now, but would some time --

2          THE COURT:  I don't want to -- I don't feel the

3  need to put a date.

4          MR. RAMEY:  Okay.

5          THE COURT:  I -- I'll set a deadline if I need

6  somebody to do something in the case, because it affects

7  other things I'm doing.  A motion to bifurcate you can file

8  at a time that's convenient to you.  I'll tell you, if I

9  were you, I would probably wait until closer to the trial.

10         MR. RAMEY:  Yes, your Honor.

11         THE COURT:  Because it will be clearer as the

12  trial approaches how much time each thing is going to take

13  and what the claims will actually look like and all of that

14  kind of stuff.

15         MR. RAMEY:  Yes, your Honor.

16         THE COURT:  Yeah.

17         MR. RAMEY:  Nothing from Plaintiff, your Honor.

18         THE COURT:  Ms. Lamkin, anything further for

19  today?

20         MS. LAMKIN:  No, your Honor.  Thank you.

21         THE COURT:  Mr. Zito?

22         MR. ZITO:  No, your Honor.

23         THE COURT:  All right.  Thank you, all.

24         MS. KALRA:  Thank you, Judge.

25         MR. RAMEY:  Thank you, your Honor.

26

1        (Proceedings concluded at 2:36 p.m.)

27

<u>CERTIFICATE OF TRANSCRIBER</u>

1
2
3      I certify that the foregoing is a true and correct
4  transcript, to the best of my ability, of the above pages of
5  the official electronic sound recording provided to me by
6  the U.S. District Court, Northern District of California, of
7  the proceedings taken on the date and time previously stated
8  in the above matter.
9      I further certify that I am neither counsel for,
10 related to, nor employed by any of the parties to the action
11 in which this hearing was taken; and, further, that I am not
12 financially nor otherwise interested in the outcome of the
13 action.
14
15
16
17      Echo Reporting, Inc., Transcriber
18          Thursday, November 30, 2023
19
20
21
22
23
24
25