**Pages 1 - 27**

                  UNITED STATES DISTRICT COURT

                  NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jon S. Tigar, Judge

LAURI VALJAKKA,                   )
                                  )
            Plaintiff,            )
                                  )
  VS.                             )        **NO. CV 22-01490-JST**
                                  )
NETFLIX, INC.,                    )
                                  )
            Defendant.            )
_____   )


                        Oakland, California
                        Thursday, November 30, 2023


                 **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

                        RAMEY LLP
                        5020 Montrose Boulevard, Suite 800
                        Houston, TX 77006
                   BY:  **WILLIAM RAMEY, ESQUIRE**
                        **SUSAN KALRA, ESQUIRE**


For Defendant:

                        PERKINS COIE LLP
                        505 Howard Street, Suite 1000
                        San Francisco, CA 94117
                   BY:  **SARAH E. PIEPMEIER, ESQUIRE**

                        PERKINS COIE LLP
                        1201 Third Avenue, Suite 4900
                        Seattle, WA 98101
                   BY:  **JASSIEM MOORE, ESQUIRE**




Reported By:    Pamela Batalo-Hebel, CSR No. 3593, RMR, FCRR
                Official Reporter

| | |
|---|---|
| 1 | **<u>Thursday - November 30, 2023</u>**                    **<u>2:00 p.m.</u>** |
| 2 | **P R O C E E D I N G S** |
| 3 | **---oOo---** |
| 4 | **THE CLERK:**  Your Honor, now calling CV 22-1490-JST, |
| 5 | Lauri Valjakka vs. Netflix, Inc. |
| 6 | If counsel could please state their appearances for the |
| 7 | record, starting with counsel for plaintiff. |
| 8 | **MR. RAMEY:**  Good afternoon, Your Honor.  Bill Ramey |
| 9 | and Susan Kalra for the plaintiff, Mr. Lauri Valjakka. |
| 10 | And, Ms. Lee, I don't see Ms. Kalra on here now. |
| 11 | **THE CLERK:**  I do not see her in the attendees either. |
| 12 | My apologies. |
| 13 | **MR. RAMEY:**  I'm sorry, Ms. Lee. |
| 14 | Your Honor, my apologies.  She will be joining shortly. |
| 15 | She's doing part of this with me. |
| 16 | **THE COURT:**  All right.  Good afternoon. |
| 17 | **MR. RAMEY:**  Thank you, Your Honor. |
| 18 | **MS. PIEPMEIER:**  Good afternoon, Your Honor.  Sarah |
| 19 | Piepmeier from Perkins Coie on behalf of Defendant Netflix.  I |
| 20 | am joined by my colleague, Jassiem Moore.  We will be splitting |
| 21 | the argument today.  And more importantly, by our clients, |
| 22 | Laurie Charrington and Asa Wynn-Grant from Netflix. |
| 23 | Good to see you again, Your Honor. |
| 24 | **THE COURT:**  Very good.  Good afternoon. |
| 25 | The matter is on calendar today for Netflix's motion for |

1    summary judgment.

2        I do have a tentative ruling which is that -- let me go

3    through it in some detail, which is that questions of ownership

4    and assignment are determined by reference to state or foreign

5    jurisdictional law and questions of abandonment and revival are

6    determined under federal law.

7        I need to do a little better job of roadmapping.  There

8    are three issues in the summary judgment -- three issues

9    presented for decision in the summary judgment motion.  One is

10   whether Mr. Valjakka had a statutory or constitutional injury

11   sufficient to confer standing on him, and that's the issue I

12   started to discuss a second ago.

13       The next has to do with misconduct at the PTO.  And the

14   last has to do with whether Netflix's product actually

15   infringes the patent.

16       My tentative ruling is in favor of Netflix on the first

17   issue, and so I don't reach the second two and I don't need

18   argument on those issues today.

19       Turning to the first issue, as I said a moment ago, there

20   are two separate threads here.  One is who owned the rights to

21   the patent at what point in time and was the revival at the PTO

22   effective.  The parties agree that the patent application was

23   abandoned by SBO at some point.

24       So turning to the first point, the Court has to decide

25   that question under Finnish law, and the Finnish courts have

1    already conclusively decided that the utilization agreement was

2    ineffective to give any patent rights to Lauri Valjakka, and so

3    he didn't own the rights to this patent at any time relevant to

4    this litigation, and he, therefore, had no exclusionary rights

5    to assert, and he did not suffer any injury.

6        A question arises from the briefs about how the Court

7    should determine what Finnish law is.  Mr. Valjakka has

8    submitted the written testimony of an expert who has a theory

9    about the Finnish common law, but -- and there are some

10   problems with that theory.  It's never been tested in a Finnish

11   court, for example.

12       But I don't really need to get into that because under

13   principles of international comity, I think the Finnish court's

14   decision is binding on me, and this is not a place for

15   collateral attack on that decision.  If there are criticisms to

16   be made of the Finnish court's decision, the appropriate place

17   to level those criticisms was in the Finnish courts as part of

18   their appellate process, whatever that is, although having said

19   that, this particular decision was affirmed on appeal in

20   Finland.

21       So that's how the question of ownership is resolved, and

22   then we get to the question of abandonment and revival in the

23   USPTO, and that question is decided as a matter of federal law.

24       Mr. Valjakka couldn't revive the patent application at the

25   PTO because it wasn't his application to revive.  SBO had

1    abandoned it.  So for all those reasons, I would find that

2    Mr. Valjakka didn't own any patent rights at any relevant time

3    and grant summary judgment on that basis.

4        Mr. Ramey, in light of that tentative, perhaps I should

5    hear from you first.

6            **MR. RAMEY:**  Thank you, Your Honor.

7        Yes.  Basis of ownership, we assert that -- as we said in

8    our briefing, that Mr. Valjakka was able to establish ownership

9    in two ways, not just through the Finnish common law, as the

10   Court pointed out, that hasn't been tested, but we do have an

11   expert talking about what Finnish law is, but also under U.S.

12   contract law.

13       And I -- and I think that --

14           **THE COURT:**  What is your best authority -- well, two

15   things.  What is your best authority for why United States

16   contract law has any say in the matter?  And, secondly, you

17   appear to have chosen California law, and I'm curious why that

18   is.

19           **MR. RAMEY:**  Yes, Your Honor.

20       We cited in the briefs the case that we said established

21   that it was U.S. contract law that should apply, in particular

22   California law, and we went back to saying that the *Wells* case

23   led us in that direction, and that was 503 F.3d at 738 through

24   9, and then also *DDB Technologies vs. MLB Advanced Media*, 517

25   F.3d 1284, as to why California law should apply.

1          And when we -- when we looked at the -- the way we judged

2     it, Your Honor, we went back and looked at it and we decided

3     that it had to be a determination of what the nunc pro tunc

4     agreement said because that was not addressed by the Finnish

5     court.

6          The Finnish court --

7          **THE COURT:**  You don't -- they may not have spoken to

8     those agreements, but you don't dispute that they had those

9     agreements in front of them, do you?

10          **MR. RAMEY:**  I don't see any evidence in the record

11     that I could find them.  We've searched the record that's in

12     here.  We don't have any record that they are in front of us.

13     And I don't believe I'm finding those in the record.

14          So what we did is we looked at the matter from what did

15     the Finnish court look at, and it looked at the assignments --

16     the November 16th, 2005, asset purchase agreement from e-3

17     Systems to Suomen Biisi Oy, and that's shown on page 6 of

18     Netflix's motion through the assignment history, all those

19     different dates.

20          But when we looked at that original agreement, we noted

21     that that agreement was made effective 11/16/2005, but Netflix,

22     in their briefing on pages 1 to 2, right at the start, they say

23     Hey, Mr. Valjakka never assigned his rights until, they say,

24     you know, November 29th, 2005.  And --

25          **THE COURT:**  Part of the problem -- part of the problem

we have here is that the Finnish court in its decision listed
some of the evidence that was before it, including evidence
that was provided by your client, and that evidence has not
been produced in this litigation, even though presumably it's
in the custody and control of your client.

So it's a little -- it's going to be -- on that record,
it's going to be a little hard for this Court to reach any
conclusions about what was in front of the Finnish courts, if
that's even relevant, because, as I said, I don't think
collateral attack -- I don't think it's open to this Court to
collaterally attack the Finnish judgment.

But anyway, isn't it true -- am I -- well, let me say that
again in a -- in a different -- slightly different way.

Netflix says that that evidence, which I think is at ECF
188-9 at page 10 -- that that evidence has not been produced in
this litigation.  Is that true?

**MR. RAMEY:**  We -- as far as I know, we don't have that
evidence either.  We have searched for it, and we have gone to
the Finnish court for what's in that evidence, and it was not
given to us from the Finnish court.  That -- that's -- we did
search for it.

**THE COURT:**  So your representation to the Court is
that Mr. Valjakka had that evidence at one time sufficient for
him to be able to give it to the Finnish court, and he doesn't
have it anymore?

1    **MR. RAMEY:**  The 13 years since the information was

2    provided to the -- and we will go back to 2022 or even late '1,

3    the 12 years, 11 years -- that we could not come up with the

4    evidence.  We've requested it from the start.  But -- but

5    sorry.  I didn't mean to lose my thought --

6        **THE COURT:**  So you haven't seen it either?  That's

7    something you and I have in common.  We haven't seen that

8    evidence that the Finnish court saw.

9        **MR. RAMEY:**  Right.  But I do believe, Your Honor, if

10   you go into what the Finnish court looked at -- and I'm looking

11   at the decision which could be found at, Your Honor, 116-2,

12   specifically at page LV-002221, that basically the Finnish

13   court was considering what happened to the European

14   application.  They talked about the DMTS invention, but they

15   were really looking about how this applied to Finnish -- how

16   this applied in European law, Finnish patent application law,

17   and how that worked.

18       We know that U.S. law treats their inventions differently,

19   and Netflix admitted so much by saying that Mr. Valjakka never

20   assigned his rights until far in 2007.

21       And so what we have here is -- is a difference in

22   treatment between Mr. Valjakka's rights and the rights that e-3

23   Systems had.  The e-3 Systems --

24       **THE COURT:**  Does the decision say -- does the decision

25   contain the phrase "insofar as the question is of the invention

1   to which patent EP-1421759 has been granted and for which

2   patent applications are pending in the United States, Russia,

3   Hungary and China"?  In --

4          **MR. RAMEY:**  It does.

5          **THE COURT:**  It says that?

6          **MR. RAMEY:**  Yes, Your Honor.  But I don't believe that

7   what the Court was addressing and actually the U.S.

8   applications at that point because they kept referring back --

9   I think the carve-out was meant to be more narrow by this

10  court.  I don't think it meant to affect the entire right

11  because U.S. contract law definitely applies differently to the

12  invention in the '685 application.  That was specifically done

13  through those nunc pro tunc assignments that we've talked about

14  far too much in this case.

15      And so we do think --

16         **THE COURT:**  So -- you keep saying federal law.  On the

17  question of whether federal law applies to this question at

18  all, you told me a second ago you like a case called *Wells*

19  which is *Wells vs. Turner Entertainment Company*, 503 F.3d 728,

20  and your pincite was page 738 to 39.  That's not a patent case,

21  is it?

22         **MR. RAMEY:**  No, Your Honor.  That was a copyright

23  case, and that -- what that was explaining was when you have --

24  contracts could be viewed as either -- they were either

25  canceled or rescinded, and that case is begging the difference

1   of explaining why when a nunc pro tunc agreement is entered

2   into, that basically all it's doing is canceling the effect of

3   whatever the current assignment is --

4        **THE COURT:**  Mr. Ramey, you and I both need to slow

5   down for the court reporter a little bit, so go ahead.

6        **MR. RAMEY:**  I apologize.

7        That case was a copyright case, and it was explaining what

8   happened when a contract is canceled and when a contract is

9   rescinded.

10       A rescinded contract would cancel all the rights going

11  back, but a canceled contract would only affect those executory

12  rights.  And so our point by using that case was simply that

13  the SBO transfer had occurred on August 15th, 2007, when the

14  company went out of business and quit using the patents to

15  revert the rights back to Mr. Valjakka.  And then so later when

16  he executed the nunc pro tunc, that effectively changed the

17  rights then, but it didn't change what had happened during that

18  2005 to 2007 period.

19       **THE COURT:**  We have a fundamental choice of law

20  question before we can get into any of this, and Netflix says

21  the question of ownership is to be determined by reference to

22  Finnish law.

23       At a higher level of distraction, the cases they cite say

24  the question of ownership assignment is to be determined by the

25  law of the relevant state or foreign jurisdiction.  That's what

1    their cases say.

2         In this case, the agreement in question was between

3    Finnish persons or entities, was executed in Finland, it

4    applied Finnish law.  So assuming their cases are right, I

5    never get to the question of federal law, and *Wells* is

6    irrelevant.

7         So my question for you is are their cases wrong?  Is it a

8    wrong statement of the law to say that questions of ownership

9    and assignment of a patent are determined by reference to state

10   or foreign jurisdiction law?  Is that wrong?

11        **MR. RAMEY:**  That is not wrong, Your Honor, to say

12   that -- to say that general proposition.  Here, though, we have

13   something very different than just a general statement that

14   said who owns the DMTS invention.  Here we have specific

15   application of what was the effect of the nunc pro tunc

16   agreements on the ownership of the U.S. application.

17        We don't disagree that the -- that all -- that what the

18   Court says with the -- with the -- pardon me -- with the 2005

19   agreement, the asset purchase agreement, did transfer rights.

20   We then --

21        **THE COURT:**  Okay.  I'm not going to quarrel with you

22   anymore because I don't think it's getting either of us

23   anywhere, but I'll just tell you I don't think that makes a

24   difference, and I will give you a hypothetical, and it's

25   ridiculous, like most of my hypotheticals, but it makes a

1    point.

2         Let's says you and I enter into a contract.  Okay?  And

3    the contract -- and I'm going to assume for purposes of my

4    hypothetical that I'm in Texas, just like you.  Okay?  And my

5    contract is I'm going to sell you donkey and the donkey is

6    located in Italy, but I'm going to bring that donkey to your

7    house.  Okay?  That's what I'm going to do.  And I'm on the

8    phone -- where are you, in Houston?

9         **MR. RAMEY:**  Yes, Your Honor.

10        **THE COURT:**  I'm on the phone in Austin and you're on

11   the phone in Houston, and we make this agreement, and then we

12   reduce to writing, and I mail it to you, and you sign it and

13   I've already signed it.  So we've got a written contract

14   between two persons in Texas that made a contract, and it's to

15   be performed in Texas.

16        Now, the thing, the object, the consideration, the object

17   of consideration of the contract is in a foreign country.  We

18   can give the donkey a name, if we want to.  We don't have to.

19   But he's an Italian donkey.  Okay?

20        This contract is not governed by Italian law.  It isn't.

21   That's a first-year law school Texas-written contract, and when

22   I don't give you that donkey and you sue me and you take me to

23   court, you're going to take me to a Texas trial court, and they

24   are going to apply Texas law.

25        And so I need you to explain to me why it matters when two

1    Finnish persons or entries make a contract about an asset that

2    has a relationship to the United States, why somehow that

3    upends the settled law that we've been discussing and all of a

4    sudden makes federal law applicable.  That's what I need help

5    on.

6         **MR. RAMEY:**  I would simply look at page 8 of our

7    briefing.  We actually cited you to the wrong case, Your Honor.

8    We do cite basically the same general law.  The construction of

9    patent assignment agreements is a matter of state contract law.

10   And then we cite that under California law, that absent an

11   express choice of law, the contract is interpreted according to

12   the law and usage of the place where it is to be performed, or

13   if it doesn't indicate a place of performance, according to the

14   law and usage of the place where it is made.

15       So we would --

16       **THE COURT:**  Why -- assuming that's -- assuming that I

17   care -- that's not the -- assuming that it is relevant, what

18   that source of authority said, let's take it at face value.

19   Why isn't -- applying those criteria, why isn't the answer

20   Finnish law?

21       **MR. RAMEY:**  Because the U.S. patent assignment affects

22   a U.S. patent that is guaranteed by the U.S. Constitution.  It

23   is very U.S.-centric in law.

24       **THE COURT:**  Now we are back to the donkey.  He doesn't

25   have Italian constitutional protection, but I don't see a

1    meaningful distinction on the facts.

2              MR. RAMEY:  And they -- like the donkey, Your Honor,

3    they can't sue on the U.S. patent in Finland.  They can only

4    sue on the U.S. patent in the U.S.  So it's a very different

5    thing, I believe.

6         And the case I should have given you, Your Honor -- and my

7    apologies -- was *Euclid Chemical Company vs. Vector Corrosion*

8    *Technologies*, 561 F.3d 1340.

9         And we also cite --

10             THE COURT:  What does that case say?

11             MR. RAMEY:  That case -- just basically that quote I

12   read of what the -- where you interpret contracts.  It provides

13   simply that quote as to how to use it.  And then it also

14   provides us guidance to California Civil Code Section 1646, to

15   where you look to the law and usage of the place where it is

16   made.

17        And so because a U.S. patent agent who was licensed by the

18   U.S., Joshua Wert, drafted these patent assignment, the

19   nunc pro tunc assignments, had Mr. Valjakka executed them for

20   effect only on the U.S. patent application, we would say that

21   U.S. law should apply to the interpretation of those,

22   specifically California law.

23             THE COURT:  A patent examiner drafted these

24   agreements?

25             MR. RAMEY:  If I said "examiner," I meant "agent,"

1    Your Honor.

2            **THE COURT:**  A patent agent.  He's a U.S. lawyer;

3    right?  I mean --

4            **MR. RAMEY:**  I believe he's only a patent agent.  I

5    don't want to misrepresent anything to the Court.

6            **THE COURT:**  I'm being sloppy with my vocabulary.  He

7    is a -- he is a professional that someone prosecuting a patent

8    can go to, much like anybody would go to a lawyer for advice.

9    He doesn't work for the U.S. government.  He has clients like

10   Mr. Valjakka; right?

11           **MR. RAMEY:**  Yes, Your Honor.  My belief is at that

12   time -- and I believe now, but I don't know -- he lives in

13   Sweden but he serves U.S. clients as a registered U.S. Patent

14   and Trademark agent.

15           **THE COURT:**  I see.  And you think that makes federal

16   law apply?

17           **MR. RAMEY:**  I think it was drafted with the -- it was

18   drafted as a U.S. contract to apply to U.S. patents, which

19   makes U.S. federal law apply, yes, Your Honor.

20           **THE COURT:**  Okay.  I mean -- okay.  I hear you saying

21   that.

22           **MR. RAMEY:**  Yes, Your Honor.

23        And that is the basis of our U.S. -- of U.S. law claim.

24        We actually also think that Mr. Tepora's common law claim

25   does find support in the law and is a statement of Finnish law,

1   and it is very appropriate here because it didn't attach until

2   Suomen Biisi abandoned the patent application, which was at

3   some point after the -- the -- at some point after March-- or

4   March of 2010.  So likely --

5        **THE COURT:**  You think questions of abandonment and

6   revival are determined under Finnish law, not United States

7   federal law?

8        **MR. RAMEY:**  No, Your Honor.  I'm saying if you wanted

9   to go to Finnish law, we do have a source that actually

10  protects their --

11       **THE COURT:**  I don't want to do or not do anything.  I

12  want to do whatever the law tells me I'm supposed to do, and my

13  question for you is I am familiar with your expert's opinion

14  about abandonment, but as I said earlier in the hearing, I

15  think abandonment -- abandonment and revival of a patent

16  application are matters that are determined by federal law, so

17  I don't know where Finnish law comes into it.  That's all.

18       **MR. RAMEY:**  Yes, Your Honor.  I guess I would

19  question -- if I might, I would question that if abandonment

20  under common law and under Finnish law was going to necessarily

21  be U.S. law, then why wouldn't the contract rights, the

22  assignments rights for that also be construed according to U.S.

23  law?  If it's one, it should be the other; right?  I mean, why

24  would -- I mean, I don't -- okay.  Pardon me, Your Honor.  I'm

25  trying to articulate something that I'm doing a poor job of,

1    and I don't mean to do that, but I believe that --

2         **THE COURT:**  It doesn't matter whether I think they

3    should both be decided by reference to the same authority or

4    not.  What matters is what the governing courts of appeal have

5    said is the authority I should be looking to.  And if those --

6    if those are two different things, then they're two different

7    things.  There is not a normative question here, I don't think.

8         **MR. RAMEY:**  The case I cited, the *Euclid* case, is a

9    Federal Circuit case talking about -- and it talks more about

10   it's okay to look to U.S. state contract law when -- when

11   construing the assignments, and that's what we have here.

12        **THE COURT:**  I see.  Okay.

13        **MR. RAMEY:**  And that's what we have here.  We have

14   patent assignments for the U.S. drafted by a U.S. practitioner

15   that were made -- were filed and recorded --

16        **THE COURT:**  I thought you said he lived in

17   Switzerland.

18        **MR. RAMEY:**  I believe it's Sweden, Your Honor.

19        **THE COURT:**  Sweden, okay.

20        **MR. RAMEY:**  But he is -- he does have a U.S.

21   registration number.  And so that's why people go to him for

22   his expertise in preparing U.S. documents, for recording

23   assignments of U.S. property rights.

24        **THE COURT:**  So your position is even if -- if this

25   gentleman, because he is a registered patent agent with the

United States Patent and Trademark Office, if he drafts an

agreement, even if it's not a document that's going to be filed

with the PTO or another United States agency, that whatever

contract he drafts should be interpreted according to

United States federal law because he was involved in the

drafting of it?

**MR. RAMEY:**  No, Your Honor.  I believe that the facts

of this case should be narrowly construed to what happened.

The facts of this case is -- if we went through the evidence,

Mr. Valjakka stated in there that he executed these

nunc pro tuncs to effectively clean up the assignment of the

U.S. patent application.  And that, Your Honor, can be found in

paragraphs -- I'm sorry, Your Honor.  They can be found --

118 -- Document 118-20.

We can go through his testimony, and he talks about that

he did that to clean them up, the assignments, and that starts

in paragraph 2 through paragraph 12 of his declaration, that he

goes through, talks about why he -- he executed those.

And then in paragraph 13, he talks about the basis for the

nunc pro tuncs' assignment when he talked to Joshua Wert.  So

the intent was to have U.S. law apply to simply the U.S.

application because he didn't, Your Honor -- and there's

nothing in the record -- and he didn't try to have the -- the

other portion of the DMTS invention, that being the European

patent application, and, I believe, Your Honor, the Russian

1    patent application dealt with in the same manner.  He simply

2    tried to correct the assignments and make the U.S. application

3    be treated under the nunc pro tunc assignments he'd had Joshua

4    Wert draft.

5         And that -- we believe does provide -- that California law

6    should apply under what we talked about previously --

7             **THE COURT:**  That's the *Euclid* case?

8             **MR. RAMEY:**  That's the *Euclid* case that says that

9    state law --

10            **THE COURT:**  In the *Euclid* case -- in the *Euclid*

11    case -- that's a Court of Appeals decision.  The district court

12    was in Ohio, and it applied Ohio law to the dispute in front of

13    it, and the parties in that case, if you give me just a moment,

14    were the Euclid Chemical Company and Vector Corrosion

15    Technologies.

16         Now, do you have any reason to believe that those were not

17    Ohio entities or that the place of performance was not to be in

18    Ohio?  In other words, do you have any reason to believe that

19    *Euclid* is in any way inconsistent with the rule that I

20    announced at the beginning of the hearing?

21            **MR. RAMEY:**  The only -- yes.  I disagree in the sense

22    that I think the assignment of a U.S. patent application is

23    meant to be construed under U.S. law because it only could

24    be -- the U.S. patent application could only be sued under U.S.

25    courts.  You know, it could be sold -- I get it -- in other

countries.  There are things that could be done with it as a

piece of property, but it can't be enforced.

     The only thing we're talking about here is giving standing

to Mr. Valjakka for a lawsuit that he filed against Netflix.

And --

          **THE COURT:**  Let me ask you a question.

          **MR. RAMEY:**  Yes, Your Honor.

          **THE COURT:**  Because I'm enjoying this immensely.  I

don't think -- okay.  Let's go there.

     So we live in a common law country, but not all countries

are common law countries.  Some countries are civil law

countries.  And I will represent to you, because it was

represented to me by a Swiss banking lawyer and confirmed for

me by a United States contract professor, that in civil law

countries, consideration is not a requirement for a valid

contract.

     Do you follow me so far?

          **MR. RAMEY:**  Yes, Your Honor.

          **THE COURT:**  So following your line of reasoning, is it

correct, for example, that two German persons could make a

contract with each other in Germany for performance in Germany

about rights to a United States patent application, and that in

a later lawsuit, that contract -- one of them could assert as a

defense that there was a lack of consideration, even though

when they made that contract in Germany, that is not an element

1   of a contract claim?

2        I withdraw the question, actually.  I don't know why I'm

3   making you answer that.  The question answers itself.

4        I think I should just let you finish your argument,

5   Mr. Ramey, and I will stop interrupting you.

6        **MR. RAMEY:**  Yes, Your Honor.

7        If I may, just for a second -- if we -- if we do decide

8   that taking what the Court said -- that if we do decide that

9   ownership would be decided under Finnish law, we think the

10  abandonment should also then therefore be decided under Finnish

11  law, and then Professor Tepora's opinion would address these

12  concerns that the Court has, we believe.

13       However, if it's determined that abandonment is going to

14  be construed under U.S. law, we believe that the ownership

15  issue, the assignments that were recorded not in the Swedish

16  court or in some other European court or patent office, they

17  were recorded solely in the U.S. Patent and Trademark Office

18  solely to effect U.S. patent rights.

19       **THE COURT:**  But they may have been recorded there, but

20  these are documents that give rise to rights under contract

21  law; correct?

22       **MR. RAMEY:**  Well, yes, Your Honor.  They do give rise

23  to rights that arrive under contract law, and we would say that

24  that contract law is contract law that was meant to be

25  construed according to U.S. law because where it was

1    recorded -- it's just a -- just to finish that part of the

2    argument, that we would proffer that the -- we would -- that

3    U.S. law should determine ownership and abandonment or Finnish

4    law should determine both, and we think that we provided

5    evidence to sustain dismissal of the motion for summary

6    judgment.

7        And with that, Your Honor, I think that goes through the

8    points that the Court wanted to address today.

9        **THE COURT:**  Thank you, Mr. Ramey.

10       I wonder if you have read a case called *International*

11   *Nutrition Company vs. Horphag Research Limited*, a 2001 Federal

12   Circuit case, 257 F.3d 1324.

13       I'm not smart enough to have this at my fingertips, but

14   somebody in my chambers just sent me a message online while you

15   and I were talking that contained a quote from that case.  And

16   what the case says -- and I pulled it up on Westlaw, so I'm not

17   looking at the staff member's message, but what it says is INC,

18   the plaintiff -- "INC argues that the ownership of a

19   United States patent is a matter of United States patent law

20   and granting comity based on a determination of ownership under

21   French law would be contrary to United States patent law, but

22   comity is appropriate because the French courts merely

23   determined who owned the United States patent pursuant to a

24   French contract.  Contrary to INC's position, the question of

25   who owns patent rights and on what terms typically is a

question exclusively for state courts and not one arising under United States patent laws.  A contractual agreement to apply French law as to ownership is just as valid as an agreement to apply the law of a particular state.  There is, therefore, no conflict between United States patent law and enforcing the intent of the parties to the development contract that it should be interpreted under the laws of a foreign country."

Now, it may be -- oh, it actually says that there's no explicit choice of law clause in the next paragraph.

So, anyway, I read that to you only because it appears directly to meet the argument you just made.

**MR. RAMEY:**  Your Honor, if I may, I may have written that down wrong.  Was that 257 1354?

**THE COURT:**  257 1324.  The part that I read you is at pages 1329 through 1330.

**MR. RAMEY:**  Yes, Your Honor.  And, again, we would at that -- I mean, still fall back on our position that if you go to what the Helsinki court was deciding, it was a very limited question about whether or not the DMTS agreement itself transferred rights with the -- with the November 16th, 2005, asset purchase agreement.  That's the sole decision they reached, and they didn't reach the issue of whether or not the U.S. application will be treated differently.

And we think we briefed that sufficiently for the Court's consideration simply because if you take Netflix at what they

1    pled, Mr. Valjakka never assigned his rights until late in

2    2007.  So, therefore, everything -- nothing could have occurred

3    until then.  And so it's almost as if -- if Mr. Valjakka had

4    not done those nunc pro tunc agreements at all, would this be a

5    different conversation, we have to ask ourselves?

6            **THE COURT:**  We'll never know.  We'll never know

7    because no one has produced -- your client has not produced the

8    evidence that was in front of the Finnish court, so I don't

9    have any way of second guessing their determination as to which

10   agreements were effective and which were not.  I don't have

11   access to the same evidence.

12           Fortunately, I don't need to worry about that because I

13   am, I think, obligated to give comity -- or excuse me -- to

14   give deference or give effect to their decision, but I have no

15   way of knowing whether it was a good decision or not.

16           **MR. RAMEY:**  Yes, Your Honor.

17           And, if I may, just one -- wouldn't comity only be

18   extended to the portion of the -- of the decision that would

19   need to be applied to, and here it only would need to be

20   applied to the DMTS agreement as it applied to where -- where

21   the court decision starts off on, the European application.

22   That the U.S. applications it wouldn't need to apply to because

23   they do have separate contracts that affect them.  Wouldn't

24   that -- that would be a --

25           **THE COURT:**  I'm not much for answering questions, but

1   I'll take your argument on that point.

2         **MR. RAMEY:**  I apologize, Your Honor.  I didn't mean to

3   say it that way.  If I were thinking about this logically, I

4   was going to go -- I apologize.  Would go to the next

5   statement.

6        Comity would only apply to the portions that it needed to.

7   There is no reason to extend it to affect the assignment of

8   what is quintessentially a U.S. property right, a patent right,

9   in our Constitution, Article 1 Section; 8 right?  I mean,

10  it's -- fundamentally that's a constitutional right that

11  Mr. Valjakka is able to partake in when he comes to the U.S.

12  and then he's able to file suit.

13        **THE COURT:**  Yeah.  If you didn't own that house on a

14  Monday, I don't really care what happened on a Tuesday.  You

15  know what I'm saying?

16        Once somebody decides you don't own this as of a certain

17  point in time, you did not own this.  You don't own things for

18  some purposes and not for others, or maybe you do, but not --

19  not on the facts in front of me, I don't think.  Maybe I'm

20  misapprehending your argument.

21        **MR. RAMEY:**  No, Your Honor.  And I apologize for

22  saying -- I was putting a hypothetical to myself, and I should

23  have done a better job of articulating, but just if the

24  nunc pro tuncs either did something or they did not, under

25  Netflix's argument, we believe that regardless if the

1    nunc pro tuncs were there, the -- Netflix is saying the result

2    should be that Lauri Valjakka doesn't have ownership.  We think

3    because the nunc pro tuncs are there and there is no evidence

4    in of the court decision -- I only have the court decision.  It

5    doesn't -- at the end of the day, Your Honor, I'm not sure that

6    it matters that they may have considered whether the two

7    Germans had property rights in Texas, as you said earlier.  I'm

8    not sure they care about that.  What matters is what they put

9    in their decision.  And then their decision there's --

10            **THE COURT:**  What matters is that they made the

11    decision.

12            **MR. RAMEY:**  Okay.

13            **THE COURT:**  That's how comity works.

14            **MR. RAMEY:**  But --

15            **THE COURT:**  If -- if a trial court in a different

16    jurisdiction or a state court makes a decision that someone

17    doesn't like, they can appeal it or they can use the collateral

18    attack procedures that are available in that jurisdiction, but

19    the way international comity works, it's not for me to -- to

20    second guess that -- a decision of a Finnish court if I a find

21    that it applies.  That's -- that's how comity works.  I just

22    give effect to it.  And so that's -- that's what I think.

23            **MR. RAMEY:**  Yes, Your Honor.  And thank you for

24    indulging my argument.

25        I think that we would still stand by our position that it

1    shouldn't apply to these separate -- the nunc pro tuncs change

2    things because they were different.  And with that, Your Honor,

3    thank you very much.

4              THE COURT:  Thank you.

5         Ms.Piepmeir, I'm not much for sports metaphors, but I like

6    this one.  You just took the snap.  You're ahead by six points.

7    You've got 25 seconds on the clock.  You can take a knee, if

8    you want, or you can make argument.  Somebody prepared to argue

9    this point to a fair thee well.  They can, if they want, but

10   you're going to win this point if no one says anything.

11             MS. PIEPMEIER:  Thank you, Your Honor.  I actually am

12   one for sports metaphors, and I do like them.

13        I was actually going to ask Your Honor if you had any

14   questions for me?  And if you do not, Your Honor, then I have

15   nothing to add to the conversation that just occurred, other

16   than to say that even if we applied California law, the

17   argument falls apart, and I don't think we get to that question

18   for the reasons we've just discussed, but even if we did, their

19   argument --

20             THE COURT:  I think it would be an error for the Court

21   to refer to California law in its order.

22             MS. PIEPMEIER:  Thank you.  I have nothing to add to

23   this.

24             THE COURT:  This motion is now under submission.

25                  (Proceedings adjourned at 2:38 p.m.)

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Friday, December 1, 2023

_____
Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
U.S. Court Reporter