# Exhibit A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

---------------------------x

| | | |
|---|---|---|
| AIPI, LLC, | : | Civil Action No.: |
| | : | 1:24-mc-2 |
| Movant, | : | |
| versus | : | Friday, January 24, 2025 |
| | : | Alexandria, Virginia |
| NETFLIX, INC., | : | |
| | : | Pages 1-28 |
| Respondent. | : | |

---------------------------x

The above-entitled motions hearing was heard before the Honorable Leonie M. Brinkema, United States District Judge. This proceeding commenced at 10:23 a.m.

A P P E A R A N C E S:

FOR THE MOVANT: BRENDAN KLAPROTH, ESQUIRE
KLAPROTH LAW PLLC
2300 Wisconsin Avenue, NW
Suite 100A
Washington, D.C. 20007
(202) 618-2344

FOR THE RESPONDENT: RACHAEL LAMKIN, ESQUIRE
BAKER BOTTS, LLP
101 California Street
Suite 3200
San Francisco, California 94111
(415) 291-6200

CAILYN REILLY KNAPP, ESQUIRE
LAUREN DREYER, ESQUIRE
BAKER BOTTS, LLP
700 K Street, NW
Washington, D.C. 20001
(202) 639-7764

COURT REPORTER: STEPHANIE M. AUSTIN, RPR, CRR
Official Court Reporter
United States District Court
401 Courthouse Square
Alexandria, Virginia 22314
(607) 743-1894
S.AustinReporting@gmail.com

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

P R O C E E D I N G S

THE DEPUTY CLERK: Civil Action Number 1:24-mc-2, AiPi, LLC versus Netflix, Inc.

Would counsel please note their appearance for the record, first for the plaintiff.

MR. KLAPROTH: Good morning, Your Honor. Brendan Klaproth for AiPi. I have my paralegal here, Lisa Butler, as well. I'm just informing the Court in case I need to consult with her.

THE COURT: Would you like to sit up here? You can come up.

MR. KLAPROTH: Thank you, Your Honor.

THE COURT: Put you within the, you know, scope of the Court in case.

MS. BUTLER: Thank you.

THE COURT: All right. And for Netflix.

MS. LAMKIN: Good morning, Your Honor. Rachael Lamkin, Cailyn Knapp and Lauren Dreyer here on behalf of Netflix.

THE COURT: All right. Well, since you all filed your papers, has there been any further progress in resolving some of these issues?

MS. KNAPP: I can speak to the sealing motion, Your Honor.

There has been progress. Counsel for the parties

have conferred this morning, and we are in agreement that with the exception of the numbers in Exhibits J and K, the material is not commercially sensitive or has already been made public, and the documents do not meet the standard for sealing.

THE COURT: All right. So what we're going to do is we'll issue an order today that orders that all of the sealed materials other than -- well, in J and K, you have -- I assume you're having redacted versions that will be publicly available?

MR. KLAPROTH: Your Honor, I think it's a little bit more limited. For the first exhibit, it is going to be just be the account numbers, which --

THE COURT: I'm sorry?

MR. KLAPROTH: For that first exhibit, it is the account numbers.

During our meet-and-confer this morning Ms. Knapp indicated that one of the documents we requested be sealed had previously been filed in the underlying litigation. I trust their representation, and we're fine with that particular document being filed publicly. But I think the rest of them --

THE COURT: So it is just J then that you want just the account numbers redacted from? Is that all?

MS. KNAPP: That's right.

MR. KLAPROTH: Yes, that's correct.

And then the second exhibit was ...

MS. KNAPP: Was K. And Exhibit K --

MR. KLAPROTH: Yeah. So that was a document Ms. Knapp indicated had been previously filed publicly.

THE COURT: Fine.

MR. KLAPROTH: I accept that representation. We withdraw our request.

THE COURT: All right. We'll accept that.

So the order will reflect that the motion to seal then is denied in all respects except for Exhibit J, right, which will remain in its totality under seal, and you will file a redacted version for public view that simply redacts the account numbers.

MS. KNAPP: That's right for Exhibit J.

THE COURT: For J.

And K is unsealed.

MS. KNAPP: That's right.

MR. KLAPROTH: And we would request that the remaining exhibits be sealed.

THE COURT: Well --

MS. KNAPP: So Netflix actually doesn't take any position as to the remaining exhibits. We were opposing the sealing of Exhibits J and K.

THE COURT: And the rationale for remaining -- for

having the other exhibits remain under seal is what?

MR. KLAPROTH: That they were trade secrets and contained pricing information. But we'll defer to Your Honor.

THE COURT: I will tell you that this sealing business -- I'm getting close to the point of just saying if you have a case with me, everything is -- once you come to court -- what you all do during discovery is fine, and that's what our rules are trying to reflect. To enhance discovery, we'll allow the lawyers to put whatever label you want on the documents: Eyes of counsel only, eyes of outside counsel only, whatever you do.

But when you come to court and you start filing pleadings, the public has a right to understand what it is that's being litigated in court, and only the most genuinely appropriately sealable materials should be kept sealed. And I find continuously that what lawyers are asking to have sealed is really ridiculous. It's either already publicly out there, or it doesn't qualify. It's just maybe it's embarrassing, we would rather not have this out in the open, but that's not a rationale. And the Fourth Circuit I think in the *Conoco* case has given us clear direction in that respect.

MR. KLAPROTH: Understood, Your Honor.

THE COURT: All right. So then the only thing

that's going to be relevant to this motion, the only thing that's going to remain under seal are the account numbers in J. All the other things that were subject to the motion to seal are denied. So they're all remaining public.

MR. KLAPROTH: Okay. Thank you.

THE COURT: Thank you. All right. Then we have the motion -- the key motion here is the motion for civil contempt, and that one is complicated.

So had you worked anything further out on this? I mean, the problem is, I am satisfied from the record before me that AiPi has not properly complied with what is, in my view, a clear obligation to provide a significant amount of discovery which would appear to be available but has not been made available.

So have you been able to work any more of this out?

MR. KLAPROTH: Your Honor, we've been continuing to talk. Just so you know first off, just to give you context, this is not a case where -- I know most discovery disputes are lawyer-driven; this is not. I've had a very good relationship with opposing counsel.

THE COURT: And you're relatively new counsel to this case, too; right?

MR. KLAPROTH: Yeah. Unfortunately.

THE COURT: You've inherited a lot of grief, I

know.

MR. KLAPROTH: I've walked into a quagmire of litigation, and I'm trying to chart a path forward that gives Netflix all the documents they need and we can send them back on their way to the Northern District of California and they can try their case. So that's our goal here. I'm willing to work with them to give them whatever they need.

So if it's -- you know, as far as the privilege issue, I mean, my client just doesn't have the resources to fight the privilege issue or to meet the demands of what they need for the privilege logs. My client said let's produce the documents. The problem I'm running into is that there's other interested parties that have a privilege issue. So I --

THE COURT: All right. Let me ask you a question.

MR. KLAPROTH: Uh-huh.

THE COURT: Is your client, AiPi, LLC, is it or it is not a law firm?

MR. KLAPROTH: I can't really -- I don't know. Right. Because there's no clear definition of what a law firm is. There's lawyers working for them --

THE COURT: Well --

MR. KLAPROTH: -- and the plaintiff in the underlying case understood them to be their lawyers. So

it's complicated, and it's not the way I would do things, but I can't answer that question. I just don't know.

THE COURT: Well, my understanding is there's clear evidence in this record that representations have been made by members of the -- of that entity that it does not provide and did not provide legal advice in the Northern District of California litigation.

Is that your understanding?

MR. KLAPROTH: That is my understanding. I've read those declarations. On the other hand, though, there's a situation where the plaintiff in that case is saying they were my lawyers, they were giving me legal advice. And I believe -- and I can stand corrected -- the judge did find that they were acting as lawyers in that case.

THE COURT: Were they engaging in the unauthorized practice of law then in California? Are they licensed to practice in California?

MR. KLAPROTH: I don't know. And, you know, I was retained to respond to the subpoena and not the underlying issues, especially anything dealing with California because I'm not licensed there. So I don't know what the ethical rules are in California. And, quite frankly, I don't want to misstate something to the Court, because I just don't know.

THE COURT: All right. And I respect you for

that. All right.

But you know the problems that's going on here.

MR. KLAPROTH: Your Honor, it's a mess. It's a mess. And I'm trying my best, and I'm in a very tough spot here, because I'm trying to make sure we overdisclose everything and produce everything, but, at the same time, I'm trying to protect the privilege issues for those underlying parties. Because a lot of the stuff at this point, what we're looking at, I mean, they're seeking documents pertaining to material litigation decisions. Definitionally, I think that entails work product, right.

THE COURT: Of course, as you know, there's a significant exception to the attorney/client privilege, even if it exists, for the crime-fraud exception.

MR. KLAPROTH: Understood.

THE COURT: And there's certainly -- from what I understand is what went on in the Northern District of California and apparently has gone on elsewhere with your client, is there may be a very good basis to find that, in this case, the crime-fraud exception would break any claim of privilege.

I mean, you know, there's an argument being made in this case that the individual who brought the patent litigation -- the groundless, meritless patent litigation in the Northern District of California was getting advice from

AiPi or other entities that AiPi had pulled together to fund the litigation and then sets up an LLC off shore and, as I understand it, in part from the last hearing as well, monies that this plaintiff had gotten in settlements from other litigation brought were the same sort of problems, where other parties had settled, rather than fighting the way Netflix has in this case, that several hundred thousand dollars may have been sent off shore, and so there's a fraudulent conveyance concern going on.

So, I mean, it's a very ugly nasty case, and I think the way in which to get it as well resolved as possible is for your client to just come forward and divulge everything it's got. All right.

MR. KLAPROTH: Your Honor, we're fine with that. I mean, if there's an order, we're going to comply with it. So it's just I don't want to be in a position where I'm waiving, for example, the plaintiff's privilege in the underlying case. And if there was a crime-fraud exception, I think it would probably be best to adjudicate it in that court where the plaintiff's present.

THE COURT: Well, I think what's going to have to happen is, if anybody -- if any alleged client of AiPi believes that their, you know, sensitive attorney/client materials are going to be revealed, they need to come into this court and tell us, you know, hey, they were our

attorneys, or we were having sensitive conversations or communications with them, and, you know, we're invoking our right to the privilege. It's the client's right.

MR. KLAPROTH: Your Honor, I couldn't agree more. And what I tried to fashion, I was just trying to be creative, is to model the Local Rule Civil 5, right, Local Rule 5, where we'll get the documents, I'll sequester what I think could potentially be privileged, send it to the lawyer in the underlying case, Mr. Ramey and Mr. Valjakka, give them a certain time period that the Court thinks is reasonable to assert privilege. And that's what I did. I said you have 14 days, otherwise we're turning it over. And with these particular set of documents, they said no objection. So we're ready to turn those over.

With anything else that comes up, for an additional search I think this would be a workable framework where we give them a fixed period of time, if they don't assert privilege, we'll produce it. And if they do assert privilege, I think I can sequester the documents and they can go fight in California over whether those documents should be privileged based on those parties' assertion.

THE COURT: No, I think they'll have to come here --

MR. KLAPROTH: Okay.

THE COURT: -- and they'll have to assert the

privilege in front of me.

MR. KLAPROTH: Okay.

THE COURT: And they'll have to be here in this court; I'm not going to do it remotely; all right?

MR. KLAPROTH: Your Honor, I think that makes perfect sense. But I think that framework, if that's agreeable with Your Honor, we will sequester everything and just give them a fixed period of time to whatever the Court deems reasonable to assert privilege, and if they don't, we'll turn it over.

THE COURT: All right. Let me hear from defense counsel. Or from Netflix.

MS. LAMKIN: Good morning, Your Honor.

If I could address anything in each order, the Court is right. Privilege issues under Rule 45 have to happen in the compliance court here.

This proposed solution doesn't work for us, Your Honor, because we don't have time. Judge Tigar has already extended the trial four times, and we're very concerned he won't extend it again.

THE COURT: Your date is March 25?

MS. LAMKIN: 27, Your Honor.

THE COURT: 27. Okay. Well, we can speed that up. This shouldn't be that difficult.

MS. LAMKIN: It shouldn't, Your Honor. And as

this Court knows, this Court already issued an order to AiPi. They did not comply with that order. The production of 33 responsive documents and the search of a single folder hand-created by Morehouse on one laptop is inexcusable. They didn't even look -- they all share an email server. They didn't even search the email server to look at Mr. Lund's emails, Mr. Sheets's emails.

And one more thing, Your Honor, because it's important. Mr. Klaproth, we have no issue with him. He has cooperated we think as well as his client will let him cooperate. But, for example, the document he cites where they pulled up Mr. Valjakka's declaration where he said I believe AiPi are my lawyers, in response to that declaration is the declaration Mr. Lund filed, and he said Mr. Valjakka is wrong, we are not his lawyers. We filed that here in this court, ECF 11/2. So even the document they cite to was refuted by AiPi who said, under oath, Mr. Valjakka is wrong, we were never his lawyers, we're not his lawyers now. They did commit the unauthorized practice of law, if I can offer an expedited procedure.

The privilege log contains 68 documents. It's woefully deficient. But Mr. Valjakka and Mr. Ramey already waived privilege according to the documents they filed with the Court. Let's immediately get those documents, let's divide them into categories, and let's do the

attorney/client privilege exceptions, the crime-fraud exceptions, including the unauthorized practice of law briefing on an expedited basis. At the same time, let's let a forensic discovery third party collect the documents. We can proceed at the same time in parallel.

Privilege briefing, especially the exceptions that apply here, as the Court noticed, collect the documents. Once the privilege issue is decided, we think all the documents will come over. That's what we think is the truly expedited procedure that should happen here.

THE COURT: All right. Now, the forensic examination, how quickly do you understand it could be done?

MS. LAMKIN: I have two associates looking at it now, Your Honor. Within the month, we believe.

THE COURT: All right. That would be the end of February?

MS. LAMKIN: Yes, Your Honor.

THE COURT: That's getting it pretty tight.

MS. LAMKIN: We would rather they just turned everything over. We just can't count on that.

THE COURT: But the 68 documents are ready to be turned over now?

MS. LAMKIN: According to their representation. I don't know why they're still holding them.

THE COURT: All right. Let me hear from counsel

about the --

MR. KLAPROTH: Your Honor, we can turn those over. We were ready to turn them over even before the motion was filed. I just don't want there to be a subject matter waiver where people are turning around looking at me saying we waive --

THE COURT: How about I order you to do it.

MR. KLAPROTH: That's perfect.

THE COURT: That gets you out of it.

MR. KLAPROTH: If I have an order, then it's not voluntary.

THE COURT: All right. So if the order says the 68 documents currently in possession of counsel must be provided -- today is Friday -- by close of business Monday?

MR. KLAPROTH: That's fine.

THE COURT: All right.

MR. KLAPROTH: That's perfectly fine. I'll have them today.

THE COURT: We'll have that in the order. Or that's the first thing.

All right. The second thing is, I think the forensic discovery is important. That, again, gets you off the hook. I mean, you have an outside third party doing it, so I am going to grant that part of the request.

In terms of the cost, however, I'm not going to

impose that at this point. If down the road in California you all are successful, I think it's up to the California court to award that as part of the damages you would be receiving. All right. So there wouldn't be any out-of-pocket costs at this point to AiPi.

MR. KLAPROTH: Okay. Thank you, Your Honor.

And with respect to the forensic imaging, I'm okay even if they want to find a neutral third party to do a preliminary -- like, if we give terms that says these are documents that are likely to be privileged or have these people's names, if this third party wants to start segregating documents to expedite. Because I'm a two-person law firm, and I'm the only lawyer in Virginia, so I can't go up against, you know, Netflix's team of lawyers. I've dropped everything for the past month just on this to get them their documents. But if it turns over 10,000 documents, I'm simply not going to be able to review those documents in a timely fashion with their deadline.

So I'm willing to work with them, and if they want to have the forensic examiner who's neutral who can kind of segregate out potentially privileged things, I'm fine with that, too. So whatever expedites the things and makes it easier for everybody, I'm fine with.

THE COURT: All right. Yes.

MS. LAMKIN: But we should have the privilege

briefing concurrent starting now, as soon as we can look at those documents.

And I would like to remind my colleague across the aisle, my brother across the aisle and the Court, there are at least three or four attorneys barred in this state associated with AiPi and a related law firm called Whitestone Law. There's no shortage of lawyers that AiPi has chosen. When it will do legal work and when it not is interesting. But they can certainly help collect these documents, review these documents.

What we think should happen is forensic discovery immediately. And we'll try to do it faster than a month. Forensic discovery immediately and briefing on the privilege issues now.

MR. KLAPROTH: Just two quick responses to that.

I think the problem is -- with the lawyers with AiPi is they've been disqualified from -- okay. I'll stand corrected. I -- Judge Tigar issued an order disqualifying certain lawyers from representing, and that's why I had to get involved.

MS. LAMKIN: Do you mind?

MR. KLAPROTH: Please. Please.

MS. LAMKIN: Just quickly, Your Honor. Mr. Morehouse has created two entities. He created AiPi, which he claims is not a law firm; and he created later an

entity called Whitestone Law, and they have almost identical overlap between the two entities. Judge Tigar barred Whitestone Law from representing Plaintiff Lauri Valjakka because they have a conflict. So he said Whitestone Law, you cannot represent Mr. Valjakka. He said nothing about the status of AiPi as a law firm or who they may represent, and he certainly did not rule that AiPi's lawyers cannot represent themselves in this matter.

THE COURT: All right. Well, again, counsel, neither you nor I know that much about the Northern District case.

MR. KLAPROTH: Unfortunately. And I would like to not know too much more.

Just a final issue with respect to the privilege briefing. I don't think it's necessary because we're going to turn this stuff over. And if we have this framework where, you know, the -- Mr. Valjakka or Mr. Ramey has, even if it's seven days to assert privilege over the documents and they don't, the documents are going to get produced. So I don't know why we would need any briefing on the issue. I mean, at the end of it all, if there are certain documents that are withheld, sure. But if they're going to be produced, I don't think we need to --

THE COURT: All right. I think the way to do it is -- and, counsel, I'm going to have you draft an order so

that we get this as accurate as possible, and you'll have a chance to review it before it comes to court, and if there's a fight over it, sobeit. I know that you are -- right now, there's a redline version of the proposed order, but I want a new one.

The new order is going to certainly reflect there has to be full and complete production responsive to Netflix's subpoenaed topics, accompanied by a complete and proper privilege log. I'm not sure that a latter part is going to be necessary. Instead, it should be that any claim by any alleged client of AiPi, any privilege claim must be asserted and filed in this court within seven days of the production of the allegedly privileged material. An oral argument will occur in this court at a time that we'll set once we see what, if any, objections we get. All right. That should cover that particular issue, and I'll let, Counsel, you work out that language.

The other issue that is at issue in this motion is discovery into the use of Netflix's AEO financial information. And, again, that's a very important issue because, as I understand it, AiPi should not have that information; right?

MR. KLAPROTH: I don't know, but I do know that we're willing to agree to the discovery.

THE COURT: All right.

MR. KLAPROTH: You know, as far as the subpoenas involved and their discovery into it, no objection.

THE COURT: All right.

MS. LAMKIN: Yes.

THE COURT: All right. Then forensic discovery, we'll allow that to go forward.

There was an issue that the plaintiff has raised about, you know, keywords for search. And, I mean, my exercise with forensic imaging is that it does help if there are, you know, keywords that are being looked for.

Are you not able to come up with a list? I would think all these various lawyers' names and the LLC and that sort of thing would be the key things you're looking for.

MS. LAMKIN: We're happy to do that, Your Honor. As we understand the process, we give the forensic examiner a set of search terms --

THE COURT: Right.

MS. LAMKIN: -- the forensic examiner does his or her work and then may suggest additional search terms to use, and we'll follow those threads. So we're fine with proposing the initial search terms, happy to do it. We just don't want to be restricted to those terms if the forensic examiner comes back to us and says, well, you really should look at these five other words.

THE COURT: I'll tell you what then, I don't think

there's any objection at the first tier, that is there will be a list of search terms.

MR. KLAPROTH: Your Honor, whatever they want. We just want light at the end of the tunnel.

THE COURT: Right.

MR. KLAPROTH: So we don't want them to keep coming back to the well to drink.

THE COURT: Here's what I would suggest. With search terms, it would be best if you can put them in the order. Okay. With the caveat that if the forensic examination suggests that it would be reasonable to also look for, you know, A, B and C, you first run that by defense counsel. I'm sorry, defense -- AiPi counsel to see whether there's any objection. If there's no objection, then those can be also searched, but that's it. Only a second look, so-to-speak.

Is that -- so that sort of solves the problem about it going on. And there's also going to be a time frame on this thing. It's got to be done early enough so the March 27th deadline is --

MR. KLAPROTH: Yeah. And the only concern just if there's too much that I can't physically do the work. So if it comes back with 20,000 documents, I'm not going to be able to do that. Right. So that's the only concern or restriction on our end.

THE COURT: Right. But you understand if it comes back with 20,000 documents indicating that there's only like 60 or 70 in the first disclosures, not a problem for you, but a problem for your client.

MR. KLAPROTH: And, Your Honor, I totally understand that. And one thing, though, is this is scooping up because my client had a relationship with Mr. Ramey on other cases. So it's scooping up a bunch of other cases, all this stuff, that is just not responsive. So that's what's coming up, and that's what I saw, what this additional search has done. So there is going to have to be a review just to kind of weed that stuff out.

THE COURT: All right. Now, there's also an issue about a 30(b)(6) deposition.

First of all, let me ask defense -- sorry, Netflix. Do you want just one, or do you want several 30(b)(6)s?

MS. LAMKIN: Several. Given the context of this motion practice, several.

THE COURT: I would think. So Morehouse would be one or not?

MS. LAMKIN: Yes.

THE COURT: Who else?

MS. LAMKIN: We would want to speak to Lund, Morehouse and Sheets.

THE COURT: Now, they shouldn't take all that long; should they?

MS. LAMKIN: No.

THE COURT: Can that be done in one day? Two or three hours per lawyer?

MS. LAMKIN: I don't think so, Your Honor, because I think -- and let me just clarify. Mr. Klaproth said that really we should only be talking about the Netflix/Valjakka case. But the Federal Circuit is clear in *RCDI* that all litigation misconduct that is related across all of the cases -- and that's the Federal Circuit's order in *RCDI* -- have to be looked at. So it's not just the Netflix/Valjakka case, it's AiPi's misconduct across the entire Valjakka campaign. So those documents will be responsive.

I think we should have one 30(b)(6) deposition on its own, one day, and then I can split up Morehouse, Lund and Sheets and their personal depositions in a single day, Your Honor.

THE COURT: So you want Morehouse first?

MS. LAMKIN: I -- whoever they designate as their 30(b)(6) witness can be their 30(b)(6) witness across the topics. I suspect it will be Morehouse. But a 30(b)(6) deposition, and then an individual deposition of Morehouse, Lund and Sheets. And I can do that in one day, Your Honor.

THE COURT: Yeah.

MR. KLAPROTH: So, Your Honor, the only thing in the subpoena was a 30(b)(6). So what I can say is this, Morehouse is going to be the 30(b)(6) witness and testify on behalf of the company. AiPi right now is Morehouse and three staff members. That's it. So --

THE COURT: Well, during the time frame of this campaign, were there other attorneys?

MR. KLAPROTH: Yeah. Yeah.

THE COURT: There were?

MR. KLAPROTH: Yeah. So the issue is control at this point. Right. So I can't -- you know, if people aren't working for AiPi, it's almost like a former employee, I can't force them to appear.

THE COURT: I think the main thing is, let's do the Morehouse 30(b)(6) first and see if that creates any problems.

MR. KLAPROTH: Okay. I think so.

THE COURT: All right. So that needs to get scheduled as soon as possible so that we don't bump into, you know, a time frame issue; all right. And --

MS. LAMKIN: Just to clarify, Your Honor. As soon as possible, but after we receive the bulk of the documents. I don't want to have to depose him without the documents.

MR. KLAPROTH: He's ready to appear whenever they want.

THE COURT: All right.

MS. LAMKIN: Great.

THE COURT: I'll let you all work that out.

So I am granting the motion -- or within the order that Mr. Morehouse will appear for a 30(b)(6) deposition at a time agreed to by counsel; all right?

MS. LAMKIN: Thank you.

THE COURT: Is there anything else that you want in the order? I think that covers it. All right.

MS. LAMKIN: I think so, Your Honor. I would want to -- I think so, Your Honor.

I would want to preview one issue that I suspect we're going to have, and that's a spoliation issue, because Mr. Morehouse wanted to restrict the document collection to just his laptop, and it appears that Mr. Sheets and Mr. Lund, among several other people, are no longer with AiPi.

So I just want to understand for Mr. Klaproth, did Mr. Morehouse retain the relevant information from Mr. Lund and Mr. Sheets and the other employees that were working for AiPi at the time?

MR. KLAPROTH: So, Your Honor, a lot of these questions -- like, if I was doing this, I would just take the deposition and ask Mr. Morehouse, where are these -- you know, how -- about the system. But I -- so I just don't

want to misspeak or misstate anything because I don't know.

THE COURT: All right.

MR. KLAPROTH: My understanding, though, with that caveat is that AiPi was not issuing devices to people. So if, like, Erik Lund was working on the matter, he was using his only personal laptop. AiPi does have access to the emails, so they've been working to gain access to all the emails.

But as far as devices are concerned, the only device -- like, AiPi is Mr. Morehouse at this point, you know. He's got his computer. I've seen the directory, it's very organized. Like Valjakka, sub folder; Netflix with, like, 13 sub folders. He was on all the emails. So he should have everything. And I just can't speak to the other devices. I think they're in the possession of other people.

THE COURT: Did they have any kind of cloud service?

MR. KLAPROTH: No. I mean, it's not a sophisticated operation. So there's no server I'm aware of, there's no cloud service. It's locally stored on a computer. I mean, he has the computer.

THE COURT: All right. Let's take it one step at a time. All right.

So everybody is clear then. So in terms of the motion itself, I'm not going to actually do a ruling on

motion -- it's a motion for contempt. I'm going to keep it open, and we'll see how the 30(b)(6) deposition goes and see if there's any evidence of spoliation. Because if there is evidence of actual spoliation, then that clearly would support a motion for contempt. All right. Not against you, Counsel.

MR. KLAPROTH: Thank you, Your Honor. Just as long as the Court's aware, I'm doing everything. I've moved deadlines in other cases, I'm supposed to have summary judgment due today. I've dropped everything to just try to placate and get Netflix what it needs. So I am committed to doing that.

THE COURT: All right. Anything further on this matter then?

MS. LAMKIN: No. Thank you, Your Honor.

THE COURT: All right. Then you're all free to go.

And Counsel, I'm sorry. Try to get that order done maybe by the end of today so I can be looking at it Monday.

MS. LAMKIN: Absolutely, Your Honor.

THE COURT: All right.

(Proceedings adjourned at 10:53 a.m.)

-----------------------------------

I certify that the foregoing is a true and accurate transcription of my stenographic notes.

Stephanie Austin

Stephanie M. Austin, RPR, CRR