EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

AiPi, LLC,

      Movant,

    v.

NETFLIX, INC.,

      Respondent.

Civ. Action No. 1:24mc2 (LMB/WEF)

**NETFLIX, INC.'S MEMORANDUM IN SUPPORT OF
ITS MOTION FOR CIVIL CONTEMPT**

## <u>TABLE OF CONTENTS</u>

**Page**

I.   INTRODUCTION .................................................................................................. 1

II.  LEGAL AUTHORITY ......................................................................................... 3

III. ARGUMENT ........................................................................................................ 4

  A.  AiPi Violated This Court's Order By Failing To Produce Responsive Documents 4

  B.  AiPi Violated This Court's Order By Failing To Conduct An Adequate Search For Documents ....................................................................................... 12

  C.  AiPi Disregarded This Court's Admonition To Only Make Legitimate Privilege Objections ........................................................................................ 14

  D.  AiPi Should Be Held In Contempt ......................................................... 16

    1)  AiPi had knowledge of this Court's Order ................................... 16

    2)  The Court's Order was in Netflix's favor .................................... 17

    3)  AiPi violated the Court's Order and had constructive knowledge of its violation ................................................................................. 17

    4)  Netflix has suffered cognizable harm .......................................... 18

  E.  Netflix Respectfully Requests Briefing On the Privilege Issues ............ 18

  F.  AiPi's Litigation Misconduct Warrants An Order Mandating Forensic Discovery ............................................................................................... 21

    1)  AiPi is committing perjury and fraud upon the courts at a national scale 21

    2)  AiPi is committing the unauthorized practice of law.................... 23

    3)  AiPi used Netflix's confidential financial information, clearly designated Highly Confidential Outside Counsel Only ................................. 24

    4)  AiPi's conduct, including gamesmanship, improper withholding, and multiple instances of perjury, necessitates forensic discovery ........ 25

IV.  REMEDIES SOUGHT ....................................................................................... 26

V.   THE PARTIES' MEET AND CONFER DID NOT ADDRESS NETFLIX'S CONCERNS ....................................................................................................... 26

VI.  CONCLUSION.................................................................................................... 27

# **TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Buffalo Wings Factory, Inc. v. Mohd*,
    No. 1:07cv612 (JCC), 2008 U.S. Dist. LEXIS 82247 (E.D. Va. Oct. 15, 2008)....................17

*California Innovations v. Ice Rover*,
    1:22-cv-01986-RM-NRN, ECF Nos. 61-1, 61-2 (D. Colo. Dec. 12, 2023) ..........................22

*Capital Associated Indus. v. Stein*,
    922 F.3d 198 (4th Cir. 2019) .............................................................................24

*Carbajal v. Hayes Mgmt. Serv.*,
    No. 4:19-cv-00287-BLW, 2022 U.S. Dist. LEXIS 130744 (D. Idaho July 21, 2022) ...........19

*De Simone v. VSL Pharms., Inc.*,
    36 F.4th 518 (4th Cir. 2022) .....................................................................4, 16, 18

*Delta T, LLC v. Williams*,
    337 F.R.D. 395 (S.D. Ohio 2021) ....................................................................25

*Drueding v. Travelers Home and Marine Insurance Co.*,
    22-cv-00155-LK, 2022 WL 17092736 (W.D. Wash. Nov. 21, 2022) ...................................25

*Fennell v. Town of Pocahontas*,
    No. 1:05CV00045, 2005 U.S. Dist. LEXIS 19007 (W.D. Va. Sep. 2, 2005).........................19

*Galaxy CSI, LLC v. Galaxy Comput. Servs., Inc. (In re Galaxy Comput. Servs., Inc.)*,
    Civil Action No. 04-07-A (LMB), 2004 U.S. Dist. LEXIS 28162 (E.D. Va. Mar. 31, 2004) 19

*Gasner v. Dinwiddie*,
    162 F.R.D. 280 (E.D. Va. 1995) ......................................................................22

*Hawkins v. Stables*,
    148 F.3d 379 (4th Cir. 1998) ..........................................................................19

*IHS Global Ltd. v. Trade Data Monitor LLC*,
    2019 U.S. Dist. LEXIS 220327, 2019 WL 7049687 (D.S.C. Dec. 23, 2019) ........................25

*In re Gen. Motors Corp.*,
    61 F.3d 256 (4th Cir. 1995) ............................................................................4

*John B. v. Goetz*,
    531 F.3d 448 (6th Cir. 2008) ..........................................................................25

*Johnson v. Deputy LNU*,
    No. 3:20-CV-01923-AKK, 2021 U.S. Dist. LEXIS 273746 (N.D. Ala. Dec. 17, 2021)..........4

*Mt. Valley Pipeline, LLC v. Easements To Construct, Operate, & Maintain A Nat. Gas Pipeline*,
    No. 7:17-cv-00492, 2018 U.S. Dist. LEXIS 75780 (W.D. Va. May 4, 2018)........................18

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
    572 U.S. 545 (2014)...............................................................................................................23

*Progressive Southeastern Insurance Company v. Arbormax Tree Service, LLC*,
    2018 WL 4431320 (E.D. N.C. Sept. 17, 2018).....................................................................16

*Rainbow Sch., Inc. v. Rainbow Early Educ. Holding LLC*,
    887 F.3d 610 (4th Cir. 2018) .......................................................................................3, 16, 25

*Rambus, Inc. v. Infineon Techs. AG*,
    222 F.R.D. 280 (E.D. Va. 2004)............................................................................................19

*Redner's Mkts., Inc. v. Joppatowne G.P. Ltd. P'ship*,
    608 F. App'x 130 (4th Cir. 2015) ...................................................................................16, 26

*Richmond Ass'n of Credit Men v. Bar Ass'n of City of Richmond*,
    167 Va. 327, 189 S.E. 153 (1937).........................................................................................24

*Ronsdorf v. Raiffeisenbank Dornbirn Reg. Gen. M.B.H.*,
    63 Va. Cir. 499 (Cir. Ct. 2003) .............................................................................................24

*Rutledge v. City of Danville*,
    No. 4:13-cv-00066, 2013 U.S. Dist. LEXIS 172934 (W.D. Va. Dec. 9, 2013)......................21

*S. Coal Corp. v. Brickstreet Mut. Ins. Co.*,
    Civil Action No. 7:19-cv-00457, 2024 U.S. Dist. LEXIS 32356 (W.D. Va. Feb. 26, 2024)
    ....................................................................................................................4, 16, 17, 18

*Schwartz v. Rent-A-Wreck of Am.*,
    261 F. Supp. 3d 607 (D. Md. 2017) .........................................................................................4

*Shillitani v. United States*,
    384 U.S. 364 (1966)...............................................................................................................16

*Stone Basket Innovations, LLC v. Cook Med. LLC*,
    892 F.3d 1175 (Fed. Cir. 2018)..............................................................................................23

*Teleglobe Communs. Corp. v. BCE, Inc. (In re Teleglobe Communs. Corp.)*,
    493 F.3d 345 (3d Cir. 2007).....................................................................................................2

*Townhouse Rest. of Oviedo v. Nuco2*,
   No. 19-14085-CIV-ROSENBERG/MAYNARD, 2020 U.S. Dist. LEXIS 108809 (S.D. Fla.
   May 5, 2020) ......................................................................................................................15

*United States v. Okun*,
   281 F. App'x 228 (4th Cir. 2008) ......................................................................................2

*Witthohn v. Fed. Ins. Co.*,
   164 F. App'x 395 (4th Cir. 2006) ....................................................................................22

**STATUTES**

35 U.S.C. § 285 .........................................................................................................18, 21, 23, 24

KVIP Law .........................................................................................................................................13

Va. Code Ann. § 54.1-3904 ..........................................................................................................24

Whitestone Law .............................................................................................................................22

**OTHER AUTHORITIES**

Fed. R. Civ. P. 45(e)(2)(A) ...........................................................................................................14

Fed. R. Civ. P. 45(g) ...................................................................................................................3, 16

L.R. 3-15 .......................................................................................................................................6, 13

Netflix's "Highly Confidential, Attorneys' Eyes Only" ............................................................9

Order, 15:3-21 ................................................................................................................................17

Order, 15:6–8, 15:15–17 ................................................................................................................4

Order, 15:7-8, 15:15-17 ..................................................................................................................1

Order, 15:12-14 ...........................................................................................................................2, 14

Order, 16:17-19 ..............................................................................................................................25

Rule 11, Section 1927, and Section 285 ....................................................................................10

Rule 45 ..........................................................................................................................................14, 23

Va. Sup. Ct. R. 1A:5(e) ..................................................................................................................24

Netflix, Inc. ("Netflix") respectfully moves for an order of contempt against AiPi, LLC ("AiPi") pursuant to Federal Rule of Civil Procedure 45(g) and this Court's inherent authority. Given that Netflix is seeking compliance with Judge Brinkema's order mandating discovery from AiPi, and that magistrate judges cannot issue contempt orders (28 U.S.C. § 636(e)), Netflix respectfully requests that this Motion be heard by Judge Brinkema in the first instance.

## I.    INTRODUCTION

AiPi should be held in civil contempt for violating this Court's December 13, 2024 Order (ECF Nos. 49, 50; hereinafter "Order"). In denying AiPi's Motion to Quash, this Court commanded AiPi to provide "full and open discovery" and "the full range of discovery." Order, 15:7-8, 15:15-17.[1] And yet, despite its material involvement in Valjakka's seventeen (17) litigations[2] spanning three (3) years and counting, and even though AiPi's principal, Eric Morehouse, swore to this Court under oath that he was in possession of "thousands" of responsive documents, AiPi produced a mere twenty (20) responsive documents. *See* Morehouse Decl., ECF No. 17-2, at ¶ 8; *see also* AiPi Reply, ECF No. 24, at 8-9.

Moreover, Morehouse was the *only* representative of AiPi that even participated in a search for documents responsive to Netflix's subpoena. Messrs. Lund and Sheets did not participate, and Morehouse did not himself search Lund or Sheets' email accounts, hard drives, company folders, etc. Morehouse did not even search his own email accounts. Instead, Morehouse only searched (i) a single folder on his personal hard drive and (ii) emails "from" William Ramey using but two search terms, "Netflix," and "CDN," ignoring all of the other relevant search terms. As detailed below, AiPi's search for responsive documents was woefully inadequate.

---

[1] Citations refer to the transcript serving as the Court's Order, ECF No. 50.
[2] Fifteen (15) district court litigations and two (2) *inter partes* reviews before the USPTO.

1

Further, AiPi's privilege log ignores this Court's admonition that "[AiPi's] counsel . . . better make sure that you have a legitimate reason to argue that it's attorney/client privilege." Order, 15:12-14. For example, there are entries that comprise emails between members of AiPi alone. *See, e.g.*, Nimeroff Decl., Exh. Nos. B-C, Privilege Log Entry ("PLE") No. 9.  AiPi claims that it is not a law firm and does not provide legal services or advice.  Lund Decl., ECF No. 11-2, ¶¶ 10-12. In its privilege log, AiPi describes the email contents as "Email discussing Netflix's letter outlining deficiencies in Plaintiff's infringement contentions and strategies for responding. Discussion potential amendments for the '167 patent to bolster infringement claims." *Id.* That is, Messrs. Morehouse, Lund, and Sheets—solely amongst themselves—discussed strategies for responding to Netflix's letter detailing deficiencies in Valjakka's infringement contentions and how to amend those contentions to improve Valjakka's infringement allegations.  AiPi withheld that email citing three (3) distinct privilege doctrines: (i) the attorney client privilege, (ii) the attorney work product privilege, and (iii) the common interest privilege.  It is entirely improper for AiPi to claim these three (3) privileges for emails solely between members of AiPi.  For example, the common interest privilege only applies as between separate counsel communicating between separate entities. *Teleglobe Communs. Corp. v. BCE, Inc. (In re Teleglobe Communs. Corp.)*, 493 F.3d 345, 365 (3d Cir. 2007) ("[T]he privilege only applies when clients are represented by separate counsel."); *United States v. Okun*, 281 F. App'x 228, 231-32 (4th Cir. 2008) ("But in this case, Okun failed to establish that he and IPA were represented by separate legal counsel engaged in a joint strategy."). AiPi is a single (allegedly non-legal) entity communicating with itself; the common interest privilege does not apply to PLE No. 9. This is but one example of the many "[il]legitimate" reasons supplied by AiPi in contravention of this Court's Order. Indeed, AiPi claimed the common interest privilege in sixty-seven (67) of

the sixty-eight (68) privilege log entries and not one of those entries appears to satisfy the requisite elements, including the use of separate counsel between two distinct entities.

As a remedy for AiPi's contempt of this Court's Order, Netflix merely seeks that which this Court already ordered: full and complete discovery before the close of fact discovery in the underlying litigation ("NDCA Litigation") on March 27, 2025. To meet the close of fact discovery, and given AiPi's brinksmanship thus far, Netflix seeks (i) AiPi's full and complete production, with sanctions imposed for any failure to comply; and (ii) briefing on AiPi's unfounded privilege objections.

Further, AiPi's meager production contains evidence that AiPi has engaged in nationwide litigation misconduct including (1) perjury, (2) the improper use of Netflix's Highly Confidential, Attorneys' Eyes Only ("AEO") financial information, (3) participation in Valjakka's fraudulent transfers, and (4) the unauthorized practice of law, all described more fully below.

Finally, AiPi's minimal production, privilege log, and litigation misconduct raise significant concerns about AiPi's diligence in responding to these requests, and therefore Netflix requests forensic discovery to ensure that AiPi is meeting its Court-ordered discovery obligations.

## II.    LEGAL AUTHORITY

"The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it." Fed. R. Civ. P. 45(g). Further, this Court has the inherent authority to issue a civil contempt order. *Rainbow Sch., Inc. v. Rainbow Early Educ. Holding LLC*, 887 F.3d 610, 617 (4th Cir. 2018).

The party moving for civil contempt must establish the following four elements by clear and convincing evidence: (1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge; (2) that the decree was in the movant's favor; (3) that the alleged

contemnor by its conduct violated the terms of the decree, and had knowledge (or at least constructive knowledge) of such violations; and (4) that the movant suffered harm as a result. *S. Coal Corp. v. Brickstreet Mut. Ins. Co.*, Civil Action No. 7:19-cv-00457, 2024 U.S. Dist. LEXIS 32356, at *5 (W.D. Va. Feb. 26, 2024) (citing *De Simone v. VSL Pharms., Inc.*, 36 F.4th 518, 529 (4th Cir. 2022)). Once the movant meets its initial burden of showing these four elements, the burden of production shifts to respondent to raise a defense on an appropriate ground. *Id*. (citing *Schwartz v. Rent-A-Wreck of Am.*, 261 F. Supp. 3d 607, 613 (D. Md. 2017)).

"The appropriate remedy for civil contempt is within the court's broad discretion." *De Simone v. VSL Pharms., Inc.*, 36 F.4th 518, 535-36 (4th Cir. 2022) (citing *In re Gen. Motors Corp.*, 61 F.3d 256, 259 (4th Cir. 1995)); *see also Johnson v. Deputy LNU*, No. 3:20-CV-01923-AKK, 2021 U.S. Dist. LEXIS 273746, at *3 (N.D. Ala. Dec. 17, 2021) ("District courts enjoy wide discretion to fashion an equitable remedy for civil contempt that is appropriate to the circumstances.") (cleaned up).

## III.    ARGUMENT

### A. AiPi Violated This Court's Order By Failing To Produce Responsive Documents

This Court was clear: "this is definitely a case where I think the defendant has a right to get full and open discovery . . . there's enough smoke about this case that I think it's appropriate that the full range of discovery should be granted." Order, 15:6–8, 15:15–17. Moreover, this Court warned AiPi that it should not provide evasive or incomplete discovery and that AiPi would be "required to provide appropriate answers to all of the outstanding requests within 14 days of today's date." *Id*. at 15:18–20. AiPi ignored this Court's Order.

AiPi produced a meager seventy-nine (79) documents, and most of those documents are nonresponsive. Many of the documents are either duplicates, or emails from Ramey to Morehouse

asking AiPi to pay Ramey's outstanding invoices. As detailed below, AiPi produced a mere twenty (20) responsive documents. But when AiPi was seeking to quash Netflix's subpoena, AiPi's principal and founder Eric Morehouse submitted a declaration to this Court averring under oath that there were "thousands" of documents responsive to Netflix's original requests. Morehouse Decl., ECF No. 17-2, at ¶ 8.[3]   Indeed, AiPi's recent briefing stated that a production of "five thousand documents" would be a "conservative estimate." ECF No. 24, at 9.

AiPi produced six (6) folders of documents, each corresponding to the six (6) Topics in Netflix's subpoena. The evidence before this Court demonstrates that AiPi failed to produce material responsive documents:

**Topic No. 1** seeks "All agreements and drafts of same between AiPi and persons/entities with a financial interest in Valjakka's Campaign, e.g., Lauri Valjakka, Ramey LLP, Kenealy Vaidya, LLP, IP Case Group 1 LLC, and investors in Valjakka's Campaign." ECF No. 35-2 at 11.

Folder 1 contains eleven (11) documents. One of those documents is just the signature page of another document in the folder. Another document is non-responsive (a pre-suit assignment of the Asserted Patents). One of the documents is a duplicate, leaving a mere eight (8) documents produced pursuant to Topic 1.

Further, with one (1) exception, AiPi only produced its agreements with Valjakka and Ramey. But in documents filed in the NDCA Litigation, Valjakka represented that both Kenealy Vaidya, LLP and IP Case Group 1 have a financial interest in litigation. *See*, *e.g*., NDCA

---

[3] Netflix then issued a subsequent subpoena (the one at issue here), which AiPi complained was even "broader" than the first. ECF No. 46, at 20; *see also* ECF No. 35-1, at 2 ("While one of the six requests/topics did narrow the scope of the subpoena, the remaining five topics actually expanded the scope of the subpoena that had previously been issued.").

Litigation, ECF No. 174 (L.R. 3-15 Certificate of Interested Parties). AiPi did not produce any agreements with either Kenealy Vaidya, LLP or IP Case Group 1.

AiPi did produce a "Subscription Agreement" with an entity called AiPi Litigation Funding, LLC. That Agreement does not mention Valjakka, and the subscription amount is only $95,000. Erik Lund submitted a declaration before Judge Tigar that discloses that AiPi raised a total of $1,500,000 for the Valjakka campaign.[4] Lund Decl., ECF No. 11-2 ¶¶ 30-34. None of that money is accounted for in the folder for Topic 1. And, none of the drafts requested were produced.

Further, AiPi has only claimed privilege over Topic Nos. 4 and 5, so none of the documents responsive to this Topic should have been withheld. *See* ECF Nos. 35-1, at 37, at 15-16.

**Topic No. 2** seeks "Documents regarding the creation and purpose of CDN Licensing and payments to/from CDN Licensing." ECF No. 35-2 at 11. CDN Licensing is the Finnish entity created by Valjakka to facilitate his fraudulent transfer of settlement money to CDN to avoid paying contingent creditors (Netflix's attorneys' fees for his meritless litigations).

Folder 2 contains seventeen (17) documents, half of them duplicates. Every single one of the documents comprises technical disclosures about the Content Distribution Network (CDN) technology behind the Asserted Patents; not a single document is relevant to ***CDN Licensing***, the entity. Notably, AiPi agreed to produce documents responsive to Topic 2 prior to the Court's Order. *See* ECF No. 35-1, at 2 n.2; *see also* October 25, 2024 Hearing Tr., at 5:22-24 ("[W]e agreed to Topic 2, which involves documents relating to CDN Licensing. So I think that's fine. I think that's fair game."). Despite conceding the relevance of documents regarding CDN Licensing,

---

[4] During the Parties' meet and confer, AiPi stated, "AiPi will produce signed copies of the subscription agreement for each of the investors, which should account for that discrepancy." But AiPi provided no explanation for why that wasn't already done. If AiPi does produce these documents, Netflix will advise the Court of same.

AiPi failed to produce responsive documents.

Notably, folder 6, not folder 2, contains an email thread between Morehouse and Valjakka's attorney in Finland (Onni Hietalahti) dated April 20, 2022. Lamkin Decl., Exh. A. In that email, Morehouse tells Hietalahti, "I'm transferring the $230K now. Please confirm that this is the correct bank info and that Lauri is OK with this account." Morehouse then lists the bank account information for Valjakka's entity, CDN Licensing. In response, Hietalahti confirms that the bank information for CDN Licensing is correct. This email demonstrates that AiPi was directly involved in transferring Enforcement Assets (with a sum of $230,000) to CDN Licensing. This email is not only responsive to Topic 2, but also demonstrates that Morehouse committed perjury before this Court when he submitted a declaration stating unequivocally, "AiPi has not transferred any settlement proceeds to CDN." Morehouse Decl., ECF No. 17-2 ¶ 9.

Further, buried in Hietalahti's 2022 email is the following statement, "When you have time please . . . give me a call on further measures re the ownership issue." The "ownership issue" almost certainly refers to Valjakka's lack of ownership of the asserted '167 Patent (the patent at issue in the NDCA Litigation), an issue Hietalahti was tasked with solving. And note, the email says "further measures," implying that the "ownership issue" discussion was ongoing. In the NDCA Litigation, Judge Tigar granted Netflix's motion for summary judgment that Valjakka did not own the asserted '167 Patent. NDCA Litigation, ECF No. 257. AiPi appears to have been on notice years ago that there were serious concerns that Valjakka did not own the asserted '167 Patent. But there are no documents related to ownership produced under Topic 2, and only one document responsive to Topic 6.

Upon receipt of AiPi's document production on December 27, 2024, Netflix sent multiple letters and emails to AiPi regarding Netflix's concerns with that production, including Netflix's

concerns over the lack of documents under Topic 2. Lamkin Decl., Exhs. B-E. Three (3) weeks after the production, on January 15, 2025, Morehouse gave Netflix a declaration that avers, *inter alia*, "AiPi has produced all documents containing 'CDN.'" Morehouse January 15, 2015 Declaration ¶ 4(b) (Lamkin Decl., Exh. F). Morehouse's representation is demonstrably false. By way of but one example, in the NDCA Litigation, Valjakka produced an email with Morehouse and Lund dated November 20, 2022 that discusses CDN Licensing. Lamkin Decl., Exh. G (Under Seal). Morehouse is a direct recipient of the email filed as Exhibit G; AiPi has in fact not "produced all documents containing 'CDN.'" Morehouse Decl., January 15, 2025, ¶ 4(b). Netflix is in possession of multiple other emails with "CDN" that were not produced by Morehouse.

**Topic No. 3** requests any presentations prepared or provided by AiPi to potential investors related to Valjakka's Campaign. *See* ECF No. 35-2 at 11. Folder 3 contains six (6) documents: (1) a "Cisco Claim Chart" (an infringement chart) created by AiPi for the *Valjakka v. Cisco* litigation on August 20, 2021; (2) an invalidity analysis of the asserted '167 Patent, dated October 7, 2021, with Erik Lund listed as the author in the metadata; (3) a "Validity Analysis" created by Erik Lund and Weir King of AiPi on October 7, 2021; (4) a "Venue Analysis" of the *Valjakka v. Cisco* litigation drafted by Erik Lund on October 17, 2021; (5) a PowerPoint presentation created by AiPi and dated "September 2021," titled "Patent Litigation Investments—Timelines and Financial Projections"; and (6) another PowerPoint presentation created by AiPi and dated "September 2021," titled "Patent Litigation Investments—WD Texas Patent Litigation Statistics."

Netflix assumes that these documents are responsive and that they were sent to investors as part of AiPi's efforts to raise money for Valjakka's campaign. But curiously, none of these documents even mention Valjakka. None of the documents specific to investing in Valjakka's Campaign are accounted for and none appear to be on AiPi's privilege log. If the documents were

provided to potential and actual investors via email, AiPi did not provide any of the emails to which these documents were attached. And none of the financial projections specific to Valjakka's campaign were provided.

Further, according to a declaration that AiPi principal Erik Lund filed in the NDCA Litigation, AiPi raised about $1.5 million from investors for the Valjakka Campaign. Lund Decl., ECF No. 11-2 ¶¶ 28, 34. It is unfathomable that AiPi raised $1.5 million from investors without sending a single email, letter, PowerPoint, or any method of presenting the investment opportunity.

**Topic No. 4** seeks emails between AiPi and Ramey LLP and/or Erick Robinson (Valjakka's former litigation counsel) regarding material litigation decisions. The folder for Topic 4 contains fourteen (14) emails, none of which is responsive.

Most of the emails are from Ramey asking AiPi to pay his invoices.[5] But not one of the documents in folder 4 is an email between AiPi and Ramey LLP and/or Erick Robinson regarding material litigation decisions. And AiPi's privilege log does not account for the volume of communications that should be responsive to Topic 4. For example, the earliest entry in AiPi's privilege log is dated September 13, 2021. Nemiroff Decl., Exhs. B-C, PLE No. 1. AiPi/Ramey filed Valjakka's first lawsuits (against Akamai, Cisco, and Amazon) on September 10, 2021. There should be considerable entries related to material litigation decisions, including any pre-suit investigation before AiPi/Ramey/Robinson/Valjakka chose to sue Akamai, Cisco, and Amazon. But AiPi did not produce a single document responsive to Topic 4.

**Topic No. 5** seeks "Any communications to or from AiPi related to attorneys' fees or sanctions in the Valjakka Campaign." ECF No. 35-2 at 11. AiPi produced a single email from

---

[5] One email discloses Netflix's "Highly Confidential, Attorneys' Eyes Only" financials to AiPi in violation of the NDCA Litigation Protective Order, discussed *infra*.

Joseph Zito (the attorney who took over about ninety (90) AiPi cases for Ramey) to AiPi's Morehouse, Lund, and Sheets, dated February 20, 2024. The email is redacted in its entirety.

But Netflix is aware of at least one email between Ramey and AiPi warning AiPi that its litigation strategies may lead to sanctions. ECF No. 37-3. And Netflix sent numerous letters to Ramey that implicate attorneys' fees based on Rule 11, Section 1927, and Section 285, including a February 8, 2022 letter from S. Piepmeier regarding improper venue allegations; a December 12, 2022 letter from S. Piepmeier regarding litigation misconduct; a December 16, 2022 letter from S. Piepmeier regarding insufficient supplemental infringement contentions for the '102 patent; and a June 23, 2023 letter from S. Piepmeier regarding bad faith litigation. Netflix would expect AiPi's "full and open" response to Topic No. 5 to include at least the communications related to these letters, as well as any other communications related to attorneys' fees or sanctions. But AiPi produced nothing beyond one email redacted in its entirety, and there appear to be no other corresponding entries in AiPi's privilege log.[6] Nemiroff Decl., Exhs. B-C.

After Netflix sent multiple communications detailing the deficiencies in AiPi's December 27, 2024 production, including concerns with the absence of documents under this Topic, Morehouse submitted a declaration to Netflix averring, "AiPi produced all documents concerning the risk of attorney fees to be awarded against Valjakka. I searched for all documents contained within the Netflix folder. I was also the primary contact person from AiPi regarding the Valjakka litigation and I am not aware, or have any recollection, of any communications other than AIPI_Privilege000001-000005." Morehouse Decl., January 15, 2025, ¶ 4(f) (Lamkin Decl., Exh.

---

[6] There is one entry nearly two (2) weeks after Ms. Piepmeier's February 8, 2022 correspondence that cites "Netflix's letter," but the description of the correspondence doesn't match the contents of the 2/8/22 letter. *See* Nimeroff Decl., Exhs. B-C, PLE No. 9.

F).[7] Netflix respectfully submits that Morehouse's representation is not credible, and the extremely limited scope of his search is plainly inadequate. For example, the CTD matter, when Microsoft sent a letter threatening sanctions and fees to Ramey, Ramey sent that letter directly to Morehouse and AiPi. Lamkin Decl., Exh. I (Under Seal).  Here, Netflix's counsel, Sarah Piepmeier, *supra*, sent Ramey at least four (4) letters threatening sanctions and fees, and yet Morehouse is claiming he is not in possession of a single one those letters or any communications related thereto (or was unable to find them in the single folder that he searched).

Finally, **Topic No. 6** seeks "All documents showing payments to any person/entity of the Enforcement Assets."[8] ECF No. 35-2 at 11. The folder corresponding to Topic 6 contains thirteen (13) documents.  Nine (9) of the documents are emails from Ramey asking AiPi to pay his invoices. Those invoices demonstrate, consistent with the AiPi Engagement Agreement, AiPi did the legal work for the AiPi plaintiffs, including Valjakka. *See* AiPi/Ramey Engagement Agreement ¶ 1(b) (Lamkin Decl., Exh. J – Under Seal).

The remaining four (4) documents appear to be responsive in that they appear related to settlement money from/to the Valjakka Campaign, including the email wherein Morehouse says he is transferring money to CDN Licensing "now." Lamkin Decl., Exh. A. But there is no way to assess the amount of monies paid to investors in Valjakka's campaign.  There are no bank records, wire transfer records, no proof of payment, and no invoices.

In his declaration filed in the NDCA Litigation, Erik Lund explains that AiPi paid (i) Ramey $295,539.00, (ii) experts $267,594.76, (iii) Valjakka $258,500, and (iv) investors $393,911. Lund Decl., ECF No. 11-2 ¶¶ 29-34. But AiPi failed to produce a single bank transfer

---

[7] AIPI_Privilege000001-000005 is the 2024 document redacted in its entirety in folder 5, *supra*.

[8] AiPi only claimed privilege over Topics Nos. 4-5, so none of the documents responsive to this Topic should have been withheld. *See* ECF Nos. 35-1, at 15-16.

confirmation. The same Lund declaration states that "[t]he Valjakka case has reached settlement with five entities for a total of $1,285,000." *Id*., at ¶ 28. Documents evidencing these payments by AiPi to entities/persons must exist for said payments to have occurred, but AiPi did not produce them.[9]

### B. AiPi Violated This Court's Order By Failing To Conduct An Adequate Search For Documents

Upon receipt of its December 27, 2024 production, Netflix sent AiPi multiple communications detailing the inadequacy of AiPi's production. Lamkin Decl., Exhs. B-E. Initially, AiPi ignored Netflix's communications. Lamkin Decl., Exh. D. Ultimately, Morehouse provided a declaration detailing his very limited search for documents. Lamkin Decl., Exh. F. Morehouse's declaration raises more concerns than it assuages.

Morehouse explained that he only searched two sources (i) a single "Netflix" folder on a hard drive in his "possession" (likely a folder on his personal laptop), and (ii) his own emails from Ramey using two search terms, "Netflix" and "CDN":

> AiPi's business records are stored locally on a computer in my possession. AiPi maintains a computer file on Mr. Valjakka's lawsuit against Netflix ("Netflix File"). This file contains the documents AiPi has relating to Mr. Valjakka'a lawsuit against Netflix. In addition, I saved emails relevant to Mr. Valjakka's lawsuit against Netflix within this folder.
>
> In response to the subpoena issued by Netflix, I conducted a search for documents and emails responsive to the six topics by reviewing each of the documents contained within the Netflix folder. I categorized the documents as they pertained to the six topics in the subpoena. In addition to this search, I also searched all of the emails from William Ramey relating to "Netflix." All of these emails containing the term "Netflix" were produced or logged as privileged. I searched for the term "Netflix" because this search term would necessarily encompass the subtopics

---

[9] During the pre-filing meet and confer, and in Morehouse's declaration, AiPi says it will attempt to obtain copies of the wire transfers. *See* Morehouse January 15, 2025 Decl., at ¶ 4(g) ("I will search to see if I can obtain this information from AiPi's bank."). AiPi offers no explanation for why this hasn't already been done. And Morehouse's statement makes little sense; confirmation of transfers should be available online with AiPi's bank and evidence suggests that Morehouse retained wire transfers. *See, e.g*., Lamkin Decl., Exh. N (Under Seal).

listed within topic 4. I also separately searched for "CDN" as it pertained to topic
2 and topic 4(e).

Morehouse Decl., January 15, 2025, ¶¶ 2-3 (Lamkin Decl., Exh. F.)

Morehouse's search was woefully inadequate. As for the "Netflix File" folder stored
"locally" on his personal hard drive, the only documents on Morehouse's hard drive would be
documents he took the time to save in that folder. And, at the relevant time, there were thirty-four
(34) employees and advisors for AiPi.  Individuals working on the Valjakka Campaign would
likely have no ability to place their work product or emails on Morehouse's personal computer,
and Morehouse did not search any other computers.

Morehouse did not even search his own emails, much less Sheets or Lund's emails, or any
of the other many AiPi employees mentioned in AiPi's privilege log, *e.g.* "JMerril," "mozmen,"
"rkerber, or "slewis".  Nemiroff Decl., Exhs. B-C, PLE Nos. 1, 12.

The only actual email Morehouse claims to have searched (other than those allegedly saved
to his hard drive) were emails (presumably to him) "from" Ramey, and he only searched using two
terms, (1) Netflix, and (2) CDN.  Morehouse failed to search using terms clearly relevant under
Netflix's Topics, including: "Valjakka," "CUVTA," "fraudulent transfer," "Attorneys' fees,"
"Onni," "sanctions," "ownership" and "standing" to name a handful.

In addition to failing to thoroughly search his AiPi email, Morehouse did not search the
other email accounts he used for this work, including emorehouse@kviplaw.com. Lamkin Decl.,
Exh. H (Under Seal).[10]

Morehouse's inadequate search fails to comply with this Court's Order mandating a full
and complete production.

---

[10] KVIP Law is Kenealy, the other entity with a financial interest in the Valjakka Campaign
according to the Local Rule 3-15 disclosures that Valjakka filed in the NDCA Litigation.

### C. AiPi Disregarded This Court's Admonition To Only Make Legitimate Privilege Objections

AiPi did not heed this Court's warning that "counsel . . . better make sure that you have a legitimate reason to argue that it's attorney/client privilege." Order, 15:12-14. Pursuant to Rule 45, "[a] person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material ***must*** . . . describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, ***will enable the parties to assess the claim***." Fed. R. Civ. P. 45(e)(2)(A) (emphasis added). Here, AiPi's privilege log appears both under- and over-inclusive—*i.e*., it both fails to log all seemingly withheld communications, and also claims protection for communications that are clearly not privileged.

***First***, Morehouse and AiPi told this Court there were thousands of responsive documents ECF Nos. 17-2 ¶ 8; 35-1 at 2; 46 at 2 n.2; 46 at 20. But AiPi produced only twenty (20) responsive documents, and its privilege log contains only sixty-eight (68) entries.

***Second***, 67 of the 68 entries have a cut-and-paste claim to three (3) privileges: the attorney-client privilege, work product doctrine, and common interest privilege. Netflix is skeptical that AiPi can meet its burden of showing that 67 of 68 entries are protected by all three (3) privileges. And, as discussed above, AiPi cited the common interest privilege and the attorney client privilege to withhold documents that are plainly not subject to those privileges.

***Third***, AiPi Erik Lund submitted a sworn declaration to Judge Tigar averring:

o "Eric Morehouse, Joseph Zito, Erik Lund, and Ken Sheets are not co-counsel with William Ramey," ¶ 6;

o "I did not provide legal services to Mr. Valjakka," ¶¶ 10-12; and

o "AiPi is not involved in legal decision making." ¶¶ 11-12.

Lund Decl., ECF No. 11-2.

And yet, AiPi's privilege log describes multiple communications wherein Erik Lund is sending work product to Ramey as "attorney client communication" and "attorney work product." *See, e.g.*, Nemiroff Decl., Exhs. B-C, PLE Nos. 4-9. Incredibly, as noted above, at least one of the entries comprises an email that is just between members of AiPi. *Id.*, at PLE No. 9. AiPi cannot have it both ways: if AiPi "did not provide legal services to Mr. Valjakka," then its communications regarding Valjakka's case and alleged work product are not protected. If it did, Lund committed perjury.

**Fourth**, AiPi's first entry is dated September 13, 2021. *Id.*, at PLE No. 1. Erick Robinson (AiPi/Valjakka's original outside counsel) filed lawsuits on behalf of Valjakka against Cisco, Akamai, and Amazon on September 10, 2021. There should be dozens (or more) entries for any pre-suit communications between Robinson, AiPi, and Valjakka discussing, *inter alia*, (1) which entities to sue, (2) which claims to allege, (3) which products to accuse, (4) which forum to file, (5) any invalidity or patent eligibility concerns, to name a handful of material litigation decisions and analyses that must occur before filing suit. None of those communications were logged.

**Fifth**, numerous privilege log entries consist of multiple emails contained in a thread. In fact, 36 of the 86 entries are "threads" of multiples emails. AiPi cannot bury emails in a "thread" and use a single (inadequate) descriptor for all the emails in the thread. *See Townhouse Rest. of Oviedo v. Nuco2*, No. 19-14085-CIV-ROSENBERG/MAYNARD, 2020 U.S. Dist. LEXIS 108809, at *3 (S.D. Fla. May 5, 2020) ("This Court agrees with what appears to be the majority view that emails should be individually described in a privilege log even if they appear in a string of emails.") (collecting cases).

**Sixth**, the privilege log also fails to identify the roles of the persons listed as authors and/or recipients of the communications listed, which makes it impossible for Netflix to ascertain whether

any applicable privilege was waived through communications with third parties. *See, e.g.*, Nemiroff Decl., Exhs. B-C, PLE No. 12 (listing unidentified Diana Kelman; mozmen@aipisolutions.com; rkerber@aipisolutions.com; slewis@aipisolutions.com; Andy Rosen; henning@safecast.co.uk); *see also Progressive Southeastern Insurance Company v. Arbormax Tree Service, LLC*, 2018 WL 4431320, at *8 (E.D. N.C. Sept. 17, 2018) (finding privilege log deficient for not identifying roles of each person listed). Some entries even mention a recipient named "USPTO," which would indicate that this communication was sent to a third party—the United States Trademark and Patent Office—thereby waiving any privilege claim for these communications. *See* Nemiroff Decl., Exhs. B-C, PLE Nos. 39-40, 42. At least one of the entries includes Henning von Spreckelsen (henning@safecast), an investor for a separate plaintiff (SafeCast) in another set of the one hundred and forty (140) AiPi/Ramey litigations, waiving privilege for those communications. *See id.,* at PLE No. 12.

AiPi's privilege log is woefully inadequate and claims privilege where none can possibly apply, in violation of this Court's Order and the Federal Rules.

### D. AiPi Should Be Held In Contempt

"There can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt." *Redner's Mkts., Inc. v. Joppatowne G.P. Ltd. P'ship*, 608 F. App'x 130, 131 (4th Cir. 2015) (citing *Shillitani v. United States*, 384 U.S. 364, 370 (1966)); *see also Rainbow Sch., Inc. v. Rainbow Early Educ. Holding LLC*, 887 F.3d 610, 617 (4th Cir. 2018); Fed. R. Civ. P 45(g).

All four requisite elements for civil contempt are met here. *See S. Coal Corp. v. Brickstreet Mut. Ins. Co*., Civil Action No. 7:19-cv-00457, 2024 U.S. Dist. LEXIS 32356, at *5 (W.D. Va. Feb. 26, 2024) (citing *De Simone v. VSL Pharms., Inc*., 36 F.4th 518, 529 (4th Cir. 2022)).

1) <u>AiPi had knowledge of this Court's Order</u>

Element 1 for civil contempt is "the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge." *Brickstreet, supra*, at *5. It is beyond dispute that AiPi had actual knowledge of this Court's Order. AiPi's counsel appeared at the hearing and received notice through the Court's ECF system; AiPi produced documents and a privilege log in response to that Order; and Morehouse submitted a declaration describing his limited efforts to comply with that Order.

### 2) The Court's Order was in Netflix's favor

Element 2 for civil contempt is "the decree was in the movant's favor." *Brickstreet, supra*, at *5. This element is satisfied. *See* Order, 15:3-21.

### 3) AiPi violated the Court's Order and had constructive knowledge of its violation

Element 3 for civil contempt is "the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (or at least constructive knowledge) of such violations." *Brickstreet, supra*, at *5. This Court should have "no difficulty" finding AiPi violated this Court's Order and has knowledge thereof. *See Buffalo Wings Factory, Inc. v. Mohd*, No. 1:07cv612 (JCC), 2008 U.S. Dist. LEXIS 82247, at *32 (E.D. Va. Oct. 15, 2008). AiPi's "attempts to comply have been, thus far, late, half-hearted, and insufficient." *Id*. AiPi's obdurate production is sufficient to find constructive knowledge of its violation of this Court's Order. *Id*.

Further, AiPi is comprised of attorneys with more than 100 years of legal experience. Morehouse was admitted to the Virginia bar in 2003 and the D.C. bar in 1995, among other admissions. Sheets was admitted to the Virginia bar in 1999, among other admissions. Lund was admitted to the USPTO in 2021, among other admissions. Weinstein was admitted to the USPTO in 1998, among other admissions. Giammittorio was admitted to the Virginia bar in 1988.[11] All

---

[11]    *See*    https://web.archive.org/web/20230817111619/https://aipisolutions.com/who-we-are/, https://web.archive.org/web/20231209021913/https://aipisolutions.com/who-we-are/

are deeply experienced patent litigators. There is no question that these lawyers understand an order compelling a full and complete production and an admonition against unfounded privilege allegations.[12]

> 4) Netflix has suffered cognizable harm

The final element is "the movant suffered harm as a result." *Brickstreet, supra*, at *5. The attorneys' fees Netflix expended for attempting to obtain AiPi's compliance with this Court's Order, and bringing this Motion, constitutes cognizable harm. *Mt. Valley Pipeline, LLC v. Easements To Construct, Operate, & Maintain A Nat. Gas Pipeline*, No. 7:17-cv-00492, 2018 U.S. Dist. LEXIS 75780, at *52-53 (W.D. Va. May 4, 2018) (finding that the harm element was satisfied where "MVP has incurred attorneys' fees in having to prosecute the contempt motion").

Further, Netflix has suffered "informational harm" because it continues to be prejudiced by AiPi's withholding of evidence that is relevant to Netflix's Section 285 claim for fees against AiPi. *See De Simone*, 36 F.4th at 535. Netflix has certainly suffered harm in the lengthy delay to the NDCA Litigation.

Netflix has established each requisite element, based on this record before the Court, and therefore respectfully requests an order finding AiPi in civil contempt.

### E. Netflix Respectfully Requests Briefing On the Privilege Issues

In addition to the remedies discussed in Section IV, *infra*, Netflix seeks briefing on AiPi's privilege allegations.[13] Fact discovery is set to close on March 27, 2025 in the NDCA Litigation

---

[12] Further, AiPi's intent is irrelevant. *Telecomm. Sys. v. Mobile* 365, Inc., No. 3:06CV485, 2009 U.S. Dist. LEXIS 126761, at *11 (E.D. Va. Mar. 31, 2009) (collecting cases).

[13] While AiPi and Ramey signed an Engagement Agreement saying AiPi would do "all" of the legal work, at least in the NDCA Litigation, Ramey appears to have done substantial work later in the case. It is possible AiPi and Ramey entered into a subsequent agreement. Any subsequent agreement modifying the original Engagement Agreement must be produced. Netflix has requested same, should it exist.

and there is no guarantee Judge Tigar will extend the schedule for a fourth time. The alleged privilege issues should be decided now. Especially where, as here, AiPi's multiple crimes are likely to prevent any privilege (assuming *arguendo* one existed) from attaching. *Rambus, Inc. v. Infineon Techs. AG*, 222 F.R.D. 280, 287 n.18 (E.D. Va. 2004) ("[I]n order to establish the applicability of the attorney-client privilege, the proponent must show, *inter alia*, that the communication was not made 'for the purpose of committing a crime or tort.'") (citing *Hawkins v. Stables*, 148 F.3d 379, 383 (4th Cir. 1998)).

Regarding CUVTA, none of the AiPi communications related to CUVTA should be privileged. *Galaxy CSI, LLC v. Galaxy Comput. Servs., Inc. (In re Galaxy Comput. Servs., Inc.)*, Civil Action No. 04-07-A (LMB), 2004 U.S. Dist. LEXIS 28162, at *1, *5–6 (E.D. Va. Mar. 31, 2004); *Carbajal v. Hayes Mgmt. Serv.*, No. 4:19-cv-00287-BLW, 2022 U.S. Dist. LEXIS 130744, at *55 (D. Idaho July 21, 2022). As such, CUVTA-related email should be produced. *See, e.g.*, Nemiroff Decl., Exhs. B-C, PLE Nos. 62, 67, 69.

Moreover, perjury is a crime. *Fennell v. Town of Pocahonta*s, No. 1:05CV00045, 2005 U.S. Dist. LEXIS 19007, at *13 (W.D. Va. Sep. 2, 2005) ("Perjury is a crime[.]") Morehouse submitted at least one perjurious declaration. In his July 22, 2024 declaration submitted to this Court, Morehouse averred, "AiPi has not transferred any settlement proceeds to CDN." ECF 17-2 ¶ 9. That statement is demonstrably false. Lamkin Decl., Exhs. A, N. Morehouse may also have committed perjury when he told this Court there were "thousands" of responsive documents when trying to quash Netflix's subpoena. ECF No. 17-2, at ¶ 8.[14]

---

[14] AiPi cannot be heard to say that Morehouse was describing documents responsive to an earlier served and broader subpoena when AiPi consistently represented to this Court that the current subpoena at-issue is even "broader" than the subpoena Morehouse was referring to. *See, e.g.*, ECF Nos. 35-1, at 2; 46, at 2; 46, at 20.

Morehouse's January 15, 2025 declaration also contains demonstrably false statements, including that "AiPi has produced all documents containing 'CDN.'" *Compare* Lamkin Decl., Exh. F ¶ 4(b) *with* Exh. G.

Erik Lund committed perjury when he repeatedly swore to Judge Tigar that neither he nor AiPi performed legal services for Valjakka. ECF No. 11-2 ¶¶ 10-12. The Ramey/AiPi Engagement Agreement and Valjakka Litigation Plan make clear that AiPi will be providing legal services. Lamkin Decl., Exhs. J-K. To be clear, these Agreements do not state that AiPi will "support" Ramey, they do not say that Ramey will review AiPi's work product. They say the opposite: AiPi will do all legal work.

AiPi's privilege log appears to confirm that Erik Lund did in fact draft Valjakka's complaint and infringement charts, for example. *Compare* Nemiroff Decl., Exhs. B-C, PLE Nos. 1,4 *with* Lund Decl. ¶ 10; *see also* Zito Decl., ECF No. 21-2, Exh. I ¶ 5 ("In November of 2021, Morehouse said he wanted to work with [Ramey] and Ramey LLP. He [Morehouse] proposed a financial arrangement whereby Ramey LLP would enter the appearances and assist with case work but his [Morehouse's] internal attorneys and staff would handle the majority of the drafting, including discovery.").

Lund and Morehouse's perjury, perpetrated upon this Court and upon Judge Tigar, was done in furtherance of several schemes, including (i) preventing Netflix from obtaining discovery to which it is entitled, (ii) preventing Judge Tigar from joining AiPi to the NDCA Litigation, and (iii) keeping their illegal business structure with William Ramey secreted from the courts. Thus, any communications in furtherance of those schemes are not privileged and should be produced.

Further, Morehouse and Lund's perjury before this Court should undermine any claim to privilege over documents pertaining to the subjects of their perjury, including (1) AiPi's role in

providing legal advice in the Valjakka litigations, such as the material decisions related to Netflix's upcoming § 285 fees motion (Topic Nos 4-5), and (2) the search for and collection of documents responsive to this Court's Order and Netflix's subpoena.

Finally, the unauthorized practice of law is a crime. *Rutledge v. City of Danville*, No. 4:13-cv-00066, 2013 U.S. Dist. LEXIS 172934, at *2-3 (W.D. Va. Dec. 9, 2013) ("[T]he unauthorized practice of law is a Class 1 Misdemeanor in the Commonwealth of Virginia."). As such, again, communications and documents pertaining to AiPi's role in providing legal advice in the Valjakka litigations, including the material decisions related to Netflix's upcoming § 285 fees motion (Topic Nos 4-5) are not privileged.

Netflix respectfully requests briefing on these issues to ensure that a ruling can be obtained, and AiPi's compliance ensured, prior to the March 27, 2025 discovery cut-off in the NDCA Litigation.

## F. AiPi's Litigation Misconduct Warrants An Order Mandating Forensic Discovery

### 1) AiPi is committing perjury and fraud upon the courts at a national scale

For the first time in this litigation, AiPi produced its Engagement Agreement with Ramey. Lamkin Decl., Exh. J (Under Seal). The Agreement demonstrates that the members of AiPi have committed the unauthorized practice of law, perjury, and fraud upon courts on a grand scale. This scheme—just discovered—is relevant to each of the issues raised in this Motion and to attorneys' fees in the underlying NDCA Litigation.

AiPi's Engagement Agreement with Ramey expressly states that AiPi, not Ramey, will do "*all* drafting of documents, legal work and research[.]" Lamkin Decl., Exh. J, at 1-2 (emphasis added). Under this Agreement, Ramey is a ventriloquists' doll, mouthing AiPi's legal work to the courts.

AiPi also produced its Litigation Plan with Valjakka, which also makes clear that AiPi will

do all "substantive" legal work in each of the Valjakka's cases, including expressly against Netflix.

Lamkin Decl., Exh. K.

Ramey appeared on behalf of AiPi and AiPi-backed plaintiffs in one hundred and forty

(140) litigations under this Agreement. Lamkin Decl., Exhs. L, M (*California Innovations v. Ice

Rover*, 1:22-cv-01986-RM-NRN, ECF Nos. 61-1, 61-2 (D. Colo. Dec. 12, 2023) (Ramey Decl.

listing all AiPi/Ramey cases)).  As Judge Neureiter rightly suspected in one of the Ramey/AiPi

cases:

> The Court has received attorney William Ramey's Response (Dkt. #61) to the Show
> Cause Order (Dkt. #58) regarding whether Mr. Ramey should be referred to the
> Court's Committee on Conduct for his neglectful behavior in this case. (Dkt. #58).
> Mr. Ramey's response raises more questions than it answers. These questions
> include the scope of the relationship between Ramey LLP, Mr. Eric Morehouse,
> and Whitestone Law, PLLC ("Whitestone") (formerly "AiPi LLC"); and whether
> Mr. Ramey was essentially acting as "straw man" (or "straw lawyer") by filing
> cases under his name on behalf of other lawyers or a law firm that was expected to
> do the work without Mr. Ramey or Ramey LLP's meaningful involvement, and
> without Mr. Ramey or Ramey LLP having any meaningful connection with the
> clients on behalf of whom the suits were being prosecuted.
>
> . . .
>
> The Court has serious concerns about the arrangements outlined in Mr. Ramey's
> declaration—whether they are consistent with a lawyer's obligations to his clients
> and the Court under the Colorado Rules of Professional Conduct, and whether such
> an arrangement in this matter has interfered with the fair administration of justice.

*California Innovations,* No. 1:22-cv-01986-RM-NRN, ECF No. 65.[15]

Judge Neureiter was unable to confirm his suspicions as AiPi submitted a false declaration

in response (ECF No. 21-2, Exh. I) and the case settled thereafter. But he was absolutely correct,

---

[15] Netflix respectfully asks this Court to take judicial notice of the court documents in other
AiPi/Ramey cases. *Witthohn v. Fed. Ins. Co.*, 164 F. App'x 395, 397 (4th Cir. 2006) (stating courts
may take judicial notice of court records) (citing *Gasner v. Dinwiddie*, 162 F.R.D. 280, 282 (E.D.
Va. 1995)).

Ramey was the "straw man" for AiPi and AiPi was expected to do the legal work without Ramey's "meaningful involvement."  And under the Ramey/AiPi Engagement Agreement, their fraud upon the courts was to be repeated one hundred and forty (140) times. Lamkin Decl., Exh. J, at 7 ("The above list is not intended to be exhaustive and it is AiPi's intention to pursue as many case groups of both tiers as possible with Ramey & Schlvaller."); *id.*, Exhs. L, M.[16]

The relevance and materiality of the scheme being perpetrated on the courts by AiPi (and Ramey) to these proceedings include: (1) it evidences that AiPi is engaged in the unauthorized practice of law, undermining any claim to privilege; (2) the scheme and perjury therein will be considered by Judge Tigar as part of Netflix's § 285 fees motion and thus necessarily expands the scope of Netflix's Rule 45 subpoena as explained by this Court in its Order (*see, e.g.*, 3:11-15, 14:13-21, 14:22-15:2); and (3) the existence of the scheme itself and the multiple perjurious declarations filed by Ramey and AiPi before courts across this country demonstrate the need for forensic discovery here.

Under controlling caselaw, AiPi's scheme must be considered in Judge Tigar's § 285 attorneys' fees calculus in the underlying NDCA Litigation. *Stone Basket Innovations, LLC v. Cook Med. LLC*, 892 F.3d 1175, 1183 (Fed. Cir. 2018) ("In considering the 'totality of the circumstances' in a § 285 motion, a party's similar conduct in other litigation is also relevant.") (citing *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014)).  Further, all told, AiPi's scheme—just disclosed—is relevant to nearly every issue raised in this Motion.

2)  AiPi is committing the unauthorized practice of law

Under its contracts with Ramey and Valjakka and as demonstrated by the evidence cited herein, AiPi is clearly practicing law, but it is not a law firm. As such, it and its members are

---

[16] Judge Neureiter's order contains one error: AiPi did not become Whitestone. They are separate entities (though with considerable overlap in personnel).

engaged in the unauthorized practice of law. Va. Sup. Ct. R. 1A:5(e); *Richmond Ass'n of Credit Men v. Bar Ass'n of City of Richmond*, 167 Va. 327, 336, 189 S.E. 153, 158 (1937); Va. Code Ann. § 54.1-3904 (citing *Richmond*); *see also Capital Associated Indus. v. Stein*, 922 F.3d 198 (4th Cir. 2019) (affirming a finding of the unauthorized practice of law under North Carolina law on similar facts: a non-law firm, employing attorneys, providing legal services outside their organization). The unauthorized practice of law is a crime. *Ronsdorf v. Raiffeisenbank Dornbirn Reg. Gen. M.B.H.*, 63 Va. Cir. 499, 500 (Cir. Ct. 2003) ("Unauthorized practice of law can constitute a Class 1 misdemeanor under the law of Virginia."). These crimes present yet another reason why AiPi's communications and work product in furtherance of its scheme (and its "exceptional" conduct pursuant to 35 U.S.C. § 285) are not privileged.

### 3) AiPi used Netflix's confidential financial information, clearly designated Highly Confidential Outside Counsel Only

AiPi produced an email sent by Ramey to AiPi with the subject "here are the Netflix financials." Lamkin Decl., Exh. O (Under Seal). Ramey notes in the body of the email "please treat as AEO." *Id.* The document includes detailed and highly confidential financial information belonging to Netflix. Ramey never should have sent the AEO financials to AiPi, especially given that AiPi is a litigation funder. And AiPi should have immediately deleted the Highly Confidential AEO financials. But instead, it appears that AiPi used Netflix's AEO information as part of AiPi's work product in the Valjakka Campaign. *See* Privilege Log, PLE Nos. 10-11; *see also id.*, at 22, 68 (discussing AEO documents). AiPi's possession and use of Netflix's AEO financial information is highly concerning, given its status as a litigation funder and its demonstrated disregard for the law.[17]

---

[17] During the pre-filing meet and confer, AiPi stated, "Mr. Morehouse has indicated that he has not used this document for any purpose, including within the lawsuit. He also has no recollection

4) <u>AiPi's conduct, including gamesmanship, improper withholding, and multiple instances of perjury, necessitates forensic discovery</u>

Forensic imaging of computer devices ("forensic discovery") is not uncommon in civil litigation. *IHS Global Ltd. v. Trade Data Monitor LLC*, 2019 U.S. Dist. LEXIS 220327 at *9, 2019 WL 7049687 at *3 (D.S.C. Dec. 23, 2019) ("[F]orensic imaging is not uncommon in the course of civil discovery.") (quoting *John B. v. Goetz*, 531 F.3d 448, 459 (6th Cir. 2008)); *Delta T, LLC v. Williams*, 337 F.R.D. 395, 400 (S.D. Ohio 2021) (accord)).

AiPi's discovery conduct makes clear the need for forensic discovery. *See Drueding v. Travelers Home and Marine Insurance Co.*, 22-cv-00155-LK, 2022 WL 17092736, at *6 (W.D. Wash. Nov. 21, 2022) ("Ms. Drueding's repeated misrepresentations and foot-dragging raise serious concerns about her future efforts to comply with discovery obligations in good faith and lead the Court to conclude an independent forensic examination of her electronic devices is necessary and appropriate."). AiPi's conduct to date has already been strongly admonished by this Court, and its egregiously deficient response to this Court's Order only bolsters this conclusion. *See* Order, 16:17-19 ("If that case were before me on these facts, I'd be finding it's an extraordinary case. This is not how patent litigation should be done in this country."); *see also id.* at 12:7-12 (describing Valjakka's and AiPi's litigation tactics as "illegal extortion").

As such, Netflix requests permission to conduct forensic discovery of AiPi. *See IHS Glob.*, 2019 U.S. Dist. LEXIS 220327, at *17; *see also Rainbow Sch.*, 887 F.3d at 617 (affirming the trial court: "the court invoked its broad discretion to craft an appropriate remedy and ordered the appointment of a 'temporary, independent auditor [to] help resolve these questions and bring [Early Education's] business activities into compliance with the injunction to the extent that this

---

of reviewing the document at issue. He is willing to sign a statement to that effect." Mr. Morehouse received emails with Lund and Sheets' use of Netflix's AEO financials. Nemiroff Decl., Exhs. B-C, PLE Nos. 10-11.

can reasonably be accomplished'"). Said imaging should include the imaging of all computers used by members of AiPi from, at least, June 1, 2021 to the present.

## IV. REMEDIES SOUGHT

"The appropriate remedy for civil contempt is within the court's broad discretion[.]" *Redner's Mkts.*, 608 F. App'x at 131. Here, based on AiPi's conduct, Netflix requests the following remedies:

(1) Full and complete discovery, including:

    a.  A full and complete production responsive to Netflix's subpoena Topics.

    b.  Discovery into AiPi's use of Netflix's AEO financial information.

    c.  A third-party expert to conduct forensic discovery, including the imaging of all computers used by members of AiPi from, at least, June 1, 2021 to the present.

    d.  The production of a complete and proper privilege log concurrent with the (1)(a) production.

    e.  Briefing on the privilege issues after the (1)(a) production.

    f.  A deposition of AiPi covering the topics in (1)(a), *supra*, before March 3, 2025.

## V. THE PARTIES' MEET AND CONFER DID NOT ADDRESS NETFLIX'S CONCERNS

AiPi's Court-ordered production occurred on Friday, December 27, 2024. On Monday December 30, 2024, Netflix wrote to AiPi and asked AiPi to immediately identify all persons that accessed Netflix's AEO financials. Lamkin Decl., Exhs. B, D. AiPi still has not provided the requested information.

Netflix also raised many concerns with AiPi's document production that still have not been addressed. *See* Lamkin Decl., Exhs. B-E. Indeed, Morehouse provided a declaration explaining his search methods that raises more concerns that it alleviates. *Id.*, at Exh. F. Nonetheless, during its

26

January 15, 2025 meet and confer with AiPi pertaining to this Motion, Netflix told AiPi that it would inform the Court as to any efforts AiPi made to rectify Netflix's concerns over the next ten (10) days in anticipation of the January 24, 2025 hearing.

As to AiPi's privilege log, during the pre-filing meet and confer, AiPi stated that it would simply produce all of the documents on said log if Netflix signed a stipulation stating that said production did not amount to a subject matter waiver. AiPi also said Netflix could argue the full scope of waiver over any documents sought that were privileged but not currently on AiPi's privilege log. But, AiPi's proposed solution favors AiPi and harms Netflix. First, it harms Netflix greatly to give up its rights to a subject matter waiver. And, Netflix would still have to engage in litigation over documents not yet properly listed on AiPi's privilege log, of which there are many, *supra*. Netflix declined AiPi's proposed "solution," but will continue to try to find areas of compromise before the noticed hearing.[18]

## VI.    CONCLUSION

For the reasons stated herein, Netflix respectfully requests the remedies detailed in Section IV, *supra*.


Dated: January 17, 2025                 Respectfully submitted,

                                        */s/ Cailyn Reilly Knapp*
                                        Cailyn Reilly Knapp (VA Bar No. 86007)
                                        BAKER BOTTS L.L.P.
                                        700 K Street N.W.
                                        Washington, DC 20001
                                        Tel: (202) 639-7753
                                        Fax: (202) 585-4070
                                        Email: cailyn.reilly.knapp@bakerbotts.com

---

[18] AiPi produced eight (8) documents late last night. Netflix will review and provide a summary of the documents in its Reply to this Motion to be filed next week.

Rachael Lamkin (admitted *pro hac vice*)
BAKER BOTTS L.L.P.
101 California Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 291-6264
Fax: (415) 291-6364
Email: rachael.lamkin@bakerbotts.com

*Counsel for Respondent Netflix, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th of January, 2025, I electronically filed a copy of the foregoing with the Clerk of Court using the Court's CM/ECF System which will send notification of such filing to all registered filers.  I also caused the foregoing to be served by electronic mail on the following:

Brendan J. Klaproth (VSB No. 97494)
**Klaproth Law PLLC**
2300 Wisconsin Avenue, NW
Suite 100A
Washington, DC 20007
202-618-2344
Fax: 202-618-4636
Email: bklaproth@klaprothlaw.com

*Counsel for Movant AiPi, LLC*

*/s/ Cailyn Reilly Knapp*
Cailyn Reilly Knapp (VA Bar No. 86007)
BAKER BOTTS L.L.P.
700 K Street N.W.
Washington, DC 20001
Tel: (202) 639-7753
Fax: (202) 585-4070
Email: cailyn.reilly.knapp@bakerbotts.com

*Counsel for Respondent Netflix, Inc.*

# Exhibit A

**From:**      Onni Hietalahti <onni.hietalahti@tamoralegal.fi>
**Sent:**      Wednesday, April 20, 2022 11:08 PM
**To:**      Eric Morehouse
**Cc:**      jmerril@aipisolutions.com
**Subject:**      VS: Bank details / CDN Licensing Oy - Transfer

Eric,

Thank you for your effort and sorry that we (=Lauri) have been bugging you with the hurried payment schedule.

Lauri is the main shareholder of the recipient company so the transaction is fine with him. The payment requisites are correct.

According to the tax treaty US – Finland royalties are exempt from US withholding tax. Let us know if you require documents or actions to confirm this issue.

When you have time please:
-   let us have an account on proceeds and expenses so far
-   give me a call on further measures re the ownership issue

Take care!
Onni

**Onni Hietalahti**
Advocate | Tamora Legal Attorneys Ltd.
+ 358 40 488 9260 |  Lappeentie 16, 55100 Imatra, Finland



This message is confidential and intended only for the receiver. Kindly delete the message immediately and inform the sender If you are not the intended receiver of this message.
www.tamoralegal.fi

---

**Lähettäjä:** Eric Morehouse <emorehouse@kviplaw.com>
**Lähetetty:** torstai 21. huhtikuuta 2022 0.53
**Vastaanottaja:** Onni Hietalahti <onni.hietalahti@tamoralegal.fi>
**Kopio:** 'Jonathan Merril' <jmerril@aipisolutions.com>
**Aihe:** RE: Bank details / CDN Licensing Oy - Transfer

Onni,

I'm transferring the $230K now.

Please confirm that this is the correct bank info and that Lauri is OK with this account.

Eric

**Eric D. Morehouse**
Founder



+1 (703) 346-4787
11718 Bowman Green Dr.
Reston, VA 20190
[www.aipisolutions.com](www.aipisolutions.com)
[EMorehouse@aipisolutions.com](EMorehouse@aipisolutions.com)

---

**From:** Onni Hietalahti
**Sent:** Thursday, April 07, 2022 5:46 AM
**To:** Eric Morehouse <emorehouse@kviplaw.com>
**Subject:** Bank details / CDN Licensing Oy

Eric,

Banking details for payment of settlement proceeds are as follows:

Recipient:              CDN Licensing Oy
IBAN account number:    ████████████████
SWIFT/BIC:              ████████
Bank name:              OP Corporate Bank plc
Bank address:           Gebhardinaukio 1, FI-00510 Helsinki

As we spoke, there is a dire need for cash currently at our end.

For our accounting we would also need some specification of expenses covered so far.

Br. Onni

Onni Hietalahti
Asianajaja  |  Asianajotoimisto Tamora Legal Oy
040 488 9260  |  Lappeentie 16, 55100 Imatra



Tämä sähköposti on luottamuksellinen. Se on tarkoitettu ainoastaan vastaanottajalle. Mikäli ette ole viestissä tarkoitettu vastaanottaja, olkaa hyvä ja ilmoittakaa siitä lähettäjälle sekä poistakaa viesti välittömästi.
[www.tamoralegal.fi](www.tamoralegal.fi)

# Exhibit G

| From: | Lauri Valjakka |
|---|---|
| To: | Onni Hietalahti; elund@aipisolutions.com; emorehouse@aipisolutions.com |
| Cc: | "Matti Saraheimo" |
| Subject: | VS: New Discovery Requests - Valjakka v. Netflix |
| Date: | Sunday, November 20, 2022 5:14:15 AM |

Erik et all,

If I have understood correctly this is dealing with RPX communication. I have not contacted any of the defendants other than the letters of 2014, of which all you have the copies; Google, Apple, Akamai, Netflix, Microsoft, Sony and Intertrust.

I have not licensed ever, any other parties than AiPi/Ramey and CDN Licensing Finland Ltd., and long-sine licensed and terminated Finland Post and Suomen Biisi Oy. All rights of exploitation of my IP I have terminated from IPRA Technologies Ltd. in February 2021.

Should there be some other things to do, pls. advise asap.

BR
Lauri

**Lähettäjä:** Onni Hietalahti <onni.hietalahti@tamoralegal.fi>
**Lähetetty:** lauantai 19. marraskuuta 2022 14.02
**Vastaanottaja:** Lauri Valjakka <lauri.valjakka@eezykeyz.fi>
**Aihe:** Fwd: New Discovery Requests - Valjakka v. Netflix

Hanki Outlook for Android

**From:** elund@aipisolutions.com <elund@aipisolutions.com>
**Sent:** Thursday, November 17, 2022 7:11:25 PM
**To:** Lauri Valjakka <lauri.valjakka@eezykeyz.fi>
**Cc:** Onni Hietalahti <onni.hietalahti@tamoralegal.fi>; emorehouse@aipisolutions.com <emorehouse@aipisolutions.com>; Ksheets@aipisolutions.com <ksheets@aipisolutions.com>
**Subject:** New Discovery Requests - Valjakka v. Netflix

Hi Lauri and Onni,

Please see the additional discovery requests from Netflix. They are not asking for much. Can you please provide to the best of your knowledge any info/docs responsive to these requests?

We can assist with the RPX information and asserting attorney client privileges. However, if there are other licensing, covenants, monetization efforts, we need to know about those and disclose the relevant dates/info.

Please let us know if you have any questions.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY  CUVTA000288

Thanks,
Erik

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY  CUVTA000289

# Exhibit H

**Ksheets@aipisolutions.com**

| | |
|---|---|
| **From:** | Onni Hietalahti |
| **Sent:** | Friday, April 22, 2022 8:17 AM |
| **To:** | Lauri Valjakka; Matti Saraheimo |
| **Subject:** | VS: Payment |

Lauri / Matti

Olen äsken suorittanut CDN:n tililtä:
- 75 k€ lainanlyhennyksen Tommille
- 25 k€ osakaslainan Masalle
- 60 k€ osakaslainan Laurille

Teidän osakaslainanne ilmoitetaan v. 2022 veroilmoituksella, jos niitä ei ole maksettu takaisin 31.12.2022 mennessä. Niistä määrätään pääomatulovero (30/34%). Veron saa takaisin, jos maksaa osakaslainan pois 5 v. kuluessa.

Tilille jäi nyt n. 50 k€. Maksan siitä nyt ainakin minun maksamat kulut pois.

t. Onni

---

**Lähettäjä:** Lauri Valjakka <lauri.valjakka@eezykeyz.fi>
**Lähetetty:** perjantai 22. huhtikuuta 2022 11.29
**Vastaanottaja:** 'Eric Morehouse' <emorehouse@kviplaw.com>; Onni Hietalahti <onni.hietalahti@tamoralegal.fi>
**Kopio:** 'Jonathan Merril' <jmerril@aipisolutions.com>
**Aihe:** VS: Payment

Eric,
Many thanks indeed!
BR
Lauri

---

**Lähettäjä:** Eric Morehouse <emorehouse@kviplaw.com>
**Lähetetty:** perjantai 22. huhtikuuta 2022 0.23
**Vastaanottaja:** Lauri Valjakka <lauri.valjakka@eezykeyz.fi>; 'Onni Hietalahti' <onni.hietalahti@tamoralegal.fi>
**Kopio:** 'Jonathan Merril' <jmerril@aipisolutions.com>
**Aihe:** Payment

Lauri and Onni,

I've attached the confirmation of wire transfer – the $230K should be in your account.

Eric

**Eric D. Morehouse**
Founder

LV-CUVTA-000141



+1 (703) 346-4787
11718 Bowman Green Dr.
Reston, VA 20190
www.aipisolutions.com
EMorehouse@aipisolutions.com

LV-CUVTA-000142

# Exhibit J

# ENGAGEMENT AGREEMENT

This Engagement Agreement ("Agreement") is entered into by and between AiPi, LLC (referred to as "Client") and Ramey & Schwaller, LLP ("Ramey & Schwaller) on the terms and conditions and for the consideration hereinafter set forth. The effective date of this Agreement is **October 1, 2021**.

**WHEREAS**, Client is involved in various litigation activities ("Litigation") as contained in Exhibit A related to various technologies (collectively referred to as the "Technology");

**WHEREAS**, Client desires to bring Ramey & Schwaller to serve as Lead Counsel in the Litigation; and,

**WHEREAS**, the Client desires to engage Ramey & Schwaller (referred to as Firm") on the terms and conditions hereinafter set out and for the remuneration set out herein to pursue litigation or settlement against the Defendants (the "Litigation");

**NOW THEREFORE**, for and in consideration of the premises and for other good and sufficient consideration, receipt and sufficiency of which is hereby acknowledged, the parties hereto covenant and agree as follows:

1. <u>Two-Tiered Engagements</u>. Provided that the representation of Client would not violate any Ethical Rule or Rule of Procedure for Firm, in its sole discretion, and provided that the Client is responsible for paying all reasonable Expenses, Firm has agreed and does hereby agree to handle the Litigation on behalf of the Client as follows:

   a.    For Tier 3 cases (or other unfunded cases), provided Client does all drafting of documents, legal work and research, the Firm agrees to a Contingent fee as follows: ▆▆▆ until the defendant answers or otherwise pleads, then ▆▆▆ If the case proceeds to 90 days from the First scheduled Markman, then ▆▆▆ If the case proceeds 60 days past receiving the Markman Order,

then ███. These percentages are on a per case basis and in any case cannot exceed the percentage that AiPi is entitled to from the patent owners – in other words Client/AiPi can't pay Firm more than Client/AiPi is entitled to from the patent owners. The expenses for every case shall be chargeable to the group of related cases.

      b.     For Tier 1 and 2 cases (or other funded cases), provided Client does all drafting of documents, legal work and research, Firm agrees to accept ███ for each Group of Related cases through the first scheduled Markman Hearing. A Group of Related cases is defined to mean cases involving at least one identical patent and having a filing date within 90 days of one another. The ███ shall be payable as follows:

        1.     ███ upon the filing of the first lawsuit of a Group of Related cases.

        2.     ███ when the first defendant in a Group of Related cases answers or otherwise pleads.

        2.     ███ upon the occurrence of 90-days before the first scheduled Markman Hearing.

        3.     ███) upon the occurrence of 30-days before the First Scheduled Markman.

2.     Expenses may be advanced by Firm (under Firm's discretion) and shall include, but are not limited to, consulting and testifying expert fees, local counsel fees that are not attorney fees, computerized research, court reporter fees, transcription costs, telephone charges, photocopying charges, courier and overnight delivery charges, travel (including mileage, parking, airfare on nonrefundable United tickets, lodging, meals and ground transportation), facsimile transmission, costs incurred in computerized research and litigation support systems, filing fees, witness fees, reimbursement for the cost of any third parties described below to the extent such costs are paid

initially by the Firm, reasonable meals only during travel required for Litigation, in-house and outsourced third party copying and reproduction charges of any kind, court fees and costs, filing fees, copy charges, research charges, and jury consultants. Further, notwithstanding the foregoing, attorney fees of any contingency counsel (contingency or otherwise) hired will not be considered an Expense and will not increase the Contingent Fee defined herein. Still yet, any attorney sanctions or any other fee that is awarded as a result of Firm's misconduct shall not be considered an Expense.

3.      For Tier 3 cases, Gross Proceeds shall mean the total amount of any settlement agreement entered into between Client (and/or its successor in interest), and any other entity or individual sued for the acts that proximately caused Client damage, to settle the Litigation or a final judgment entered by a court, including past damages, future damages, pre-judgment interest and post-judgment interest. Firm shall be reimbursed from Gross Proceeds for all expenses incurred and not paid by Client. Net Proceeds shall mean the greater of the following that are actually recovered:

a.      The amount of recovery remaining after deduction of Expenses and costs from Gross Proceeds whether by settlement or judgment;

b.      The value of any service performed by Potential Defendants for the benefit of Client;

c.      The value of the benefit received by Client from Defendant(s); or,

d.      An award of attorneys' fees

The Client is entitled to the remaining Net Proceeds after the deduction of the Contingent Interest from the Gross Proceeds. The Client hereby grants to Firm an interest in and lien upon Gross Proceeds derived from the Litigation, whenever received and from whatever source derived, up to

██ of Net Proceeds (in accordance with the above chart) plus the total amount of Expenses incurred or paid by Firm and not paid by Client.

4.     The Firm will invoice Client periodically for Expenses and any required payment for Tier 1 and 2 cases.

5.     During the course of our representation, it may be appropriate to hire third parties to provide services on your behalf. These services may include consulting or testifying experts, investigators, providers of computerized litigation support, video tape services and court reporters.

5.     Client and Firm have agreed to limit the scope of this engagement to the prosecution of the Litigation, which includes any United States Patent & Trademark Office post grant proceedings against the Technology.  The Firm is not responsible for other matters for which we have not specifically been engaged per the terms of this Agreement.  A separate engagement letter will be necessary for such representation, unless otherwise agreed in writing.

6.     <u>Termination of Representation by Client</u>.  This Agreement may be terminated as to Firm by the Client with or without cause, by the giving of thirty (30)-days-notice in writing to Firm.  In the event such termination is without cause, then and in that event Firm's right to reimbursement of Expenses and its contingent fee interest in the litigation shall remain intact and unaffected, notwithstanding Firm's lack of involvement after termination.  In the event such termination is with cause, then and in that event, Firm's right to reimbursement of Expenses shall remain intact and unaffected, notwithstanding Firm's lack of involvement after termination.   Moreover, reimbursement of Expenses incurred or paid by Firm shall be made first, before any other distribution of Gross Proceeds.  Further in the event such termination is with cause, then and in that event, Firm's contingent fee interest in the litigation shall be reduced on a pro rata basis as a percentage of hours invested in the litigation by Firm prior to termination as compared to the hours

**ENGAGEMENT AGREEMENT**                                                    **Page 4 of 7**

invested in the litigation by new counsel after termination, notwithstanding Firm's lack of involvement after termination.[1]

7.    <u>Termination of Representation by Firm.</u>  This Agreement may be terminated as to Client by Firm with or without cause, by the giving of thirty (30) days notice in writing to Client.  In the event such termination, then and in that event Firm's right to reimbursement of Expenses and its contingent fee interest in the litigation shall remain intact and unaffected, notwithstanding Firm's lack of involvement after termination.  Client fully assents to Firm's termination of representation and agrees to execute any and all documents necessary to let Firm out of the litigation.  Firm's contingent fee interest in the litigation shall be reduced on a pro rata basis as a percentage of hours invested in the litigation by Firm prior to termination as compared to the hours invested in the litigation by new counsel after termination, notwithstanding Firm's lack of involvement after termination.[2]

8.    <u>No Guarantee of Success.</u>  Each of the parties to this Agreement recognizes that there can be no assured outcome in the litigation, and no representations or warranties concerning the litigation are made in that regard by any of the parties hereto.

9.    <u>Bench Trial.</u>  In the event a dispute should arise between or among the parties to this Agreement concerning rights or obligations of the parties hereunder, or the construction or interpretation of this Agreement, or involving the relationship created by this Agreement or related

---

[1]  In the avoidance of doubt, and by way of example, if Ramey & Schwaller invested 800 man hours of the total of 1000 man hours invested in the Litigation (with 200 man hours invested by new counsel) and settlement were to occur one week prior to the first trial settling while Client was represented by new counsel, then Ramey & Schwaller would be entitled to receive a contingency interest of ▮ x ▮ or ▮ of Net Proceeds, to be calculated after the payment of all Expenses.

[2]  In the avoidance of doubt, and by way of example, if Ramey & Schwaller invested 800 man hours of the total of 1000 man hours invested in the Litigation (with 200 man hours invested by new counsel) and settlement were to occur one week prior to the first trial settling while Client was represented by new counsel, then Ramey & Schwaller would be entitled to receive a contingency interest of ▮ ▮ ▮ of Net Proceeds, to be calculated after the payment of all Expenses.

**ENGAGEMENT AGREEMENT**                                                 Page 5 of 7

in any way thereto, then the parties may agree that such dispute shall be filed in a Judicial District Court of Harris County, Texas for a bench trial, no jury. Each part assents that the Court, in its discretion, may award attorneys' fees and costs to the prevailing party.

10. <u>Availability of ADR</u>. The parties hereto are fully cognizant of the fact that various ADR (Alternative Dispute Resolution) techniques and procedures are available to resolve the litigation. These techniques and procedures include, *inter alia*, mediation, non-binding arbitration, mini-trial, summary jury trial and early case evaluation. During the progress of the representation of the Client, Firm will provide guidance to the Client concerning the timing, type of procedure and availability of ADR as and when appropriate.

11. <u>Severability</u>. If any part or portion of any term of this Agreement is found to be invalid, the remainder of the portion or terms of the Agreement shall continue on in full force.

12. <u>Engagement Review</u>. Each party has reviewed this Agreement and each party is charged with drafting this Agreement.

13. <u>Entire Agreement</u>. Paragraphs 1-13 represent the entire agreement between the parties. Any changes to the terms herein disclosed are only effective if in writing and signed by both parties.

WITNESS our hand this _____ day of _____, 20___.

RAMEY & SCHWALLER, LLP　　　　　　**AiPi, LLC**

_____　　　_____

William P. Ramey, III　　　　　　　Eric Morehouse_____

# EXHIBIT A

**Ward Participations Case Group** including Samsung, American Express, Bank of America, Chase, Citibank, Wells Fargo, etc. – Tier 1/2

**Lauri Valjakka Case Group** incluidng Akamai, Amazon, Cisco, Microsoft, Netflix, Apple, Google, Intertrust, Sony, etc. – Tier 1/2

**Peter Pedersen Case Group** including Google, J2Global, Mailjet/Mailgun, Microsoft, Verizon, Klaviyo, Salesforce, etc. – Tier 1/2

**George Aposphoros Case Group** – still identifying infringers with the goal of filing complaints in January 2022 – Tier ½

**M4Siz Case Group** – including CostCo, Home Depot, JC Penney, Kohls, Walgreens, etc. – Tier 3

**LifeProxy Case Group** – including Auctionstealer.Com, Bidslammer, Auctiva, eSnipe, etc. – Tier 3

**The above list is not intended to be exhaustive and it is AiPi's intention to pursue as many case groups of both tiers as posssible with Ramey & Schwaller.**

# Exhibit K



# Litigation Plan for Lauri Valjakka

Lauri Valjakka (Lauri) owns US patent No. 8,495,167, and believes that its claims are being infringed in the US by multiple entities including Akamai Technologies. Lauri has not yet enforced the 167 patent. Lauri is interested in enforcing or otherwise monetizing the 167 patent against potential infringers in the US starting with Akamai. AiPi is interested in monetizing the 167 patent, such as via a licensing and litigation campaign based on the terms specified herein.

AiPi will will draft a Complaint with all supporting documents against Akamai. AiPi will engage an acceptable US law firm (and in particular Erick Robinson at Porter Hedges) to have the Complaint filed in WD Texas and served on Akamai to initiate the litigation. After service of the Complaint, AiPi will perform requisite substantive analyses for supporting the litigation, manage the US law firm, and coordinate with other counsel and experts. AiPi will follow the same process for other defendants, including but not limited to Microsoft, Sony, and Netflix, once infringement analyses are completed and verified.

For each of these cases, AiPi shall pursue one of two alternative financing strategies, which will cover not only the actual litigation but also any IPR filed in an attempt to invalidate the patent, and which will be selected during the course of each litigation. In particular, AiPi shall either directly finance the litigations or alternatively obtain outside investors to provide the financing.

However, regardless of the financing strategy, the business arrangement between AiPi and Lauri will be the same. In particular, AiPi shall, upon settlement or judgment, adopt the previously discussed litigation funding model where AiPi will receive the invested amount (i.e., actual amounts spent on each litigation) plus the greater of ██ of the remainder or a multiple of the actual spend depending on the duration of the case, i.e., ██ the actual spend if settlement or judgment occurs less than 1 year after service of the Complaint, or ██ the actual spend if settlement or judgment occurs 1 year or longer after service of the Complaint.

Key members of AiPi's team are discussed below.

## Our Team



**Jonathan Merril, MD**
This effort will be led by Jonathan Merril, a serial entrepreneur, who has founded and managed a number of medical and educational technology companies that resulted in both public and private acquisitions. Jon has focused his career on the use of technologies that include simulation, machine learning and cloud-based solutions to catalyze business and IP growth. Jon is also an expert in the use of intellectual property and data analytics to drive value by augmenting R&D efforts, defending technology positioning, and identifying present and future competitors, customers, M&A candidates, etc. Successful exits include the sale of HT Medical (medical virtual reality education company) to Immersion Corp (NASDAQ) for $42M; C3P Pharmacy Education (pharmacy education platform) to HealthAnswers, Inc.; and Astute Tech (e-learning platform) to Echo360.



11718 Bowman Green Drive, Suite 100, Reston, VA 20190
3050 K Street, NW, Suite 302, Washington, DC  20007
www.AiPiSolutions.com

Jon is a Founder of AiPi, LLC, and provides intellectual property and business strategy consultations.  He has provided business and IP landscape analysis and patent services for a wide range of technology companies, and works with various investment bankers, venture capitalists, etc., such as in the context of M&A.



### Eric Morehouse, JD

Eric Morehouse will support AiPi's efforts. Eric is a patent attorney having nearly three decades of experience with numerous technologies, including aerospace, image processing, medical devices, pharmaceuticals, computer software, electrical switches and connectors, and telecommunications. He has lectured and supervised training seminars for technology companies and law firms on various aspects of patent practice, including patent specification and claim drafting, examination and post-examination strategies, claim construction, validity and infringement analyses, patent infringement litigation, and IP strategy creation.

After spending a career in private practice as a patent attorney, Eric now specializes in consulting early, mid-stage, and mature technology companies to enhance their valuations and monetize IP portfolios. In addition to AiPi, Eric is a Founder of PiVerse, Inc., which implements IP support services including searching, IP analytics, valuation support, etc., and Dulany Street Capital, which finances patent infringement litigations. Eric combines IP strategy and implementation services to generate revenue from IP and enhance corporate valuations.



### Hon. Tidal (Ty) McCoy

Ty is venture capitalist and in particular **founder and Chairman of IronGate Capital Advisors – a leading Washington, DC area venture capital fund**, former business executive, and Presidential Appointee/Senate Confirmed. He led the US Air Force, as Acting Secretary/UnderSecretary/SrAsstSecy from 81-88, in reestablishing US military/air/space/cyber power during the Cold War, fielding advanced technologies such as Stealth aircraft and reshaping USAF/NATO warfighting doctrine to ensure deterrence through the ability to defeat RedAir and strike deep (AirLand Battle doctrine leader), while also ensuring nuclear deterrence with advanced technology insertion. In this capacity and in earlier capacity, as Deputy Assistant to the Secretary of Defense (Immediate Office), he reported to 7 SecDefs and three Presidents, on various matters. He holds many of the highest DOD civilian and military awards (also, combat command and special operations assignments).

After retirement from Federal Service, he founded/sold a national bank, discovered/transacted on the sale of Network Solutions for a 1785X return in 5 years, managed the dual use transfer of solid rocket motor technology into the modern auto airbag at Pres Thiokol Technologies to create a revenue stream of several tens of billions of dollars, and advanced other technology companies to strong success.

Ty focuses on understanding threats, needs, problems, and opportunities—or creating them, and then shaping the real question and finding the best solution using capital, talent, partnerships, public relations, congressional support, public acceptance/demand, education, legal/financial/technology knowledge, and strategic planning/teaming.



11718 Bowman Green Drive, Suite 100, Reston, VA 20190
3050 K Street, NW, Suite 302, Washington, DC 20007
www.AiPiSolutions.com



**Edward Rossotti**

AiPi's efforts will also be supported by Edward Rossotti. Edward is a finance executive with over twenty years of capital raising structured senior lending and financial planning and analysis experience. Edward received a term federal appointment in 2010 to serve as a Senior Investment Officer with the United States Department of Energy Loan Programs Office, where he led investment teams evaluating and structuring loans to finance carbon reducing projects in the automobile industry. Previously, he was a Director with Susquehanna International Group (SIG), where he raised capital for public and private companies and advised on mergers and acquisitions. Earlier in his career, Edward managed Financial Planning and Analysis for a business process outsourcing division of MCI Communications, Inc.

Edward graduated from The University of Pennsylvania with a B.A. in Economics in 1994. While there, he was on the Dean's List and the Varsity Lightweight Crew Team. In 2000, Edward received an M.B.A with honors from Georgetown University's McDonough School of Business, where he concentrated in Finance.



**Stoyan Radkov, PhD**

After a successful career as a senior scientist at Imperial College London and University College London, researching viral oncology, Stoyan trained as a patent attorney at the top tier IP firm D. Young & Co, before moving in-house to Pfizer, in the UK, and then Novartis and Syngenta, in Switzerland.  Stoyan has a wealth of experience in undertaking patent due diligence projects, FTOs, validity & infringement opinions, IP landscape analyses, patent application drafting and filing, global patent prosecution, life-cycle management and strategic advice. Stoyan advises companies on the value of their existing IP portfolio and how to maximize its full potential.

One of Stoyan's particular strengths is his ability to rapidly grasp technically & scientifically demanding concepts. Stoyan is also able to explain complex technical and scientific concepts clearly and succinctly to others – especially to members of the EPO. His success at the EPO has been recognized in the Legal 500: "*New partner Stoyan Radkov specializes in high-value oppositions and appeals at the EPO, representing clients from the biotech and life sciences industries.*" Stoyan's education and training include the following:

- First Class – BSc Honours Degree – Microbiology, University of Reading
- PhD – Viral Oncology – Ludwig Institute for Cancer Research, St Mary's Hospital, Imperial College London
- Post-doctoral fellow – Imperial College London
- Senior CRC funded post-doctoral fellow – University College London
- Private practice IP attorney – D. Young & Co (UK), UDL (Partner – UK) and HGF (Director, UK and Basel, CH)
- In-house IP attorney – Pfizer (Sandwich, UK), Novartis (Basel, CH) and Syngenta (Basel, CH)



### Ken Haase, PhD

Ken Haase, PhD, will lead AiPi's technical team. Ken is an expert in computer software, machine learning, artificial intelligence, Internet of Things and computer/electronic hardware. Ken graduated from MIT with a B.S. as well as a PhD, in Computer Science and Philosophy (completing his PhD at MIT's Artificial Intelligence Laboratory, studying under the AI luminary, Marvin Minsky), and is an experienced inventor who has been credited with pioneering work at the MIT Media lab.

Ken's on-going research leverages the increasing value of rich semantic metadata. He has developed crucial technologies for generating, managing, and applying such metadata for search, routing, and automation, and he has developed R&D strategies for machine learning, visualization, bioinformatics, geospatial technologies, electronics and other technologies. Ken worked on a system for Bank of Boston to predict cost of various financial instruments, and this work was profiled by Harvard Business School. Ken then built a platform for search and discovery with large databases including: a layered data cache architecture, a distributed RPC (Remote Procedure Call) architecture, a simple but versatile serialization format, and a lightweight object reference protocol.

Ken developed this platform by incorporating architectural advancements across the software and network stack, including new algorithms, integration of emerging protocols and standards, and optimized code for CPU and GPU architectural advancements. These developments were driven by both the character of the data being searched, and the need for flexibility in both how things are described and in how they may be stored (different database models and servers) or accessed (web and database protocols). This work has been published as an open-source platform called Kno.

As a professor at MIT's Media Laboratory, Ken focused on these issues with "people in the loop" and UX/UI with machine learning. Ken and his students designed and created systems that used structured knowledge to help people search, understand, and use online information and services. Ken worked on issues involving natural language and textual analysis to extract meaning from language, and developed technical solutions supporting very large heterogeneous databases that could efficiently represent, at scale, fine-grained metadata from a variety of sources and processes.



### George Aposporos

AiPi's efforts will also be supported by George Aposporos. George is a tech executive, founder, and consultant for growth companies and non-profits, specializing in creating transformative initiatives. He was founding VP of Business Development at Amazon.com, and helped turn Amazon from an upstart US bookseller into an international e-commerce destination. George grew Amazon's Business Development group and oversaw strategic partnerships, including with AOL, Yahoo, and Netscape. George was also instrumental in growing Amazon's customer base from 300,000 to 11 million customers, and revenues from $15 million to c. $1.5 billion in 2 years.

George has worked directly with both Jeff Bezos and Priceline founder Jay Walker, and is a named inventor on several US patents directed to streaming media system technologies. George focuses on creating and growing foundational new business lines through innovative strategies, business development, marketing, innovation, growth strategies, brand management, and partnerships.

11718 Bowman Green Drive, Suite 100, Reston, VA 20190
3050 K Street, NW, Suite 302, Washington, DC 20007
www.AiPiSolutions.com

## Logistics and Signatures

*Lauri shall own all intellectual property covering innovations that AiPi develops in accordance with its services under this Proposal.*

**AiPi, LLC**

**Lauri Valjakka**

Signature:_____

Signature: _____

Eric Morehouse

Name:  Lauri Valjakka_____

Founder

Title:  CEO & Founder_____

Date:_____

Date:  19.8.2021_____

# Exhibit N

| | |
|---|---|
| **From:** | Onni Hietalahti |
| **To:** | Lauri Valjakka; Matti Saraheimo |
| **Subject:** | VS: Payment |
| **Attachments:** | image001.png |
| | image005.png |

---

Lauri / Matti

Olen äsken suorittanut CDN:n tililtä:

- 75 k€ lainanlyhennyksen Tommille
- 25 k€ osakaslainan Masalle
- 60 k€ osakaslainan Laurille

Teidän osakaslainanne ilmoitetaan v. 2022 veroilmoituksella, jos niitä ei ole maksettu takaisin 31.12.2022 mennessä. Niistä määrätään pääomatulovero (30/34%). Veron saa takaisin, jos maksaa osakaslainan pois 5 v. kuluessa.

Tilille jäi nyt n. 50 k€. Maksan siitä nyt ainakin minun maksamat kulut pois.

t. Onni

---

**Lähettäjä:** Lauri Valjakka <lauri.valjakka@eezykeyz.fi>
**Lähetetty:** perjantai 22. huhtikuuta 2022 11.29
**Vastaanottaja:** 'Eric Morehouse' <emorehouse@kviplaw.com>; Onni Hietalahti <onni.hietalahti@tamoralegal.fi>
**Kopio:** 'Jonathan Merril' <jmerril@aipisolutions.com>
**Aihe:** VS: Payment

Eric,
Many thanks indeed!
BR
Lauri

---

**Lähettäjä:** Eric Morehouse <emorehouse@kviplaw.com>
**Lähetetty:** perjantai 22. huhtikuuta 2022 0.23
**Vastaanottaja:** Lauri Valjakka <lauri.valjakka@eezykeyz.fi>; 'Onni Hietalahti' <onni.hietalahti@tamoralegal.fi>
**Kopio:** 'Jonathan Merril' <jmerril@aipisolutions.com>
**Aihe:** Payment

Lauri and Onni,

I've attached the confirmation of wire transfer – the $230K should be in your account.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY  CUVTA000290

Eric


**Eric D. Morehouse**
Founder

+1 (703) 346-4787
11718 Bowman Green Dr.
Reston, VA 20190
www.aipisolutions.com
EMorehouse@aipisolutions.com

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY  CUVTA000291

# Exhibit O

**From:** William Ramey <wramey@rameyfirm.com>
**Sent:** Friday, January 6, 2023 9:09 AM
**To:** elund@aipisolutions.com; emorehouse@aipisolutions.com
**Subject:** here are the Netflix financials
**Attachments:** NFX-VALJ-00007111.xlsx

please treat as AEO.

William P. Ramey, III



5020 Montrose Bvd., Suite 800
Houston, Texas 77006
(713) 426-3923
(832) 900-4941 (facsimile)

This communication is CONFIDENTIAL and may be privileged. If you are not the intended recipient, please notify me immediately and delete this message. Further disclosure or copying of any portion of this message is unauthorized.