Sarah E. Piepmeier, Bar No. 227094
SPiepmeier@perkinscoie.com
Elise Edlin, Bar No. 293756
EEdlin@perkinscoie.com
PERKINS COIE LLP
505 Howard Street, Suite 1000
San Francisco, California 94105
Telephone: +1.415.344.7000
Facsimile: +1.415.344.7050

*Additional attorneys listed on signature page.*

*Attorneys for Defendant*
*NETFLIX, INC.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| LAURI VALJAKKA,<br><br>　　　　*Plaintiff*,<br><br>　　v.<br><br>NETFLIX, INC.,<br><br>　　　　*Defendant*. | **Case No. 4:22-cv-01490-JST**<br><br>**NETFLIX, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR AN ORDER TO SHOW CAUSE AND SANCTIONS AGAINST PLAINTIFF'S FORMER ATTORNEY, WILLIAM RAMEY AND RAMEY LLP**<br><br>Date:　May 8, 2025<br>Time:　2:00 PM<br>Place:　Courtroom 6<br>Judge:　Hon. Jon S. Tigar |

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................... 1

II. AIPI WAS NOT AUTHORIZED TO RECEIVE NETFLIX'S PROTECTED MATERIALS ................................................................................................................. 2

    A. Whitestone Law's appearance for AiPi is irrelevant because Whitestone attorneys could not access Netflix's Protected Material. ......................................... 3

    B. The AiPi attorneys were not "affiliated" with Mr. Ramey's firm. ........................... 3

    C. The AiPi attorneys were not "professional vendors" either. ................................... 4

    D. Subsequently agreeing to be bound by the Protective Order cannot un-ring the bell. ........................................................................................................................ 5

III. MR. RAMEY'S ALLEGED CONFESSION DOES NOT ABSOLVE HIM OR REMOVE HARM TO NETFLIX ................................................................................... 6

    A. Mr. Ramey's "co-counsel" email and alleged phone call confession did not put Netflix on notice. ................................................................................................ 6

    B. Although demonstrating harm is not necessary, Netflix was and continues to be harmed by the disclosure. .................................................................................. 7

IV. DISCOVERY IS NECESSARY TO UNDERSTAND THE EXTENT OF POTENTIAL HARM TO NETFLIX AND MITIGATE IT ...................................................................... 8

    A. Netflix's requested discovery is not duplicative. ..................................................... 9

    B. Mr. Ramey asks Netflix and the Court to trust people at AiPi whom he referred to as "liars." ............................................................................................... 10

V. THE COURT SHOULD DISREGARD MR. RAMEY'S ATTEMPT TO BLAME NETFLIX FOR HIS VIOLATIONS ............................................................................. 10

VI. CONCLUSION ............................................................................................................. 11

# TABLE OF AUTHORITIES

**CASES**

*Apple Inc. v. Samsung Elecs. Co.*,
  No. 5:11-cv-01846 LHK, 2013 WL 9768650 (N.D. Cal. Oct. 2, 2013), *aff'd*,
  2013 WL 5693759 (Oct. 15, 2013) ................................................................................. 1, 8, 9

*EscapeX IP, LLC v. Google LLC*,
  No. 23-cv-10839, 2025 WL 893739 (VSB) (VF), (S.D.N.Y. Mar. 24, 2025) ..................... 2, 10

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*,
  10 F.3d 693 (9th Cir. 1993) .................................................................................................. 4

*Koji IP, LLC v. Renesas Elecs. Am., Inc.*,
  No. 24-cv-03089-PHK, 2025 WL 917110 (N.D. Cal. Mar. 26, 2025) ............................ 1, 2, 4

*LifeScan Scot., Ltd. v. Shasta Techs, LLC*,
  No. 11-cv-04494-WHO, 2013 WL 5949629 (N.D. Cal. Nov. 6, 2013) ................................. 7

*mCom IP, LLC v. City Nat'l Bank of Fla*,
  No. 23-23427-Civ-Scola, 2025 WL 939224 (S.D. Fla. Mar. 28, 2025) .................................. 4

*Raytheon Co. v. Cray, Inc.*,
  No. 2:16-mc-0898 DAK, 2017 WL 398362 (D. Utah Jan. 30, 2017), *aff'd*, 2017
  WL 823558 (Mar. 2, 2017) ................................................................................................... 1

*Reynolds v. Roberts*,
  207 F.3d 1288 (11th Cir. 2000) ............................................................................................ 7

*United States v. Nat'l Med. Enters, Inc.*,
  792 F.2d 906 (9th Cir. 1986) ................................................................................................ 8

*VDPP, LLC v. Volkswagen Grp. of Am., Inc.*,
  No. H-23-2961, 2024 WL 3378456 (S.D. Tex. Jul. 11, 2024) .............................................. 2

**OTHER AUTHORITIES**

Fed. R. Civ. P. 37 ........................................................................................................................ 7

# I.     INTRODUCTION

No reasonable litigant would produce confidential information or source code without the safety net of a protective order, which is the only assurance against dissemination beyond counsel who have appeared and are bound by oaths they take as officers of the bar. Although counsel who receive protected information are bound by a contract (*i.e.*, the protective order), compliance is enforced largely by honor code, making violations difficult to discover. As Judge Grewal aptly observed, "confidential information remains confidential because counsel and clients alike follow court orders." *Apple Inc. v. Samsung Elecs. Co.*, No. 5:11-cv-01846 LHK, 2013 WL 9768650, at *2-3 (N.D. Cal. Oct. 2, 2013); *aff'd*, 2013 WL 5693759 (Oct. 15, 2013). If lawyers choose not to follow the rules governing Protected Material, the protective order fails.

As a reasonable litigant, Netflix assumed that its adversaries would follow the "basic rule[s]" of protective order compliance (*see id.*) when it produced scores of confidential financial and technical documents and allowed attorneys who appeared for Mr. Valjakka and disclosed experts to review its source code—the "crown jewels" of its business. *See* ECF No. 301-01 ("Edlin Declaration"), ¶5; *see generally Raytheon Co. v. Cray, Inc.,* No. 2:16-mc-0898 DAK, 2017 WL 398362, *2-3 (D. Utah Jan. 30, 2017), *aff'd*, 2017 WL 823558, *3 (Mar. 2, 2017). Here, years into this litigation, Netflix learned that Mr. Ramey did not follow those rules or uphold the oath he took when he was admitted *pro hac* to this Court, agreeing to "familiarize [himself] with, and abide by, the Local Rules of this Court, especially the Standards of Professional Conduct for attorneys."[1] Instead, Mr. Ramey repeatedly shared Netflix's most confidential technical and financial information with AiPi, a litigation funder responsible for funding dozens of cases, mostly against large tech companies. And Mr. Ramey has no reasonable explanation for his repeated Protective

---

[1] Mr. Ramey has litigated dozens of cases in the Northern District of California. This is one of the few cases where he sought and received admission *pro hac vice*. *See Koji IP, LLC v. Renesas Elecs. Am., Inc.*, No. 24-cv-03089-PHK, 2025 WL 917110, at *3-4 (N.D. Cal. Mar. 26, 2025) (summarizing Mr. Ramey's history of N.D. Cal. litigations and *pro hac* admissions); *see also* Northern District of California Application for Pro Hac Vice Admission, accessible at https://cand.uscourts.gov/wp-content/uploads/attorneys/CAND_Application_for_Pro_Hac_Vice-11-2021.pdf.

Order violations; as described in greater detail below, each of Mr. Ramey's *post hoc* justifications fails under the lightest scrutiny. While Netflix's Motion addresses only the specific Protective Order violations in this case, Mr. Ramey's ever-shifting justifications are especially troubling when viewed against the backdrop of the growing number of courts that have sanctioned him for repeatedly flouting the rules of professional conduct and civil procedure.[2]

## II.     AIPI WAS NOT AUTHORIZED TO RECEIVE NETFLIX'S PROTECTED MATERIALS

Netflix details the explanations Mr. Ramey offered during the lengthy meet-and-confer process in its opening Motion, but he now jettisons each of those explanations in favor of four *post hoc* excuses for his improper disclosure. *See* ECF No. 302-17 at 5-8.

(1) AiPi consists of lawyers from Whitestone Law (who appeared for AiPi),

(2) AiPi was an affiliate of the Ramey firm,

(3) AiPi was a litigation vendor, and

(4) AiPi subsequently agreed to be bound by the Protective Order.

AiPi fits into none of the (internally inconsistent) boxes Mr. Ramey constructs. Regardless, no one (including Mr. Ramey) even attempted to meet the necessary procedural requirements to allow disclosure under any of those circumstances, so AiPi was not authorized to receive Netflix's Protected Material.

---

[2] *See, e.g., Koji IP, LLC,* 2025 WL 917110, at *16 (granting personal sanctions against Mr. Ramey for the unauthorized practice of law in this district and finding that Mr. Ramey's declaration in opposition was "not accurate or candid"); *EscapeX IP, LLC v. Google LLC*, No. 23-cv-10839, 2025 WL 893739 (VSB) (VF), at *5 (S.D.N.Y. Mar. 24, 2025) (granting attorneys' fees for filing a "baseless suit" without an "adequate pre-suit investigation and then unnecessarily multipl[ying] the proceedings," and noting that Mr. Ramey's firm submitted a purported joint stipulation for dismissal (signed by Mr. Ramey) providing that each side would bear their own attorneys' fees, even though defendant had not consented to or authorized that stipulation); *VDPP, LLC v. Volkswagen Grp. of Am., Inc.*, No. H-23-2961, 2024 WL 3378456, at *3 (S.D. Tex. Jul. 11, 2024) (holding Mr. Ramey and client jointly and severally liable for sanctions because, among other things, they "sought relief that was clearly precluded," failed to disclose relevant documents, and "prolonged the litigation with false statements about [the client's] settlement agreements.").

### A. Whitestone Law's appearance for AiPi is irrelevant because Whitestone attorneys could not access Netflix's Protected Material.

Mr. Ramey is correct that an attorney at Whitestone Law (Mr. Zito) appeared and that AiPi's attorneys (Messrs. Morehouse, Lund, and Sheets) also purportedly work for Whitestone (Opp. at 4-5), but he omits two crucial details: (1) when Mr. Zito appeared and (2) for whom. *First,* Mr. Zito initially attempted to appear in the case in October 2023—*after* all of Mr. Ramey's Protective Order violations described in Netflix's Motion. *See* Mot. at 4, 6-7. The AiPi attorneys were certainly not authorized to receive Netflix's Protected Material prior to October 2023 simply because they were affiliated with a firm that would later appear for a third party, which Mr. Ramey appears to recognize. *See* Opp. at 5:18-20.

*Second*, Mr. Zito and Whitestone were admitted as counsel for *non-party* AiPi. *See* ECF Nos. 235, 236. The Protective Order confirms that a non-party has no right to access the sensitive documents of a party. While a "Producing Party" may be either a "Party or Non-Party," only a "Party" may be a "Receiving Party" eligible to "receive Disclosure of Discovery Material from a Producing Party." *See* ECF No. 302-02, ¶¶2.13 & 2.16. Because "Non-Party" AiPi and its attorneys at Whitestone had no right to receive, review, or use Netflix's Protected Materials, each time Mr. Ramey provided those documents to the AiPi attorneys, he violated the Protective Order.

### B. The AiPi attorneys were not "affiliated" with Mr. Ramey's firm.

Next, Mr. Ramey asserts that he could disclose Netflix's confidential information because he believed the AiPi attorneys were his firm's "affiliates" under the Protective Order. *See* Opp. at 5:18-6:7. But Mr. Ramey's alleged "subjective" belief cannot be credited when it contradicts objective facts he clearly knew: the AiPi attorneys were not affiliated with his eponymous firm; instead, per the Engagement Agreement, they were his clients. *See* ECF No. 302-06. That Mr. Valjakka had other attorneys secretly working on his case does not automatically make those attorneys "affiliates" of Mr. Ramey's firm. Indeed, the Protective Order contemplates that there may be "other outside counsel" working for a party who *do not* meet the requirements of the "Outside Counsel of Record" authorized to receive Protected Material. ECF No. 302-02, ¶2.9.

The AiPi attorneys were such "other outside counsel," making Mr. Ramey's disclosure to them improper.

Accepting Mr. Ramey's invitation to stretch the definition of "affiliates" beyond recognition would eviscerate the Protective Order.[3] *In re Dual-Deck Video Cassette Recorder Antitrust Litig.,* 10 F.3d 693, 695 (9th Cir. 1993) (order of civil contempt is warranted where, *inter alia*, a party's conduct is "not based on a good faith and reasonable interpretation of the order."). It would allow any attorney vaguely interacting with a law firm of record to see an opposing party's most sensitive information without the producing party knowing, preventing them from identifying conflicts or policing compliance with the protective order (*e.g.*, with the terms of a prosecution bar). As here, any attorney that owns a litigation funding entity (such as Mr. Morehouse) would have unfettered, stealth access to the kinds of information he could use to secure funding for future litigations. Hester Decl., Ex. S at 31. If the attorneys are patent prosecutors (such as Messrs. Morehouse and Sheets), they would have the ability to use the information to obtain patents reading onto a company's products. *Id.* at 7-8; *id.*, Ex. T. In short, an "affiliate[] [of] a law firm which has appeared" can only reasonably refer to other attorneys of that same firm who may not have individually appeared—the kinds of attorneys that can easily be identified, vetted, and monitored in the future to avoid unlawful disclosure or misuse of Protected Materials.

**C.    The AiPi attorneys were not "professional vendors" either.**

Next, Mr. Ramey argues that, if AiPi are not "affiliates" of his firm, they are essentially a professional vendor. But AiPi's agreement with Mr. Ramey provides that AiPi's attorneys would perform all "substantive" legal work in the Valjakka cases, and the Protective Order violations

---

[3] Netflix is not aware of any case interpreting "affiliates" within the context of this Court's standard protective order, but then again, it is also not aware of any arrangement like the one between Mr. Ramey and AiPi, where the attorneys doing significant legal work never appear in the case, which has resulted in sanctions from multiple courts. *See, e.g., Koji IP*, 2025 WL 917110, at *21 (personally sanctioning Mr. Ramey and referring him to multiple bar organizations for repeatedly performing legal work in the Northern District of California without seeking admission to practice there); *mCom IP, LLC v. City Nat'l Bank of Fla*, No. 23-23427-Civ-Scola, 2025 WL 939224, at *2 (S.D. Fla. Mar. 28, 2025) (affirming magistrate judge's order sanctioning plaintiff whose counsel of record failed to investigate merits of case in reliance on Ramey, who was not admitted to practice in the case).

reveal AiPi drafting infringement contentions, revising expert reports, and updating damages contentions. *See* Mot. at 5-7 (citing ECF Nos. 302-7 at 1 & 301-8 through 301-10). These are legal tasks, not the administrative-type activities that the Protective Order uses to define "Professional Vendor." *See* ECF No. 302-02, ¶2.14 ("photocopying, videotaping, translating, preparing exhibits or demonstrations, and organizing, storing or retrieving data …").

Mr. Ramey relies only on a declaration describing AiPi as a "legal support company" that collects, marks, and provides documents in the litigation. *See* Opp. at 7:1-14 (*citing* ECF No. 233-01, ¶26). But the contemporaneous documents and emails Netflix has since obtained fatally undermine the assertions AiPi, who attempted to minimize its role to avoid the jurisdiction of this Court, made in its declaration. Moreover, a "Professional Vendor" must nonetheless have "signed the 'Acknowledgement and Agreement to Be Bound' (Exhibit A)" to view Netflix's Protected Materials. *See* ECF No. 302-02, ¶¶7.2(e), 7.3(d), and 9.2(d). There is no evidence that any AiPi attorney ever signed Exhibit A to the Protective Order, including prior to Ramey's disclosures.

### D. Subsequently agreeing to be bound by the Protective Order cannot un-ring the bell.

Mr. Ramey then argues "no harm, [no foul]" because he provided AiPi's lawyers with a copy of the Protective Order and that "[e]ach of them agreed to be bound by the terms." *See* Opp. at 5:18-22, ECF No. 311-1, ¶8. Even if true, a belated promise to abide by the terms of the Protective Order cannot retroactively solve Mr. Ramey's repeated violations. There are at least five problems with this claim. *First*, Netflix has no way of verifying that this statement is accurate, Mr. Ramey provides no documentary evidence supporting it (despite purporting to provide evidence for other assertions), and Mr. Ramey's prior lack of candor makes such evidence significant. *See, supra,* FN2. *Second*, Mr. Ramey never says *when* AiPi allegedly promised to comply. Indeed, that Mr. Ramey apparently made efforts in 2025—more than two years after the fact—to confirm that AiPi attorneys did not misuse Netflix's information suggests that they had not previously agreed to be bound. *See* Opp. at 7:2-12. *Third*, the claim is simply implausible: If each of the AiPi attorneys had previously agreed to be bound by the Protective Order, AiPi would

1  have presumably cited that agreement when Netflix first emailed AiPi about the violations in
2  December 2024.  Instead, AiPi owner Eric Morehouse submitted a declaration on January 15, 2025
3  promising that "AiPi *agrees* to be bound by all to be bound by [sic] all the terms of this Stipulated
4  Protective Order."  *See* ECF No. 302-19, ¶6 (emphasis added).  Mr. Morehouse's declaration does
5  not say that he or any other AiPi attorney had previously agreed to be bound.  *See id*.  *Fourth*, as
6  noted above, simply agreeing to be bound by a protective order is insufficient because only specific
7  categories of individuals can receive Protected Materials, and AiPi attorneys do not fall into any
8  of the enumerated categories.  *Finally*, Mr. Ramey's failure to follow the procedures set forth in
9  this Court's Protective Order deprived Netflix of the opportunity to object to the dissemination of
10 Netflix's confidential information to litigation funder AiPi.

### III. MR. RAMEY'S ALLEGED CONFESSION DOES NOT ABSOLVE HIM OR REMOVE HARM TO NETFLIX

#### A. Mr. Ramey's "co-counsel" email and alleged phone call confession did not put Netflix on notice.

14 Mr. Ramey's most striking assertion is that Netflix ignored his prior (alleged) confessions
15 that he disclosed Protected Material to AiPi.  *See* Opp. at 3:2-4.  This claim is specious given how
16 steadfast Netflix has been in seeking relief from Mr. Ramey's and Valjakka's wrongdoings: If
17 Netflix knew a litigation funder had improper access to its highly confidential documents, it would
18 have immediately raised the issue with Mr. Ramey, as it did last December when AiPi produced
19 proof that Mr. Ramey was facilitating the misappropriation.  *See* ECF No. 302-17 at 7-8.

20 Not only is this assertion substantively implausible, but the purported communications
21 were not the disclosure Mr. Ramey suggests.  Netflix had no basis to believe that Mr. Ramey failed
22 to comply with the Protective Order.  Netflix did not even know that AiPi was involved here until
23 June 2023, as fact discovery was closing.  And although Mr. Ramey would (a few months later)
24 refer to AiPi's attorneys as his "co-counsel," none of the attorneys had appeared in the case as Mr.
25 Valjakka's outside counsel of record (as Mr. Ramey recognized in the same email).  *See* ECF No.
26 311-02.  Tellingly, the only legal work described in that introductory email was that AiPi attorneys
27 planned to defend Mr. Valjakka's deposition, which could not involve Netflix's Protected Material

(because Mr. Valjakka, then represented by counsel, was not permitted to review Netflix highly confidential information). *See* Opp. at 6:12-13. Regarding the shocking suggestion that Netflix's counsel ignored an alleged phone call confession that he was disclosing Protected Material to AiPi, Mr. Ramey's only "support" is that he and one Netflix attorney spoke frequently about their various cases adverse to one another. *See* Opp. at 3:12-20. Put simply, Netflix did not delay or ignore enforcement of the Protective Order. Upon discovering the violation in December 2024, Netflix immediately investigated and then promptly brought this motion. *See generally* Mot. at 6:6-7:15.

Regardless, Mr. Ramey's alleged confessions would not absolve his prior Protective Order violations. *See* Opp. at 3:2-4. Unless Mr. Ramey can prove AiPi were "Outside Counsel of Record" as defined by the Protective Order (which he cannot; *see* above), then AiPi's attorneys would need to (1) fit within another category of persons allowed to view Netflix's Protected Material (they do not) and (2) sign Exhibit A to the Protective Order (they did not).

**B. Although demonstrating harm is not necessary, Netflix was and continues to be harmed by the disclosure.**

Mr. Ramey misunderstands the law when he suggests that Netflix must show harm to prevail. *See* Opp. at 12:17-13:2. Rule 37 mandates that a Court sanction a party that disobeys a discovery order (such as a protective order) for at least "the reasonable expenses, including attorney's fees, caused by the failure." *See* Fed. R. Civ. P. 37(b)(2)(A), (C); *see generally* Mot. at 9:9-26. Expenses "caused" by the failure include the costs of assessing, investigating, and filing a motion for sanctions; at minimum, Netflix is entitled to those. *See, e.g., LifeScan Scot., Ltd. v. Shasta Techs, LLC*, No. 11-cv-04494-WHO, 2013 WL 5949629, at *4, *7 (N.D. Cal. Nov. 6, 2013) (awarding defendants' attorneys' fees for filing motions related to plaintiff's violation of protective order). And in seeking an order to show cause, Netflix need not demonstrate financial harm; the simple act of improper disclosure is *per se* harmful. Netflix must only cite the Court-ordered provisions at issue and allege that the non-moving party has not complied with those provisions. *See Reynolds v. Roberts*, 207 F.3d 1288, 1298 (11th Cir. 2000); *see generally* Mot. at 8:26-9:6. If

the Court ultimately issues a show cause order and finds Mr. Ramey in contempt of the Protective Order, Netflix must then justify its request for monetary sanctions by demonstrating harm in the form of its "actual losses" resulting from the violation. *See* Mot. at 11, n.6 (citing *United States v. Nat'l Med. Enters, Inc*., 792 F.2d 906, 910 (9th Cir. 1986)).  To the extent Mr. Ramey is making arguments about Netflix's *proof* of attorneys' fees incurred to date, Netflix already addressed this in its Motion at 12:3-18.

Although Netflix need not demonstrate "harm" to receive monetary sanctions, the potential harm to Netflix is obvious, and it is irrelevant that AiPi is not a "competitor."  *See* Opp. at 13:3-11.  AiPi is a litigation funding entity that has backed at least 100 cases in the last few years. Hester Decl., Ex. U, ¶7; Ex. V.  While unauthorized disclosure of a party's materials to a competitor does present serious risk of harm (as in *Apple v. Samsung*), so too does disclosure to a company whose entire business is filing lawsuits seeking millions from companies like Netflix. The *Apple v. Samsung* case did not rest on the parties' status as competitors, but the potential for misuse of the producing party's sensitive information, which applies equally here.  When Mr. Ramey provided AiPi unauthorized access to Netflix's sensitive financial and technical records—with no obligation that AiPi comply with the Protective Order—he facilitated AiPi's use of that information to pursue cases against Netflix in the future.  Worse, he provided at least Messrs. Morehouse and Sheets (who are patent prosecutors) information they could use to secure patents directly targeting Netflix's systems.  And had Netflix not pursued discovery against AiPi for its CUVTA claims, Netflix never would have known of the violations because, as far as Netflix is aware, no AiPi employee offered to comply with the Protective Order until *after* Netflix discovered Mr. Ramey's violations.  To this day, Netflix does not know the full extent of disclosure or the damage it may cause.

## IV. DISCOVERY IS NECESSARY TO UNDERSTAND THE EXTENT OF POTENTIAL HARM TO NETFLIX AND MITIGATE IT

Notwithstanding the above, Mr. Ramey maintains that discovery regarding his violations is unnecessary, and that Netflix should simply rely on his purported investigation and

communications with the AiPi attorneys, in effect allowing the "fox . . . to investigate without supervision the disappearance of chickens at the henhouse." *See Apple v. Samsung*, 2013 WL 9768650, at *2-3. Netflix should be empowered to review Mr. Ramey's correspondence about Netflix with other parties (including AiPi and Whitestone) to determine what he disclosed, when, and to whom.[4]

### A. Netflix's requested discovery is not duplicative.

Mr. Ramey is correct that Netflix seeks discovery from AiPi related in part to communications between AiPi and Mr. Ramey, but it is not a foregone conclusion that "everything" relevant to Netflix's Motion "will be discovered" without such discovery. *See* Opp. at 11:10-14. Notably, Mr. Ramey admits he sent Netflix's Protected Material to Joe Zito and Weir King, who (as far as Netflix is aware) are not attorneys at AiPi. *See* ECF No. 302-18 at 1. And although Mr. Zito became AiPi's outside counsel by November 2023, he was seemingly uninvolved in AiPi's work on Valjakka's litigation campaign before then. Logically, any discovery that *AiPi* produces in EDVA will not include communications between Mr. Ramey's firm and these attorneys alone. And although Judge Brinkema ordered forensic imaging of "all devices used by AiPi . . . that are within the possession or control of AiPi," the only devices AiPi produced for imaging were from Eric Morehouse (save for one USB storage drive purportedly from Ken Sheets). *See* ECF No. 311-13; Hester Decl., ¶8. AiPi's discovery will not reveal everything sent to Messrs. Lund and Sheets, either. Only Mr. Ramey and his firm will have copies of their communications with Zito, King, Lund, and Sheets, and anyone else to whom Mr. Ramey may have disclosed Protected Material.

---

[4] Mr. Ramey over-indexes on his alleged "cooperativeness" to avoid discovery. Initially, Mr. Ramey did not respond to Netflix's emails about his violations for over three weeks. *See* Mot. at 7:18-26. Once he responded, he repeatedly changed his story, from claiming that he committed only one Protective Order violation, to admitting that at least five attorneys associated with AiPi and/or Whitestone Law received Netflix's Protected Material throughout the litigation. *See* ECF No. 302-17 at 2-5; ECF No. 302-18. And Mr. Ramey has not produced any of the communications between his firm and AiPi that Netflix requested in January. *See* ECF No. 302-17 at 5-6.

### B. Mr. Ramey asks Netflix and the Court to trust people at AiPi whom he referred to as "liars."

Mr. Ramey's purported efforts to contact AiPi and Whitestone attorneys about their use of Netflix's Protected Material are inadequate in at least three respects. *See* Opp. at 8:21-9:12. *First,* Mr. Ramey's only "support" is, once again, self-serving statements in his declaration. He does not attach a single email with Messrs. Morehouse, Sheets, Lund, or King (or their representatives) where the attorneys make representations about their uses of Netflix's Protective Material. Mr. Ramey simply asks Netflix to trust him and AiPi, which is difficult not only because his credibility has recently been called into question by numerous courts (*see supra*, FN2), but also because Mr. Ramey recently suggested to a Bloomberg Law reporter that Morehouse and Lund are "liars." Hester Decl., Ex. W. *Second*, that each of the AiPi and Whitestone attorneys admits they used Netflix's "Protected Material" "only" for "the Valjakka case" is itself a problem, because none of them had the right to use Netflix's confidential documents *for any case*. *Third*, Mr. Ramey apparently did not contact Mr. Zito regarding his use of Netflix's Protected Material that Mr. Ramey admittedly sent him. *See* ECF No. 302-18 at 2. Netflix needs the ability to fully investigate the improper dissemination of its Protected Materials, and discovery into Mr. Ramey's communications with others about the Materials is the first step.

## V. THE COURT SHOULD DISREGARD MR. RAMEY'S ATTEMPT TO BLAME NETFLIX FOR HIS VIOLATIONS

Mr. Ramey repeatedly attacks Netflix's motives, consistent with his apparent belief that he is a victim of "Big Tech."[5] On the contrary, courts have recognized that "Big Tech" is the victim of "Mr. Ramey," who "has a track record of commencing frivolous lawsuits against tech giants . . . for the purpose of forcing a modest settlement on the assumption that the tech giant will prefer to capitulate than fight back." *EscapeX IP*, 2025 WL 893739, at *10 (cleaned up). Here, Mr. Ramey is the one who asserted one patent that his client did not own and another that was invalid

---

[5] Mr. Ramey's declaration contains multiple inflammatory, irrelevant, unsupported, and false accusations that do not warrant a substantive response and are not evidence.

while improperly disclosing Netflix's most confidential information to a litigation funder, whose identity he actively concealed from Netflix for multiple years. *See* Opp. at 3:21-4:19. Mr. Ramey's declaration improperly and inaccurately describes alleged conversations concerning unrelated cases and companies that are not parties to this lawsuit. ECF No. 311-1, ¶¶5-7, 21-24. These theatrics are irrelevant, and Netflix respectfully requests that the Court disregard Mr. Ramey's self-serving statements.

## VI. CONCLUSION

For the reasons stated above, Netflix requests the Court grant Netflix's requested relief.

| | |
|---|---|
| Dated: April 22, 2025 | Respectfully submitted,<br><br>/s/ Sarah E. Piepmeier<br>Sarah E. Piepmeier, Bar No. 227094<br>Elise S. Edlin, Bar No. 293756<br>PERKINS COIE LLP<br>505 Howard Street, Suite 1000<br>San Francisco, California 94105<br>SPiepmeier@perkinscoie.com<br>EEdlin@perkinscoie.com<br>Telephone: +1.415.644.7000<br>Facsimile: +1.415.344.7050<br><br>Janice L. Ta (appearance *pro hac vice*)<br>PERKINS COIE LLP<br>405 Colorado Street, Suite 1700<br>Austin, Texas 78701<br>JTa@perkinscoie.com<br>Telephone: +1.737.256.6100<br>Facsimile:  +1.737.256.6300<br><br>Adam Hester, Bar No. 311206<br>PERKINS COIE LLP<br>33 E. Main Street, Ste. 201<br>Madison, Wisconsin, 53703<br>AHester@perkinscoie.com<br>Telephone: +650.838.4311<br><br>Rachael D. Lamkin (SBN 246066)<br>Karan Singh Dhadialla (SBN 296313)<br>BAKER BOTTS L.L.P.<br>101 California Street, Suite 3200<br>San Francisco, CA 94111<br>Telephone: + 1.415. 291.6200<br>Facsimile: +1.415.291.6300<br>rachael.lamkin@bakerbotts.com<br>karan.dhadialla@bakerbotts.com<br><br>**Attorneys for Defendant**<br>**NETFLIX, INC.** |