**PAGES 1 – 31**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jon S. Tigar, Judge

```
LAURI VALJAKKA,                     )
                                    )
          Plaintiffs,               )
                                    )
VS.                                 )  NO. 4:22-cv-01490-JST
                                    )
NETFLIX, INC.                       )
                                    )
                                    )
          Defendants.               )
_____)
```

San Francisco, California (via Zoom)
Thursday, May 8, 2025

**TRANSCRIPT OF REMOTE PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

**IN PRO PER**

For Defendant Netflix:

Perkins Coie LLP
505 Howard Street, Suite 1000
San Francisco, CA 94105
BY:  **SARAH E. PIEPMEIER, ATTORNEY AT LAW**

For Nonparty William P. Ramey:

Ramey LLP
5020 Montrose Blvd, Suite 800
Houston, TX 77006
BY:  **WILLIAM P. RAMEY, III**

Also Present:  Audrey Stano, Netflix

REPORTED REMOTELY BY:  April Wood Brott, CSR No. 13782
Official United States Reporter

**Thursday - May 8, 2025**                                                    <u>**2:06 P.M.**</u>

<u>P R O C E E D I N G S</u>

---o0o---

  **THE COURTROOM DEPUTY:**  The U.S. District Court is now in session, the Honorable Jon Tigar presiding.  Calling Civil Case Number 22-1490-JST, Valjakka versus Netflix Inc.

  Parties, please state your appearances, beginning with the plaintiff.

  **MR. VALJAKKA:**  Hello.  I'm Lauri Valjakka.

  **THE COURT:**  Hello, Mr. Valjakka.

  **MS. PIEPMEIER:**  Your Honor, Sarah Piepmeier from Perkins Coie on behalf of Defendant Netflix, and not on video but with me today is Netflix's principal counsel, Audrey Stano.  Thank you, Your Honor.

  **THE COURT:**  Good afternoon.

  **MR. RAMEY:**  Good afternoon, Your Honor.  Bill Ramey for nonparty William P. Ramey and Ramey LLP.  We're ready to proceed, Your Honor.

  **THE COURT:**  Welcome.  The matter's on calendar for two things this afternoon.  One is much bigger than the other.  One of them is Netflix's motion for sanctions and for an order to show cause re contempt, and the other is to discuss the status of discovery.

  Ms. Piepmeier filed a status report on discovery a couple of days ago, and in it she lays out the facts, and she

1    concludes by saying that Netflix and Plaintiff Valjakka will be

2    prepared to discuss whether the remaining discovery can be

3    completed on the remaining schedule or not and whether some

4    adjustment might be necessary.  I thought it might make sense

5    just to get it out of the way and talk about that before we

6    turn to the bigger question of the motion.

7         So Ms. Piepmeier, let me start with you, and then Mr.

8    Valjakka, I'll hear whatever you have to add.

9         **MS. PIEPMEIER:**  Thank you, Your Honor.

10        We have received -- I'm not going to get into all the of

11   the details of the EDVA proceeding, unless Your Honor is

12   interested, but the upshot is we've received over a hundred

13   thousand documents in the past few weeks, which we are making

14   our way through.  The current close of fact discovery is May

15   26th, 2025.  There are two or so depositions remaining to be

16   taken, but obviously we would like to have reviewed, or at

17   least searched, as many of those documents as possible before.

18        So and we have, I should say, met and conferred with

19   Mr. Valjakka on this, but what we would propose, if the Court

20   is amendable to it, is extending the fact discovery deadline to

21   July 2nd -- we had originally thought a little bit earlier than

22   that, but Mr. Valjakka provided some input that July 2nd would

23   be better for him -- and to have our dispositive motion hearing

24   deadline be September 22nd with a pretrial conference statement

25   due mid-December.

1    I understand that's triggered off of the date of the

2    pretrial conference, which is obviously triggered by Your

3    Honor's calendar.  So we would certainly be flexible in that

4    regard, but essentially what we're looking at is moving the

5    fact discovery cutoff approximately five weeks and then having

6    dispositive motion practice later this summer and early this

7    fall and then setting up whatever's convenient for Your Honor

8    to the extent that there needs to be a pretrial conference.

9        **THE COURT:**  Okay.  I can respond to that in just a

10    moment.

11    Mr. Valjakka, has what Ms. Piepmeier said -- is that

12    correct, everything that she said?

13        **MR. RAMEY:**  Yes.  Yes, Your Honor.

14        **THE COURT:**  Okay.  Well, I don't have a problem

15    extending the discovery cutoff.  There's good cause for me to

16    make that order.  There's a lot of material still to get

17    through, and July 2nd seems like a perfectly fine date.  I've

18    not pulled up the scheduling order that I issued before on my

19    screen.  Typically I set a dispositive motion -- well, I do.  A

20    hearing deadline.  That's right.  Okay.  So I apologize.  I'm

21    just coming from something else, an event I was speaking at; so

22    I'm a little bit at cross purposes.

23    Anyway, yeah.  So I'm happy to set a hearing deadline of

24    September 22nd.  At the moment, I think it would be the 20 --

25    oh, I take it back.  September -- it would be on a Thursday,

1    and the 25th actually happens to be a court retreat.  All the

2    judges will be sitting in a conference room talking about court

3    rules and things like that.  So we could go to go to October

4    2nd and make that the hearing deadline.

5            **MS. PIEPMEIER:**  Your Honor, speaking on behalf of

6    Netflix, I believe that is fine.  I would love the opportunity

7    to consult with my client and co-counsel, if that's acceptable,

8    and we could file something promptly after we do that.

9            **THE COURT:**  My suggestion is this, just because I want

10   to avoid having too many back and forth communications between

11   you, the Court, Mr. Valjakka, your client because there are

12   other dates we need to set also -- pretrial conference, a

13   trial, and I need to ensure that there's sufficient distance

14   between the pretrial conference and the summary judgment

15   hearing date so we can get the work done and you can know what

16   the Court's ruling is before you're preparing for trial, and

17   then I need to make sure I'm available on that date.

18       So my proposal would be why don't I just start with

19   October 2nd as a hearing date, issue an amended scheduling

20   order, you can see it, Mr. Valjakka can see it, and then if you

21   have any concerns about the dates or they need to be adjusted,

22   that's fine.  Just get in touch with the Court.  We can have a

23   case management conference.  We can move the dates.  My hunch

24   is that the dates will be fine, and then no one will have

25   anything further to do.

1          **MS. PIEPMEIER:**  Thank you, Your Honor.  I just

2     confirmed the most important date, which is I'm not running the

3     Chicago Marathon until the following week.  So at least I

4     should be good.

5          **THE COURT:**  Very good.

6          **MS. PIEPMEIER:**  I'll let my client speak for herself,

7     but thank you, Your Honor.  That sounds perfect.

8          **THE COURT:**  All right.  Mr. Valjakka, is October 2nd

9     okay with you as a hearing date?

10          **MR. RAMEY:**  Yes, Your Honor.

11          **THE COURT:**  Okay.  Terrific.  So as I said, I'll start

12     with that, I'll issue an amended scheduling order, and then we

13     can take care of any amendments to that order later if we need

14     to.

15     Mr. Valjakka, you're welcome to stay if you want to watch

16     the hearing involving Mr. Ramey.  It's still your case,

17     although you're not, I don't think, directly affected by that

18     motion, so -- but that's what we're going to do now.  We're

19     going to turn to that motion.

20          **MR. VALJAKKA:**  Thank you, Your Honor.

21          **THE COURT:**  And I've read the papers.  So I think I'm

22     prepared for the hearing today.

23     Ms. Piepmeier, it's your motion.  You can go first.

24          **MS. PIEPMEIER:**  Thank you, Your Honor.  I'm going to

25     try not to repeat anything that is in the papers, and I'm going

1    to try to keep this brief.

2        Mr. Ramey claims that this entire dispute, kerfuffle, is

3    much ado about nothing, but in the 20 years that I've been

4    practicing in this district, I have never once come across a

5    situation where opposing counsel purposely provided

6    documents -- confidential documents, technical documents,

7    financial documents, source code -- to a third party.

8        I've never seen that happen.  I've never even read a case

9    where that happened before.  The closest case we have found is

10    the Apple/Samsung disputes.  Those are close, but those don't

11    reach this level.  And Netflix is treating this as a big deal

12    because it is a big deal.

13        Now, let me start with just a few facts that are not in

14    dispute, or at least that I believe I think are not in dispute.

15    Things have changed a little bit as we've gone through

16    briefing, but I understand these facts to not be in dispute:

17    First, Mr. Ramey repeatedly disclosed Netflix confidential

18    information to a third party over the course of approximately a

19    year, at least a year.

20        This was not inadvertent.  This was not a mistake.  In

21    *Apple-Samsung*, as Your Honor may know, this began with a

22    mistake of failed redaction.  This did not begin as a mistake

23    or end as a mistake.  Second, Mr. Ramey apparently viewed AiPi

24    as his co-counsel, and yet he never mentioned them to Netflix

25    until over two years into this litigation, and he apparently

1    never told them to appear as counsel.

2        Or actually, I don't know if he told them, but they never

3    appeared as counsel.  Mild footnote on that, which I'll come to

4    in a second.  As far as we know, he never asked them to sign on

5    to the protective order until after we raised this issue to him

6    years into the litigation when we discovered it, and it took

7    him over a month to even respond to our email when we

8    discovered the disclosure, the improper disclosure.  That is

9    not consistent with taking this seriously.  That is not

10   consistent with "Oh, this was a mistake."

11       Now, why is this a big deal?  Let me go back to that.

12   This is a big deal for two reasons, other than the fact that

13   it's somewhat shocking in that it was purposeful.  The first

14   reason it's a big deal, Your Honor, is that AiPi, this

15   organization and individuals associated with it, is a

16   litigation funder.  It's not a law firm, although lawyers work

17   there or worked there.  I don't even know who's still there at

18   this point.  This is not co-counsel.

19       This is not me, Sarah Piepmeier, Perkins Coie, working

20   with Baker Botts as co-counsel.  This is Mr. Ramey working with

21   a litigation funder.  Their business is to find lawsuits,

22   underwrite them, and sue companies such as Netflix.  And the

23   concern here isn't just, "Oh, AiPi is going to have access to

24   some Netflix confidential information, which they shouldn't

25   have for purposes of this suit, and it might influence how they

1   view continuing to fund or settlement" or whatever it is that

2   they're able to do.

3       The issue, Your Honor, is that they are still to this day

4   looking for new lawsuits to underwrite, and they have

5   confidential information about Netflix's financials, technical

6   information, and source code that could influence their

7   decision to underwrite new cases or that could inspire them to

8   bring new cases.  That's a really big deal, and that is a very,

9   very different scenario from just kind of an improper

10  disclosure to another set of lawyers.

11      The second reason, Your Honor, is that most of the

12  individuals that we know about are patent prosecutors.  So

13  they're wearing a bunch of hats at AiPi.  They're lawyers,

14  they're doing some kind of legal work, although they're not a

15  law firm.

16      They're litigation funders, and they're patent

17  prosecutors, and they now have access to Netflix's technical

18  information and source code while they are prosecuting patents.

19  That's the precise reason we have a Prosecution Bar in the

20  protective order.  They've never signed on to that.  For all we

21  know, they are prosecuting patents right now directly to read

22  on Netflix's technology.  Your Honor, this is egregious.

23      Now, the timeline of all of this suggests that this wasn't

24  a mistake.  This was an intentional desire to withhold the

25  identify of AiPi from Netflix.  And I've actually prepared a

1    brief timeline that I think would be helpful to show.  Would it

2    be okay, Your Honor, if I put that up on the screen?

3              **THE COURT:**  That's fine.

4              **MS. PIEPMEIER:**  Okay.  This is the only slide I have,

5    and it will be brief.  The last thing I want to do is show a

6    bunch of slides.

7         So, Your Honor, what we have here is a timeline that is

8    showing the litigation, salient litigation events and the

9    disclosures.  Now, we know from the documents that we've seen

10   that these disclosures occurred for approximately or at least,

11   I should say, a year from late -- from August 2022 through July

12   2023.  That is the main period during which Netflix was

13   producing confidential information.  Nobody mentioned AiPi to

14   us at all until the fall of 2023.

15        The only -- we didn't even know they existed.  So the idea

16   that we knew or somehow, you know, agreed that they were

17   receiving Netflix confidential information is frankly

18   preposterous.  But I want to point out a few dates that I think

19   are really significant here that show the intent to hide AiPi,

20   which obviously then hid the fact that they had this

21   information.

22        The first, Your Honor, is that the local Rule 315

23   certificate that Valjakka filed when this case was transferred

24   didn't include AiPi.  We had no idea that they were in any way

25   involved.  It did include the Ramey firm.  It did not include

1    AiPi.

2        We started producing documents after that.  We produced

3    source code.  How did we first learn that AiPi was even a

4    thing, that it was an entity?  We learned it because they

5    produced documents in Finnish, a whole bunch of Finnish

6    documents, and we just had them translated because we didn't

7    know what they were.  In Mr. Valjakka's deposition on June 1st,

8    2023, we asked him what is this AiPi, and he said, "It's my

9    litigation funder."

10       Nobody ever said, "Oh, they're my counsel," or, you know,

11   that didn't spur them, for example, to amend their Local 315

12   certification to add AiPi.  In fact, they did amend it, but

13   they didn't add AiPi at that point.  So it's still being hidden

14   from us.  We first find out in October of 2023 that AiPi

15   actually has lawyers that are somehow involved when the whole

16   CUVTA dispute starts.

17       And Mr. Ramey mentions them in an email in response as Mr.

18   Valjakka's counsel representing him.  He never says, "Oh,

19   they're going to be, you know, accessing Netflix's confidential

20   information."  And then interestingly, Your Honor, on October

21   25th, 2023, Joe Zito, who is somehow affiliated with AiPi and

22   Whitestone Law, files a pro hac to represent Mr. Valjakka.

23       The very next day, Your Honor, the Court issued an order

24   to show cause why that shouldn't be withdrawn because there was

25   no local counsel within California to serve as his sponsor.  So

1    he withdraws that.  So at that point we certainly have no

2    reason to believe that anyone affiliated with AiPi is appearing

3    in this case, is accessing Netflix's confidential information.

4         **THE COURT:**  Let me ask you a question, because I don't

5    recall having seen it addressed in the papers filed by either

6    side, and I'm not even sure it's relevant, but I recall

7    sometime in the -- around the beginning of 2024, January or

8    February, there was a hearing in which the question was whether

9    Whitestone Law should be disqualified from representing AiPi,

10   and I sort of had to go around the mulberry bush a little bit

11   with Mr. Zito, but he eventually conceded that there was a

12   conflict, that AiPi and Mr. Valjakka had become adverse, and

13   he, I think, really wanted me not to grant the motion because

14   he just wanted to withdraw it.  But anyway, I granted the

15   motion.

16        Does that play into this somehow?  Because Zito's -- you

17   know, does that -- I mean, if it does play into it, it makes it

18   worse.  I'm just not sure how it plays into it.

19        **MS. PIEPMEIER:**  So, Your Honor, this is part of the

20   confusion.  I think Your Honor is hitting on part of the

21   confusion that we've had all along, which is what is AiPi, what

22   type of entity is it, what lawyers are associated with it, and

23   what are their interests.  Whom are they representing, if

24   anyone?

25        And at first we thought, for one day at least, that Joe

1    Zito was representing Mr. Valjakka because he filed a pro hac,

2    and then he withdrew it after Your Honor issued the order to

3    show cause.  Then he files a pro hac for AiPi, and we were

4    interacting with him as AiPi's counsel.  That is how we

5    understood his role in the CUVTA dispute.

6        Now, you're right, Your Honor.  At some point during that

7    fall, his interests became -- or their interests -- his

8    interests.  I don't know whether to say his or theirs because I

9    don't even know what the full entity --

10           **THE COURT:**  Right, because it was a finger -- it had

11   become a finger-pointing exercise regarding who might have to

12   pay any CUVTA --

13           **MS. PIEPMEIER:**  Well --

14           **THE COURT:**  -- damages, I think.

15           **MS. PIEPMEIER:**  Well, and beyond that, Your Honor, for

16   the forthcoming fees motion, yes, but I think it does make it

17   worse, Your Honor, to answer your question directly, because

18   our understanding is that there was, at least by that point --

19   just don't know when it happened -- an adversity between Mr.

20   Valjakka and AiPi.  And so if that is the case, the idea that

21   these materials of Netflix were being disclosed seems even more

22   ridiculous because how could they have been counsel for Mr.

23   Valjakka?

24       The reason that I footnote that a little bit, Your Honor,

25   is that the adversity didn't exist ab initio.  The adversity

1    became apparent at some point, and so if --

2         **THE COURT:**  Right.

3         MS. PIEPMEIER:  And so if the disclosures happened

4    earlier, I can't impute some kind --

5         **THE COURT:**  I think, yeah.  Just to interrupt you and

6    myself in the thought process, I think pursuing that line of

7    inquiry further would require figuring out whether there was an

8    -- whether there became an independent duty of disclosure of

9    some kind once the adversity became known.  And we don't have

10   the people in front of us or the facts that would be required

11   to follow up on that, so I'll just leave it alone.

12        **MS. PIEPMEIER:**  Okay.  Thank you, Your Honor.  And

13   I'll be brief on finishing this timeline.

14        My point in this is that throughout the entire period

15   where Netflix was providing confidential information, it didn't

16   even know who AiPi was.  When it did find out who AiPi was, we

17   understood that they were a litigation funder.  And then in the

18   fall of 2023, after we had produced everything and when we were

19   basically doing summary judgment briefing, we were introduced

20   to certain people affiliated with AiPi as counsel for Mr.

21   Valjakka, but we're never told that they are going to be

22   accessing confidential information.

23        And I want to make one point.  Mr. Ramey points out in his

24   opposition that we should have known because, you know, there

25   were a bunch of them at Mr. Valjakka's second deposition, which

1    was in the fall of 2023.  That is true, Your Honor, and in

2    fact, I still have in my mind, from watching that on Zoom, a

3    mental image of the conference room with a whole bunch of AiPi

4    lawyers -- or people -- I don't know who they were -- sitting

5    around.

6        Here's the difference:  It's one thing to say, "I have,

7    you know, counsel who's representing my interests."  It's

8    another thing for them to appear in a lawsuit and sign on to

9    the protective order.  I viewed that at the time, Your Honor,

10   as akin to how I sometimes have in-house counsel sitting in on

11   a client's deposition.  That doesn't mean they have the right

12   to access the other side's confidential information.  They're

13   there for their own sides's confidential information.

14       And they were relevant to CUVTA, not to Netflix, right?

15   They were on the Valjakka, Ramey, AiPi, CUVTA side of things,

16   not on the Netflix side of things.  So there's absolutely no

17   way that that put us on notice that our confidential

18   information would be produced in any way or had been

19   disseminated.

20       The thing that I find most telling, Your Honor, is that we

21   had years -- years -- when we could have learned about this,

22   when they could have followed the appropriate procedures.

23   Frankly, we would have objected had we known.  There is no way

24   in the world Netflix would have said, "Oh, yeah.  Please go

25   ahead and share this information with a litigation funder."

1    That's just preposterous.

2         The moment we found out about this in late December over

3    the holidays, we instantly emailed Mr. Ramey and everyone, and

4    then we met and conferred pursuant to the Court's rules, and

5    then we filed this motion.  The idea that we had known about

6    this for a year is preposterous.  And even if we had, it can't

7    undo the harm.

8         So let me go, Your Honor, to what we think should be done

9    at this point.  And I'll take down the timeline because I know

10   that that can be distracting.

11        **THE COURT:**  On the "what should be done" point, let me

12   ask you a question.  If I were concerned that, quote, "all

13   documents and communications between Ramey LLP and AiPi related

14   to this action" were overbroad, what would you think about

15   adding to that phrase the words "that contain, refer to, or

16   relate to discovery of any kind produced by Netflix"?  And

17   beyond the question of what you would think about that, the

18   question would be if you don't like it, what relevance does it

19   not reach?

20        **MS. PIEPMEIER:**  Your Honor, thank you for that.  What

21   I think it doesn't reach is communications with experts, draft

22   expert reports.  Maybe that's implicit in what Your Honor's

23   talking about, but we understand that essentially AiPi was on

24   the phone with and sharing information with Mr. Ramey and

25   experts.

1          And so I want to make sure it's not just discovery that

2     Netflix produced but the analysis thereof.  That, as Your Honor

3     knows, is what was at issue in *Apple-Samsung*.  It was an expert

4     report.  And I want to make sure that sort of information would

5     be covered.

6               **THE COURT:**  If the expert...

7               **MS. PIEPMEIER:**  Perhaps it is implicitly, but, you

8     know, we'd like to be explicit.

9               **THE COURT:**  What if I were to add the phrase "or rely

10    upon" so that an expert has relied upon or incorporated

11    Netflix's discovery in her work?

12              **MS. PIEPMEIER:**  Yes.

13              **THE COURT:**  So then it would say that "contain, refer

14    to, relate to, or rely upon discovery of any kind produced by

15    Netflix."

16              **MS. PIEPMEIER:**  I think that is appropriate, Your

17    Honor.

18              **THE COURT:**  All right.  You should finish your

19    argument about remedy then.

20              **MS. PIEPMEIER:**  Okay.  Thank you, Your Honor.

21         So the first thing, Your Honor, is we do think there

22    should be an order to show cause on civil contempt.  I'll set

23    that aside that we've already said that.  That's obviously Your

24    Honor's decision.

25         We do think, as we said in our motion, that our fees in

1    bringing this motion and investigating it would be appropriate.

2    We can't itemize them because I'm still arguing about this

3    right now, and to the extent that there's any remedial

4    information that we need to look at, we think that would be

5    included.

6        We also think, Your Honor, that it would be appropriate

7    for us to, after the production, have a half-day deposition of

8    Mr. Ramey.  We believe that anyone who has received this

9    Netflix confidential information who has not signed on to the

10   protective order needs to do so immediately and needs to be

11   bound by it, including the Prosecution Bar.  That's obviously

12   of vital importance to Netflix.

13       I will say, Your Honor, I'm not sure -- the Prosecution

14   Bar exists in the protective order -- it would serve that

15   purpose.  One thing that I am concerned about here is I don't

16   know what to do about the litigation funding piece.  Part of

17   me, Your Honor -- and Your Honor will probably see this as

18   overbroad, but I would like to have an injunction prohibiting

19   AiPi from bringing any kind of a suit against Netflix for a

20   period of time.

21       **THE COURT:**  You don't request that relief, so I don't

22   have anything to say about it.

23       **MS. PIEPMEIER:**  Okay.  Thank you, Your Honor.

24       We also -- I'm sorry.  You look like you're about to

25   speak.  I don't mean to interrupt you.

1          **THE COURT:**  I'm not.

2          **MS. PIEPMEIER:**  Okay.  We also think that referral to

3    the State Bar would be appropriate for the improper disclosure

4    by Mr. Ramey and anyone else who provided that information.

5    And Your Honor may have seen that in the recent order from

6    Judge Kang in the Koji matter, similar certification

7    requirement.

8          **THE COURT:**  Yes, I'm aware of Judge Kang's order.

9          **MS. PIEPMEIER:**  That, Your Honor, would be the relief

10   we're requesting at this time.  Obviously I don't know, to the

11   extent Your Honor orders any discovery, what that might entail,

12   but at this point, this is what we know about.

13         **THE COURT:**  Thank you, Ms. Piepmeier.

14      Mr. Ramey?

15         **MS. PIEPMEIER:**  Thank you, Your Honor.

16         **MR. RAMEY:**  Yes.  Good afternoon, Your Honor.  Bill

17   Ramey again for William Ramey and Ramey LLP.

18      I want to, if I could, Your Honor, start with the

19   protective order, start with docket Number 56, and while we

20   thought we had a good faith basis in sharing the information

21   that we did, we felt that the lawyers -- we're not talking

22   about AiPi being an entity that received documents.  We dealt

23   with lawyers on that side.

24      We, in fact, had a partnership, working relationship, with

25   the lawyers that are in AiPi, which were Eric Morehouse; Erik

1    Lund; Ken Sheets; Weir King; and later on, Joe Zito.  Those are

2    the only lawyers we ever dealt with and gave the Netflix

3    confidential information to.  Those are the ones we worked

4    with.

5        And if you go back to document Number 56, Your Honor, it

6    -- outside counsel is defined as attorneys who are not

7    employees of a party to this action but are retained to

8    represent or advise a party to this action and have appeared in

9    this action on behalf of that party or affiliated with the law

10   firm that has appeared on behalf of that party.

11       And so we always felt that those lawyers were affiliated

12   with my firm because there was a connected operation, connected

13   services that we were providing for Valjakka.  And as this

14   court is aware, Mr. Valjakka has submitted declarations of

15   evidence to this court that he felt that Eric Morehouse, Erik

16   Lund, Ken Sheets, Weir King, and Joe Zito each were his his

17   lawyers and he knew they were involved in the case.

18       So this is not a -- this is -- this isn't a question of us

19   giving dockets to an elusive funder, but I do of course make

20   that argument even if we did, just that AiPi is a separate

21   entity.  They were providing litigation support services that

22   would be covered as apparent exclusive protective order as

23   well.

24       So we felt we have a good faith and reasonable

25   interpretation of the protective order that was entered by this

1    court just because it fits within the affiliated language, we

2    always felt.  We never hid anything from Netflix about this.  I

3    want to --

4            **THE COURT:**  Is there any magic, Mr. Ramey, to the

5    part, to the phrase "of record"?  I did pull up the protective

6    order onto my screen, clicked away and looked at it briefly.

7    It's quite dense, so I obviously did not read it while you were

8    arguing, but I did see that the term "outside counsel" is

9    defined.  But I also see that attorneys' eyes only material are

10   only to be disclosed to outside counsel, quote, "of record,"

11   and I wonder if you could tell me what the significance of that

12   phrase is, since "record" -- since the R in "record" is

13   capitalized, it's obviously a defined term.

14           **MR. RAMEY:**  Yes, Your Honor.  So how we felt with that

15   was his outside counsel of record.  So outside counsel though

16   is -- of record -- I just read you that definition, Your Honor.

17   That was the affiliated -- the language that had that

18   "affiliated" in it.  That comes directly from, Your Honor,

19   document Number 56 at 3.

20           **THE COURT:**  I see.  And so -- oh, that's right.  So

21   there's a paragraph, 2.11, on page 3 of the document which says

22   "outside counsel of record" or, quote, "attorneys who are not

23   employees of a party to this action but are retained to

24   represent or advise a party to this action and have appeared in

25   this action on behalf of that party" -- oh, I see -- "or are

1    affiliated with the law firm which has appeared on behalf of

2    that party."

3         And your contention is that they were affiliated with you?

4         **MR. RAMEY:**  Yes, or even affiliated with Whitestone

5    Law.  We heard Ms. Piepmeier bring up that they had no idea

6    that Whitestone Law might have had access to material, but they

7    appeared for the deposition of Mr. Valjakka.

8         **THE COURT:**  What is it about their having appeared at

9    a deposition that automatically would lead a careful lawyer to

10   conclude that you had shared source code and Netflix financial

11   documents with them?  These are not matters -- I ask that

12   question because, of course, these are not matters within Mr.

13   Valjakka's knowledge, so it's unlikely to arise at the

14   deposition.

15        **MR. RAMEY:**  Yes, Your Honor, but we, in fact, did

16   disclose in October of 2023.  I think that's --

17        **THE COURT:**  Right.  That's a separate matter.  I'm

18   asking you about a question about an argument you made in your

19   papers and that you just made to me, which is the fact that

20   these lawyers who were sitting at your client's deposition

21   should have told Netflix that you had disclosed their

22   documents.  And I'm asking you again what is it about those

23   circumstances that would lead someone to draw that inference?

24        **MR. RAMEY:**  Your Honor, I'm simply going off of what

25   the protective order says for what it -- what is outside

1    counsel and who's permitted to see the information.  We didn't

2    -- that's all I'm going off of.  I'm just my reasonable --

3            **THE COURT:**  Fair enough.

4            **MR. RAMEY:**  -- what I believed was reasonable.

5            **THE COURT:**  Fair enough.  So is the argument that any

6    time other lawyers beyond those who are signatories to a

7    protective order -- if any lawyers, other lawyers, surface

8    during the litigation, that the other side should reasonably

9    conclude that those lawyers also got access to attorneys' eyes

10   only documents even if that fact is not stated?

11           **MR. RAMEY:**  Your Honor, I think that's maybe a little

12   bit broader than I would go.  Here, we weren't trying to hide

13   them.  We felt they fit within the definition of "affiliated,"

14   and of course -- as there's been a lot of testimony before this

15   court how we worked with AiPi and how -- what then later on --

16   who were the Whitestone lawyers.  The simple fact that they

17   carry an AiPi email address seems to be what Netflix is

18   concerned about, that AiPi got their information.  And I can

19   guarantee -- and I've tried to be very transparent with

20   Netflix.

21       And then on top of that, Your Honor, if we could go to

22   paragraph 15 of my declaration submitted in support of our

23   response, I have spoken to each of these lawyers -- Eric

24   Morehouse, Ken Sheets, Weir King, and Erik Lund -- and they've

25   all verified that they have treated the material subject to the

1    terms of the protective order.  So there's -- that removes the

2    harm aspect that we're talking about.

3         **THE COURT:**  I don't -- I don't -- I'm not sure that

4    Netflix is required to show harm.  But putting that to one

5    side, do you disagree with the principle that one of the

6    reasons that parties who are going to divulge information enter

7    into protective orders is so that they will be aware of who has

8    their information?  Do you disagree with that as a general

9    principal?

10        **MR. RAMEY:**  No, Your Honor.  I agree with that a

11   hundred percent.

12        **THE COURT:**  Okay.

13        **MR. RAMEY:**  And so we would assume -- and it was our

14   interpretation of the contract that, because we were working

15   with four affiliated -- what we considered the affiliated

16   lawyers, that's why we shared the information with them.  We've

17   gone out of our way to try to reassure Netflix, since they made

18   us aware, that there wasn't any improper use of that material.

19   We think we provided that assurance.

20        I would like to touch on that, if I may, Your Honor, a few

21   things Ms. Piepmeier brought up.  She says that they notified

22   me and it took a month with us to get back with them.  I was

23   out of town in Fort West, Texas over the -- on December 30th.

24   I don't even think I read the email until about a week later,

25   and then of course the first thing I did was try to figure out

1    what's going -- you know, what's the issue here.

2         So I contacted at the time Eric Morehouse's lawyer in

3    Virginia, and that's how I became aware of the matters that

4    were going on in Virginia.  So I did start my investigation,

5    and I got back with them three weeks after that initial email

6    from them, which I think is very reasonable, considering the

7    allegations they were making.

8         And I got back and I said, "Look, here's what I'm going to

9    identify."  I went through everything.  I found out, "Okay.

10   Here's another person that" -- Weir King -- he was the lawyer

11   we hadn't originally included on there.  So I made them aware

12   that he had also received that information.  So we've tried to

13   work with them at every step along the way.

14        I have not asked them to sign a -- well, I may have, but

15   they have not signed the protective order at this point.  But

16   if the -- if that would solve this issue for the Court, I'm

17   welcome to go back to them and ask if they'll sign the

18   acknowledgement on a protective order.  They've all put forward

19   in declarations, even Gary Morehouse in a separate one, that he

20   has --

21            **THE COURT:**  Mr. Ramey, I think that horse has already

22   left the barn.

23            **MR. RAMEY:**  Pardon me, sir?

24            **THE COURT:**  You asked if I wanted these other lawyers

25   to sign the protective order.  I said I think that horse has

1    already left the barn.

2         **MR. RAMEY:**  Oh.  Your Honor, and I don't think there's

3    been any harm shown here.  And if we go back to the case that

4    we cited at the start, the -- the case -- it's *Life*

5    *Technologies vs. Biosearch*.  It's 2012 Westlaw 6160039.  It

6    relies on the principal case, the *In Re Crystal Palace* case,

7    that any -- indeed, if there is civil contempt found of a

8    breach of this court's protective order, they're stuck with the

9    damages of their actual harm they've experienced from the

10   result to this, and it shouldn't be a fishing expedition.  They

11   shouldn't be able to get damages that are --

12        **THE COURT:**  Mr. Ramey.

13        **MR. RAMEY:**  -- broader than the actual harm.

14        **THE COURT:**  I've got enough to do in this case.  I'm

15   not likely to issue an order to show cause re contempt.  I just

16   don't think I need to.  I mean, I don't want to give away the

17   ruling, but let's assume for the sake of argument that I'm

18   going to grant Netflix's motion for sanctions under Rule 37

19   and, if I thought it were appropriate, refer you to the State

20   Bar or this court's professional practice committee, which is a

21   separate decision I need to make, I think, outside of this

22   motion.

23       I don't know why on earth I would then pursue contempt

24   proceedings, which is just a lot more work for everybody.  I

25   think -- I'll just say coming into this hearing, I think

1    Netflix made a pretty good argument that its material was

2    improperly disclosed, and they're not required to show harm.  I

3    think they have.  I don't think having people affiliated with a

4    litigation funder look at Netflix's source code is a situation

5    of no harm.

6        But anyway, I don't think they're required to show harm,

7    and I think that if that's the ruling I wind up sticking with,

8    that attorneys fees as a sanction are going to be appropriate,

9    and I have a feeling that those attorneys fees are going to be

10    very substantial.  So I don't think you -- I guess what I'm

11    telling you is until I tell you otherwise in this hearing, I

12    don't think you need to argue contempt.  I just don't think I'm

13    going there.

14        **MR. RAMEY:**  Yes, Your Honor.

15        So to go back to what we were trying to base this on was

16    what we did to the protective order was we just had a good

17    faith interpretation of what we thought the term "affiliated"

18    meant when it was attached to the outside counsel.  I didn't go

19    any further than looking at docket Number 56 and what I felt

20    was within the terms of the protective order.

21        And we didn't try to -- we didn't try to hide anything

22    from Netflix or in any other way not be forthright with them.

23    In fact, we've done -- since they raised their concern with us,

24    we've done everything we can to show them that their -- that we

25    didn't use, that there wasn't improper use of material, if they

1    felt it was an improper disclosure to show there was no

2    improper use.

3          And we think we've done that.  As each of the Netflix --

4    or each of the -- what they're calling AiPi lawyers and I'm

5    calling the Whitestone lawyers -- Eric Morehouse, Erik Lund,

6    Ken Sheets, and Weir King -- have already agreed to be bound by

7    the terms of the protective order.  I don't think that it does

8    show any further harm for what Ms. Piepmeier is concerned about

9    on the Prosecution Bar.

10          I think that they've all testified, they've all put

11    evidence before the Court that they would be bound by those

12    terms, and I don't think that the -- that therefore that

13    further harm can be shown by that if there was shown to be a

14    technical breach of the protective order and that I shouldn't

15    have read the affiliated language to cover the lawyers Eric

16    Morehouse, Erik Lund, Ken Sheets, and Weir King.

17          Now, with regards to this court's question of whether or

18    not referral to the State Bar or the disciplinary regulators --

19    I don't think that would be appropriate because this was a good

20    faith, a reasonable -- we tried to interpret the term

21    "affiliated" what we thought would fit within there.  So it was

22    our belief, and we don't -- it wasn't bad faith that was

23    attached to this.  There was no bad faith.

24          And we didn't give the documents, in our minds, to AiPi as

25    a litigation funder.  In our minds, the way AiPi funds

1     litigation is they merely set up separate entities that are in

2     control of that.  Eric Morehouse, Erik Lund -- they don't --

3     they're not involved in that at all.  They're simply involved

4     in providing the litigation support services that I've talked

5     about in numerous filings with this court.  So in our mind,

6     AiPi -- there's -- it's not a litigation funder they're dealing

7     with.  We're dealing with litigation support services, as Erik

8     Lund testified about in his declaration.

9          And then the -- on top of that, the partnership that we

10    had, that we worked with the lawyers themselves was for

11    providing the technical support for our firm to be able to

12    prosecute the case.  And then that's really all I can say with

13    that, Your Honor.  It was just our good faith, what we thought

14    was a good faith and reasonable interpretation of the term

15    "affiliated."

16         Thank you, Your Honor.

17         **THE COURT:**  Thank you, Mr. Ramey.

18         Ms. Piepmeier, you're ahead on points, and I think

19    I -- in my comments to Mr. Ramey, I signaled pretty clearly

20    what the Court's ruling was likely to be.  With that

21    background, is there anything further you want to add?

22         **MS. PIEPMEIER:**  Your Honor, I'm going to test my luck,

23    and I'm going to just say two quick things very, very briefly.

24         First of all, Your Honor, if Mr. Ramey's interpretation of

25    Section 2.11 of the protective order were correct, any law firm

1    could be affiliated, any law firm at all.  That's just not

2    reasonable.

3         Second of all, Your Honor, the idea that "Oh, I was

4    disclosing this information to them as lawyers, not as a

5    litigation funder."  You know, "Just ignore the fact that

6    that's what their email address is," is absolutely ludicrous

7    when it's the same people who are acting in both capacities.

8    They can't just take off their litigation funder hat and say,

9    "Today I'm a lawyer."

10        So with that, Your Honor, I will rest.  Thank you.

11        **THE COURT:**  Mr. Ramey, is there anything you'd like to

12   say just in response to Ms. Piepmeier's two quick comments?

13        **MR. RAMEY:**  Yes, Your Honor.

14        It's just simply that it's not uncommon that lawyers

15   sometimes do have more than one business that they work with,

16   and so I don't think -- I think the simple fact that they might

17   have -- that we were transacting with an AiPi email address

18   doesn't mean that the documents were going into the funding

19   part of the business.  That -- like as I said, that was

20   separately -- there was a separate LLCs that they worked with.

21   This -- Eric Morehouse, Erik Lund, Ken Sheets, and Weir King

22   were providing the litigation support services that I was using

23   and working with on Mr. Valjakka's case.

24        And with that, thank you, Your Honor.

25        **THE COURT:**  Thank you, Mr. Ramey.  This motion is now

1    under submission.   Thank you.

2         (The proceedings concluded at 2:47 P.M.)

3                         ---o0o---

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATE OF REPORTER

2           I certify that the foregoing is a correct transcript from

3      the record of proceedings in the above-entitled matter.

4

5      DATE:  Monday, May 12, 2025

6

7      _____

8                   April Wood Brott, CSR No. 13782

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25