United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LAURI VALJAKKA,

          Plaintiff,

    v.

NETFLIX INC,

          Defendant.

Case No. 22-cv-01490-JST

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Re: ECF Nos. 329, 330, 348

Before the Court are the parties' cross-motions for summary judgment on Defendant Netflix's counterclaim against Plaintiff Lauri Valjakka for violations of the California Uniform Voidable Transactions Act ("CUVTA"), ECF Nos. 328-2, 330, as well as Valjakka's motion for a stay, ECF No. 348. The Court will grant summary judgment to Netflix, deny summary judgment to Valjakka, and deny Valjakka's motion for a stay.

I.      BACKGROUND

        A.      Undisputed Facts

The material facts are undisputed. Netflix is a Delaware corporation headquartered in Los Gatos, California. ECF No. 75 at 10. Valjakka, a Finnish citizen living in Finland, is the named inventor of United States Patent Nos. 8,495,167 ('167 Patent) and 10,726,102 ('102 Patent) (collectively, "Asserted Patents"). ECF No. 74 ¶ 1; ECF No. 143-1 ¶ 2. The '167 Patent "provides improved data communications networks, methods of operating data communications networks, network servers, network terminals and computer programs." ECF No. 74-1 at 8. The '102 Patent "relates generally to a method of using digital rights management keys to provide access to access restricted content." *Id*. at 25.

In 2021, Valjakka established CDN Licensing Oy ("CDN"), a Finnish entity. ECF No.

126-11 at 12; ECF No. 127-2 at 6.  Valjakka owns 70% of CDN and retains control over the company.  ECF No. 143-1 ¶¶ 3–4.  CDN is "at break now" and will "need to [be] restructure[d] because of the bankruptcy."  ECF No. 127-2 at 8.[1]  Valjakka is also the founder and CEO of IPRA Technologies Oy Ltd. ("IPRA Tech"), a Finnish company that attempted to monetize Valjakka's patents prior to litigation but subsequently declared bankruptcy in May 2023.  *Id.* at 7; ECF No. 204 at 2.

In September 2021 in the Western District of Texas, Valjakka filed this complaint against Netflix alleging infringement of the '167 and '102 Patents.  ECF No. 1.  Around the same time, he began filing other infringement lawsuits based on the same patents.  *See* ECF No. 328-2 at 9 n.3. In late October 2021, Akamai—a defendant in one of the other suits—provided to Valjakka's then-outside counsel, Erick Robinson, two Finnish court opinions holding that Valjakka did not own the Asserted Patents.  *AiPi, LLC v. Netflix, Inc.*, No. 1:24-mc-00002-LMB-WEF, ECF No. 92-5 (E.D. Va. Apr. 11, 2025) at AiPi0000367; *see* ECF No. 116-2 at 2, 12.

Shortly thereafter, Valjakka transferred all rights in the Asserted Patents from himself to CDN without disclosing the transfers to the Court, Netflix, or the numerous parties with whom he would later settle his infringement assertions.  In November, 2021, Valjakka transferred all rights to litigation and licensing proceeds from the asserted '167 Patent to CDN.  ECF No. 143-1 ¶ 5. The agreement licensing the '167 Patent to CDN ("'167 License") expressly states that Valjakka transferred the rights to cover personal debts while protecting his revenue from liabilities arising from litigation:

> The Licensor is aware that the patent may be subject to demands concerning the reversal of the legal action, based on recovery legislation, by creditors of IPRA Technologies Ltd Oy and Lauri Valjakka. The Parties note that the purpose of the transfer and this agreement is the use of the license and sales revenues obtained from the patent also to cover the debts of Lauri Valjakka and IPRA Technologies Ltd. Oy.

ECF No. 126-3 at 3.

On December 31, 2021, Valjakka granted a license to CDN for the rights in the '102

---

[1] The quote is from Plaintiff Valjakka's deposition.  It is unclear from the testimony to whose bankruptcy he is referring.

United States District Court
Northern District of California

patent. ECF No. 143-1 ¶ 6. That license conveyed "the exclusive right to utilize the patent on whatever grounds and to benefit from all the licensing and other revenues paid for the patent as well as damages for infringement of the patent." ECF No. 126-6 at 2. Both licenses included the right to all litigation and licensing proceeds, including from settlement and final judgments relating to the Asserted Patents (the "Enforcement Assets"). ECF No. 143-1 ¶¶ 5–6. Both licenses also included the exclusive right to license the patent to third parties. ECF No. 126-3 at 4; ECF No. 126-6 at 2. The only right Valjakka retained was the right to sue for infringement: "With this agreement, the Parties intend to agree on the transfer to the Licensee of all rights associated with the patent, however, in such a way that the Licensor, as the registered owner of the patent in the US Patent Register and based on ownership, is the plaintiff in legal proceedings concerning patent infringements." ECF No. 126-6 at 43; *see also* 126-3 at 5.

On December 22, 2021, Valjakka entered into a settlement and licensing agreement with Akamai. ECF No. 126-5. Therein, Valjakka purported to grant Akamai a license to both Asserted Patents, even though CDN now held the exclusive right to license the '167 Patent.[2] *Id*. at 4–5.

On January 3, 2022, the next business day after Valjakka signed the '102 License, he sued three more entities in his own name, attesting to be the owner of the Asserted Patents. *See, e.g.*, *Valjakka v. Sony Interactive Ent. Inc.*, No. 6:22-cv-00005-ADA, ECF No. 1 ¶ 15 (W.D. Tex. Jan. 3, 2022) ("Plaintiff Lauri is the owner of the entire right, title, and interest in and to the patents-in-suit."); *see* ECF No. 328-2 at 9 n.3. Ultimately, Valjakka would sign at least four more settlement and licensing agreements resolving fourteen lawsuits filed between September 10, 2021 and May 16, 2022. In each, Valjakka again fraudulently warranted that he had all rights to license the Asserted Patents, failing to disclose CDN's role. ECF No. 126-9 at 8 (§ 5.5(a)); ECF No. 126-10 at 7 (§ 5.1.1); ECF No. 126-8 at 5–6 (§ VI(2)-(4)); ECF No. 126-7 at 6–7 (§ 2.1(a)-(c)).

As of November 24, 2023, Valjakka had received settlement payments "for a total of $1,285,000." ECF No. 233-1 ¶ 28. AiPi, Valjakka's litigation funder, established IP Case Group 1 LLC to manage settlement proceeds from Valjakka's patent assertion campaign. ECF No. 328-3

at 2.  CUVTA discovery has revealed the following payments received by CDN from IP Case Group 1 LLC, representing Valjakka's share of the Enforcement Assets: (1) $245,588.98 received on April 22, 2022, ECF No. 328-4 at 3; (2) $98,802.80 received on July 18, 2022, ECF No. 328-5 at 3; (3) $274,598.07 received on July 21, 2022, *id*., for a total of $618,989.85.

In sum, CDN paid approximately €145,000 for exclusive rights to the Asserted Patents, ECF No. 126-3 at 4 (licensing the '167 Patent to CDN for € 95,000); ECF No. 126-6 at 3 (licensing the '102 Patent to CDN for €50,000), which have yielded over $1.2 million in revenue, ECF No. 233-1 ¶ 28.

### B.      Procedural History

The case was transferred to this Court in March 2022.  ECF No. 18.  The currently operative third amended complaint was filed in December 2022.  ECF No. 74.  The same month, Netflix answered the complaint, bringing counterclaims and seeking judgment under 35 U.S.C. § 285 for attorney's fees.  ECF No. 75.

After becoming aware that Valjakka had licensed his patents to CDN, Netflix moved for a preliminary injunction to prevent the potential transfer of Enforcement Assets from Valjakka to CDN under CUVTA.  ECF No. 126-12.  Netflix asked the Court to enjoin Valjakka, "pending trial, from using, moving, concealing, transferring, or otherwise disposing of any licensing or settlement asset in his possession, custody or control."  ECF No. 127-3 at 2.  Simultaneously, Netflix filed motions to amend the scheduling order to allow targeted discovery on the CUVTA, and to amend its answer to add an additional counterclaim under the CUVTA, which the Court promptly granted.  ECF Nos. 128, 129, 136.

The Court granted Netflix's motion for a preliminary injunction on October 18, 2023. ECF No. 204.  In that order, the Court found that CUVTA applied to Valjakka's transfer of the enforcement assets to CDN even though he owned CDN, that Netflix's claim for attorney's fees was cognizable under CUVTA, that the transfer to CDN would put assets out of reach, and that Netflix was likely to succeed on the merits of its fraudulent conveyance claim under CUVTA.  *Id*. at 3–6.  On the last point, several of the CUVTA "badges of fraud" supported finding an intent to defraud, and Valjakka had failed to establish a supervening legitimate purpose.  *Id*. at 6–10.

On August 21, 2025, Netflix filed a motion for summary judgment on the CUVTA counterclaim. ECF No. 328-2. Four days later, Valjakka also moved for summary judgment on the CUVTA counterclaim. ECF No. 330. On September 4, 2025, Valjakka opposed Netflix's motion. ECF No. 335. On September 8, 2025, Netflix opposed Valjakka's motion. ECF No. 336. Netflix then replied to Valjakka's opposition to its motion on September 11, 2025, ECF No. 338, and Valjakka did the same on September 15, 2025, ECF No. 340.

On September 26, 2025, Valjakka also filed a motion to stay the proceedings and dismiss the CUVTA counterclaim "on the grounds that no qualifying transfer occurred, Plaintiff was not a transferee, and the license agreement relied upon by Defendant was cancelled retroactively," because the Finnish Supreme Court reopened ownership proceedings concerning the Asserted Patents, and for various other reasons. ECF No. 348 at 3. Netflix opposed, ECF No. 351, and Valjakka replied, ECF No. 352.

## II.     LEGAL STANDARD

Summary judgment is only appropriate where the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On summary judgment, the court draws all justifiable factual inferences in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Id*. at 252. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251–252.

## III.    DISCUSSION

Netflix argues that it is entitled to an injunction preventing the transfer of Enforcement Assets under the CUVTA until its forthcoming attorney's fees motion is adjudicated. Cal. Civ. Code § 3439.07(a)(3)(A); ECF No. 328-2 at 8. In his motion for summary judgment and opposition to Netflix's motion, Valjakka raises three defenses: that CUVTA does not apply to Section 285 attorney's fees claims, that transfers made before Netflix affirmatively plead its

United States District Court
Northern District of California

attorney's fees claims are not subject to CUVTA, and that he acted in good faith. ECF Nos. 330, 335.

### A.    Section 3439.04(a)(1)

To establish a violation of California Civil Code § 3439.04(a)(1), a creditor must prove (1) a transfer or obligation (2) by a debtor (3) "with actual intent to hinder, delay, or defraud any creditor of the debtor." "A creditor making a claim for relief under [Section 3439.04(a)] has the burden of proving the elements of the claim for relief by a preponderance of the evidence." Cal. Civ. Code § 3439.04(c).

### 1.    Netflix Is a Creditor Under CUVTA

In the order granting a preliminary injunction, this Court concluded that Netflix is a "creditor" under the CUVTA because it holds a contingent claim for attorney's fees under 35 U.S.C. § 285. ECF No. 204 at 4–5. In his summary judgment briefing, Valjakka argues that Netflix cannot be a "creditor" within the meaning of the CUVTA merely by asserting a 35 U.S.C. § 285 claim for attorney's fees during ongoing litigation because Netflix "has only a remote possibility of asserting a valid claim for attorney's fees," in part because fees under Section 285 are only awarded "in exceptional cases." ECF No. 330 at 3; ECF No. 335 at 7; *see* 35 U.S.C. § 285. But Valjakka already made this argument once, ECF No. 143 at 5–6, and the court rejected it in granting the preliminary injunction, ECF No. 204 at 4–5. Valjakka offers no reason for the Court to reconsider its prior conclusion.

As the Court previously noted, a creditor is a person who has a claim, meaning "a right to payment, whether or not the right is . . . contingent[.]" Cal. Civ. Code § 3439.01(b)–(c); ECF No. 204 at 4–5. A "contingent liability" is "a liability that depends on the occurrence of a future and uncertain event." *Liability*, Black's Law Dictionary (11th ed. 2019). Netflix's claim for attorney's fees under Section 285 comfortably fits within this definition.

### 2.    Valjakka Transferred the Enforcement Assets to CDN

As of November 24, 2023, Valjakka had "reached settlement with five entities for a total of $1,285,000." ECF No. 233-1 ¶ 28. Through CUVTA discovery, Netflix uncovered transfers of the Enforcement Assets totaling at least $618,989.85 to CDN. ECF No. 328-4 at 3; ECF No. 328-

United States District Court
Northern District of California

5 at 3.

### a.    Timing of Transfers

Valjakka licensed the Asserted Patents to CDN at the end of 2021 and transferred no Enforcement Assets to CDN after July 21, 2022,[3] but Netflix did not raise its claim for Section 285 attorney's fees until it answered the third amended complaint on December 23, 2022.  ECF No. 330 at 4–5; *see* ECF No. 75 ¶ 15.  Valjakka therefore argues that any transfers are not cognizable under CUVTA because they occurred months before Netflix sought attorney's fees under Section 285.  ECF No. 330 at 4–5.  He offers no reasoning, however, in support of his position that transfers are not cognizable if they predate the contingent claim.  Moreover, he quotes the language of the statute, which clearly states that "[a] transfer made or obligation incurred by a debtor is voidable as to a creditor, *whether the creditor's claim arose before or after the transfer was made or the obligation was incurred*," if certain conditions are met.  *Id*. at 5; Cal. Civ. Code § 3439.04(a) (emphasis added).

In addition, Netflix has put forth uncontested evidence that Valjakka was aware of the risk of attorneys' fees at the time of his fraudulent transfers, meaning that the timing of the transfers cannot undermine Netflix's claim of fraudulent intent.  ECF No. 336 at 6.  On November 30, 2021, Valjakka's litigation funders forwarded an email to Valjakka from counsel for Akamai, arguing that Akamai would prevail on a motion to dismiss and would "almost certainly recover its fees given the exceptional nature of this case."  ECF No. 336-3 at 4.  Thus, Valjakka was aware of his potential liability for attorneys' fees when he transferred litigation settlement funds in April and July of 2022.  *See* ECF No. 328-4 at 3; ECF No. 328-5 at 3.

Netflix has conclusively established the first and second elements of a claim under California Civil Code § 3439.04(a)(1).

### 3.    Intent to Hinder, Delay, or Defraud

### a.    The CUVTA Badges of Fraud

The CUVTA enumerates eleven nonexclusive factors—called "badges of fraud"—that

---

[3] Valjakka made his final transfer of funds to CDN, through the AiPi-controlled IP Casegroup, on July 21, 2022.  ECF No. 330 at 5; ECF 330-X ¶ 16.

indicate actual intent to hinder, delay, or defraud creditors. *Virtue Glob. Holdings Ltd. v. Rearden LLC*, No. 15-CV-00797-JST, 2016 WL 9045855, at *6 (N.D. Cal. June 17, 2016). "No minimum number of factors tips the scales toward actual intent." *In re Beverly*, 374 B.R. 221, 236 (B.A.P. 9th Cir. 2007). "The presence of several badges of fraud can constitute conclusive evidence of actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose." *Id*.

The CUVTA provides:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor.

. . .

(b) In determining actual intent under paragraph (1) of subdivision (a), consideration may be given, among other factors, to any or all of the following:

(1) Whether the transfer or obligation was to an insider.

(2) Whether the debtor retained possession or control of the property transferred after the transfer.

(3) Whether the transfer or obligation was disclosed or concealed.

(4) Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

(5) Whether the transfer was of substantially all the debtor's assets.

(6) Whether the debtor absconded.

(7) Whether the debtor removed or concealed assets.

(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

(10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred.

(11) Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor.

Cal. Civ. Code § 3439.04. Netflix contends that several of these "badges of fraud" conclusively establish Valjakka's fraudulent intent because "they present an undisputed pattern of concealment, insider self-dealing, and inadequate consideration that no reasonable jury could overlook." ECF No. 328-2 at 13. In addition to the five badges found by this Court in its preliminary injunction order—Badges 1, 2, 3, 7, and 8—Netflix identifies two additional ones—Badges 5 and 9.

Netflix first urges the Court to find, as it did in ruling on Netflix's motion for a preliminary injunction, that Valjakka's transfers satisfied the first badge of fraud because they were made to an insider. ECF No. 328-2 at 13; Cal. Civ. Code § 3439.04(b)(1). This badge is easily satisfied because the parties agree that CDN is owned and controlled by Valjakka. ECF No. 143-1 ¶¶ 3–4. The Court's prior order drew on the bankruptcy code, which defines an "insider" as a "corporation of which the debtor is a director, officer, or person in control." ECF No. 204 at 7–8 (quoting 11 U.S.C.A. § 101.). "Because Valjakka controls CDN, that entity is an insider, and the transfer of the Licenses between Valjakka and CDN constituted an insider transaction." *Id*. at 8. Valjakka does not challenge this conclusion or identify any evidence undermining it.

The second badge of fraud is also easily met. The parties agree that Valjakka retains control over CDN. ECF No. 143-1 ¶ 4. Accordingly, "the debtor retain[s] . . . control of the property transferred after the transfer." *Id.*; Cal. Civ. Code § 3439.04(b)(2).

Third, Valjakka has identified nothing to undermine the Court's prior conclusion that he concealed the transfer of his assets (Badge 3). Cal. Civ. Code § 3439.04(b)(3). Valjakka argues only, as he has before, that he disclosed the existence of CDN as one of his subsidiaries in response to Netflix's first round of interrogatories. ECF No. 335 at 3, ECF No. 143 at 9.[4]

The Court previously found that while "Valjakka disclosed the *existence* of CDN in his responses to Netflix's interrogatories," he "concealed the *actual transfer* of rights to Enforcement

---

[4] Valjakka also asserts that that he conveyed CDN's role to AiPi, whom he believed to be his counsel, and he does not know why AiPi did not convey that information to Netflix in interrogatory answers. ECF No. 330 at 6. Given that Valjakka personally attested to the accuracy of his responses, his lawyers' action or inaction is not at issue.

Assets through the Licenses during discovery and in his settlement agreements." ECF No. 204 at 8. For example, Valjakka's response to Interrogatory No. 8, which requested that he identify every entity with financial, ownership, or other interest in the Asserted Patents, did not mention the Licenses or CDN or IPRA Tech. ECF No. 126-11 at 7–9. This was so even though CDN had received $245,588.98 in Enforcement Assets on April 22, 2022—three months prior to the date of the original interrogatory responses—and an additional $373,400.87 by September 9, 2022, the date of Valjakka's supplemental responses addressing the same interrogatory. ECF No. 328-4 at 3; ECF No. 328-5 at 3. Similarly, in the settlement agreements he produced, despite the fact that the Licenses incontrovertibly state that "the Licensor cannot grant parallel licenses based on the same patent to third parties," ECF No. 126-3 at 4; ECF No. 126-6 at 2, Valjakka asserted that he had the right to grant the patent license, effectively concealing the existence and role of CDN. ECF No. 126-9 at 8 (§ 5.5(a)); ECF No. 126-10 at 7 (§ 5.1.1); ECF No. 126-8 at 5–6 (§ VI(2)-(4)); ECF No. 126-7 at 6–7 (§ 2.1(a)-(c)). As the Court noted in the preliminary injunction order, such facts also support a finding of the seventh badge of fraud—that Valjakka removed or concealed his assets. Cal. Civ. Code § 3439.04(b)(7).

Netflix argues that Badge 5 is also satisfied because Valjakka transferred "substantially all" of his assets. ECF No. 328-2 at 14; Cal. Civ. Code § 3439.04(b)(5). As evidence, Netflix points to correspondence between Valjakka and his personal Finnish attorney acknowledging that Valjakka's debts exceeded his ability to pay, recommending that Valjakka "consider using CDN's funds for [his] own financing . . . as your debts go into the red," and stating that CDN's expected income would not cover all of Valjakka's creditors, "especially IPRA's retroactive debts," even if he received larger settlements than expected. ECF No. 328-2 at 14 (citing ECF No. 328-7 at 2). From the evidence, it appears possible that Valjakka had significant other assets, but that those assets merely fell short of his debts. Although Valjakka does not contest the evidence identified by Netflix or otherwise argue that the transfers did not involve "substantially all" of his assets, the Court does not find that a reasonable jury would ineluctably conclude that Badge 5 is satisfied.

The same evidence *does* establish Badge 9, which applies to debtors who were "insolvent or became insolvent shortly after the transfer was made or the obligation was incurred." Cal. Civ.

10

Code § 3439.04(a)(9). Badge 9 is additionally supported by a loan agreement entered into by CDN on November 5, 2021, which explains that "[t]he company and Lauri Valjakka's need for funding is urgent and the creditor has understood the risks associated with allocating funding." ECF No. 328-2 (quoting ECF No. 328-9 at 2).

With regard to Badge 8—whether "the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred"—the Court previously found that the consideration for the Licenses was not reasonably equivalent to the value of the transferred assets. ECF No. 204 at 9; Cal. Civ. Code § 3439.04(b)(8). Valjakka offers no new arguments challenging this determination. Netflix, meanwhile, argues that additional transfers of Enforcement Assets to CDN, uncovered through CUVTA discovery, "further compound[] the imbalance of consideration." *See* ECF No. 336 at 7 (citing ECF No. 328-4 at 3; ECF No. 328-5 at 3). The undisputed evidence shows that CDN paid for the Asserted Patent Licenses less than a fifth of what it has made in revenue so far. *Compare* ECF No. 126-3 at 4; ECF No. 126-6 at 3 (CDN paid approximately €145,000 in 2021, or approximately $165,000)[5] with ECF No. 233-1 ¶ 28 (summing enforcement assets received by CDN so far to a total of $1,285,000). Badge 8 tilts even more strongly in Netflix's favor than it did at the preliminary injunction stage.

In the aggregate, these several badges of fraud constitute conclusive evidence of Valjakka's intent to defraud. *See In re O'Gorman*, 115 F.4th 1047, 1058 (9th Cir. 2024) ("[T]he confluence of several [badges of fraud] can constitute conclusive evidence of actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose.'" (quoting *In re Acequia, Inc.*, 34 F.3d 800, 806 (9th Cir. 1994)). Given the largely unrefuted evidence presented by Netflix, no reasonable jury could find that Valjakka transferred the Enforcement

---

[5] According to the European Central Bank, the exchange rate in November and December of 2021 was 1.13 to 1.14 dollars per euro. European Central Bank, Euro Foreign Exchange Reference Rates, https://www.ecb.europa.eu/stats/exchange/eurofxref/shared/pdf/2021/12/20211231.pdf (last visited March 13, 2026); *see also* European Central Bank, Euro Foreign Exchange Reference Rates, https://www.ecb.europa.eu/stats/policy_and_exchange_rates/euro_reference_exchange_rates/html/index.en.html (last accessed March 13, 2026) (providing the same information).

United States District Court
Northern District of California

Assets without actual intent to hinder, delay, or defraud Netflix or Valjakka's other creditors.

### b. Other Indicia of Fraud

The CUVTA badges of fraud are not exhaustive. *See Virtue Glob. Holdings Ltd.*, 2016 WL 9045855, at *6. Netflix argues that Valjakka's fraudulent intent is further evidence by (1) the fact that he transferred assets while maintaining liabilities and (2) his overall litigation strategy. ECF No. 328-2 at 16.

Valjakka transferred to CDN rights to the Asserted Patents and Enforcement Assets, but not the associated liabilities (such as Netflix's claim for attorney's fees). ECF No. 126-3; ECF No. 126-6. Separating the liability from the assets potentially renders unenforceable any ruling awarding fees to Netflix and does suggest fraudulent intent.

Netflix's second argument is less compelling. Netflix provides examples of purported deceptive conduct in Valjakka's "overall litigation strategy," but these do not appear relevant to Valjakka's intent in creating CDN and transferring the assets to it. For instance, Netflix argues that Valjakka falsely stated in certain settlement agreements that the Asserted Patents have never "been the subject of any pending or past litigation." ECF No. 328-2 at 16. While these statements may speak to a habit of deception, they do not necessarily suggest that the transfers at issue were fraudulent. Similarly, Netflix notes that Valjakka created CDN fourteen days after his attorneys and litigation funders became aware that a Finnish court had found Valjakka not to have any right to the Asserted Patents in 2009. *Id*. But insofar as the creation of CDN was designed to insulate the patents and enforcement assets from liability caused by the deficiencies in Valjakka's claim, then it does not appear relevant when Valjakka's attorneys and funders learned of those deficiencies—only when Valjakka himself (or his litigation opponents) did.

Netflix's first additional indicium of fraud, but not the second, moderately supports the Court's conclusion that Valjakka acted with the requisite fraudulent intent.

### c. Valjakka Does Not Establish a Supervening Legitimate Purpose

Once indicia of fraud are established, the burden shifts to the transferee to demonstrate "'significantly clear' evidence of a legitimate supervening purpose" for the transfers at issue. *In re Acequia, Inc.*, 34 F.3d at 806 (quoting *Max Sugarman Funeral Home, Inc. v. A.D.B. Invs.*, 926

12

F.2d 1248, 1254–55 (1st Cir. 1991)).  Valjakka claims that CDN was created "for the sole purposes of tax effective administration and division with his Finnish partners of possible litigation proceeds" and to "set[]up an income stream for himself instead of a large lump sum payment" of the settlement money he anticipated.  ECF No. 330 at 6; ECF No. 335 at 3.  In granting the preliminary injunction, the Court found that "Valjakka neither explains, nor provides supporting evidence showing, how the creation of CDN allows Valjakka to accomplish these goals."  ECF No. 204 at 10.  At summary judgment, Valjakka has identified no additional evidence or argument supporting such an explanation.  The Court's prior order also found that "some of the evidence before the Court specifically contradicts Valjakka's assertions," including the '167 License, which states that at least part of the purpose of the License is to "cover the debts of . . . IPRA Tech."  ECF No. 204 at 10 (citing ECF No. 126-3 at 3).  This discrepancy likewise remains unrebutted by Valjakka.  Valjakka's unsupported assertions fail to meet his burden to provide "'significantly clear' evidence of a legitimate supervening purpose," and no reasonable jury could find for him on this point.  *In re Acequia,* 34 F.3d at 806.

### d.      Good Faith

CUVTA outlines a defense wherein "[a] transfer or obligation is not voidable under [Section 3439.04(a)(1)], against a person that took in good faith and for a reasonably equivalent value given the debtor or against any subsequent transferee or obligee." Cal. Civ. Code § 3439.08(a); *see also Brandlin v. Eurolux, LLC*, No. 21-56001, 2022 WL 2713232, at *1 (9th Cir. July 13, 2022).  "The test is conjunctive, i.e., the party asserting the defense must establish both elements, and failure to meet either is fatal to the assertion of the defense." *In re Fox Ortega Enters., Inc.*, 631 B.R. 425, 459 (Bankr. N.D. Cal. 2021).  "[A] transferee cannot benefit from the good faith defense if that transferee had fraudulent intent, colluded with a person who was engaged in the fraudulent conveyance, actively participated in the fraudulent conveyance, or had *actual knowledge of facts showing knowledge of the transferor's fraudulent intent*." *Nautilus, Inc. v. Yang*, 11 Cal. App. 5th 33, 37 (2017) (emphasis in original).

Valjakka argues that his transfer was in good faith because he was "in firm belief both regarding the validity of his infringement claim and his ownership of the '167 [P]atent," which is

13

"supported by several legal experts and by Valjakka's advisors." ECF No. 330 at 5; *see also* ECF No. 335 at 4, 5–6; ECF No. 340 at 3–4. "Therefore, on July 21, 2022, when Valjakka transferred the last payment to CDN[,] he had no grounds to expect that Netflix would file a claim under Section 285 nor grounds to view any of his actions with respect to settlement proceeds as contrary to the rights of his creditors." *Id*. at 6.

The transferee here is CDN. This Court has concluded that Valjakka undertook the transfer with fraudulent intent and CDN, as an entity owned and controlled by Valjakka, effectively shared in that knowledge. Under the test articulated in *Nautilus*, therefore, CDN cannot show the requisite good faith because it had actual knowledge of the transferor's fraudulent intent. 11 Cal. App. 5th at 37.

Moreover, Section 3439.08(a) is clear that the good faith defense applies to CUVTA claims "against a person that took" the transfer "for a reasonably equivalent value." In analyzing Badge 8 in the order granting a preliminary injunction and in this order, the Court has twice concluded that consideration for the licenses granted to CDN was not reasonably equivalent to the value of the transferred assets. Valjakka therefore may not avail himself of the good faith defense under Section 3439.09(a).

### B.   Section 3439.04(a)(2): Constructive Fraud

Netflix last argues that summary judgment is warranted under the constructive fraud provisions of CUVTA. California Civil Code Section 3439.04(a)(2) provides that a transfer is voidable if the transferor "(1) did not receive 'reasonably equivalent value in exchange for the transfer' and (2) made the transfer when it 'believed or reasonably should have believed' it could not pay its debts 'as they became due.'" *Brandlin v. Eurolux, LLC*, 2022 WL 2713232, at *1 (quoting Cal. Civ. Code § 3439.04(a)(2)).

As the Court outlined above, the undisputed evidence shows that CDN paid for the Asserted Patent Licenses less than a fifth of what it has made in revenue so far. *Compare* ECF No. 126-3 at 4; ECF No. 126-6 at 3 with ECF No. 233-1 ¶ 28. The evidence that Valjakka, CDN, and IPRA were each insolvent or approaching insolvency at the time of the transfers is likewise undisputed. ECF No. 328-7 at 2; ECF No. 328-9 at 2; ECF No. 328-10 at 2. In light of these

United States District Court
Northern District of California

14

facts, Netflix is entitled to summary judgment under Section 3439.04(a)(2).

## IV.   MOTION TO STAY

Valjakka has also filed a motion for a stay.  ECF No. 348.  When determining whether to stay proceedings, the Court weighs the three factors set forth in *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936): "(1) the possible damage to the non-moving party, (2) the hardship or inequity which a party may suffer in being required to go forward, and (3) the orderly course of justice." *Dewse v. Albertsons Companies, Inc.*, No. 3:22-CV-00013-H-JLB, 2022 WL 20667669, at *1 (S.D. Cal. Aug. 15, 2022).  Valjakka makes no attempt to analyze the *Landis* factors.  Rather, he attempts to rehash the merits of the CUVTA claims.  Having already addressed the parties' summary judgment arguments, the Court need not give Valjakka another bite at the apple.

In any case, Valjakka's stay motion raises no arguments that would alter the Court's conclusion here.  For instance, he asserts that the license agreement "was cancelled on September 26, 2023, retroactive to November 5, 2021," but does not explain which license agreement was cancelled or what impact that cancellation has on Netflix's CUVTA claims, except to say that "Plaintiff held no license during Defendant's filings."  ECF No. 348 at 4.  As Netflix argues in opposition, Valjakka appears to argue "that [he] did not violate CUVTA because he created a retroactive document that essentially makes the whole fraudulent transfer disappear."  ECF No. 351 at 3.  Similarly, Valjakka suggests that Netflix's removal of two witnesses from their witness list "undermines credibility," ECF No. 348 at 4, but the Court has not relied on Netflix's credibility and the record shows that the two witnesses were not removed in any event.  ECF No. 351 at 6.  Other statements in the motion to stay, including that the "historical enforcement record supports vigilance," appear to have little relation to the issues in the case at all.  *Id*.

Valjakka does argue that a stay is warranted because the Finnish Supreme Court reopened ownership proceedings on the '167 patent, but he does not explain the posture or significance of that proceeding.  ECF No. 348 at 4.  In addition, as Netflix argues, Valjakka apparently intends to argue that he obtained ownership of the '167 patent when its actual owners abandoned it, but as this Court previously held in granting Netflix summary judgment on Valjakka's patent application, US law governs abandonment and revival of a US patent application, which is what is at issue

15

United States District Court
Northern District of California

here.  ECF No. 351 at 4–5 (quoting ECF No. 257 at 12–13).  Any contrary decision of the Finnish Supreme Court is therefore not relevant.  *Id*.

The motion for a stay is denied.

### CONCLUSION

Netflix has met its burden to show that it is entitled to summary judgment.  Valjakka shall continue to hold the Enforcement Assets pending adjudication of Netflix's forthcoming attorney's fees motion.

Netflix shall file its motion for attorney's fees by April 17, 2026.  The pretrial conference scheduled for March 20, 2026 and the trial scheduled for April 6, 2026 are vacated.  All other deadlines are vacated.  All other pending motions and stipulations are denied as moot.

**IT IS SO ORDERED.**

Dated:  March 13, 2026



_____
JON S. TIGAR
United States District Judge