Sarah E. Piepmeier, Bar No. 227094
SPiepmeier@perkinscoie.com
PERKINS COIE LLP
505 Howard Street, Suite 1000
San Francisco, California 94105
Telephone: +1.415.344.7000
Facsimile:  +1.415.344.7050

Janice L. Ta (appearance *pro hac vice*)
JTa@perkinscoie.com
PERKINS COIE LLP
405 Colorado Street, Suite 1700
Austin, Texas 78701
Telephone: +1.737.256.6100
Facsimile:  +1.737.256.6300

[Additional Counsel Listed on Signature Page]

***Attorneys for Defendant***
***NETFLIX, INC.***

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| LAURI VALJAKKA, | **Case No. 4:22-cv-01490-JST** |
| *Plaintiff*, | **NETFLIX, INC.'S MOTION FOR ATTORNEYS' FEES** |
| v. | |
| NETFLIX, INC., | Date:   July 2, 2026 |
| *Defendant*. | Time:   2:00 PM |
| | Place:  Courtroom 6 |
| | Judge:  Hon. Jon S. Tigar |

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ....................................................................................................... 1

II. STATEMENT OF FACTS ........................................................................................... 2

    A. Valjakka Never Owned the '167 Patent.............................................................. 2

    B. Valjakka Had No Right to Assert the Patent-Ineligible '102 Patent..................... 3

    C. Valjakka and His Counsel's Serial Misconduct Through This Proceeding........... 4

        1. Valjakka's first outside counsel withdraws when he learns of the '167 patent "ownership issue," leading to Mr. Ramey taking over. .......... 4

        2. Valjakka and his new counsel repeatedly abused the judicial process........................................................................................................ 7

        3. Valjakka refuses to dismiss even after Netflix uncovers the ownership issue. ...................................................................................... 11

        4. Valjakka fraudulently transferred proceeds from his settlement to CDN. ............................................................................................. 11

III. ARGUMENT ............................................................................................................. 12

    A. Netflix Is Entitled to Attorneys' Fees from Valjakka Under 35 U.S.C. § 285........................................................................................................................ 12

        1. That Valjakka filed this lawsuit, and his attorneys maintained it, knowing (and concealing) that Valjakka lacked standing, is exceptional *per se* and warrants a fee award covering the entire lawsuit. ...................................................................................................... 13

        2. Netflix told Valjakka his patent infringement claims were objectively unreasonable, yet he refused to drop them, which is an additional basis to award Netflix its fees. .............................................. 17

        3. Valjakka and his counsel engaged in additional misconduct that further supports a fee award............................................................... 18

    B. As Sanctions Against Mr. Ramey and Ramey LLP, the Court Should Also Hold Them Jointly and Severally Liable for Netflix's Attorneys' Fees Pursuant to 28 U.S.C. § 1927 and/or the Court's Inherent Power. ...................... 20

    C. Netflix's Requested Fees and Sanctions Are Further Justified by the Need to Deter Similar Misconduct. ............................................................................. 22

    D. Netflix Seeks Only Half Its Reasonable Fees. .................................................. 23

IV. CONCLUSION ......................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Advanced Video Techs, LLC v. HTC Corp.*,
No. 1:11 Civ. 06604, 2015 WL 7621483 (S.D.N.Y. Aug. 28, 2015) .......................... 13, 14, 15

*Alzheimer's Inst. Am., Inc. v. Avid Radiopharmaceuticals*,
No. 10-6908, 2015 WL 1422337 (E.D. Pa. Mar. 30, 2015) ..................................................... 13

*Apple Inc. v. Samsung Elecs Co.*,
No. 5:11-cv-01846, *slip op.* (N.D. Cal. June 20, 2014), ECF No. 3117 ................................. 23

*Chromadex, Inc. v. Elysium Health, Inc.*,
No. 18-1434, 2024 WL 5105618 (D. Del. Aug. 20, 2024) ....................................................... 25

*Chromadex, Inc. v. Elysium Health, Inc.*,
No. 18-1434-CFC, 2024 WL 1255520 (D. Del. Mar. 25, 2024) .............................................. 18

*Dig. Reg of Tex., LLC v. Adobe Sys., Inc.*,
No. C 12-1971 CW, 2015 WL 1026226 (N.D. Cal. Mar. 9, 2015) ......................................... 13

*Fink v. Gomez*,
239 F.3d 989 (9th Cir. 2001) .................................................................................................... 20

*Hensley v. Eckerhart*,
461 U.S. 424 (1983) .................................................................................................................. 23

*Highmark Inc. v. Allcare Health Mgmt. Sys.*,
134 S. Ct. 1744 (2014) ............................................................................................................. 13

*Homeland Housewares, LLC v. Sorensen Rsch. & Dev. Tr.*,
No. 11-cv-3720-GW, 2013 WL 12138581 (C.D. Cal. May 20, 2013) ..................................... 18

*In re Intel Sec. Litig.*,
791 F.2d 672 (9th Cir. 1986) .................................................................................................... 20

*In re PersonalWeb Techs., LLC*,
No. 18-md-02834, 2020 WL 5910080 (N.D. Cal. Oct. 6, 2020) ............................................. 15

*Int'l Nutrition Co. v. Horphag Res. Ltd.*,
257 F.3d 1324 (Fed. Cir. 2001) .................................................................................................. 5

*Intel Corp. v. Terabyte Int'l, Inc.*,
6 F.3d 614 (9th Cir. 1993) ........................................................................................................ 23

*Inventor Holdings, LLC v. Bed Bath & Beyond, Inc.*,
876 F.3d 1372 (Fed. Cir. 2017) ................................................................................................ 22

*Inventor Holdings, LLC v. Bed Bath & Beyond Inc.*,
No. CV 14-448-GMS, 2016 WL 3090633 (D. Del. May 31, 2016) ...................................... 18

*IPVX Pat. Holdings, Inc. v. Voxernet LLC*,
No. 5:13-CV-01708 HRL, 2014 WL 5795545 (N.D. Cal. Nov. 6, 2014) ............................. 17

*Kilopass Tech. Inc. v. Sidense Corp.*,
No. C 10-02066 SI, 2014 WL 3956703 (N.D. Cal. Aug. 12, 2014) ................................ 17, 25

*Koji IP, LLC v. Renesas Elecs. Am., Inc.*,
No. 24-cv-03089-PHK, 2025 WL 917110 (N.D. Cal. Mar. 26, 2025) ........................... passim

*Koji IP v. Renesas Elecs. Am., Inc.*,
No. 24-cv-03089, 2025 WL 980796 (N.D. Cal. Mar. 31, 2025).................................... 20, 21

*Lowe v. Sheildmark, Inc.*,
No. 1:19-cv-748, 2022 WL 3647773 (N.D. Ohio Aug. 23, 2022).......................................... 16

*Lowe v. Sheildmark, Inc.*,
No. 1:19-cv-00748, 2023 WL 3043769, at *4-5 (Apr. 21, 2023), *aff'd on other
grounds*, No. 2023-1786, 2025 WL 893211 (Fed. Cir. Mar. 24, 2025).......................... 16, 25

*Max Sound Corp. v. Google, Inc.*,
No. 14-cv-04412, 2017 WL 4536342 (N.D. Cal. Oct. 11, 2017) ................................... 13, 16

*mCom IP, LLC v. City Nat'l Bank of Fla*,
No. 23-23427-Civ-Scola, 2025 WL 939224 (S.D. Fla. Mar. 28, 2025) ............................... 11

*Moreno v. City of Sacramento*,
534 F.3d 1106 (9th Cir. 2008).......................................................................................... 23

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
134 S. Ct. 1749 (2014) .............................................................................................. passim

*Raneire v. Microsoft Corp*,
No. 3:15-cv-0540, 2016 WL 3390509 (N.D. Tex. Feb. 24, 2016) ....................................... 13

*Raydiant Oximetry, Inc. v. ALC Med. Holdings LLC*,
808 F. Supp. 3d 987 (N.D. Cal. 2025) ........................................................................... 21, 22

*Silicon Genesis Corp. v. EV Grp. E. Thallner GmbH*,
No. 22-cv-04986, 2024 WL 1643677 (N.D. Cal. Apr. 15, 2024)......................................... 23

*Stone Basket Innovations, LLC v. Cook Med. LLC*,
892 F.3d 1175 (Fed. Cir. 2018)...................................................................................... 13, 19

*WiNet Lab LLC v. Motorola Mobility, LLC*,
No. 20 C 1094, 2021 WL 4929220 (N.D. Ill. Sept. 22, 2021)....................................... 13, 14

*WiNet Labs LLC v. Motorola Mobility, LLC,*
   No. 20 C 1094, *slip op.* (N.D. Ill. Sept. 19, 2022), ECF No. 69 ...................................... 14, 25

**STATUTES**

28 U.S.C. § 1927 .................................................................................................. 1, 20, 21, 25

35 U.S.C. §101 ............................................................................................................... 18, 22

35 U.S.C. § 285 ................................................................................................................ passim

**OTHER AUTHORITIES**

Fed. R. Civ. P. 54 ................................................................................................................. 1

Local Rule 3.8 ...................................................................................................................... 8

Local Rule 3-15(b) ........................................................................................................... 8, 9

**TABLE OF ABBREVIATIONS**

| Valjakka | Plaintiff Lauri Valjakka |
|---|---|
| Netflix | Defendant Netflix, Inc. |
| '167 patent | U.S. Patent No. 8,495,167 |
| '102 patent | U.S. Patent No. 10,726,102 |
| AiPi | AiPi, LLC |
| CDN | CDN Licensing Finland OY |
| CUVTA | California's Uniform Voidable Transactions Act |
| USPTO | United States Patent and Trademark Office |
| Robinson Decl. | April 17, 2026 Declaration of Erick Robinson (Ex. E to the Piepmeier Decl.). |
| Protective Order | Stipulated Protective Order for Litigation Involving Patents, Highly Sensitive Confidential Information and/or Trade Secrets dated July 25, 2022 (ECF No. 56). |
| Patent-Ineligible 12(c) Order | Order Granting in Part and Denying in Part Motion for Judgment on the Pleadings dated August 22, 2023 (ECF No. 132). |
| No Ownership MSJ Order | Order Granting Defendant's Motion for Summary Judgment dated July 8, 2024 (ECF No. 257). |
| PO Violation Order | Order Granting-in-Part and Denying-in-Part Netflix's Motion for an Order to Show Cause and Sanctions dated July 10, 2025 (ECF No. 324). |
| Fee Setting Order | Order Setting Reasonable Expenses and Attorney's Fees dated November 19, 2025 (ECF No. 353). |
| CUVTA MSJ Order | Order on Cross-Motions for Summary Judgment (ECF No. 368). |
| Finnish Court Order | July 26, 2009 Helsinki Court of Appeal Order (affirming Helsinki District Court order of January 26, 2009) regarding "Dispute on rights based on a patent") (see ECF No. 116-02). |
| Piepmeier Decl. | Declaration of Sarah Piepmeier in Support of Netflix's Motion for Attorneys' Fees |
| Lamkin Decl. | Declaration of Rachael Lamkin in Support of Netflix's Motion for Attorneys' Fees |

### NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on July 2, 2026 at 2 p.m., in Courtroom 6, Second Floor, United States District Court for the Northern District of California, Oakland Courthouse, 1301 Clay Street, Oakland, CA 94612, Defendant Netflix, Inc. moves for an order awarding Defendant Netflix, Inc. $3 million (less than 50% of fees incurred) in reasonable attorneys' fees pursuant to 35 U.S.C. § 285, 28 U.S.C. § 1927, the Court's inherent power, Fed. R. Civ. P. 54, and Civil L.R. 54-5. *See also* ECF No. 368 at 16 (setting deadline for Netflix's motion for attorneys' fees).

Defendant's motion is based on this notice of motion, the accompanying memorandum of points and authorities, the accompanying declarations of Sarah E. Piepmeier ("Piepmeier Decl.") and Rachael Lamkin ("Lamkin Decl."), the pleadings and other papers submitted in this action, any oral argument or other material that may come before the Court at hearing, as well as any additional matters as to which this Court may take judicial notice.

### MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

If this case is not exceptional, it is hard to imagine one that is. As described more fully below, Netflix respectfully requests an order holding Plaintiff Valjakka, William Ramey, and the firm Ramey LLP jointly and severally liable for $3 million of Netflix's reasonable attorneys' fees from this litigation. Netflix's request is conservative, as it incurred more than twice that amount over four-and-a-half years defending against Valjakka's nine-figure damages demand. Given the extreme nature of the exceptional misconduct, a substantial fee award to sanction this conduct is warranted.

Long before launching his ambitious litigation campaign, Valjakka knew he did not own the only patent he initially asserted (the '167 patent) against Netflix. Undeterred by a 2010 Finnish Court of Appeals Order finding that he had no rights to the '167 patent, Valjakka submitted fraudulent declarations to USPTO claiming ownership, then filed a spate of patent infringement lawsuits that led to a string of early settlements.

But Valjakka was not the only one who knew that the campaign was doomed from the start. Netflix discovered that Valjakka's (second) outside counsel, William Ramey, also knew that

Valjakka lacked standing before he appeared in the case.  Together, Valjakka, Mr. Ramey, and AiPi (Valjakka's litigation funder/manager/secret outside counsel) went to great lengths to hide this fact from Netflix and the Court: they withheld key evidence and settled early with defendants who uncovered the issue.

Netflix refused to pay Valjakka for patents that it was not using and had never used.  After tracking down third-party witnesses through two trips to Finland, who alerted its counsel to the ownership issue, Netflix uncovered evidence that Valjakka did not own the '167 patent—and never had.  Netflix repeatedly gave Valjakka a chance to walk away; when he refused, Netflix sought summary judgment for lack of standing.

Masquerading as owner of the '167 patent was only the beginning for Valjakka.  He also added another patent (the '102 patent), which Netflix later learned suffered a different ownership defect and was similarly doomed from the start. Valjakka and his counsel compounded these fatal flaws by repeatedly refusing to supplement or withdraw deficient contentions and discovery responses, skipping deadlines, violating the Protective Order, illegally transferring funds to defraud Netflix of attorneys' fees, making fraudulent misrepresentations to defendants who settled, and misleading Netflix and courts (plural) about, among other things, AiPi's role as shadow outside counsel.  Even Mr. Ramey knew their conduct was exceptional, as he privately warned AiPi around the close of fact discovery that "THERE WILL BE A LARGE FEE MOTION."  (Ex. A[1].)

Netflix respectfully requests that the Court award attorneys' fees assessed jointly and severally against Valjakka, Mr. Ramey, and Ramey LLP as a sanction for their roles in the misconduct in this (and related) litigations.

## II.     STATEMENT OF FACTS

### A.     Valjakka Never Owned the '167 Patent.

The '167 patent issued in 2013 and is directed to computer networks and communications. The substance of the patent's disclosure and claims is irrelevant to this Motion, however, because Valjakka's partial ownership interest terminated long before the patent issued.

---

[1] Unless otherwise noted, all exhibit citations herein are to the Piepmeier Declaration.

As set forth in the Summary Judgment order, Valjakka's original interest (as co-inventor) was, by 2008, transferred to an entity Valjakka owned called SBO. (*See generally* No Ownership MSJ Order at 1-2.) SBO declared bankruptcy in 2008, at which point Valjakka petitioned courts in Finland for confirmation that the '167 application rights reverted to himself and other owners of SBO pursuant to a "Utilization Agreement" through which Valjakka purportedly gave SBO his interest in the application. (*See id.* at 3.) But the Helsinki District Court definitively found that Valjakka did not have any rights in the application when the Utilization Agreement was entered (as a result of the *nunc pro tunc* agreements), and thus, there was nothing to revert. (*See id.*) The Utilization Agreement had, according to the court, "no significance" on the issue of who owned the patent application. (*See id.* (quoting ECF No. 116-2 at 12).) The decision was affirmed by a Finnish appeals court in March 2010. (*See id.*) Around that time, SBO affirmatively abandoned the application at the USPTO, and its attorney told Valjakka as much. (*See id.* at 4.)

Undeterred, Valjakka sought to claim and revive the patent application by defrauding the USPTO through the twice-rejected theory that the rights could revert to him under the Utilization Agreement. (*See id.* at 4-5.) Crucially, Valjakka never disclosed the Finnish Court decisions to the PTO (*see id.*), which (without the benefit of this information) revived the application and ultimately issued the '167 patent. Valjakka and his companies have masqueraded as the rightful owners ever since, suing twelve of the world's largest tech companies.

**B.      Valjakka Had No Right to Assert the Patent-Ineligible '102 Patent.**

The '102 patent issued in 2020 and relates to providing access to restricted content. Here, the substance matters because the asserted claims are plainly not eligible for patenting under *Alice* and its progeny, as the Court confirmed via judgment on the pleadings. (*See* Patent-Ineligible 12(c) Order at 5-8.) The claim language is "typical of claims held to be directed at abstract ideas" and "simply instructs the practitioner to implement the abstract idea" of "providing restricted access to resources" using "conventional components and functions." (*See id.* at 6-8 (quotations and punctuation omitted).) The cases supporting the Court's reasoning were, by and large, foundational

decisions that any prolific patent litigators (such as Mr. Ramey[2]) should have known. (*See id.*) The Court found Valjakka's arguments in opposition "unpersuasive" and that Valjakka "mischaracterized" a Federal Circuit decision. (*See id.*)

Valjakka's attempt to assert the '102 patent against Netflix had a second, even more obvious flaw: he did not have the right to do so. In November 2021 (a month *before* he added the patent to this case), Valjakka granted a company called CDN an ███████████. (*See* Ex. B.) By its terms, ████████████████████████████████████████████████████████, was CDN. (*See id.* at 1████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████)[3] CDN is not and has never been a party to this lawsuit.

### C.    Valjakka and His Counsel's Serial Misconduct Through This Proceeding.

#### 1.    Valjakka's first outside counsel withdraws when he learns of the '167 patent "ownership issue," leading to Mr. Ramey taking over.

Valjakka initiated this lawsuit in the Western District of Texas in September 2021, asserting only the '167 patent. Valjakka's outside counsel, including AiPi, Erick Robinson (Valjakka's first outside counsel), and Mr. Ramey, would all soon learn what Valjakka already knew: he did not own the '167 patent.

In October 2021—before Netflix answered the WDTX Complaint—counsel for another defendant (Akamai) notified Mr. Robinson of its belief that Valjakka did not own the '167 patent. (*See* Ex. E (Robinson Decl.), ¶¶5-6 & Ex. A; Piepmeier Decl., Ex. F.) Although neither Robinson nor AiPi still possess a copy of the attachments to the October 22 email from Akamai's counsel, they either included or at least led Mr. Robinson and AiPi to English-language copies of the Finnish Court Order establishing that Valjakka did not own the '167 patent. On October 28 (six days later),

---

[2] Ramey LLP employs just four attorneys, but has appeared in nearly 1,500 patent cases. (*See* Ex. C & Ex. D.) According to DocketNavigator, this would make Ramey LLP the 50th most active firm in all of U.S. patent litigation since 2008, except that nearly all its activity has occurred in just the last five years. (*See* Ex. C.)

[3] Valjakka entered into a similar agreement with CDN for rights in the '167 patent, but, since he did not own the patent at that time, he had no rights to grant. (ECF No. 126-03.)

AiPi's Eric Morehouse told Valjakka that the decision was "a problem" and that Mr. Robinson was threatening to withdraw, as he would "not litigate this case unless we solve the [ownership] issue immediately." (ECF No. 316-02 at 8.)

Morehouse recognized that Valjakka "need[ed] documents … showing that ownership went to [Valjakka] after the bankruptcy," but because none existed, they pivoted:  Valjakka's Finnish *personal attorney* (Onni Heitalahti) drafted an opinion of counsel about Finnish law under the direction of Morehouse (a U.S. attorney). (*See id.*; *see also* Exs. G, H.)  AiPi apparently provided the declaration to Mr. Robinson so that he could provide to Akamai. (*See* Ex. I at 6.)

In response to the opinion letter, Akamai charged Valjakka with inequitable conduct (for failing to disclose the Finnish Court Order to the PTO), threatened to share the Finnish Court Order with other defendants, and invoked sanctions. (*See* Ex. I at 1-3.)[4]  Akamai's responses to the opinion of counsel letter apparently terrified Valjakka's cohort:

**Robinson Withdraws:**   On November 13, 2021, Erick Robinson resigned from all Valjakka cases involving the '167 patent. (*See* ECF No. 370-10, Ex. J.)  He told Morehouse that he "cannot in good faith continue as counsel in the Valjakka cases" given the ownership issue, particularly because of an unspecified issue AiPi raised "related to the revival of the Valjakka patent that would prevent 'fixing' the ownership issue." (*See* ECF No. 370-10*; see also* Ex. E, ¶¶14.)

**Valjakka Settles with Akamai to Preserve the Campaign:**  Morehouse acknowledged Akamai's arguments that there was "no evidence supporting [their] position," and that "the evidence of record actually contradicts what" Valjakka and Heitalahti contended about Valjakka's ownership claim. (*See* Ex. K at 2.)  Nonetheless, Valjakka procured a *second* opinion of counsel, which Akamai similarly rejected. (*See* Exs. L, M, N.)  Akamai again threatened to share what it knew with the other defendants unless Valjakka dismissed his claims with prejudice, and said it

---

[4] In a subsequent email, Akamai's counsel shared with AiPi (who then sent Ramey) a "Federal Circuit case that essentially dictates the result" on the ownership issue. (*See* Ex. I at 3.)  The attachment was not produced by AiPi, but based on Akamai's description, the case is likely *Int'l Nutrition Co. v. Horphag Res. Ltd.*, 257 F.3d 1324, 1328–31 (Fed. Cir. 2001). (*See* Ex. I at 3 ("In it, the court affirmed judgment against the plaintiff based on a French court's ruling that the plaintiff did not own the asserted patent under the terms of a French contract.").)  This is the case that this Court found dictated the result that Valjakka did not own the '167 patent. (*See* No Ownership MSJ Order at 10.)

would seek its fees.  (*See* Ex. N at 7.)  From then on, the goal was to "settle[]" with Akamai at "seemingly all cost" to prevent the ownership issue from becoming public while AiPi "achieve[d] some other settlements." (*See* ECF No. 316-03 at 6.)  Valjakka's Finnish attorney Heitalahti even admitted to Valjakka that "[g]etting Akamai out of the game is now the absolute top priority, because until then nothing else will move forward, and the entire campaign is exposed to a fatal risk." (*See* Exs. O at 4, P (certified translation of O) at 4.)

**Mr. Ramey Negotiates Akamai's Silence:**  When Mr. Ramey stepped in for Mr. Robinson in mid-November 2021, AiPi notified him of the Finnish Court Order.  (*See* Ex. I at 1-2.)  Despite admitting that "[t]his is a mess" and "[t]he Appeals Court decision and district court decision do seem to address ownership" (*see id.*), Mr. Ramey nonetheless stayed the course.  He negotiated settlement with Akamai and slipped a detailed nondisclosure provision into the deal after all material terms were agreed.  (*See* Ex. Q at 3-4.)  Mr. Ramey then informed AiPi and advised that it was a "decent deal."  (*See* Ex. R.)[5]

With Akamai out of the way and the ownership issue buried, Valjakka and his counsel continued to litigate and settle the remaining cases, focusing in particular on granting a license to patent risk insurance entity RPX and its clients.  (*See* Ex. S.)  Licensing RPX allowed Valjakka to obtain royalties from, and avoid litigation with, many (perhaps dozens) of entities that could challenge Valjakka's patent on the merits in litigation.  To obtain those licenses, Valjakka misrepresented to multiple parties that he had the exclusive right to do so, when he did not (due to CDN and, for the '167 patent, additionally because he did not own it).  (*See generally* ECF No. 162 at 9:9-14; ECF Nos. 126-07 - 126-10 (license and settlement agreements).)

Valjakka filed (and Mr. Ramey signed) a First Amended Complaint against Netflix on January 3, 2022, adding the '102 patent, while maintaining that Valjakka owned the '167 patent. (*See* ECF No. 14.)  AiPi advised that Valjakka add the '102 patent to the case to "strengthen[]" it, given that the only patent then-asserted suffered from "the ownership issue," and that it would otherwise "significantly help[] our settlement discussions."  (*See* ECF No. 316-03 at 8.)

---

[5] When another defendant later noticed the ownership issue, Valjakka and his counsel similarly "contain[ed] the ownership issue" with that party through settlement.  (*See* Ex. U at 3.)

### 2.   Valjakka and his new counsel repeatedly abused the judicial process.

At every stage of the litigation, Valjakka and his counsel failed to comport with basic rules and norms of this (or any) Court.  Their conduct goes beyond simply missing deadlines, skipping telephone conferences, and failing to timely participate in joint filings (although all of that happened, too).  (*See, e.g.,* Piepmeier Decl., ¶47, Ex. T (Dec. 12, 2022 Piepmeier Ltr.) at 3.)  The following examples demonstrate a few of the ways that Valjakka and his counsel unnecessarily multiplied Netflix's fees and costs.

### a.   Valjakka's own retained expert confirmed that infringement allegations were baseless.

**'102 patent.** On May 17, 2022, Valjakka served infringement contentions for the '102 patent.  Although Valjakka was required to "provide reasonable notice to [Netflix] why [he] believes [he] has a 'reasonable chance or proving infringement,'" his contentions mostly relied on conclusory assertions on "information and belief," and he otherwise failed to connect the Netflix web pages he cited to the claim limitations.  (*See* Exs. V (May 17, 2022 Inf. Contentions) at 40-45, W (Aug. 19, 2022 Piepmeier Ltr.) at 2.)  Netflix promptly explained these deficiencies (*see id.*), but when Valjakka served supplemental contentions on December 6 (six months into discovery), he made *no changes* to his '102 patent claim charts.  (*See* Ex. X at 153-58.)  So Netflix wrote—again—to demand Valjakka provide sufficient notice of his infringement theories, or admit he had none and drop his case.  (*See* Ex. T (Dec. 12, 2022 Piepmeier Ltr.) at 1.)  Valjakka supplemented a second time, citing a few additional Netflix documents and explaining some of his theories in more than conclusory statements, but he ultimately failed to articulate how Netflix performs various key steps of the only asserted independent claim.  (*See* Ex. Y (Jun. 23, 2023 Piepmeier Ltr.) at 3-4.)  Indeed, Valjakka's retained technical expert, Dr. Jonyer, reviewed Netflix's source code and confirmed that Netflix did not infringe the '102 patent.  (*See* ECF No. 315-05 at 3-4.)  Almost immediately after code review, Valjakka voluntarily dropped his claims for the '102 patent.  (*See* Ex. Y (Jun. 23, 2023 Piepmeier Ltr.) at 3.)

**'167 patent.** The deficiencies are nuanced enough to warrant their own motion, but one stands out: Valjakka pressed forward even though Netflix's accused Open Connect system did not have the "transport request" necessary to infringe every asserted claim.  Netflix told Valjakka about

this deficiency *at least three times,* yet he persisted. (Ex. W at 4; Ex. T at 1-2; *See* Ex. Y at 4.) As with the '102 patent, Dr. Jonyer reviewed Netflix's source code and concluded that Netflix did not infringe. (*See* ECF No. 315-05 at 3-4.) But if Valjakka dropped both asserted patents after source code review, his case was over. Valjakka instead fired Dr. Jonyer and hired a new expert who was willing to opine on infringement, including under a never-before-disclosed doctrine of equivalents theory. (*See generally* ECF No. 162 at 21-25.)

### b. Valjakka's damages contentions were equally unsupported and unreasonable.

As Mr. Ramey is well aware,[6] this District requires early damages contentions that "identify each of the categor(-ies) of damages [a plaintiff] is seeking," and its theories of recovery, and the "factual basis for damages" for each category of damages sought." *See* Pat. L.R. 3.8. Valjakka simply disregarded this requirement. Nearly a year into the case, Valjakka contended he would be entitled to damages "greater than $100 million," but did not disclose any theory in support of that claim. (*See* Exs. Z at 3, ZA (Aug. 25, 2022 Edlin Ltr.).) After Netflix notified Valjakka of the deficiencies, he supplemented his contentions, but inexplicably increased his $100+ million demand to a whopping 22% of Netflix's total annual revenues (i.e., billions of dollars) based on one website's summary of "computer/electronics industry" court-awarded royalties between 1990-2006. (*See* Ex. ZB at 17.) When Valjakka's expert served his report after the close of fact discovery, the damages model changed (again) to effectively seek disgorgement of all Netflix profits that were allegedly attributable to the accused Open Connect platform. (*See generally* ECF No. 179 at 5:1-14.)

### c. Valjakka withheld material evidence and information during discovery.

Mr. Ramey and Valjakka were obliged (under multiple rules Mr. Ramey should know) to disclose the identities and roles of AiPi and CDN, but they withheld that information from Netflix and the Court. *See* N.D. Cal. Civ. Local Rule 3-15(b). Valjakka's filed his first disclosure in April 2022, not long after he consented to transfer to this District, and very early in the case. (*See* ECF

---

[6] Mr. Ramey has participated in at least fifty-six cases in this District. *See Koji IP, LLC v. Renesas Elecs. Am., Inc.,* No. 24-cv-03089-PHK, 2025 WL 917110, at *3-4 (N.D. Cal. Mar. 26, 2025).

No. 36.)  AiPi and its affiliates that helped fund Valjakka's campaign should have been disclosed because they would "hav[e] a financial interest in the outcome of the litigation."  *See* N.D. Cal. Civ. Local Rule 3-15(b)(2); (*see* Ex. #C (Valjakka/AiPi funding agreement) at 2.)  Similarly, CDN had a direct financial interest in the litigation insofar as it has ████████ to receive profits from enforcement.  (*See* ECF Nos. 126-03, 143-1, ¶¶5-6; Ex. B.)  Valjakka disclosed neither.

Valjakka was also obligated to disclose information about AiPi and CDN in response to Netflix's discovery requests, including at least Request for Production Nos. 22, 31, and 33 (which relate to financial interests in the patents and litigation) and Interrogatory No. 8 (similar). (*See* Ex. ZD; CUVTA MSJ Order at 9-10.)  On several occasions, Netflix wrote Valjakka regarding deficiencies in his objections and responses to these and similar discovery requests. (*See, e.g.,* Exs. ZE (Jul. 22, 2022 Edlin Ltr.), ZF (Oct. 6, 2022 Ta. Ltr.), #ZG (Nov. 9, 2022 Edlin Ltr.), ZH (Mar. 1, 2023 Edlin Ltr.).)  But Valjakka only produced his ████████████████ with CDN as discovery was closing (technically, after it originally closed before being extended), and in Finnish. (Piepmeier Decl., ¶29.)  And Netflix did not learn of AiPi's involvement until Valjakka's deposition, also at the close of discovery.

Netflix also requested documents about ownership of the asserted patents.  Valjakka produced the bare minimum: a *Finnish-language* copy of the Finnish Court Order.  And although Netflix repeatedly challenged Valjakka about deficiencies in his production about ownership issues (*see* Exs. ZE-ZH), he never identified the Finnish Court Order as proof that he was complying (presumably because doing so would alert Netflix to the ownership issue).  Valjakka also failed to produce any of the highly relevant documents it sent to or received from Akamai, including both of its opinions of counsel, *English-language* copies of the Finnish Court Order that Akamai provided (or led Valjakka's US-based counsel to discover), and prior art analysis provided by Akamai.  (Piepmeier Decl., ¶75.)  Netflix only learned about these documents from AiPi after Valjakka's claims were dismissed.  (*Id.*)

### d.   Mr. Ramey facilitated AiPi's unauthorized practice of law and improperly provided them with Netflix confidential documents.

Discovery from AiPi revealed two other significant abuses of the judicial process.

First, Mr. Ramey and his firm repeatedly violated the Protective Order by sending litigation funder AiPi Netflix's highly confidential technical and financial records.  (*See generally* PO Violation Order.)

Second, AiPi's attorneys performed extensive legal work for Valjakka without admission or authority to practice in this District.  In October 2023 (the month before dispositive motions were due), Mr. Ramey disclosed for the first time that attorneys at AiPi "had been representing Valjakka 'from the start.'"  (*See* ECF No. 216 (Lamkin Decl. ISO Motion for Joinder) at 2:13-15.)  Although one of AiPi's attorneys, Erik Lund, stated in a declaration in conjunction with CUVTA briefing that "I do not represent [] Valjakka," and "AiPi is not counsel for [] Valjakka" (*see* ECF No. 233-01, 4-5), Netflix later obtained *thousands* of documents from AiPi demonstrating its extensive role in dictating case strategy, drafting pleadings and contentions, revising expert reports, and otherwise serving as outside counsel to Valjakka.  (*See, e.g.,* ECF Nos. 315-03 (AiPi attorneys review damages report), 315-04 (AiPi attorneys revise damages contentions), Exs. ZI (AiPi attorneys draft amended complaint), ZJ (Mr. Ramey asks AiPi to draft MSJs), Ex. ZK (AiPi drafts opposition to Netflix's Motion for Judgment on the Pleadings), Ex. ZL (AiPi drafts supplemental infringement contentions); *see also* Piepmeier Decl., ¶75)  Indeed, according to the Engagement Agreement between Mr. Ramey and AiPi (also produced for the first time by AiPi), AiPi would do "all drafting of documents, legal work and research" for the Valjakka campaign (among others).  (ECF No. 302-06 at 1-2.)

AiPi's attorneys (Morehouse, Lund, and Sheets) are not and have never been barred in this District, and none sought admission *pro hac* vice to appear on behalf of Valjakka.  (*See, e.g.,* Ex. ZM (Lund ND Cal Bar History), ZN (Morehouse), ZO (Sheets).)  While this case has been pending, Mr. Ramey has been sanctioned by multiple courts for his role in a similar outside counsel model, i.e., where one attorney is admitted to practice but other attorneys who are not admitted perform significant legal work.  *See Koji IP*, 2025 WL 917110, at *19-22 (personally sanctioning Mr. Ramey and referring him to multiple bar organizations for repeatedly performing legal work in the Northern District of California without seeking admission to practice there, instead relying on an admitted  attorney at his firm "essentially as a pass-through for work product prepared by" Mr.

Ramey and others); *mCom IP, LLC v. City Nat'l Bank of Fla*, No. 23-23427-Civ-Scola, 2025 WL 939224, at *2 (S.D. Fla. Mar. 28, 2025) (affirming magistrate judge's order sanctioning plaintiff whose outside counsel of record failed to investigate merits of case in reliance on Mr. Ramey, who was not admitted to practice in the case).  Mr. Ramey is responsible for this conduct because, as he repeatedly told the Court in briefing on the PO motion regarding the Whitestone (AiPi) lawyers, "I controlled their actions and his [sic] professional liability insurance covered their actions."  (ECF 311-1, ¶8.)

### 3. Valjakka refuses to dismiss even after Netflix uncovers the ownership issue.

Throughout litigation, Netflix promptly notified Valjakka when he or his counsel unreasonably multiplied litigation and/or pursued meritless arguments.  (*See, e.g.,* Exs. T, W, Y, ZA, ZE, ZF, ZG, ZH.)  When Netflix uncovered the ownership issue (despite Valjakka's best efforts to bury it, *see supra*, Section II.C.1), counsel advised Valjakka and Mr. Ramey in writing that "Valjakka knew that he lacked standing" to sue on the '167 patent from the outset of the case.  (*See* Ex. Y at 1-3.)  At that point (June 2023), the Netflix case was last pending of the twelve filed by Valjakka and AiPi.  They always saw Netflix as the biggest target, and so they pressed forward, even though Mr. Ramey would soon privately express to AiPi that "WE CANNOT LOSE THIS CSE [sic] OR THERE WILL BE A LARGE FEE MOTION." (Ex. A.)  As such, Netflix was forced to continue to incur attorneys' fees and expert witness expenses until it could secure a court-ordered dismissal via summary judgment.

### 4. Valjakka fraudulently transferred proceeds from his settlement to CDN.

Although Valjakka knew he may owe attorneys' fees for his baseless litigation (which Akamai emphasized while this case was in its infancy, Ex. I at 1-3), the then-insolvent Valjakka nonetheless fraudulently transferred all of his settlement proceeds–over $1 million–to CDN. (CUVTA MSJ Order at 1-4.)  Netflix moved for a preliminary injunction to prevent Valjakka from transferring licensing proceeds, which the Court granted after finding an intent to defraud Netflix as a creditor under CUVTA.  (*Id.* at 4-5.)  The Court later granted summary judgment on CUVTA and maintained the injunction pending adjudication of this motion.  (*Id.* at 16.)

-11-

## III.   ARGUMENT

Valjakka should never have filed this lawsuit; at the very least, Mr. Ramey and the attorneys at his firm should have dismissed it in 2021 when they became aware that Valjakka did not own the only patent asserted in the Complaint.  As described below, each of them should be jointly and severally liable for Netflix's attorneys' fees[7] from the outset of this case because knowingly asserting a patent without rights to do so is sanctionable.  But the truly egregious conduct is not bringing the suit in the first place (or refusing to dismiss it in 2021).  It is that they all continued to litigate it in an exceptional manner for multiple years.  The Court should use its discretion to jointly and severally award Netflix's requested $3 million in reasonable attorneys' fees against Valjakka, Mr. Ramey, and Ramey LLP given their extensive involvement in perpetuating Valjakka's fraud and responsibility for the exceptional conduct described in this motion.

### A.   Netflix Is Entitled to Attorneys' Fees from Valjakka Under 35 U.S.C. § 285.

"The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285.  Bad faith is not required—a case is exceptional if (1) it "stands out from others" with respect to its substantive (lack of) strength or (2) it was unreasonably litigated.  *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756-57 (2014).  Fees may be granted under either prong of *Octane Fitness to* compensate the moving party and to deter future conduct.  *See id.* at 1756 n.6.  The circumstances a court should consider include "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence."  *Id*. at 1756 n.6.  Courts consider the totality of the circumstances in deciding whether to award fees, and the preponderance of the evidence standards applies. *Id*. at 1756, 1759.

"Because the exceptional case determination may be informed by the district court's unique insight into the manner in which the case was litigated, it is within the sound discretion of the district court." *Dig. Reg of Tex., LLC v. Adobe Sys., Inc.*, No. C 12-1971 CW, 2015 WL 1026226, at *1 (N.D. Cal. Mar. 9, 2015) (*citing Highmark Inc. v. Allcare Health Mgmt. Sys.*, 134 S. Ct. 1744, 1748 (2014)).  However, "[i]n considering the 'totality of the circumstances' in a § 285 motion, a

---

[7] To be conservative, Netflix does not request its costs in this action.

party's similar conduct in other litigation is also relevant." *Stone Basket Innovations, LLC v. Cook Med. LLC*, 892 F.3d 1175, 1183 (Fed. Cir. 2018) (*citing Octane Fitness*, 572 U.S. at 554).

> **1.      That Valjakka filed this lawsuit, and his attorneys maintained it, knowing (and concealing) that Valjakka lacked standing, is exceptional *per se* and warrants a fee award covering the entire lawsuit.**

> **a.      Valjakka did not own the only patent asserted at filing.**

Where a plaintiff knew or should have known it does not own a patent but files an infringement action anyway, the resulting case is exceptional and warrants an award of fees under Section 285. In post-*Octane Fitness* cases Netflix located where the plaintiff had no rights to an asserted patent, Courts have unanimously awarded attorneys' fees.[8] And this record is more extreme than in any of those, as plaintiff Valjakka, his named outside counsel (Mr. Ramey), and his shadow outside counsel (AiPi) all knew he did not own the '167 patent, but charged forward while obstructing Netflix's (and other defendants') ability to uncover the admitted but concealed "ownership issue." (*See* ECF No. 316-03 at 6-7.)

**Valjakka's** misconduct spans over a decade and involves fraud on multiple federal courts and the USPTO. By 2010, Valjakka inarguably knew that he did not own the '167 patent application because two Finnish Courts had reached that conclusion. (*See* No Ownership MSJ Order at 2-3.) Nonetheless, later that year, Valjakka told the USPTO he owned the patent application, and in his subsequent correspondence with the USPTO, he never disclosed the Finnish Court Order, but instead relied on a "Utilization Agreement" to support his claim to ownership, even though the Finnish Courts found that agreement did not give him any rights to that application. (*See id.* at 4.) In *Advanced Video Techs. LLC v. HTC Corp.*, plaintiff knew it lacked evidence to establish ownership over an asserted patent, but nonetheless recorded ownership with the PTO, supporting its claim by "represent[ing] to the PTO that [a] deal" had been consummated that would have given it ownership, when in fact the deal never happened. No. 1:11 Civ. 06604, 2015 WL

---

[8] *See Max Sound Corp. v. Google, Inc.,* No. 14-cv-04412, 2017 WL 4536342, *7 (N.D. Cal. Oct. 11, 2017); *WiNet Lab LLC v. Motorola Mobility, LLC*, No. 20 C 1094, 2021 WL 4929220 (N.D. Ill. Sept. 22, 2021); *Raneire v. Microsoft Corp*, No. 3:15-cv-0540, 2016 WL 3390509 (N.D. Tex. Feb. 24, 2016); *Advanced Video Techs, LLC v. HTC Corp.,* No. 1:11 Civ. 06604, 2015 WL 7621483, at *7 (S.D.N.Y. Aug. 28, 2015); *Alzheimer's Inst. Am., Inc. v. Avid Radiopharmaceuticals*, No. 10-6908, 2015 WL 1422337 (E.D. Pa. Mar. 30, 2015).

7621483, at *3 (S.D.N.Y. Aug. 28, 2015).  The court felt that "AVT genuinely but naively believed it held title to the patent-in-suit" but its belief was "mistaken."  *See id.* at *6.  But because AVT "did not in fact own the patent—that alone makes th[e] case 'exceptional,'" and AVT's "head-in-the-sand" approach to the ownership issue while filing serial patent infringement lawsuits "further support[ed] sanctions."  *See id.*  Here, in contrast, Valjakka filed serial patent infringement litigations while *knowing* that he had no right and title to the '167 patent and only appeared to have ownership based on his own fraudulent USPTO filings.

Valjakka may contend he believed that he had the right to claim ownership of the '167 patent because the rightful owner went bankrupt.  However, under Section 285, a plaintiff's subjective belief that it owned the patent is no excuse if it is *objectively unreasonable*.  *See, e.g., AVT*, 2015 WL 7621483, at *8 ("Knowing that it could not prove good title rendered any reliance by AVT on the beliefs or the statements of AVC and Epogy objectively unreasonable—even if [AVT's principals] actually (i.e., subjectively) believed that AVT had title."); *WiNet Labs*, 2021 WL 4929220, at *3-*4 (awarding fees to defendant who was "forced to defend" multiple litigations "against a plaintiff who has no claim on the underlying patent," notwithstanding "post-hoc intentions asserted by the inventors" regarding ownership).  The *WINet* case is similar in that the inventors claimed patent rights reverted to them after the owner of the patent (a British Virgin Islands LLC) was dissolved.  *See WiNet Lab*, 2021 WL 4929220, at *1.  But unlike Valjakka, the inventors and plaintiff WiNet had not been informed by multiple courts of competent jurisdiction that they did not own the patent, and yet WiNet was still ordered to pay defendant's fees.  Valjakka has no such plausible deniability and, accordingly, should be ordered to pay Netflix's attorneys' fees.

**Mr. Ramey** learned about the ownership issue when he joined the case after prior outside counsel resigned because of it.  (*See* Ex. I at 1-3; Ex. J; Ex. E (Robinson Decl), ¶¶5, 14.)  Mr. Ramey agreed that the Finnish Court Opinion "seem[s] to address ownership" (*see* Ex. I at 1), and so Mr. Ramey should have advised Valjakka to dismiss.  Indeed, when counsel for Akamai provided evidence that Valjakka did not own the patent, it also apparently cited a Federal Circuit decision that any U.S. patent lawyer would have recognized made the Finnish Court Opinion

dispositive on the ownership issue. *See supra* at n.4; *see also In re PersonalWeb Techs., LLC*, No. 18-md-02834, 2020 WL 5910080, at *5 (N.D. Cal. Oct. 6, 2020) ("The Court agrees with Amazon/Twitch that PersonalWeb's claims related to S3 were clearly barred based on existing Federal Circuit precedent on the *Kessler* doctrine and thus, were objectively unreasonable when brought."). Mr. Ramey instead adopted the same "head-in-the-sand" approach found to warrant a finding of attorneys' fees. *See AVT*, 2015 WL 7621483, at *6.

Mr. Ramey worked with AiPi and Valjakka to bury the ownership issue, ensuring that parties who knew about it (such as Akamai) could not disclose it to other defendants, while refusing to produce ownership-related documents in their possession (as agents of Valjakka) pursuant to Netflix's discovery requests. *See supra*, Section II.C.1. The materials AiPi produced showed that its attorneys, those employed by Mr. Ramey's firm, and Valjakka's Finnish personal attorney collectively made decisions on producing documents, including withholding an opinion on ownership by a Finnish attorney on the basis of "privilege," even though AiPi and Valjakka's first outside counsel sent similar opinions to Akamai a year-and-a-half earlier. (*See* ECF No. 316-04 at 2 ("Last week, Kyril [Talanov, of Ramey LLP], Lauri [Valjakka], and I [Onni Hietalahti] … also went through more recent documents of which professor Tepora's statement regarding ownership was one …. Kyril did not want to produce that document and we decided not to. He saw it as an internal privileged document."); *see also* Exs. I at 6, N at 5-6.) Ultimately, Valjakka produced only Finnish-language copies of the Finnish Court Opinion, *even though he (and his counsel) possessed*, among other documents highly relevant to the ownership issue, *English-language copies*, correspondence with Akamai explaining the significance of the opinion, and multiple English-language opinions of counsel. That Valjakka's Finnish attorney emphasized only Finnish-language copies of the Tepora report were produced in a Finnish court action, and only in "secret" (*see* ECF No. 316-04 at 2), further underscores how they sought to "obfuscate[] the fact that there were potential problems with its standing" due to the ownership issue. *See Max Sound*, 2017 WL 4536342 at *10 (discovery obfuscation among exceptionally unreasonable litigation misconduct supporting award of attorneys' fees). Thus, Valjakka's counsel only exacerbated the exceptional nature of his case by the unreasonable way they litigated the ownership issue.

-15-

### b.      Valjakka hid that he divested all exclusive rights in the patents until the close of discovery.

Under similar circumstances, at least one court has ordered a patent owner to pay all attorneys' fees from the date it entered into an agreement granting a non-party all exclusive rights in the patent and failed to timely disclose the identity of and rights held by that party. In *Lowe v. Sheildmark, Inc.,* plaintiffs entered into a series of arrangements during litigation whereby a non-party obtained all exclusive rights to the asserted patent—namely, the right to license and monetize without restriction. *See* No. 1:19-cv-748, 2022 WL 3647773, at *1 (N.D. Ohio Aug. 23, 2022). After the defendants independently discovered the existence of the agreement (which was publicly available), the Court granted summary judgment for lack of standing. *See id.* at *6. In a subsequent opinion, the Court granted attorneys' fees under Section 285 because, with respect to information about the relevant agreements, "[p]laintiffs (1) took no initiative to supplement their productions; (2) refused to produce the ownership and license documents when confronted by Defendants; and (3) filed a Fourth Amended Complaint in which Plaintiffs explicitly misrepresented to Defendants and to this Court the status of the patent." *See* No. 1:19-cv-00748, 2023 WL 3043769, at *4-5 (Apr. 21, 2023), *aff'd on other grounds*, No. 2023-1786, 2025 WL 893211 (Fed. Cir. Mar. 24, 2025) (affirming award based on Court's inherent authority to sanction rather than alternative bases under Section 285).

Here too, Valjakka obfuscated that he assigned all exclusive rights to CDN in October 2021, a month after filing this case asserting the '167 patent and two months *before* amending his complaint to add the '102 patent. *See supra,* Sections II.A.1 and II.C.1. Valjakka's amended complaint (which Mr. Ramey signed) nonetheless claimed he owned "all rights, title, and interest" in the patents. (*See* ECF Nos. 14, ¶¶12-13.)[9] And despite multiple requirements that he disclose information about the CDN agreements—and multiple requests from Netflix that he comply with those requirements—Valjakka similarly failed to do so until May 15, 2023, three days after the close of fact discovery deadline, when he produced *Finnish-language* copies of the agreements. (*See* Piepmeier Decl. ¶29 (LV2_000410 and LV2000799); ECF No. 77.) Even if the Court finds

---

[9] Valjakka would affirm that contention in two additional amendments in May and December 2022 (also signed by Mr. Ramey). (*See* ECF Nos. 39 & 74 (¶¶12-13).)

the CDN licenses (and Valjakka's related discovery misconduct) are not enough to *per se* award fees back to the date they were entered (as in *Lowe*), at a minimum, these facts should be regarded as significant exceptional misconduct that, in addition to the "ownership issue" and other misconduct described herein, supports an award of fees back to the beginning of this case.

> **2.** **Netflix told Valjakka his patent infringement claims were objectively unreasonable, yet he refused to drop them, which is an additional basis to award Netflix its fees.**

Beyond his knowing lack of standing, Valjakka and counsel also knew or should have known that his infringement claims were untenable, and so too, his assertion of the '102 patent, which was clearly directed to patent-ineligible subject matter.

A patent owner's pursuit of a weak infringement theory can amount to objectively unreasonable conduct warranting imposition of fees, particularly where the patent owner was notified of the deficiencies. *See, e.g., Kilopass Tech. Inc. v. Sidense Corp.*, No. C 10-02066 SI, 2014 WL 3956703, at *10 (N.D. Cal. Aug. 12, 2014). Here, Netflix notified Valjakka at least three times, including early in discovery, that his infringement read on the '167 patent was objectively baseless. *See supra*, Section II.C.2 (citing Exs. W, T & Y)). Yet Valjakka refused to dismiss, even in the highly unusual situation in which his own expert reviewed the source code and confirmed Netflix did not infringe. (*See* ECF No. 315-05 at 3-4.) For the '102 patent, Valjakka's infringement contentions never evolved beyond conclusory assertions for key limitations, despite repeated requests from Netflix that he identify his theories and support them with evidence. *See supra*, Section II.C.2 (citing Exs. T-Y). *See IPVX Pat. Holdings, Inc. v. Voxernet LLC*, No. 5:13-CV-01708 HRL, 2014 WL 5795545, at *5-8 (N.D. Cal. Nov. 6, 2014) (awarding attorneys' fees and holding that patentee's "litigation position on infringement was unreasonable" where patentee "assert[ed] literal infringement without comparing the elements of the claim to the accused product in more than a wholly conclusory fashion."). While Valjakka eventually voluntarily dismissed his '102 patent infringement claims in June 2023 (after his expert confirmed no infringement by Netflix, *see* ECF No. 315-05 at 3-4), by then, the parties had already extensively litigated the claim for over eighteen months, and Netflix had filed a Section 101 motion.

Since *Octane Fitness*, district courts have deemed cases exceptional when the plaintiff asserted a patent whose claims were clearly directed toward unpatentable subject matter. *See, e.g.*, *Inventor Holdings, LLC v. Bed Bath & Beyond Inc.*, No. CV 14-448-GMS, 2016 WL 3090633, at *3 (D. Del. May 31, 2016) (finding that the plaintiff's claims "were objectively without merit" and awarding fees under Section 285). Here, Valjakka should have known the '102 patent claims were ineligible under *Alice* and its progeny, and the Court found that his arguments in opposition to Netflix's motion were "unpersuasive" and "mischaracterized" binding precedent. *See* Patent-Ineligible 12(c) Order at 6-8; *see also Chromadex, Inc. v. Elysium Health, Inc.*, No. 18-1434-CFC, 2024 WL 1255520, at *2 (D. Del. Mar. 25, 2024) (patent owner's litigation position "st[ood] out" from other patent eligibility cases where it was clearly invalid under binding precedent that patent owner "confusing[ly]–if not misleading[ly]" characterized in opposing summary judgment).

### 3. Valjakka and his counsel engaged in additional misconduct that further supports a fee award.

"Litigation misconduct and unprofessional behavior are relevant to the award of attorney fees, and may suffice, by themselves, to make a case exceptional." *See Homeland Housewares, LLC v. Sorensen Rsch. & Dev. Tr.*, No. 11-cv-3720-GW, 2013 WL 12138581, at *6 (C.D. Cal. May 20, 2013); *see also Octane Fitness*, 572 U.S. at 554) (fee awards under § 285 are based on totality of the circumstances). The Court has already found that Mr. Ramey repeatedly violated the Protective Order by providing litigation funder AiPi with Netflix's highly confidential documents. *See* PO Violation Order. Beyond this and other material misconduct described in the Statement of Facts above, Mr. Ramey also facilitated AiPi's covert unauthorized practice of law.

"Attorneys practicing in the Northern District of California must either be members of the Court's bar, or alternatively, admitted to practice in a particular case pending in the Court *pro hac vice*." *Koji IP*, 2025 WL 917110, at *14 (*citing* Civil L.R. 11-1(a), 11-3). AiPi's document productions reveal that its attorneys performed extensive legal work for Valjakka's case, including: (1) drafting the original complaint and claim chart (Ex. ZP); (2) amending the complaint and preparing infringement contentions (Exs. ZI, ZL); and (3) responding to dispositive motions (Ex. ZK). Mr. Ramey facilitated this working relationship—his Engagement Agreement with AiPi

-18-

provides that AiPi will do "all drafting of documents, legal work and research" (ECF No. 302-06 at 1-2), and Mr. Ramey directed AiPi to perform these tasks. (*See, e.g.,* Exs. ZI & ZJ.)  Although Mr. Ramey and other attorneys at his firm ultimately signed and served Valjakka's legal filings and appeared at hearings and in depositions, AiPi unquestionably engaged in the unauthorized practice of law.  *See e,g., Koji IP,* 2025 WL 917110, at *19-20 (having out-of-state, unadmitted attorneys "perform the bulk of substantive work, including overall case strategy," is unauthorized practice of law).

Valjakka and Mr. Ramey hid AiPi until long after the entity should have been disclosed (*see supra*, Section II.C.3), and Mr. Ramey only identified AiPi's attorneys in October 2023 because their relationship was breaking down.  (*See* ECF No. 311-02 (Mr. Ramey introduces Morehouse, Lund, and Sheets); Ex. A (August 2023 email chain between Mr. Ramey and AiPi).)  While AiPi did not deny its role as a litigation funder, it vehemently opposed the suggestion that its attorneys performed legal work for Valjakka, all the while knowing that its communications with Mr. Ramey and Valjakka demonstrated the opposite.  And AiPi's attorneys submitted misleading (if not perjurious) declarations to that effect here (to avoid being joined) and in the Eastern District of Virginia (in an effort to quash Netflix's subpoena to AiPi).  (*See* ECF No. 233-1, ¶¶10-12 (Lund declares, "I did not provide legal services to Mr. Valjakka.  I am not his lawyer.  AiPi is not involved in legal decision making."); Ex. ZQ (Morehouse declaration in EDVA litigation, ECF No. 17-2, ¶7: "AiPi's responsibilities under the [funding] agreement [with Valjakka] were to provide litigation support and funding").)

Mr. Ramey's conduct beyond this matter is relevant, as well: "In considering the 'totality of the circumstances' in a § 285 motion, a party's similar conduct in other litigation is also relevant." *Stone Basket Innovations, LLC v. Cook Med. LLC*, 892 F.3d 1175, 1183 (Fed. Cir. 2018) (*citing Octane Fitness,* 572 U.S. at 554.)  The Ramey-AiPi relationship totaled 140 cases litigated in seven federal district or appellate courts (including eleven other cases filed by Valjakka).  (*See* Ex. ZR, ¶7 & Attachment.)  Mr. Ramey filed the vast majority of these cases in the Western District of Texas.  Mr. Morehouse has never been admitted to practice there, and where Messrs. Lund and Sheets were only admitted in 2023, after the vast majority of the 140 cases were filed (as evidenced

by their case numbers shown in the attachment within Exhibit ZR). *See* Exs. ZS-ZU (searches for AiPi attorney names on WD Tex bar website). As far as Netflix can tell, none of the AiPi attorneys appeared in any of these other cases prior to the breakdown of the Mr. Ramey-AiPi relationship in late 2023 (i.e., nearly two years after it started). Thus, it appears that AiPi committed (and Mr. Ramey aided and abetted) unauthorized practice of law in myriad other cases and fora.

**B.      As Sanctions Against Mr. Ramey and Ramey LLP, the Court Should Also Hold Them Jointly and Severally Liable for Netflix's Attorneys' Fees Pursuant to 28 U.S.C. § 1927 and/or the Court's Inherent Power.**

While Valjakka is surely culpable for his conduct leading up to the filing of his litigation campaign, his attorneys (namely, Mr. Ramey and Ramey LLP) are at least equally culpable for perpetuating the case against Netflix despite many obvious defects that they knew (e.g., the ownership defect), or at least should have known (basically everything else), at the outset of litigation. As described herein, Mr. Ramey and Ramey LLP vexatiously multiplied litigation in bad faith by refusing to dismiss a case they knew was baseless. Given the extent of counsel's misconduct, each should be held jointly and severally liable for Netflix's attorneys' fees from defending Valjakka's baseless patent infringement claims.

Under 28 U.S.C. § 1927, any attorney who "multiplies the proceedings in any case unreasonably and vexatiously" may be made to pay excess costs, expenses and attorney fees incurred because of this conduct. Although "sanctions pursuant to section 1927 must be supported by a finding of subjective bad faith," "a district court may find such bad faith when an attorney has acted recklessly if there is something more, such as frivolousness, harassment, or an improper purpose." *See Koji IP v. Renesas Elecs. Am., Inc.*, No. 24-cv-03089, 2025 WL 980796, at *5 (N.D. Cal. Mar. 31, 2025) (cleaned up). The authority to award attorneys' fees is also "under the inherent power of the court" where "counsel has 'willfull[y] abuse[d] judicial process' or otherwise conducted litigation in bad faith." *In re Intel Sec. Litig.*, 791 F.2d 672, 675 (9th Cir. 1986) (citations omitted); *see also Fink v. Gomez*, 239 F.3d 989, 994 (9th Cir. 2001) (sanctions available based on the Court's inherent power for conduct "tantamount to bad faith … including recklessness when combined with an additional factor.").

Courts in this District have sanctioned counsel with joint and several liability for an award of attorneys' fees against a party under § 285, based on the Court's authority under § 1927 and/or its inherent authority. For example, in *Koji IP*, the Court held Mr. Ramey and his firm jointly and severally liable for attorneys' fees awarded based on a lack of pre-suit diligence regarding certain accused products (which were in-fact prior art) and for violating the "two complaints" rule by initiating a third lawsuit involving the same infringement allegations. *See* 2025 WL 980796, at *11-13, *18.

Furthermore, Courts in this district will hold individual attorneys jointly and severally liable with their law firms for sanctions awards under § 1927. In *Raydiant Oximetry, Inc. v. ALC Med. Holdings LLC*, the Court awarded nearly $1.5 million in fees under § 1927 and found that counsel's bad faith conduct was appropriately sanctioned by holding a law firm and its attorneys jointly and severally liable for that award. *See* 808 F. Supp. 3d 987, 1004-06 (N.D. Cal. 2025). The court awarded fees from the date declaratory judgment defendant asserted counterclaims for patent infringement. *See id.* at 1003. Counsel was "already on notice that [it was] pursuing [] objectively baseless [patent infringement] claims," which it exacerbated by "ignor[ing] every possible red flag in bringing and litigating this case." *See id.* at 1005.

Here, and as discussed in the preceding sections, Mr. Ramey knew no later than November *2021* that Valjakka did not own the '167 patent. *See supra*, Section II.C.1. "Attorneys have a duty under Section 1927 to correct or withdraw litigation positions after it becomes obvious that they are meritless." *See Raydian Oximetry*, 808 F. Supp. 3d at 1003 (cleaned up). Rather than dismiss the litigation, they persevered while working to repress evidence of Valjakka's baseless ownership claim until the end of fact discovery (despite Netflix's discovery requests that would have required disclosure). *See supra*, Sections II.C.1 and II.C.3. Under such circumstances, an "appropriate" deterring sanction is to hold Mr. Ramey and Ramey LLP jointly liable for the fullest extent of the Netflix's attorneys' fees. *See Raydian Oximetry*, 808 F. Supp. 3d at 1005-06.

Separately, Mr. Ramey knew, or should have known, that the asserted '102 patent was likely to be found invalid under 35 U.S.C. §101, and that Valjakka's infringement allegations as to each asserted patent were at least unsupported, if not entirely incorrect, including at least because Netflix

-21-

repeatedly told them as much in correspondence throughout discovery. *See supra*, Section II.C.2. Maintaining suit amidst these red flags conduct amounts to bad faith and willful abuse of judicial process. Further, holding Mr. Ramey and the Ramey LLP firm jointly liable for Netflix's attorneys' fees based on their continued pursuit of these infringement assertions is an appropriate deterrent given that counsel are in best position to know the deficiency of Valjakka's legal contentions, especially after the parties produce discovery on an attorneys-eyes-only basis.

### C.    Netflix's Requested Fees and Sanctions Are Further Justified by the Need to Deter Similar Misconduct.

An important factor in assessing the appropriateness of attorneys' fees, and a necessary consideration for determining sanctions, is the potential that the award may deter similar misconduct in future litigation. *See Octane Fitness*, 134 S. Ct. at 554 n.6; *Raydiant Oximetry*, 808 F. Supp. 3d at 1005 (noting that, generally, "sanctions should be limited to the amount necessary to deter similar kinds of misconduct in the future."). All relevant parties engaged in exceptional, bad faith misconduct of the kind courts have recognized can be deterred by a significant fee award.

Courts routinely consider the need to deter "wasteful," meritless litigations. *See, e.g., Inventor Holdings, LLC v. Bed Bath & Beyond, Inc.*, 876 F.3d 1372, 1377-78 (Fed. Cir. 2017) (affirming award of fees in case involving assertion of ineligible patent based on "the need to deter similarly weak arguments in the future."). Valjakka's patent infringement claims were outright baseless given the ownership and standing issues, and were otherwise, at best, objectively weak in various substantive respects. *See supra*. An award of fees here would serve to deter parties from filing and litigating patents amidst any of these known or obvious weaknesses.

An order granting sanctions against Mr. Ramey and Ramey LLP will also deter their practice of having Mr. Ramey or a member of his firm appear in the case with all substantive legal work done by AiPi. As the court in *Koji IP* noted, such a practice "appears to be an attempt to avoid exposing" AiPi's attorneys "to the supervising and discipline" of the relevant federal courts. *See* 2025 WL 917110, at *20. Federal Courts are responsible for determining and overseeing their own "admissions rules and procedure" (*see id.* at *19), and this sanction will help ensure that Mr. Ramey and other attorneys will follow those procedures.

**D.      Netflix Seeks Only Half Its Reasonable Fees.**

The Court has articulated the standard for assessing the reasonableness of Netflix's attorneys' fees in the Fee Setting Order (at 2-3).  To briefly summarize, courts apply the "lodestar method" to determine a reasonable attorney award against a party sanctioned for violating a protective order.  *See, e.g., Silicon Genesis Corp. v. EV Grp. E. Thallner GmbH*, No. 22-cv-04986, 2024 WL 1643677, at *1 (N.D. Cal. Apr. 15, 2024).  The method "multiplies the number of hours reasonably expended … by the reasonable hourly rate."  *See id.* (*citing Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614, 622 (9th Cir. 1993).  The "resulting figure is presumptively reasonable."  *See* Order Setting Reasonable Attorney's Fees and Costs, *Apple Inc. v. Samsung Elecs Co.,* No. 5:11-cv-01846, *slip op.* at 3 (N.D. Cal. June 20, 2014), ECF No. 3117 (*citing Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)). Indeed, the Ninth Circuit recognizes that a trial court "should normally grant [a fee] award in full" if the party opposing the request "cannot come up with specific reasons for reducing the fee request." *See Moreno v. City of Sacramento*, 534 F.3d 1106, 1116 (9th Cir. 2008) (vacating district court fee award that made "substantial cuts to a winning lawyer's fee request" without "specific explanation" as to its basis).

As set forth in the Piepmeier and Lamkin Declarations, the rates billed to Netflix by the attorneys working on this matter are consistent with the rates prevailing in the San Francisco Bay Area for similar work performed by intellectual property attorneys of comparable skill, experience, and reputation.  In addition, Netflix, a sophisticated client, has endorsed Perkins Coie's and Baker Botts's rates through its selection of counsel.  In granting Netflix's request for fees related to Mr. Ramey's violations of the Protective Order, the Court acknowledged that the fees charged by Netflix's counsel were "comparable to market rates in this district for attorneys with similar experience."  (*See* Fee Setting Order at 4.)

Netflix's counsel incurred a significant but reasonable number of hours defending Netflix in this baseless lawsuit.  Netflix's outside counsel litigated Valjakka's multiple patent infringement claims through fact and expert discovery before prevailing on dispositive motions.  Throughout, Netflix's counsel investigated and identified the myriad substantive deficiencies in Valjakka's claims (discussed herein), and because Valjakka refused to drop his claims, Netflix was forced to

continue.   Valjakka's other litigation misconduct (such as filing in the wrong court, skirting discovery obligations, blaming its failure to set forth a cognizable infringement case on allegedly missing documents, failing to appear at scheduled meet and confers, and failing to prepare drafts of joint filings) only multiplied the proceedings.  (*See* Piepmeier Decl., ¶47; Ex. T.)  And when it became clear that Valjakka was improperly siphoning away proceeds from other settlements to avoid liability to Netflix (i.e., attorneys' fees), Netflix then needed to pursue its CUVTA claims, which required additional discovery from Valjakka and discovery from AiPi in the Eastern District of Virginia (where AiPi resisted for nearly a year), as well as motion practice to secure a preliminary injunction, and eventually, summary judgment.  (*See* Piepmeier Decl., Exs. ZV-ZW and Lamkin Decl., Exs. 1-2 for invoices and yet-to-be-invoiced summaries describing the work performed.)

Netflix seeks only $3 million; a fraction of its total fees incurred.  In particular, looking at only those attorneys at Perkins Coie and Baker Botts who billed in excess of 100 hours on the matter, Netflix incurred reasonable fees of roughly $6.2 million.[10]  (*See* Piepmeier Decl., 8:3-9:10.)  Beyond that $6.2 million, Netflix incurred over $800,000 in additional fees for work performed by other attorneys, paralegal and other non-attorney support on this district court litigation, let alone for work related to PTAB proceedings on the asserted patents.  (Piepmeier Decl., ¶6; Lamkin Decl., ¶8.)  And Netflix also incurred hundreds of thousands in costs and fees to technical and damages experts.  (*See generally* Piepmeier Decl., Ex. ZV ("Disbursements and Other Costs").)  But to be conservative, Netflix only requests $3 million, which amounts to less than 50% of the $6.2 million of its reasonable fees.

Netflix understands that (the discounted) $3 million is nonetheless a significant fee award.  But the misconduct and outright fraud perpetuated by Valjakka and Mr. Ramey on this court (among others) warrants a significant punishment.  Further, "§ 285 is a means to *make whole* a party injured by an egregious abuse of the judicial process."  *See Kilopass*, 82 F.Supp.3d at 1166 (internal quotations omitted) (emphasis in original).  As such, in various cases cited throughout this brief, Courts awarded fees incurred from most or all of a litigation having one major substantive

---

[10] This figure already removes the full amount of fees Netflix's lawyers incurred related to the PO violation motion, i.e., over $300K, from which Netflix sought only $95,000. (*See* ECF Nos. 332-4 at 6 (Declaration), 353 at 3 (Order).)

defect.[11]  In contrast, Valjakka had no standing to assert either patent (and in the case of the '167 patent, no legal interest in the patent whatsoever), asserted baseless infringement claims for both patents, and should have known that one patent was obviously invalid as patent-ineligible, *on top of* significant litigation misconduct such as his counsel's rampant violations of the case Protective Order and unauthorized practice of law.  As such, a full fee award "fulfils § 285's dual goal of deterrence and restitution" (*see id.*), and holding both Mr. Ramey (individually) and his firm jointly and severally liable for that award likewise serves the deterrence purpose for awarding sanctions under § 1927 and the Court's inherent powers.

**IV.    CONCLUSION**

For the reasons stated above, Netflix respectfully requests that the Court award attorneys' fees of in the amount of $3 million.

---

[11] *See, e.g., Kilopass Tech.*, 82 F.Supp.3d at 1165-66, 1175 (awarding over $5 million in fees—"all reasonable attorneys' fees arising out of the patent-related litigation"—in view of the plaintiff's "objectively baseless" infringement allegations and various litigation misconduct); *WiNet Labs LLC v. Motorola Mobility, LLC*, No. 20 C 1094, *slip op.* at 6-7 (N.D. Ill. Sept. 19, 2022), ECF No. 69 ("although the standing issue was raised only mid-way through the litigation," Plaintiff "never had standing or ownership rights" in the asserted patent; had "any pre-suit investigation [] occurred," defendant "would not have needed to have any financial outlay at all," i.e., expended money to defend the case), *Chromadex, Inc. v. Elysium Health, Inc.*, No. 18-1434, 2024 WL 5105618, at *1 (D. Del. Aug. 20, 2024) (overruling patent owner's objection to nearly $4 million in fees incurred by defendant before the *Markman* hearing because the Court's order finding the asserted patent-ineligible did not hinge on the construction of any specific term); *see also Lowe*, 2023 WL 3043769, at *1, *6-7 (awarding all attorneys' fees from date plaintiffs "relinquished their exclusionary power under the" asserted patent).

Dated:  April 17, 2026

Respectfully submitted,

*/s/ Sarah E. Piepmeier*

Sarah E. Piepmeier, Bar No. 227094
SPiepmeier@perkinscoie.com
PERKINS COIE LLP
505 Howard Street, Suite 1000
San Francisco, California 94105
Telephone: +1.415.344.7000
Facsimile:  +1.415.344.7050

Janice L. Ta (appearance *pro hac vice*)
JTa@perkinscoie.com
PERKINS COIE LLP
405 Colorado Street Suite 1700
Austin, Texas 78701
Telephone: +1.737.256.6100
Facsimile:  +1.737.256.6300

Adam Hester, Bar No. 311206
AHester@perkinscoie.com
PERKINS COIE LLP
33 E. Main Street, Ste. 201
Madison, WI 53703
Telephone: +1.650.838.4311

Rachael D. Lamkin, Bar No. 246066
rachael.lamkin@bakerbotts.com
Karan Singh Dhadialla, Bar No. 296313
karan.dhadialla@bakerbotts.com
BAKER BOTTS L.L.P.
101 California Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 291-6200
Fax: (415) 291-6300

***Attorneys for Defendant***
***NETFLIX, INC.***