# EXHIBIT 2

**Pages 1 - 39**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jon S. Tigar, Judge

LAURI VALJAKKA, )
)
Plaintiff, )
)
VS. ) **NO. 4:22-cv-01490-JST**
)
NETFLIX, INC., )
)
Defendant. )
)

Oakland, California
Thursday, July 2, 2026

**TRANSCRIPT OF REMOTE ZOOM VIDEOCONFERENCE PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
RAMEY LLP
446 Heights Blvd., Suite 200
Houston, TX 77007
**BY: WILLIAM PETERSON RAMEY, III, ATTORNEY AT LAW**

For Defendant:
PERKINS COIE LLP
505 Howard Street, Suite 1000
San Francisco, CA 94105
**BY: SARAH E. PIEPMEIER, ATTORNEY AT LAW**

BAKER BOTTS LLP
101 California Street, Suite 3200
San Francisco, CA 94111
**BY: RACHAEL D. LAMKIN, ATTORNEY AT LAW**

REPORTED REMOTELY BY: Kendra A. Steppler, RPR, CRR
Official United States Reporter

Thursday - July 2, 2026 2:00 p.m.

P R O C E E D I N G S

---o0o---

**THE COURTROOM DEPUTY:** U.S. District Court is now in session, the Honorable Jon S. Tigar presiding.

Calling Civil Case Number 22-1490-JST, Valjakka v. Netflix, Inc.

Parties, please state your appearances for the defendant.

**THE COURT:** Well, why don't we start -- let's start with the plaintiff, actually. Or, actually, no, let's start -- I understand what you're saying. Let's start with the defendant.

**MS. PIEPMEIER:** Good afternoon, Your Honor. Sarah Piepmeier from Perkins Coie LLP on behalf of defendant Netflix.

**MS. LAMKIN:** Good afternoon, Your Honor. Rachael Lamkin from Baker Botts on behalf of Netflix.

**THE COURT:** Very good.

Mr. Ramey, would you enter an appearance, please?

**MR. RAMEY:** Yes, Your Honor. William Ramey for William Ramey and Ramey LLP. And we're ready to proceed, Your Honor. Thank you.

**THE COURT:** Great. Thank you. And I heard on the Zoom, because I was able to hear it before I had fully joined, that the courtroom deputy gave Mr. Valjakka, two or three times, the opportunity to join the Zoom hearing in a speaking

role as a panelist. And he declined each time, even after she explained to him that he would not be able to speak if he did not accept the Zoom invitation.

So, from that, I take it that he is going to listen to today's proceedings, but he is not going to offer oral argument. I did read, very carefully, the papers that he filed in opposition to the motion. But I wanted to make a record of that fact before we went any further.

The matter is on calendar today for two motions. One, is Netflix's motion for fees. The other is for Mr. Ramey's motion to strike. The Court will deny the motion to strike. So -- for reasons that I'll explain in writing. So I don't need argument on that. But you should just know that the materials that were the subject of that motion are a fair basis for comment today.

I'll let each of the two sides have 20 minutes to spend as they like. If you want two bites at the apple, you should stop before the 20 minutes is up. And we'll go back and forth. I'll hear first from Netflix's counsel, and then from Mr. Ramey, and then from Netflix's counsel, and then, finally, again, from Mr. Ramey.

Ms. Piepmeier, who will be arguing for Netflix today?

**MS. PIEPMEIER:** Good afternoon, Your Honor. I will be arguing the fees motion for Netflix.

**THE COURT:** All right. You have the floor.

**MS. PIEPMEIER:** Thank you, Your Honor. And thank you, Your Honor, for the ruling on the motion to strike in advance of this argument, because it makes it a little bit easier for us to proceed.

Your Honor, Netflix brings this fees motion reluctantly. It's necessary, given the extreme positions and the conduct at issue, in plaintiff Valjakka's multi-venue and multi-plaintiff litigation campaign. As Your Honor probably knows, Netflix is the last one standing out of more than a dozen different defendants.

And as Mr. Ramey and Mr. Valjakka's oppositions would suggest, they view this -- or portray this at least -- as a hard fought, complicated, multi-venue, you know, ordinary course patent litigation matter where Netflix just happened to win. And that's not the case here.

This was a frivolous suit from beginning to end, brought in bad faith, and litigated through misconduct and fraud. And I realize that those are harsh words. I do not say them lightly. I have been fortunate, over the past almost 25 years, to win a lot of cases through luck or hard work or otherwise. And I can count on one hand the number of fees motions I've brought. And certainly none that rises to this level of seriousness.

So I realize that I am using intense words when I say "misconduct" and when I say "fraud." And, unfortunately, I

mean them. And those are intentional choices.

The fraud started when Mr. Valjakka filed a petition to revive the patent application that ultimately issued as the '167 patent before the USPTO in 2010 without telling the USPTO, which had no other way to know, that the basis on which he sought to revive that application had been twice denied by the Finnish District Court and the Finnish Supreme Court. He simply didn't tell the PTO that.

And the fraud continued, 11 years later, when he filed this case and about a dozen other cases against a whole slew of defendants. And the Court has already identified multiple instances of plaintiff's fraudulent intent here. So I'm not going to belabor that point. In granting Netflix's motions on CUVTA, the Court repeatedly identified, quote/unquote, "substantial evidence" of Valjakka's intent to defraud, not just related to Netflix, but related to the entire litigation campaign.

In fact, the Court even noted that Valjakka went so far as to execute settlement agreements warranting that he had rights to license that he simply didn't have. And that was a fraudulent warrant of rights that he simply didn't have. Those are just a couple of examples. I'm not going to belabor that point, because I believe it's already been determined within the law of this case that Mr. Valjakka had fraudulent intent here.

And that would be bad enough. But the actual infringement allegations as to both the '102 patent and the '167 patent -- just as a reminder, the '167 patent is the one that Netflix won summary judgment of no ownership on. The '102 patent is the patent where Netflix won a 12(c) motion of -- that it covered an abstract idea.

The infringement allegations were frivolous at best. And the Court didn't have occasion to rule on that because the Court determined that the '102 patent was abstract and that the '167 patent -- there was no subject-matter jurisdiction. So it didn't have occasion to reach Netflix's summary judgment motion of no infringement on the '167 patent.

But these infringement allegations were among the worst I've seen. And so we repeatedly implored Mr. Valjakka, through Mr. Ramey, to simply drop the case and walk away. And when I say "repeatedly implored," I mean phone calls, emails, over and over and over again, and, I mean, at least three that I have right here very detailed letters that I sent -- very detailed, single-spaced, typed, multipage letters starting on August 19th, 2022, continuing to December 12th, 2022, into June 23rd, 2023, outlining the just gross failures of any kind of infringement allegation and, by the time we get to June 2023, the failures of any kind of ownership allegations.

And we were explicit about that, starting in 2022, that we intended to seek sanctions under Section 285 and 1927 and the

Court's inherent power. And we implored, please drop this case and we will walk away. And we did that over and over and over again. And not only did they not drop the case; they just didn't even respond. They just failed to respond to any of this correspondence.

And then, as Your Honor knows, we obtained a trove of emails between Mr. Valjakka, his secret litigation funder AiPi, and Mr. Ramey. And those emails provide deep and uncontroverted evidence of the calculated campaign to keep the ownership issue, which Counsel -- not just Mr. Valjakka -- but Counsel knew about from day one, from at least November 16th, 2021, hidden as long as possible, to force settlement among the other defendants and to maintain infringement allegations that were so deficient that Valjakka's own retained and paid expert refused -- refused -- to provide an infringement report as to either patent.

Now, Mr. Ramey congratulates himself for dropping the '102 patent after that happened. But the expert said the same thing about the '167 patent, and he maintained those allegations. And the '102 patent became irrelevant shortly thereafter, because the Court found it covered an abstract idea.

We also learned through these emails -- through this treasure trove of emails -- of the willful protective order violation by Mr. Ramey. Now, the Court has already ordered the payment of fees by Mr. Ramey for that. That hasn't happened

yet. But the Court has already ordered that. We're not seeking duplicate fees for the protective order violation. But that is still evidence of the bad-faith conduct that Mr. Ramey and his team employed throughout this litigation. We don't need to be double-paid for it, but it is a pattern and practice of litigation misconduct.

The Court, in the order on the PO motion, found that Mr. Ramey's arguments were unavailing and that he violated the protective order by sharing confidential material covered by that order with unauthorized parties. That was not an accident; that was willful. That was by design.

We also learned -- and here's where we get into the emails that were the subject of the motion to strike -- we also learned, in this treasure trove of emails produced by AiPi, that Mr. Ramey admitted to being deeply uncomfortable with this case and concerned about an impending fees motion. In an email to AiPi, after setting forth the many issues facing this case, including ownership, inventorship, and infringement -- or lack of infringement, I should say -- Mr. Ramey told AiPi, in all caps -- and this is in an email from -- sent with high importance on Friday, August 18th, 2023 -- we cannot lose this case or there will be a large fee motion. We must prevail or settle. Now, this is Mr. Ramey's own words in an email to AiPi.

We also learned that of November 16th -- as of

November 16th, 2021 -- this is right when Mr. Ramey is entering into the case for Mr. Robinson -- he personally knew that there was an English version of the Finnish court opinion that showed Mr. Valjakka had no rights to the asserted patent.

So it's not just the emails going back and forth with counsel for Akamai, who, at that point, were negotiating settlement with Mr. Ramey. The emails with them, the emails with AiPi, the emails with Mr. Valjakka's Finnish counsel -- it is that Mr. Ramey himself knew that this ownership issue was a huge one and sent multiple emails saying, "We got to fix this. We got to find a way around this."

But he had, at that point, an English version of the Finnish court opinions that still today have not been produced to Netflix. We only received them in Finnish a couple of years later, and we had to have them translated to figure out what the significance was. He personally knew about that from day one.

Now, if he personally knew about that on day one, which we have proof in writing he did, and he continued to maintain this lawsuit, and, in fact, added the '102 patent, which had absolutely no basis for infringement, that cannot be understood in any way, other than a vexatious attempt to multiply the proceedings. The proceedings should have stopped.

Now, under 1927, the initial filing of the first complaint doesn't count for purposes of fees. That initial filing of the

first complaint was done by Mr. Robinson. Mr. Ramey filed the amended complaint in early 2022. But, by that point, he knew of the ownership defect. And instead of dismissing the case -- or cases at that point -- as to all defendants, as he should have done, he orchestrated a settlement with Akamai to keep this all hidden, because Akamai was threatening to share this with the codefendants. And so we didn't find out about it until about 18 months later, through two trips to Helsinki.

And I note, to this day, some of the documents that Mr. Ramey had, at that point, and that Mr. Ramey's client, Valjakka, certainly had, have still not been produced to Netflix.

We also learned, for example, that Mr. Ramey, in those emails, tried to add back in willfulness allegations that the Court had struck until AiPi said, "Look, you can't do that. There's absolutely no basis in law and fact." That's in the emails that we received.

So all of that should have been enough under Section 285, for sure, and even under the stricter, more exacting standards of 1927 and the Court's inherent power. But we actually have bad-faith conduct related to this fees motion itself that I think warrants special note.

The first is a bad-faith attempt, in my mind, to strike these documents from the record, which clearly had already been waived, although I won't jump the gun on that one, because we

obviously have not seen the Court's opinion. But, more importantly, we have a gross mischaracterization --

**THE COURT:** The gist -- the gist of the order is that Mr. Ramey was offered an opportunity to tell the Court -- and collateral litigation in the East Coast -- that the documents were privileged and should not be produced -- or to tell AiPi that -- and he didn't say anything. And that constituted a waiver.

**MS. PIEPMEIER:** Thank you, Your Honor. That's certainly consistent with our understanding. And for that reason, we believe that it was, frankly, improper for Mr. Ramey to try to strike them. And, in fact, our ability to reply on those issues was hindered because we couldn't talk about them. And we didn't talk about them.

I will take that opportunity now to just mention that one other thing that I believe in the conduct of this fees motion is very telling is Mr. Ramey's gross mischaracterization -- and I don't say that lightly -- of the recent Finnish Supreme Court order.

Now, Mr. Ramey, in his opposition brief, states that the recent Finnish Supreme Court order -- and I quote -- "overturned the lower court ruling on which Netflix relies and held that the ownership dispute had not been adjudicated on the merits and must be reopened in the Helsinki district court."

That is a categorically false statement. I believe it is

a willfully false statement, because it is obvious what the Finnish Supreme Court did. First of all, it didn't overturn anything that happened in 2009 or 2010. It is a completely separate proceeding. The 2009 and 2010 orders had to do with, as Your Honor likely recalls, the utilization agreement and all of that. And the court at that time -- the Finnish courts found that there were no rights reverted through the utilization agreement, and so Mr. Valjakka did not have ownership of the patent. I won't get into the details there, because that would take up the rest of my seven minutes.

But in addition to that, the grounds of the 2003 Finnish action that is occurring now, apparently, is appropriation. And the kind of finders-keepers rule that Mr. Valjakka subsequently came up with, that was not even at issue in the 2009/2010 orders. That is something new. And the court hasn't found that there's any merit to those allegations. It simply said that the jurisdictional finding shutting that down was wrong, and it has to be adjudicated by the District Court. It's simply false to state that it overturned anything on which Netflix relies.

And even more -- even if that weren't enough, all of it is completely irrelevant. Because the Court has now said twice that even if the Finnish court does find that there was some kind of, you know, appropriation or whatever, that doesn't work. Because the U.S. Patent Office looks at U.S. law when it

determines whether or not something has been abandoned and then revived. So it's irrelevant what the Finnish court does if it does anything at this point.

And I believe that those factual and legal misstatements are further evidence of the type of conduct and the frivolous arguments that we're seeing here that Netflix has had to respond to.

Finally, I'll just note that -- and then I'd like to reserve the last few minutes of my time -- I'd like to note that his statements regarding Mr. Robinson are also mischaracterizations at best. Mr. Robinson, as the Court may recall, was the lawyer who originally filed this action against Netflix and against some of the other defendants in September of 2021.

And Mr. Robinson sent, as the Court has seen, what we refer to as a six-paragraph email detailing his reasons for withdrawing from this case. And the reasons for withdrawing were quite clearly, as he said on November 13th, 2021, because he has a disagreement with AiPi regarding, quote/unquote, "the priority of the Valjakka cases." He does not see a possibility of moving forward. The ownership issue is troubling to me, as I was not made aware of this issue until after filing the cases.

And when he suggested withdrawing and refiling the cases to fix it, he heard, for the first time, that there is an issue

related to the revival of the Valjakka patent that would prevent fixing the ownership issue. And so, for that reason, he withdrew.

This is a contemporaneous email that we have from November 2021 which Mr. Robinson credited and reaffirmed in a declaration submitted with Netflix's fees motion. And I'm not sure if anyone quite understands how extraordinary that is, but -- that he did that. And, yet, Mr. Ramey comes back and says, oh, yeah, well, what I remember from our phone call five years ago is something completely different that controverts the literal contemporaneous written record of what happened at that time.

Those are examples, Your Honor, of the types of frivolous and mischaracterized arguments that we got again and again. Now, because we know that Mr. Ramey knew as of November 16th, 2021 --

**THE COURT:** Ms. Piepmeier, you have about four minutes left.

**MS. PIEPMEIER:** Thank you, Your Honor.

-- that there was no ownership and no standing, all of Netflix -- there is a but-for test, and all of Netflix's fees since that point would not have been incurred, because it should have been dismissed on that day. And under 1927 or the Court's inherent power, we believe that Netflix is due its fees from November of 2021 at the latest.

And I won't belabor the Section 285 point, because I believe that one is a little bit clearer. Thank you, Your Honor.

**THE COURT:** Thank you. You have about three and a half minutes left.

Mr. Ramey?

**MR. RAMEY:** Yes, Your Honor. If I might begin, I'd like to -- and I thank the Court for its time. I'd like to just briefly march down the -- kind of what I wanted to prepare -- present for today, but then talk a little bit first -- but I want to start on the "vindication" word that I used.

I think "vindication" is right, because Netflix' entire motion, at first, was based on the fact that it was ruled against Valjakka. And that what the Helsinki Court did -- the Finnish court -- as far as I can understand it from talking to Helsinki counsel, is it did, in fact, reopen the proceedings -- the -- called the Market Court -- the district court -- that will consider the appropriation argument. So it did, in fact, take away its argument that Mr. Valjakka did not own the patent. That is what the Finnish court did. That opinion doesn't exist anymore about that. So that was what "vindication" means.

I fully admit that there hasn't been a determination that Mr. Valjakka owns the patent in Finland yet. And I fully admit

that the Court's ruling -- this Court's ruling -- wouldn't change based on that one way or the other. But the basis of Netflix's motion was simply that Mr. Valjakka had been ruled about -- against -- at the Finnish court. And that simply is not the case at this point. That's what that was for.

And I'd like to address one other thing. Netflix glossed over something that's very important, probably for the audience that's on the call today. But they said that Mr. Valjakka did not have expert testimony supporting his infringement positions. And it's true, we dropped the '102 patent from the case. We were in discussions with Netflix's counsel about a week, maybe two weeks, before the Court's order dismissing that case -- dismissing the '102 patent.

We did, in fact, have expert testimony of Dr. Kozek, who provided a sworn declaration as evidence of -- for evidence of infringement in the response to the motion for summary judgment. So we did have expert testimony. It's not uncommon you get several different opinions about something, and then you move forward with the opinion you like more than the ones you didn't like.

Mr. -- the other expert was actually very much involved in the IPR proceedings -- in the post-grant proceedings -- before the patent office. So he still believed in the case and provided opinions here. He just simply didn't provide the infringement positions for the case. And that's -- that's

not -- that is part of the record. That is before the Court. And it's not uncommon for counsel to write numerous letters. We did, in fact, take issue with the fact that we didn't respond. We did, in fact, respond. But none of that is before the Court right now about that.

But I'd like to go back -- pardon me -- to -- briefly, if I could -- to the Court's not -- you know -- not striking the exhibits. I realize we don't have an order yet. I would just simply say that the Court, from what I heard, is basing its decision, in part at least, on the fact that we were provided the opportunity to object in the Eastern District of Virginia. And I'd simply like to provide the Court with the reason why we did not object in the Eastern District of Virginia to these documents.

It was our understanding, from being involved in this Court in this case, that Netflix was seeking documents to support its CUVTA case between AiPi and Valjakka. And that's what the Section 45 subpoena allowed by this Court in the Eastern District of Virginia was meant to do. So we didn't consider part of our dispute. We were already trying to get out of the case at this point.

**THE COURT:** I don't understand what you're saying. As I understand it -- and I could bring up my notes. It would take me a second, so I might not get this quite right. But, as I understand it, counsel for AiPi sent you an email or an

electronic letter that contained a link to all of the documents that it was contemplating producing. And it said, if you have any objection to our producing these, tell us. And you didn't tell them that you had any objection. Am I missing something there?

I mean, I don't -- so whether it was in relation to CUVTA or something else doesn't really matter for my purposes. I'm trying to determine, is there -- you know -- you asserted a common interest privilege and the protection of the work product doctrine. And so the only thing I asked myself is, were you given an opportunity to assert those objections and did you timely assert them? And maybe there's some other part of the -- of your argument I'm not getting, but that's why that order is going to come out that way.

**MR. RAMEY:** Yes, Your Honor. All I'm trying to say is that the privilege is mine personally to serve. I didn't have a privilege with the Eastern District of Virginia compelling production for a dispute between Mr. Valjakka and AiPi about the crime-fraud exception. That wasn't -- that wasn't something that I was involved in. And that's why we didn't object. It wasn't the -- it wasn't -- AiPi couldn't waive my privilege anyways. My privilege was between me and Mr. Valjakka for the evidence -- for the conversations we had -- for the very documents that Netflix brought up in this fees motion -- you know -- assessment of the case and whatnot.

So all I'm saying is the reason we didn't object there is that that was -- we didn't have a dog in that fight. And so we were concerned with the other case. And I understand the Court's ruling. I think I just want to make the Court aware of the reason that we didn't object is that that was a separate -- our privilege, we feel, is still intact, because our privilege is personal to me, and my communication is a work product that I created, and between my -- cocounsel was affiliated at KVI and later moved to Whitestone, I think, if I remember the name correctly -- those lawyers working with me had nothing to do with AiPi and the CUVTA privilege. It was -- mine was between specific lawyers I was working with on this case.

But I'll go on from there. I don't want to spend too much time. The Court's indicated -- I just want to make the Court aware of the basis for why we didn't raise that issue.

**THE COURT:** All right.

**MR. RAMEY:** Yeah. Thank you, Your Honor.

So going back to the -- what I think the -- the easiest part of this case is that Section 285 doesn't reach -- doesn't reach counsel. We get that from *Dragon Intellectual Property v. DISH Network*, 956 F.3d 1358. And Netflix pretty much concedes that. Their heading is -- you know -- Netflix is entitled for attorney's fees from Mr. Valjakka under Section 285.

And I'd take -- take that to a case that issued -- the

opinion issued after Netflix filed its fee motion in *mCom v. City National* at 17541370. It's a May 15th, 2026, Federal Circuit opinion that sets forth the structure from the Federal Circuit of what they look at for 285 and Section 1927. And it does allow collapsing of one on both.

And I realize that Netflix says it's taking 285 and 1927 together for the same conduct. I just want to differentiate, 285 can't be considered as something that can be awarded against counsel.

And so that leaves us with the primary heart of what's left. And that's the Section 1927 or inherent power section that can reach counsel. And this is something that requires -- at least under Section 1927 -- subjective bad faith or recklessness coupled with object -- frivolousness of the case -- harassment or improper purpose. And that's *Fink v. Gomez*. And that's -- it's all in our briefing. And the inherent power requires a specific record-based finding of bad faith. And then we get from the other Federal Circuit cases that even an unreasonable position is not a sanctionable one.

And, here, I'd just like to walk the Court through the basis of why we didn't -- we didn't dismiss the case. I would fully admit -- and I will go right back to Ms. Piepmeier's comments about the case -- that when I substituted in the case, I had conversations with Mr. Robinson. You'll note on that email that she holds up in front of the Court, I'm not copied

on that email. My conversations with Mr. Robinson were very clear.

He said, hey, I'm changing firms, exactly what's in my declaration. Here's the issues -- you know -- you're going to want to look at these. And that's why I peppered -- started peppering the lawyers I was working with over at AiPi. Hey, we need to address these. This is very concerning. That's how you work up a case. It's not common that internal communications become public and part of something, as has happened here, but that still shows that we weren't denying any part of this case. We were working every issue that was before us, saying, I was uncomfortable with this and that, and moving between different aspects of it.

That's -- in fact, Ms. Piepmeier says I have an English version of the Finnish opinion. I -- if I -- I don't actually remember that. I didn't look that up for the -- for today's hearing. I don't think I did. I know I'm speaking to Finnish counsel. I know we had the opinion that even Mr. Robinson talked to me about, that he was the -- that this is what it was based on. His comments to me was exactly what I said. This is an issue that we can build a case around. That's exactly what he told me. And that's what his opinion was.

I mean, that's -- it's almost -- belies belief that counsel was -- come into a case from another counsel that told them, don't take this case, man. There's this many problems

with it. That belies belief. And that's what Netflix is asking you to do, Your Honor. This is a -- Mr. Robinson -- we took the issues we were given, and we worked them up.

But I'll go back now to why we think that what we did was right. We did file on the '167 and the '102. The '102 patent was later found invalid under Section 101. The '167 we had a -- we also had a -- we think a good-faith infringement basis. The Court itself denied the 12(c) on that. And so we then took that case forward -- built it with an expert opinion and took it through summary judgment. As Ms. Piepmeier said, the Court didn't reach the issue of infringement in this case there. But that was our basis, and we just never had a ruling on it.

When we get to the ownership theory, it was -- it was supported. It was supported by Finnish declarations; Finnish legal opinions, from what we could tell; conversations from the record at the USPTO. All this stuff predated my involvement in the case at all, Your Honor, and my firm's involvement -- even Mr. Robinson's involvement. All this was there. So it was something that we came into. It was before us.

We weren't involved in creating it. We didn't create the Finnish opinion. We didn't create the Finnish law around this. We didn't create any of that. We didn't create the USPTO record. We didn't do any of the revival petitions. What we had was the record before us that we -- they -- we then investigated. We took that ownership record and said, okay,

here. Here's a Finnish expert, Professor Tepora. And that's at ECF 188 to -- 4 through 7 -- where he gave us his opinion about this. And then we had a California contract revision theory. That's at ECF 188, 7 through 9.

Those are two independent legs that we felt were sufficient on their own if they had proven to be correct. We get it. And we're not asking the Court to change anything about its order. The Court found it not sufficient. And we're not asking the Court to change that. But these were justiciable issues. These weren't fraudulent issues. This was a record that we came into. We didn't create it. This is the record that we then took to the Court, and we asked for a ruling. And we got that ruling. And we lost. We're not denying that. We're not denying that at all.

Here, Ms. Piepmeier says we should have known since November 17th of 2021 that Mr. Valjakka didn't have ownership. But that's not true. We had all these other things. That's -- that's -- in fact, that's never been ruled on by the Finnish court. That's never been decided by the Finnish court. In fact, we just have a Supreme Court opinion saying that from Finland that there is no adjudication, finally, of the ownership issue.

And then Ms. Piepmeier admitted that, when she exclaimed that it was -- that I was overreaching by saying "vindicated." Everyone agrees that it's an open issue. And it doesn't change

how this Court ruled. And we're not asking it to. We're just simply saying that we took good-faith arguments that we lost. But they were still good-faith arguments.

And our understanding of the summary judgment issue was it was partially based on commenting and not a frivolousness finding. And so we would just go back to that. That we didn't see a frivolousness finding in the summary judgment dispute that was on the record now. Netflix used -- when it was denied the ability to join AiPi into the case, it used a Rule 45 subpoena through a separate dispute about a CUVTA violation to then pull emails and put it back before this Court to try to now use in a sanction motion.

And that's -- that's why we filed the motion to strike, because it just seemed it was an improper way for them to get discovery that they were otherwise denied by this Court when the Court denied the motion to join.

I'd like to go back to the case that -- the *mCom* case -- the Federal Circuit recent one. Netflix led with this opinion. They said that, you know, the City National -- this is -- this is the hallmark of our case. It was -- the Federal Circuit that -- said that everything about that decision was wrong, except for the dismissal of the patent invalidity of the patent. It reversed the 285. It reversed the 1927. And it said you can't reach 1927, because counsel should have been more diligent.

The Federal Circuit came out and said that -- you know -- that if diligence is issued, that won't get you to 1927. And you see how Ms. Piepmeier tries to get around that. She throws in there that we overexaggerated --

**THE COURT REPORTER:** Sorry. Can you say that again? "We overexaggerated" --

**MR. RAMEY:** By using the word "vindication." My apologies, ma'am. By using the word "vindication" in our briefing. We think that Mr. Valjakka was, in fact, vindicated. His long-fought quest about ownership of this dates back prior to 2008. And, finally, he's getting the chance for a court to rule on it. And that's -- that was what -- our use of the word "vindication."

The -- you know -- we didn't frivolously bring any claims. We had expert opinions that supported our infringement allegations -- good expert opinions. We had a good-faith basis for carrying those forward. We just don't see anything in here that shows bad faith or any step that we took along the way -- sorry, Your Honor, just checking my time real quick.

**THE COURT:** You have about five and a half minutes.

**MR. RAMEY:** Yes, Your Honor. Thank you. Thank you.

And -- then we just don't see any gross misrepresentation -- what was here. We took a developed record. We didn't create the record. We didn't add to the record. We worked the record that was before us.

**THE COURT:** Let me ask you a question.

**MR. RAMEY:** Yes, Your Honor.

**THE COURT:** Let me ask you a question. Part of Netflix's narrative is Valjakka's got these suits out there against other defendants. Akamai's lawyer comes to you and says Valjakka doesn't own that patent. And we're going to tell the other defendants. And you're going to have to defend this lack of ownership against all these other defendants.

Don't you send out an email -- or isn't there a communication at that point where you say, we've got to get this thing wrapped up, because we don't want other people to know about this lack of ownership?

**MR. RAMEY:** The issue that -- yes, Your Honor. So Mr. Robinson, early on, discussed this issue before he even left the case. He said, here, Akamai's coming forward. We're trying to work out a settlement with them. You know, here's the -- they're saying these bad facts. Here's our Finnish declarations over here.

And so rather than create the issues on both sides, we did settle that case. But it wasn't in bad faith. Our issues remain the same. We produced that Finnish opinion. Everything became public record. And that -- the fact that Akamai had done some -- had -- we didn't know -- I don't know exactly what Akamai had. I mean, they told us, basically, that they were going to challenge ownership based on largely the facts that

are before the case [sic] in this case now. But I didn't have a record of what they were going to say. But we -- I do know that Mr. Robinson had started that process with Akamai before I was even involved. It was part of our diligence, part of my discussions with Mr. Robinson.

And so, again, this is a record that I inherited, not one I created. And we did our level -- dead-level best to work those issues to make sure that we could address everything that Akamai said. And we thought we had done that. And that's in later. And we produced everything along the way. And there's -- simply because -- you know -- there were issues about whether or not ownership is proper. That doesn't mean that the case is frivolous. That means that we had to address it. That often happens in litigation, and that's what we attempted to do.

I'd like to briefly, if I might, talk just a little bit about Netflix's -- some of its accounts. You know, they bring up the *Raydiant* case at 808 --

**THE COURT REPORTER:** I'm sorry. Can you repeat that?

**MR. RAMEY:** Yes, Your Honor -- yes, ma'am. Sorry. 808 F.Supp.3d 987, the *Raydiant Oximetry* case. That's where they -- they -- but that was where counsel was warned pre-suit that the claims were baseless, with no evidentiary basis, so they kept pressing 'em.

And then the *Lahiri* case -- that case was 606 F.3d 1216.

That was a foreign law case that was straightforward where reliance was unreasonable. Here, this Court already said, for the '167, it was a close call. And there's a Finnish court opinion in Tepora's declaration that we had all before I got involved in the case. And that almost clearly just makes -- that I was working an issue, not creating something out of thin air.

And then the *Koji* case they cite -- it's a case that's on appeal. But it involved two complaints not even close to relevant. And the remainder of the cases are all Section 285 cases.

Now, I -- so I don't think that the -- that Netflix has made the bad-faith showing that they have to for inherent power or Section -- or for 1927 sanctions. I think that we have -- we went into the case, worked what we had to answer the questions there. We didn't create any facts. We addressed things before us, and that makes it different. We -- you know -- regardless of when we may have been aware of this stuff, this is what we worked. You know, we inherited the record. We -- we did everything we could to work the record.

And you will see from the -- you've heard from Ms. Piepmeier that we dropped the '102. We thought we had a good case, and we got involved with the expert, and he said, no, I'm not going to -- this one I don't think you should -- you're going to get there. And it's going to weaken your

chances with the '167. So we dropped it. They admit that.

This -- and when -- you see, when I wanted to assert willfulness based on stuff, you heard -- cocounsel was telling me, no, we don't have the evidence for that. Those -- that's what lawyers are supposed to do -- talk through the issues. How does working through issues and working the case to present it turn into bad faith? I just don't see it.

Bad faith requires more than that. It requires something that is trying to pull the -- something over -- the wool over the Court's eyes for inherent power, basically. And then when -- it has to be reckless, at a minimum, with subjective bad faith for the Section 1927. And I just don't get it here.

And if the Court's not inclined to reach the bad-faith issue, I won't spend much time, but I will just say that the -- the fee issues -- you know -- the 28.4 percent of those that they're alleging occurred after my -- after this Court's allowed me to withdraw in March 2024 -- so I'd ask that the Court take that into consideration, if it does, in fact, consider awarding fees.

And I'll reserve the rest of my time, Your Honor.

**THE COURT:** Actually, you got about ten seconds left. But I'll tell you what, when we come back, I'll give you five minutes.

Ms. Piepmeier, you had three and a half, but I'll give you five minutes too --

**MR. RAMEY:** Thank you, Your Honor.

**THE COURT:** -- for any concluding remarks you want to make.

**MS. PIEPMEIER:** Thank you, Your Honor. I'm trying to organize everything I just heard into something coherent here. Let me start where Counsel ended, with this concept of working up the case and what that entails.

A reasonable litigant, when faced with these issues, would have done what Erick Robinson did, which is say, "Whoa, this is a problem. I need to withdraw." That's why I think that that email and that declaration are so important. Because he was faced with the same evidence -- or a smaller amount of it, at least -- as Mr. Ramey, and he said, "No. I'm not going to do this. I'm not going to continue. I don't think this is proper." That is what happens when you work a case and determine it.

Now, what Mr. Ramey's argument -- that, oh, well, you know, we whiteboarded it, and we figured out -- or whatever he was saying -- if it were true that he had come up with the answer in the course of those conversations, then we probably would have seen some of that produced in this litigation, and perhaps the result would have been different. But the fact was the problem was identified, and no solution was identified, and he pressed on.

And, you know, if there really had been such transparency

and, oh, this is all fine, perhaps he would have produced the Tepora report, which one of his colleagues said, in an email, he was going to try to withhold as privileged until they ultimately produced it on the last day of fact discovery. You know, if we had seen that earlier, it probably would have cut this case considerably; right? If he had produced the English version of the order -- of the Finnish order -- earlier, we would have seen it.

The issue here is not just that he proceeded in face of knowing all of these things, which a reasonable litigant would have withdrawn from. It's that he hid the information through discovery, and wasn't transparent about it, and settled with Akamai in order to bury it. That is not what a reasonable litigant does.

The second point I want to make is on the case law. The *mCom* case that was overturned by the Federal Circuit, you know, was something we cited --

**THE COURT:** Let me ask you a question, actually, about the Akamai settlement. Because it's a -- you know -- I think you can look at it as part of a broader course of conduct. And you can say he knew that he had a bad ownership problem, and so he should not have proceeded with the litigation against Netflix. And so maybe it's evidence of that.

But would another lawyer in his situation have done anything different as it pertains solely to Akamai? Wouldn't

someone have just tried to get out of the case, and settle it, and why wouldn't you make it confidential? You know what I mean?

**MS. PIEPMEIER:** Your Honor, I agree with that. I agree that a reasonable litigant is going to try to get out, and get a little bit of money, and -- which is what they did -- and settle the case. But I do think it's part of a broader course of conduct in the case.

And I think that the emails that we have, which we were fortunate to have in this case, show that. I mean, they show a concerted attempt to say, we got to get out of this. We got to -- we got to bury it.

And when you couple that with the fact that the evidence that Akamai had at that time was withheld from us for 18 months, that the conversations with AiPi were -- you know, we only got later -- we didn't even know about AiPi's existence -- when you put that all together, I think that is strong evidence that it was a course of conduct.

And that brings me to my next point, if I might, which is that he -- Mr. Ramey says, you know, it wouldn't make sense for me to hear from Mr. Robinson that I have these issues with this case and then to press on unless I had solved them. Well, unfortunately, we can't divorce our understanding of how Mr. Ramey litigates this from all of the other cases in which he's been sanctioned for similar conduct.

And I think the *Koji* case is a very telling example of this. This is a pattern and practice of Mr. Ramey's behavior. His -- his allegations -- his working relationship with AiPi -- the 140 cases that he had with AiPi, he is responsible for their conduct. He admitted as much. He admitted that his malpractice carrier would be covering them.

And so whatever they did in this case ultimately rolls up to him. That's what he told the Court in arguing against the PO violation motion.

**THE COURT:** Ms. Piepmeier, you have about 30 seconds left.

**MS. PIEPMEIER:** Thank you.

The final thing I'll say is that I think the closest cases on point here are *Raydiant Oximetry* and Cody -- *Koji* -- I'm sorry. And I do think that they speak specifically to 1927 and the Court's inherent power. I was very clear in my opening remarks that that is a different standard than 285. I do believe that that standard is met.

And, finally, I would say that the Finnish -- well, I'm not even going to talk about the Finnish court ruling, because I'm out of time.

In short, Your Honor, I think a reasonable litigant would have done exactly what Mr. Robinson did and would have withdrawn at that point. Maybe they would have settled with Akamai. But they certainly wouldn't have filed a frivolous

pleading adding an additional patent a couple months later.

And that, coupled with what we know of the relationship with AiPi and the course and conduct in other cases, I believe absolutely satisfies the standards set forth in *Raydiant Oximetry* and *Koji*. Thank you, Your Honor.

**THE COURT:** Thank you, Ms. Piepmeier.

**MR. RAMEY:** Yes, Your Honor. Thank you.

Briefly, you know, some of these communications that Ms. Piepmeier's discussing are ones that -- that I'm not copied on. I think the Court can see that. In fact, I think three quarters of the ones that I'm looking -- or sought to strike -- were ones that I wasn't even copied on. These were ones that were outside of me. And so while I might be responsible for actions that overtly AiPi takes, discussions they have internally, of course, I wouldn't be held responsible for.

And Ms. Piepmeier raises the issue of frivolousness on the '102. I didn't see anywhere in the 12(c) motion being granted on that '102 patent that the Court said it was frivolous. The Court found it invalid under Section 101, which happens a lot. It was a contested issue. We thought it was a good case, but the Court ruled otherwise.

And then Ms. Piepmeier -- I'd like to take us to the *mCom* case. Ms. Piepmeier raises all these other cases that she said the Court should use in its consideration of the conduct in this case. And the *mCom* case that was recently decided by the

Federal Circuit -- unless Netflix has shown some sort of nexus to this case, it can't -- this Court should not consider those. And the -- that's -- and Netflix has not shown a nexus.

In fact --

**THE COURT REPORTER:** I'm sorry. "In fact" -- if you could slow down a little. "In fact" and then I didn't hear you --

**MR. RAMEY:** Filing a number -- many cases -- or a number of cases does not make someone's conduct -- the Federal Circuit uses the word "exceptional" -- but, here, it definitely doesn't make it in bad faith, an even higher standard. So this Court should not consider the other cases. That is something that's very clear from the *mCom* recent Federal Circuit decision.

Going back to what a reasonable litigant may have done, I have a declaration before this Court, Mr. Robinson has a declaration before this Court, but what we haven't heard is anyone answering whether Mr. Robinson had a conversation with me.

And you will see that I'm not copied on Mr. Robinson's email to AiPi. So are there are things that AiPi may have been told by Mr. Robinson that I was not told? Are there things -- certain things -- that they may have been made aware of? Yes. But that doesn't make my conduct, my firm's conduct, or either lawyer working with me on this case bad faith simply because

Mr. Robinson had separate conversations about issues in this case. But I think what you'll see in my declaration is he told me primarily the issues related to moving between law firms. And I'll stand by those.

And for Ms Piepmeier to say that somehow that should be discounted when I'm here testifying about what I said -- I don't see Mr. Robinson here testifying about this. I see him filing a document with the Court so he didn't have to come testify about this. That's what I see. He -- Mr. Robinson -- she could have presented him as a witness if it was going to help her case. But she instead drafted a declaration, and asked him to sign it, and put it before this Court.

I will say one more thing, Your Honor. The -- go back to the fact that what we did was litigate the facts that were before us. Every one of the facts that was before us had a path -- could -- they could overcome the issue. We had an issue -- we had to overcome the inventorship issue. We litigated that issue. We had a way to -- everything from the USPTO, I wasn't involved in. We had a way to overcome the infringement issue on the '167. We went forward with it. On the '102 patent, when we saw we weren't going to succeed from that, we dropped that. We called them up and dropped it. Every step we took in this case was proper. We worked the facts that were before us, and we came to -- and we tried to take those facts forward.

The Akamai resolution was already in process before I was involved. That's something Mr. Robinson himself was working on. So the -- I can't see anything in this case that makes any of the conduct before us -- before the Court -- taken in bad faith.

And, with that, Your Honor, losing a close case with the Court -- one that went all the way to summary judgment, one that wasn't dismissed on the pleadings, one that involved the highest court in Finland -- that's not bad faith. That's not -- maybe the Court can reach it under Section 285. But it's not bad faith that would trigger Section 1927 or the Court's inherent power. And I ask that the -- if the Court does reach it, I ask that the Court limit the time that Netflix is allowed to recover.

And, with that, I thank the Court. Unless the Court has questions, I'm done.

**THE COURT:** I don't. Thank you. This motion is under submission.

**MS. LAMKIN:** Your Honor, might I -- Rachael Lamkin -- might I make two points about the motion to strike that I think will be helpful to the Court?

**THE COURT:** Well, you're already going to win. Do you want to put that at risk?

**MS. LAMKIN:** I don't, sir. I'm happy to be quiet. But I think they are two things that might help the Court.

All right. I see the look on your face, Your Honor, and I'm done.

**THE COURT:** That's fine. I like somebody that wants another card when they already know they can beat the table. Go ahead.

**MS. LAMKIN:** Just the first one, Your Honor, is the waiver issue is not just the failure to intervene in the Eastern District of Virginia. In this court itself, Mr. Ramey, Docket 311, page 11, argues that this Court need not grant Netflix its release on the -- on -- on the sanctions motion, because Mr. Ramey says Netflix already has everything it needs. It got it in the Eastern District of Virginia case. So Ramey and Netflix were adverse in that sanctions motion, and he didn't intervene in this court to assert work product privilege.

And just the second thing, Your Honor. I ask the Court to look at the roving identity of Mr. Morehouse, Mr. Lund, and Mr. Sheets in this set of motions and the motion to strike their KI -- KVIP lawyers. Sometimes they're AiPi lawyers. Sometimes they're Whitestone lawyers. I think it also goes to the issue of bad faith. And I thank the Court for two minutes of time.

**THE COURT:** Mr. Ramey, I don't think I'm --

**MR. RAMEY:** Your Honor --

**THE COURT:** I don't think I'm going to do anything

with that stuff Ms. Lamkin said. But I think, out of fairness, you can have two minutes if you want it.

**MR. RAMEY:** Why not, Your Honor. I appreciate it.

This -- you know -- this is a protection that's not owned by -- by Mr. Valjakka. This is a privilege that's owned by me. And so unlike the attorney-client privilege, which belongs to the client, this one -- I own it. I didn't waive it. I had no idea that they were going to use it in the sanctions motion. So I would say that it wasn't waived limited to that. So AiPi producing documents is not a relinquishment of anything of mine. And, with that, I'll leave it, Your Honor.

**THE COURT:** All right. Thank you. That concludes --

**MR. RAMEY:** Thank you, Your Honor.

**THE COURT:** -- this hearing.

**MS. PIEPMEIER:** Thank you, Your Honor.

(Proceedings adjourned at 2:52 p.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Thursday, August 20, 2026

Kendra Steppler

Kendra A. Steppler, RPR, CRR

Official Reporter, U.S. District Court